## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

DANIEL KANG,

     Plaintiff,

v.

THE MAYOR AND ALDERMEN
OF THE CITY OF SAVANNAH/
and ROY W. MINTER, JR., Chief
of Police for the City of Savannah,
Georgia, in his Individual and
Official Capacities,

     Defendants.

Civil Action No.

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW, DANIEL KANG, and files this his Complaint against the

Mayor and Aldermen of the City of Savannah (hereinafter the "City of Savannah")

and Roy W. Minter, Jr., Chief of Police for the City of Savannah, Georgia, in his

Individual and Official Capacities, alleging as follows:

## PARTIES, JURISDICTION, & VENUE

1. Plaintiff DANIEL KANG is a resident of Chatham County, Georgia, and is

domiciled therein.

-1-

2. Defendant CITY OF SAVANNAH is a municipality, a body corporate, and an entity capable of suing or being sued.  With respect to this municipal Defendant, Plaintiff has satisfied the requirements of O.C.G.A. § 36-33-5 by providing the municipality with an ante litem notice within six (6) months of the accrual of the cause of action.  (A copy of this ante litem notice is attached hereto as "Exhibit A").

3.  At all times relevant hereto, Defendant ROY W. MINTER, JR. was the Chief of Police for the City of Savannah, Georgia.  Upon information and belief, MINTER is a resident of Chatham County, Georgia, and is domiciled therein.

4. Jurisdiction and venue are proper in this Court. The Court has subject matter jurisdiction over the claims sounding in federal law pursuant to 28 U.S.C. 1331; the Court has pendent jurisdiction over the claims sounding in state law pursuant to 28 U.S.C. § 1367; and venue is proper in this division pursuant to 28 U.S.C. §§ 1391 (b)(1) and/or (b)(2).

## FACTUAL ALLEGATIONS

**A.   Plaintiff's Employment History with the City of Savannah Police Department up to July 2020.**

5.  Plaintiff Daniel Kang joined the Savannah-Chatham Metropolitan Police Department in 2012 and served in several positions including patrol, Crime Suppression, Special Weapons and Tactics ("S.W.A.T."), Narcotics and Special

Investigations Section.

6. While at the police department, Plaintiff made numerous felony arrests and received many awards and accolades, including:

a)   Certus Bank Community Spotlight Hero (December 2014) for continued excellence in protecting and serving the citizens of the Central Precinct Neighborhood and the City of Savannah as a whole;

b)   Medal of Valor (March 2016) in honor and recognition for demonstrating exceptional bravery, exemplary courage, and unselfishly risking his safety to alleviate danger during a shootout with a suspect and rendering aide to fellow officers;

c)   Unit Teamwork Citation, S.W.A.T. (April 2016) in honor and recognition for the outstanding performance in the coordinate and cumulative effort in responding to a barricaded gunman who was firing at officers, their vehicles and equipment (based on teamwork displayed in spending ten hours in cold, wet conditions to convince a gunman to surrender without causing any harm to officers, bystanders or the gunman);

d)   Medal of Distinction (March 2017) in honor and recognition for demonstrating exceptional bravery and exemplary courage, along with S.W.A.T. team members, when responding to a domestic shooting and quickly rescuing the injured woman who had been shot;

e)   Medal of Valor (August 2018) in honor and recognition for

demonstrating exceptional bravery, exemplary courage and unselfishly risking his life while responding to a barricaded gunman resulting in the successful apprehension of the suspect and the rescue of a woman and two children; and

f)      Agent of the Quarter (1st Quarter 2019) for seizing 2.5 pounds of methamphetamine on two separate occasions, several guns, several thousand dollars, and furthering cases of federal law enforcement entities.

7. Prior to joining the police department, Plaintiff was in the Air Force, where he served on active duty for over eight years. During that time, Plaintiff served in three combat deployments to Iraq and one combat deployment to Afghanistan. Plaintiff was honorably discharged from active duty, but he remained in the reserves in support of Special Operation Command at the rank of Major while with the Department.

8. Around 2019, the Savannah-Chatham Metropolitan Police Department demerged forming separate police departments for the City of Savannah and Chatham County. Plaintiff then began working for the Savannah Police Department (the "Department").

9. Prior to the demerger, Plaintiff was working on the county Counter Narcotics Team ("CNT").

10. After the demerger, Plaintiff was among a small group of officers who were

involuntarily assigned to the Central Precinct of Patrol Division of the Department. Initially, Plaintiff and the other officers served warrants under the Patrol Division. They were later assigned to Special Investigation Section devoted to conducting jurisdiction-wide warrant service in the City (hereinafter referred to as the "SIS Warrant Unit" or the "Unit"). These transfers were made without providing any notice or explanation to Plaintiff and other officers transferred from the county CNT.

11. From the outset, the SIS Warrant Unit had limited resources, equipment and personnel. For example, by July 2019, there were only four personnel members assigned to the Unit, and at least six members were necessary for their missions. Additionally, the officers in the Unit lacked critical equipment, including unmarked vehicles, surveillance equipment, a sufficient number of portable computers (known as Mobile Data Terminal or "MTD"), access to MobileCom (which gives the officers access to databases to run individuals without going through dispatch), and desktop computers.

12. Plaintiff and his superior, Sergeant Octavio Arango, expressed their concerns about the lack of personnel, resources and equipment on numerous occasions, including concerns that the lack of resources and equipment was not only a danger to the officers involved but could also lead to compromised missions and jeopardize the safety of the community.

13.   There was also a lack of communication and guidance provided to the members of the SIS Warrant Unit. Despite this, Plaintiff and the other members of the SIS Warrant Unit drafted policies and guidance to assist SPD leadership in further developing guidance, rules and regulation. These  policies were blatantly ignored. Command staff did not attempt to create a policy for the SIS Warrant Unit even though it was required by the Department's policies and procedures.

14.   Despite several critical shortfalls, the SIS Warrant Unit was very successful. Since the inception of the Unit in June 2019 until late February 2020, it had successfully carried out nearly 80 arrests.

15. Starting in or around March 2020, COVID-19 began to spread rapidly in the United States.[1]

16. Despite the global pandemic, the officers in the Unit were not provided adequate personal protective equipment ("PPE"). It was not until April 2020 that the Unit officers were given one mask and one set of eye protection. In fact, prior to this, officers had been instructed not to wear masks or other forms of PPE even if the equipment was purchased personally by the officers.

---

[1]      As of April 12, 2021, there have been 31,015,033 total cases in the United States and 559,172 deaths. *Covid-19*, *Cases & Data*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/index.html (last visited Apr. 12, 2021).

17. Officers, as front-line workers, were at high risk for contracting the virus. As a result, many officers have lost their lives due to COVID-19 complications.

**B. Chief Minter Joins the Department and Crime Rates Increase**.

18.  Defendant Minter was appointed to the position of Chief of Police for the Savannah Police Department in August of 2018.

19. In the twelve months prior to Defendant Minter joining the Department, Total Violent Crimes[2] totaled 929, with an average of 77.42 incidents a month.[3]

20.  In the twelve months following Defendant Minter becoming Chief of Police, Total Violent Crimes rose to 960, with an average of 80 incidents a month.

21.  Over the next twelve months, August 2019 through July 2020, Total Violent Crimes increased to 1041, averaging 86.75 a month. This represents a 12.06% increase in Total Violent Crimes compared to the twelve months before Minter

---

[2]     Total Violent Crimes includes homicide, rape, robbery, and aggravated assault.

[3]     The crime statistics contained in this Complaint are from the Official Website for the City of Savannah, Georgia. *Archive Center, SPD Weekly Crime Reports*, Savannah, Georgia, https://www.savannahga.gov/Archive.aspx?ysn ExecuteSearch=1&txtKeywords=weekly+crime+report&lngArchiveMasterID=0& txtDateRange=&dtiStartDate=01%2F01%2F2020&dtiEndDate=01%2F04%2F202 1(last visited Apr. 13, 2021).

became Chief.

22. From August 2020 until February 2021, Total Violent Crimes totaled 702 in seven months, averaging 100.29 per month.

### C. Chief Minter's Actions and Inactions Lead to Frustration, Decreased Morale, and Distrust within the Department.

#### 1. Officer Adrian Gates Internal Affairs Investigation and Suspension

23. In July of 2019, an investigation was opened on Officer Adrian Gates, an officer assigned to the Gang Unit, for alleged association with suspects and alleged gang members. The investigation was initiated by the Plaintiff's supervisor, Sergeant Arango, when a concerned citizen approached him and informed him Gates frequented the residence of suspects under investigation for multiple armed robberies.

24. This was not the first Internal Affairs investigation concerning Officer Gates. At this point, Officer Gates had two pending Internal Affairs ("IA") investigations. Additionally, a separate IA investigation had been completed which resulted in the determination that Gates violated two policies.

25. In the fall of 2019, Officer Gates was alleged to have violated the Oath of Office, Ethics and Conduct, SPD GO # ADM-004.

26. After a thorough investigation, the discipline review board found that Gates had violated the policies as alleged and recommended termination as the appropriate

and reasonable discipline.

27. Next, Chief Minter reviewed the IA investigation file and sustained, or agreed with, the allegations. However, inexplicably, Chief Minter did not follow the board's recommendation of termination and instead imposed only a 40-hour suspension for Gates.

28. Two weeks later, Officer Gates was taken off of administrative leave and returned to full-duty status.

### 2. *Human Resources Complaints Against Chief Minter*

29. On April 10, 2020, all members of the SIS Warrant Unit, including Plaintiff and his superior, Sergeant Arango, signed a group Human Resources complaint (the "Group Complaint") against Chief Minter with 22 separate complaints included therein. The Group Complaint was signed by 75 members of the Savannah Police Department.

30. The Group Complaint asserted allegations of favoritism, public embarrassment, and disrespect shown by Chief Minter from the time he began as Chief until April 2020, when the Group Complaint was signed. (A copy of the Group Complaint is attached hereto as "Exhibit B").

31. More specifically, the Group Complaint stated that Chief Minter, among

other things:

a)  Made a series of threats to members of the department including threats of removal from ranks, threats of removal from command, and threats of removal from units;

b)  Used intimidation and admonishment to instill embarrassment and his power, as well as belittling in front of peers and subordinates;

c)  Engaged in selective positional movements with no standardized measure of success or failure and showed an unwillingness to discuss changes with the affected personnel;

d)  Failed to communicate and distanced himself from responsibility in matters of promotions, transfers and policies;

e)  Failed to plan for the safety and security of the Department with adequate supplies and equipment, including safety gear for critical incidents;

f)  Failed to listen to the needs of specialized units whose mission relies upon training and equipment, leaving them vulnerable and operating outside of the standard federal and state levels;

g)  Engaged in favoritism in the levels of promotion and specialized positions, including the creation of positions for loyalty instead of skill;

h)  Engaged in inconsistent punishment levels for like violations through an Office of Professional Standards ("OPS") system, which was designed to be unbiased, but now operated with the Chief's absolute control;

i)      Made untrue statements to the public, politicians, media and employees concerning the effectiveness, strategies, morale, manpower, and readiness of the Department;

j)      Increased the workload of supervisors, detectives and officers to impose his personal agenda with no explanation as to the goal;

k)      Renamed and reallocated resources for pet projects believed to be ineffective and solely for personal growth;

l)      Showed a complete breakdown of communication between levels of command staff to mid-level supervision and employees, thereby creating confusion; and

m)      Exhibited outright disrespect to members of staff, leading to dissension and an overwhelming distancing by members of the Department to remaining out of the target zone.

(*See* Exhibit B).

32. Plaintiff submitted a personal human resources complaint against Chief Minter (the "Personal Complaint") on the same day that he signed the Group Complaint. (A copy of the Personal Complaint is attached hereto as "Exhibit C").

33. The Personal Complaint stated that Plaintiff, and other officers with similar training and experience, had been subjected to a hostile work environment. Plaintiff further stated that "[t]he situation caused significant grief, anguish, and is a significant contributing factor to [his] moral, mental and physical health." (*See*

Exhibit C).

34. Plaintiff also complained about the lack of resources, communication, guidance, and personnel provided to the SIS Warrant Unit.

35. Plaintiff contended that the allegations outlined in the Personal Complaint "show[ed] a pattern of decisions targeted either against [him]self or like-minded officers despite any failure in conduct, work ethic, or other reasons of merit." Further, Plaintiff noted that "[a]ny negative actions taken to my rank, position, the units I am a part of, or the members of aforementioned units will be assumed as retaliation for my participation in this process." (*See* Exhibit C).

36. Human Resources assured the officers that they were seeking a third party/outside source to review the HR complaints; however, they requested that the complaints be sent directly to Human Resources.

37. Jeffrey Grant, Human Resources Director for the City of Savannah, retained Susan Cox, an attorney out of Statesboro, Georgia, to review the complaints against Minter.

38. Upon information and belief, Mr. Grant and Ms. Cox used to work with one another.

39. Ms. Cox has over thirty years of experience litigating and mediating in

Statesboro.

40. Mr. Grant previously worked as the Human Resources Director for the City of Statesboro for over seven years.

**D.   The Darryl Faitele Encounter Serves as Pretext for Plaintiff's Wrongful Termination.**

41.   Four days after signing the Group Complaint and submitting Plaintiff's Personal Complaint to HR, Plaintiff was involved in an incident involving the arrest of an individual who was mistaken for their target, Kahlil Kelly. Kelly had violent felony arrest warrants for aggravated assault, battery and obstructing a 911 call.

42. When the SIS Warrant Unit neared Kelly's apartment, the officers observed a black female and a black male, believed to be Kelly, look at the officers and slam the door of the apartment shut.

43.   The officers believed the male was Kelly because of the similarities of height, weight, age, skin complexion, and because he fled into the apartment where police had been told Kelly resided.

44.   The officers entered the apartment due to safety concerns including an elevated second story apartment and due to Kelly's history of domestic violence. Moreover, the officers did not have previous knowledge of the layout of the apartment and were entering unfamiliar territory. Thus, the suspect had superior

knowledge concerning the layout of the apartment and location of possible weapons.

45. When the officers entered the apartment, they asked for Kelly to come outside. The black male responded to Kelly and walked towards the officers.

46. After the black male walked toward them, the officers asked the male to get on the ground repeatedly. After he refused, Plaintiff placed the male on the ground for his safety, the team's safety, and the safety of others nearby.

47. The male's chin was injured in the process. Plaintiff called for EMS to check out the individual's chin.

48. Once handcuffed, the individual began to cuss at the officers repeatedly and became disorderly.

49. Plaintiff checked the individual's wallet and found indication showing that the black male may have been Darryl Faitele not Kahlil Kelly. Plaintiff was unable to verify the individual's identity until the scene was cleared.

50. At the time, the other SIS Warrant Unit members were dealing with multiple occupants inside the apartment. Corporal Brandon Lord spoke with the individuals in the apartment. One of those individuals, Jawan Kelly, identified himself as Kahlil Kelly's brother. Jawan Kelly confirmed that Kahlil Kelly had lived in the apartment for approximately one year.

51. In addition to Mr. Faitele and Jawan Kelly, the following individuals were present in Kahlil Kelly's apartment: Jaquesia Habeeb, Mr. Faitele's girlfriend; Darrell Kelly, Kahlil Kelly's brother; Jayda Davis; Hassan Johnson; Shalenta Johnson; and Daquan Scott.

52. Corporal Lord also spoke with Kahlil Kelly's mother via FaceTime and told her that Kahlil had an active warrant for his arrest. Kahlil Kelly's mother was cooperative and gave Corporal Lord Kahlil's phone number.

53. After the other officers gained control of everyone inside the apartment, Plaintiff let the other team members know about the identification he found on the male. Initially, the identification of the black male could not be corroborated as Darryl Faitele because the SIS Warrant Unit did not have MobileCom access to run this information. Instead, Mr. Faitele's information had to be verified through dispatch after the officers cleared the house, and it was safe to do so.

54. The officers also learned that Mr. Faitele was Kahlil Kelly's cousin.

55. The suspect began spitting at the officers and had blood in his mouth. At one point, Plaintiff felt a spray of moisture against the side of his face.

56. Plaintiff became concerned because of the possible diseases carried in blood and saliva such as HIV, Hepatitis and COVID-19. Complicating matters

further, the SIS Warrant Unit had not been provided with spit masks to minimize potential COVID-19 exposure.

57. Moreover, at the time of the incident, the Department had no policies, procedures, or training provided to officers concerning how to handle spitting suspects. Additionally, Georgia POST does not include such training. As noted above, the officers were provided inadequate equipment for such a situation.

58. Plaintiff pulled the individual's shirt over his face for a short period of time to prevent him from spitting on the officers. Then, Sergeant Arango tied a shirt around the individual's mouth as a face covering, but the shirt became untied shortly thereafter and fell to the ground.

59. The suspect continued to act belligerently and cussed at the team hundreds of times which caused a higher risk of Plaintiff contracting COVID-19 through airborne pathogens.

60. At one point, Plaintiff cussed at the suspect.

61. An ambulance arrived and took the suspect to Candler Hospital by EMS.

62. The team decided not to arrest Mr. Faitele at that time but to obtain arrest warrants for simple battery and obstruction by hindering at a later date. This decision was made because officers had encountered issues with the jail accepting prisoners due to the COVID-19 pandemic.

63. The team was later instructed not to take out arrest warrants on Mr. Faitele. However, the team was not given any explanation as to why he should not be arrested.

64. Upon information and belief, this order was sent down from Chief Minter.

**E.     Plaintiff's Internal Affairs Investigation and Wrongful Termination Constitute Unlawful Retaliation.**

65. On April 27, 2020, Plaintiff was asked to go to the IA office to surrender his badge, police identification and equipment and was informed that he was being placed on administrative leave.

66. Two days later, on April 29, 2020, Plaintiff reached out to the Employee Assistance Program ("EAP") and began counseling following a recommendation from Plaintiff's supervisor, Sergeant Arango. The recommendation was made because of the stressors outlined in the Personal Complaint to Human Resources as well as Plaintiff being placed on administrative leave.

67. On May 1, 2020, Plaintiff returned to IA and was given a Garrity Form and Notification. Under allegations, it simply stated "Conduct."

68. This did not comply with Defendants' policies and procedures, including OPS-016, which provides "[w]hen an employee is notified that they have become the subject of an [Office of Professional Standards] investigation, the employee shall be

issued a written or electronic notice of the allegation and the employee's rights and responsibilities relative to the investigation. [CALEA 52.2.5]."

69. On June 10, 2020 the discipline review board met. The allegations against Plaintiff were listed as: Conduct Unbecoming, Treatment of Others, and Reporting a Police Response to use of Aggression/Resistance/Force.

70. The discipline review board recommended the following for Plaintiff's alleged violations: additional training, removal from the Special Investigations Section, review of S.W.A.T. membership, and a 5-day suspension.

71. On June 24, 2020, Plaintiff was called back to IA for a "mitigation hearing." At this point, Plaintiff did not know the results of the disciplinary review board and did not know the allegations other than "conduct," as described on the Garrity form.

72. Plaintiff had been told not to prepare for the hearing and to accept responsibility. He did as he was told.

73. One of the members of the board expressed concern about Plaintiff's mental health as a result of his involvement with an Officer Involved Shooting ("OIS") in 2015.

74. Plaintiff was ordered to undergo a psychological examination. The doctor who interviewed Plaintiff determined that he was fit for duty but recommended that

Plaintiff continue to receive counseling.

75. Instead of following the board's recommendation of a 5-day suspension, Chief Minter decided to terminate Plaintiff. This decision was made despite Plaintiff never having received any discipline throughout his long tenure as an officer with the Department until the Faitele encounter.

76. On July 17, 2020, Plaintiff was called back to IA and was given a Suspension Prior to Termination Form. He signed the document and was informed he had one business day to appeal the decision. At the meeting, the Plaintiff was given a DVD with the IA investigative files. At this point, IA again violated their published policy (OPS-016) as they failed to include a Letter of Transmittal ("LOT").

77. When Plaintiff asked why a LOT outlining the Douglas Factors was not included in the IA file, Plaintiff was told that the policy requiring a LOT was a "draft policy" that "had not been published" at the time.

78. However, other officers who had been investigated by IA both before and after Plaintiff were provided a LOT with their IA files, including Officer Gates.

79. When Plaintiff received his IA files, he first learned what policies he was alleged to have violated and the discipline review board findings.

80. Plaintiff submitted his request for appeal the following business day.

81. The following Thursday, July 23, 2020, Plaintiff had his appeal with Chief

Minter. However, Chief Minter sustained his decision. Chief Minter continued to bully Plaintiff during the hearing, telling him that he would fire Plaintiff for anything Minter wanted.

82. Plaintiff immediately requested an appeal with Savannah City Manager Pat Monahan. However, the City Manager upheld Chief Minter's decision simply because Plaintiff had used curse words during the Faitele encounter.

83. On August 12, 2020, Savannah Mayor Van Johnson, Chief Minter, and District Attorney Meg Heap held a press conference announcing that they were pressing criminal charges against Plaintiff and his supervisor, Sergeant Arango, as a result of the Faitele encounter. The motivation for this announcement was solely for political and personal reasons.

84. Plaintiff and his counsel continued to appeal this decision contending that the firing was retaliatory, Chief Minter was not impartial, the termination was driven by political desires, and that the Department violated numerous policies.

85. A grand jury found that there was insufficient evidence to indict Plaintiff.

86. Chief Minter's decision to terminate Plaintiff occurred after Plaintiff joined in the submission of the Group Complaint and submitted his own Personal Complaint against Minter. Both of these complaints were still pending at the time of Minter's decision.

87. Due to these Human Resources complaints pending against Chief Minter, Minter had a clear conflict of interest in sitting on this panel and deciding to terminate Plaintiff.

88. Other officers had committed similar "violations" to what the Department has alleged were committed by Plaintiff but received fewer severe penalties, if any penalty at all.

89. Chief Minter wrongfully terminated Plaintiff despite his distinguished and stellar career with the Department. Prior to the Faitele encounter, Plaintiff had no prior disciplinary history.

90.  Plaintiff, and his supervisor, Sergeant Arango, were improperly targeted by Chief Minter and retaliated against for speaking out about Minter's wrongdoings.

**F.   Chief Minter and the Department Failed to Follow the Applicable Policies and Procedures.**

91.  Throughout the incidents outlined above, the Defendants failed to adhere to numerous policies and procedures.

92. For example, Code of Conduct CM-001 requires adherence to the Employee Standards, which states that City Employees shall "to communicate regularly, politely, and honestly with each other[,]" and for those who supervise and manager others, "[a]dminister discipline in a firm, but, fair manner."

93. Chief Minter failed to comply with Code of Conduct CM-001 as he did not administer discipline "in a firm, but, fair manner" especially when considering the treatment of Officer Gates versus Plaintiff.

94. Moreover, other officers committed similar "violations" to what Defendants alleged Plaintiff committed but received far fewer harsh punishments, if any. For example:

> a) upon information and belief, an officer arrested an individual who she wanted to "teach a lesson;"
>
> b) a detective with the Department has bragged about pointing and deploying his taser on individuals, who he believed were disorderly, while working off duty at bars in the City of Savannah without reporting a use of force;
>
> c) a detective has used profanity and threatened to harm citizens who have "disrespected" him;
>
> e) an officer was found to have acted outside of his lawful capacity by entering a suspect's residence without a warrant or permission when he arrested a juvenile;

f)      an officer knowingly and unlawfully detained an individual on two separate occasions and was subsequently terminated. However, charges were never brought against the officer;

g)      an officer was cited and suspended for only three days for violating the Oath of Office, Ethics and Conduct and Body Worn Camera policies; and

h)      a civil action was brought against an officer alleging wrongful arrest, false imprisonment, aggravated assault, battery, and home invasion/burglary. The Department did not hold a press conference regarding this incident, and he is still employed with the Department.

95. As outlined above, Defendants also failed to adhere and comply with the following polices and procedures:

a)      CM-001/City of Savannah Employee Standards: Code of Conduct: "Communicate regularly, politely, and honestly with each other and our customers;"

b)      CM-001/City of Savannah Employee Standards: Leadership Principles: "Continuously improve systems and processes by utilizing the Plan, Do, Study, Act approach;"

c)  CM-001/City of Savannah Employee Standards: Leadership Principles: "Value Employees as the City's most valuable resource;"

d)  Savannah Police Department OPS-016, Section IV. Complaint Process, which provides in pertinent part:

1)  "Allegations of police misconduct are received as complaints from both citizens and [the Department] personnel. All complaints against [the Department] and its personnel will be documented and investigated, including anonymous complaints. [CALEA 52.1.1];"

2)  "The supervisor processing the complaint will record pertinent information regarding the complaint on the Complaint Form (SPD Form 1044w);" and

3)  "When an employee is notified that they have become the subject of an OPS investigation, the employee shall be issued a written or electronic notice of the allegation and the employee's rights

and responsibilities relative to the investigation. [CALEA 52.2.5]."

e)    SPD GO # ADM-004 Oath of Office, Ethics, and Conduct 3. Impartiality: "SPD employees, while charged with consistent and practical enforcement of the law, must remain completely impartial toward all persons coming to the attention of [the Department]. Exhibiting partiality for or against a person because of race, creed, or influence is unprofessional conduct.  Similarly, unwarranted interference with the private business of others, when not in the interest of justice is unprofessional conduct and prohibited;"

f)    CM-001/City of Savannah Employee Standards: Code of Conduct: "Conduct ourselves in a manner which is respectful courteous, and professional.  Appropriate behavior shall be exhibited towards all our customers: both fellow City employees and members of the public;"

g)    ADM-004: Conduct Unbecoming: "The conduct of a public employee, on or off duty, reflects upon the SPD. The SPD shall investigate complaints and/or circumstance suggesting an SPD

employee has engaged in conduct unbecoming and shall impose

disciplinary action when appropriate;" and

h)    ADM-004: Treatment of Others: "Employees shall treat citizens,

superiors, subordinates and associates with respect. They shall be

courteous and civil at all times in their relationships with one

another and in the presence of the public . . . Employees shall not

engage in offensive or harassing conduct, verbal or physical

towards fellow employees, supervisors or the public . . . No

employee shall speak disrespectfully of any nationality, race, sex

or religion. No employee will engage in grossly indecent or

vulgar talk with would detract from the efficient operation of the

Department or create an uncomfortable work environment."

**G.    The Department and City of Savannah Failed to Comply with Plaintiff's Open Records Act/Freedom of Information Act Requests.**

96.  On November 10, 2020, Plaintiff sent a FOIA/ORR seeking:

a)    Records of any police officer dismissed for using curse words;

b)    Policies of the Department in effect which says S.W.A.T. team

members who are spat at, threatened and the subject in a group

disobeys a direct comment in a potentially dangerous situation,

that the City personnel may not use bad language and are subject to firing for this;

c)     Any documentation where the disciplinary panel has suggested a 5 day suspension of an officer and the officer has been fired for the same offense;

d)     Emails or other documentation:

        i.     between the district attorney's office and the mayor's office regarding Plaintiff  in 2020;

        ii     between Roy Minter and the mayor's office regarding Plaintiff and/or Sergeant Arango in 2020; and

        iii.     between Richard Wiggins, David Barefield and Roy Minter in 2020.

e)     The City / the  Department code of ethics and policy manual(s) that address conflicts of interest and the issue of whether a City official with an outstanding complaint can sit on a disciplinary panel for the employee who submitted the complaint;

f)     Documents regarding the establishment, procedures and authority of the Citizens Commission which reviewed the actions of Plaintiff on April 14, 2020;

g)   Any contact the Department has had with the United States Air

Force regarding Plaintiff;

h)   Any insurance policies which would provide

coverage for this incident;

I)   The criminal records of Khalil Kelly and Darryl Faitele;

j)   All IA investigative files conducted since Plaintiff and

Sergeant Arango were placed on administrative leave in April

2020 to include but not limited to, Benjamin Abbassi, Samantha

Heard (aka Sosbe), Adrian Gates, Dana Purvis (aka Dana Knight),

and Wayne Peterson.

 (A copy of this request is attached hereto as Exhibit D).

97. In response, Plaintiff only received copies of the City of Savannah

Employee Standards: Code of Conduct, Leadership Principles, and Code of Ethics

Policy Manual CM-001(Employee Standards); City of Savannah Policy Manual CM-

001; and  Mayor Johnson's News Conference July 1, 2020 talking points.

98. When Plaintiff reached back out to follow up on the ORR/FOIA request,

the City requested a "simplified" request.

99.  A "simplified" request was sent on March 9, 2021.

100. To date, Plaintiff has still yet to receive the following: emails regarding Plaintiff; Internal Affair files (allegedly being produced today); and City of Savannah Personnel files of the following employees: Samantha Heard-Sosbe, Mathew Clay, Darryl Repress, Antwan Diggs, Andrew Inglett, Conner Wakefield, Clarence Few, Larry Brown, Shinita Young, Nicole Khaalis, Rodney Reynolds, and Bijan Abbassi.

**H.     Chief Roy Minter Jr.'s Presentation at the Downtown Business Association Meeting.**

101. Upon information and belief, on February 10, 2021, Defendant Minter displayed a PowerPoint presentation of George Floyd, Rayshard Brooks, Breonna Taylor, and rioting around the country. Defendant Minter falsely stated the citizens of Savannah have not rioted nor caused property damage.

102. After discussing those incidents, Chief Minter then displayed a slide with photographs of Defendant Kang and his superior, Sergeant Arango. Defendant Minter bragged about his "accomplishment" of firing the two officers.

## <u>CAUSES OF ACTION</u>

### COUNT I:
### 42 U.S.C. § 1983:
### CLAIM FOR OF RETALIATION BY GOVERNMENT EMPLOYER  FOR PLAINTIFF'S CONSTITUTIONALLY PROTECTED SPEECH AS TO DEFENDANT CITY OF SAVANNAH

103. The Plaintiff realleges and incorporates herein paragraphs 1 through 102 of the Complaint.

104. Plaintiff reported to Human Resources for the City of Savannah matters of public concern, *i.e.*, favoritism being displayed within the Department, bullying by Defendant Minter, lack of communication and leadership and the failure to provide adequate and essential supplies, personnel and resources to certain squads,  in the Group Complaint and the Personal Complaint.

105. Plaintiff, a government employee, made these statements on matters of public concern.

106. The Plaintiff's interest in his ability to speak freely about such a critical matter clearly outweighed the interest of the City of Savannah in prohibiting the speed in order to promote the efficiency of the public services it performs through its employees.

107. The Plaintiff's exercise of his free speech rights played a substantial role in the City's termination of Mr. Kang's employment, which is an adverse employment action, and has caused Plaintiff to sustain damages.

108. Defendant City of Savannah would not have reached the decision to terminate Plaintiff in absence of the protected conduct.

## COUNT II:
## 42 U.S.C. § 1983 and § 1985:
## CLAIM FOR OF RETALIATION BY GOVERNMENT EMPLOYER  FOR PLAINTIFF'S CONSTITUTIONALLY PROTECTED SPEECH AS TO DEFENDANT MINTER

109. Plaintiff realleges and incorporates herein by reference Paragraphs 1 through 108 above as though fully set forth herein.

110. Defendant Minter, the Chief of the City of Savannah Police Department, desired that Plaintiff be terminated from his position with the Department. Defendant Minter's desire was motivated by the fact that Plaintiff voiced concern to human resources through both the Group Complaint and the Personal Complaint, which included criticisms or favoritism, bullying, lack of leadership and communication, and the failure to provide adequate and essential supplies, personnel and resources to certain squads.

111. The comments and criticisms made by Plaintiff exposed Defendants and the City leadership to further criticism from the media and public.

112. Defendant Minter established a pre-textual reason for Plaintiff's termination, as evidenced by the fact that other members of the department have committed similar "violations" to what Defendants allege Plaintiff did, and those individuals received less harsher punishments, if any. This pretext is further evinced by the fact that Plaintiff was not given sufficient information about the alleged violations in order to allow him to properly prepare for his hearings. This failure by Defendants was a clear violation of City policies.

113. Defendants conspired to deprive Plaintiff Kang of his federally protected constitutional right to free speech, by causing his retaliatory discharge as punishment for Kang's protected comments to Human Resources.

114. The actions of Defendant Minter has caused the Plaintiff to suffer damages.

## COUNT III:
## CLAIM FOR VIOLATION OF SUBSTANTIVE DUE PROCESS AS TO THE CITY OF SAVANNAH

115. Plaintiff realleges and incorporates herein by reference Paragraphs 1 through 114 above as though fully set forth herein.

116. Plaintiff was an employee of the City of Savannah.  He is therefore a public employee.

117. Plaintiff had a property interest in his employment.

118. His employer, the City of Savannah, terminated Plaintiff for an improper motive and by means that were pre-textual. The Plaintiff was, in reality, terminated for his critical comments of Defendant Minter submitted to Human Resources through the Group Complaint and the Personal Complaint. These complaints led to further criticism against Defendants.

119. The City's asserted reason for terminating Plaintiff, *i.e.*, the Darryl Faitele incident, was a pre-textual means to disguise this improper retaliatory motive.

120. The City of Savannah violated Plaintiff's substantive due process rights, for which he is entitled to compensatory damages.

**COUNT IV:**
**CLAIM FOR VIOLATION OF PROCEDURAL DUE PROCESS**
**AS TO DEFENDANT CITY OF SAVANNAH**

121. Plaintiff realleges and incorporates herein by reference Paragraphs 1 through 120 above as though fully set forth herein.

122. Defendants failed to follow their policies and procedures concerning OPS investigations and improperly withheld vital information from Plaintiff related to the

investigation and hearing process, including information regarding the allegations made against him.

123. Because Plaintiff was not given this information, which he was entitled to under City policy OPS-016, he was not afforded adequate notice of the allegations made against him and thus, the ability to defend himself against those allegations was hindered.

124. As a result, the Plaintiff has sustained damages, including but not limited to loss of employment, loss of seniority, and loss of fringe benefits.

**COUNT V:**
**CLAIM FOR ATTORNEYS FEES**
**PURSUANT TO 42 U.S.C. § 1988 AND GEORGIA STATE LAW**

125. Plaintiff realleges and incorporates herein by reference Paragraphs 1 through 124 above as though fully set forth herein.

126. All individual and municipal Defendants were acting under color of state law at the time they caused injury to Plaintiff.

127. As to these Defendants, Plaintiff is entitled to a reasonable allowance for attorney's fees as part of Plaintiff's costs.

128. Further, Defendants have acted in bad faith, have been stubbornly litigious, or have caused Plaintiff unnecessary trouble and expense.

129. Plaintiff is entitled to an award of attorneys fees pursuant to O.C.G.A. § 136-11.

## COUNT VI:
## PUNITIVE DAMAGES

130. Plaintiff realleges and incorporates herein by reference Paragraphs 1 through 129 above as though fully set forth herein.

131. The acts of Defendants set forth above show willful misconduct, wantonness, and/or the entire want of care which would raise the presumption of conscious indifference to the consequences.

132. Plaintiff is entitled to an award of punitive damages to punish, penalize, and deter the Defendants.

## CLAIMS FOR RELIEF

Wherefore, Plaintiff prays:

A.   That summons and process issue and be served upon Defendants;

B.   For a trial by a jury comprised of twelve persons;

C.   That the Defendants be held jointly and severally liable for the injuries of the Plaintiff; and

D.   That Plaintiff Daniel Kang recover for his claims under 42 U.S.C. § 1983 and 1985, compensatory damages as allowed by law,

including but not limited to compensation for lost wages (past and/or future); benefits, other remuneration, and mental pain and suffering;

E.      To allow Plaintiff to resign from the Department  in good standing and have his termination status and the notification to the Georgia Officer Standard and Training Counsel be amended accordingly;

F.      That Plaintiff recover attorney's fees from the Defendants under applicable federal and state law;

G.      That punitive damages be awarded in an amount determined by the jury; and

H.      For such other and further relief as the Court deems just and proper.

This the 14th day of April, 2021.

SAVAGE & TURNER, P.C.

By:    */s/ Brent J. Savage*
        Brent J. Savage
        Georgia Bar No. 627450

102 East Liberty Street, 8th Floor
Post Office Box 10600
Savannah Georgia 31412
Phone:  (912) 231-1140
Fax: (912) 232-4212
lhatcher@savagelawfirm.net