

**SAVAGE
TURNER
DURHAM
PINCKNEY
AND
SAVAGE**
TRIAL ATTORNEYS

BRENT J. SAVAGE
ROBERT BARTLEY TURNER
JAMES D. DURHAM
KATHRYN HUGHES PINCKNEY
BRENT J. SAVAGE, JR.
R. BRIAN TANNER
SHANNON C. O'REILLY
ZACHARY R. SPROUSE
SAMUEL L. MIKELL
WINSTON A. EDWARDS
CAROLYN M. ADAMS

October 27, 2020

**CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

City of Savannah Police Department
201 Habersham Street
Savannah, GA 31401

**CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

City of Savannah
c/o Jennifer N. Herman, Esquire
Senior Assistant City Attorney
Post Office Box 1027
Savannah, GA 31402

Re:          Daniel Kang
Date of Loss  :  July 17, 2020 through present and ongoing
Place of Loss :  Savannah, GA

Gentlemen:

Please be advised that this firm represents Daniel Kang in connection with his suspension, termination and attempted prosecution by the City of Savannah / Savannah Police Department.

Mr. Kang attended the University of Illinois and graduated in 2002 with a Bachelor's of Science in Aeronautical and Astronautical Engineering.  After graduating from College, he joined the Air Force where he served on active duty over 8 eight years.  During this time, Mr. Kang was deployed to Iraq three times and also served in Afghanistan once.

While in the Military, Mr. Kang obtained a Masters in Arts in Intelligence Studies from American Military University.  He then joined the Air Force reserves and still currently serve in support of Special Operations Command at the rank of Major.

Without regard for the terrible upswing in violent crime in Savannah, this is the type of officer we need to retain.

After being honorably discharged from active duty military, Daniel Kang joined Savannah Police Department in 2012 and served in several positions including Patrol, Crime Suppression, SWAT, Narcotics, and Special Investigations Section.

Mr. Kang always enjoyed helping people and working towards making our community a safe place for all of our citizens to live, work and play.  He made numerous felony arrests throughout his career and received many awards and accolades, including:

- Certus Bank Community Spotlight Hero (Dec 2014) - continued excellence in protecting and serving the citizens of the Central Precinct Neighborhood and the City of Savannah as a whole. Officer Kang was committed to his department, precinct and kept the integrity of his beat intact

- Medal of Valor (March 2016) - in honor and recognition for demonstrating exceptional bravery, exemplary courage and unselfishly risking one's own safety to alleviate danger during a shootout with a suspect and rendering aide to a fellow officers on October 28, 2015

- Unit Teamwork Citation, Central Precinct CSU (Apr 2016) - in honor and recognition for outstanding performance in the coordinated and cumulative effort to improve public safety in the Central Precinct neighborhoods by saturating high crime areas, tracking down the violent criminals, and building rapport with the citizens to improve community policing efforts

- Unit Teamwork Citation, SWAT (Apr 2016) - in honor and recognition for the outstanding performance in the coordinated and cumulative effort on February 4th, 2016 when you responded to a barricaded gunman at a Georgetown apartment complex; the gunman was firing at officers, their vehicles, and equipment.  The citation was based upon teamwork displayed to spend 10 hours in cold, wet conditions to convince the gunman to surrender without causing any harm to officers, bystanders, or the gunman

- Unit Teamwork Citation, SWAT (Apr 2016) - in honor and recognition for the outstanding performance in the coordinated and cumulative effort when responding to an "officer down" call in Pooler on February 10th, 2016 in which a deputy had been shot by a barricaded gunman and others were pinned down behind their vehicles

- Medal of Distinction (March 2017) - in honor and recognition for demonstrating exceptional bravery and exemplary courage, along with SWAT team members, when responding to a domestic shooting on December 23, 2016 and quickly rescuing the injured woman who had been shot

- Medal of Valor (August 2018) - in honor and recognition for demonstrating exceptional bravery, exemplary courage and unselfishly risking his life while responding to a barricaded gunman on Chapel Lake South on February 18, 2017, resulting in the successful apprehension of the suspect and rescue of a woman and two children

- Agent of the Quarter (1st Quarter 2019) - seized 2.5 lbs of methamphetamine on 2 separate occasions, several guns, several thousand dollars, while furthering cases of federal law enforcement entities.

-

Daniel Kang accomplished all this with no disciplinary history throughout his career up to that point.

<u>The Day of the Incident</u>

Mr. Kang was accused of very serious charges by the Savannah Police Department, none of which are true, and has ultimately been wrongfully terminated.  Below is a synopsis of the events which led to Mr. Kang's wrongful termination:

On 14 April 2020, Mr. Kang's shift with the violent felony warrant unit started at 10:00 a.m. His unit's mission is to locate and arrest violent individuals who had warrants for serious violent felonies in order to decrease violent crime and increase public safety. There were only four individuals assigned to this unit despite multiple requests for increased personnel: SGT Mike Arango, CPL Brandon Lord, APO Steve Reagin, and Cpl. Kang.

The repeated failure by Chief Minter to address the under staffing of the SWAT division is at the heart of this matter.  There should be a minimum 6 persons on the team - not four.  To put officers' lives on the line without proper staffing is alien to putting doctors/nurses/medical personnel on the front lines to treat COVID-19 patients without PPE.  It was wrong to do to these officers, just as it was to the medical front liners.

The team left the office and began searching for the first individual.  They eventually found and arrested Mr. Nicholas Brown who had 2 warrants for Aggravated Assault, one warrant for Aggravated Battery, and a warrant for battery. Mr. Brown was charged with these violent crimes stemming to a domestic violence incident. Mr. Brown cooperated with the team and he was arrested without incident. The team called for a uniformed officer who came and transported Mr. Brown to jail.

The second task for the day was to locate Michael Fowler, who had serious violent felony arrest warrants.  The warrants indicated Mr. Fowler started bothering other customers at a City Market bar, then went outside and retrieved a firearm from his car, pointed it at several people in the establishment, and then left the area driving recklessly.  While doing so, he struck a pedestrian and caused serious injury.  This led to the hospitalization to the victim.  To Mr. Kang's recollection, the victim went into a coma for some time.

The team had an address where they believed Mr. Fowler was located.  While approaching the residence, they observed a car parked out front with Mr. Fowler and an unidentified individual sitting inside.  Kang confirmed Mr. Fowler's identity by asking him and requested for him to step out of the vehicle.  The team placed him in handcuffs and walked him away from the residence to fill out paperwork and arranged for a transport to take Mr. Fowler to jail.

<u>The Darryl Faitele Encounter</u>

The SWAT team then went to Moss Pointe Apartments at 9400 Abercorn St where they believed an individual named Mr Khalil Kelly may be living.  Mr. Kelly had serious violent felony arrest warrants for Aggravated assault, battery, and obstructing a 911 call. This occurred during a domestic violence incident several months earlier.  The team

initially believed Mr. Kelly lived in apartment 426.  While knocking, maintenance personnel at the apartment noticed them and told them to speak with the property manager.  The team was told Kelly lived in a different apartment.  They found the apartment and began to approach it.  Mr. Kang heard APO Reagin state he may have someone who matches Mr. Kelly's description in a car in the parking lot.  The team approached and made spoke with him.  They quickly determined it was not Mr. Kelly, told him, "Sorry wrong person,".

Mr. Kang then turned his attention back towards apartment 530 and observed a black female and black male, who he believed to be Mr. Kelly, look at the team, then slam the door shut.  Mr. Kang believed this to be Kelly because of the similarities of height, weight, age, skin complexion, and he was looking outside from the residence where they were told Mr. Kelly resided.  Seeing him flee inside, the team was concerned about the woman's safety due to the domestic violence incident in Kelly's past.

The team went up the stairs to the apartment, Kelly was called to come outside.  Ofc. Kang saw the person they observed flee into the apartment walk towards them.  Kang placed him to the ground for his safety, the team's safety, and the safety of other people nearby.  Once handcuffed, the individual began to cuss the team repeatedly and became disorderly.  Kang checked his wallet and found identification that indicated he was Mr Darryl Faitele.  During this time, while the only three other SWAT Team members were dealing with multiple occupants inside the apartment;  Kang waited for the other members to gain control of everyone inside the apartment.  Then he let them know he found identification on the person he was dealing with that stated his name was possibly Mr Darryl Faitele.

While being belligerent and disorderly, Mr. Faitele was spitting.  At one point Mr. Kang felt a spray of moisture against the side of his face.  He was concerned about this due to possible diseases carried in blood such as HIV, Hepatitis, and COVID-19.  Kang believed he was assaulted.  The SWAT team was not provided with spit masks to minimize COVID-19 exposure.  He also requested EMS for Mr. Faitele so medical people could look at his chin.  During this entire time, Mr. Faitele continued to be disorderly and belligerent towards everyone present.  While viewing the video of events, Mr. Kang heard Mr. Faitele cussing at the team at least 200 times.  Some of the words used were, "Bitch ass...., Fuck ass...., Ho ass..., Pussy ass..., etc."

The only thing Daniel Kang did that was unprofessional that day is he cussed Mr. Faitele out.  He regretted doing that and he took full responsibility for acting that way.  This, however, is not a dischargeable offense.  When the ambulance arrived, Mr. Faitele was transported to Candler Hospital by EMS.  Once in care of medical staff, the team decided not to arrest Mr. Faitele at that time, but to possibly obtain arrest warrants at a later date.  They decided to handle it this way because the jail was not accepting any prisoners at that time because of the COVID-19 pandemic.  Mr. Kang then left the hospital.

At no time did Mr. Kang mean for Mr. Faitele to be harmed in any way.  When Mr. Kang placed him on the ground he did it because he believed at that point that Mr. Faitele was the violent felon the team was trying to get off the street.  He was placed on the ground and handcuffed for his safety, the team's safety and the people's safety who were still inside the apartment.  Importantly, this was only after Faitele failed to follow repeated police orders to "get on the ground".

When he was summoned out of the door of the apartment he was called "Khalil". He responded to that name. He did not tell the team his name. He would only say he was not Khalil. He was also the person who had come out of the apartment with the female then rushed back inside. He fit the description of the person the team was looking for. Mr. Kang handcuffed him as per the policy of the Savannah Police Department when taking someone in custody.

Regarding Mr. Kang pulling a shirt over Mr. Faitele's face, the only reason he did that was Mr. Kang was trying to prevent Faitele from spitting blood on him again. He didn't try and put the shirt over Faitele's mouth to harm him, to provoke him or to insult him. He simply did it to keep him from possibly harming him and the others around him. And, again because the Police were not provided appropriate equipment to deal with folks spitting at them.

The initial recommendation for Officer Kang was for a suspension of 5 days. Then, Roy Minter got involved. Officer Kang, along with seven-six other officers, filed a petition trying to bring to the department's attention numerous problems with the Minter administration. This is still pending. How Roy Minter could sit on disciplinary committees on Officer Kang is incredible. It violates City protocol and any basic sense of fairness.

The use of Roy Minter on the panels which led to Cpl. Daniel Kang's dismissal and indictment was an absolute impermissible conflict of interest.

Cpl. Kang filed two complaints against Roy Minter, yet Minter kept himself on the panels which led to Cpl. Kang's dismissal and indictment. His firing is a classic retaliatory firing which is impermissible under Georgia Law.

The bullying of Cpl. Kang continued at his termination hearing when Minter told Kang he would fire him for anything Minter wanted. (Not true).

The City knows the SWAT team has been put under tremendous pressure. It is understaffed and under equipped. Instead of properly addressing this, the Police Department has defunded the SWAT team in part and fired two of those who brought it to their attention.

The claims made herein by Daniel Kang are for the damages sustained by him as a result of this incident, which include lost wages, mental pain and suffering, and attorney's fees. Mr. Kang estimates that the damages he has suffered as a result of this incident are$2,000,000.00.

Please be advised that Officer Kang is ready, willing and able to give a sworn statement and will comply with any other reasonable request to enable you to review this claim.

To the extent necessary, the purpose of this correspondence is to satisfy the requirements of O.C.G.A. § 50-21-26 and all other Georgia statutes regarding *ante litem* notice. Additionally, this notice is given to afford the City of Savannah and Savannah Police Department the opportunity to investigate this claim, ascertain the evidence, and to avoid the incurrence of unnecessary litigation. This request is being sent to you via certified mail, return receipt requested.

If you have any questions or if you would like to discuss this matter further, please give me a call.

Yours very truly,

Brent J. Savage
SAVAGE, TURNER, DURHAM,
PINCKNEY & SAVAGE

BJS/

cc:     Daniel Kang



BRENT J. SAVAGE
ROBERT BARTLEY TURNER
JAMES D. DURHAM
KATHRYN HUGHES PINCKNEY
BRENT J. SAVAGE, JR.
R. BRIAN TANNER
SHANNON C. O'REILLY
ZACHARY R. SPROUSE
SAMUEL L. MIKELL
WINSTON A. EDWARDS
CAROLYN M. ADAMS

November 10, 2020

City of Savannah Police Department
Attn: Open Records
201 Habersham Street
Savannah, GA 31401
Re: Open Records Request

Dear Sir/Madam:

This firm represents Daniel Kang. In accordance with the Open Records Act, O.C.G.A. § 50-18-70 et seq., we are writing to request the following records maintained by your office:

A.   Records of any police officer dismissed for using curse words who were:

     i.   general police officers;
    ii.   SWAT team members;

B.   Policies of SPD in effect which says SWAT team members who are spat at, threatened and the subject in a group disobeys a direct comment in a potentially dangerous situation, that the City personnel may not use bad language and are subject to firing for this;

C.   Any documentation where the disciplinary panel has suggested a 5 day suspension of an officer and the officer has been fired for the same offense;

D.   Emails or other documentation:

     I.   between the district attorney's office and the mayor's office regarding Daniel Kang in 2020;
    II.   between Roy Minter and the mayor's office regarding Daniel Kang and/or Octavio Michael Arango in 2020;
    III.   between Richard Wiggins, David Barefield, and Roy Minter in 2020;

E.     The City of Savannah / City of Savannah Police Department code of
       ethics and policy manual(s) as they address:

       I.     conflicts of interest policies and the issue of whether a person with
              an outstanding complaint against a City official has that same city
              official sit on a disciplinary panel dealing with the complaining city
              employee;

F.     Documents regarding the establishment, procedures and authority of the
       Citizens Commission which reviewed the actions of Daniel Kang on April
       14, 2020;

G.     Any contact the City of Savannah Police Department has had with the
       United States Air Force regarding Daniel Kang;

H.     Any insurance policies applicable which would provide coverage for the
       actions of the City of Savannah / Police Personnel in reference to their
       investigation, disciplining and indictment of Daniel Kang;

I.     The criminal records of Khalil Kelly and Darryl Faitele;

J.     All IA investigative files conducted since Daniel Kang and Michael Arango
       were placed on administrative leave on April 2020 to include but not
       limited to, Benjamin Abbassi, Samantha Heard (aka Sosbe), Adrian
       Gates, Dana Purvis (Aka Dana Knight), Wayne Peterson;

Of course, we will pay all reasonable administrative and copying costs, as required by
O.C.G.A. § 50-18-71. Pursuant to O.C.G.A. § 50-18-71(f), please make these records
available within a reasonable time, not to exceed five (5) business days.

Thank you very much for your help in this matter. If you need any additional
information or materials to proceed on this request, please let me know at your earliest
convenience.

Sincerely,

Brent J. Savage
SAVAGE, TURNER, DURHAM,
PINCKNEY & SAVAGE

BJS/lah

# CITY OF SAVANNAH
## CONFLICT RESOLUTION PROGRAM

The City of Savannah is committed to the process of assisting employees and supervisors in resolving conflict. Conflict is a normal part of human interaction. Most conflicts are resolved by people learning to work more effectively with each other. The City encourages its employees to seek informal resolution to all workplace conflict; however, there are times when conflict does not get resolved and escalation leads to anger, bitterness, and a breakdown in communication. In the workplace this can lead to further problems with morale and work performance.   The City's Conflict Resolution Program provides employees and supervisors with guidelines on how to resolve conflict informally.   The program also outlines the process to follow when informal resolution to workplace conflict has been ineffective and formal assistance is requested from the Employee Relations Coordinator.

**Resolving Workplace Conflict (Informal)**

**Employee Responsibilities**

Employees are encouraged to be responsible in their communication and behavior at work. When a conflict arises, employees are encouraged to:

☐ Approach the other person to determine if the other person is willing to talk.
☐ Avoid blaming and "name calling" when talking about the problem.
☐ Avoid soliciting others to take sides in the conflict.
☐ Be a good listener and understand the other's point of view.
☐ Look for areas of agreement and mutual concerns.
☐ Offer an apology if appropriate but don't discount personal feelings.
☐ Be firm about individual interests but be flexible on the solution.


In addition to these guidelines, the City offers classes in conflict resolution and workplace communication and encourages all employees to attend.

**Supervisor Responsibilities**

Supervisors are also encouraged to assist employees in resolving conflicts at work. To do this, supervisors should:

☐ Encourage employees to discuss differences and concerns
☐ Listen to problems without becoming defensive or emotional.
☐ Avoid gossip and discussion of one employee about another.
☐ Empower employees to discuss conflict with each other.
☐ Sit in on discussions and help employees find resolution if needed.
☐ Be open to creative solutions to conflict.


Supervisors are also encouraged to take classes designed to improve their communication and conflict resolution skills.

**Employee Assistance Program (EAP) Involvement**

*Self-referrals:*   If an individual employee has been unable to resolve a workplace conflict, the employee may seek guidance and consultation from the Employee Assistance Program Coordinator.   The EAP Coordinator will conduct an initial assessment in order to ascertain the influences of other personal or work-related factors that may be impacting the conflict.   If an employee seeks help with conflict resolution from the EAP, all information relayed to the EAP Coordinator is strictly confidential, except when mandated reporting is required by law or if an employee provides written permission to release information.

*Supervisory Referrals:*   If a supervisor is aware that there is a conflict between or among employees that is affecting work performance, including the morale of the department, the supervisor should counsel the employees individually regarding the conflict, encouraging the employees to work out the disagreement. If the conflict is not resolved and continues to be a problem, the supervisor should meet again individually with each employee and inform the employee that he or she is making a referral to the EAP in order to assist the employee with resolving the conflict.   Should the employee refuse/decline the referral and the conflict persists then further disciplinary action may be warranted by the supervisor based on the associated work performance issues. The EAP Coordinator will confirm with the supervisor whether the employee attended the first session. No other information will be released without the employee's written consent.

*Mandatory Referrals:*   Mandatory referrals to the EAP for employee conflicts are reserved for those infractions which upon occurrence are so serious that termination from employment is a high probability.   Examples of such infractions include but are not limited to:   a conflict involving any physical altercation or a serious verbal threat of harm.   In these cases, employees must follow-through with the EAP referral or immediate termination will result.

**Employee Assistance and Employee Relations Involvement**

*In-house Mediation:*   Mediation services to assist in the resolution of employee conflict may be provided by either the EAP Coordinator or the Employee Relations Coordinator, depending on several factors.   If an employee has utilized EAP services beyond the initial evaluation and/or in the past has had a counseling relationship with the current EAP Coordinator, then the Employee Relations Coordinator will be the designated mediator.   The EAP Coordinator may provide mediation services if there is no current or past counseling relationship with either of the employees involved in the conflict.   This is to insure that neutrality and therefore the integrity of the process is maintained.

Mediation works the best when the conflict is between employees on the same peer level.   It does not work as well for a conflict between employees on different work levels such as a supervisor and an employee, although there are exceptions.   Mediation to resolve a conflict between an employee and a supervisor will only occur when there are limited options for resolution, and the supervisor's authority is protected.

**Employee Relations Involvement for Team/Workgroup Conflicts**

Mediation services to assist in the resolution of conflict involving an entire team, work group or department may be provided by the Employee Relations Coordinator. Department supervisors

and above may request conflict resolution services for teams or groups.   The Employee Relations Coordinator will conduct an initial assessment with the requesting supervisor or manager, and if necessary, with the team, to gather pertinent information.   All employees on the team must participate in the conflict resolution process.   The findings are confidential and used to develop and implement a management approved course of action and/or specific training programs to resolve team conflict.   Instances of team conflict include but are not limited to: New and transitional management; changing processes and systems; team work issues; team performance and motivation; building a team; and team communication.   The Employee Relations Coordinator may at times, involve the Employee Assistance Coordinator, Human Resources staff, and/or department director, with the employee(s) written permission to release information.

**Formal/External Mediation**

In some cases, employee conflicts may be referred to the Mediation Center by either the EAP or Employee Relations Coordinator.   The Mediation Center is an outside agency that assists in a more formal mediation by trained mediators in order to assist in resolving conflicts.   A formal mediation can be mandated by management when work performance issues are evident because of the conflict.   In these instances, the department will be responsible for any costs associated with the mediation.   When the Employee Relations Coordinator or the EAP Coordinator and the department director agree to use formal mediation, the process proceeds as follows:

- The department director will make the referral to the EAP or the Employee Relations Coordinator
- The EAP or Employee Relations Coordinator will schedule and coordinate the mediation with the Mediation Center.
- The department director will be advised as to whether the parties willingly take part in the mediation
- The process will be discontinued if either party refuses to cooperate or if disputants don't follow the process.
- The mediator will work with both parties to come to an agreement to resolve the conflict.
- A written statement of this agreement will be given to management and to the employees.
- The employees will be held accountable to follow agreement.

**For additional information on the City of Savannah's Conflict Resolution Program, contact:**
**Anthony Caston, Employee Relations Coordinator**
**City of Savannah**
**Human Resources Department**
**P.O. Box 1027**
**Savannah, GA 31402**
**(912) 651.6484 Office Phone**
**(912) 433.3413 Cell Phone**
**(912) 525.1648 Confidential Fax**

**Rev. 1/10/2019**

# Statement of Workplace Conflict

Employee's Name.   Kang, Daniel                    Dept. <u>Savannah Police Department</u>

1. Date, time and location the event or discussion took place:

<u>29 May 2019, 1130 – 1230, Savannah PD Headquarters</u>

2. Give a brief statement of your workplace conflict including names of all parties involved and any persons who witnessed the conflict:   (Stick to the facts)

This statement is being provided to outline a timeline of behavior from Chief Roy Minter and Assistant Chief Stephanie Price beginning on 29 May 2019 to present date which has created a hostile work environment for myself and/or police officers with similar background in training and experience (specialized investigations and specialized tactics).   The decisions made by Chief Roy Minter and Assistant Chief Price are neither transparent nor are the rationales explained in a clear manner (or at all).   I believe they lied to myself and other like minded officers on at least one occasion.   The situation caused significant grief, anguish, and is a significant contributing factor to my morale, mental and physical health.   My work records will show I have a history of being a loyal, hard working, and diligent employee.   However, the recent events gave me pause and consideration to seek employment elsewhere.

Starting in 2019, my coworkers and I, while assigned to CNT, began to hear rumors that due to city-county demerging, personnel allotments from the surrounding agencies to CNT would change.   Consequently, SPD had an overage of personnel assigned to CNT and several would be sent back.   As time passed, we heard little to no communication regarding on how the determination on regarding reassignment of SPD personnel at CNT would be handled.   I received a copy of a memorandum dated 22 May 2019 from Lieutenant Michael Izzo to Assistant Chief Stephanie Price the following personnel would be reassigned: SGT Mike Arango, CPL Brandon Lord, CPL Steve Reagin, APO Derek Bradley, and myself.   The memorandum further stated, "All of the above agents have done an excellent job while at CNT and have conducted themselves in a manner that reflects highly on the Savannah Police Department." Our investigation record at CNT supports the statement.

On 23 May 2019, SPD Special Order 19015 was issued reassigning SGT Arango, CPL Lord, CPL Reagin, APO Bradley, and myself to Central Precinct of Patrol division.   Order 19015 was signed by Chief Roy Minter.   Up to this point, no one communicated where we would be being transferred to, nor were any inputs solicited from any of the officers involved.   We were confused, upset, and disappointed.   Lieutenant Izzo and Lieutenant Gene Harley (CCPD) informed us we were selected by the Chief of Police.

On the following Saturday, 25 May 2019, several of us participated in the 200 Club Savannah Mile.   Several members of command staff, to include Chief Roy Minter were present.   None of them provided any explanations for the transfer to Central Precinct nor why we were never solicited for inputs for the involuntary transfer. Furthermore, Chief Roy Minter made no attempt to speak with any of us present.

On Tuesday, 28 May 2019, Lieutenant McPhaul contacted us to have a meeting with Assistant Chief Price the following day at 1130.   When we met with her the next day, she stated we would not be performing a patrol task, but we would simply be assigned to patrol to conduct jurisdiction wide warrant service and we would report to her, not Captain Herron.   The work would utilize our unique skillsets developed from countless hours of surveillance and tactical training and experience.   She further added she "had a soft spot for specialized units" (paraphrased). Afterwards, we developed a Concept of Operations (CONOPS) and developed a General Order regarding the

warrant squad.   Additionally, she was aware of this point that APO Bradley was planning on leaving the department.

On Saturday, 1 Jun 2019, SGT Arango informed Captain Herron of the developments.   He insisted on us sending him the CONOPS and General Order even though we informed him the products were still in development.   His insistence without requesting us to explain the material to him led me to believe he intended to pass it off as his own strategies to combat crime in his precinct.   SGT Arango then contacted Assistant Chief Price on 6 June 2019 stating we developed the CONOPS and General Order to the best of our abilities and sent copies of the above mentioned documents.   The CONOPS and General Order would explain the personnel, vehicles, and equipment we would need to be successful along with guiding philosophies and core mission essential tasks.   SGT Arango and Assistant Chief Price then agreed to meet.   I was then informed Assistant Chief Price would not be bothered to hear the briefing regarding the warrant squad.   We were then told to report to Captain Herron and simply do as we were told.   This is quite contradictory to what Assistant Chief Price stated on the meeting we had on 29 May 2019.

Since then, APO Derek Bradley resigned from the department, reducing our unit to four personnel (including a supervisor).   We begged to obtain critical equipment, such as the switch from marked patrol vehicles to detective vehicles and desktop computers.   We further stressed the manning situation was not only a danger to officers involved, but may lead to compromise of mission.   Every time, our requests were ignored.   Despite this, we worked and managed the best we can to mitigate risks and achieve mission objectives.

On 17 February 2020, SGT Arango sent an email to Captain Gay and Lieutenant Toth stating our need for personnel, MDT, and vehicles.   In this email, it was explained why having a minimum of six personnel was critical to our core mission tasks: surveillance and building clearing.   I have not heard a response as of yet.   Only afterwards, in February 2020, did SGT Arango secure a meeting with Assistant Chief Price again where she asked questions that were indicative of her lack of understanding of our mission requirements.   During this meeting, Assistant Chief Price displayed shock at our undermanned and underequipped situation.   However, if she would have given the opportunity for us to brief her back in June 2019, she would have had a firm grasp on the situation.

A situation which caused further frustration was the insistence by SGT Arango's supervisors forcing us to change the name of our unit, something we took pride in.   Never was an explanation given to why we were forced to change our name.   To add further to the frustration, it appeared to be from individuals who took no part in creating or developing the unit.

On 18 February 2020, I sent out an email to the SWAT distribution list detailing several Physical Fitness Tests (PFTs) other SWAT teams use for selection.   I sent it to all SWAT members because there are a number of individuals who are fitness enthusiasts but also because I was instructed to learn about other PFTs.   I was informed by SWAT command the impetus for the research was because Chief Roy Minter did not like a portion of the PFT (the situps) and desired it changed.   Many of the PFTs I learned about had some sort of situps.   Additionally, I assisted in brainstorming other potential PFTs for SWAT.   As of this time, I have not heard of any feedback regarding this matter.

On Friday, 21 February 2020, I received an email from Lieutenant Hiram Rivera regarding personally owned 1911s as a primary duty weapon where it stated the Chief's Office will remove the ADM-013 from policy without any explanation and little to no warning.   I personally spent much of my own time and funds to purchase a 1911, associated support equipment, and ammunition to practice, maintain standards, and improve my skills in firearms. I am involved with various firearms competitions as well.

LT Bradley Beddow requested an explanation and further added there have been no policy violations nor failure in policy regarding personally owned 1911s.   I had knowledge OFC Nicholas Marlow was cleared both criminally and administratively by the DAs office and IAD respectively of any wrongdoing involving an officer involved shooting with 1911s.   Lieutenant Rivera responded to LT Beddow and confirmed LT Beddow's assertions and offered no explanation.   Furthermore, he added personally owned patrol rifles may suffer similar outcomes where

there are more participating officers.   LT Beddow then contacted me the following day and stated Captain Tobar contacted him and offered little to no explanation.   No explanations on drawbacks to allowing personally owned weapons were articulated, however, I am aware of several benefits to the department.   I am aware of several officers who purchased 1911s and were in the midst of training to meet the qualifications required when the email was released.   This led me to believe some combination of Chief Roy Minter and Assistant Chief Stephanie Price simply enacted this policy out of biases and/or personal prejudices.

On 28 February 2020, we were tasked to write an email to Captain Gay detailing the SIS – Warrants arrest numbers and our highlights.   I was informed it was for the Chief and his meeting with city hall.   As of 7 April 2020, I have not received any feedback regarding any further support for SIS – Warrants.

The following stated above shows a pattern of decisions targeted either against myself or like minded officers despite any failure in conduct, work ethic, or other reasons of merit.   The officers involved are amongst the highest decorated officers on the department and do not perform the duties requested and do so for a quiet, personal pride, sense of duty, and not for any public display of recognition nor reward.   I would like to repair the distrust whether perceived or otherwise.   I would like explanations for the decisions made affecting myself and an ability to professionally debate the benefits and drawbacks of the decisions in a non attributional setting.   I hope upon hearing the facts and logic, they will reconsider their current courses of action.   If they maintain their decision, they should do so supported by facts and logic regarding personally owned weapons and take tangible steps towards improving the capabilities of our unit.   Any negative actions taken to my rank, position, the units I am a part of, or the members of aforementioned units will be assumed as retaliation for my participation in this process.

See attached for references regarding memorandums, emails, and other associated documents.

3. Please list the steps you have taken to resolve this conflict:

I utilized the chain of command by providing inputs to SGT Arango to move up the chain.   I also took active roles in articulating our concerns whether by developing documents, proof reading communiques, doing research, and otherwise advising SGT Arango so he can better advise his supervisors.   I would like this meeting to have a mediator and SGT Arango, CPL Lord, and CPL Reagin are invited to be present at their own discretion.

Employees Signature: _____     Date: _10 Apr 2020_____

**Please complete and return to the Human Resources Employee Assistance Coordinator.**

**Rev. 10/28/10**



*Chatham~Savannah Counter Narcotics Team*



# POLICE



**Dwane E. Ragan**
*Director*

71 Ross Road
Savannah, Georgia
31405

**Telephone**
*(912) 652-3900*

To:        **Assistant Chief Stephenie Price, Savannah Police Department**

From:    **Lieutenant Michael Izzo, SPD/ CNT**

Date:    May 22, 2019

Subject:    **Returning Savannah Police Officers**

Chief Price,

Director Ragan asked me to provide you a list of Savannah Police Officers that are scheduled to return to our home department June 9, 2019.

1. **Sergeant Octavio (Mike) Arango (PR # 00173)** – Sergeant Arango was hired by the Savannah Police Department September 12, 2005. Sergeant Arango has been assigned to the Counter Narcotics Team since January of 2014. Sergeant Arango has held the position of Group Supervisor for one of the Tactical Enforcement Teams. Sergeant Arango also is a Team Leader for the SPD SWAT Team.
2. **Corporal Brandon Lord (PR # 00353)** - Corporal Lord was hired by the Savannah Police Department March 13, 2006. Corporal Lord has been assigned to the Counter Narcotics Team since March 2018. During his tenure at CNT, Corporal Lord has been assigned to a Tactical Enforcement Team. Corporal Lord is also a member of the SPD SWAT Team.
3. **Corporal Daniel Kang (PR# 12043)** – Corporal Kang was hired by the Savannah Police Department on September 10, 2012. Corporal Kang has been assigned to the Counter Narcotics Team since December 2016. Corporal Kang has been assigned to a CNT Tactical Enforcement Team. Corporal Kang is also a member of the SPD SWAT Team.
4. **Corporal Ronald Reagin (PR# 1207)** – Corporal Reagin was hired by the Savannah Police Department on September 23, 2013. Corporal Reagin has been assigned to the Counter Narcotics Team since March of 2018. Corporal Reagin has been assigned to a Tactical Enforcement Team. Corporal Reagin is also a member of the SPD SWAT Team.
5. **APO Derek Bradley (PR# 62303)** – APO Bradley was hired by the Savannah Police Department on June 22, 2015. Corporal Bradley has been assigned to the Counter Narcotics Team since February of 2018. APO Bradley has been assigned to a Tactical Enforcement Team. APO Bradley is a former member of the SPD SWAT Team.

All of the above agents have done an excellent job while at CNT and have conducted themselves in a manner that reflects highly on the Savannah Police Department.

**SPD SPECIAL ORDER**                          **OFFICE OF THE CHIEF OF POLICE**

---

**SO #  SPD-19015**                                       **ISSUE DATE:05/23/2019**
**PERSONNEL ASSIGNMENT**                   **EFFECTIVE DATE:06/09/2019**

---

Effective Sunday, June 9, 2019, the below listed officers will be transferred from the Counter Narcotics Team (CNT) to the Central Precinct of the Patrol Division.  Prior to the effective date, these officers shall contact Captain Ben Herron for further reporting instructions.

- Sergeant Octavio Arango
- Corporal Brandon Lord
- Corporal Daniel Kang
- Corporal Ronald Reagin
- APO Derek Bradley

Distribution:

Savannah Police Department

BY ORDER OF:

ROY W. MINTER, JR.
CHIEF OF POLICE

**Daniel Kang**

| | |
|---|---|
| **From:** | Michael Mcphaul |
| **Sent:** | Tuesday, May 28, 2019 10:39 AM |
| **To:** | Brandon Lord; Octavio Arango; Ronald Reagin; Derek Bradley; Daniel Kang |
| **Subject:** | Meeting with the Asst. Chief |

Good Days Sirs,

I need for each of you to contact me pertaining to meeting with the AC.  We are looking at tomorrow at 1130 if that will work for you.  Thanks!!!

Lt. Michael A. McPhaul
Chief of Police Admin LT
Police Head Quarters
201 Habersham St
Savannah GA.  31401
(912) 658-0500 Cell
(912) 525-3100  Ext 1262
Mmcphaul@SavannahGa.Gov

**Daniel Kang**

| | |
|---|---|
| **From:** | Octavio M. Arango |
| **Sent:** | Saturday, June 1, 2019 12:13 PM |
| **To:** | Ben Herron |
| **Cc:** | Octavio Arango; Daniel Kang; Ronald Reagin; Brandon Lord; Derek Bradley |
| **Subject:** | [Caution - External Email]New Assignment |

Good afternoon Captain,
We all had a meeting with Assistant Chief Price on 5/29/19 (last Wednesday) in regards to a special assignment.
Contrary to your welcome email, AC Price informed us that this was not a patrol function and we would be utilized to target violent crimes and specific fugitives (wanted for violent felonies). As you probably know, there has been a great deal of confusion surrounding our reassignment. If possible, I would like to have my team meet with you on Monday to discuss this assignment in further detail.

Respectfully,


Sergeant O.M. Arango
Chatham Savannah Counter Narcotics Team
Group Supervisor
SCMPD SWAT
Work cell: 912-547-6909
Warning: This email originated outside the City of Savannah. Do not reply, click links, or open attachments unless you are certain you recognize the sender's name, telephone number, and email address. Please report suspicious email to DoITSecurity@Savannahga.Gov<mailto:DoITSecurity@Savannahga.Gov>

**Daniel Kang**

| | |
|---|---|
| **From:** | Octavio M. Arango |
| **Sent:** | Thursday, June 6, 2019 12:15 PM |
| **To:** | Stephenie Price |
| **Cc:** | Octavio Arango; Lenny Gunther; Ben Herron; Daniel Kang; Brandon Lord; Derek Bradley; Ronald Reagin |
| **Subject:** | [Caution - External Email]Re: Special Warrant Investigations & Fugitive Team (SWIFT) Unit Proposal |

Yes ma'am, let me know when you're available and we can come give you a detailed explanation.


Sergeant O.M. Arango
Chatham Savannah Counter Narcotics Team
Group Supervisor
SPD SWAT
Work cell: 912-547-6909

On Jun 6, 2019, at 12:02 PM, Stephenie Price <SPrice@savannahga.gov> wrote:

> See me in regard to this before implementing any of the attached information.  We need to
> discuss this information.
> Asst. Chief Stephenie Price

> **From:** Octavio Arango
> **Sent:** Thursday, June 6, 2019 11:51 AM
> **To:** Stephenie Price <SPrice@Savannahga.Gov>; Lenny Gunther <LGunther@Savannahga.Gov>; Ben
> Herron <BHerron@Savannahga.Gov>
> **Cc:** Daniel Kang <DKang@Savannahga.Gov>; Brandon Lord <blord@Savannahga.Gov>; Derek Bradley
> <DBradley@Savannahga.Gov>; Ronald Reagin <RReagin@Savannahga.Gov>
> **Subject:** Special Warrant Investigations & Fugitive Team (SWIFT) Unit Proposal

> Assistant Chief Price, Major Gunther, Captain Herron,

> After receiving the initial orders and the preliminary explanation of what our duties may be, I got
> together with my unit and we developed a plan of action.  We took the initiative to make
> recommendations on how this unit should operate in order to maximize the utility of my team's skill
> set.   We drafted a detailed, preliminary general order governing the creation of this unit and a
> PowerPoint detailing the proposed mission, philosophies, and SOPs.  We send these documents with the
> understanding that the decision is ultimately yours, however we'd be remise if we did not provide any
> guidance on how to best meet your goals.

> Respectfully,


> Sgt. O. Arango

> CNT Tactical Team GS

1

SPD SWAT Tactical Commander

omarango@chathamcounty.org

cell: 912-547-6909

**Warning:** This email originated outside the City of Savannah. Do not reply, click links, or open attachments unless you are certain you recognize the sender's **name, telephone number, and email address**. Please report suspicious email to DoITSecurity@Savannahga.Gov

**Daniel Kang**

| | |
|---|---|
| **From:** | Octavio Arango |
| **Sent:** | Monday, February 17, 2020 1:01 PM |
| **To:** | David Gay; Joe Toth |
| **Cc:** | Daniel Kang; Brandon Lord; Ronald Reagin |
| **Subject:** | SIS Warrant Squad Needs |

Good afternoon,

The Special Investigations Section – Warrant Squad has several requests that are critical to the unit's capability to conduct its assigned mission of apprehending violent offenders within and surrounding Savannah PDs jurisdiction. Several requests were made previously.

The following requests are as follows, prioritized from most to least critical:
Personnel
MDT
Vehicles
Binoculars
Bluetooth Devices for radios

Personnel
In June 2019, we were transferred from CNT to form the unit.  We started with 5 members (including supervisor).  Due to attrition, we are reduced to 4 members.  We request at minimum 2 more officers (who meet minimum requirements of SWAT Basic school and investigations background) for 6.

6 Personnel is needed for primarily 2 major mission essential task items: surveillance and building clearing.

Surveillance requires at minimum 5 with a supervisor.  This is so one member can watch a stationary target while 4 are ready to conduct mobile surveillance upon the stationary member seeing the suspect move.  The 4 conducting the follow then can switch taking the lead vehicle in the follow frequently.  This is so suspects are not alerted to the presence of law enforcement personnel and compromise the investigation.  Similarly, CNT SOP stated 6 as a minimum for mobile surveillance.
Building clearing requires a minimum of 6 so 2 can secure the perimeter while the remaining 4 can conduct clearance. Of the four assigned to entry, 2 can enter a room and clear it while 2 can remain outside the room to secure the hallway and serve as backup.  However, even with these numbers, we would operate in the margins, increasing risk to officer safety.  This in turn then increases the potential of violent and even lethal force encounters.

We request OFC Ward and OFC Iatrou who are both currently assigned to VCTF.  We request them due to their skillset (SWAT Basic and investigations background) and because they are assigned to VCTF, they will not impact patrol shift personnel.

Requesting assistance is not a reliable means for SIS-Warrants to obtain personnel needed because other units may not have the skillsets we require and the other units have their own priorities based on missions tasked to them.

These additional personnel will allow the supervisor to maintain a broader operational view while the remaining can focus on the minutia of the task at hand, would allow us to conduct more through and deliberate investigations, and help ensure quality control is maintained.

MDT

Since the inception of SIS WS in June 2019, we were provided 2 desk top computers. However, this was not through official means. This was obtained from the unit's capability to liaise and network with other police personnel. Currently, we do not have any true organic computers (desktops, laptops, MDTs, Toughbooks, etc). As of consequence, we need to rely upon a patrol shift not utilizing all MDTs available. More computers (especially MDTs) will bring the unit the capability to write search warrants while on scene, conduct verify and further elaborate on intelligence garnered from citizen contacts and field interviews, and allow us access to other databases.

Inability to conduct vehicle checks, NCIC/GCIC checks will enhance efficiency and reduce the amount of time expended on investigations by quickly eliminating erroneous intelligence. Furthermore, time would not be spent returning to the office to use computers for uses described above.

Vehicles
SIS-Warrants started in marked units which gave us less capability than a precinct CSU. We were only able to manage 3 Ford Fusions and a Chevrolet Impala. All of these vehicles are extensively used by police for the past decade and are visually distinctive in the environments we conduct investigations in. Consequently, the risk to mission due to compromise increases during surveillance because criminals in the community know those vehicles to be police vehicles after years of exposure. We are able to partially mitigate risk to mission due to extensive surveillance training and experience.

Vehicles that are innocuous and common throughout the community would not only enhance our mission to conduct surveillance, but to increase safety to officers especially with the rise of criminal ambushes on police officers; vehicles that look like police vehicles have an increased risk to ambushes.

Binoculars/Optics:
Quality optics will increase our surveillance capabilities by giving us the option to increase standoff from a suspect, thus lowering our chances of detection.

Respectfully,

Sergeant O. Arango
SIS Warrant Squad Supervisor
SPD SWAT Tactical Commander
912-433-2062


Sent from my iPhone

2

**Daniel Kang**

| | |
|---|---|
| **From:** | Daniel Kang |
| **Sent:** | Tuesday, February 18, 2020 7:22 PM |
| **To:** | xSCMPD_SWAT |
| **Subject:** | SWAT PFTs |
| **Attachments:** | SWAT PFTs.pptx |

All,

I was asked to research various SWAT Team Physical Fitness Tests.
See attached.

Dan

**Daniel Kang**

| | |
|---|---|
| **From:** | Octavio Arango |
| **Sent:** | Wednesday, February 26, 2020 6:51 PM |
| **To:** | Daniel Kang; Ronald Reagin; Brandon Lord |
| **Subject:** | Fwd: SWAT |
| **Attachments:** | image001.png |

Sergeant O. Arango
SPD SWAT Tactical Commander
SWIFT Supervisor
Work cell: 912-433-2062

Begin forwarded message:

> **From:** Octavio Arango <OArango@Savannahga.Gov>
> **Date:** February 26, 2020 at 6:47:37 PM EST
> **To:** Phillip Collard <PCollard@Savannahga.Gov>
> **Cc:** Ben Herron <BHerron@Savannahga.Gov>
> **Subject: Re:  SWAT**
>
> I agree and fully stand behind Sgt. Collard.  It is unanimously felt that we (the SPD tactical community) are being unfairly treated by our Executive Command Staff.  Hopefully, we can come to an amicable solution before other means are explored.
>
> Sergeant O. Arango
> SPD SWAT Tactical Commander
> SIS Warrant Squad Supervisor
> Work cell: 912-433-2062
>
>> On Feb 26, 2020, at 6:40 PM, Phillip Collard <PCollard@savannahga.gov> wrote:
>>
>> Sir,
>>
>> A couple of weeks ago I sent you and Major Gavin a power point with fitness standards from our department and several other tier 1 teams across the nation.  I have not received any feedback.  I have a hard time understanding why our test needs to be changed.  The SPD's current fitness standards contain sit-ups according to the training unit and its current model the "Cooper standard".  Our current standard required no equipment and they are basic exercises that can be easily trained on.  I am inquiring this matter because it has delayed our recruiting efforts.  This matter appears to not be justified at all.  However, the departments fitness test is not in question.  I'm not alone in saying why is SWAT being targeted?
>>
>> For quite some time now SWAT has had to beg, borrow, and steal to acquire equipment that is needed to maintain a high level of readiness.  SPD is a Tier 1 team held to an

1

extremely high standard.  However,  it seems that we cannot get the support that a Tier 1 team needs.  We have rifles that have different lower receivers from the 1980's.  Our upper receivers are from 2002.  For the last several years we have put in to get them replaced.  This is just one of many issues with equipment we are having.  I am not sure what the problem is but it is seriously starting to effect the morale of my dedicated Operators.

Additionally, the Assistant Chief has directed us to qualify with all weapon systems quarterly.  This takes up a ton of precious training time and money for ammunition.  I have discussed this with my Assistant Commander Sgt. Arango.  I think we need some support or we may lose more highly trained officers.  Any feedback would be appreciated.

V/R

**Sgt. Phillip Collard**
**Savannah Police Dept.**
**VCTF/S.W.A.T.**
**(912)-667-1767**

**Daniel Kang**

| | |
|---|---|
| **From:** | Hiram Rivera |
| **Sent:** | Friday, February 21, 2020 5:09 PM |
| **To:** | Bradley Beddow; Nicholas Marlow |
| **Cc:** | Shawn Kinzer; Chris Hinson; Stephen Rivers; Chris Boyette; David Bates; James Lyttle; Daniel Kang; Joseph Altomare; Jon Lindsey; Alexander Tobar; Stephenie Price; Clayton Cortes; Jase Gallagher |
| **Subject:** | RE: Model 1911 authorized officers |

I am sorry to be the bearer of this disheartening news. You are right, none of you are in violation of any current policy. That is why I was sending out the email as a heads up that the policy will be seeing a change in the near future. The same change will happen with Patrol Rifles. I am also following the direction of our leadership.

The Chief would like all officers to carry department issued weapons with the exception of back-up weapons. The changeover will also happen with those officers carrying their personal patrol rifles.

It's a heads up, wait until the policy change if you like. Training unit staff will carry department issued weapon as we have been directed to and until told otherwise. There is nothing illegal, inappropriate or immoral or unethical about the order. It's what I was directed to do.

And we all know policy can change at any time…

If I learn more about the changes I will share them… decide for yourself what you should do, my friends.

*Lieutenant Hiram Rivera Jr*
Savannah Police Department
Training and Professional Development
(O) 912 525-3100 ext 1598
(C) 912 667-2523

---

**From:** Bradley Beddow
**Sent:** Friday, February 21, 2020 4:00 PM
**To:** Nicholas Marlow <NMarlow@Savannahga.Gov>; Hiram Rivera <HRivera@Savannahga.Gov>
**Cc:** Shawn Kinzer <SKinzer@Savannahga.Gov>; Chris Hinson <CHinson@Savannahga.Gov>; Stephen Rivers <SRivers@Savannahga.Gov>; Chris Boyette <csboyette@chathamcounty.org>; David Bates <DBates@Savannahga.Gov>; James Lyttle <JLyttle@Savannahga.Gov>; Daniel Kang <DKang@Savannahga.Gov>; Joseph Altomare <JAltomare@Savannahga.Gov>; Jon Lindsey <JLindsey@Savannahga.Gov>; Alexander Tobar <ATobar@Savannahga.Gov>; Stephenie Price <SPrice@Savannahga.Gov>; Clayton Cortes <CCortes@Savannahga.Gov>; Jase Gallagher <JGallagher@Savannahga.Gov>
**Subject:** RE: Model 1911 authorized officers

1

I'm curious as well. I don't see any benefit of taking away a privilege from those of us that have strived to reach and maintain a standard that was set forth by policy several years ago only to have it taken away with little notice, explanation, or known policy violations by those that carry 1911's. To the best of my knowledge I am unaware of any of us that are listed as being qualified to carry a 1911 violating or acting contrary to policy as it regards the qualification standards and it's daily duty use. What impact to the overall function of the department will this have by removing this privilege from a small number of officers that are driven to excel not only in firearms but in all areas of their careers? There are number of officers from the rank of LT and below that are still striving to make this standard, not for the sake of wearing a pin, but to be able to carry the platform and be recognized for their dedication to becoming better shooters.

**From:** Nicholas Marlow
**Sent:** Friday, February 21, 2020 3:12 PM
**To:** Hiram Rivera <HRivera@Savannahga.Gov>
**Cc:** Bradley Beddow <BBeddow@Savannahga.Gov>; Shawn Kinzer <SKinzer@Savannahga.Gov>; Chris Hinson <CHinson@Savannahga.Gov>; Stephen Rivers <SRivers@Savannahga.Gov>; Chris Boyette <csboyette@chathamcounty.org>; David Bates <DBates@Savannahga.Gov>; James Lyttle <JLyttle@Savannahga.Gov>; Daniel Kang <DKang@Savannahga.Gov>; Joseph Altomare <JAltomare@Savannahga.Gov>; Jon Lindsey <JLindsey@Savannahga.Gov>; Alexander Tobar <ATobar@Savannahga.Gov>; Stephenie Price <SPrice@Savannahga.Gov>; Clayton Cortes <CCortes@Savannahga.Gov>; Jase Gallagher <JGallagher@Savannahga.Gov>
**Subject:** Re: Model 1911 authorized officers

Received. I will get requalified with my Glock 21 as soon as possible.

This is quite upsetting news to us. Is there any way someone could share why this is being taken away?

Respectfully,

**TFO Nicholas C. Marlow**
Savannah Police Department S.W.A.T.
USMS Southeast Regional Fugitive Task Force
c: (912)-414-2301
e: nmarlow@savannahga.gov; nicholas.marlow@usdoj.gov

Sent from my iPhone

On Feb 21, 2020, at 2:35 PM, Hiram Rivera <HRivera@savannahga.gov> wrote:

Good afternoon,

You are receiving this email because you have been identified as a Marksman who had previously been authorized to carry your personally owned 1911 while on duty as a primary duty weapon.

The Chief's Office has decided that moving forward, all officers will carry department issued primary weapons, while on duty (excluding back-up weapons) in accordance with ADM-013 . There will be a policy revision removing the addendum outlining the 1911 criteria.

In the meantime, If you are not carrying your SPD issued primary duty weapon and have not qualified with it, please make arrangements with Sergeant Cortes. Those Marksman who have qualified with both , Assistant Chief Price would like the transition to your SPD duty weapon to

happen immediately if you are not already doing so.

Officers can still achieve the Marksman ribbon by achieving the required standard set forth by the Armorer using the SPD issued duty weapon.

Thank you for your assistance...


Lieutenant Hiram Rivera Jr
Savannah Police Department
Training and Professional Development
(O) 912 525-3100 ext 1598
(C) 912 667-2523



-----Original Message-----
From: Clayton Cortes
Sent: Friday, February 21, 2020 9:56 AM
To: Hiram Rivera <HRivera@Savannahga.Gov>
Subject: FW: Model 1911 authorized officers

SPD officers currently approved for 1911 as primary duty weapon.

Lt. Beddow **
Sgt  Cortes **
Sgt  Kinzer **
Sgt Hinson
Scpl  Rivers **
Cpl Boyette
Cpl  Bates **
Cpl Lyttle *
Apo kang
Apo Marlow *
App Altomere **
Ofc Lindsey

(*) will need to re-qualify with the department weapon.
(**) Have qualified with their personally owned 1911 and department issued weapon.
The rest have not yet qualified for 2020.




Sent from my iPhone

## Daniel Kang

| | |
|---|---|
| **From:** | Daniel Kang |
| **Sent:** | Friday, February 28, 2020 1:44 PM |
| **To:** | David Gay; Joe Toth |
| **Cc:** | Octavio Arango; Brandon Lord; Ronald Reagin |
| **Subject:** | Special Investigations Section - Warrants |
| **Attachments:** | SIS WS Stat Tracker.xlsx |

Captain Gay,

Sent on behalf of SGT Arango.

Special Investigations Section – Warrants began operations on Sunday, 9 June 2019.  We did not have a designated mission but took it upon ourselves to execute outstanding and active arrest warrants throughout Chatham and surrounding counties.  This unit is entirely comprised of SWAT certified individuals with heavy tactical experience and training along with investigations and surveillance experience.  We maintained deputatization to conduct our mission.  We started out in class C uniforms, marked vehicles assigned to Central Precinct (Patrol Division).  We were able to obtain unmarked units in late June and by 23 June 2019, we were transferred from patrol to Special Investigations Section (SIS).

Since then, SIS – Warrants had 60 arrests where we assisted the US Marshals Service with 5 arrests and VCTF with 2.
2019 Arrests: 57
June – 9
July – 12
August – 17
September – 3
October – 2
November – 8
December – 6

2020 Arrests: 20
January – 9
February – 11

SIS – Warrants Significant Arrests/Highlights
Luis RIVERA H/M 26 Jul 1980, CRN 190121035, 26 Jun 2019
RIVERA had active arrest warrants from CNT who requested our assistance.  RIVERA had Felony narcotics and Possession of a Firearm During Commission of a felony from CNT, he also had traffic violation warrants from SPD and was a suspect for aggravated assault.  We located his residence at 716 E 34th St and conducted interviews with one of the residents.  Based on the evidence gathered, SIS – Warrants drafted a search warrant for the residence.  Additional units from VCTF/SWAT were requested and eventually entry was made.  RIVERA was located hiding in the attic and was arrested in possession of an AR-15 style rifle.

Joshua JENKINS B/M 3 Aug 2019, CRN 190719141, 3 Aug 2019
Detective Hamm at CID/Robbery contacted us during his robbery investigation and requested our assistance.  Detective Hamm forwarded information and eventually, the arrest warrant for Armed Robbery on Joshua JENKINS.  SIS conducted surveillance at his residence at 10438 Gray Fox Way while simultaneously planning a SWAT based contingency.  SWAT executed a knock and announce search warrant on 3 August 2019, arrested JENKINS, while securing the residence which led to the recovery of evidence critical to CID/Robbery's investigation.

James SMITH B/M 28 Aug 2019, CRN 190828013, 28 Aug 2019
SIS – Gang forwarded us intelligence stating Statesboro had arrest warrants on James SMITH for Identity Fraud.  SIS – Warrants performed intelligence actions and conducted surveillance on SMITH.  On 28 Aug 2019, SIS – Warrants conducted mobile surveillance and affected a traffic stop on SMITH leading to his arrest.  Smith was found in possession of a 5.7 caliber machine pistol.

Rashad LEE B/M 30 Jun 1986, CRN 190913018, 13 Sep 2019
CID/SVU obtained arrest warrants on Rashad LEE for Aggravated Sodomy.  Detective Pugh contacted SIS – Warrants for assistance and provided critical intelligence.  SIU and SWAT assisted in conducting surveillance while SWAT conducted mission planning activities.  During this time, surveillance assets observed a vehicle associated with LEE return to the residence.  SIS and SWAT mobilized assets.  While attempting to stop the vehicle, LEE fled by vehicle.  After a collision with a tree, LEE attempted to flee on foot where SIS affected the arrest.  LEE was arrested for active SVU warrants, felonious Fleeing to Elude, and other traffic violations.

Garnell QUARTERMAN B/M 2 Jan 1990, CRN 200117146,  17 Jan 2020
CID/Robbery was actively investigating QUARTERMAN as a suspect in several robberies in the Savannah area and was working closely with Garden City PD.  GCPD was able to obtain arrest warrants on QUARTERMAN.  Detective Hamm contacted us.  SIS then contacted VCTF and SIS – Gang requesting assistance for surveillance.  After extended surveillance on a residence associated with QUARTERMAN, contact was made with an individual who was arrested VCTF for narcotics and firearms violations.  SIS – set initial perimeter and eventually was able to gain voluntary consent to search for individuals inside the residence.  QUARTERMAN attempted to escape but was detained by perimeter units.  The residence was then secured for CID/Robbery for a search warrant.

## CITY OF SAVANNAH
## CONFLICT RESOLUTION PROGRAM

The City of Savannah is committed to the process of assisting employees and supervisors in resolving conflict. Conflict is a normal part of human interaction. Most conflicts are resolved by people learning to work more effectively with each other. The City encourages its employees to seek informal resolution to all workplace conflict; however, there are times when conflict does not get resolved and escalation leads to anger, bitterness, and a breakdown in communication. In the workplace this can lead to further problems with morale and work performance.   The City's Conflict Resolution Program provides employees and supervisors with guidelines on how to resolve conflict informally.   The program also outlines the process to follow when informal resolution to workplace conflict has been ineffective and formal assistance is requested from the Employee Relations Coordinator.

**Resolving Workplace Conflict (Informal)**

**Employee Responsibilities**

Employees are encouraged to be responsible in their communication and behavior at work. When a conflict arises, employees are encouraged to:

☐ Approach the other person to determine if the other person is willing to talk.
☐ Avoid blaming and "name calling" when talking about the problem.
☐ Avoid soliciting others to take sides in the conflict.
☐ Be a good listener and understand the other's point of view.
☐ Look for areas of agreement and mutual concerns.
☐ Offer an apology if appropriate but don't discount personal feelings.
☐ Be firm about individual interests but be flexible on the solution.

In addition to these guidelines, the City offers classes in conflict resolution and workplace communication and encourages all employees to attend.

**Supervisor Responsibilities**

Supervisors are also encouraged to assist employees in resolving conflicts at work. To do this, supervisors should:

☐ Encourage employees to discuss differences and concerns
☐ Listen to problems without becoming defensive or emotional.
☐ Avoid gossip and discussion of one employee about another.
☐ Empower employees to discuss conflict with each other.
☐ Sit in on discussions and help employees find resolution if needed.
☐ Be open to creative solutions to conflict.

Supervisors are also encouraged to take classes designed to improve their communication and conflict resolution skills.

**Employee Assistance Program (EAP) Involvement**

*Self-referrals:*  If an individual employee has been unable to resolve a workplace conflict, the employee may seek guidance and consultation from the Employee Assistance Program Coordinator.   The EAP Coordinator will conduct an initial assessment in order to ascertain the influences of other personal or work-related factors that may be impacting the conflict.   If an employee seeks help with conflict resolution from the EAP, all information relayed to the EAP Coordinator is strictly confidential, except when mandated reporting is required by law or if an employee provides written permission to release information.

*Supervisory Referrals:*  If a supervisor is aware that there is a conflict between or among employees that is affecting work performance, including the morale of the department, the supervisor should counsel the employees individually regarding the conflict, encouraging the employees to work out the disagreement. If the conflict is not resolved and continues to be a problem, the supervisor should meet again individually with each employee and inform the employee that he or she is making a referral to the EAP in order to assist the employee with resolving the conflict.   Should the employee refuse/decline the referral and the conflict persists then further disciplinary action may be warranted by the supervisor based on the associated work performance issues. The EAP Coordinator will confirm with the supervisor whether the employee attended the first session. No other information will be released without the employee's written consent.

*Mandatory Referrals:*   Mandatory referrals to the EAP for employee conflicts are reserved for those infractions which upon occurrence are so serious that termination from employment is a high probability.   Examples of such infractions include but are not limited to:   a conflict involving any physical altercation or a serious verbal threat of harm.   In these cases, employees must follow-through with the EAP referral or immediate termination will result.

**Employee Assistance and Employee Relations Involvement**

*In-house Mediation:*   Mediation services to assist in the resolution of employee conflict may be provided by either the EAP Coordinator or the Employee Relations Coordinator, depending on several factors.   If an employee has utilized EAP services beyond the initial evaluation and/or in the past has had a counseling relationship with the current EAP Coordinator, then the Employee Relations Coordinator will be the designated mediator.   The EAP Coordinator may provide mediation services if there is no current or past counseling relationship with either of the employees involved in the conflict.   This is to insure that neutrality and therefore the integrity of the process is maintained.

Mediation works the best when the conflict is between employees on the same peer level.   It does not work as well for a conflict between employees on different work levels such as a supervisor and an employee, although there are exceptions.   Mediation to resolve a conflict between an employee and a supervisor will only occur when there are limited options for resolution, and the supervisor's authority is protected.

**Employee Relations Involvement for Team/Workgroup Conflicts**

Mediation services to assist in the resolution of conflict involving an entire team, work group or department may be provided by the Employee Relations Coordinator. Department supervisors

and above may request conflict resolution services for teams or groups.   The Employee Relations Coordinator will conduct an initial assessment with the requesting supervisor or manager, and if necessary, with the team, to gather pertinent information.   All employees on the team must participate in the conflict resolution process.   The findings are confidential and used to develop and implement a management approved course of action and/or specific training programs to resolve team conflict.   Instances of team conflict include but are not limited to: New and transitional management; changing processes and systems; team work issues; team performance and motivation; building a team; and team communication.   The Employee Relations Coordinator may at times, involve the Employee Assistance Coordinator, Human Resources staff, and/or department director, with the employee(s) written permission to release information.

**Formal/External Mediation**

In some cases, employee conflicts may be referred to the Mediation Center by either the EAP or Employee Relations Coordinator.   The Mediation Center is an outside agency that assists in a more formal mediation by trained mediators in order to assist in resolving conflicts.   A formal mediation can be mandated by management when work performance issues are evident because of the conflict.   In these instances, the department will be responsible for any costs associated with the mediation.   When the Employee Relations Coordinator or the EAP Coordinator and the department director agree to use formal mediation, the process proceeds as follows:

- The department director will make the referral to the EAP or the Employee Relations Coordinator
- The EAP or Employee Relations Coordinator will schedule and coordinate the mediation with the Mediation Center.
- The department director will be advised as to whether the parties willingly take part in the mediation
- The process will be discontinued if either party refuses to cooperate or if disputants don't follow the process.
- The mediator will work with both parties to come to an agreement to resolve the conflict.
- A written statement of this agreement will be given to management and to the employees.
- The employees will be held accountable to follow agreement.


**For additional information on the City of Savannah's Conflict Resolution Program, contact:**
**Anthony Caston, Employee Relations Coordinator**
**City of Savannah**
**Human Resources Department**
**P.O. Box 1027**
**Savannah, GA 31402**
**(912) 651.6484 Office Phone**
**(912) 433.3413 Cell Phone**
**(912) 525.1648 Confidential Fax**


**Rev. 1/10/2019**

# Statement of Workplace Conflict

Employee's Name: <u>Commanders, Supervisors, Officers and Employees of the Department both exempt and Non-exempt</u>
Dept. <u>Savannah Police Department</u>

1. Date, time and location the event or discussion took place:

<u>August of 2018 to Present</u>

2. Give a brief statement of your workplace conflict including names of all parties involved and any persons who witnessed the conflict:   (Stick to the facts)

This request is being made on behalf of the listed participants by way of their signatures (see attached) as employees of the City of Savannah Police Department to address a series of complaints against Chief Roy Minter and his failures to abide by both the City of Savannah's Employee Standards and Leadership Principles. All signee's have done so of their own free will and agreed to the request of a Formal/External Mediation to be conducted as part of the City of Savannah's Conflict Resolution Program, as this complaint encompasses the entire workgroup. This workgroup includes Commanders, Supervisors, Officers and Civilian Employee's both Exempt and Non-exempt that request to have their concerns and grievances aired and mediated as a unified front to cover the below listed complaints on Chief Roy Minter's leadership and adherence to City policy.

All employees associated with this request will be at the ready to give personal accounts and examples of the violations:

 HR-035 Employee Relations Program
1. City Values
2. Code of Conduct
7. Supervisory Conduct requirements


Chief Roy Minter has conducted himself in a manner contradictory to these policies and its subsections through:

- A series of threats aimed at members of command staff and supervisors of units in group settings. Threats of removal from rank. Threats of removal from command. Threats of removal from units. These threats were placed as a warning to all to not disappoint him and implant fear in the rank and file.

- Intimidation and admonishing to instill embarrassment as a tool and instill his power in numerous meetings where officers, supervisors and commanders were publically belittled in front of peers and subordinates. Criticism without growth, coaching or intelligent strategizing led to confusion and a disharmonious level of communication between specialized units, staff and command.

- Selective positional movements with no standardized measure of success or failure to bring about said transfers and an unwillingness to discuss changes with the effected personnel or command.

- Selective "Open Door" policy which has limited access to officers who needed to communicate issues and concerns but were denied access while others had unlimited access.

- Lack of communication and a distancing from responsibility in the matters of promotions, transfers and policies. A refusal to put his name to decisions that affect the department as a whole to avoid liability or blame.

- Separation of command decisions during critical incidents. Does not assume control over what he sees as an issue and attacks decisions at a later time. Failure to act in chaotic situations.

- Failure to plan for the safety and security or the department by the ways of supplies and equipment. No foresight to equip the officers with safety gear for critical incidents

- Inability to communicate the focus, strategies and goals of the department. Ever changing practices, designs and orders which have led to a department with no collective mission statement and a fragmented series of leaders that plan for avoidance of command due to a lack of team unity.

- Failure to listen to the needs of specialized units whose very mission relies upon training and equipment which leaves them vulnerable operating outside of the standard federal and state levels. Increased level of expectation with limited resources given when requested.

- Favoritism in the levels of promotion and specialized positions. Created positions for loyalty instead of skill and those of skill removed from positions to make way for those of favor. No adherence to probationary periods or posting of job positions.

- Inconsistent punishment levels for like violations through an OPS system designed to be biased but now operates with the Chiefs absolute control. Relieved Office or Professional Services of all counter balances of leadership.

- Unable to create a strategy surrounding the community he is in.

- No focus on the logistical needs of specific units or divisions. Implements a one size fits all mentality.

- Untrue statements made to public, politicians, media and Employee's concerning the effectiveness, strategies, morale, manpower and readiness of the department.

- Implementation of unnecessary projects and technology lacking benefit to the objectives of the department.

- Increasing workload upon supervisors, detectives and officers to impose his personal agenda with no explanation as to the goal. Lack of empathy for the assignments already placed upon employees.

- Renaming and reallocating of resources for pet projects believed to be ineffective and solely for personal growth

- Unfocused training practices that do not train and develop for the future of the department

- Complete breakdown of communication between levels of command staff to mid-level supervision and employee's creating confusion and multiple varying procedures depending on the precinct or unit. Much of this due to the attitudes displayed toward individuals that are pivotal to the command and control.

- Outright disrespect shown to members of staff which leads to dissention and an overwhelming distancing by members of the department to remain out of the target zone.

- Lack of structure and stability generated through his leadership and an inability to develop trust, honesty and open communication.

- Created a fractured team focused on survival of his administration rather than the goals to protect and serve.

3. Please list the steps you have taken to resolve this conflict:

Due to the various members on the complaint and request for mediation this question would be best answered through the process and cannot be fully listed in this section.

Employees Signature: _See below and attached forms_          Date: _4 - 10 - 20  Thru 4 - 15 - 20_

**Please complete and return to the Human Resources Employee Assistance Coordinator.**

Rev. 10/28/10

1. Employee Printed Name and Signature: _VOID_
2. Employee Printed Name and Signature: _VOID_
3. Employee Printed Name and Signature: _Cpt. George Gundich   CPT_
4. Employee Printed Name and Signature: _Cpt. Cary Hill_
5. Employee Printed Name and Signature: _Capt Tony R._
6. Employee Printed Name and Signature: _Capt W Hagood_
7. Employee Printed Name and Signature: _Cf. Fred Baldwin_
8. Employee Printed Name and Signature: _Lt. Raymond Retzer_
9. Employee Printed Name and Signature: _1836, G. Lord_
10. Employee Printed Name and Signature: _Sgt Octavio Arango   00173_
11. Employee Printed Name and Signature: _APO Ronald S. Reagin   #1207_
12. Employee Printed Name and Signature: _CPL. Brandon Lord   00363_
13. Employee Printed Name and Signature: _CPL Daniel H Klang   12043_
14. Employee Printed Name and Signature: _CPL. Sharif Lockett   61577_

15. Employee Printed Name and Signature: Robert D. Mowers Jr. Sgt. Robert D Mowers Jr    4342

16. Employee Printed Name and Signature: STPD J. Davey    61963

17. Employee Printed Name and Signature: J. Gause / 63003

18. Employee Printed Name and Signature: SGT P. Collard    10567

19. Employee Printed Name and Signature: Officer P. Iatrou    62888

20. Employee Printed Name and Signature: Officer J West    63200

21. Employee Printed Name and Signature: Det. A Gorman    62057

22. Employee Printed Name and Signature: Detective Tori May    62715

23. Employee Printed Name and Signature: APO Nicholas G. Marlow    62724

24. Employee Printed Name and Signature: Det Molly Montgomery    62483

25. Employee Printed Name and Signature: Dist. BENJAMIN VALDIVIESO    62463

26. Employee Printed Name and Signature: Det. Derek Korte    62711

27. Employee Printed Name and Signature: Sgt Tchit-Frere, Kennel    10027

28. Employee Printed Name and Signature: LT Darold Holmes    1598

29. Employee Printed Name and Signature: Cpl. MATT Russell    11025

30. Employee Printed Name and Signature: Cpl Jase Gallagher    61838

31. Employee Printed Name and Signature: LT Keith L. Edwards    1302

32. Employee Printed Name and Signature: Sgt Christopher Hewett    #1763

33. Employee Printed Name and Signature: CPL Erica Tremblay    #11337

34. Employee Printed Name and Signature: Jordan Hoff    63710

35. Employee Printed Name and Signature: David Cortis    63763

36. Employee Printed Name and Signature: Officer Joe Eblin    63764

37. Employee Printed Name and Signature: OFC Robert Prescer    63563

38. Employee Printed Name and Signature: OFC Jeremy Lambert    63089

39. Employee Printed Name and Signature: Elizabeth Harrell    11565

40. Employee Printed Name and Signature: John Alberts    61435

#1798

41. Employee Printed Name and Signature: Scott Henderson

42. Employee Printed Name and Signature: Alfredo Saenz de Viteri   10980

43. Employee Printed Name and Signature: Joseph Supple   63774

44. Employee Printed Name and Signature: Melanie DuBose   102559

45. Employee Printed Name and Signature: Scott Bill   10565

46. Employee Printed Name and Signature: David Owens   1280

47. Employee Printed Name and Signature: Chris Talley   #5912

48. Employee Printed Name and Signature: James Hutchens

49. Employee Printed Name and Signature: Nicholas E. Melke   0025

50. Employee Printed Name and Signature: SGT. Jeffrey Oliver   5765

51. Employee Printed Name and Signature: Sgt. Rebekah Pankey   11451

52. Employee Printed Name and Signature: Sgt Brian Spence   #10972

53. Employee Printed Name and Signature: APO Allison Stark   #104105

54. Employee Printed Name and Signature: Cpl Ronald Neslein   61159

55. Employee Printed Name and Signature: OFC David Carrier   63000

56. Employee Printed Name and Signature: OFC Joshua Orlansky   63117

57. Employee Printed Name and Signature: OFC Michael Grossman   63512

58. Employee Printed Name and Signature: APO Joseph Arabolu   62148

59. Employee Printed Name and Signature: CPL Austin Foraker   11867

60. Employee Printed Name and Signature: Lt.   C0363

61. Employee Printed Name and Signature: Sgt Tiffany Manuel   00063

62. Employee Printed Name and Signature: Sgt Bryony Harris   10798

63. Employee Printed Name and Signature: Sgt Eric Dokarski   #1020

64. Employee Printed Name and Signature: Cpl Bryan Gay   11719

65. Employee Printed Name and Signature: Det Mason Hamm   11324

66. Employee Printed Name and Signature: Sgt. Ron Cooper   #5915

67. Employee Printed Name and Signature: _Cpl. Anthony Ravita_ _Anthony Ravita_

68. Employee Printed Name and Signature: _APO Samantha Heard_ _6310l_

69. Employee Printed Name and Signature: _Cpl Edison_ _1334_

70. Employee Printed Name and Signature: _Sgt. SEAN Carr_ _Sean Carr 3832_

71. Employee Printed Name and Signature: _Cpl. Michael Dobson_ _#5086_

72. Employee Printed Name and Signature: _Sanford Stephens_

73. Employee Printed Name and Signature: _Cpl. Chester Balmer_ _Cpl_

74. Employee Printed Name and Signature: _GATES, Arrial_

75. Employee Printed Name and Signature: _Det. Sherry Conway_

76. Employee Printed Name and Signature: _APO Travis Duncan_

77. Employee Printed Name and Signature: _Sgt. Zang M___ _1208_

78. Employee Printed Name and Signature: _____

79. Employee Printed Name and Signature: _____

80. Employee Printed Name and Signature: _____

81. Employee Printed Name and Signature: _____

82. Employee Printed Name and Signature: _____

83. Employee Printed Name and Signature: _____

84. Employee Printed Name and Signature: _____

85. Employee Printed Name and Signature: _____

86. Employee Printed Name and Signature: _____

87. Employee Printed Name and Signature: _____

88. Employee Printed Name and Signature: _____

89. Employee Printed Name and Signature: _____

90. Employee Printed Name and Signature: _____

91. Employee Printed Name and Signature: _____

92. Employee Printed Name and Signature: _____