**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| DANIEL KANG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. CV421-111 |
| | ) | |
| THE MAYOR AND ALDERMEN OF THE | ) | |
| CITY OF SAVANNAH, and ROY W. | ) | |
| MINTER, JR., Chief of Police | ) | |
| for the City of Savannah, | ) | |
| Georgia, in his Individual and | ) | |
| Official Capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**O R D E R**

Before the Court is Defendant Roy W. Minter, Jr.'s ("Chief Minter") Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 37), which Plaintiff Daniel Kang has opposed (Doc. 48). For the following reasons, Chief Minter's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

**BACKGROUND**

I.   PLAINTIFF'S DUTIES WITH THE SAVANNAH POLICE DEPARTMENT

This case involves allegations that Roy W. Minter, Chief of Police for the City of Savannah Police Department, unlawfully terminated Plaintiff for engaging in constitutionally protected speech. (Doc. 35 at ¶¶ 114-115.) The following events are described

as alleged in Plaintiff's Second Amended Complaint.[1] (Id.)
Plaintiff joined the Savannah-Chatham Metropolitan Police
Department in 2012 and served in several different units, including
Patrol, Crime Suppression, Special Weapons and Tactics, and the
Narcotics and Special Investigations Section. (Id. at ¶ 7.) In
2018, the Savannah-Chatham Metropolitan Police Department
demerged, forming separate police departments for the City of
Savannah and Chatham County.[2] (Id. at ¶ 10.) Chief Minter was
appointed Chief of Police for SPD in August of 2018. (Id. at ¶ 20.)

Prior to the demerger, Plaintiff worked on the county Counter
Narcotics Team ("CNT"). (Id. at ¶ 11.) After the demerger,
Plaintiff began working for the Savannah Police Department
("SPD"). (Id. ¶ 10.) Plaintiff was among a small group of officers
who were involuntarily assigned to SPD's Central Precinct Patrol
Division. (Id. at ¶ 12.) Plaintiff and other officers were later
assigned to the Special Investigation Section ("SIS"), a
department devoted to conducting jurisdiction-wide warrant service
in Savannah. (Id.) Neither Plaintiff nor the other officers who

---

[1] For the purposes of this Order, the Court will accept all factual
allegations in the Second Amended Complaint (Doc. 35) as true and
construe all allegations in the light most favorable to Plaintiff.
Timson v. Sampson, 518 F.3d 870, 872 (11th Cir. 2008).

[2] Plaintiff alleges that the demerger took place around 2019. (Doc.
35 at ¶ 10.) For the sake of accuracy, the Court notes that the
demerger became official on February 1, 2018. Savannah Police,
History, http://savannahpd.org/history/ (last visited Mar. 14,
2022).

were transferred to SIS from the county CNT received any notice or explanation for their transfers. (Id.)

II. <u>LACK OF RESOURCES AND PERSONNEL AT SIS</u>

SIS had limited resources, equipment, and personnel. (Id. at ¶ 13.) In July 2019, only four personnel members were assigned to SIS, although at least six members were necessary for their missions. (Id.) The SIS officers also lacked equipment critical to their roles, including unmarked vehicles, surveillance equipment, access to MobileCom, and a sufficient number of portable and desktop computers. (Id.) Plaintiff and his superior Sergeant Octavio Arango expressed concerns about the lack of personnel and resources on numerous occasions. (Id. at ¶ 14.) Despite inadequate communication and guidance from SPD leadership, Plaintiff and other SIS officers drafted policies and guidance to assist SPD leadership in developing rules and regulations for SIS. (Id. at ¶ 15.) SPD leadership ignored the proposed policies and did not attempt to create policies for SIS. (Id.)

III. <u>INVESTIGATION INTO OFFICER ADRIAN GATES</u>

In July 2019, an Internal Affairs ("IA") investigation was opened into Officer Adrian Gates, an African American officer assigned to the Gang Unit, and his alleged association with suspected gang members. (Id. at ¶ 25.) At the time of this investigation, two other IA investigations into Officer Gates's conduct were pending. (Id. at ¶ 26.) Additionally, a separate IA

investigation already concluded that Officer Gates violated two SPD policies. (Id.) In the most recent investigation, Officer Gates was accused of violating several SPD policies for failing to report his findings after visiting suspected gang houses and warning suspects about police raids. (Id. at ¶¶ 27, 28.) Officers also found a fake urine product often used to pass drug tests in Officer Gates's car. (Id.)

At the conclusion of the IA investigation, the discipline review board found that Officer Gates had violated the SPD policies as alleged and recommended termination as the appropriate discipline. (Id. at ¶ 29.) Chief Minter reviewed the IA investigation and sustained the allegations against Officer Gates. (Id. at ¶ 30.) However, Chief Minter rejected the discipline review board's recommendation of termination and instead placed Officer Gates on a 40-hour suspension. (Id.) Two weeks later, Officer Gates was taken off administrative leave, and he returned to full-duty status. (Id. at ¶ 31.) Plaintiff alleges that Chief Minter's treatment of Officer Gates's investigation is one of many examples of Chief Minter treating Black officers more favorably than non-Black officers like Plaintiff, who is Asian. (Id. at ¶¶ 32, 130.)

IV.  HUMAN RESOURCES COMPLAINTS AGAINST CHIEF MINTER

On April 10, 2020, 75 members of the SPD, including all members of SIS, signed a group Human Resources ("HR") complaint (the "Group Complaint") which included 22 separate complaints

against Chief Minter. (Id. at ¶ 33.) In the Group Complaint, the complaining officers alleged that Chief Minter had engaged in, inter alia, corruption, favoritism, and disrespect towards SPD officers. (Id. at ¶¶ 35, 36.) The Group Complaint was submitted on April 15, 2020. (Id. at ¶ 34.) Jeffery Grant, HR Director for the City of Savannah, confirmed receipt of the Group Complaint on April 25, 2020, stating that additional information would be sent out on April 29, 2020. (Id.)

Also on April 10, 2020, Plaintiff submitted an individual HR complaint (the "Personal Complaint") against Chief Minter and Assistant Chief Stephanie Price. (Id. at ¶ 37.) In the Personal Complaint, Plaintiff stated that he had been subjected to a hostile work environment and that "[t]he situation caused significant grief, anguish, and is a significant contributing factor to [his] moral, mental and physical health." (Id. at ¶ 38.) Plaintiff also complained about Chief Minter's failure to provide adequate resources, communication, or personnel to the SIS. (Id. at ¶ 39.) Plaintiff contended that the allegations outlined in the Personal Complaint "show[ed] a pattern of decisions targeted either against [him]self or like-minded officers despite any failure in conduct, work ethic, or other reasons of merit." (Id. at ¶ 40.) Plaintiff also warned that "[a]ny negative actions taken to my rank, position, the units I am a part of, or the members of aforementioned units will be assumed [to be] retaliation for my

participation in this process." (Id.) HR assured the complaining officers that it was seeking a third party to review the complaints; however, HR requested that the complaints be sent directly to the department. (Id. at ¶ 41.) Jeffery Grant eventually retained attorney Susan Cox to review the complaints against Chief Minter. (Id. at ¶ 42.)

V.   PLAINTIFF'S ENCOUNTER WITH DARRYL FAITELE

On April 14, 2020, four days after signing the Group Complaint and submitting his Personal Complaint, Plaintiff was involved in an incident during the execution of an arrest warrant on Kahlil Kelly. (Id. at ¶ 46.) Mr. Kelly had violent felony arrest warrants pending for aggravated assault, battery, and obstructing a 9-1-1 call. (Id.) When SIS approached Mr. Kelly's apartment, officers observed a Black female and a Black male, later identified as Darryl Faitele, look at the officers and slam the apartment door shut. (Id. at ¶ 47.) The SIS officers believed Mr. Faitele was Mr. Kelly because of their similarities in height, weight, age, and skin complexion, and because Mr. Faitele fled into the apartment where police believed Mr. Kelly was residing. (Id. at ¶ 48.) The SIS officers entered the apartment and asked for Mr. Kelly to come outside. (Id. at ¶ 50.) Mr. Faitele responded to the name Kelly and walked towards the officers. (Id.) After Mr. Faitele refused officers' repeated instructions to get on the ground, Plaintiff placed Faitele on the ground. (Id. at ¶ 51.) Mr. Faitele's chin

was injured in the process, and Plaintiff called EMS to evaluate the injury. (Id. at ¶ 52.)

Plaintiff checked Mr. Faitele's wallet and found identification that suggested the individual was Darryl Faitele rather than Kahlil Kelly. (Id. at ¶ 54.) After the other SIS officers gained control of the situation inside the apartment, Plaintiff informed his team members about the identification he found in Mr. Faitele's wallet. (Id. at ¶¶ 56, 58.) However, the officers could not immediately verify Mr. Faitele's identity because SIS did not have MobileCom access to obtain this information. (Id. at ¶ 58.) As a result, Mr. Faitele's information had to be verified through dispatch, which could not safely be accomplished until after the officers cleared the apartment. (Id.)

Once he was handcuffed, Mr. Faitele began to swear at the officers and became disorderly. (Id. at ¶ 53.) Mr. Faitele also began spitting at the officers with blood in his mouth. (Id. at ¶ 60.) At one point, Plaintiff felt a spray of moisture against the side of his face. (Id.) Plaintiff became concerned because of the possible diseases caried in blood and saliva. (Id. at ¶ 61.) Additionally, the SIS officers had not been provided with masks to minimize their exposure to COVID-19. (Id.) To prevent Mr. Faitele from spitting on the officers, Plaintiff pulled Mr. Faitele's shirt over Mr. Faitele's face for a short time. (Id. at ¶ 63.) Sergeant Arango also tied a shirt around Mr. Faitele's mouth, but the shirt

became untied shortly thereafter and fell to the ground. (Id.)
Eventually, an ambulance arrived and transported Mr. Faitele to
Candler Hospital. (Id. at ¶ 65.) The SIS officers decided against
arresting Mr. Faitele at that time but planned to later obtain an
arrest warrant for simple battery and obstruction. (Id. at ¶ 66.)
SIS was later instructed, without explanation, not to pursue an
arrest warrant for Mr. Faitele.[3]  (Id. at ¶ 67.)

VI.  PLAINTIFF'S INTERNAL AFFAIRS INVESTIGATION AND TERMINATION

On April 27, 2020, Plaintiff was asked to go to the IA office
and surrender his badge, police identification, and equipment.[4]
(Id. at ¶ 69.) Plaintiff was informed that he was being placed on
administrative leave. (Id.) On May 1, 2020, IA gave Plaintiff and
Garrity Form and Notification. (Id. at ¶ 71.) The form omitted any
description of the allegations against Plaintiff. (Id. at ¶ 71.)
The lack of description did not comply with SPD's policies,
including OPS-016, which provides: "[w]hen an employee is notified
that they have become the subject of an [Office of Professional
Standards] investigation, the employee shall be issued a written
or electronic notice of the allegation and the employee's rights

---

[3] Plaintiff alleges "[u]pon information and believe" that the order
not to arrest Faitele "was sent down from Chief Minter." (Doc. 35
at ¶ 68.)
[4] Plaintiff fails to allege the basis for the Internal Affairs
investigation into his conduct; however, it is clear from the
remainder of the amended complaint that the investigation was
related to the incident with Mr. Faitele.

and responsibilities relative to the investigation." (<u>Id.</u> at ¶ 72 (alterations in original).)

On June 10, 2020, the discipline review board had a meeting regarding Plaintiff. (<u>Id.</u> at ¶ 73.) The allegations of misconduct against Plaintiff were listed as: "Conduct Unbecoming, Treatment of Others, and Reporting a Police Response to use of Aggression/Resistance/Force." (<u>Id.</u>) After reviewing the allegations, the discipline review board recommended that Plaintiff receive additional training, be removed from SIS, have his S.W.A.T. membership reviewed, and be suspended for five days. (<u>Id.</u> at ¶ 74.) On June 24, 2020, Plaintiff was summoned to IA for a "mitigation hearing." (<u>Id.</u> at ¶ 75.) At this time, Plaintiff knew neither the conclusions of the disciplinary review board nor the extent of the allegations against him. (<u>Id.</u>) Plaintiff was instructed not to prepare for the hearing and to accept responsibility for his conduct, which Plaintiff did. (<u>Id.</u> at ¶ 76.) At the mitigation hearing, one of the discipline review board members expressed concern about Plaintiff's mental health due to his involvement in an officer involved shooting in 2015. (<u>Id.</u> at ¶ 77.) Plaintiff was also ordered to undergo a psychological examination, and the doctor who examined Plaintiff determined that he was fit for duty but recommended that he continue counseling. (<u>Id.</u> at ¶ 78.)

Instead of following the discipline review board's recommendation, Chief Minter terminated Plaintiff. (Id. at ¶ 79.) Plaintiff alleges that "[u]pon information and belief, [Chief] Minter had knowledge of Group Complaint and Personal Complaint, and he retaliated against Plaintiff for his participation in submitting said Complaints." (Id.) On July 17, 2020, IA gave Plaintiff a Suspension Prior to Termination Form. (Id. at ¶ 80.) Plaintiff was informed that he had one business day to appeal the decision and received a DVD with the IA investigative files. (Id.) However, IA violated OPS-016, a published policy, by failing to provide Plaintiff with a Letter of Transmittal ("LOT"). (Id.) Other officers who were investigated by IA before and after Plaintiff, including Officer Gates were provided with a LOT along with their IA files. (Id. at ¶ 82.)

On July 18, 2020, Plaintiff submitted his request for appeal. (Id. at ¶ 84.) Chief Minter held a hearing for Plaintiff's appeal on July 23, 2020. (Id. at ¶ 85.) Chief Minter sustained his decision to terminate Plaintiff. (Id.) At the hearing, Chief Minter bullied Plaintiff, "telling him that he would fire Plaintiff for anything Minter wanted." (Id.) Plaintiff immediately requested an appeal with Savannah City Manager Pat Monahan. (Id. at ¶ 86.) Mr. Monahan upheld Chief Minter's decision on the ground that Plaintiff had used curse words during his encounter with Mr. Faitele. (Id.) On August 12, 2020, officials for the City of Savannah, including

10

Chief Minter, held a press conference announcing that they were pressing criminal charges against Plaintiff and Sergeant Arango based on their actions during their encounter with Mr. Faitele. (Id. at ¶ 87.) A grand jury ultimately found that there was insufficient evidence to indict Plaintiff. (Id. at ¶ 89.)

VII. <u>PROCEDURAL HISTORY</u>

On April 14, 2021, Plaintiff brought suit against Defendants Chief Minter and the Mayor and Aldermen of the City of Savannah (the "City"), pursuant to 42 U.S.C. § 1985, alleging that Defendants terminated him in retaliation for engaging in constitutionally protected speech and that his termination violated his substantive and procedural due process rights. (Doc. 1 at 30-34.) Plaintiff's original complaint has been amended twice, adding additional allegations and removing the official capacity claim originally brought against Chief Minter. (Docs. 23, 35.) Relevant to this motion, Plaintiff brings the following claims against Chief Minter in the second amended complaint: a retaliation claim under 42 U.S.C. §§ 1983 and 1985; a deprivation of property interest claim under 42 U.S.C. § 1983; an equal protection claim under 42 U.S.C. §§ 1983 and 1985; and claims for punitive damages and attorneys' fees. (Doc. 35 at 25-30.) Chief Minter now moves to dismiss all of Plaintiff's claims against him. (Doc. 37.)

11

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " Id. (quoting Twombly, 550 U.S. at 555, 127 S. Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " Id. (alteration in original) (quoting Twombly, 550 U.S. at 557, 127 S. Ct. at 1966).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. (quoting Twombly, 550 U.S. at 570, 127 S. Ct. at 1974). For a claim to have facial plausibility, the plaintiff must plead factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1261 (11th Cir. 2009) (quotations

12

omitted), abrogated on other grounds by Mohamad v. Palestinian
Auth., 566 U.S. 449, 132 S. Ct. 1702, 182 L. Ed. 2d 720 (2012).
Plausibility does not require probability, "but it asks for more
than a sheer possibility that a defendant has acted unlawfully."
Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949. "Where a complaint
pleads facts that are 'merely consistent with' a defendant's
liability, it 'stops short of the line between possibility and
plausibility of "entitlement to relief." ' " Id. (quoting Twombly,
550 U.S. at 557, 127 S. Ct. at 1966). Additionally, a complaint is
sufficient only if it gives "fair notice of what the . . . claim
is and the grounds upon which it rests." Sinaltrainal, 578 F.3d at
1268 (quotation omitted).

When the Court considers a motion to dismiss, it accepts the
well-pleaded facts in the complaint as true. Id. at 1260. However,
this Court is "not bound to accept as true a legal conclusion
couched as a factual allegation[.]" Iqbal, 556 U.S. at 678, 129 S.
Ct. at 1950. Moreover, "unwarranted deductions of fact in a
complaint are not admitted as true for the purpose of testing the
sufficiency of [plaintiff's] allegations." Sinaltrainal, 578 F.3d
at 1268 (citing Aldana v. Del Monte Fresh Produce, N.A., Inc., 416
F.3d 1242, 1248 (11th Cir. 2005)). That is, "[t]he rule 'does not
impose a probability requirement at the pleading stage,' but
instead 'simply calls for enough fact to raise a reasonable
expectation that discovery will reveal evidence of' the necessary

element." <u>Watts v. Fla. Int'l Univ.</u>, 495 F.3d 1289, 1295-96 (11th Cir. 2007) (quoting <u>Twombly</u>, 550 U.S. at 545, 127 S. Ct. at 1959).

## ANALYSIS

Chief Minter advances three main arguments in support of his motion to dismiss. First, Chief Minter argues that Plaintiff's § 1985 claims are barred by the intracorporate conspiracy doctrine. (Doc. 37, Attach. 1 at 5.) Second, Chief Minter argues that he is entitled to qualified immunity on Plaintiff's individual capacity § 1983 claims. (<u>Id.</u> at 6-11.) Third, because Plaintiff's underlying claims fail, Chief Minter argues that the derivative claims for punitive damages and attorneys' fees are due to be dismissed as well. (<u>Id.</u> at 12.) For the reasons explained below, Chief Minter's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.  PLAINTIFF'S § 1985 CLAIMS ARE BARRED BY THE INTRACORPORATE CONSPIRACY DOCTRINE

In the second amended complaint, Plaintiff brings two claims against Chief Minter under 42 U.S.C. § 1985—a First Amendment retaliation claim and a race discrimination equal protection claim. (Doc. 35 at 25-26, 27-28.) Chief Minter argues that Plaintiff has failed to plead a valid claim for relief under § 1985(3) because under the intracorporate conspiracy doctrine Chief Minter is incapable, as a matter of law, of conspiring with

the City or its employees.[5] (Doc. 37, Attach. 1 at 5.) In response, Plaintiff argues that this case falls under an exception to the intracorporate conspiracy doctrine because Chief Minter acted outside the scope of his employment when he conspired with the City and other officers to retaliate against Plaintiff. (Doc. 48 at 8-10.) Plaintiff also argues that the intracorporate conspiracy doctrine should not apply because a third party was retained to review the HR complaints against Chief Minter. (Id. at 10.)

42 U.S.C. § 1985 provides an action in tort against individuals who conspire to interfere with civil rights. Farese v. Scherer, 342 F.3d 1223, 1231 (11th Cir. 2003) (per curiam) (citing

---

[5] In his brief in support the motion to dismiss, Chief Minter fails to clearly argue whether the intracorporate conspiracy doctrine bars both of Plaintiff's § 1985 claims. (Doc. 37, Attach. 1 at 5.) For example, Chief Minter only discusses Plaintiff's claim that Defendants conspired to deprive him of his First Amendment rights, a claim which is contained in Count II of the Second Amended Complaint. (Id.) Yet, when he discusses the First Amendment claim, Chief Minter cites to Plaintiff's race based equal protection claim, which is contained in Count V of the Second Amended Complaint. (Id. (citing Doc. 35 at ¶ 133).) In his responsive brief, Plaintiff appears to argue that both § 1985 claims fall under exceptions to the intracorporate conspiracy doctrine, although Plaintiff also struggles to delineate whether his arguments pertain to one or both of these claims. (Doc. 48 at 6-10.) While the Court will examine the viability of both § 1985 claims, moving forward, the parties are warned that they must set forth their arguments clearly and distinctly so that the Court can accurately assess their claims and defenses. Monroe Cnty. Emps.' Ret. Sys. v. S. Co., 333 F. Supp. 3d 1315, 1322 (N.D. Ga. 2018) ("It is not the role of the Court to make arguments for the parties but to consider and decide the specific arguments made by the parties." (citing Fils v. City of Aventura, 647 F.3d 1272, 1284 (11th Cir. 2011)).

_Childree v. UAP/GA CHEM, Inc._, 92 F.3d 1140, 1146-47 (11th Cir.
1996)). In the second amended complaint, Plaintiff fails to state
which of the three § 1985 subdivisions applies to his claims.
However, it is clear from Plaintiff's allegations and his arguments
in response to Chief Minter's motion to dismiss that his claims
sound in § 1985(3). (Doc. 48 at 6-7 (citing 42 U.S.C. § 1985(3)).)
To state a claim under § 1985(3), a plaintiff must allege

> (1) defendants engaged in a conspiracy; (2) the
> conspiracy's purpose was to directly or indirectly
> deprive a protected person or class the equal protection
> of the laws, or equal privileges and immunities under
> the laws; (3) a conspirator committed an act to further
> the conspiracy; and (4) as a result, the plaintiff
> suffered injury to either his person or his property, or
> was deprived of a right or privilege of a citizen of the
> United States.

_Jimenez v. Wellstar Health Sys._, 596 F.3d 1304, 1312 (11th Cir.
2010) (citing _Johnson v. City of Fort Lauderdale_, 126 F.3d 1372,
1379 (11th Cir. 1997)). In order to satisfy the first element of
a § 1985 claim, a plaintiff "must show an agreement between 'two
or more persons' to deprive him of his civil rights." _Dickerson v.
Alachua Cnty. Comm'n_, 200 F.3d 761, 767 (11th Cir. 2000) (citing
42 U.S.C. § 1985(3)).

The intracorporate conspiracy doctrine stands for the
proposition that acts of corporate agents made within the scope of
their employment are acts of the corporation itself and, therefore,
cannot form the basis for a conspiracy between the corporate agent
and the corporation. _McAndrew v. Lockheed Martin Corp._, 206 F.3d

1031, 1036 (11th Cir. 2000) (en banc). "Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." Denney v. City of Albany, 247 F.3d 1172, 1190 (11th Cir. 2001) (quoting McAndrew, 206 F.3d at 1036). The Eleventh Circuit has applied the doctrine to public entities such as a city and its employees. Denney, 247 F.3d at 1190 (citations omitted); Grider v. City of Auburn, 618 F.3d 1240, 1262 (11th Cir. 2010) (holding the intracorporate conspiracy doctrine barred § 1983 claims against two city police officers). While some circuits treat the scope of employment question as an exception to the doctrine, the Eleventh Circuit "treats scope of employment more as part of the formulation of the intracorporate conspiracy doctrine itself." Grider, 618 F.3d at 1261 n.30 (citing McAndrew, 206 F.3d at 1036). "[T]he question of whether a defendant acted within the scope of his employment is distinct from whether the defendant acted unconstitutionally." Id. at 1261.

Here, the Court finds that the intracorporate conspiracy doctrine applies as a bar to Plaintiff's § 1985(3) claims. The Court first notes that it is questionable whether Plaintiff has sufficiently alleged that Chief Minter conspired with anyone to deprive Plaintiff of his civil rights. In Count II and Count V, Plaintiff makes only conclusory allegations that Chief Minter conspired with the City and other officers. (Doc. 35 at ¶¶ 117,

133.) Plaintiff also does not allege that any other Savannah employee influenced Chief Minter's decision to terminate Plaintiff, which is the basis for his civil rights claims. The closest Plaintiff comes to asserting involvement by another person is his allegation that Pat Monahan, the City Manager, sustained Chief Minter's decision. (Id. at ¶ 86.) Because Chief Minter fails to argue this point, the Court will assume Plaintiff has sufficiently alleged an agreement between Chief Minter and other City employees. Nevertheless, the intracorporate conspiracy doctrine clearly bars Plaintiff's claims, as Plaintiff's alleged co-conspirators are all agents of the same public entity. Denney, 247 F.3d at 1190-91 (affirming summary judgment on § 1985(3) claim where "no outsiders [were] alleged to be involved").

Furthermore, the Court is unpersuaded by Plaintiff's arguments that Chief Minter acted outside of the scope of his employment. Plaintiff does not allege that Chief Minter lacked authority to discipline police officers; rather, he claims that Chief Minter's choice to discipline him in this instance was unconstitutional.[6] The Eleventh Circuit has clarified that the

---

[6] In his response, Plaintiff contends that Chief Minter acted outside of the scope of his employment when he protected officers with gang affiliations and made untrue statements to the public. (Doc. 48 at 9.) The Court fails to see how this alleged conduct, which occurred prior to the HR complaints made against Chief Minter, could be considered part of a conspiracy to deprive Plaintiff of his rights. The fact that Plaintiff's complaints about this conduct allegedly led Chief Minter to retaliate against him

scope of employment inquiry is focused on "whether the employee . . . was performing a function that, **but for the alleged constitutional infirmity,** was within the ambit of the officer's scope of authority . . . and in furtherance of the employer's business." Grider, 618 F.3d at 1261 (emphasis added). Because Plaintiff has not alleged that terminating officers, if done with a lawful motive, was outside the scope of Chief Minter's job duties, the intracorporate conspiracy doctrine applies. See id. at 1262 ("Our inquiry is not whether Officer Crook had the authority to prosecute in an unconstitutional manner and with malicious intent, but instead whether engaging in prosecutions is part of Crook's job-related powers and responsibilities."); Stern v. Leath, No. 3:18-CV-807-WKW, 2021 WL 2874113, at *4 (M.D. Ala. July 8, 2021) (finding dean acted within scope of authority when threatening teacher about speaking to press, even if he intended to chill speech, because dean had authority to address teacher concerning intra-college conflicts (citation omitted)).

Additionally, the Court rejects Plaintiff's argument that Susan Cox's role shows third-party involvement in the conspiracy. (Doc. 48 at 10.) As Defendant notes, Ms. Cox's only alleged participation in this matter was her review of the HR Complaints made against Chief Minter. (Doc. 50 at 2.) Plaintiff makes no

_____

does not make the underlying conduct part of the conspiracy to retaliate.

allegation, even of a conclusory nature, that Ms. Cox was involved in the decision to terminate Plaintiff or otherwise deprive him of his civil rights. Plaintiff's arguments to the contrary are an improper attempt to broaden the scope of his complaint through a brief opposing a motion to dismiss. See Kuhn v. Thompson, 304 F. Supp. 2d 1313, 1321 (M.D. Ala. 2004) ("It is axiomatic that a plaintiff cannot amend the complaint by arguments of counsel made in opposition to a motion to dismiss." (citations omitted)). Because Plaintiff has failed to present a sufficient reason why the intracorporate conspiracy doctrine does not bar his claims,[7] Chief Minter's motion is **GRANTED IN PART** to the extent he seeks dismissal of Plaintiff's § 1985 claims against him.

II.  CHIEF MINTER HAS NOT SHOWN THAT HE IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S § 1983 CLAIMS

In addition to § 1985, Plaintiff also brings his claims against Chief Minter pursuant to 42 U.S.C. § 1983. (Doc. 35 at 25-28.) According to Chief Minter, Plaintiff's First Amendment claim fails to overcome his defense of qualified immunity for two

---

[7] Other circuits have recognized exceptions to the intracorporate conspiracy doctrine in § 1985 civil rights cases, but these exceptions have not been officially adopted in this circuit. Grider, 618 F.3d at 1262-63. Plaintiff references these exceptions in his brief, but he only argues the "scope of employment" exception applies in this case, which, as the Court has explained, is not actually an exception at all. (Doc. 48 at 7-8, 9.) Because Plaintiff has failed to argue that any other exception applies to the facts of this case, the Court need not consider whether the exceptions can be utilized in this circuit.

reasons. (Doc. 37, Attach. 1 at 7, 10.) First, Plaintiff failed to plead a First Amendment violation because he did not adequately allege that Chief Minter was aware of the HR complaints when he terminated Plaintiff and the <u>Pickering</u> balancing test weighs against finding a constitutional violation. (<u>Id.</u> at 7-9.) Second, even if Plaintiff pled a violation of his constitutional rights, that right was not clearly established law at the time of the alleged violation because a lawful motive existed for terminating Plaintiff, namely his participation in the Faitele incident. (<u>Id.</u> at 10-11.) Finally, Chief Minter briefly argues in a footnote, without citing supporting law, that Plaintiff failed to allege a violation of clearly established law in his due process and equal protection claims. (<u>Id.</u> at 10 n.3.)

In response, Plaintiff argues that Chief Minter failed to establish that he acted within the scope of his discretionary authority and, therefore, is not entitled to a qualified immunity defense. (Doc. 48 at 11-12.) Plaintiff argues that he alleged facts from which the Court can plausibly infer that Chief Minter knew of the HR complaints prior to terminating him and opposes Chief Minter's application of the <u>Pickering</u> balancing test. (<u>Id.</u> at 12-17.) Plaintiff also contends that Chief Minter is not entitled to qualified immunity under a mixed-motive standard because Chief Minter's decision to terminate Plaintiff was based solely on unlawful motives. (<u>Id.</u> at 20-22.) Having considered the parties

arguments, the Court finds that Chief Minter did not establish that he acted pursuant to his discretionary authority, and therefore, the Court must deny his motion to dismiss these claims.

A. Qualified Immunity

"A complaint 'may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint.'" Wall-DeSousa v. Fla Dep't of Highway Safety & Motor Vehicles, 691 F. App'x 584, 589 (11th Cir. 2017) (quoting Quiller v. Barclays Am./Credit, Inc., 727 F.2d 1067, 1069 (11th Cir. 1984), aff'd on reh'g en banc, 764 F.2d 1400 (11th Cir. 1985) (en banc). When a government official is sued in his individual capacity for performing a discretionary function, qualified immunity protects the official from civil liability unless his actions violated clearly established law. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). If it is established that Chief Minter acted within his discretionary authority, Plaintiff "bear[s] the burden 'to establish that [Chief Minter] violated [his] constitutional rights[] . . . and that the right involved was 'clearly established' at the time of the time of the putative misconduct.'" Leslie v. Hancock Cnty. Bd. of Educ., 720 F.3d 1338, 1345 (11th Cir. 2013) (quoting Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012)).

However, it is the defendant's burden to establish that he was acting within his discretionary authority. Kjellsen v. Mills, 209 F. App'x 927, 929 (11th Cir. 2006) (per curiam) (citing Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003); see also Espanola Way Corp. v. Meyerson, 690 F.2d 827, 830 (11th Cir. 1982) ("Aside from affirmatively asserting the [qualified immunity] defense, defendants must prove that their acts fall within the scope of discretionary authority."). To satisfy this burden, a defendant must set forth "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (quotation omitted). The appropriate inquiry is whether "the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004) (citation omitted).

The Court agrees with Plaintiff that Chief Minter has failed to assert facts showing that he was acting within the scope of his discretionary authority when he decided to terminate Plaintiff. (Doc. 48 at 12.) Chief Minter, in his brief in support of the motion to dismiss, fails to make any argument about discretionary authority and, instead, analyzed only whether Plaintiff could

23

overcome the qualified immunity defense. (Doc. 37, Attach. 1 at 6-11.) Chief Minter addresses the issue for the first time in his reply brief. (Doc. 50 at 3-4.) Even assuming Chief Minter's new arguments are properly before the Court, see Pattee v. Ga. Ports Auth., 477 F. Supp. 2d 1272, 1274 (S.D. Ga. 2007) ("Many district courts in the Eleventh Circuit reject new arguments raised in reply briefs." (collecting cases)), Chief Minter's arguments amount to nothing more than the "bald assertion" that Chief Minter was acting pursuant to his discretionary authority, Espanola, 690 F.2d at 830 ("A bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice."). Although Chief Minter may believe "no reasonable argument can be made that [he], as Chief of Police, was not acting within the scope his discretionary authority[,]" it is still his burden to satisfy, and it is not enough to say that "Plaintiff [does not] assert that Chief Minter [did not] have the authority to fire him." (Doc. 50 at 3.) Chief Minter appears to imply that the answer to the discretionary authority inquiry is so self-evident that it is unnecessary for him to make the argument. However, even if terminating employees is generally one of Chief Minter's job functions, there still may be questions about whether Chief Minter executed that function "in an authorized manner[,]" which is a relevant question in the discretionary authority inquiry. Holloman, 370 F.3d at 1266. Without a substantive argument

24

from Chief Minter, the Court is incapable of accurately answering these questions. Monroe Cnty. Emps.' Ret. Sys. v. S. Co., 333 F. Supp. 3d 1315, 1322 (N.D. Ga. 2018) ("It is not the role of the Court to make arguments for the parties but to consider and decide the specific arguments made by the parties." (citing Fils v. City of Aventura, 647 F.3d 1272, 1284 (11th Cir. 2011)).

The two cases that Chief Minter relies on are distinguishable as the courts in those cases expressly stated that the parties did not dispute whether the government employee acted within his discretionary authority. Stanley v. City of Dalton, 219 F.3d 1280, 1285 (11th Cir. 2000) ("It is undisputed that Chadwick acted within his discretionary authority in terminating Stanley."); Folks v. Tuscaloosa Cnty. Sheriff's Dep't, No. 7:07-CV-01726-LSC, 2008 WL 11422705, at *5 n.10 (N.D. Ala. Apr. 17, 2008) ("Plaintiffs do not dispute that Defendant was acting within his discretionary authority."). Here, where Plaintiff disputes the issue and no factual record has been developed, the Court finds that Chief Minter has failed to meet his burden of establishing that he was acting within his discretionary authority.[8] Mar. Petroleum Assocs.,

_____

[8] The Court sees no conflict between this holding and its decision respecting Plaintiff's § 1985 claims despite some obvious overlap between the scope of employment and discretionary authority inquiries. To state a claim under § 1985, it is Plaintiff's responsibility to allege facts showing the existence of a conspiracy, which, in this case, required Plaintiff to allege that Chief Minter acted outside the scope of his employment to avoid the intracorporate conspiracy doctrine. As stated above, Plaintiff

LLC v. City of Ft. Lauderdale, No. 10-62463-CIV-ZLOCH, 2011 WL 13217294, at *3-4 (S.D. Fla. July 27, 2011) (denying motion to dismiss on qualified immunity grounds where defendants "offer[ed] no more than a blanket one-line assertion that they were acting within their discretionary authority[]"); Street v. City of Bloomingdale, No. CV406-256, 2007 WL 1752469, at *3 (S.D. Ga. June 15, 2007) ("Defendants have failed to even address whether their actions were part of their discretionary job functions. Accordingly, their motion to dismiss on qualified immunity grounds is **DENIED**." (emphasis in original)). As a result, Chief Minter's motion is **DENIED IN PART** to the extent he seeks dismissal of Plaintiff's § 1983 claims on qualified immunity grounds.

III. PUNITIVE DAMAGES AND ATTORNEYS' FEES

Because the Court has denied Chief Minter's motion to dismiss some of Plaintiff's underlying claims, his motion is **DENIED IN PART** to the extent he seeks dismissal of Plaintiff's punitive damages and attorneys' fees claims as derivative.

---

is not required to allege any such facts to overcome a qualified immunity defense; rather, Chief Minter must first address the discretionary authority issue before the burden shifts. Because a different party bears the burden for each claim, it is logically consistent to find both that Plaintiff failed to state a claim under § 1985 and that Defendant failed to carry its burden to raise a qualified immunity defense. See Conner v. Tate, 130 F. Supp. 2d 1370, 1378 (N.D. Ga. 2001) (finding officers were not entitled to qualified immunity where neither party addressed in its brief whether the officers were acting within their discretionary authority).

**CONCLUSION**

For the foregoing reasons, Chief Minter's motion to dismiss (Doc. 37) is **GRANTED IN PART** and **DENIED IN PART**. As a result, Plaintiff's claims against Chief Minter brought pursuant to 42 U.S.C. § 1985 are **DISMISSED**. Plaintiff's claims against Chief Minter brought pursuant to 42 U.S.C. § 1983 and his claims for attorneys' fees and punitive damages remain pending.

SO ORDERED this _31ˢᵗ_ day of March 2022.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA