EXHIBIT 4

1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

```
DANIEL KANG,                      )
                                  )
            Plaintiff,            ) CIVIL ACTION NO.:
                                  )
       vs.                        ) 4:21-cv-111-RSB-CLR
                                  )
THE MAYOR AND THE ALDERMEN        )
OF THE CITY OF SAVANNAH           )
and ROY W. MINTER, JR.,           )
CHIEF OF POLICE FOR THE           )
CITY OF SAVANNAH, GEORGIA,        )
in his individual and             )
official capacities,              )
                                  )
_____Defendants._____  )
```

## DEPOSITION OF

## GARY VOWELL

2:23 p.m.

December 21, 2022

Savage Turner Pinckney Savage & Sprouse
102 East Liberty Street
Savannah, Georgia

Annette Pacheco, RPR, RMR, CCR-B-2153

**Gilbert & Jones**
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
*Brunswick*, GA 31520

*gilbertandjones1@gmail.com*
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
*Savannah*, GA 31406

EXHIBIT 4

2

```
 1              APPEARANCES OF COUNSEL

 2    On behalf of the Plaintiff:

 3        BRENT J. SAVAGE, Esq.
          SAVAGE TURNER PINCKNEY SAVAGE & SPROUSE
 4        102 East Liberty  Street
          Savannah, Georgia  31401
 5        912-231-1140
          bsavage@savagelawfirm.net
 6
          MICHAEL G. SCHIAVONE, Esq. (By videoconference)
 7        JACKSON & SCHIAVONE
          1111 Bull Street
 8        Savannah, Georgia  31401
          912-232-2646
 9        js_law@bellsouth.net

10
      On behalf of the Defendant The Mayor and the Aldermen
11    of the City of Savannah:

12        PATRICK T. O'CONNOR, Esq. (By videoconference)
          PATTY TANZER PAUL, Esq. (By videoconference)
13        OLIVER & MANER, LLP
          218 West State Street
14        Savannah, Georgia  31401
          912-236-3311
15        ptoconnor@olivermaner.com
          ppaul@olivermaner.com
16

17    On behalf of the Defendant Roy W. Minter, Jr.:

18        SHAWN A. KACHMAR, Esq. (By videoconference)
          HUNTER, MACLEAN, EXLEY & DUNN
19        200 East Saint Julian Street
          Savannah, Georgia  31401
20        912-236-0261
          skachmar@HunterMaclean.com
21

22
      Also Present:  Daniel Kang
23                   Octavio Arango

24
                           - - -
25
```

GILBERT & JONES

EXHIBIT 4

Page 3

**INDEX TO EXAMINATIONS**

| Examination | Page |
| --- | --- |
| Examination by Mr. Kachmar | 4 |
| Examination by Mr. O'Connor | 38 |
| Examination by Mr. Savage | 48 |

- - -

GILBERT & JONES

Page 4

(Reporter disclosure made pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia.)

MR. KACHMAR: This will be the deposition of Gary Vowell taken pursuant to notice and agreement of counsel for all purposes allowed by law.

Madam Court Reporter, could you swear the witness, please.

GARY VOWELL, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. KACHMAR:

Q. Mr. Vowell, good afternoon. My name is Shawn Kachmar. I'm an attorney for Chief Roy Minter in this lawsuit. Also on the line are counsel for the City of Savannah.

Have you ever been deposed before?

A. Yes, sir.

Q. Okay. So you know how it goes. Because we're on Zoom and there are technology lags, etcetera, I will try to let you finish answering before I ask a question. And, likewise, if you let

GILBERT & JONES

Page 5

me finish asking before you answer, we'll try to keep a clear record for the court reporter; is that fair?

A. That's fair. Yes, sir.

Q. Okay. And I'm sure she will remind you, but a yes or a no or a word as opposed to a nod of the head or a murmur is better for the record. Okay?

A. That's correct. Yes, I understand.

Q. Great. I try to ask clear questions, but sometimes I don't. If I ask you a question and you don't understand the question, would you please tell me that you don't understand or ask me for clarification?

A. Sure. Yes, sir.

Q. Okay. And if I ask you a question and you answer it, can I assume that you understood the question?

A. Yes, sir.

Q. Okay. Thanks. Mr. Vowell, I reviewed the August 17, 2021, report that you issued in this case. Have you looked at that report since you issued it?

A. Yes, sir, I have.

Q. Okay. And let me ask you a few questions about it. On page 1, paragraph 1 listed, it says Qualifications. Do you see that?

A. Yes, sir.

GILBERT & JONES

Page 6

Q. All right. Is that a full and complete list of all of your qualifications?

A. There's two additions that I failed to put on there yet. I attended the Georgia Chiefs of Police training in 2020. I think that was in Duluth, Georgia. That was while I was serving as commissioner of the Department of Public Safety. It was a requirement.

And also I currently serve on the Georgia DNR board and serve as a secretary of that board.

Q. Do you have a separate CV or resumé that you keep current?

A. I'm sure my wife does, yes, sir. My secretary, my wife.

Q. If you remember, if you could get that to Mr. Savage's office.

A. Yes, sir.

Q. Thank you. Are you currently employed?

A. Not full time, no, sir.

Q. Okay. And you serve as an expert witness on a part-time basis?

A. Yes, sir.

Q. Okay. And you also serve on the Georgia DNR board?

A. That's correct.

GILBERT & JONES

EXHIBIT 4

## Page 7

Q. Do you served on any other boards or commissions?

A. Not at this time. No, sir.

Q. Okay. Starting at the bottom of page 1 of your report and over to page 2, there's a list of matters in which you state you've testified as an expert witness in state and federal courts in the last five years. Is that a full and complete list of all matters where you either served as a testifying expert or otherwise?

A. Yes, sir.

Q. Okay.

A. I have other pending cases, but, yes, sir, I've served on these.

Q. Okay. So did you issue an expert opinion in each of the cases listed?

A. Best of my knowledge, yes, sir. It would be in the file.

Q. Okay. And you've also issued an expert opinion in this case; correct?

A. Yes, sir.

Q. Are there any other cases where you issued either a written expert opinion or given testimony and verbally presented an expert opinion other than what's listed in your expert report and in this case?

## Page 8

A. No, sir. I think that's complete.

Q. All right. Let me ask you about the report itself. Did you write the report or did someone send you a template?

A. I wrote the report. It's my report.

Q. Okay. Did you work with Mr. Register at all in drafting your report?

A. No, sir.

Q. Did you share any drafts of your report with anyone before you issued a final report?

A. I sent the report to, directly to Brent.

Q. The final or a draft?

A. This is the final, yes, sir.

Q. Did you send any draft reports to anyone?

A. No, sir.

Q. Okay. So the only report you ever shared with Mr. Kang's attorneys is your final report; is that correct?

A. Yes, sir.

Q. Did you assist Mr. Register with drafting his report?

A. No, sir.

Q. Mr. Vowell, as we sit here today, do you have any personal knowledge that Chief Minter or Pat Monahan, the city manager for the City of

## Page 9

Savannah at the time, discriminated against Officer Kang because of his race?

A. Not that I'm familiar with, no, sir.

Q. Okay. In the report on page 2, paragraph 3, you list materials reviewed, and the items listed are the complaint. I assume by that you mean the complaint filed in this lawsuit; correct?

A. That's correct, yes, sir.

Q. Okay. You list a motion to dismiss filed by Chief Minter, an answer filed by the City of Savannah, 26(a) disclosures by the defendants and Mr. Kang, information provided by the city pursuant to the Freedom of Information Act request and Mr. Kang's affidavit dated August 17, 2021. Do you see that --

A. Yes, sir.

Q. -- list of materials?

A. Yes, sir.

Q. Okay. Did you review any other materials other than what's listed here prior to drafting and issuing your expert report?

A. The only other materials that I've reviewed other than what's listed here is a report by Arango, Officer Arango, and a time line.

Q. Okay. Who gave you those pieces of

## Page 10

information? Were they documents?

A. Yes, sir. Mr. Savage provided them for me.

MR. KACHMAR: So, Brent, I want to be careful. I don't want to ask about anything that's privileged.

MR. SAVAGE: Yeah. No. No. Ask away. I mean, I think that this is not a guy who's a professional witness. So I think your question was did he look at anything prior to issuing his report.

He -- I think he got Kang's time line after he issued the report, and I think he's got Arango's. Basically what it is is Arango's Power Point for his appeal. And I'll give you both those if you don't have them already.

Q. (By Mr. Kachmar) Well, to your knowledge, Mr. Vowell, were both of those documents or pieces of information shared as discovery in this case?

MR. KACHMAR: And maybe, Brent, you need to answer that.

MR. SAVAGE: Darn if I know. I mean, I don't really do discovery very much. But --

MR. KACHMAR: Let's do this.

Q. (By Mr. Kachmar) Mr. Vowell, I'll also

EXHIBIT 4

**11**

1 ask that those two additional materials, the report
2 by Mr. Arango and the time line you referenced, if
3 you could ensure you send them to Mr. Savage, and
4 then he can determine whether to produce them or not.
5     MR. SAVAGE: I know what they are. We'll
6 produce them to you at the first break.
7     MR. KACHMAR: Okay.
8     Q. (By Mr. Kachmar) Mr. Vowell, did you
9 review the audio or the transcript of Officer Kang's
10 interview with internal affairs related to this
11 appeal incident?
12     A. No, sir. I've not seen that video.
13     Q. Okay. Well, it was audio.
14     A. Audio.
15     Q. There was also a written transcript.
16 Okay.
17     Did you review any body-worn camera
18 footage?
19     A. From the scene, yes, sir.
20     Q. Okay. Do you recall whose body-worn
21 camera footage it was?
22     A. Some was Officer Arango, and I think the
23 majority of it was Kang.
24     Q. So the best of your recollection, you've
25 reviewed at least two different videos from Kang and
    GILBERT & JONES

**12**

1 from Arango?
2     A. Yes, sir.
3     Q. Okay. And how was that provided to you?
4 Was it on a flash drive? Was it on a CD? Was it
5 uploaded?
6     A. Flash drive.
7     Q. Okay. And did you review that before or
8 after drafting and issuing your report?
9     A. Before.
10     Q. Okay. Did you review the Power Point
11 Officer Kang used at various stages prior to his
12 termination in which he lists some mitigating factors
13 he wanted considered?
14     A. No, sir. Not prior.
15     Q. Did you review the testimony of
16 Richard Register in this case?
17     A. No, sir.
18     Q. Okay. During Mr. Register's deposition, I
19 asked him whether Chief Minter, as chief of police,
20 at the time had the authority to make discipline
21 decisions regarding Officer Kang, and he said that he
22 did. Would you agree with Mr. Register?
23     A. No, sir.
24     Q. Why not?
25     A. The chief of police is not a
    GILBERT & JONES

**13**

1 constitutional officer. He's appointed. And subject
2 to any policies and procedures, I presume that the
3 chief of police has to run that by the city council,
4 if you will. And any decision he makes, I would
5 assume that the county -- the city government would
6 have -- would need to be notified.
7     Q. Okay. When you were -- strike that.
8     What's your opinion of what authority, if
9 any, the chief of police for the City of Savannah has
10 in making discipline decisions for officers in the
11 department?
12     A. In this particular incident or overall?
13     Q. Just generally.
14     A. Sure, at times. It's according to the
15 circumstances. But I don't know what their complete
16 policy is.
17     Q. Mr. Register also said that based on what
18 he had reviewed of Officer Kang's conduct during the
19 Faitele incident, that some form of discipline might
20 be reasonable. Would you agree with that?
21     A. I agree.
22     Q. Mr. Vowell, have you had any contacts with
23 any appointed or elected officials with the city of
24 LaGrange in relation to this case?
25     A. I vaguely know the police chief. He
    GILBERT & JONES

**14**

1 taught a block in the -- in the Georgia Chiefs of
2 Police school, and also he served on the Board of
3 Public Safety while I was commissioner of the
4 Department of Public Safety.
5     Q. Okay. Are you talking about
6 Chief Deckmar?
7     A. That's correct.
8     Q. Okay. My question was: Have you had any
9 contact with any appointed or elected officials with
10 the city of LaGrange in relation to this case?
11     A. No, sir.
12     Q. In issuing your expert report, did you
13 rely upon or refer to any national or state
14 guidelines or recommended best practices that would
15 apply or inform your opinion?
16     A. I based my opinions on my work experience
17 and my almost 40 years of law enforcement and
18 especially majority of that spent in supervision.
19     Q. Okay. So the answer is no?
20     A. No.
21     Q. You've relied on your experience?
22     A. That's correct.
23     Q. Okay. One of your opinions is that
24 Chief Minter should not have been involved in the
25 discipline or firing of Officer Kang; correct?
    GILBERT & JONES

EXHIBIT 4

**Page 15**

1 A. That's correct.
2 Q. I'm sorry?
3 A. He should not have, that's correct.
4 Q. Okay. And, in part, you base that opinion
5 on what you said was a conflict of interest that
6 Chief Minter had because Officer Kang had
7 participated in a group complaint filed with the city
8 about the chief and also an individual complaint;
9 correct?
10 A. That's correct.
11 Q. Okay. Would you agree that if the group
12 complaint or the individual complaints had not been
13 filed, Chief Minter had the authority to make
14 discipline decisions regarding Officer Kang?
15 A. No. I can't make that determination.
16 Q. Why not?
17 A. You can't unring the bell. There's other
18 reasons that's in my report why he should not have
19 fired Kang other than conflict of interest.
20 Plus, as stated in here, this -- this
21 report could change as the case progresses.
22 Q. Okay. Mr. Vowell, I didn't ask you if he
23 should have fired Officer Kang. What I asked you
24 specifically was if the -- if the group complaint and
25 individual complaint had not been filed, did the
GILBERT & JONES

**Page 16**

1 chief of police have the authority to make a
2 discipline decision regarding Officer Kang?
3 MR. SAVAGE: You didn't talk, Shawn, about
4 objections and all. I object to your question.
5 Once, as Barefield said in his sworn testimony
6 two weeks ago, they came to the conclusion that
7 there's potential criminal liability for Kang
8 and Arango, they never should have gone forward
9 with any disciplining.
10 MR. KACHMAR: All right. What's your
11 objection, Mr. Savage?
12 MR. SAVAGE: That's my objection. I mean,
13 you just can't ask these questions that don't
14 bear on the facts in the case and then try to
15 sweep in with a federal judge to get summary
16 judgment.
17 Q. (By Mr. Kachmar) Mr. Vowell, you can go
18 ahead and answer the question.
19 A. Repeat your question again, please.
20 Q. If the -- if the group complaint and
21 individual complaint had not been filed, did the
22 chief of police have the authority -- say there was
23 no conflict of interest -- does the chief of police
24 have the authority and ability to make a discipline
25 decision about Officer Kang?
GILBERT & JONES

**Page 17**

1 A. No, sir. I don't think so.
2 Q. Okay. And your opinion is based on
3 whatever's in your report; correct?
4 A. Yes, sir.
5 Q. Are there any factors other than what's in
6 your report that you're relying on to make your
7 answer right now?
8 A. Well, I've not been provided with
9 information concerning the Douglas Factors, and I've
10 seen no -- no letter of --
11 MR. SAVAGE: Transmittal.
12 A. Committal from them.
13 MR. SAVAGE: Transmittal.
14 A. Transmittal. I'm sorry. And no evidence
15 that they were ever explained, Officer Kang was ever
16 explained what the allegations were against him prior
17 to his administrative hearing.
18 Q. (By Mr. Kachmar) All right. Mr. Vowell,
19 apparently I'm not being clear. I'm not asking you
20 about process or the substance of the decision. I'm
21 just asking a basic question. Does the chief of
22 police have the authority to make a discipline
23 decision?
24 MR. SAVAGE: I'm going to object -- I'm
25 going to object to that. I mean, you're just
GILBERT & JONES

**Page 18**

1 taking all the facts out of the case. Minter
2 broke his own policies. He can't discipline
3 people when he breaks his own policies.
4 MR. KACHMAR: Mr. Savage, what is your
5 specific objection? I object to your talking
6 objections trying to coach the witness.
7 MR. SAVAGE: I'm not trying to coach
8 anybody. Your questions are unfair. I talked
9 to you about whether Minter wanted to try to
10 settle this case. You never get back to me.
11 The city's elicited listed settlement
12 discussions. So --
13 MR. KACHMAR: There's no requirement that
14 questions be fair. If you have an objection,
15 make your objection. Please stop your speaking
16 objections trying to coach the witness.
17 MR. SAVAGE: I'm not trying to coach him.
18 But I would never go on record as a lawyer in
19 this state saying it's no -- I have no
20 requirement that my questions be fair.
21 MR. KACHMAR: Okay.
22 MR. SAVAGE: That's outrageous that
23 lawyers don't have to be fair.
24 MR. KACHMAR: You have your objection.
25 Q. (By Mr. Kachmar) Mr. Vowell, are you
GILBERT & JONES

EXHIBIT 4

## Page 19

1 going to answer my question or not?
2    A.    I answered your question. I said no.
3    Q.    Okay. If the evidence in the case showed
4 that Mr. -- that Chief Minter had no knowledge that
5 Officer Kang signed the group complaint or submitted
6 an individual complaint, would your opinion change at
7 all?
8    A.    No.
9    Q.    Why?
10    A.    I'm not being coached by Mr. Savage. I'm
11 quite familiar with policies. If you set policies,
12 you follow your own policies. You don't say don't do
13 as I do, do as I say do. And that's exactly what
14 Chief Minter did.
15         He has -- he has the legal position that
16 he has -- he needs or should excused himself from
17 this particular case. And I know you didn't ask for
18 an explanation. I apologize.
19    Q.    Let me ask it a different way then. Your
20 opinion is that Chief Minter had a conflict of
21 interest because Officer Kang had submitted an
22 individual complaint and signed the group complaint;
23 correct?
24    A.    That's correct.
25    Q.    Is it your -- is it your opinion that
GILBERT & JONES

## Page 20

1 Chief Minter would still have a conflict of interest
2 if he had no knowledge that Officer Kang had signed
3 the group complaint or submitted the individual
4 complaint?
5    A.    Would he still have the authority?
6    Q.    Would he still have a conflict of
7 interest?
8         MR. SAVAGE: That's a legal conclusion.
9 So that's my objection.
10    A.    I don't know.
11    Q.    (By Mr. Kachmar) Is it your opinion that
12 if any employee of a police department submits a
13 complaint to human resources, that any supervisor
14 above that employee would not be permitted to make
15 personnel decisions about that employee?
16         MR. SAVAGE: Let me -- let me object to
17     that question. This -- these are complaints
18     against Minter personally. So that question is
19     not going to any of the facts in this case.
20    Q.    (By Mr. Kachmar) Mr. Vowell, you can
21 answer the question.
22    A.    Could you repeat the question.
23    Q.    Is it your opinion that if any employee
24 within a police department files a complaint with
25 human resources about someone above them in the chain
GILBERT & JONES

## Page 21

1 of command, that no one in that chain of command can
2 make a personnel decision about that employee?
3    A.    That's my opinion, yes, sir.
4    Q.    Okay. And would your -- does your opinion
5 change if the person in the chain of command did or
6 did not have knowledge of the complaint?
7    A.    If they didn't have knowledge, I wouldn't
8 have any heartburn about it.
9    Q.    In paragraph 1 of your opinion -- I'm
10 sorry. It's 1, 2, page 3, paragraph 4 is titled
11 Opinions. And then under that section, paragraph 1
12 starts off with "Roy Minter should not have." Do you
13 see that paragraph, sir?
14    A.    I'm with you.
15    Q.    Okay. At the end of that paragraph, you
16 said, "The fact that the city manager would review
17 the firing of Dan Kang in no way absolves the actions
18 of Roy Minter in participating in the firing of
19 Dan Kang."
20         And then here's the sentence I'm curious
21 about: "This includes having any input with internal
22 affairs or any review panel deciding Daniel Kang's
23 fate for the April 14, 2020, incident at issue in
24 this case."
25         Can you explain to me what you mean by
GILBERT & JONES

## Page 22

1 that last sentence?
2    A.    Well, I believe internal affairs had
3 recommended suspension of five days. And I believe,
4 according to what I reviewed and seen, that would
5 have been a proper, more proper form of discipline
6 than firing.
7    Q.    So you agree that some form of discipline
8 was okay. You disagree about the severity of
9 discipline in this case; is that correct?
10    A.    Yes.
11    Q.    Do you have any --
12         MR. SAVAGE: Well, let me -- let me put
13     this objection on. He don't follow policies.
14         THE COURT REPORTER: I'm sorry.
15     Mr. Kachmar, there was some talking over here.
16     If you could start over.
17         MR. KACHMAR: Okay. Sure.
18    Q.    (By Mr. Kachmar) Mr. Vowell, do you have
19 any evidence or are you aware of any evidence that
20 Chief Minter gave direction to internal affairs or to
21 the discipline review panel in this case about what
22 decisions either one of them should make?
23    A.    I do not have any physical evidence to
24 address that.
25         MR. SAVAGE: He's not following his own
GILBERT & JONES

EXHIBIT 4

**23**

1  policies.
2     A.   Other than Roy Minter didn't follow his
3  own -- own policies.  That's made the heartburn I
4  have with it, with his discipline.
5     Q.   (By Mr. Kachmar)  So in paragraph 2 of
6  your opinion, the second sentence, you said:  "The
7  video of the encounter with Dan Kang and his
8  affidavit shows the city had not provided Mr. Kang
9  with appropriate personal gear."  Do you see that?
10    A.   I do.
11    Q.   Okay.  So just to be clear, when you say
12 "the video of the encounter with Dan Kang," you're
13 talking about either Dan Kang or Officer Arango's
14 body-worn camera footage from the incident; is that
15 correct?
16    A.   Yes, sir.
17    Q.   Okay.  Would your opinion change at all if
18 the evidence was that Officer Kang and Officer Arango
19 were told to go to the quartermaster for any
20 equipment they might need?
21    A.   I'm not privy to that, if they had that
22 information given to them or not.  And I'm not going
23 to answer the question on what should have and who
24 should have issued what.
25    Q.   Were you actively employed in April of

GILBERT & JONES

**24**

1  2020?
2     A.   I was.
3     Q.   What was your position?
4     A.   As I explained to you earlier, I was the
5  commissioner of the Department of Public Safety and
6  the colonel of the Georgia State Patrol.
7     Q.   Did all of the officers in the Department
8  of Public Safety and Georgia State Patrol have full
9  access to PPE in April of 2020?
10    A.   To the best of my recollection, we did.
11 And, also, we shipped, flew, trucked PPE all over the
12 state of Georgia to first responders and law
13 enforcement.
14    Q.   Do you recall if any of that was shipped
15 to the Savannah Police Department?
16    A.   I can only assume that they received some.
17 I'm not --
18       MR. SAVAGE:  If they asked for it.
19    A.   -- sure.
20    Q.   (By Mr. Kachmar)  All right.  Would you
21 agree that in the first six months of 2020 when COVID
22 was really starting to hit, that there were some PPE
23 shortages around the state of Georgia?
24    A.   Yes, sir.  I understand.
25    Q.   Okay.

GILBERT & JONES

**25**

1     A.   And remember.
2     Q.   Do you have any -- do you have any
3  specific evidence of what PPE related to COVID
4  specifically was available to the Savannah Police
5  Department in April of 2020?
6     A.   No, sir.
7     Q.   In paragraph 4 of your opinion, you said
8  that the officers wanted to charge Mr. Faitele with
9  obstruction and simple battery and, quote, these
10 charges were agreed to by their superiors only to be
11 countermanded by Chief Minter.  Do you see that?
12    A.   I see it.
13    Q.   What evidence did you rely on to state
14 that the charges were countermanded by Chief Minter?
15    A.   In, I believe it was in Daniel Kang's time
16 line of events or his affidavit.  I can't remember
17 which it was.
18    Q.   But it wasn't direct evidence; correct?
19 It was either Mr. Kang's affidavit or a time line
20 here someone had put together; correct?
21       MR. SAVAGE:  I don't know what direct
22    evidence is.  I mean, if you're calling Kang a
23    liar who helped serve on four tours of duty in
24    the Middle East and is assigned to Centcom.
25       MR. KACHMAR:  Mr. Savage, what's your

GILBERT & JONES

**26**

1  objection?
2        MR. SAVAGE:  What's direct evidence?  I
3     mean, he signed affidavits.  I don't know what
4     the answer to that is.
5        MR. KACHMAR:  Okay.  I'm asking Mr. Vowell
6     what he relied on in making that statement.
7        MR. SAVAGE:  And he gave you the answer.
8     And you said, well, that's not direct evidence.
9     I don't think that's --
10    Q.   (By Mr. Kachmar)  Do you have any personal
11 information that Chief Minter countermanded --
12       MR. SAVAGE:  He's told you what his
13    evidence was.
14    Q.   (By Mr. Kachmar) -- those recommendations?
15    A.   I've answered that question, sir.
16    Q.   No, you haven't.  I've asked you if you
17 have any personal information that Chief Minter
18 countermanded those recommendations.
19       MR. SAVAGE:  He's answered your question.
20    He's told you what it is.  It's Kang's time line
21    and Kang's affidavit.  And an --
22    Q.   (By Mr. Kachmar)  The answer to the
23 question is no; correct?
24       MR. SAVAGE:  -- and an affidavit is direct
25    evidence.

GILBERT & JONES

EXHIBIT 4

**Page 27**

Q. (By Mr. Kachmar) Mr. Vowell, the answer to my question is no; correct?

MR. SAVAGE: No, he's answered your question.

A. I'm going to rely on my -- my prior answer that I feel like I've answered your question.

Q. (By Mr. Kachmar) Okay. Paragraph 6 of your opinion starts off "In paragraphs 8 to 13 of Daniel Kang's affidavit." Do you see that paragraph, sir?

A. Yes, sir.

MR. SAVAGE: Let me get Kang's affidavit for you. Do you have it?

Q. (By Mr. Kachmar) And that entire paragraph is about Officer Adrian Gates; correct?

MR. SAVAGE: Hold on just a second. Shawn. I'm trying to get him the affidavit.

A. I left my affidavit of Kang in another office. But your question was does the whole paragraph pertain to Officer Adrian Gates? Is that -- was that your question?

Q. (By Mr. Kachmar) Yeah. It was a poor question. So paragraph 6 of your opinion is about Officer Gates. And then you give some opinions about Gates's discipline versus Kang's discipline; correct?

**Page 28**

A. That's correct.

Q. Okay. So my question is: In relying -- in forming your opinion, paragraph 6, did you rely entirely on Daniel Kang's affidavit?

A. I did.

Q. Okay. Did you review Officer Gates's -- any files related to Officer Gates before reaching your opinion?

A. I've not been provided any.

Q. Are you aware that Officer Gates was fired?

MR. SAVAGE: Eventually.

A. Mr. Savage said eventually, but I had no information or knowledge that he was fired back in 2020.

Q. (By Mr. Kachmar) As we sit here today, can you state whether the conduct of Officer Kang was accused of and the conduct Officer Gates was accused of was the same or similar?

A. No, sir.

MR. SAVAGE: No, sir, you can't? Or no, sir, you don't believe it?

A. I don't believe it.

Q. (By Mr. Kachmar) All right. You said earlier that one of your criticisms of Chief Minter

**Page 29**

was that he failed to follow policy; correct?

A. Correct.

Q. Okay. Did you review OPS 16, which is the document governing internal affairs complaints and discipline?

A. I did.

Q. Did you review the draft policy as well?

A. I have OPS 016 Office of Professional Standards, August 29th, 2018.

Q. Is that the only policy you reviewed?

A. That's the only one I have. I've not seen any amendments to it.

Q. Okay. In paragraph 7 of your opinion, sir, you say: "It's my understanding Chief Minter used, in part, draft policies in disciplining firing Daniel Kang." Do you sea that in your opinion?

A. Yes, sir.

Q. Okay. What draft policies are you referring to?

A. I'm not sure, but I think it's in Kang's time line. I can't be for certain, but I believe that's where I obtained that information.

Q. Okay. Did you review the actual draft policy or did you just rely on Officer Kang's statement that draft policies were used?

**Page 30**

A. I used what I was provided, which was Arango's time line -- Arango's time line, Daniel Kang's time line and Kang's affidavit.

MR. SAVAGE: I've given him excerpts of depositions since then. So, I mean I --

Q. (By Mr. Kachmar) As you sit here today, in forming your opinion, you don't recall whether you reviewed draft policies; is that accurate?

A. That's accurate.

Q. Okay. So please describe for me why your opinion is that Chief Minter failed to follow policy.

MR. SAVAGE: I gave you Gavin's deposition.

Q. (By Mr. Kachmar) Are you being handed some documents, sir?

A. No, sir. This is my documents I brought myself. You know, if you want to see my documents, sir, you should have been here. I am not relying on anybody's notes. Okay?

Q. I'm just asking what you're referring to.

A. No, you didn't.

Q. Yes, I did.

A. You asked me if somebody was handing me notes.

Q. I said -- I'm asking you what documents

**Page 31**

1 you're looking at.
2    A.   Right now I'm looking at Daniel Kang's
3 time line. Okay? I didn't bring my complete file in
4 here because it's about that thick.
5    Q.   Okay. Well, Mr. Savage also said he was
6 looking for some documents to hand you. I just want
7 to make sure we understand what you're looking at
8 while you're testifying.
9       MR. SAVAGE: I don't think I said to hand
10    to him. I said he doesn't have Kang's affidavit
11    in front of him.
12    Q.   (By Mr. Kachmar) So my question was:
13 Please describe for me what -- how you came to the
14 opinion that Chief Minter failed to follow policy?
15    A.   Well, why don't you refer back to my first
16 opinion to answer that question. Plus I've got
17 Gavin's --
18       MR. SAVAGE: Deposition.
19    A.   -- deposition, which I haven't reviewed in
20 full. Don't hold me to it that I gained that from
21 Arango's appeal for termination or anything. It
22 could be I don't remember right off if that was in
23 the affidavit or in the deposition.
24    Q.   (By Mr. Kachmar) Okay. So after you
25 issued your opinion before your testimony today,
           GILBERT & JONES

**Page 32**

1 you've been provided additional information that has
2 informed some of your testimony today; is that
3 correct?
4    A.   I've received some information after I've
5 made my report and wrote my opinions.
6    Q.   Okay. Has any of that information changed
7 any of your opinions in your August 17, 2021, expert
8 report?
9    A.   No, sir.
10    Q.   What -- what policies did Chief Minter not
11 follow?
12    A.   The policies he put in place and the
13 policies -- well, he would change, according to what
14 I've read, he would change policies in mid-stream, if
15 you will. Like I said, policies and procedures
16 should be approved by a governing body, not just put
17 in place by an appointed police chief. They can
18 surely take his recommendations.
19    Q.   So are you saying that the Savannah city
20 council should have reviewed and approved any
21 policies that apply to the Savannah Police
22 Department --
23    A.   I do.
24    Q.   -- before they go into effect?
25    A.   I would think so.
           GILBERT & JONES

**Page 33**

1    Q.   Is it also your opinion that the Savannah
2 city council should review and approve any personnel
3 decisions made by the chief of police before they're
4 final?
5    A.   I don't know what the city's policy is on
6 what's required of the chief to provide them.
7 Surely, I would think he would notify them of any and
8 all disciplinary actions of severity to them.
9    Q.   Have you served as the -- the head of any
10 organizations or departments in an appointed capacity
11 and not in an elected capacity?
12    A.   I have.
13    Q.   Okay. Did you have the -- and which --
14 tell me which organizations you were the head of in
15 an appointed capacity rather than elected?
16    A.   The Department of Public Safety, colonel.
17       MR. SAVAGE: I sent you this.
18    Q.   (By Mr. Kachmar) In any -- were any of
19 the policies that you believe Chief Minter failed to
20 follow pertinent to the decision to discipline or
21 terminate Officer Kang?
22       MR. SAVAGE: Let me object to the form of
23    that question. I mean, you have not filed
24    Douglas Factors. You have not find LOTs in this
25    stuff. And you guys want to put these people on
           GILBERT & JONES

**Page 34**

1 the street.
2       MR. KACHMAR: Mr. Savage, I object to your
3    speaking objections. You objected to the form.
4    It's on the record.
5    Q.   (By Mr. Kachmar) Mr. Vowell, you can
6 answer the question.
7       MR. SAVAGE: Well, you've self-admitted
8    that it's not important to ask fair questions.
9    I would say you're following through on that.
10    Q.   (By Mr. Kachmar) Mr. Vowell, you can
11 answer the question.
12    A.   Well, repeat the question. I forgot
13 again.
14    Q.   Were any -- your statement earlier was
15 Chief Minter failed to follow policy.
16    A.   Right.
17    Q.   My question earlier was what policies, and
18 you didn't specify specific policies.
19    A.   His own policy.
20    Q.   I'm sorry?
21    A.   I'm sorry. His own policies.
22    Q.   What are his own policies? I certainly
23 don't have the whole department list of policies in
24 affidavit or sworn testimony. I even had -- can I
25 expound on your --
           GILBERT & JONES

EXHIBIT 4

**Page 35**

1    MR. SAVAGE:  Yeah, you can answer it any
2 way you want.
3    A.   The information provided to me was that
4 Chief Minter did not follow internal affairs
5 recommendation or this CARES, CARES committee that he
6 appointed and put together.
7         MR. SAVAGE:  City council did.
8    A.   And didn't -- it's just my opinion he
9 broke the policies that he had set forth for himself
10 and his department.
11    Q.   (By Mr. Kachmar)  Okay.  So you've
12 identified the internal affairs policy.  Are there
13 any other policies you can specifically identify that
14 Chief Minter failed to follow?
15    A.   The Douglas Factors and the letter of
16 transmittal.
17    Q.   Okay.  Anything else?
18    A.   Not at this time.
19    Q.   So even if Chief Minter failed to follow
20 policy, Officer Kang had an opportunity to cure in
21 his appeals to both the chief and to the city
22 manager; is that right?
23         MR. SAVAGE:  I object to that.  Those are
24 all legal conclusions whether you can ever use
25 policies that haven't been adopted, whether you

**Page 36**

1 can break constitutional laws and then we got to
2 cure it.
3         MR. KACHMAR:  I object to your speaking
4 objections.  State your objection.  It's on the
5 record.
6    Q.   (By Mr. Kachmar)  Mr. Vowell, you can
7 answer.
8         MR. SAVAGE:  Well, you should have put
9 stipulations at the beginning of the deposition
10 if you wanted to limit me.
11         MR. KACHMAR:  There are standard rules
12 that apply, Mr. Savage.
13         MR. SAVAGE:  Well, they're not to say --
14         MR. KACHMAR:  Speaking objections are not
15 appropriate and you know it.
16    Q.   (By Mr. Kachmar)  Mr. Vowell, you can
17 answer the question.
18    A.   And your question was?
19    Q.   Even if Chief Minter failed to follow
20 policy, didn't Mr. Kang have an opportunity -- wasn't
21 there a cure opportunity in Mr. Kang's appeals to the
22 chief of police and to the city manager?
23    A.   I would certainly hope so.  No.  But I
24 don't think he was afforded that.
25    Q.   Were you present at Officer Kang's appeal

**Page 37**

1 hearing with the chief of police?
2    A.   Not hardly.
3    Q.   Do you know anybody who was at that
4 meeting?
5    A.   No, sir.
6    Q.   Okay.  Do you know -- do you know the list
7 of people who were at that meeting?
8    A.   No, sir.
9    Q.   Were you present at Officer Kang's appeal
10 hearing with the city manager?
11         MR. SAVAGE:  You know the answer's no.
12 We'll stipulate to that.
13    Q.   (By Mr. Kachmar)  Mr. Vowell, you can
14 answer the question.
15    A.   No.
16    Q.   Okay.  Do you know who was at that
17 meeting?
18    A.   No.
19    Q.   Do you know what materials --
20    A.   No.
21    Q.   -- were presented or discussed at that
22 meeting?
23    A.   I do not.
24    Q.   Would you describe everything Officer Kang
25 did during this appeal incident as a best practice?

**Page 38**

1    A.   I couldn't.  I couldn't speak for Kang.
2    Q.   Well, as a law enforcement -- as someone
3 who's worked in law enforcement for decades and has
4 lots of leadership experience, would you consider
5 what he did as a best practice for a police officer?
6    A.   Are you referring to the incident or are
7 you referring to his appeal?
8    Q.   No.  The incident with Mr. Faitele.
9    A.   I think I've answered that question for
10 you by saying some form of discipline I agreed with.
11         MR. KACHMAR:  Mr. Vowell, that's all I
12 have right now.  Counsel for the city may have
13 some questions for you.  Thank you for your
14 time.
15         THE WITNESS:  Thank you.  Yes, sir.
16         MR. O'CONNOR:  I'm Pat O'Connor nor.
17         MR. SAVAGE:  He wants to take a quick
18 break to use the restroom, Pat.
19         MR. O'CONNOR:  Yeah, no problem.
20         (Recess from 3:11 p.m. to 3:18 p.m.)
21              EXAMINATION
22 BY MR. O'CONNOR:
23    Q.   Mr. Vowell, as I was saying, I'm
24 Pat O'Connor.  Along with Patty Paul, we represent
25 the city.

EXHIBIT 4

## Page 39

1  A. Yes, sir.
2  Q. Just a few questions. On the cases you
3  listed that you have worked on in the disclosure --
4  A. Yes, sir.
5  Q. -- how many of those involve Mr. Savage or
6  his firm?
7  A. All of them.
8  Q. All right. And I know one of them is
9  being defended by my firm, Christopher Davis versus
10 Sheriff McDuffy at Effingham County?
11 A. Yes, sir.
12 Q. Have you been involved in any other cases
13 either against or for my law firm, Oliver Maner?
14 A. I don't recall any.
15 Q. Okay. The opinions in your report that
16 Mr. Kachmar was asking you about, the one dated
17 August 17th, 2021 --
18 A. Yes, sir.
19 Q. -- I think you made this clear, but I want
20 to be sure I heard it correctly -- those are still
21 your opinions at this time; correct?
22 A. Yes, sir.
23 Q. And even though you reviewed some
24 additional materials, at this time you have not
25 changed any of those opinions?

## Page 40

1  A. That's correct, sir.
2  Q. And you said at one point during the first
3  part of your deposition that you -- I apologize about
4  that phone. It'll stop in a second. You said that
5  this report could change as the case progresses.
6     Is there anything today that you know of
7  you need to review that might affect your report?
8  A. I haven't read a couple of depositions.
9  Just parts of them. I would certainly put some
10 weight in there if it applied to any of my opinions.
11 Q. Can we agree to this? That if you review
12 something that changes your report, will you either
13 provide an updated report or some kind of written
14 disclosure through Mr. Savage of what changes there
15 are?
16 A. Yes, sir. I sure will.
17 Q. Thank you. Now, you said -- were you the
18 commissioner -- was your position commissioner of the
19 Department of Public Safety?
20 A. Yes, sir.
21 Q. So as commissioner of the Department of
22 Public Safety, were there times when you would adopt
23 policies?
24 A. Sure. Made amendments to policies, yes,
25 sir.

## Page 41

1  Q. And as commissioner, you could amend
2  policies or adopt new policies or delete policies as
3  you saw fit; correct?
4  A. That's correct.
5  Q. Would you -- was it necessary for you when
6  you needed to adopt or amend or delete a policy to
7  seek the approval of a legislative body to do that?
8  A. The Board of Public Safety had oversight.
9  So I would present it to the Board of Public Safety.
10 Q. Right. But you would not take your
11 policies to the legislature, would you?
12 A. No, sir.
13 Q. Nor to the governor?
14 A. No, sir.
15 Q. And so it would not be usual for a chief
16 of police who's the department head to take policy
17 changes to a city council, would it? That would not
18 be usual?
19 A. I don't think an appointed police chief --
20 when I was overseeing the Board of Public Safety,
21 they had to approve any changes or amendments I made
22 to policies. So I would think a city police chief
23 would need the blessings of the local government body
24 to amend or adopt changed policies.
25 Q. All right. You say you would think.

## Page 42

1  You're not stating that as an opinion in this case,
2  are you?
3  A. No. That's -- that's -- I would certainly
4  hope that would be the way it works.
5  Q. Well, a city council is a group of elected
6  people just like the state legislature. They are
7  legislative and they are political in that they're
8  elected. So --
9  A. Well, I don't think you're comparing
10 apples to apples. That's just my opinion.
11 Q. Okay. But that -- your opinion doesn't
12 hinge -- your opinions as to the propriety of
13 anything that Chief Minter did does not hinge on
14 whether policies were reviewed or approved by the
15 city council of Savannah?
16 A. No. No.
17 Q. Thank you. Now, in your review of the
18 materials, you became aware that there was a
19 disciplinary review board that also made
20 recommendations regarding discipline on Mr. Kang for
21 his involvement in the Faitele incident; correct?
22 A. Correct.
23 Q. And I just want to make sure I'm clear.
24 You are not disagreeing with the opinions of the
25 disciplinary review board members that Mr. Kang's

EXHIBIT 4

**Page 43**

1 actions merited some form of discipline. You are
2 just disagreeing with termination as the ultimate
3 sanction; correct?
4     A.    That's my opinion.
5     MR. SAVAGE: Well, I don't want to have
6 too many objections. I'm going to ask him
7 another opinion based on Barefield's testimony.
8 So you'll see --
9     MR. O'CONNOR: I'm sorry, Brent. The mike
10 must be far away from you.
11     MR. SAVAGE: Yeah. I'm going to ask him
12 an opinion on Barefield's testimony. It's our
13 position there never should have been a board
14 discipline on anybody once Barefield reached the
15 conclusion that these people had criminal,
16 potential criminal problems.
17     MR. O'CONNOR: That's fine. You can make
18 your arguments. I need to --
19     MR. SAVAGE: Well, I'm just going to get
20 an opinion from him. That's okay. Go ahead.
21     MR. O'CONNOR: When you say you're going
22 to ask for an opinion, you mean here today or
23 later?
24     MR. SAVAGE: Yeah, today. And I'll put it
25 in his report. And you can take his deposition,
GILBERT & JONES

**Page 44**

1 Pat. It's not fair to just spring it on you.
2 But it's our position once Barefield found that
3 there were criminal problems, there never should
4 have been any discipline attempted by Minter, by
5 Monahan, by the chain of command. Once they
6 said that there were criminal problems, that's
7 against the law to go forward.
8     A.    I wasn't asked that question previously,
9 but I was prepared for it. I certainly wish he had
10 expounded more on the criminal complaint. That would
11 have, certainly should have --
12     MR. SAVAGE: Ended it.
13     A.    -- ended it right there.
14     Q.    (By Mr. O'Connor) Are you saying that
15 once -- and let's stick with police officers --
16     A.    Yes, sir.
17     Q.    -- the police officer has criminal charges
18 pending against them, that the department for which
19 that officer works at that point can't take any
20 disciplinary action while the criminal charges are
21 pending?
22     A.    They can't.
23     Q.    They can or cannot?
24     A.    Cannot.
25     Q.    So if I have a police officer who is
GILBERT & JONES

**Page 45**

1 charged with murder, I've got to leave him out there
2 on the street without taking any disciplinary action?
3     A.    No, sir. No, sir. I do not -- I do not
4 think putting someone on administrative leave during
5 a criminal investigation is any form of disciplinary
6 action. Does that answer -- does that clear it up
7 for you?
8     Q.    Possibly.
9     A.    Okay.
10     Q.    All right. Let's go ahead with my
11 question.
12     A.    Yes, sir.
13     Q.    If Mr. Savage has questions, I may have a
14 few more.
15     A.    Yes, sir.
16     Q.    You are aware that the decision to
17 terminate Mr. Kang's employment was reviewed by the
18 city manager at the time, Pat Monahan; correct?
19     A.    Correct.
20     Q.    And there were some questions about this,
21 and you may have already answered this. If you have,
22 I apologize for asking it again.
23     You're not aware of the degree of
24 independent review Mr. Monahan did on the facts of
25 this matter before he made his recommendation;
GILBERT & JONES

**Page 46**

1 correct?
2     A.    No, sir.
3     Q.    Did you see in the record that Monahan put
4 down his own reasons for the termination of Kang's
5 employment or were you aware of that?
6     A.    I don't recall what Monahan saw
7 recommendation-wise.
8     Q.    All right. So as we sit here today,
9 you're not criticizing or complimenting Mr. Monahan's
10 decision one way or the other; correct?
11     A.    No, sir.
12     Q.    I'm not sure that came out right. Are you
13 giving an opinion about the propriety of
14 Mr. Monahan's recommendations to today?
15     A.    Well, since we've opened up the subject,
16 it should have never gone that far. So . . .
17     Q.    I get that. I understand that, that you
18 have your opinions. But whatever decision or
19 whatever recommendations Monahan made, you are not
20 criticizing today; correct?
21     A.    I can't criticize or agree.
22     Q.    Thank you. And so that would include that
23 you don't have an opinion as we sit here today that
24 Mr. Monahan took action against Officer Kang based on
25 his participation in the human resources complaint
GILBERT & JONES

EXHIBIT 4

## Page 47

 1  against Minter; correct?
 2  A.  I can't answer that, sir.
 3  Q.  Thank you.  I want to make clear, make my
 4  understanding clear that in regards to the city, you
 5  are not giving an opinion that the city of Savannah
 6  violated any of Mr. Kang's procedural due process;
 7  right?
 8      MR. SAVAGE:  That's a -- that's a legal
 9  conclusion.
10      MR. O'CONNOR:  It may be.  And so I just
11  want to make sure he doesn't have an opinion on
12  it.
13  A.  I can't answer that, sir.
14  Q.  (By Mr. O'Connor)  Thank you.  Do you know
15  whether Mr. Kang ever filed a claim in the Superior
16  or State Court, either State Court or Superior Court
17  of Georgia seeking a writ of mandamus?
18  A.  I'm not aware of that, sir.
19      MR. O'CONNOR:  Mr. Vowell, that's all I
20  have subject to coming back and asking more if
21  there are additional questions asked by the
22  other lawyers.
23      THE WITNESS:  Thank you, sir.
24      MR. SAVAGE:  I've got just a few and then
25  you guys may have more.

GILBERT & JONES

## Page 48

 1          EXAMINATION
 2  BY MR. SAVAGE:
 3  Q.  I want you to assume that in a deposition
 4  of Captain Barefield, who was part of the IA task
 5  force, that he reached the conclusion that Kang and
 6  Arango had potential criminal problems in this case.
 7  And rather than advising them of that -- they never
 8  told Kang or Arango that -- they continued on down
 9  two parallel train tracks, one to get them indicted,
10  and the other one to disciplining them internally.
11      Knowing what you know about police work,
12  do you consider it appropriate not to reveal to the
13  two officers that you feel they've committed crimes
14  and putting them through a civil procedure where you
15  gain more information to use against them eventually
16  in criminal actions to get them indicted in the grand
17  jury?  Should that ever happen?
18  A.  That should never happen.
19      MR. O'CONNOR:  Before -- I'm sorry.
20  Before you -- I was trying to make an objection
21  before you answered.
22      MR. SAVAGE:  Sure.  Go ahead.
23      MR. O'CONNOR:  I'll just object to the
24  form of the question.
25      MR. SAVAGE:  Okay.

GILBERT & JONES

## Page 49

 1  Q.  (By Mr. Savage)  The other thing is
 2  they -- they put Kang on the streets despite the
 3  five-day recommendation.  And they admit, you know,
 4  Gavin is the assistant chief that Minter wholesaled
 5  in getting these guys the policies into place of the
 6  city of Savannah.
 7      Have you ever seen senior officers or a
 8  deputy chief say that we didn't use proper
 9  procedures.  We didn't give them Douglas Factors.  We
10  did not give them letter of transmittal setting out
11  the charges.  We believed that they may have criminal
12  problems as Barefield testified.
13      Have you ever seen people go after people
14  like that and then try to say, oh, well, forget about
15  Minter.  Monahan could cure all these problems
16  despite not advising him of potential criminal
17  violations, not advising him of colluding with the
18  district attorney's office to indict these people.
19  Have you ever seen that happen?
20      MR. O'CONNOR:  Object to form.
21  A.  No, sir, I have not.
22  Q.  (By Mr. Savage)  Do you think that's
23  right?
24  A.  Absolutely not.  No, sir.
25  Q.  I mean, we put these guys on the street to

GILBERT & JONES

## Page 50

 1  get shot at.  I can't count how many times that they
 2  got sworn at by Faitele.  Faitele is a federal
 3  criminal, federal felon.  He stole money from all
 4  taxpayers in the United States by making up a barber
 5  shop, and, yet, we're protecting these guys.  And we
 6  say, well, Monahan had the last say-so.
 7      Have you ever heard a city manager say
 8  it's okay to break our own rules, it's okay not to
 9  advise our employees that we're going after them
10  criminally, and I'm going to cure it all?  Have you
11  ever seen a city manager try to do that?
12      MR. O'CONNOR:  Object to form.
13  A.  No, sir.
14  Q.  (By Mr. Savage)  I mean, do you think
15  that's right?
16  A.  No, sir.
17      MR. SAVAGE:  That's all I got.  Thank you,
18  guys.  And, Pat and Shawn, I mean, I'm going to
19  amend his report.  You can take more deposition.
20  I don't want to -- I mean, I don't think it's
21  fair.  I do think fairness is important.  I
22  think Shawn thinks it's important.  He just
23  misspoke.
24      MR. O'CONNOR:  I don't have any further
25  questions today.

GILBERT & JONES

EXHIBIT 4

## Page 51

1  MR. SAVAGE: Okay. But you can take it
2  again when I amend the report. I get it. And I
3  think Shawn's a fair guy. He just misspoke.
4  MR. O'CONNOR: And we'll see if we need to
5  come back after we see his amended report.
6  MR. SAVAGE: Okay.
7  (Deposition concluded at 3:33 p.m.)
8  (Pursuant to Rule 30(e) of the Federal
9  Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
10 signature of the witness has been reserved.)

GILBERT & JONES

## Page 52

### CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA:
COUNTY OF CHATHAM:

I hereby certify that the foregoing transcript was reported as stated in the caption and the questions and answers thereto were reduced to writing by me; that the foregoing 51 pages represent a true, correct, and complete transcript of the evidence given on Wednesday, December 21, 2022, by the witness, GARY VOWELL, who was first duly sworn by me.

I certify that I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c); I am a Georgia Certified Court Reporter here as an employee of Gilbert & Jones, Inc. who was contacted by Shawn A. Kachmar, Esquire, to provide court reporting services for the proceedings; I will not be taking these proceedings under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and by the attached disclosure form I confirm that neither I nor Gilbert & Jones, Inc. are a party to a contract prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board.

This 12th day of January, 2023.

_____
Annette Pacheco, CCR-B-2153

GILBERT & JONES

## Page 53

### DISCLOSURE OF NO CONTRACT

I, Debbie Gilbert, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Gilbert & Jones, Inc. was contacted by Shawn A. Kachmar, Esquire, to provide court reporting services for these proceedings and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board for the taking of these proceedings.

There is no contract to provide reporting services between Gilbert & Jones, Inc. or any person with whom Gilbert & Jones, Inc. has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

This 12th day of January, 2023.

_____
Debbie Gilbert, FIRM REPRESENTATIVE
Gilbert & Jones, Inc.

GILBERT & JONES

## Page 54

**DEPOSITION OF: GARY VOWELL/AP**

I do hereby certify that I have read all questions propounded to me and all answers given by me on December 21, 2022, taken before Annette Pacheco, and that:

___ 1) There are no changes noted.
___ 2) The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. ___ Line No. ___ should read:_____
_____
Reason for Change_____

Page No. ___ Line No. ___ should read:_____
_____
Reason for Change_____

Page No. ___ Line No. ___ should read:_____
_____
Reason for Change_____

Page No. ___ Line No. ___ should read:_____
_____
Reason for Change_____

Page No. ___ Line No. ___ should read:_____
_____
Reason for Change_____

Page No. ___ Line No. ___ should read:_____
_____
Reason for Change_____

Page No. ___ Line No. ___ should read:_____
_____
Reason for Change_____

GILBERT & JONES

EXHIBIT 4

| | |
|---|---|
| 1 | DEPOSITION OF: GARY VOWELL/AP |
| 2 | Page No. ___ Line No. ___ should read:_____ |
| | _____ |
| 3 | Reason for Change_____ |
| 4 | Page No. ___ Line No. ___ should read:_____ |
| | _____ |
| 5 | Reason for Change_____ |
| 6 | Page No. ___ Line No. ___ should read:_____ |
| | _____ |
| 7 | Reason for Change_____ |
| 8 | Page No. ___ Line No. ___ should read:_____ |
| | _____ |
| 9 | Reason for Change_____ |
| 10 | Page No. ___ Line No. ___ should read:_____ |
| | _____ |
| 11 | Reason for Change_____ |
| 12 | Page No. ___ Line No. ___ should read:_____ |
| | _____ |
| 13 | Reason for Change_____ |
| 14 | |
| 15 | If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition. |
| 16 | |
| 17 | _____ |
| | **GARY VOWELL** |
| 18 | |
| 19 | Sworn to and subscribed before me, This the ___ day of _____, 20__. |
| 20 | _____ |
| | Notary Public |
| 21 | My commission expires: _____ |
| 22 | |
| 23 | Please forward corrections to: |
| 24 | Gilbert & Jones, Inc. P. O. Box 14515 |
| 25 | Savannah, GA 31416 (912) 355-0320 |
| | GILBERT & JONES |