EXHIBIT 12

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

DANIEL KANG,                          )
                                      )  CIVIL ACTION NO.
            Plaintiff,                )
                                      )  4:21-CV-111-WTM-CLR
      vs.                             )
                                      )
THE MAYOR AND ALDERMEN OF THE         )
CITY OF SAVANNAH and ROY W.           )
MINTER, JR., Chief of Police          )
for the City of Savannah,             )
Georgia, In His Individual            )
and Official Capacities,              )
                                      )
            Defendants.               )
_____      )

VIDEOCONFERENCE DEPOSITION OF

LIEUTENANT TORRANCE GARVIN

August 31, 2022

10:31 a.m.

218 West State Street
Savannah, Georgia

Thomas J. Dorsey, RPR, CCR-2781

## Gilbert & Jones
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520

gilbertandjones1@gmail.com
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
Savannah, GA 31406

EXHIBIT 12

1                   <u>APPEARANCES OF COUNSEL</u>

2

    On behalf of the Plaintiff:

3

        MICHAEL G. SCHIAVONE, ESQ., (BY VIDEOCONFERENCE)
4       Schiavone Law Group, P.C.
        1111 Bull Street
5       Savannah, Georgia  31401
        (912)232-2646
6       js_law@bellsouth.net

7       JAMES H. WILSON III, ESQ.
        Savage, Turner, Pinckney, Savage & Sprouse
8       102 East Liberty Street, 8th Floor
        Savannah, Georgia  31401
9       (912)231-1140
        jwilson@savagelawfirm.net

10

11  On behalf of the Defendant The Mayor and Aldermen of
    The City of Savannah:
12
        PATRICK T. O'CONNOR, ESQ.
13      PATRICIA T. PAUL, ESQ.
        Oliver Maner LLP
14      218 West State Street
        Savannah, Georgia  31401
15      (912)236-3311
        pto@olivermaner.com

16

17  On behalf of the Defendant Roy W. Minter, Jr.:

18      TAYLOR L. DOVE, ESQ.
        Hunter Maclean
19      200 East St. Julian Street
        Savannah, Georgia  31401
20      (912)695-6984
        tdove@huntermaclean.com

21

22  Also Present:

23      Daniel Kang
        Jamar Bacon
24      Mike Arango, (By Videoconference)

25                      - - -


                    Gilbert & Jones

EXHIBIT 12

**3**

### INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| By Mr. Schiavone | 4 |
| By Mr. Dove | 39 |

- - -

### INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 5 | Bates Nos. City 0839-43 | 7 |
| 6 | Bates Nos. City 0831-38 | 29 |
| 7 | Letter of transmittal dated April 28, 2021 | 34 |

(Original Exhibits 5 through 7 have been attached to the original transcript.)

**Gilbert & Jones**

---

**4**

1    (Reporter disclosure made pursuant to
2  Article 10.B. of the Rules and Regulations of the
3  Board of Court Reporting of the Judicial Council of
4  Georgia.)
5                TORRANCE GARVIN,
6  having first been duly sworn, was examined and
7  testified as follows:
8      MR. SCHIAVONE:  This is the deposition --
9  Mr. Garvin, what is your rank?  I can't see from
10 here.
11     THE WITNESS:  Lieutenant, Mr. Schiavone.
12     MR. SCHIAVONE:  All right.
13     THE WITNESS:  Yes, sir.
14     MR. SCHIAVONE:  All right.  This is the
15 deposition of Lieutenant Garvin pursuant to
16 notice under the Federal Rules of Civil
17 Procedure.  I assume all objections except to
18 the form of the question are reserved?
19     MR. O'CONNOR:  That is agreed.  And
20 Lieutenant Garvin will reserve reading and
21 signing.
22     MR. SCHIAVONE:  All right.
23              EXAMINATION
24 BY MR. SCHIAVONE:
25     Q.    Lieutenant Garvin, would you state your

**Gilbert & Jones**

---

**5**

1  name, please, for the record?
2      A.    It's Torrance Garvin, T-o-r-r-a-n-c-e.
3      Q.    All right.
4      A.    G-a-r-v-i-n.
5      Q.    And how are you employed, Lieutenant?
6      A.    Through the City of Savannah on the
7  Savannah Police Department.
8      Q.    And how long have you been with the City
9  of Savannah?
10     A.    30 and a half years.
11     Q.    All right.  How many years do you have to
12 be there to retire?  That's a lifetime.
13     A.    Almost, yes.
14     Q.    30 years?
15     A.    Yes.
16     Q.    That's pretty -- that's impressive.
17           All right, Lieutenant.  I'm going to ask
18 you some questions.  It pertains to the civil suit
19 that Dan Kang filed against the City and the former
20 chief, Chief Minter.
21           And, you know, if you don't understand a
22 question or something -- you need me to repeat it --
23 just ask me.  Okay?  And I'll try not to interrupt
24 you when you answer any questions that I ask.  Okay?
25     A.    Okay.

**Gilbert & Jones**

---

**6**

1      Q.    Let's go back.  Back in 2019, do you
2  recall what division you were assigned to?
3      A.    I probably was assigned to the special ops
4  division, if I'm not mistaken, which would include
5  traffic, K-9, and minor patrol and all other
6  collateral units.
7      Q.    All right.  Are you aware of the incident
8  pertaining to Pernell Drayton, the execution of an
9  arrest warrant?
10     A.    Somewhat familiar.
11     MR. SCHIAVONE:  All right.  If Dan is
12 there, Dan, can you get the use-of-force form?
13 Let's get it marked as an exhibit on Pernell
14 Drayton.
15     MR. O'CONNOR:  Off the record.
16           Did you bring the exhibits from the other
17 day?
18     THE REPORTER:  I did.
19     MR. O'CONNOR:  Yeah.  So we're on No. 5,
20 right?
21     THE REPORTER:  Correct.
22     MR. KANG:  Yes.  Do you want me to verify
23 which one?
24     MR. WILSON:  So, Mike, can you go back and
25 reask that question and clarify which

**Gilbert & Jones**

**EXHIBIT 12**

**7**

1    use-of-force exhibit you're asking for as an
2    Exhibit 5 -- Exhibit 5, I think?
3        MR. SCHIAVONE:  Okay.  It's been marked.
4    It would have been dated August 3rd, 2019,
5    show-of-force form, I believe, that it pertained
6    to the Pernell incident.
7        MR. WILSON:  We've got it.
8        MR. SCHIAVONE:  If we can give that --
9    what number would that be now?
10       MR. WILSON:  I think it's 5, right?
11       MR. O'CONNOR:  Yes.
12       MR. SCHIAVONE:  I think so.  That was the
13   last one.  All right.  Get that marked as
14   Exhibit 5 for me.
15       (Exhibit 5 was marked for identification.)
16       THE WITNESS:  And if I may, if this
17   happened in 2019, I had several units, so I
18   would have also had the special investigation
19   unit which is known as our SIU unit.
20       MR. SCHIAVONE:  All right.  That's fine.
21       THE WITNESS:  Which would consist of --
22   which would consist of our gang unit and our
23   warrant squad.
24       MR. SCHIAVONE:  Yes, sir.
25       MR. O'CONNOR:  All right.  He's got

**Gilbert & Jones**

**8**

1    Exhibit 5 now.
2        MR. SCHIAVONE:  All right.
3        Q.   (By Mr. Schiavone)  Lieutenant, can you
4    take a look at that and see if you recognize it?
5        A.   It has had the heading of Savannah Police
6    Department Show-of-Force Report and different
7    indications.
8        Q.   Yes, sir.
9             Well, let me go through it.  And this form
10   was filed, apparently, by Officer Kang after an
11   incident in the execution of a lawful arrest warrant
12   for a Pernell Drayton.  He was a violent offender
13   charged with aggravated battery, aggravated assault,
14   and cruelty to children.  Kang as well as Sergeant
15   Arango were assigned at this point.  I think they
16   were actually members of the SWAT team, but they were
17   being assigned to execute warrants at this time.  Do
18   you recall that?
19       A.   I recall several, Corporal Kang and
20   Sergeant Arango being on a warrant squad.  Their --
21       Q.   All right.
22       A.   -- other duties may have let them be on
23   the SWAT team, but they were assigned to the warrant
24   squad that we had currently with our department.
25       Q.   All right.  Were you -- were there no

**Gilbert & Jones**

**9**

1    existing policies for the warrant squad at that time?
2        A.   The warrant squad was just another
3    manpower or resource that we had.  We were working on
4    putting something in place to identify this new unit
5    that we were -- had started up.
6        Q.   But isn't it true that no policies have
7    ever been put in place?
8        A.   I'm not sure, sir.
9             Back in this time those officers that made
10   up the warrant squad were -- came from our counter
11   narcotics team.  So this is something that they, the
12   department, had just formed.
13       Q.   All right.  Would the duties of a warrant
14   squad be different than the duties of a SWAT squad?
15       A.   Totally different, sir.
16            Our SWAT team is high-risk situations
17   involving barricaded situ -- armed robbery, stuff
18   like that.  The time that we call the SWAT team is
19   when we have a barricaded situation where someone is
20   with a gun or the SWAT team was requested by any
21   other member of the department, like our criminal
22   investigation division to help secure -- to help
23   serve a warrant.
24       Q.   All right.  But would you agree that
25   serving warrants for violent offenders is a very

**Gilbert & Jones**

**10**

1    dangerous duty?
2        A.   You never know what the situation's going
3    to be.  So serving a misdemeanor warrant could be a
4    dangerous situation.  So when we go out we make sure
5    we have all the precautions that we need and enough
6    manpower depending on what the situation itself is.
7        Q.   All right.  But back in 2019 and actually
8    up through 2020, this particular unit wasn't given
9    all the things necessary to do the duties of
10   executing these warrants.  They weren't given pepper
11   canisters and things to de-escalate situations.  They
12   were not given a number of different things they
13   could use if things were to escalate when they
14   executed those warrants.  Isn't that true?
15       MR. O'CONNOR:  Object to the form.  You
16   can answer subject to the objection.
17       THE WITNESS:  Each officer is issued
18   departmental handcuffs, weapon.  If they go
19   through the Taser program now we have a Taser
20   and also an OC spray.  Each officer that comes
21   on the department is issued an OC spray, a
22   baton --
23       Q.   (By Mr. Schiavone)  Right.
24       A.   -- and everything else.
25       Q.   All right.  But other than the baton,

**Gilbert & Jones**

EXHIBIT 12

**11**

1 those other two that you mentioned were not given to
2 these officers on this particular execution of the
3 warrant on Drayton?
4     A.    These officers --
5     Q.    They weren't given those?
6     A.    These officers who were uniformed or even
7 plain clothes have the option of having all their
8 equipment with them, the things that I just
9 mentioned.  So they should have had -- they should
10 have had every access that any other patrol officer
11 would have.
12     Q.    All right.  Now, do you -- do you -- are
13 you telling me that -- can you tell me that that --
14 that they were actually given that?  Or is that
15 general -- that's the general policy?
16     A.    That's the general -- if you're employed
17 as a police officer, the department issues certain
18 things from the very beginning.  I already -- I made
19 mention of those in -- those things.  If you're a
20 part of a specialized unit like SWAT, SWAT has
21 different equipment than the regular patrol officers.
22 These officers here were assigned to the warrant
23 squad.  They were also a part of the SWAT team.  So
24 they had capabilities of getting any necessary
25 equipment that they thought they needed to execute

**12**

1 whatever type of warrant they were going out to do.
2     Q.    All right.  So when they executed this
3 warrant, if they have to take some action over
4 above -- over and above actually handcuffing the
5 individual and taking them into custody, if some use
6 of additional force is necessary, are they required
7 to file a use-of-force form?
8     A.    If they -- they are required to follow the
9 policy that we have in place for use of force.  Any
10 type of resistance, any type of force that they use
11 they have to follow the policy.
12     Q.    All right.  And that's required in every
13 case?
14     A.    It depends on the situation.  If an
15 officer use any type of force against any citizen to
16 effect an arrest or had to use, deploy their OC, had
17 to deploy their baton, even their Taser now since we
18 have Tasers or even have to pull out their weapon, we
19 have different policies in place for everything that
20 is required by us to effectively make an arrest or
21 detain an individual.  It depends on the level that
22 that individual gives resistance or no resistance.
23     Q.    All right.  In this particular case the
24 Officer Kang had to use an implement called -- is it
25 a SOC?  Are you familiar with that?

**13**

1     A.    Yes, I am.
2     Q.    Can you explain to me what that is?
3     A.    Basically that's a tool that members who
4 have trained and qualified to properly use that, and
5 mainly those are the individuals on our SWAT team.
6         As I said before, these officers who were
7 on our warrant squad were actually also members of
8 the SWAT team.  So they had access to that particular
9 weapon, and that weapon is just like a regular
10 shotgun.  Instead of having real rounds in it you use
11 what is called a super SOC.  A super SOC is used to
12 stun someone to disable them in the capacity.
13     Q.    All right.  All right.  And once somebody
14 files that use-of-force form, what happens to the
15 form?
16     A.    The form goes through the proper chain of
17 command.  The sergeant investigates it, sends it
18 through the chain, which would be the next step,
19 which would have been the lieutenant which would --
20 would have been me.  I would look at body-worn
21 camera, read reports, look at all the facts, and do
22 an investigation based off what the sergeant sent.
23     Q.    All right.  Now, as I understand it,
24 looking at Exhibit 5, it appears that Sergeant Arango
25 reviewed it and found that the use of force was

**14**

1 justified and within policy, and this was sent to you
2 on August 13, 2019; is that correct?
3     A.    What I -- what I have in front of me is
4 just a standard information.  It doesn't have any --
5 it doesn't really have anything that says that he
6 investigated it or anything else.  His part of the
7 investigation is missing.  There's nothing here
8 besides you showing me some pictures, different
9 things that indicate that it was entered light of day
10 and everything else.  There's nothing here from
11 Sergeant Arango that says that he investigated this
12 to let me know that he sustained it in policy or
13 without policy.
14     Q.    Well, is it stated on that exhibit that
15 Arango found use of force justified and within
16 policy?  Do you see that where he made that finding?
17 It's probably around the third page, I think.
18     A.    No, sir.  The third page just shows me a
19 picture of a -- of a male figure.
20     Q.    All right.  Try the fourth page.
21     A.    All right.  I see on the -- I guess on
22 August the 3rd after reviewing this incident I find
23 that the force was both justified and within the
24 department policy --
25     Q.    So --

1   A.   -- from Sergeant Arango.
2   Q.   So he made that finding and it was sent to
3 you on that same page -- it was sent to you on
4 August 13th, 2019?
5   A.   Yes.
6   Q.   But there's nothing to indicate that you
7 made the finding or investigated it?
8   A.   There's a note here that says there's no
9 ARS report and no memo outlining the use of the super
10 SOC.  So when I got it I probably sent it back to him
11 indicating that I needed to see the ARS reports and
12 the purpose of why the super SOC had to be used.
13   Q.   When would that have come back to you?  Or
14 would it?
15   A.   I sent that -- I sent that back on the
16 same day that I received it from looking at this
17 paper here on August the 13th at 3:18.
18   Q.   And would you have followed up on it and
19 asked him to provide you with that additional
20 information?
21   A.   Yes, I would have.
22   Q.   All right.  And at some point would you
23 have done an investigation and made a conclusion?
24   A.   Yes, I would have.
25   Q.   All right.  If you looked at that form,

1 nothing indicates that you ever did that, but yet you
2 contacted -- well, you contacted Sergeant Arango
3 seven months later on February 11th, 2020.  Do you
4 see that?
5   A.   Yes, I do.
6   Q.   All right.  And you still didn't
7 investigate or do anything on the complaint.  This
8 was not a complaint; isn't that true?  The defendant
9 didn't complain about it?  His family?  This was all
10 administratively, right?
11   MR. O'CONNOR:  Object to the form.  You
12 can answer if you understand the question.
13   THE WITNESS:  I'm really trying to
14 basically understand what you're trying to say.
15   When I sent it back to Sergeant Arango to
16 get the information that I needed once that
17 information was returned to me I did look at it.
18 I looked at the video.  I looked at the ARS
19 reports that are required and I did make a
20 determination.  So it depended on if the -- the
21 timeline that when I requested it and when
22 Sergeant Arango sent it back to me.
23   Q.   (By Mr. Schiavone)  All right.  So there
24 would be a written document that shows your
25 investigation and your conclusions?

1   A.   Yes, it would.
2   Q.   All right.  And do you recall what your
3 findings were in relation to it?
4   A.   Unless I have it in front of me, I really
5 don't know, because at that time there were some
6 major moves around the department for lieutenants and
7 I was moved out out of my unit and put back into the
8 precinct on the south side at that particular time,
9 if I'm not mistaken.
10   Q.   All right.  And if you look at that same
11 page it indicates that you sent something to
12 Lieutenant Barefield.  Do you see that?
13   A.   Yes.
14   Q.   Who would he have been in relation to
15 this?
16   A.   Lieutenant Barefield who is now Captain
17 Barefield was the commander of our office of
18 professional standards, which is better known as IA,
19 internal affairs.
20   Q.   All right.  And you would have sent him
21 your written conclusions and what you found?  That
22 would have been sent to him?
23   A.   It would -- it should have.
24   Q.   All right.
25   A.   And I think in here it says that --

1   MR. SCHIAVONE:  That would have --
2   MR. O'CONNOR:  Mike, he wasn't finished.
3   MR. SCHIAVONE:  I'm sorry.
4   THE WITNESS:  It says in here that it was
5 rerouted to -- rerouted to Lieutenant Toth.
6 Lieutenant Toth was the person that took over
7 the SIU plus the warrant squad detail.
8   Q.   (By Mr. Schiavone)  All right.  And
9 that -- that looks like it was on July 31st, 2020?
10   A.   It could.  Yes, sir.  It could be or it --
11   Q.   All right.
12   A.   But that's from -- yes.
13   Q.   All right.  If -- the report and
14 recommendations that you did, would that have been
15 the end of it, of the investigation?
16   A.   No, sir.
17   Q.   Would you have done that?
18   A.   No, sir.  It goes from me.  Then it goes
19 to the next person in the chain.  The next person in
20 the chain would have been Captain David Barefield --
21 I mean, Captain David Gay.  He would have looked at
22 it and he would have made -- either agreed with my
23 findings or found something else different, then
24 moved it on up.
25   Q.   All right.  And would there -- would he

**EXHIBIT 12**

**19**

1 have to reduce something to writing?
2     A.   He would have.
3     Q.   And who was that?
4     A.   Captain David Gay who's no longer with the
5 department.
6     MR. SCHIAVONE:  All right.  Give me one
7    second.
8     Q.   (By Mr. Schiavone)  And if you look at the
9 form where it indicates that Lieutenant Toth sent it
10 to Sergeant Phillip Collard, do you see that?
11     A.   Yes, I do.
12     Q.   And if you look at -- he was the -- at
13 that time then, this would have been on August
14 3rd, 2020 -- 2020 that he sent it and Sergeant
15 Collard on August 26, 2020 indicates he was -- he at
16 the time, was he the SWAT commander?
17     A.   He could have been. I'm not sure.
18     Q.   All right. Also, do you know whether or
19 not he was a use-of-force instructor?
20     A.   I'm not sure what type of training besides
21 the SWAT training that he has.
22     Q.   All right. Why would -- why would this go
23 back down to a sergeant? Why would Toth -- do you
24 know why Toth would have sent that to this
25 individual?

**Gilbert & Jones**

**20**

1     A.   I can't speak for Lieutenant Toth. I
2 don't know why he sent it back down. Maybe he wanted
3 to get better information and send it to the sergeant
4 to have the sergeant look into it. I can't --
5     Q.   All right.
6     A.   -- really speak for him, so I really don't
7 know why he sent it back down.
8     Q.   All right. If you know, Sergeant Collard
9 states, this is a year old, and I was not present or
10 assigned to this unit. It would be unethical -- he
11 was concerned it would be unethical for him to
12 investigate this. Is that what he stated --
13     A.   That's what you just read.
14     Q.   -- on the form?
15     A.   That's what you just read in there and
16 that's what I'm looking at. I can't speak for
17 Sergeant Collard neither.
18     Q.   All right. Now, you did -- in your
19 investigation, as I understand what transpired, this
20 would have been on video, the Pernell incident; is
21 that correct?
22     A.   Yes, it would have been.
23     Q.   All right. And from what I can tell in
24 the video obviously these were serious charges that
25 this individual was accused of and being arrested

**Gilbert & Jones**

**21**

1 for -- would you agree? -- aggravated assault,
2 aggravated battery, cruelty to a child?
3     A.   If that's what the -- if those were the
4 charges of that said individual, yes. That would be
5 a high nature violent crime against someone.
6     Q.   Do you know what -- can you tell me what a
7 OODA loop is?
8     A.   I have no idea, sir.
9     Q.   Have you ever heard of that before?
10     A.   Not -- I can't say if I have or not.
11     Q.   How about the priorities of life?
12     A.   Priority of life?
13     Q.   Priorities of life.
14     A.   That's a standard thing that we -- that we
15 train about in reference to the force level or taking
16 someone's life, the value of someone's life. That's
17 my understanding of it.
18     Q.   Well, do you know what the elements are of
19 that, of priorities of life?
20     A.   I can't -- I can't say right offhand at
21 the moment, sir.
22     Q.   All right. Well, let me explain it to
23 you. These are things that officers who are
24 specially trained to execute warrants as well as SWAT
25 team members, these are what they're required to do

**Gilbert & Jones**

**22**

1 when they go into these situations, observe, orient,
2 decide, act. That's what that means.
3     Now, if you've never been trained in that
4 and you don't know what that is, how are you able to
5 do an evaluation of these officers in a use-of-force
6 situation if you don't know exactly what they're
7 trained to do?
8     MR. O'CONNOR:  Object to the form.
9     Q.   (By Mr. Schiavone)  And make conclusions?
10 Explain to me how you can make conclusions and
11 recommendations to the chief if you don't know the
12 process and the elements.
13     MR. O'CONNOR:  Object to the form. It's
14    multiple, and there are other issues. So I'll
15    just make my objection to the form. You can
16    proceed and answer if you can.
17     THE WITNESS:  Stating what you said, I'm
18    looking at the violation of -- of what we have
19    in policy, the use of force itself. As far as
20    their training is concerned, that's their
21    training. I have never trained as a SWAT
22    member, so I have no idea their level of
23    training that they go through. So each officer
24    on this department have certain certificates,
25    certain certifications in their own field of

**Gilbert & Jones**

EXHIBIT 12

**23**

1  operation.  SWAT is a different breed by itself.
2  Those officers do a lot of more intense training
3  because they're on a specialized unit that we
4  utilize.  I'm looking for violations as far as
5  policy is concerned.  The use of force itself,
6  was this force necessary, was this force within
7  policy or was this force outside of policy.
8  That's what I'm looking at.
9      Q.   (By Mr. Schiavone)  All right.  And do you
10  recall that you didn't make any finding that use of
11  force had been violated policy in this case?
12      A.   What I can recall is that I looked at the
13  video and I had major concerns on the situation in
14  itself.  And one of the things that really stood out
15  to me is why did Sergeant Arango tell everyone to
16  turn off their body-worn cameras.  That was one of my
17  number one concerns there.  As I stated before, I had
18  multiple units that I was over, so I may not have
19  gotten to this in a timely manner, but I did look at
20  the video because this was a use of force that came
21  to my desk.
22      Q.   All right.  But you didn't make a finding
23  of a violation of use-of-force policy though, did
24  you?
25      A.   I can't recall if I did or not.  If I did

**Gilbert & Jones**

**24**

1  it would have been here.
2          As I indicated before, a lot of the
3  lieutenants on the department got moved around and I
4  was one of the lieutenants that got moved.  So this
5  may have sat for a while, and that's why it probably
6  got back sent to Lieutenant Toth who is now over the
7  unit to look -- to actually look into it.  But I did
8  have concerns because of the mere issue of telling
9  the users to turn off their body-worn cameras.
10  That's not something that we do.  That's outside of
11  our policy.
12      Q.   All right.  All right.  Let me give you a
13  little background on dates.  Of course, this occurred
14  on August 3rd, 2019.  This civil suit that was filed
15  in this case was filed on April 14th, 2021, almost
16  two years after the Pernell arrest.  Kang and Arango
17  were accused of a crime and at some point Arango was
18  indicted on September 17th, 2020.
19          Now, you were contacted either by Gunther,
20  Adams, Gay or the chief on April 28th or sometime
21  before April 28th, 2021 ordering you to do a new
22  report about this, weren't you?
23      A.   A new report on what, sir?
24      Q.   Well, you said you'd already made a
25  finding.  You already made the conclusions, written

**Gilbert & Jones**

**25**

1  findings before April of 2021.  But then you were
2  contacted by one of these officers that the chief
3  wanted you to find something else and to do a new
4  transmittal.  Weren't you?
5      A.   Mr. Schiavone, I have no idea what you're
6  talking about, sir.  Are we talking about the current
7  thing --
8      Q.   Well --
9      A.   -- or are we talking about somebody else?
10      Q.   Well, we're talking about the Pernell
11  incident.  What's a letter of transmittal?
12      A.   A letter of transmittal is where the
13  lieutenant does his final investigation and sends
14  that letter.  It's basically a form that we use.  It
15  outlines the -- and I don't have one in front of me
16  so I may not know exactly all the stuff in it, but it
17  basically entails the investigation, the reason for
18  the investigation, were any violations sustained or
19  unsustained.  That information is passed on up
20  through the chain of command.  And it also has
21  certain other things to it which I just can't
22  remember at this time.
23      Q.   All right.  But you had already -- you've
24  already testified that you have already done that in
25  this case.

**Gilbert & Jones**

**26**

1      A.   I did not say --
2      Q.   You made your conclusions.
3      A.   I did not say I did a --
4      Q.   You made your findings.
5      A.   I did not say I did an LOT, sir.  You did
6  not ask me that question.  What you basically
7  asked --
8      Q.   Well --
9      A.   -- me -- if I can -- if I can finish.
10  What you basically --
11      Q.   Yes, sir.
12      A.   -- asked me, what did I do.  I said I
13  looked at it.  If I made an inv -- if I made a
14  determination it would have been sent up.  You never
15  asked me about an LOT, sir.
16      Q.   All right.  But -- but your determination
17  and conclusions you reduced to writing?
18      A.   It would have been done down as far as
19  whatever I thought the violation was.  So let me make
20  sure I'm clear.  Are we talking about the Pernell
21  incident or the Gates incident?  Because you threw up
22  Gates as something else.  So which one are we talking
23  about?
24      Q.   Gates, I've never mentioned Gates.
25      A.   You did, sir.

**Gilbert & Jones**

**EXHIBIT 12**

**27**

1    Q.   No.  I mentioned Pernell.

2    A.   No.  You mentioned Gates when you read

3   something that I've received a phone call from

4   Minter, Gunther and Adams and you mentioned Gates.  I

5   heard you very clearly, Mr. Schiavone.

6    Q.   Well, it's not about Gates at this point.

7   What it's about is that you were contacted by these

8   officers because the chief wanted you to do a new

9   report about this incident, didn't he?

10    A.   And I'll ask you again, sir, what report

11   are you talking about?  Because as far as Pernell

12   Grant is concerned, I did what I did and it was

13   passed on to Lieutenant Toth.  So which one are you

14   talking about?

15    Q.   Were you confronted by the chief or by

16   Lenny Gunther and demoted over this?

17    A.   No, sir.  I was not demoted.  I'm still a

18   lieutenant.

19    Q.   Were you written up?

20    A.   I may have received a punishment based on

21   the Pernell Grant situation due to the fact that the

22   length of time that it took for the investigation to

23   be completed.  I believe I did receive a written

24   reprimand or something for that.  So if you're

25   talking about that incident I probably was punished

**Gilbert & Jones**

**28**

1   because of the length of time that it took to

2   complete that investigation.

3    Q.   All right.  And four days and shortly

4   after this civil suit was filed you were contacted by

5   someone in order to do a report, a letter of

6   transmittal, a report and then a letter of

7   transmittal; is that correct?

8    A.   For who, sir?

9    Q.   On -- on this Pernell, on the Pernell

10   incident.

11    A.   As I stated before, sir, I had no -- I had

12   no -- I had no more involvement with that as far as

13   me passing it on and giving it back to Lieutenant

14   Barefield who is now Captain Barefield and then it

15   was sent to Lieutenant Toth.

16    MR. O'CONNOR:  Can we clear one thing up

17   for the record here?  You referred to Pernell

18   Grant.  Are we talking about Pernell Drayton?

19    THE WITNESS:  Drayton, I'm sorry.  Pernell

20   Drayton.  I'm sorry.

21    Q.   (By Mr. Schiavone)  I'm sorry.

22    A.   I'm sorry about that.

23    Q.   All right.  So -- so when you were

24   confronted and reprimanded, you weren't required to

25   do anything else after that?

**Gilbert & Jones**

**29**

1    A.   When you say confronted and reprimanded, I

2   was punished based on the length of time of this

3   particular incident here that involved Arango, Kang

4   and several other members of the -- of the unit.  Is

5   that what you're talking about, sir?

6    Q.   Yes, sir, the Pernell Drayton incident.

7    A.   All right.  I was not confronted, wasn't

8   chastised.  It went through the process.  I received

9   my punishment and I took my punishment.

10    Q.   All right.  And you had no other further

11   contact with this issue after that?

12    A.   Not as far as -- not until today.

13    Q.   Not until today?

14    A.   Yes.

15    MR. SCHIAVONE:  All right.  Let me get the

16   letter of transmittal, have that marked as

17   Exhibit 6.

18    (Exhibit 6 was marked for identification.)

19    MR. O'CONNOR:  All right.  He has

20   Exhibit 6.

21    Q.   (By Mr. Schiavone)  All right, Lieutenant.

22   I want to remind you this is a federal case.  You're

23   under oath just like you're in federal court, and now

24   I'm showing you a document which indicates you did

25   have more contact with this Pernell Drayton.

**Gilbert & Jones**

**30**

1    Now, your previous testimony is after that

2   last report that you did that was it.  Would you look

3   at this Exhibit 6 and identify it for me?

4    A.   It has Savannah Police Department response

5   to resistance report, incident date, several other

6   pages.

7    Q.   And it's a report you wrote on April 28th,

8   2021; isn't that correct?

9    A.   Let me get an opportunity to review it.

10   And what date did you say?

11    Q.   April 28th, 2021, the date at the top.

12    A.   It has me here April the 13th, 2021.

13    Q.   All right.  So your previous testimony

14   wasn't true, was it?

15    MR. O'CONNOR:  Object to the form.

16    Q.   (By Mr. Schiavone)  Well, let's get past

17   that.  You were aware about the group complaints to

18   human resources filed by some 70-some officers

19   including Arango and Dan Kang.  You were aware of

20   that, weren't you?

21    A.   Like everybody else in the city, yes, sir.

22    Q.   And you knew and the chief had made it

23   clear he was aware of it, didn't he?

24    A.   He made mention to the department.

25    Q.   And you -- were you aware that Dan Kang as

**Gilbert & Jones**

EXHIBIT 12

## 31

1  well as Sergeant Arango were two of the officer --
2  two officers that had signed that complaint?
3      A.  Sir, I know it was 77 people who signed
4  that complaint.  There was a lot of people.
5      Q.  All right.  Now, again, I'm going to ask
6  you, after this civil suit was filed, the chief,
7  either the chief, Lenny Gunther, Major Adams, Captain
8  Gay which was the ranks at the time of this, one of
9  these individuals contacted you and told you that the
10 chief wanted you to make different findings in
11 reference to the Pernell Drayton incident; isn't that
12 true?
13     A.  When you say make different findings, I
14 mean, you make it seem like someone's threatening me
15 to do something different.
16     Q.  Well, did you -- you were aware that the
17 chief was out to get Kang and Arango.
18     A.  Are you now --
19         MR. DOVE:  Form.
20         THE WITNESS:  You know that for a fact,
21     Mr. Schiavone?
22         MR. O'CONNOR:  Just answer.
23     Q.  (By Mr. Schiavone)  I'm asking, were you
24 aware of that?
25     A.  No, sir.

## 32

1      Q.  All right.  Were you aware that he had
2  taken all this paperwork over to the district
3  attorney's office personally to have them criminally
4  prosecuted?  You were aware of that, weren't you?
5      A.  I have no idea what chief -- what our
6  former chief of police were doing in his own time,
7  sir.
8      Q.  All right.  Well, somebody ordered you to
9  do this new report, this letter of transmittal,
10 didn't they?
11     A.  I'm not -- I'm not sure.  But if I was
12 called back into the office by someone and it looked
13 like I probably was called back by Captain Gay to
14 probably complete the investigation, because, as I
15 indicated before, a lot of things were moving around,
16 so...
17     Q.  All right.  If you look at the first line
18 of this complaint, it says, this investigation was an
19 internal complaint against the warrant squad.
20     A.  What page are you reading from, sir?
21     Q.  It would have been the front page of the
22 letter of transmittal where it says complaint.
23         MR. O'CONNOR:  Mike, do you have the
24     version that's got the Bates stamp numbers on
25     it?

## 33

1          MR. SCHIAVONE:  Um --
2          MR. O'CONNOR:  If you could tell us the
3  Bates page number that might help.
4          MR. SCHIAVONE:  No.  Let me make sure I've
5  got -- that he has the right exhibit.  This
6  would have been the letter of transmittal to
7  Roy Minter through the Gunther, Adams and Gay
8  from Lieutenant Garvin and it was dated
9  April 28th, 2021.
10         MR. O'CONNOR:  I don't think you and he
11 are looking at the same document.  Exhibit 6 is
12 entitled Savannah Police Department, Response to
13 Resistance Report, and the first line after that
14 says incident details.
15         MR. SCHIAVONE:  All right.  Just give me a
16 second; okay?
17         MR. O'CONNOR:  Sure.
18         MR. SCHIAVONE:  Because I don't want to
19 confuse anyone.
20         MR. O'CONNOR:  Mike, I think you and
21 Lieutenant Garvin are looking at different
22 documents.  If you have the document and you
23 want to scan it over here we can print it.
24         MR. SCHIAVONE:  All right.  Give me a
25 second then.

## 34

1          (Recess taken from 11:12 a.m. to 11:33
2  a.m.)
3          MR. WILSON:  So I think we'll mark this as
4  Exhibit 7.
5          (Exhibit 7 was marked for identification.)
6          MR. O'CONNOR:  All right, Mike.
7  Lieutenant Garvin's got what's been marked
8  Exhibit 7 now which is entitled Letter of
9  Transmittal, Savannah Police heading and then
10 Letter of Transmittal.
11         MR. SCHIAVONE:  Great.  Thank you.
12     Q.  (By Mr. Schiavone)  All right, Lieutenant.
13 Let me give you a chance to review it.  Exhibit 7 is
14 dated April 28th, 2021.  It's a report, apparently,
15 that you prepared; is that correct?
16     A.  Yes.
17     Q.  And you were directed by one of those
18 officers again, the chief, Lenny Gunther, Major
19 Adams, Captain Gay to create a new report -- weren't
20 you? -- four days after the suit was filed, weren't
21 you?
22     A.  No, sir.
23     Q.  Nobody contacted you and told you to do
24 this?
25     A.  I was called to Captain David Gay at the

**EXHIBIT 12**

**35**

1 time to complete the investigation of the incident.
2    Q.    All right. Did he tell you that this was
3 being ordered by the chief?
4    A.    He told me that it had to be completed
5 because it was not completed. I have no idea
6 anything else after that, sir.
7    Q.    All right. The beginning of Exhibit 7 it
8 says, this investigation was an internal complaint
9 against the warrant squad. Explain to me what that
10 means.
11    A.    It was an in-house investigation, sir.
12    Q.    All right. So this was not from a citizen
13 or the defendant or the defendant's family?
14    A.    No, sir.
15    Q.    All right. And you in turn did this
16 report; is that correct?
17    A.    Based on what you -- a copy of this, yes.
18    Q.    All right. And Arango and Kang had been
19 fired on July 14th, 2020; is that correct?
20    A.    I have no idea, sir.
21    Q.    Well, in order to do this report, didn't
22 you have to go and interview all the witnesses?
23    A.    I don't believe I talked to anyone. It
24 was so long ago. Based on what I have in front of
25 me, this is my investigation.

**36**

1    Q.    All right. So based on your memory then,
2 I mean, tell me what the normal procedure would be
3 before you do a letter of transmittal. Would you
4 have gone and interviewed all the witnesses?
5    A.    I would have talked to all, everybody that
6 was involved in the use of force.
7    Q.    And you would have looked at all the
8 exhibits and if there were video of the incident you
9 would review all that?
10    A.    As I indicated before, I did watch the
11 body-worn camera. And the thing that had me
12 disturbed was the mere fact that Sergeant Arango told
13 the officers to turn off their body-worn cameras.
14    Q.    All right. And was that the basis of your
15 recommendations in this exhibit?
16    A.    I need to look at. It was several
17 violations that were stated. And under
18 recommendation I recommended that the violations
19 against Sergeant Arango and Corporal Kang be
20 sustained.
21    Q.    All right. Was that based upon him not
22 ordering that the videos be turned on?
23    A.    That was based on what the reports were,
24 what I looked at, and what the policy violation as
25 indicated on this form here, sir.

**37**

1    Q.    All right. You didn't make any finding of
2 use of force, did you, excessive use-of-force policy?
3    A.    Looking at what I have in front of me,
4 there's nothing in -- directly says anything about
5 the use of force. It's about the oath of office,
6 ethics and conduct and the body-worn camera and
7 supervisory responsibility.
8    Q.    All right. It also shows that nothing was
9 done with the Douglas Factors which would be normal
10 procedure; is that correct?
11    A.    It doesn't show my initials, but that
12 doesn't mean nothing was done with it.
13    Q.    All right. And at some point you
14 submitted this report to whom?
15    A.    The captain, David Gay.
16    Q.    And if you'll notice that that's attached
17 to this Exhibit 7. And Captain Gay on June 22nd,
18 2021 reversed your findings as to Kang who was
19 involved in a civil suit now. He didn't sustain
20 those two allegations, did he?
21    A.    Reading what Captain Gay said, he says, I
22 sustain the two allegations against Sergeant Arango
23 and additionally I also sustain the third allegation
24 against Sergeant Arango.
25    Q.    But he does not sustain the allegations

**38**

1 against Kang who filed the civil suit, did he?
2    A.    Corporal Kang's name is nowhere in this
3 report, sir. Oh, I'm sorry.
4    Q.    All right.
5    A.    I see it now. I apologize. Thank you.
6    Q.    So it's true that he didn't -- he reversed
7 you on those two allegations?
8    A.    As I stated before, it goes up the chain
9 of command. Whatever my recommendations are or what
10 I find I send it up. The person behind me may see
11 something different. That's why we have a -- that's
12 why we have a policy. That's why we also have a
13 chain of command.
14    Q.    All right. And Gay, Captain Gay, he
15 inserts an additional charge against Arango
16 considering aggression and resistance of force, the
17 use of nondeadly force, didn't he?
18    A.    As it indicated on this paper, yes.
19    Q.    And -- and that was contrary to what you
20 had found; isn't that true?
21    A.    As I indicated on what I submitted, this
22 is what I investigated.
23    MR. SCHIAVONE: All right. Give me one
24 second, please.
25    MR. O'CONNOR: Sure.

EXHIBIT 12

## 39

1    (Pause.)

2         MR. SCHIAVONE:  Pat, I think that's

3    everything I've got.  Thank you.

4         MR. O'CONNOR:  Thank you.  The City has no

5    questions for Lieutenant Garvin.  Mr. Dove may

6    have some questions for you.

7         MR. DOVE:  Yeah.  I just have a couple

8    questions.

9         MR. O'CONNOR:  He represents Chief Minter.

10        THE WITNESS:  Okay.

11             EXAMINATION

12   BY MR. DOVE:

13   Q.   Hey, Lieutenant.  My name's Taylor Dove.

14   Like he said, I represent Chief Minter in this case.

15        You mentioned earlier that everyone in the

16   department knew about the HR complaints, correct?

17   A.   Yes.

18   Q.   You don't have personal knowledge, though,

19   of what Chief Minter may have known about these

20   particular complaints, correct?

21   A.   I'm not sure if he got a copy of the

22   petition or whatever.  I can't speak for Chief

23   Minter.

24        MR. DOVE:  Okay.  That's all I've got.

25        MR. O'CONNOR:  All right.  That's it.

**Gilbert & Jones**

## 40

1    Thank you, Mike.

2         MR. SCHIAVONE:  Thanks.

3         MR. O'CONNOR:  You're done.

4         THE WITNESS:  Thank you, sir.

5         (Deposition concluded at 11:42 a.m.)

6         (Pursuant to Rule 30(e) of the Federal

7    Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e)

8    signature of the witness has been reserved.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Gilbert & Jones**

## 41

1

2

CERTIFICATE OF COURT REPORTER

3    STATE OF GEORGIA:

4    COUNTY OF EFFINGHAM:

5

6         I hereby certify that the foregoing
transcript was reported as stated in the caption and

7    the questions and answers thereto were reduced to
writing by me; that the foregoing 40 pages represent

8    a true, correct, and complete transcript of the
evidence given on August 31, 2022, by the witness,

9    LIEUTENANT TORRANCE GARVIN, who was first duly sworn
by me.

10        I certify that I am not disqualified
for a relationship of interest under

11   O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
Reporter here as an employee of Gilbert & Jones, Inc.

12   who was contacted by Savage & Turner to provide court
reporting services for the proceedings; I will not be

13   taking these proceedings under any contract that is
prohibited by O.C.G.A. 15-14-37(a) and (b) or

14   Article 7.C. of the Rules and Regulations of the
Board; and by the attached disclosure form I confirm

15   that neither I nor Gilbert & Jones, Inc. are a party
to a contract prohibited by O.C.G.A. 15-14-37(a) and

16   (b) or Article 7.C. of the Rules and Regulations of
the Board.

17        This 3rd day of September 2022.

18

19

20

21        _____

22        THOMAS J. DORSEY, CERTIFIED COURT
REPORTER, 2781

23

24

25

**Gilbert & Jones**

## 42

1

2

DISCLOSURE OF NO CONTRACT

3         I, Debbie Gilbert, do hereby disclose
pursuant to Article 10.B of the Rules and Regulations

4    of the Board of Court Reporting of the Judicial
Council of Georgia that Gilbert & Jones, Inc. was

5    contacted by Savage & Turner to provide court
reporting services for these proceedings and there is

6    no contract that is prohibited by O.C.G.A.
15-14-37(a) and (b) or Article 7.C. of the Rules and

7    Regulations of the Board for the taking of these
proceedings.

8         There is no contract to provide reporting
services between Gilbert & Jones, Inc. or any person

9    with whom Gilbert & Jones, Inc. has a principal and
agency relationship nor any attorney at law in this

10   action, party to this action, party having a
financial

11   interest in this action, party to this action, or agent for an attorney at
law in this action, party to this action, or party

12   having a financial interest in this action.  Any and
all financial arrangements beyond our usual and

13   customary rates have been disclosed and offered to
all parties.

14        This 3rd day of September 2022.

15

16

17        _____
Debbie Gilbert, FIRM
REPRESENTATIVE

18        Gilbert & Jones, Inc.

19

20

21

22

23

24

25

**Gilbert & Jones**

# EXHIBIT 12

1 DEPOSITION OF: LIEUTENANT TORRANCE GARVIN /TJD

2 I do hereby certify that I have read all
questions propounded to me and all answers given by
3 me on August 31, 2022, taken before Thomas J. Dorsey,
and that:

4 ___ 1) There are no changes noted.

5 ___ 2) The following changes are noted:

6 Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or the Official Code of Georgia
7 Annotated 9-11-30(e), both of which read in part:
Any changes in form or substance which you desire to
8 make shall be entered upon the deposition...with a
statement of the reasons given...for making them.
9 Accordingly, to assist you in effecting corrections,
please use the form below:

10

11 Page No. ___ Line No. ___ should read:_____

12 The reason for the change is
_____

13 _____

14 Page No. ___ Line No. ___ should read: _____

15 The reason for the change is
_____

16 Page No. _____ Line No. ___ should read:_____

17 The reason for the change is

18

19 Page No. ___ Line No. ___ should read:_____

   The reason for the change is
20

21 Page No. ___ Line No. ___ should read:_____

22 The reason for the change is

23

24 Page No. _____ Line No. ___ should read:_____

   The reason for the change is
25 _____

**Gilbert & Jones**

---

1 DEPOSITION OF: LIEUTENANT TORRANCE GARVIN /TJD

2 Page No. ___ Line No. ___ should read:_____

3 The reason for the change is
_____

4 Page No. ___ Line No. ___ should read:_____

5 The reason for the change is
_____

6 Page No. ___ Line No. ___ should read:_____

7 The reason for the change is

8 _____

9 Page No. ___ Line No. ___ should read:_____

10 The reason for the change is

11 _____

12 Page No. ___ Line No. ___ should read:_____

13 The reason for the change is

14 _____

15 If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to this
16 deposition.

17 _____

18 LIEUTENANT TORRANCE GARVIN

19 Sworn to and subscribed before me,
This the ___ day of _____, 20__.

20 _____

21 Notary Public
My commission expires: _____

22

23 Please forward corrections to:

24 Gilbert & Jones, Inc.
7505 Waters Avenue, Suite F3
25 Savannah, GA 31406
(912) 355-1061
**Gilbert & Jones**

# EXHIBIT 12
## Savannah Police Department
## Show Of Force Report



Print

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 08/03/2019 | 08/03/2019 | 12:40 |

| Record ID Number | CRN | OPS # |
|---|---|---|
| 110 | 190607056 | |

| Date/Time Entered | Entered By | |
|---|---|---|
| 08/03/2019 16:58 | Corporal Daniel Kang | |

## Incident Summary

Deployed 2 less lethal/supersock rounds
Used body pressure to immobilize suspect during handcuffing

## Incident Location

**Addresses**
920 Mohawk Street, Suite/Apt #8F, Savannah, GA, 31419

- Location of Occurrence: Chatham

## Show of Force Details

| Reason For Using Force | Service Being Rendered | More Than 1 Citizen Involved |
|---|---|---|
| Effecting Arrest | Serving A Warrant | No |

| Weather Condition | Light Condition | Distance to Citizen |
|---|---|---|
| Cloudy | Interior Lighting | 7 feet to 10 feet |

| Citizen Arrested | Citizen Build | Citizen Height |
|---|---|---|
| Yes | Larger than officer | 5'7" to 5'9" |

| Citizen Influence Assessment | | |
|---|---|---|
| Agitated | | |

## Crisis Details

## Reporting/Involved Citizen

### Pernell Drayton
**Date of Birth:** 10/18/1990 **Race:** Black **Ethnicity:** Non-Hispanic **Gender:** Male

**Addresses**
920 Mohawk Street, Suite/Apt #8F, Savannah, GA, 31419

**Phone Numbers** [None Entered]
**Role:** Arrestee

**Additional Snapshot Data**

| Homeless at time of involvement | Perceived Limited English | Primary Language |
|---|---|---|

# EXHIBIT 12

[None Entered]                     [None Entered]                     [None Entered]

**Sexual Orientation**             **Gender Expression**              **Experiencing Mental Crisis (Officer Assessment)**

[None Entered]                     [None Entered]                     [None Entered]

**Experiencing Mental Crisis (Self Reported)**    **Armed at Time of Incident**

[None Entered]                     [None Entered]

**Type of Resistance Citizen Used Against Employee**
• Passive Resistance

**Injuries Sustained By Citizen**

| Injury | Region | Injury Location |
| --- | --- | --- |
| Minor Injury | 10, 12 | 1, 2 |



**Charges Against Citizen**
• Felony - Warrants
• Resist / Obstruct

## Incident Employees

### Corporal Daniel Kang - 12043

**Assignment at time of incident:** Corporal Field Operations/Intelligence & Strategic Investigations/Strategic Investigative Unit **Video Footage:** [None Entered]
**Role:** Primary Officer
**Policy Outcome:** Not yet entered

**Force used by this Employee against Citizen**
• Expandable Baton - Force Effective: No

**Less lethal force used by this Employee against Citizen**

| Force Used | Force Effective | Region | Point of Contact |
| --- | --- | --- | --- |
| Expandable Baton | No | | [Non-Contact] |

# EXHIBIT 12



**Injuries Sustained By Employee**

| Injury | Region | Injury Location |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Types |
|---|---|---|
| 08/13/2019 | BWC footage of fugitive apprehension and UOF | mp4 |
| 08/13/2019 | UOF pictures | jpg |
| 08/13/2019 | UOF Picture | jpg |
| 08/13/2019 | UOF picture | jpg |
| 08/13/2019 | UOF picture | jpg |
| 08/13/2019 | BWC footage of fugitive apprehension and UOF | mp4 |
| 08/13/2019 | UOF picture | jpg |
| 08/13/2019 | BWC footage of fugitive apprehension and UOF | mp4 |
| 08/13/2019 | UOF picture | jpg |
| 09/30/2020 | Police Reports | pdf |

## Assignment History

| Date/Time Sent | From | To | Activity |
|---|---|---|---|
| 07/31/2020 09:00 | Lie D Barefield | | Field assigned |

EXHIBIT 12

## Chain of Command History

**Routing Number: 1**

**From**                                                    Corporal Daniel Kang

**To**                                                      Sergeant Octavio Arango

**Cc:**

**Date/Time Sent**                                          08/03/2019 17:07

**Instructions From [ Corporal Daniel Kang ] To [ Sergeant Octavio Arango ]**

Request approval.

**Comments/Response From [ Sergeant Octavio Arango ]**

After reviewing this incident, I find that the force used was both justified and within department policy.

**Routing Number: 2**

**From**                                                    Sergeant Octavio Arango

**To**                                                      Lieutenant Torrance Garvin

**Cc:**

**Date/Time Sent**                                          08/13/2019 15:18

**Instructions From [ Sergeant Octavio Arango ] To [ Lieutenant Torrance Garvin ]**

Lt. Garvin, please review this Use of Force in regards to a non-compliant fugitive.

**Comments/Response From [ Lieutenant Torrance Garvin ]**

There's no ARS reports and no Memo outlining the used of ',Super Shocks ".

**Routing Number: 3**

**From**                                                    Lieutenant Torrance
                                                            Garvin

**To**                                                      Sergeant Octavio
                                                            Arango

**Cc:**

**Date/Time Sent**                                          02/11/2020 17:34

**Instructions From [ Lieutenant Torrance Garvin ] To [ Sergeant Octavio Arango ]**

ARS reports and Memo outlining the details behind the UOF (Super Shock)

**Comments/Response From [ Sergeant Octavio Arango ]**

Incident routing was closed out by IAPro user Lieutenant David Barefield and the incident was re-routed to Lieutenant Joseph L Toth [60165]

**Routing Number: 4**

**From**                                                    Lieutenant David Barefield

**To**                                                      Lieutenant Joseph Toth

**Cc:**

**Date/Time Sent**                                          07/31/2020 09:00

# EXHIBIT 12

**Instructions From [ Lieutenant David Barefield ] To [ Lieutenant Joseph Toth ]**

Re-routed due to termination. Please complete or reassign.

**Comments/Response From [ Lieutenant Joseph Toth ]**

Please complete memorandum covering the use of force with your findings. Thanks JT

**Routing Number: 5**

| | |
|---|---|
| **From** | Lieutenant Joseph Toth |
| **To** | Sergeant Phillip Collard |
| **Cc:** | |
| **Date/Time Sent** | 08/03/2020 14:20 |

**Instructions From [ Lieutenant Joseph Toth ] To [ Sergeant Phillip Collard ]**

Please complete Memo regarding the use of force. Thanks

**Comments/Response From [ Sergeant Phillip Collard ]**

This is a year old and I was not present or assigned to this unit. Not sure it would be ethical for me to investigate this matter.

**Routing Number: 6**

| | |
|---|---|
| **From** | Sergeant Phillip Collard |
| **To** | Lieutenant Joseph Toth |
| **Cc:** | |
| **Date/Time Sent** | 08/26/2020 11:35 |

**Instructions From [ Sergeant Phillip Collard ] To [ Lieutenant Joseph Toth ]**

UOF

**Comments/Response From [ Lieutenant Joseph Toth ]**

[Open routing]



# EXHIBIT 12
## Savannah Police Department
## Response To Resistance Report

## Incident Details

**Date Received**

08/03/2019

**Record ID Number**

3812

**Date/Time Entered**

03/16/2021 14:25

**SPD BlueTeam LIVE Assigned Investigator**

Interim Assistant Chief Devonn Adams - 1440

**Date of Occurrence**

08/03/2019

**CRN**

190607056

**Entered By**

[IAPro entry - Corporal Sean Sueaquan]

**IAPro Assigned Investigator**

Un-assigned

**Time of Occurrence**

12:40

**OPS #**

RR21-0105

## Incident Summary

Deployed 2 less lethal/supersock rounds
Used body pressure to immobilize suspect during handcuffing

## Incident Location

**Addresses**

920 Mohawk Street, Savannah, GA, 31419

- Location of Occurrence: Chatham

## Use of Force Details

**Reason For Using Force**

Effecting Arrest

**Weather Condition**

Cloudy

**Citizen Injured**

Yes

**Citizen Build**

Larger than officer

**Employee(s) Injured**

No

**Service Being Rendered**

Serving A Warrant

**Light Condition**

Interior Lighting

**Citizen Hospitalized**

No

**Citizen Height**

5'7" to 5'9"

**Employee(s) Taken to Hospital**

Yes

**More Than 1 Citizen Involved**

Yes

**Distance to Citizen**

7 feet to 10 feet

**Citizen Arrested**

Yes

**Citizen Influence Assessment**

Agitated

## Crisis Details

## Reporting/Involved Citizen
### Pernell Drayton
**Date of Birth:** 10/18/1990   **Race:** Black   **Ethnicity:** Non-Hispanic   **Gender:** Male

**Addresses**

920 Mohawk Street, Savannah, GA, 31419

**Phone Numbers** [None Entered]
**Role:** Arrestee

**Additional Snapshot Data**

| **Homeless at time of involvement** | **Perceived Limited English** | **Primary Language** |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

| **Sexual Orientation** | **Gender Expression** | **Experiencing Mental Crisis (Officer Assessment)** |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

| **Experiencing Mental Crisis (Self Reported)** | **Armed at Time of Incident** |
|---|---|
| [None Entered] | [None Entered] |

**Type of Resistance Citizen Used Against Employee**
· Passive Resistance

**Injuries Sustained By Citizen**

| **Injury** | **Region** | **Injury Location** |
|---|---|---|
| Minor Injury | | |



FRONT          BACK

**Charges Against Citizen**
· Resist / Obstruct
· Felony - Warrants

## Pernell Drayton

**Date of Birth:** Unknown   **Race:** Black   **Ethnicity:** Unknown   **Gender:** Male

**Addresses** [None Entered]
**Phone Numbers** [None Entered]
**Role:** [None Entered]

**Additional Snapshot Data**

| **Homeless at time of involvement** | **Perceived Limited English** | **Primary Language** |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

| **Sexual Orientation** | **Gender Expression** | **Experiencing Mental Crisis (Officer Assessment)** |
|---|---|---|

**EXHIBIT 12**

[None Entered]                      [None Entered]                      [None Entered]

**Experiencing Mental Crisis (Self Reported)**        **Armed at Time of Incident**

[None Entered]                      [None Entered]

**Type of Resistance Citizen Used Against Employee**
· Passive Resistance

**Injuries Sustained By Citizen**

| Injury | Region | Injury Location |
|---|---|---|
| Minor Injury | 10, 12 | 1, 2 |



FRONT                    BACK

## Incident Employees

### Corporal Daniel Kang - 12043

**Assignment at time of incident:** Corporal Field Operations/Intelligence & Strategic Investigations/Strategic Investigative Unit **Video Footage:** Issued - Activated - Effective
**Role:** Primary Officer
**Policy Outcome:** Within policy - but secondary policy shortfall

**Force used by this Employee against Citizen**
· Firearm - Force Effective: Yes

**Less lethal force used by this Employee against Citizen**

| Force Used | Force Effective | Region | Point of Contact |
|---|---|---|---|
| Firearm | Yes | 10, 12 | 1, 2 |

**EXHIBIT 12**



FRONT       BACK

Missed

**Injuries Sustained By Employee**

| Injury | Region | Injury Location |
|---|---|---|

No injuries noted or visible

## Tasks
No tasks to show

## Running Sheet Entries
No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Types |
|---|---|---|
| 06/22/2021 | LOT- 190607056 Arrango | docx |
| 06/22/2021 | KangArangoUoC memo | pdf |
| 06/15/2021 | ADM-007 Police Response to Aggression, Resistance, and Force | pdf |
| 06/22/2021 | Daniel Kang body-worn camera video | |
| 04/13/2021 | CPL Kang's BWC from 6/7/2019 | |
| 06/22/2021 | Body-worn video | |

## Assignment History

| Date/Time Sent | From | To | Activity |
|---|---|---|---|
| 04/13/2021 09:16 | Cor S Sueaquan | | Field status changed in IAPro from to Field assigned |

# EXHIBIT 12

| 04/13/2021 09:16 | Cor S Sueaquan | Corporal Sean Sueaquan | IAPro assigned |
|---|---|---|---|
| 04/13/2021 10:33 | Corporal Sean Sueaquan | Lieutenant Torrance Garvin | Incident re-assigned by Corporal Sean Sueaquan to Lieutenant Torrance Garvin for further work-up. |
| 06/22/2021 13:48 | Cap D Barefield | | Field status changed in IAPro from Completed - review pending to Released |
| 06/22/2021 13:49 | Cap D Barefield | | Field status changed in IAPro from Released to Field assigned |
| 06/22/2021 13:49 | Cap D Barefield | Captain David Gay | IAPro assigned |
| 06/22/2021 13:51 | Captain David Gay | Interim Assistant Chief Robert Gavin | Incident re-assigned by Captain David Gay to Major Robert Gavin for further work-up. |
| 06/22/2021 15:12 | Cor S Sueaquan | Interim Assistant Chief Devonn Adams | IAPro assigned as part of IAPro re-route |
| 07/06/2021 15:07 | Cor S Sueaquan | | Field status changed in IAPro from Completed - in holding bin to Released |

# Chain of Command History

**Routing Number: 1**

**From** Corporal Sean Sueaquan

**To** Corporal Sean Sueaquan

**Cc:**

**Date/Time Sent** 04/13/2021 09:16

**Instructions From [ Corporal Sean Sueaquan ] To [ Corporal Sean Sueaquan ]**

Use Kang's original SoF21-0003, to complete this Response to Resistance

**Comments/Response From [ Corporal Sean Sueaquan ]**

[Corporal Sean Sueaquan has re-assigned the incident to Corporal Sean Sueaquan]

**Routing Number: 2**

**From** Corporal Sean Sueaquan

**To** Lieutenant Torrance Garvin

**Cc:**

**Date/Time Sent** 04/13/2021 10:33

**Instructions From [ Corporal Sean Sueaquan ] To [ Lieutenant Torrance Garvin ]**

# EXHIBIT 12

This June 7, 2019, incident was originally submitted by CPL Kang on August 3, 2019, as a Show of Force - SoF21-0003. Before it could be corrected/changed to a Response to Resistance, CPL Kang was terminated and a new entry was resubmitted/duplicated to properly document this incident.

When this Response to Resistance entry was duplicated [from SoF21-0003], the Show of Force/ Use of Force and Crisis Details did not populate and had to be done manually. Moreover, in CPL Kang's initial SoF, he selected "Expandable Baton" as the type of force used, which was changed to "Firearm", based in part on his narrative that he "Deployed 2 less lethal/supersock rounds".

In addition, we added the evidence.com link/URL, of CPL Kang's BWC for this incident, since it was not included in with the initial SoF that was submitted.

Please review and forward with you findings

**Comments/Response From [ Lieutenant Torrance Garvin ]**

This is LOT for Sgt Arango & Cpl. D. Kang

**Routing Number: 3**

**From** Lieutenant Torrance Garvin

**To** Captain David Gay

**Cc:**

**Date/Time Sent** 05/03/2021 02:19

**Instructions From [ Lieutenant Torrance Garvin ] To [ Captain David Gay ]**

Capt. Gay,

Here is the LOT for Sgt Arango & Cpl Kang

**Comments/Response From [ Captain David Gay ]**

[Forwarded by Captain David Gay]

**Routing Number: 4**

**From** Captain David Gay

**To** Lieutenant Torrance Garvin

**Cc:**

**Date/Time Sent** 06/04/2021 11:12

**Instructions From [ Captain David Gay ] To [ Lieutenant Torrance Garvin ]**

Please check your e-mail.

Thnaks

**Comments/Response From [ Lieutenant Torrance Garvin ]**

Changes were made to reflect that either officer is still present with our agency

**Routing Number: 5**

**From** Lieutenant Torrance Garvin

**To** Captain David Gay

**Cc:**

**Date/Time Sent** 06/13/2021 00:21

**Instructions From [ Lieutenant Torrance Garvin ] To [ Captain David Gay ]**

CITY0836

# EXHIBIT 12

Capt. Gay,

The changes were made to reflect that neither officer is employed with SPD agency and no further action is needed for this incident.

**Comments/Response From [ Captain David Gay ]**

[Forwarded by Captain David Gay]

**Routing Number: 6**

**From** Captain David Gay

**To** Lieutenant Torrance Garvin

**Cc:**

**Date/Time Sent** 06/16/2021 15:33

**Instructions From [ Captain David Gay ] To [ Lieutenant Torrance Garvin ]**

Torrance,

Address the issues in my e-mail and resubmit.

Thanks

**Comments/Response From [ Lieutenant Torrance Garvin ]**

Capt. Gay

All necessary corrections have been made to LOT & Memo

**Routing Number: 7**

**From** Lieutenant Torrance Garvin

**To** Captain David Gay

**Cc:**

**Date/Time Sent** 06/16/2021 23:00

**Instructions From [ Lieutenant Torrance Garvin ] To [ Captain David Gay ]**

Capt. Gay,

Corrections made to LOT & Memo

**Comments/Response From [ Captain David Gay ]**

[Forwarded by Captain David Gay]

**Routing Number: 8**

**From** Captain David Gay

**To** Captain David Gay

**Cc:**

**Date/Time Sent** 06/22/2021 13:38

**Instructions From [ Captain David Gay ] To [ Captain David Gay ]**

I need to upload an amended LOT

**Comments/Response From [ Captain David Gay ]**

CITY0837

# EXHIBIT 12

Routing was NOT completed in BlueTeam.  The incident was moved into IAPro by IAPro user Lieutenant David Barefield

**Routing Number: 9**

**From** Captain David Barefield

**To** Captain David Gay

**Cc:**

**Date/Time Sent** 06/22/2021 13:49

**Instructions From [ Captain David Barefield ] To [ Captain David Gay ]**

Sending back so that you can upload attachments

**Comments/Response From [ Captain David Gay ]**

[Captain David Gay has re-assigned the incident to Captain David Gay]

**Routing Number: 10**

**From** Captain David Gay

**To** Major Robert Gavin

**Cc:**

**Date/Time Sent** 06/22/2021 13:51

**Instructions From [ Captain David Gay ] To [ Major Robert Gavin ]**

Assignment is complete.  See the attached LOT and memo for details.

**Comments/Response From [ Major Robert Gavin ]**

Incident assignment and routing were closed out by IAPro user Corporal Sean Sueaquan and the incident was re-assigned and re-routed to Major Devonn C Adams [1440]

**Routing Number: 11**

**From** Interim Assistant Chief Robert Gavin

**To** Interim Assistant Chief Devonn Adams

**Cc:**

**Date/Time Sent** 06/22/2021 15:12

**Instructions From [ Interim Assistant Chief Robert Gavin ] To [ Interim Assistant Chief Devonn Adams ]**

This should have been sent to you for review

**Comments/Response From [ Interim Assistant Chief Devonn Adams ]**

Completion notes: I CONCUR WITH CAPTAIN GAY AND FINDINGS

CITY0838

**EXHIBIT 12**

# SAVANNAH POLICE

To Serve, Protect and Build Trust

*SavannahPD.org*

## Letter of Transmittal

**TO:**     Roy Minter, Police Chief

**THRU:**   Lenny Gunther, Assistant Chief

           DeVonn Adams, Major

           David Gay, Captain

**FROM:**   Torrance Garvin, Lieutenant

**DATE:**   April 28, 2021

**SUBJECT:**   CRN#190607056

---

### COMPLAINT:

This investigation was an internal complaint against The Warrant Squad that was assigned under The Special Investigations Section. The following officers are assigned to the Warrant Squad: Sgt. Octavio Arango, Cpl. Brandon Lord, Cpl. Daniel Kang and Apo. Ronald Reagin. The Warrant Squad was tasked with apprehending offenders with outstanding warrants from Savannah Police Department.

On July 1 and July 3, 2019, the Warrant Squad was attempting to locate Pernell Drayton who had outstanding warrants for aggravated assault, aggravated battery and cruelty to children. The Warrant Squad responded to various previous residences attempting to locate Drayton to no avail.

### ALLEGATIONS:

**Sgt. Octavio Arango, Payroll# 00173**

**SPD GO #ADM-002 Organization and Direction, IV, A**

   **IV SUPERVISORY RESPONSIBILITY**

A.     The responsibility of a supervisor is to account for employees under their supervision and to ensure that tasks are performed correctly and efficiently. A supervisor will be held responsible for issuing proper orders. To accomplish this responsibility, these orders must not be unlawful or in violation of Department rules and regulations or policies and procedures.



EXHIBIT

7

8/31/22  TD

**EXHIBIT 12**





**SPD GO# ADM-004 Oath of Office, Ethics and Conduct**

**AA.** Orders - Orders from a superior to a subordinate will be in clear and understandable language, civil in tone, and issued in pursuit of SPD business.

**1.** Inappropriate Orders - No command or supervisory Officer will knowingly issue an order which is in violation of any law, ordinance, or Department rule. Employees who are given orders they feel to be unjust or contrary to rules and regulations must first obey the order to the best of their ability and then may proceed to appeal as provided below

**Cpl. Daniel Kang, Payroll#12043**

**SPD GO# ADM-004 Oath of Office, Ethics and Conduct**

**AA.** Orders - Orders from a superior to a subordinate will be in clear and understandable language, civil in tone, and issued in pursuit of SPD business.

**3.** Action upon receiving unlawful Orders - SPD employees receiving an unlawful, unjust, or improper order will, at the first opportunity, report in writing to the Chief of Police through official channels. This report will contain the facts of the incident and the action taken. Appeals for relief from such orders may be made at the same time. Extra-departmental action regarding such an appeal will be conducted through the office of the Chief of Police.

**SPD GO #OPS-067 Body Worn Camera**

**B. Officer Responsibilities**
**C. Activation and Deactivation of Body Worn Camera**

1. The BWC will be activated for all incidents involving citizen contacts. This would include, but is not limited to calls for service, traffic stops, activation of emergency equipment, suspicious person(s), vehicle contacts, use of force situations, warrant service, pursuits, arrest, if a pending citizen complaint is likely or any other significant event that would require supervisory notification. (CALEA 41.3.8 b, c)

**RECOMMENDATIONS:**

I recommend that the allegations against **Sgt. Octavio Arango**

**SPD GO #ADM-002 Organization and Direction, IV, A**          **SUSTAINED**

**EXHIBIT 12**



*SavannahPD.org*

**SPD GO#ADM-004 Oath of Office, Ethics and Conduct, AA; 1**     <u>SUSTAINED</u>


I recommend that the allegations against **Cpl. Daniel Kang**

**SPD GO# ADM-004 Oath of Office, Ethics and Conduct, AA; 3**     <u>SUSTAINED</u>

**SPD GO #OPS-067 Body Worn Camera, B, C**     <u>SUSTAINED</u>


## <u>RATIONALE:</u>

On 08/03/2019, The Warrant Squad executed arrest warrants at 920 Mohawk St, Apt 8F. It was determined that Pernell Drayton had active arrests warrants for Aggravated Battery, Cruelty to Children, and Aggravated Assault. It was also discovered that Drayton's live-in girlfriend, Carol Quinones, had an active Probation Violation warrant.

As the unit approached the apartment, there was a sign stating, "Trespassers will be shot" on the front window. Cpl. Lord knocked on the front door and Quinones answered the door with two small children. Quinones stated that Mr. Drayton was not present. Quinones was informed that she had an active misdemeanor Probation Violation Warrant. Her sister was to take custody of her two children.

Quinones stated that she did not want anyone going into her apartment and wanted the door to be left unlocked for her sister. The decision to enter the apartment to look for Drayton was made by Sgt. Arango due to Quinones suspicious behavior. The Warrant Squad proceeded to enter and look for Mr. Drayton. Announcements were made stating "POLICE" and that anyone in the apartment needed to advise. Apo. Reagin advised he observed movement in through the bathroom door. After repeated commands, the door opened, and Drayton was seated on the toilet. Drayton refused to show his hands after various commands, so Cpl. Kang shot Drayton with a less lethal/super sock munition.

The first round made Drayton stand up from the toilet, but he still did not comply. Cpl. Kang shot a second less lethal/super sock munition to Drayton. Apo. Reagin placed Drayton in handcuffs after a short struggle. Drayton was extremely disorderly, but after arrest and double locking he calmed down.

Drayton was secured inside the transport wagon and Quinones was moved from a marked unit to the transport wagon by Cpl. Lord. She was escorted to the wagon and pulled away from Cpl. Lord during escort. Quinones was pinned to the Cruiser door and advised to calm down. Both Drayton and Quinones were transported to Memorial Hospital for evaluation and clearance.

**EXHIBIT 12**

# SAVANNAH POLICE
### To Serve, Protect and Build Trust

*SavannahPD.org* 

During this encounter, Sgt. Arango advised Cpl. Kang to disconnect his BWC which he did do. BWC footage was available on Cpl. Lord's and Apo. Reagin's BWC.

## CORRECTIVE MEASURES:

Since both officer no longer works for this agency no further action is needed in this incident.

## ADMINISTRATIVE INSIGHT:

**Training Issues- N/A**

**Workplace Issues- N/A**

**Work / Complaint History- N/A**

**Demotion / Downgrade Considerations-**

**Relief from Duty Considerations- N/A**

## Douglas Factors

1) _____The nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; The action

2) _____The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position.

3) _____The employees past disciplinary record.

4) _____ The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability.

5) _____The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties.

**EXHIBIT 12**



6) _____ Consistency of the penalty with those imposed upon other employees for the same or similar offenses.

7) _____ Consistency of the penalty with any applicable agency table of penalties; **N/A**

8) _____ The notoriety of the offense or its impact upon the reputation of the agency.

9) _____ The clarity with which the employee was on notice of any rules that were violated in committing the offense or had been warned about the conduct in question.

10) _____ Potential for the employee's rehabilitation.

11) _____ Mitigating circumstances surrounding the offense such as unusual job tension, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter.

12) _____ The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

I hereby certify that I have considered the twelve (12) Douglas Factors as indicated above (with my initial next to each factor) for possible mitigation of the penalty.


**NAME**_____ **DATE**_____

**CAPTAIN'S COMMENTS**

**SIGNATURE**_____

**DATE**         _____


**MAJOR'S COMMENTS:**

**SIGNATURE**_____


EXHIBIT 12



*SavannahPD.org*

**DATE** _____

**ASSISTANT CHIEF'S COMMENTS**

**SIGNATURE**_____

**DATE** _____

**CHIEF'S COMMENTS:**

**SIGNATURE**_____

**DATE** _____

**EXHIBIT 12**



# SAVANNAH POLICE
### To Serve, Protect and Build Trust

*SavannahPD.org*

<u>INTER-OFFICE CORRESPONDENCE</u>

**TO:**       Roy Minter, Chief of Police

**Thru:**     Lenny Gunther, Assistant Chief of Police
             Robert Gavin, Major Field Operations

**FROM:**     David W. Gay, Captain, Criminal Investigations Division

**SUBJECT:**  OPS# Pending (CRN 190607056)

**DATE:**     June 22nd , 2021

---

After reviewing the file, I submit the following:

I do not sustain either of the two allegations against Corporal Kang.

I sustain the two allegations against Sergeant Arango. Additionally, I also sustain a third allegation against Sergeant Arango under GO# ADM-007.

Allegation #3

**GO# ADM-007 Police Response to Aggression/ Resistance/ Force**

II Non-Deadly Force

    A Parameters for the use of non-deadly force

        1. All officers who encounter a situation where the possibility of non-compliance to a lawful arrest exists, if possible, attempt to defuse the situation through verbal warning and persuasion.

This verbiage was taken from the policy in effect at the time of the incident and is included as part of the BlueTeam file.

Since both officers are no longer employed by SPD, I will not recommend discipline.

# EXHIBIT 12

Print

# Savannah Police Department
# Response To Resistance Report

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 08/03/2019 | 08/03/2019 | 12:40 |
| **Record ID Number** | **CRN** | **OPS #** |
| 3812 | 190607056 | RR21-0105 |
| **Date/Time Entered** | **Entered By** | |
| 03/16/2021 14:25 | [IAPro entry - Corporal Sean Sueaquan] | |
| **SPD BlueTeam LIVE Assigned Investigator** | **IAPro Assigned Investigator** | |
| Major Devonn Adams - 1440 | Un-assigned | |

## Incident Summary

Deployed 2 less lethal/supersock rounds
Used body pressure to immobilize suspect during handcuffing

## Incident Location

**Addresses**
920 Mohawk Street, Savannah, GA, 31419

- Location of Occurrence: Chatham

## Use of Force Details

| Reason For Using Force | Service Being Rendered | More Than 1 Citizen Involved |
|---|---|---|
| Effecting Arrest | Serving A Warrant | Yes |
| **Weather Condition** | **Light Condition** | **Distance to Citizen** |
| Cloudy | Interior Lighting | 7 feet to 10 feet |
| **Citizen Injured** | **Citizen Hospitalized** | **Citizen Arrested** |
| Yes | No | Yes |
| **Citizen Build** | **Citizen Height** | **Citizen Influence Assessment** |
| Larger than officer | 5'7" to 5'9" | Agitated |
| **Employee(s) Injured** | **Employee(s) Taken to Hospital** | |
| No | Yes | |

## Crisis Details

## Reporting/Involved Citizen
### Pernell Drayton
**Date of Birth:** 10/18/1990   **Race:** Black   **Ethnicity:** Non-Hispanic   **Gender:** Male

**Addresses**
920 Mohawk Street, Savannah, GA, 31419

**Phone Numbers** [None Entered]

# EXHIBIT 12

Role: Arrestee

**Additional Snapshot Data**

| Homeless at time of involvement | Perceived Limited English | Primary Language |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

| Sexual Orientation | Gender Expression | Experiencing Mental Crisis (Officer Assessment) |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

| Experiencing Mental Crisis (Self Reported) | Armed at Time of Incident |
|---|---|
| [None Entered] | [None Entered] |

**Type of Resistance Citizen Used Against Employee**
· Passive Resistance

**Injuries Sustained By Citizen**

| Injury | Region | Injury Location |
|---|---|---|
| Minor Injury | | |



FRONT    BACK

**Charges Against Citizen**
· Felony - Warrants
· Resist / Obstruct

## Pernell Drayton

**Date of Birth:** Unknown   **Race:** Black   **Ethnicity:** Unknown   **Gender:** Male

**Addresses** [None Entered]
**Phone Numbers** [None Entered]
**Role:** [None Entered]

**Additional Snapshot Data**

| Homeless at time of involvement | Perceived Limited English | Primary Language |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

| Sexual Orientation | Gender Expression | Experiencing Mental Crisis (Officer Assessment) |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

# EXHIBIT 12

**Experiencing Mental Crisis (Self Reported)**

[None Entered]

**Armed at Time of Incident**

[None Entered]

**Type of Resistance Citizen Used Against Employee**
· Passive Resistance

**Injuries Sustained By Citizen**

| Injury | Region | Injury Location |
|---|---|---|
| Minor Injury | 10, 12 | 1, 2 |



# Incident Employees

## Corporal Daniel Kang - 12043

**Assignment at time of incident:** Corporal Field Operations/Intelligence & Strategic Investigations/Strategic Investigative Unit Video Footage: Issued - Activated - Effective
**Role:** Primary Officer
**Policy Outcome:** Not yet entered

**Force used by this Employee against Citizen**
· Firearm - Force Effective: Yes

**Less lethal force used by this Employee against Citizen**

| Force Used | Force Effective | Region | Point of Contact |
|---|---|---|---|
| Firearm | Yes | 10, 12 | 1, 2 |

# EXHIBIT 12



**Injuries Sustained By Employee**

| Injury | Region | Injury Location |
|---|---|---|
| No injuries noted or visible | | |

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Types |
|---|---|---|
| 06/22/2021 | Body-worn video | |
| 06/22/2021 | LOT- 190607056 Arrango | docx |
| 06/15/2021 | ADM-007 Police Response to Aggression, Resistance, and Force | pdf |
| 06/22/2021 | Daniel Kang body-worn camera video | |
| 06/22/2021 | KangArangoUoC memo | pdf |
| 04/13/2021 | CPL Kang's BWC from 6/7/2019 | |

## Assignment History

| Date/Time Sent | From | To | Activity |
|---|---|---|---|
| 04/13/2021 09:16 | Cor S Sueaquan | | Field status changed in IAPro from to Field assigned |
| 04/13/2021 09:16 | Cor S Sueaquan | Corporal Sean Sueaquan | IAPro assigned |

EXHIBIT 12

| | | | |
|---|---|---|---|
| 04/13/2021 10:33 | Corporal Sean Sueaquan | Lieutenant Torrance Garvin | Incident re-assigned by Corporal Sean Sueaquan to Lieutenant Torrance Garvin for further work-up. |
| 06/22/2021 13:48 | Lie D Barefield | | Field status changed in IAPro from Completed - review pending to Released |
| 06/22/2021 13:49 | Lie D Barefield | | Field status changed in IAPro from Released to Field assigned |
| 06/22/2021 13:49 | Lie D Barefield | Captain David Gay | IAPro assigned |
| 06/22/2021 13:51 | Captain David Gay | Major Robert Gavin | Incident re-assigned by Captain David Gay to Major Robert Gavin for further work-up. |
| 06/22/2021 15:12 | Cor S Sueaquan | Major Devonn Adams | IAPro assigned as part of IAPro re-route |
| 07/06/2021 15:07 | Cor S Sueaquan | | Field status changed in IAPro from Completed - in holding bin to Released |

# Chain of Command History

**Routing Number: 1**

| | |
|---|---|
| **From** | Corporal Sean Sueaquan |
| **To** | Corporal Sean Sueaquan |
| **Cc:** | |
| **Date/Time Sent** | 04/13/2021 09:16 |

**Instructions From [ Corporal Sean Sueaquan ] To [ Corporal Sean Sueaquan ]**

Use Kang's original SoF21-0003, to complete this Response to Resistance

**Comments/Response From [ Corporal Sean Sueaquan ]**

[Corporal Sean Sueaquan has re-assigned the incident to Corporal Sean Sueaquan]

**Routing Number: 2**

| | |
|---|---|
| **From** | Corporal Sean Sueaquan |
| **To** | Lieutenant Torrance Garvin |
| **Cc:** | |
| **Date/Time Sent** | 04/13/2021 10:33 |

**Instructions From [ Corporal Sean Sueaquan ] To [ Lieutenant Torrance Garvin ]**

This June 7, 2019, incident was originally submitted by CPL Kang on August 3, 2019, as a Show of Force - SoF21-0003. Before it could be corrected/changed to a Response to Resistance, CPL Kang was terminated and a new entry was resubmitted/duplicated to properly document this incident. When this Response to Resistance entry was duplicated [from SoF21-0003], the Show of Force/ Use of Force and Crisis Details did not populate and had to be done manually. Moreover, in CPL Kang's initial SoF, he selected "Expandable Baton" as the type of force used, which was changed to "Firearm", based in part on his narrative that he "Deployed 2 less lethal/supersock rounds". In addition, we added the evidence.com link/URL, of CPL Kang's BWC for this incident, since it was not included in with the initial SoF that was submitted. Please review and forward with you findings

**Comments/Response From [ Lieutenant Torrance Garvin ]**

# EXHIBIT 12

This is LOT for Sgt Arango & Cpl. D. Kang

**Routing Number: 3**

| | |
|---|---|
| **From** | Lieutenant Torrance Garvin |
| **To** | Captain David Gay |
| **Cc:** | |
| **Date/Time Sent** | 05/03/2021 02:19 |

**Instructions From [ Lieutenant Torrance Garvin ] To [ Captain David Gay ]**

Capt. Gay, Here is the LOT for Sgt Arango & Cpl Kang

**Comments/Response From [ Captain David Gay ]**

[Forwarded by Captain David Gay]

**Routing Number: 4**

| | |
|---|---|
| **From** | Captain David Gay |
| **To** | Lieutenant Torrance Garvin |
| **Cc:** | |
| **Date/Time Sent** | 06/04/2021 11:12 |

**Instructions From [ Captain David Gay ] To [ Lieutenant Torrance Garvin ]**

Please check your e-mail. Thnaks

**Comments/Response From [ Lieutenant Torrance Garvin ]**

Changes were made to reflect that either officer is still present with our agency

**Routing Number: 5**

| | |
|---|---|
| **From** | Lieutenant Torrance Garvin |
| **To** | Captain David Gay |
| **Cc:** | |
| **Date/Time Sent** | 06/13/2021 00:21 |

**Instructions From [ Lieutenant Torrance Garvin ] To [ Captain David Gay ]**

Capt. Gay, The changes were made to reflect that neither officer is employed with SPD agency and no further action is needed for this incident.

**Comments/Response From [ Captain David Gay ]**

[Forwarded by Captain David Gay]

**Routing Number: 6**

| | |
|---|---|
| **From** | Captain David Gay |
| **To** | Lieutenant Torrance Garvin |
| **Cc:** | |
| **Date/Time Sent** | 06/16/2021 15:33 |

**Instructions From [ Captain David Gay ] To [ Lieutenant Torrance Garvin ]**

# EXHIBIT 12

Torrance, Address the issues in my e-mail and resubmit. Thanks

**Comments/Response From [ Lieutenant Torrance Garvin ]**

Capt. Gay All necessary corrections have been made to LOT & Memo

**Routing Number: 7**

| | |
|---|---|
| **From** | Lieutenant Torrance Garvin |
| **To** | Captain David Gay |
| **Cc:** | |
| **Date/Time Sent** | 06/16/2021 23:00 |

**Instructions From [ Lieutenant Torrance Garvin ] To [ Captain David Gay ]**

Capt. Gay, Corrections made to LOT & Memo

**Comments/Response From [ Captain David Gay ]**

[Forwarded by Captain David Gay]

**Routing Number: 8**

| | |
|---|---|
| **From** | Captain David Gay |
| **To** | Captain David Gay |
| **Cc:** | |
| **Date/Time Sent** | 06/22/2021 13:38 |

**Instructions From [ Captain David Gay ] To [ Captain David Gay ]**

I need to upload an amended LOT

**Comments/Response From [ Captain David Gay ]**

Routing was NOT completed in BlueTeam. The incident was moved into IAPro by IAPro user Lieutenant David Barefield

**Routing Number: 9**

| | |
|---|---|
| **From** | Lieutenant David Barefield |
| **To** | Captain David Gay |
| **Cc:** | |
| **Date/Time Sent** | 06/22/2021 13:49 |

**Instructions From [ Lieutenant David Barefield ] To [ Captain David Gay ]**

Sending back so that you can upload attachments

**Comments/Response From [ Captain David Gay ]**

[Captain David Gay has re-assigned the incident to Captain David Gay]

**Routing Number: 10**

| | |
|---|---|
| **From** | Captain David Gay |
| **To** | Major Robert Gavin |
| **Cc:** | |

# EXHIBIT 12

**Date/Time Sent**           06/22/2021
          13:51

**Instructions From [ Captain David Gay ] To [ Major Robert Gavin ]**

Assignment is complete. See the attached LOT and memo for details.

**Comments/Response From [ Major Robert Gavin ]**

Incident assignment and routing were closed out by IAPro user Corporal Sean Sueaquan and the incident was re-assigned and re-routed to Major Devonn C Adams [1440]

**Routing Number: 11**

| | |
|---|---|
| **From** | Major Robert Gavin |
| **To** | Major Devonn Adams |
| **Cc:** | |

**Date/Time Sent**           06/22/2021 15:12

**Instructions From [ Major Robert Gavin ] To [ Major Devonn Adams ]**

This should have been sent to you for review

**Comments/Response From [ Major Devonn Adams ]**

Completion notes: I CONCUR WITH CAPTAIN GAY AND FINDINGS