EXHIBIT 13

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | |
|---|---|
| DANIEL KANG, ) | CIVIL ACTION NO. |
| Plaintiff, ) | |
| ) | 4:21-CV-111-WTM-CLR |
| vs. ) | |
| ) | |
| THE MAYOR AND ALDERMEN OF THE ) | |
| CITY OF SAVANNAH and ROY W. ) | |
| MINTER, JR., Chief of Police ) | |
| for the City of Savannah, ) | |
| Georgia, In His Individual ) | |
| and Official Capacities, ) | |
| ) | |
| Defendants. ) | |

VIDEOCONFERENCE DEPOSITION OF

LIEUTENANT RICHARD WIGGINS

August 29, 2022

9:42 a.m.

218 West State Street
Savannah, Georgia

Thomas J. Dorsey, RPR, CCR-2781

**Gilbert & Jones**
— Certified Court Reporters —

P. O. Box 1894 (31521)
1607 Norwich Street
*Brunswick, GA 31520*

*gilbertandjones1@gmail.com*
**912.264.1670**

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
*Savannah, GA 31406*

EXHIBIT 13

2

```
 1                   APPEARANCES OF COUNSEL

 2
      On behalf of the Plaintiff:
 3
           MICHAEL G. SCHIAVONE, ESQ., (BY VIDEOCONFERENCE)
 4         Schiavone Law Group, P.C.
           1111 Bull Street
 5         Savannah, Georgia  31401
           (912)232-2646
 6         js_law@bellsouth.net

 7         JAMES H. WILSON III, ESQ.
           Savage, Turner, Pinckney, Savage & Sprouse
 8         102 East Liberty Street, 8th Floor
           Savannah, Georgia  31401
 9         (912)231-1140
           jwilson@savagelawfirm.net
10

11    On behalf of the Defendant The Mayor and Aldermen of
      The City of Savannah:
12
           PATRICK T. O'CONNOR, ESQ.
13         PATRICIA T. PAUL, ESQ.
           Oliver Maner LLP
14         218 West State Street
           Savannah, Georgia  31401
15         (912)236-3311
           pto@olivermaner.com
16

17    On behalf of the Defendant Roy W. Minter, Jr.:

18         SHAWN A. KACHMAR, ESQ.
           Hunter Maclean
19         200 East St. Julian Street
           Savannah, Georgia  31401
20         (912)695-6984
           skachmar@huntermaclean.com
21

22    Also Present:

23         Daniel Kang

24                       - - -

25
```

Gilbert & Jones

EXHIBIT 13

**3**

INDEX TO EXAMINATIONS

Examination                          Page

By Mr. Schiavone                        4

By Mr. Kachmar                         49

- - -

INDEX TO EXHIBITS

Exhibit      Description            Page

1         Bates Nos. Kang 001321-329

2         Bates Nos. Kang 001333-459

3         Bates Nos. Kang 000410-1338

(Original Exhibits 1 through 3 have been attached to the original transcript.)

**Gilbert & Jones**

---

**4**

(Reporter disclosure made pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia.)

LIEUTENANT RICHARD WIGGINS, having first been duly sworn, was examined and testified as follows:

MR. SCHIAVONE: All right. This is the deposition of Lieutenant Ricky Wiggins taken pursuant to the Federal Rules of Civil Procedure. I assume that all objections except to the form of the question are reserved?

MR. O'CONNOR: That's agreeable.

MR. SCHIAVONE: Is that correct?

MR. O'CONNOR: That's agreeable. That's agreeable for the City. Mr. Kachmar will have to speak for his client.

MR. KACHMAR: It's agreeable for Chief Minter as well.

MR. SCHIAVONE: Right. All right. Is everybody ready? Yeah, he was just sworn, right?

EXAMINATION

BY MR. SCHIAVONE:

Q. All right. Lieutenant Wiggins, can you

**Gilbert & Jones**

---

**5**

tell me how you're employed, sir?

A. Savannah Police Department.

Q. And how long have you been with SPD?

A. A little over 12 years.

Q. All right. And at some point part of your duties were and are and maybe still be -- are you still in Internal Affairs?

A. I am, now as OPS commander. There was a break in service between promotions.

Q. All right. And were you -- were you promoted or something? Can you tell me what that was?

A. I was. So I was promoted to lieutenant, went back to patrol for a little while, did some other jobs, and then I came back to Internal Affairs in -- over the last few months, May maybe.

Q. All right. Tell me, Internal Affairs, how long have you been in that particular section?

A. So I was in there 18 months as a sergeant where I did investigations, and now it's been about three or four months as a lieutenant.

Q. All right. How does an investigation begin? Can you explain to me the procedure?

A. It can come in one of two ways, internally or externally. Externally obviously from citizens

**Gilbert & Jones**

---

**6**

calling in sending in complaint forms, e-mails of that such. And then we also get them internally from members of the police department. When they see things that they believe are out of policy they can request through the chief or it used to be they requested for the chief for us to investigate those, those complaints.

Q. Okay. Who makes the decision -- I mean, are all complaints investigated?

A. Yes, sir.

Q. Okay. And when I say investigated, does somebody do an initial review of it, of the complaint?

A. Just kind of depends on the complaint.

So things such as rudeness complaints, you know, minor violations of policy typically if we took them in our office we'd listen to the complaint. We wouldn't necessarily review them. We'd send them over to the precinct to be investigated and they'd be investigated by the command staff. And then others depending on the nature of it Internal Affairs investigates things such as allegations of corruption, excessive force, things that could involve civil liability. Anything that, I guess you can really say, absolutely shocks, you know, the

**Gilbert & Jones**

**EXHIBIT 13**

**7**

1 public.
2 Q. All right. And at some point you were
3 assigned to look into a complaint against Dan Kang as
4 well as Mike Arango?
5 A. That's correct.
6 Q. How did that -- how did that process --
7 did somebody contact you and ask you to look into it?
8 A. I was. Our OPS commander at the time was
9 David Barefield, and he assigned it to me.
10 Q. All right. Did you know Officer Kang and
11 Sergeant Arango?
12 A. I did.
13 Q. All right. Did you just know them as
14 officers in the department or did you ever work with
15 them?
16 A. No, I've worked -- I worked with both of
17 them on several occasions.
18 Q. All right. And tell me what you received
19 initially when you were asked and assigned to the
20 case. Did you receive documentation?
21 A. From what I recall, it was the same day
22 that we had an officer-involved shooting that there
23 had been some incident involving a use of force and
24 that they needed to be placed on administrative leave
25 immediately. So I didn't really have much

**Gilbert & Jones**

**8**

1 information at that time.
2 Q. So what would be the first thing that you
3 would do when you received that assignment?
4 A. So in their case they came into the
5 Internal Affairs office and we put them on
6 administrative leave. And then I began gathering,
7 you know, my facts, which is reading reports,
8 watching body-worn camera and anything else that's
9 necessary in that case.
10 Q. And is there a policy that you have to
11 follow in reference to that?
12 A. We have an Internal Affairs policy, but
13 when it comes to the investigations, every
14 investigator I think -- you know, they have their own
15 way of doing things, and that's just kind of the way
16 that works for me. Not necessarily when we get into,
17 well, you've got to read the reports first. Then
18 you've got to do the BWC. You know, it's not
19 anything that's chronological, but there is a policy
20 for OPS.
21 Q. All right. And do you know what, which
22 policy that is?
23 A. OPS-016.
24 MR. SCHIAVONE: All right. I'd ask if
25 either Jim or Dan could have the two policies

**Gilbert & Jones**

**9**

1 that I know they have with them, have them
2 marked as exhibits for me.
3 MR. WILSON: Here. Do you want to mark
4 those as Exhibits 1 and 2?
5 MR. SCHIAVONE: All right. Can you hand
6 those to the witness, please?
7 MR. WILSON: We're just marking them right
8 now.
9 MR. SCHIAVONE: Oh, okay. Thank you.
10 (Exhibits 1 and 2 were marked for
11 identification.)
12 MR. O'CONNOR: Okay.
13 Q. (By Mr. Schiavone) All right. I'd ask
14 you to look at Exhibit 1, and can you identify that
15 for me?
16 A. This is one of our older OPS policies.
17 Q. No. Go ahead. I'm sorry.
18 A. Would most likely have been in -- this
19 would most likely have been the one in effect at the
20 time of this incident that we're discussing.
21 Q. And what's the last date of it having been
22 revised?
23 A. August 29th, 2018.
24 Q. All right. And then can you look at
25 Exhibit 2 and identify that for me?

**Gilbert & Jones**

**10**

1 A. Appears to be another one of our policies.
2 I see the marking of October 30th, 2019 erased, but
3 I -- I couldn't explain why.
4 MR. O'CONNOR: Let's just say for the
5 record these also are Bates stamped, and that
6 probably was done by your office, Jim.
7 MR. WILSON: (Nods head.)
8 MR. O'CONNOR: In other words, they've got
9 numbers in red at the bottom right corners that
10 would not have been part of the policy but are
11 on here for identification.
12 MR. SCHIAVONE: Are you talking about
13 Exhibit 2?
14 MR. O'CONNOR: Both 1 and 2.
15 MR. SCHIAVONE: Neither one of them would
16 have been the policy at the time?
17 MR. O'CONNOR: No, no, no. I'm simply
18 pointing out for the record that the red Bates
19 stamp numbers on the lower right corner of each
20 page of both exhibits was added probably by
21 Mr. Savage and Mr. Wilson's office.
22 MR. SCHIAVONE: I got you. Okay. That's
23 fine.
24 Q. (By Mr. Schiavone) And Lieutenant
25 Wiggins, you're aware that the chief followed the

**Gilbert & Jones**

**EXHIBIT 13**

**11**

1  draft policy, Exhibit 2, aren't you?
2      A.    I'm not familiar with this one at all, to
3  be honest with you, because, from my recollection,
4  the policy after August 2018 didn't come until 2021.
5      Q.    I understand.  But you were made aware
6  that he was not following Exhibit No. 1; he was
7  following the draft policy --
8      A.    I'd have to review --
9      Q.    -- weren't you?
10      A.    I'd have to review the draft policy.  I'm
11  not familiar with it, is what I'm saying.  I -- I
12  haven't seen this.
13      Q.    You've never seen that draft policy?
14      A.    I have not.
15      Q.    Did you have any communications with the
16  chief about which policy to follow in your
17  investigation?
18      A.    I did not.
19      Q.    All right.  Do you know how -- what the
20  process is for a policy to become a policy that
21  everyone has to follow?  Is there a procedure?
22      A.    Typically the -- the written and reviewed
23  and signed off by the chief.
24      Q.    Is there a specific section in the police
25  department that deals with the accreditation and

**12**

1  policy of the Savannah Police Department?
2      A.    We do have an accreditation.  It's a
3  one-man unit right now, just was hired.
4      Q.    All right.  And would draft policies have
5  to go through that office before it became policy?
6      A.    I'm not familiar with how they -- how they
7  did the accreditation policy in the past.  I know
8  recently we haven't had an accreditation manager for
9  a few months, so I have written or adjusted two
10  policies that went straight to the chief and were
11  signed.  So whether they were done that way then or
12  not I'm not sure.  That wasn't part of my job duties.
13      Q.    Are all officers including superior
14  officers and the chief required to follow policy?
15      A.    That's correct.
16      Q.    And if a draft policy exists that hasn't
17  been formalized, that that would not be permitted,
18  would it, even by the chief?
19      A.    That would be a question for the chief.
20  I'm unaware.
21      Q.    Well, can the chief create his own policy
22  if he so desires and follow it?
23      A.    I'm unaware.
24      Q.    You're unaware if he can or he can't?
25      A.    That's correct.  I know -- you know, in

**13**

1  these instances I'm kind of reviewing the one you
2  got.  We were following this one with the
3  disciplinary review panel, so...
4          MR. O'CONNOR:  Just answer his questions.
5          THE WITNESS:  Okay.  Can you hear that?
6      Q.    (By Mr. Schiavone)  All right.  But the
7  officers, all Savannah police officers, have a right
8  to know and be aware of what policies are in effect
9  at the time while they're working or if there was an
10  investigation, wouldn't that be true?
11      A.    Yes, sir.
12      Q.    All right.  And at some point Captain
13  Tobar was removed from Internal Affairs; isn't that
14  true?
15      A.    Yes, sir.
16      Q.    And what was the reason?
17      A.    I don't know.
18      Q.    Was that ordered by Chief Minter?
19      A.    To my knowledge, yes.
20      Q.    All right.  All right.  One of the things
21  that I know you indicated that you did was did you
22  review the video in the case?
23      A.    I did.
24      Q.    And let me go back through it a little bit
25  with you.  Let me understand the procedures.

**14**

1          Were you ever before you became a
2  lieutenant, were you ever in the position to execute
3  arrest warrants?
4      A.    Yes, sir.
5      Q.    All right.  And would you agree that that
6  particular duty can be very dangerous?
7      A.    Yes, sir.
8      Q.    And is there a particular section in the
9  police department that that's their only duty, is to
10  execute arrest warrants?
11      A.    At the time, yes, sir.
12      Q.    All right.  And do you know whether or not
13  Sergeant Arango and Officer Kang -- were they
14  assigned to that unit --
15      A.    They were.
16      Q.    -- on this particular -- this particular
17  day --
18      A.    Yes, sir.
19      Q.    -- that this incident happened?  All
20  right.
21          And in the course of your investigation
22  you were made aware that they initially went to the
23  address on the arrest warrant?
24      A.    Yes, sir.
25      Q.    And the arrest warrant was for a

1  particular individual.  Do you remember his name?
2  　　A.　Khalil Kelly.
3  　　Q.　And did you do a research of his
4  background, his criminal record?
5  　　A.　I don't recall.
6  　　Q.　You don't recall if you ever looked into
7  that?
8  　　A.　I don't recall if I did or not.
9  　　Q.　Have you been made aware of the subsequent
10  arrests that have occurred to that individual since
11  this incident?
12  　　A.　No, sir.
13  　　Q.　So you had no history of how many violent
14  offenses he had committed before this incident and
15  committed after this incident?
16  　　A.　I may have pulled the ones before.  I
17  don't recall.
18  　　Q.　All right.  And the warrant apparently --
19  did you look at the warrant that was used that day?
20  　　A.　I've seen it since.  I don't believe -- I
21  can't recall if I saw it when the investigation was
22  done.  I don't recall.
23  　　Q.　All right.  Wouldn't that be important to
24  review the warrant as to why they were there and what
25  they were doing?

1  　　A.　Yes, sir.
2  　　Q.　Now, my understanding in the warrant it
3  had a general description of the individual, a
4  light-skinned black male?
5  　　A.　There is -- there is generally a
6  description on the warrant, correct.
7  　　Q.　Okay.
8  　　A.　Again, I don't recall if I saw it before.
9  　　Q.　Right.
10  　　　And it would have had an address where
11  they would have been heading to execute the warrant?
12  　　A.　That's correct.
13  　　Q.　All right.  And you were made aware that
14  they went to that address and the super or someone
15  that was working at the apartment complex informed
16  them that he no longer lived at that particular
17  address?
18  　　A.　That's correct.
19  　　Q.　And they were told that he was actually in
20  another apartment that was on the second floor and
21  was given that address at the time?
22  　　A.　That's correct.
23  　　Q.　And that at some point they were in the
24  common area.  It was during the day, and a
25  light-skinned black male and woman came out of that

1  apartment onto the second floor and spotted these
2  officers as they were heading to the stairs that go
3  up to the apartment?
4  　　A.　I recall --
5  　　Q.　Were you made aware of that?
6  　　A.　I recall there being a male.  I don't
7  recall a female.
8  　　Q.　All right.  And he hurried back into the
9  apartment when he ID'd the officers?
10  　　A.　That's correct.
11  　　Q.　Now, when you were executing arrest
12  warrants, if the suspect -- if you had seen the
13  suspect acting that way, would you be concerned about
14  your safety at that point?
15  　　A.　Yes, sir.
16  　　Q.　All right.  So that that would be typical?
17  I mean, that would be normal?
18  　　A.　Yes, sir.
19  　　Q.　For the officers to be concerned at that
20  point now that this individual may have recognized
21  them?
22  　　A.　Yes, sir.
23  　　Q.　All right.  And you viewed the video when
24  they got up to the door and breached the door.
25  Sergeant Arango or someone yelled out the person's

1  name and the warrant I think at least three times?
2  　　A.　Yes, sir.
3  　　Q.　And you were aware that there were other
4  people in the room, might have been five other
5  people?
6  　　A.　Yes, sir.
7  　　Q.　Now, at that point and in the corner of
8  the room there was what appeared to be an AR-15,
9  turned out not -- it looked real but turned out not
10  to be a real gun?
11  　　A.　Yes, sir.
12  　　Q.　And at that point would you agree that
13  these officers then were -- could be in serious
14  danger of violent injury having that many people in
15  there and a possible weapon?
16  　　A.　Yes, sir.
17  　　Q.　And when Arango yelled out the name of the
18  person in the warrant, you could see that this
19  individual started moving toward them?
20  　　A.　That's correct.
21  　　Q.　And they yelled I think in the video at
22  least three times for him to get on the ground?
23  　　A.　That's correct.
24  　　Q.　At that point would you agree that he had
25  committed the crime of obstruction by not doing

1  the -- what the officers directed him to do?
2      A.  I guess.
3          MR. O'CONNOR:  To the extent you're asking
4  for a legal conclusion, I object.  You can
5  answer him subject to an objection.
6      Q.  (By Mr. Schiavone)  Well, would you have
7  considered that an obstruction when they didn't do
8  what you ordered them to do?  You've been in that
9  position.
10     A.  I would not.
11     Q.  You would not?
12     A.  He was walking towards the door.
13     Q.  So -- he was what?
14     A.  He was walking.
15     Q.  And they were standing?
16     A.  He was walking towards --
17     Q.  They were standing at the door?
18     A.  Uh-huh.
19     Q.  And are you telling me that a citizen
20 doesn't have to obey the officer in a situation like
21 that?
22     A.  From my opinion of the video, although he
23 did not get on the ground, was approaching the
24 officers, I personally would not have charged an
25 obstruction charge.

**Gilbert & Jones**

1      Q.  All right.  So if he had got to you and
2  attacked you, grabbed your weapon, killed you, you
3  don't think that was possible at that point?
4      A.  Anything's possible.
5      Q.  Well, I understand.  I'm just asking you,
6  when you're doing this investigation, you have to
7  make some conclusions, don't you?
8      A.  That's correct.
9      Q.  And it's your testimony that when an
10 officer makes a lawful request of a citizen who they
11 believe to be the suspect and he doesn't do what the
12 officers tell him to do that that would not be an
13 obstruction of them executing a lawful warrant signed
14 by a judge, a superior court judge?
15         MR. O'CONNOR:  Object to the form.  You
16     can answer.
17         THE WITNESS:  I think I'm a little
18     confused by your question.
19     Q.  (By Mr. Schiavone)  Well, they have a
20 lawful warrant executed or signed by a superior court
21 judge that directs them to find the body of this
22 particular individual who is charged with having
23 committed a violent -- a very serious violent offense
24 I believe of aggravated assault and they believe
25 they've -- they've recognized this individual in the

**Gilbert & Jones**

1  common area as spotted and he goes back into the
2  apartment.  When they get to the door, open it, they
3  yell out the name of the suspect.  That same
4  individual comes moving toward them at that point.
5          Now, wouldn't those officers' safety be at
6  issue, critically at issue, at that point?
7      A.  It could be, yes, sir.
8      Q.  And when an officer yells for that
9  individual who appears is coming toward them after
10 they've yelled the name of the suspect that he has
11 the general description of the suspect, and therefore
12 would it not be reasonable to believe that he was in
13 fact the suspect?
14     A.  Yeah, absolutely.
15     Q.  All right.  And when they tell the suspect
16 to get on the ground at least three times, you
17 wouldn't have considered that to be obstruction of
18 the officer?
19     A.  I think I guess what I'm wanting to say is
20 at the -- at the end when it was realized that it was
21 not the correct individual I personally would not
22 have felt comfortable with an obstruction charge with
23 the way it played out.
24     Q.  Well, but the conduct itself would have
25 constituted obstruction, wouldn't it, under the law,

**Gilbert & Jones**

1  I mean?  You have to make those decisions as an
2  officer before you charge someone, don't you?
3      A.  It could have, yes, sir.
4      Q.  All right.  And people often lie to you
5  about who they are?
6      A.  That's correct.
7      Q.  People sometimes who are criminals carry
8  fake IDs?
9      A.  That's correct.
10     Q.  All right.  So did you think the officers
11 had done anything wrong at this point --
12     A.  I did not.
13     Q.  -- from viewing the video?  All right.
14         And you saw in the video when they asked
15 him what his name was, do you recall what he
16 responded?
17     A.  It was some derogatory language.
18     Q.  Yeah, something like, fuck you,
19 motherfucker, that's my name?
20     A.  Yes, sir.
21     Q.  Okay.  And then he began spitting on these
22 officers.  You saw that, didn't you?
23     A.  I remember him spitting.  I remember at
24 one point Sergeant Arango said he had spit on his
25 leg.  I don't think I recall being able to actually

**Gilbert & Jones**

EXHIBIT 13

## 23

1  see it in the video, but I recall his spitting, yes.
2      Q.   All right.  All right.  And at some point
3  in order to keep him from spitting on him they --
4  there was a movement toward him to get his face away
5  from them and then they put a shirt or something to
6  try to put around his mouth to keep him from
7  spitting?
8      A.   That's correct.
9      Q.   All right.  And you were aware at this
10  time, I mean, that there were numerous -- some of
11  that spit had gone into the officer's mouth.  You
12  know, they had to deal with possibly of TB,
13  possibility of HIV, and then at this particular time
14  COVID.  Wouldn't that be a fair statement?
15      A.   Yes, sir.
16      Q.   That officers -- you know.  And so at that
17  point the spitting on the officers, did you consider
18  that to be a simple battery?
19      A.   Absolutely.
20      Q.   All right.  Now, tell me, were you aware
21  of the what I would call the group human resource
22  complaint filed by 75 members of the Savannah Police
23  Department, and my understanding is Sergeant Arango
24  was one of the main ones in signing the group up that
25  was filed with the City on April 10th, 2020?

## 24

1      A.   Yes, sir.
2      Q.   And you were aware of that at the time of
3  your investigation?
4      A.   I believe, yes.  Yeah.  It came out before
5  that, yes, sir.
6      Q.   All right.  Did you ever read that
7  complaint?
8      A.   I did when it hit the news.
9      Q.   All right.  And you recall Chief Minter
10  being visibly upset about it?
11          MR. KACHMAR:  Object to the form.
12      Q.   (By Mr. Schiavone)  Do you remember that?
13      A.   I do not.
14      Q.   Did you ever have any conversations with
15  the chief about it?
16      A.   I did not.
17      Q.   All right.  Did you go through the
18  complaint and did you see things alleged in the
19  complaint that you believe were true?
20      A.   Not that I recall.
21      Q.   So you didn't see anything in the
22  complaint that you thought was true?
23      A.   There was nothing in the complaint that I
24  could have said -- let me think of the way to say
25  this.  Nothing in the complaint applied to myself and

## 25

1  my position.  What was going on in other units I
2  can't speculate on their reasonings, but for me, my
3  unit, my position, no, sir.
4      Q.   All right.  So you never saw any
5  favoritism by the chief in promotions?
6      A.   No, sir.
7      Q.   How about inconsistent punishment levels
8  and violations of officers?
9      A.   There was inconsistent punishment.
10      Q.   And all right.  Now, in the course of your
11  investigation, was there a time limit on which you
12  had to complete the investigation?
13      A.   Well, at some -- at some point it changed.
14  They changed the times limit when they got the CARES
15  task force.  I don't recall what it was before then.
16  I know since it's been made 90 days.  I can't recall
17  if it was 90 days at that point or not.
18      Q.   All right.  Under the existing policy
19  depending on which one was followed by the chief,
20  wasn't it required that the officers be given notice
21  of what the allegations were?
22      A.   Are we talking about the -- which -- which
23  one of these policies are we talking about?
24      Q.   Well, you're telling me -- which policy
25  did you follow?

## 26

1      A.   So --
2      Q.   Which exhibit?
3      A.   So, like I said, we followed No. 2 now
4  that I'm looking through this.  The mitigation
5  hearing, the disciplinary review panel is what we
6  were going by.
7      Q.   Is that the draft policy, Exhibit 2?
8      A.   Yes, sir, that is.
9      Q.   All right.  So my understanding then of
10  your testimony is that you didn't follow the policy
11  in effect?
12      A.   Correct.
13      Q.   Exhibit 1?
14      A.   Correct.
15      Q.   All right.  And that was because the chief
16  told you to follow Exhibit 2; isn't it true?
17      A.   Yes.  That would have been instructed down
18  through my chain of command, not to me directly.
19      Q.   All right.  And so this is a draft policy
20  that has not been implemented.  Isn't that a
21  violation of policy?
22          MR. O'CONNOR:  Object to form.  You can
23      answer.
24          THE WITNESS:  I'm not quite sure.  I
25      would -- I'm trying to think of the best way to

1     put this.
2         I think my personal opinion is this draft
3     should have been put in policy if we were going
4     to follow it. Whether the chief has the
5     authority to say, hey, y'all go by this, I
6     believe he does have that authority to tell us
7     to go by, because there is a part in the oath of
8     office that says -- it has something to do with
9     orders. If you get an order from a superior you
10    follow that order first and then you can take it
11    up. So where that authority rests I don't
12    really know, but I personally believe this
13    should have been a policy if we were going to
14    follow it.
15    Q. (By Mr. Schiavone) All right.
16    A. If that makes sense.
17    Q. It makes total sense.
18         The -- the -- as I asked you previously,
19    all Savannah police officers no matter what the rank
20    including the chief are required to follow the
21    existing policy; isn't that a fair statement?
22    A. Yes, sir.
23    Q. And the existing policies are the ones
24    that have been implemented that are in full force and
25    effect, correct?

**Gilbert & Jones**

**28**

1    A. That's correct.
2    Q. And the officers, the rank-and-file
3    officers such as Kang and Arango, are required to
4    know these policies, correct?
5    A. That's correct.
6    Q. But there's no way that they would have
7    been able to be aware of the draft policy because it
8    wasn't in full force and effect, was it?
9    A. That's correct.
10   Q. So the chief directed -- not only did the
11   chief do it, but he directed superior officers, as I
12   understand your testimony, down the line that
13   eventually came to you that you were to follow this
14   draft policy?
15   A. That's correct.
16   Q. Wouldn't it be a fair statement then to
17   say that the chief, those superior officers and
18   yourself violated policy because you didn't follow
19   the existing policy?
20        MR. O'CONNOR: Object to form.
21        THE WITNESS: Again, there's a -- there's
22   a -- there's a clause in our oath of office that
23   still says we follow the direction of that
24   commanding officer. So by us following the
25   chief's direction, I don't believe those below

**Gilbert & Jones**

**29**

1    violated policy because we still followed his
2    directive.
3    Q. (By Mr. Schiavone) I understand, but
4    doesn't the rank-and-file officers have a right to be
5    informed of policy if they're going to be held
6    accountable?
7    A. Yes, sir, they do.
8    Q. In this case they weren't --
9    A. That's correct.
10   Q. -- were they?
11        So -- so this is sort of like
12   declassifying documents, right? The chief can do
13   whatever he wants?
14        MR. O'CONNOR: Object to form.
15   Q. (By Mr. Schiavone) Isn't that a fair
16   statement?
17   A. He's the chief. He's the chief.
18   Q. Okay.
19   A. He makes the decisions.
20   Q. And that's exactly what he did in this
21   case: He created a policy for himself as to Kang and
22   Arango and directed you to implement that policy even
23   though that wasn't given -- that information wasn't
24   given to these officers; isn't that true?
25        MR. KACHMAR: Object to the form.

**Gilbert & Jones**

**30**

1        MR. O'CONNOR: The same objection, but go
2    ahead.
3    Q. (By Mr. Schiavone) Isn't that true?
4    A. Can you reask that question, please? I'm
5    sorry.
6    Q. Well -- well, the chief creates a policy
7    that's not been implemented, a policy that the
8    rank-and-file officers, which would be, well, you
9    and -- and anybody else including Kang and Sergeant
10   Arango would not have seen that policy -- if I'd a
11   gone to look at policy, that would not -- I would
12   have looked at the Exhibit 1 policy as being the
13   policy in effect, wouldn't I, if I wanted to look at
14   them as an officer?
15   A. That's --
16        MR. KACHMAR: Object to the form.
17        MR. O'CONNOR: The same objection.
18        MR. SCHIAVONE: Yeah. Wouldn't I as an
19   officer? Would that be the policy I would see?
20        MR. O'CONNOR: Mr. Schiavone, can I ask
21   you to -- that was about --
22        MR. SCHIAVONE: I'm sorry.
23        MR. O'CONNOR: That was about three
24   questions. Can you just make one question out
25   of it?

**Gilbert & Jones**

EXHIBIT 13

**31**

1      MR. SCHIAVONE:  All right.  All right.
2      Q.    (By Mr. Schiavone)  As an SPD officer,
3  where are the policies kept first?
4      A.    We have the -- a local, I guess, citywide
5  network that we have them and then we have the
6  PowerDMS which is a web-based version where we keep
7  them.
8      Q.    All right.  And as an officer I'm required
9  to know policy, right?
10     A.    Absolutely.
11     Q.    And that's where I would go to read the
12  policies?
13     A.    Yes, sir.
14     Q.    And at the time the chief created a draft
15  policy, that would not have been located there,
16  correct?
17     A.    That's correct.  This was a draft that I
18  recall.  This wasn't actually signed until 2021, I
19  believe.
20     Q.    All right.  So the chief is required to
21  follow policy?
22     A.    Yes, sir.
23     Q.    Like you and these officers?
24     A.    Yes, sir.
25     Q.    And in this case he didn't, did he?

**32**

1      A.    That's correct.
2      Q.    He didn't follow Exhibit 1 which was the
3  existing policy, correct?
4      A.    That's correct.
5      Q.    All right.  Who punishes him and punishes
6  the superiors officers that directed you and you to
7  follow the nonpolicy?
8      MR. O'CONNOR:  Object to form.  Go ahead.
9      Q.    (By Mr. Schiavone)  Yeah.  Who punishes
10  y'all?  I mean, these officers were punished for
11  violating policy and it's clear now that the chief as
12  well as you and these other officers didn't follow
13  policy.  So who -- and didn't follow Exhibit 1 which
14  was the policy.  So who punishes y'all for not
15  following policy?
16     MR. O'CONNOR:  Object to form.
17     THE WITNESS:  Below the chief we followed
18     his direct orders, which I've stated is included
19     in the oath.  We still followed the orders.  As
20     far as the chief, I don't know who punishes him.
21     Q.    (By Mr. Schiavone)  So would it be a fair
22  statement to say that not everyone has to follow
23  policy?
24     A.    Everybody should follow policy.
25     Q.    I understand.

**33**

1  But would it be a fair statement that
2  apparently SPD at the time not everyone had to follow
3  policy?
4      MR. O'CONNOR:  Object to form.
5      THE WITNESS:  I believe that's a -- that's
6     a little above my -- my pay grade when you're
7     talking about the chief.
8      Q.    (By Mr. Schiavone)  I got you.  All right.
9      So then if we're following the Exhibit 2
10  policy, under the existing -- under Exhibit 1, the
11  existing policy, OPS-016, Kang as well as Arango
12  both -- it was required that they be informed of what
13  this was all about, right?
14     A.    That's correct.
15     Q.    And in this -- and in their case they were
16  not, were they?  They were not given a written
17  document or anything telling them on the front end of
18  the case exactly what the allegations were?
19     A.    No, they were not.
20     Q.    So they were given no due process, no
21  notice that would have existed under Exhibit 1 during
22  the course of this investigation because it was not
23  required in Exhibit 2, the draft policy; is that a
24  fair statement?
25     MR. KACHMAR:  Object to the form.

**34**

1      MR. O'CONNOR:  The same objection.
2      THE WITNESS:  Now -- now, when they were
3     interviewed they would have been provided their
4     Garrity which probably said something like just
5     conduct on it which was something typically that
6     we would do, is write one allegation on it.  I
7     don't recall what theirs said.
8      I think I -- so that -- so it would say
9     that, not necessarily all the allegations they
10     are being charged with.  As you know, as
11     investigations go other things can come up that
12     we realize after reading interviews, so there
13     are times where allegations are added into the
14     file.  It is typical that we do conduct.
15     But if you're asking about what was
16     sustained and what wasn't, they would not have
17     been provided that until before the appeal.
18     Q.    (By Mr. Schiavone)  All right.  But didn't
19  Exhibit 1 require that they be put on notice of the
20  allegation, all of them?
21     A.    The employee shall be issued a written or
22  electronic notice of the allegation and the
23  employee's rights and responsibilities relative to
24  the investigation.
25     Q.    All right.  And that wasn't done, was it,

EXHIBIT 13

**35**

1 pursuant to the draft policy?
2     MR. WILSON: Can you state which provision
3 you're reading?
4     MR. O'CONNOR: He was reading from
5 Exhibit 1.
6     MR. SCHIAVONE: Right.
7     Q. (By Mr. Schiavone) That was required
8 under the existing policy, but that wasn't done, was
9 it, in this case?
10     A. Again, they were -- they would have been
11 notified of one. Yes. They were not notified of
12 each policy.
13     Q. All right. And the Garrity form didn't
14 list the offenses that they were being alleged to
15 have violated, correct? It just said conduct?
16     A. From what I recall, yes, sir.
17     Q. And that didn't comply with the existing
18 policy under Exhibit 1?
19     MR. O'CONNOR: Object to form.
20     THE WITNESS: It doesn't say all -- it
21 doesn't -- it doesn't really specify. It
22 doesn't say all the allegations need to be
23 listed. It just says electronic notice of the
24 allegation. Yeah, I guess you can -- I guess
25 you can take it that way. It should list them

        **Gilbert & Jones**

**36**

1 all.
2     Q. (By Mr. Schiavone) All right. And they
3 were never notified that the disciplinary board had
4 met and decided discipline? They were notified of
5 that, were they?
6     A. Oh, yeah. They would have been notified
7 of that prior to the mitigation hearing.
8     Q. Well, if the mitigation -- is mitigation
9 hearing required in Exhibit 1, the existing policy?
10     A. No.
11     Q. So this is something that they would have
12 had no knowledge or understanding of what that meant
13 and what is under the draft policy, correct?
14     MR. O'CONNOR: Object to form.
15     THE WITNESS: That's correct.
16     Q. (By Mr. Schiavone) All right. And you
17 were aware that -- are they entitled to have a
18 complete Internal Affairs file?
19     A. Yes.
20     Q. But they were never given that, were they?
21     A. They were given it prior to the appeal.
22     Q. Are you sure about that?
23     A. I'm almost positive I gave it to them.
24     Q. All right.
25     A. Because if we ask for it we give it to

        **Gilbert & Jones**

**37**

1 them. I'm almost positive they both asked for them.
2     Q. All right. They were never given the
3 letter of transmittal of the 12 Douglas Factors, were
4 they?
5     A. No, sir.
6     Q. And that is required under Exhibit 1, the
7 existing policy, isn't it?
8     A. That's correct.
9     Q. So and can you explain to me what the
10 Douglas Factors are, as you understand it?
11     A. So basically it's kind of mitigating
12 circumstance from what I recall. You know, it kind
13 of goes through the disciplinary history, whether
14 they think the officer can be rehabilitated,
15 training. I can't go through all 12 of them. I
16 can't recall them off the top of my head, but it's
17 usually done.
18     MR. SCHIAVONE: Well, let me help you.
19 Would Jim or Officer --
20     MR. WILSON: Dan.
21     MR. SCHIAVONE: -- Kang, Dan, that's
22 right. I'm sorry. Would you have the Douglas
23 Factors marked as an exhibit?
24     MR. WILSON: Mark that Exhibit 3.
25     MR. SCHIAVONE: Got it?

        **Gilbert & Jones**

**38**

1     MR. WILSON: He's marking it right now.
2     MR. SCHIAVONE: All right. Thanks.
3     (Exhibit 3 was marked for identification.)
4     MR. KACHMAR: Can you just have him
5 identify the Bates number on it?
6     MR. O'CONNOR: Exhibit 3 is Bates Kang
7 000410 through 413. Okay.
8     Q. (By Mr. Schiavone) All right. Can you
9 identify Exhibit 3, Lieutenant?
10     A. Yes, sir. This was the memo sent from
11 Captain Halford after the disciplinary review panel
12 for Adrian Gates.
13     Q. All right. But those would be the same
14 Douglas Factors that if policy had been followed in
15 Exhibit 1 would have been required in this case; is
16 that correct?
17     A. That's correct.
18     Q. And this goes to the fundamental fairness
19 of the evaluation of punishment, doesn't it?
20     MR. KACHMAR: Object to the form.
21     THE WITNESS: I don't understand.
22     Q. (By Mr. Schiavone) Well, aren't you
23 required -- isn't everyone required to follow those
24 Douglas Factors under the existing policy under
25 Exhibit 1?

        **Gilbert & Jones**

EXHIBIT 13

**39**

1    MR. O'CONNOR:  Object to form.
2    THE WITNESS:  Yes, sir.
3    Q.   (By Mr. Schiavone)  All right.  And the
4  chief didn't require that in the draft policy, did
5  he?
6    A.   That's correct.  Oh, I -- like I said, I'd
7  have to review the whole thing.  I'm just now seeing
8  it.  But, if you say so, yeah.
9    Q.   Well, tell me, isn't the chief required as
10  well as when you do evaluations for punishment
11  required to follow City policy of a progressive
12  punishment?  Are you aware of that?
13    A.   Yes, sir.
14    MR. KACHMAR:  Object to the form.
15    Q.   (By Mr. Schiavone)  Are you aware of that?
16    A.   Yes, sir.
17    MR. KACHMAR:  Object to the form.
18    Q.   (By Mr. Schiavone)  And that wasn't
19  followed either, was it, in this case?
20    A.   That's correct.  If I recall, there was no
21  disciplinary history for Kang.
22    Q.   Okay.  And so because the chief made the
23  decision not to follow Exhibit 1, you were required,
24  as I understand your testimony, to follow this
25  Exhibit 2 policy that he wanted you to follow,

**Gilbert & Jones**

**40**

1  correct?
2    MR. KACHMAR:  Object to the form.
3    THE WITNESS:  Yes, sir.
4    Q.   (By Mr. Schiavone)  All right.  All right.
5  Are you aware of the code of conduct CEM-001 with the
6  Savannah Police Department?
7    A.   I mean, I read it.  But, I mean, I
8  don't -- I can't read it word for word.
9    Q.   And are the officers, line officers,
10  superior officers including the chief, is everyone
11  required to follow the code?
12    A.   Yes, sir.
13    MR. SCHIAVONE:  All right.  Give me one
14  second, please.
15    (Pause.)
16    MR. O'CONNOR:  By the way, he will read
17  and sign.
18    THE REPORTER:  Okay.
19    MR. O'CONNOR:  And if you just send to me
20  or Patty the transcripts for the City witnesses
21  we'll get them to them.
22    THE REPORTER:  Okay.
23    Q.   (By Mr. Schiavone)  Now, on this
24  mitigation portion of Exhibit 2, the draft policy,
25  you contacted both Dan Kang as well as Mike Arango.

**Gilbert & Jones**

**41**

1    Isn't it true that you told them just
2  accept responsibility?  Isn't that true?
3    A.   Okay.  I felt like you were going to say
4  more there.  Most likely, yes, sir.
5    Q.   All right.  And you told them not to
6  prepare and not to challenge anything, didn't you?
7    A.   I don't recall saying that.
8    Q.   You don't recall saying that?
9    A.   No, sir.
10    Q.   Well, they had complained that they were
11  not given proper equipment, that there were no direct
12  policies created for this particular unit.  They had
13  requested that and submitted that to their superiors.
14  Hadn't they submitted that to their superiors prior
15  to this incident?
16    A.   They told me in the interview -- I know
17  Arango told me in the interview that he had.
18    Q.   All right.  And nobody implemented any of
19  those policies prior to this, did they?  Or are you
20  aware of that?
21    A.   Not to my knowledge.
22    Q.   All right.  And you don't recall telling
23  them not to bring all that up in mitigation?
24    A.   I would have probably said something along
25  the lines of don't go in there with a bunch of

**Gilbert & Jones**

**42**

1  excuses, to accept responsibility.  I've said that to
2  a few people before, because in --
3    Q.   Well, because there is no -- there is no
4  mitigation before, is there?
5    A.   I'm talking about in the few cases that I
6  had seen in my time in Internal Affairs.  It wasn't
7  long, but I did know that accepting responsibility
8  was the best course of action, and that's probably
9  what I said.  You know, trying -- trying to help them
10  out the best I could.
11    As I told you earlier, I worked with them
12  on multiple occasions, liked and respected both of
13  them.
14    Q.   All right.  Did you explain to them what
15  the mitigation hearing is?
16    A.   So the way it was explained to me was it's
17  basically a chance to come in and -- it was very
18  broad -- to give any mitigating circumstances kind
19  of, you know, what you could do for the department
20  making it better, you know, what you've learned from
21  it, things like that before the chief would make a
22  final decision on his -- on what his discipline
23  wanted to be.
24    Q.   All right.  Did the chief ever tell you to
25  tell them not to do that?

**Gilbert & Jones**

1    A.    No, sir.
2    Q.    All right.  But that's basically what you
3  told both of them, not to bring that up?
4    A.    Yeah.
5    Q.    Is that true?
6    A.    That's true.
7    Q.    Okay.  All right.  So were you part of the
8  mitigation process?
9    A.    So I am on the -- I'm on the call, yes.
10  Typically Internal Affairs doesn't say anything on
11  there.  We're just there if there's any questions.
12  So I don't recall there being anything, but I would
13  have been on the call, yes, sir.
14    Q.    All right.  Did you make a determination
15  as to whether or not Kang or Arango had committed a
16  crime?
17    A.    I did not.
18    Q.    Were you required to do that?
19    A.    I was not.
20    Q.    All right.  Do you know who did?
21    A.    I do not.
22    Q.    All right.  Were you aware that the chief
23  had personally taken this case over to the district
24  attorney's office?
25    A.    I did not.

---

1    Q.    Were you aware of the press conferences
2  that were held by the chief with the mayor and the
3  existing district attorney, Meg Heap, concerning this
4  case?
5    A.    I do recall it after it happened.  I
6  didn't know about it beforehand.
7    Q.    And did you see the news press coverage of
8  it?
9    A.    Yes, sir.
10    Q.    Did you see the PowerPoint that he had
11  done making comparisons to the Floyd case and other
12  national cases?
13    A.    No, sir.
14    Q.    Do you recall seeing that?
15    A.    No, sir.
16    Q.    All right.  Now, once you completed your
17  investigation, what -- do you make recommendations
18  for punishment or is that submitted to someone else?
19    A.    That's submitted to somebody else.
20  Internal Affairs strictly fact-finders.  In this case
21  it would have gone to the disciplinary review which
22  would have been their captain, lieutenant and major
23  and it -- oh, no, this was the other one -- which
24  would have been on a similar, I guess, memo.  I can't
25  recall exactly who was on -- who was on theirs.  But

---

1  it would have been them.  David Gay, Joe Toth, Gavin
2  maybe.  I can't recall.
3    Q.    And do you recall what the recommendation
4  was?
5    A.    For Dan Kang it was five days, removal
6  from SWAT.  I think removal from the warrant squad.
7  I think there was one other one.
8    Q.    All right.  And do you remember what it
9  was as to Sergeant Arango?
10    A.    Between 15 and 20 days and then I think
11  about the same, removal from SWAT.  I'm going -- I'm
12  going based off memory, so I don't know.
13    Q.    I understand.
14    A.    Something along the lines.
15    Q.    Would that have been consistent with
16  similar conduct and punishments of other cases?
17    A.    So this one was so -- with this whole
18  disciplinary review panel I think was so new I don't
19  really know how -- how you can say it was consistent.
20        Again, it's just I don't think there has
21  been a use-of-force case kind of like that in this
22  situation, not that I've seen.  But, again, with this
23  whole let's bring the group together, this was a new
24  thing.  So I don't really want to say it was
25  consistent or not consistent.

---

1    Q.    Well, did you investigate other cases
2  before this?
3    A.    I did.  I hadn't been in Internal Affairs
4  long, but I did.
5    Q.    All right.  Were you involved in the Gates
6  investigation?
7    A.    Which one?
8    Q.    Exactly.  Tell me how many different ones
9  Gates had.
10    A.    So seven or eight.
11        MR. O'CONNOR:  Let me stop.  Are any of
12    these ongoing?
13        THE WITNESS:  No.
14        MR. O'CONNOR:  Okay.  Go ahead.
15        THE WITNESS:  None of the ones -- none of
16    the Gates cases prior to this incident was I
17    involved in.  I came in right as he had a group
18    of them wrapping up, was when I got moved over
19    there.  I think the week after or something like
20    that.  But I was involved in the three that
21    eventually led to his termination.
22    Q.    (By Mr. Schiavone)  All right.  Tell me
23  what those three allegations were.  Do you remember?
24    A.    Conduct, duty time, neglect, incompetence.
25  There was 19 of them.

**EXHIBIT 13**

**47**

1    Q.   And there had been allegations before
2 that?
3    A.   There was.
4    Q.   Allegations of him being involved in
5 criminal conduct?
6    A.   There was.
7    Q.   Allegations of him lying?
8    A.   There was.
9    Q.   And those were investigated, presented to
10 the chief, and my understanding is that the chief
11 recommended 40 hours discipline?
12    A.   That's what he received, yes, sir.
13    Q.   Yet the chief recommended termination in
14 these cases?
15    A.   That's correct.
16    Q.   And then it took, what, at least three
17 that you were involved in, more before Gates was
18 finally terminated?
19    A.   That's correct.
20    Q.   Didn't it seem odd to you that the chief
21 kept protecting Gates --
22    MR. KACHMAR:  Object to the form.
23    Q.   (By Mr. Schiavone) -- with those kinds of
24 allegations?
25    MR. KACHMAR:  Object to the form.
**Gilbert & Jones**

**48**

1    THE WITNESS:  I wasn't there for the first
2 group of cases.  I don't feel like that's a good
3 answer for me, because I don't have all that
4 direct knowledge of what went on with those
5 cases.  So I don't think that's fair to answer.
6    MR. O'CONNOR:  Mike, have you got a lot
7 more?  We might want to take a short break.  Let
8 me just say --
9    MR. SCHIAVONE:  Yeah.
10    MR. O'CONNOR:  -- for the record --
11    MR. SCHIAVONE:  Yeah.  We can --
12    MR. O'CONNOR:  -- Lieutenant --
13    MR. SCHIAVONE:  We can take a short --
14    MR. O'CONNOR:  Yeah, Lieutenant Wig --
15    MR. SCHIAVONE:  We can take a short break,
16 if that's okay.
17    MR. O'CONNOR:  Lieutenant Wiggins --
18    MR. SCHIAVONE:  I don't have a lot -- a
19 whole lot more, but I need to look at some
20 notes.
21    MR. O'CONNOR:  All right.  Lieutenant
22 Wiggins, just so y'all know, has been up pretty
23 much all night working on a matter --
24    MR. SCHIAVONE:  Oh, okay.  I'm sorry.
25    MR. O'CONNOR:  -- a police matter, so just
**Gilbert & Jones**

**49**

1 kind of keep that in mind.
2    MR. SCHIAVONE:  Yes.
3    MR. O'CONNOR:  All right.  We'll take a
4 short break.
5    (Recess taken from 10:38 a.m. to 10:50
6 a.m.)
7    MR. SCHIAVONE:  Pat, I don't think I have
8 any more questions for him.
9    MR. O'CONNOR:  Okay.
10    MR. SCHIAVONE:  I didn't realize he'd been
11 up all night.
12    MR. O'CONNOR:  All right.  Well, I don't
13 have any questions.  Patty and I don't have any
14 questions.
15    MR. KACHMAR:  I just have one question --
16    MR. SCHIAVONE:  All right.
17    MR. KACHMAR:  -- for you, sir.
18    EXAMINATION
19 BY MR. KACHMAR:
20    Q.   Is it part of your job duties to know
21 exactly the scope of the chief's policymaking and
22 rulemaking authority?
23    A.   I don't underst -- I don't -- can you
24 break that down a little bit for me?
25    Q.   Yeah.
**Gilbert & Jones**

**50**

1    So there were a lot of questions about
2 policies and what authority the chief had to create
3 and enforce policies.  Do you remember those
4 questions?
5    A.   Correct.
6    Q.   My question is, is it part of your job
7 description to know exactly the scope of the chief's
8 ability and authority to make policies, change
9 policies, et cetera?
10    A.   No, sir.
11    MR. KACHMAR:  That's all.
12    MR. SCHIAVONE:  All right.  Thank y'all.
13    MR. O'CONNOR:  Thanks.
14    THE REPORTER:  Do y'all want to order
15 these today?
16    MS. PAUL:  Yes.  We just need one copy.
17    MR. O'CONNOR:  And signature copy.
18    MR. KACHMAR:  I'll just take an electronic
19 copy or Min-U-Script.
20    THE REPORTER:  Jim, are these going to you
21 or Mr. Schiavone?
22    MR. WILSON:  Both.
23    THE REPORTER:  Are we billing Savage?
24    MR. WILSON:  Pardon me?
25    THE REPORTER:  Are we billing Savage?
**Gilbert & Jones**

EXHIBIT 13

## Page 51

```
1        MR. WILSON: Yes.
2            (Deposition concluded at 10:52 a.m.)
3            (Pursuant to Rule 30(e) of the Federal
4    Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
5    signature of the witness has been reserved.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                    Gilbert & Jones
```

## Page 52

```
1            CERTIFICATE OF COURT REPORTER
2
3    STATE OF GEORGIA:
4    COUNTY OF EFFINGHAM:
5
6            I hereby certify that the foregoing
7    transcript was reported as stated in the caption and
     the questions and answers thereto were reduced to
8    writing by me; that the foregoing 51 pages represent
     a true, correct, and complete transcript of the
9    evidence given on August 29, 2022, by the witness,
     LIEUTENANT RICHARD WIGGINS, who was first duly sworn
     by me.
10           I certify that I am not disqualified
11   for a relationship of interest under
     O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
12   Reporter here as an employee of Gilbert & Jones, Inc.
     who was contacted by Savage & Turner to provide court
13   reporting services for the proceedings; I will not be
     taking these proceedings under any contract that is
14   prohibited by O.C.G.A. 15-14-37(a) and (b) or
     Article 7.C. of the Rules and Regulations of the
15   Board; and by the attached disclosure form I confirm
     that neither I nor Gilbert & Jones, Inc. are a party
16   to a contract prohibited by O.C.G.A. 15-14-37(a) and
     (b) or Article 7.C. of the Rules and Regulations of
17   the Board.
            This 31st day of August 2022.
18
19
20
21   _____
     THOMAS J. DORSEY, CERTIFIED COURT
22   REPORTER, 2781
23
24
25
                    Gilbert & Jones
```

## Page 53

```
                DISCLOSURE OF NO CONTRACT
2
3            I, Debbie Gilbert, do hereby disclose
     pursuant to Article 10.B of the Rules and Regulations
4    of the Board of Court Reporting of the Judicial
     Council of Georgia that Gilbert & Jones, Inc. was
5    contacted by Savage & Turner to provide court
     reporting services for these proceedings and there is
6    no contract that is prohibited by O.C.G.A.
     15-14-37(a) and (b) or Article 7.C. of the Rules and
7    Regulations of the Board for the taking of these
     proceedings.
8            There is no contract to provide reporting
     services between Gilbert & Jones, Inc. or any person
9    with whom Gilbert & Jones, Inc. has a principal and
     agency relationship nor any attorney at law in this
10   action, party to this action, party having a
     financial
11   interest in this action, or agent for an attorney at
     law in this action, party to this action, or party
12   having a financial interest in this action. Any and
     all financial arrangements beyond our usual and
13   customary rates have been disclosed and offered to
     all parties.
14           This 31st day of August 2022.

17   _____
     Debbie Gilbert, FIRM
     REPRESENTATIVE
18   Gilbert & Jones, Inc.
19
20
21
22
23
24
25
                    Gilbert & Jones
```

## Page 54

```
1    DEPOSITION OF:  LIEUTENANT RICHARD WIGGINS /TJD
2        I do hereby certify that I have read all
3    questions propounded to me and all answers given by
     me on August 29, 2022, taken before Thomas J. Dorsey,
     and that:
4
5    ___ 1)  There are no changes noted.
     ___ 2)  The following changes are noted:
6
     Pursuant to Rule 30(e) of the Federal Rules of
7    Civil Procedure and/or the Official Code of Georgia
     Annotated 9-11-30(e), both of which read in part:
8    Any changes in form or substance which you desire to
     make shall be entered upon the deposition...with a
9    statement of the reasons given...for making them.
     Accordingly, to assist you in effecting corrections,
10   please use the form below:
11   Page No. ___ Line No. ___ should read:_____
     _____
12   The reason for the change is
     _____
13
     Page No. ___ Line No. ___ should read: _____
14   _____
     The reason for the change is
15   _____
16   Page No. _____ Line No. ___ should read:_____
     _____
17   The reason for the change is
     _____
18
     Page No. ___ Line No. ___ should read:_____
19   _____
     The reason for the change is
20   _____
21   Page No. ___ Line No. ___ should read:_____
     _____
22   The reason for the change is
     _____
23
     Page No. _____ Line No. ___ should read:_____
24   _____
     The reason for the change is
25   _____
                    Gilbert & Jones
```

EXHIBIT 13

```
 1   DEPOSITION OF:  LIEUTENANT RICHARD WIGGINS

 2   Page No. ____ Line No. ____ should read: _____

 3   The reason for the change is
     _____

 4

 5   Page No. ____ Line No. ____ should read: _____

     The reason for the change is
 6   _____

 7   Page No. ____ Line No. ____ should read: _____

 8   The reason for the change is
     _____

 9

10   Page No. ____ Line No. ____ should read: _____

     The reason for the change is
11   _____

12   Page No. ____ Line No. ____ should read: _____

13   The reason for the change is
     _____

14

15   If supplemental or additional pages are necessary,
     please furnish same in typewriting annexed to this
16   deposition.

17
                    _____
18                  LIEUTENANT RICHARD WIGGINS

19   Sworn to and subscribed before me,
     This the ____ day of _____, 20__.
20
     _____
21   Notary Public
     My commission expires: _____
22

23   Please forward corrections to:

24           Gilbert & Jones, Inc.
          7505 Waters Avenue, Suite F3
25           Savannah, GA 31406
              (912) 355-1061
              Gilbert & Jones
```

EXHIBIT 13

EXHIBIT

1

8/29/22  TD

SPD GENERAL ORDER                                    OPERATIONS

| GO # OPS-016: | **EFFECTIVE:** | 09/25/2004 |
|---|---|---|
| **OFFICE OF PROFESSIONAL STANDARDS** | **REVISED:** 10/21/2009 | 11/30/2011 |
| | 10/19/2010 | 02/02/2012 |
| | 03/21/2011 | 03/05/2014 |
| | 07/16/2014 | 04/18/2016 |
| | 12/13/2016 | 08/29/2018 |

## PURPOSE

The purpose of this directive is to establish guidelines for the investigation of complaints against employees of the Savannah Police Department (SPD). All complaints will be thoroughly investigated to determine the appropriate finding.

## POLICY

A system to investigate and review complaints is essential to establish and maintain the public's confidence and trust, and to protect our citizens from police misconduct. This same system will also protect the integrity and the rights of all SPD employees. Citizens are encouraged to bring forward legitimate complaints regarding policy violations and misconduct by all SPD personnel. SPD personnel will act in a courteous and professional manner when receiving complaints from citizens. SPD personnel will assist and cooperate in the processing of citizen complaints. It shall be the policy of the SPD to investigate all complaints against its employees and to maintain an Office of Professional Standards Unit which will thoroughly, expeditiously, and impartially investigate all complaints involving the Department's integrity.

When an employee's continued presence at work would be a detriment to the efficiency of the Department or to public safety, the Chief of Police or his designee may place an employee on administrative leave with pay during the investigation process. When such action is taken, the supervisor or commander responsible for making the notification shall notify the employee in writing and shall submit that notification to the appropriate Division Commander.

## PROCEDURE

### I.    OFFICE OF PROFESSIONAL STANDARDS

A.    The Office of Professional Standards (OPS) is organized under the Office of the Chief of Police. The OPS Commander reports directly to the Chief of Police. [CALEA 52.1.3]

B.    The OPS coordinates and exercises staff supervision over complaint investigations and/or allegations of policy violations and misconduct against Department employees from all sources.

C.    The OPS serves as the SPD's control agent in all citizen complaints; recording complaints when received, reviewing completed investigations for thoroughness, objectivity, and accuracy, and establishing and maintaining a complete case file on each complainant.

EXHIBIT 13

D. The OPS shall be responsible for recording, registering, and controlling all alleged or suspected policy violations and misconduct complaints against the employees of the SPD. The confidentially of internal investigation files shall be maintained in accordance with public records law.

E. The OPS Commander shall be directly responsible for the Office of Professional Standards function and shall report all complaints involving violations of the law, use of force incidents involving serious injury or death, and conduct involving moral turpitude directly to the Chief of Police, or designee, without delay. [CALEA 52.2.2]

F. The OPS shall have the authority to interview any employee, use facilities and equipment, and review any record or report of the SPD in order to facilitate the just resolution of all complaint investigations.

G. Recognizing that complaint investigations are conducted under the immediate authority of the Chief of Police, SPD personnel shall cooperate with and assist the OPS during investigations.

H. The OPS Investigators will be knowledgeable of all processes involved in the investigation of complaints, administering of discipline, and all applicable rules, orders, directives, and procedures.

I. The OPS will develop and maintain a database of all SPD complaints. Disciplinary Actions taken as a result of an Administrative Investigation or a Citizen Complaint will be entered into the OPS database/computer file. A copy of the Disciplinary Action Record, notification letters, and all other associated documentation will be filed with the completed case file. All discipline records will be maintained in accordance with the State of Georgia records retention laws.

J. The OPS will forward all Disciplinary Action Records (DAR) to the City's Human Resource Department for record-keeping purposes.

K. The OPS will apprise the Chief of Police of the status or progress of disciplinary actions that are under appeal or that may develop into an appeal.

L. The OPS will make observations or recommendations to the Chief of Police concerning any modification or improvement in disciplinary procedures, legislative updates or practices, as well as needed training based upon trends and tendencies that have been identified.

M. The OPS will monitor sensitive cases that may affect future policies or actions and will make appropriate recommendations for change.

N. The OPS will serve as the liaison with other entities involved in the disciplinary process including, but not limited to, the Chief of Police, the District Attorney's Office, The City Attorney's Office, the County Attorney's Office, and the City of Savannah Human Resources Department.

O. The OPS investigates complaints against the SPD employees. OPS investigators are responsible for the investigation. They are strictly fact finders. They DO NOT make recommendations regarding findings or penalty. The employee's Commander is the first to make a recommendation regarding the finding of the case, and the recommended penalty.

P. To expedite the closure of internal complaints, the OPS may assign a day for

EXHIBIT 13

the Command Staff to discuss and review completed cases.

Q. The OPS Investigators will be assigned to a Precinct/Division to attend Community meetings (Outreach) and to be a liaison between SPD personnel regarding the complaint process through final disposition.

## II. COMPLAINT INVESTIGATIONS

A. All complaints and discipline files can be classified under one of the following three areas:

  1. **Supervisory Discipline:** This type of discipline is usually generated through the first line supervisor, and depending on the violation or misconduct, may require a formal investigation.

  2. **Citizen Complaints:** Depending upon the severity of the allegation, such complaints may require a formal investigation. Should a citizen's complaint be so severe as to merit a formal investigation, it will then be labeled as an Internal Investigation.

  3. **Internal Investigations:** The more serious allegations usually require a formal investigation and may include the advisement of rights pertaining to an administrative investigation which is known as the Garrity Warning.

B. Supervisory personnel are authorized to investigate violations involving: [CALEA 52.2.1 a]

  1. Minor violations of policy and procedure;

  2. Allegations of rudeness to citizens;

  3. Insubordination;

  4. Tardiness or abuse of leave.

C. A comprehensive investigative report shall be prepared on all investigations. This report will include:

  1. A summary of the complaint or alleged act of misconduct.

  2. A description of the incident, physical evidence, and other pertinent information.

  3. Non-edited investigative statements.

  4. Evaluation of the complaint with a statement indicating what can or cannot be substantiated.

D. Investigations by supervisory personnel shall be forwarded through their Chain-of- Command for review to ensure citizen complaints are resolved satisfactorily. A comprehensive investigative report, LOT to include, applicable Douglas Factors will be completed and submitted to the OPS Commander as soon as possible. In those cases where delays are anticipated, the OPS Commander will be notified.

E. The OPS shall conduct investigations into: [CALEA 52.2.1b]

  1. Civil liability suits against members of the Department.

KANG 001323

EXHIBIT 13

2. Internal investigations for other agencies within the concurrent jurisdiction of the SPD, at the direction of the Chief of Police.

3. Allegations of corruption.

4. Gross misconduct.

5. Allegations of the use of excessive force or brutality.

6. Use of deadly force and firearms.

7. Violations of civil rights.

8. Allegations of criminal misconduct.

9. Incidents requiring investigation that are extremely lengthy, time consuming, involve multiple units or divisions, or when other investigative resources are unavailable.

10. All other Administrative Investigations assigned by the Chief of Police.

F. All complaint investigations should be completed within ninety days of the dated assigned. [CALEA52.2.3] Any delays should be cleared through the OPS Commander. If the case is not resolved within ninety days the complainant will be notified in writing of the case status. [CALEA 52.2.4b]

## III.   RELIEF FROM DUTY [CALEA 52.2.7]

A. When an employee's continued presence at work may be a detriment to the efficiency of the Department or to public safety, the Chief of Police or his designee may place an employee on administrative leave with pay during the investigation process.

B. When such action is taken, the supervisor or commander responsible for making the notification shall notify the employee in writing and shall submit that notification to the appropriate Division Commander.

C. When an employee is placed on Administrative Leave pending an internal investigation either the Internal Affairs Office or the employee's commanding officer will retrieve and secure the person's firearms and badges. Upon completion of the investigation the Chief of Police or designee will determine the reinstatement of the items.

## IV.   COMPLAINT PROCESS

A. Allegations of police misconduct are received as complaints from both citizens and SPD personnel. All complaints against the SPD and its personnel will be documented and investigated, including anonymous complaints. [CALEA 52.1.1]

B. Citizens wishing to register a complaint will be referred to the employee's immediate supervisor. If the immediate supervisor is unavailable, a supervisor within the employee's division shall be notified.

C. The supervisor processing the complaint will record pertinent information regarding the complaint on the Complaint Form (SPD Form 1044w).

D. All complaints will be investigated, including complaints where the complainant is unwilling to complete or sign the complaint form.

E. The complaint shall be documented and, as soon as practical, the supervisor must

**EXHIBIT 13**

telephone or e-mail the OPS for a control/tracking number.

F.  Upon receipt of a complaint the OPS Office will provide the complainant with documentation the complaint has been received and provide a description of the process. [CALEA 52.2.4a]

G.  Once a tracking number has been assigned and a brief synopsis given to the OPS Investigator, it will be determined by the OPS Commander if the investigation will be conducted by a supervisor of this Department or by an OPS Investigator.

H.  The person recording the complaint shall provide the complainant with a copy of the Complaint Form.

I.  When an employee is notified that they have become the subject of an OPS investigation, the employee shall be issued a written or electronic notice of the allegation and the employee's rights and responsibilities relative to the investigation. [CALEA 52.2.5]

## V.  INVESTIGATIVE PROCEDURES

A.  The complainant shall be interviewed as soon as practical regarding the complaint. The recorded complaint interview will be retained in the same manner as established for the internal file from which it was taken.

B.  The Complainant shall be asked to read and sign the Complaint Form.

C.  The Complainant shall write the complaint on pages two (2) through four (4) of the Complaint Form and additional pages may be added if necessary.

D.  The supervisor shall conduct a preliminary investigation, including interviewing the complainant and any witnesses readily available in person. The supervisor shall also advise the subject employee of the complaint, when appropriate.

E.  An effort will be made to locate and interview each person who may be a witness or have information relevant to the incident.

F.  When an employee is under investigation and subject to a formal interview, the interview shall be conducted under the following conditions:

1.  When practical, appropriate Commanders should be notified when one of their subordinates is to be interviewed by an OPS Investigator.

2.  Interviews of SPD employees should be scheduled during the employee's normal duty hours, when practical.

3.  Employees will be compensated for interviews conducted at times other than normal duty hours.

4.  Employees being interviewed or writing a statement concerning an internal investigation may not have an attorney, supervisor, or Commander present.

5.  The interview should take place in the Office of Professional Standards or any place necessary in order to complete the mission.

6.  The employee will be informed of the name and rank of the interviewer and all other persons present during the interview.

7.  The employee will be informed of the nature of the investigation before the interview begins.

KANG 001325

**EXHIBIT 13**

C. The LOT and Douglas Factors, with the recommended disciplinary action, shall be forwarded to the OPS for record-keeping purposes. OPS will forward the investigative file with the LOT to the next Command Officer in the Chain-of-Command. Once received, the Commander has 10 days to complete the LOT. This process will continue until it reaches the Chief of Police, or designee, for final review and approval.

D. Once a finding is reached, the subject officer will be notified by the investigating Division Commander, or designee. The subject officer shall receive a complete copy of the investigative file.

E. If the complaint is sustained and the penalty is above a written reprimand, the subject officer can respond, either verbally or in writing, within 3 days, to the allegations (Cleveland Board of Education v Loudermill).

F. When discipline is issued the employee will be notified of their right to appeal under the City of Savannah Policy (HR-020A).

G. If the employee fails to appeal to the City Manager, this non-response will constitute a waiver of the right to appeal and the discipline will be imposed.

H. Final disciplinary action reports (DAR) shall be forwarded to the OPS for recordkeeping purposes.

VII. **DISPOSTION**

A. Investigations into allegations of policy violations or employee misconduct will conclude with one of the following findings:

1. **EXONERATED** - The investigation supported the conclusion that the incident did occur, but the employee's actions were legal, proper, and reasonable.

2. **UNFOUNDED** – The investigation supported the conclusion that the employee did not engage in the alleged conduct and did not violate a rule by doing so.

3. **POLICY FAILURE -** Policy or procedure does not properly address the allegation or procedure which led to the alleged conduct and the investigation reveals recommended policy or procedural changes.

4. **NOT SUSTAINED -** The investigation didn't prove or disprove the alleged conduct.

5. **SUSTAINED -** The investigation supported the conclusion that the employee engaged in the alleged conduct and violated a rule by doing so.

B. Appropriate disciplinary action will be taken, when warranted, and a complete file maintained by the SPD Office of Professional Standards.

C. Investigative findings for those employees that have since retired or resigned will be forwarded to the Chief of Police or designee. Depending upon the final disposition of the investigation the Chief of Police or designee will change the former employee's separation status accordingly.

D. Upon conclusion of the investigation, the involved employee(s) will receive, in writing, notification of the results of the investigation.

EXHIBIT 13

1. This will also include those employees that have retired or are no longer employed with the Savannah Police Department.

   a. This notification will be done by certified mail and with a return/receipt.

## VIII. OFFICE OF PROFESSIONAL STANDARDS ROLE IN CRIMINAL INVESTIGATIONS

A. If during the course of an Internal Administrative Investigation there appears that there is, or that there may have been, a violation of criminal law, the investigation by the OPS may be suspended and the Chief of Police promptly notified.

B. No further administrative investigative effort will normally be made until after the Chief of Police has determined whether to assign the matter for criminal investigation.

C. Employees under investigation for alleged criminal law violations will be afforded those rights guaranteed by the Constitution of the United States and the policies and procedures of the SPD.

D. Generally, criminal investigations will be conducted by the appropriate investigative unit or agency unless the OPS is directed by the Chief of Police to conduct the criminal investigation.

E. Deadly force cases will be investigated in accordance with the SPD's Use of Force policy (General Order #ADM-007).

## IX. MISSED COURT, TRAINING, VEHICLE MAINTENANCE

A. The OPS shall receive notices for unexcused absences from supervisors who coordinate court, training, or vehicle maintenance for their respective units. Once received, the OPS will record the alleged unexcused absence and notify the employee's Commander.

B. The Commander or designee of the subject employee has 15 days to investigate the allegation and return the appropriate finding and/or penalty to the OPS.

C. If the finding is Sustained, the Commander or designee must recommend the appropriate pre-determined penalty for the employee and forward that recommendation to the Assistant Chief for approval, rejection or modification. These penalties have been set by the Command Staff, and are listed below:

SPD Personnel who are underlined unexcused from training, court, or appointments with vehicle maintenance will receive the following:

| First offense: | Written Reprimand |
|---|---|
| Second Offense: | 1 Day Suspension |
| Third Offense: | 3-Day Suspension |
| Fourth Offense: | Chief's Office |

KANG 001328

EXHIBIT 13

Each category will stand alone, not consolidated.

**Example:**

| Unexcused absence from court | Written Reprimand |
|---|---|
| Unexcused absence from training | Written Reprimand |
| Unexcused absence from court (second violation) | 1 Day suspension |

*Time Frame*: After two (2) years the penalty enhancement drops off, however, the disciplinary file remains. [In other words, if you have a failure to appear (Court) in January 2007 and then a failure to appear in January 2008; in January 2009 the first one drops off. If you have a third failure to appear in February 2009, then you have two penalties.]

**Example:**    Written Reprimand for court: Jan. 2007
1-Day Suspension for court: Jan. 2008
Jan. 2007 penalty drops off: Jan. 2009.
Failure to appear in Feb. 2009: 1-Day Suspension.

## X. RUDENESS COMPLAINTS

A. Rudeness complaints will generally be classified as a Citizen Complaint. Depending upon the severity of the allegation, such complaints may require a formal investigation. Should a citizen's complaint be so severe as to merit a formal investigation, it will then be labeled as an Internal Investigation.

B. When appropriate, the Precinct/Unit supervisor shall conduct the investigation, including interviewing the complainant as soon as practical regarding the complaint and any witnesses readily available in person. The supervisor shall also advise the subject employee of the complaint.

C. If the finding is Sustained (all other findings do not apply), the Commander or designee must give the appropriate pre- determined penalty to the employee. These penalties have been set by the Command Staff, and are listed below:

SPD Personnel who have sustained rudeness complaints will receive the following:

| First offense: | Written Reprimand |
|---|---|
| Second Offense: | 1 Day Suspension |
| Third Offense: | 3-Day Suspension |
| Fourth Offense: | Chief's Office |

*Time Frame*: After two (2) years the penalty enhancement drops off, however, the disciplinary file remains. [In other words, if you have a sustained rudeness complaint on January 1, 2011 and another in January 2, 2013; the January 1, 2011 will drop off and does not apply to the progressive discipline above. If you have another in February 2013, then you have two applicable offenses and a 1 day suspension would apply.]

## XI. ADMINISTRATIVE INVESTIGATION FILES [CALEA 52.1.2]

A. The OPS shall be responsible for maintaining all records regarding internal investigations within the Office of Professional Standards.

EXHIBIT 13

B. The OPS shall take all proper precautions to ensure the security of these records. These records shall be stored separate and apart from personnel records.

C. All complaints received by any member of the Department, against the Department or an employee, shall be assigned a complaint control number. OPS will assign control numbers and will enter them into a computer database.

D. OPS shall prepare a file for every complaint assigned. The file shall contain the original report, audio tapes of OPS interviews, incident reports, photographs, and other pertinent documentation.

E. Folders shall be filed numerically by control number and kept secure while in the custody and control of OPS.

F. No one may access the files without the permission from the Chief of Police or the OPS Commander.

G. No portion of the file shall be copied or reproduced by anyone other than the OPS personnel.

H. For record keeping efficiency, information contained in the log book and card files may be computerized.

## XII. OFFICE OF PROFESSIONAL STANDARDS MONTHLY AND ANNUAL REPORTS

A. The OPS Commander, or designee, will prepare a monthly report that will be due at the end of each month. The report will be provided to the Chief of Police and will detail the:

1. Number of complaints against sworn and non-sworn employees of the SPD.

2. Nature of the complaints identified by the type of Department violations.

3. Disposition of the complaints.

4. Number of Use of Force Reports received from Division Commanders during the month, including the number of incidents in which the use of force resulted in an individual being treated at a hospital.

B. The OPS Commander, or designee, will prepare an annual report at the end of each year based upon information in the previous year's monthly reports. The annual report is for dissemination to the public and to SPD employees upon request. [CALEA 52.1.5]

## XIII. EARLY INTERVENTION SYSTEM

A. The SPD has the responsibility to its employees and to the community to identify and assist employees that show symptoms of job-related stress and/or performance deficiencies. An Early Intervention System has been developed to provide a systematic review of complaints received by the SPD, and use of force incidents. It is designed to highlight tendencies in regard to complaints and use of force incidents that may otherwise be overlooked by the Department. [CALEA 35.1.9a]

EXHIBIT 13

B. The first and second line supervisors are crucial to a successful Personnel Early Warning System program. They should always be cognizant of their employees and watch for signs of performance issues. [CALEA 35.1.9d]

C. If a supervisor becomes aware of a problem with an employee that warrants immediate attention, he or she should not wait for the employee to be identified by the Personnel Early Warning System before taking action to rectify the situation.[CALEA 35.1.9 b.d]

D. These may include but are not limited to:[CALEA 35.1.9d]

1. Excessive sick leave usage

2. Excessive injuries

3. Displays of emotional hostility

4. Excessive accidents

5. Excessive tardiness

6. Alerts triggered by the Early Warning System

E. An annual report will be prepared by the OPS, outlining personnel complaints, use of force incidents, and will contain the names of employees who have received three or more OPS investigations within a rotating 365-day period or receive any ALERTS for Use of Force.

F. The OPS Case Management System will give an ALERT for 3 or more OPS investigations within a rotating 365-day period and 3 or more Use of Force Reports within a 90-day period.

1. The annual report will provide a brief profile of the complaints and use of force incidents.

2. Profile for the complaints will include the employee's name, payroll number, name of complainant, nature of the complaint, and disposition (if known).

3. Profile for use of force incidents will include the employee's name, payroll number, subject's name, date of incident, nature of incident, and extent of injury, if any.

G. Report data will be disseminated monthly to the appropriate supervisors for review. A summary of supervisory review findings will be submitted to the Office of Professional Standards. The concerned Commander or designee and the employee's supervisor will jointly make a final determination based on an assessment of the report data and other relevant criteria.

H. Determinations will result in the following alternative measures:

1. Referral to Employee Assistance Program (EAP), the City Psychologist, or other approved practitioner for counseling or referral assistance.

2. Participation in stress reduction programs.

3. Corrective action.

4. Training/Remedial Training. [CALEA 35.1.9e]

5. Reassignment

KANG 001331

# EXHIBIT 13

      6.    Suspension of outside employment authorizations

I.    The Employee Profile System establishes a data collection source profiling SPD employees to identify patterns of stress-induced or performance problems.

J.    Profiles will document specified criteria for assessment:

      1.    Compliance.

      2.    Use of Force incidents.

      3.    Commendations.

      4.    Corrective actions.

      5.    Promotional status change.

K.    Immediate supervisors, as deemed necessary, will review profile reports. The concerned Commander or designee will review profile reports annually, in conjunction with other criteria, to identify problems.

L.    Based on profile reports and relevant data, the following actions may be taken.

M.    Referral to the EAP or City Psychologist for counseling or additional referral.

      1.    Participation in stress reduction training either voluntarily of mandatory.

      2.    Corrective action.

      3.    Assessment that no problem exists, terminating further action.

N.    All ALERTS will be maintained within the OPS Case Management System.

O.    All levels of supervision will be responsible for ensuring that the OPS is aware of all complaints against, commendations awarded, and each incident of use of force involved by each employee under their command. This is to ensure accuracy in compiling profiles. [CALEA 31.5.9b]

P.    All levels of supervision can make recommendations of remedial training in instances where remedial or additional training can correct the behavior. In these situations, the OPS will still be notified of the recommendation.

Q.    The OPS Commander will prepare a yearly report evaluating the effectiveness of the early warning system and make recommendations for any changes to the Chief of Police.

This General Order supersedes all written directives issued prior to 08/29/2018, pursuant to Office of Professional Standards.

> **BY ORDER OF:**
> **Original Signature on File**
>
> _____
> **Mark Revenew**
> **Interim**
> **Chief of Police**

**EXHIBIT 13**



| GO # OPS-016: | **EFFECTIVE:** | | **09/25/2004** |
|---|---|---|---|
| **OFFICE OF PROFESSIONAL STANDARDS** | **REVISED:** | 10/21/2009 | 11/30/2011 |
| | | 10/19/2010 | 02/02/2012 |
| | | 03/21/2011 | 03/05/2014 |
| | | 07/16/2014 | 04/18/2016 |
| | | 12/13/2016 | 08/29/2018 |
| | | | ~~10/30/2019~~ |

## PURPOSE

The purpose of this directive is to establish guidelines for the investigation of complaints against employees of the Savannah Police Department (SPD). All complaints will be thoroughly investigated to determine the appropriate finding.

## POLICY

A system to investigate and review complaints is essential to establish and maintain the public's confidence and trust, and to protect our citizens from police misconduct. This same system will also protect the integrity and the rights of all SPD employees. Citizens are encouraged to bring forward legitimate complaints regarding policy violations and misconduct by all SPD personnel. SPD personnel will act in a courteous and professional manner when receiving complaints from citizens. SPD personnel will assist and cooperate in the processing of Service complaints. It shall be the policy of the SPD to investigate all complaints against its employees and to maintain an Office of Professional Standards Unit which will thoroughly, expeditiously, and impartially investigate all complaints involving the Department's integrity.

When an employee's continued presence at work would be a detriment to the efficiency of the Department or to public safety, the Chief of Police or his designee may place an employee on administrative leave with pay during the investigation process. When such action is taken, the supervisor or commander responsible for making the notification shall notify the employee in writing and shall submit that notification to the appropriate Division Commander.

## PROCEDURE

I. **OFFICE OF PROFESSIONAL STANDARDS**

    A. The Office of Professional Standards (OPS) is organized under the Office of the Chief of Police. The OPS Commander reports directly to the Chief of Police.

    B. The OPS coordinates and exercises staff supervision over complaint investigations and/or allegations of policy violations and misconduct against Department employees from all sources.

    C. The OPS serves as the SPD's control agent in all Service complaints; recording complaints when received, reviewing completed investigations for thoroughness, objectivity, and accuracy, and establishing and maintaining a complete case file on each complainant.

    D. The OPS shall be responsible for recording, registering, and controlling all alleged or suspected policy violations and misconduct complaints against the employees of the SPD. The confidentially of administrative investigation files shall be

KANG 001333

EXHIBIT 13

maintained in accordance with public records law.

E. The OPS Commander shall be directly responsible for the Office of Professional Standards function and shall report all complaints involving violations of the law, use of force incidents involving serious injury or death, and conduct involving moral turpitude directly to the Chief of Police, or designee, without delay.

F. The OPS shall have the authority to interview any employee, use facilities and equipment, and review any record or report of the SPD in order to facilitate the just resolution of all complaint investigations.

G. Recognizing that complaint investigations are conducted under the immediate authority of the Chief of Police, SPD personnel shall cooperate with and assist the OPS during investigations.

H. The OPS Investigators will be knowledgeable of all processes involved in the investigation of complaints, administering of discipline, and all applicable rules, orders, directives, and procedures.

I. The OPS will develop and maintain a database of all SPD complaints. Disciplinary Actions taken as a result of an Administrative Investigation or a Service Complaint will be entered into the OPS database/computer file. A copy of the Disciplinary Action Record, notification letters, and all other associated documentation will be filed with the completed case file. All discipline records will be maintained in accordance with the State of Georgia records retention laws.

J. The OPS will forward all Disciplinary Action Records (DAR) to the City's Human Resource Department for record-keeping purposes.

K. The OPS will apprise the Chief of Police of the status or progress of disciplinary actions that are under appeal or that may develop into an appeal.

L. The OPS will make observations or recommendations to the Chief of Police concerning any modification or improvement in disciplinary procedures, legislative updates or practices, as well as needed training based upon trends and tendencies that have been identified.

M. The OPS will monitor sensitive cases that may affect future policies or actions and will make appropriate recommendations for change.

N. The OPS will serve as the liaison with other entities involved in the disciplinary process including, but not limited to, the Chief of Police, the District Attorney's Office, The City Attorney's Office, the County Attorney's Office, and the City of Savannah Human Resources Department.

O. The OPS investigates complaints against the SPD employees. OPS investigators are responsible for the investigation. They are strictly fact finders. They DO NOT make recommendations regarding findings or penalty. The employee's Commander is the first to make a recommendation regarding the finding of the case, and the recommended penalty.

P. To expedite the closure of administrative complaints, the OPS may assign a day for the Command Staff to discuss and review completed cases.

Q. The OPS Investigators will be assigned to a Precinct/Division to attend Community meetings (Outreach) and to be a liaison between SPD personnel regarding the complaint process through final disposition.

KANG 001334

**EXHIBIT 13**

## II.   COMPLAINT INVESTIGATIONS

A.   All complaints and discipline files can be classified under one of the following three areas:

   1.   **Supervisory Discipline:**  This type of discipline is usually generated through the first line supervisor, and depending on the violation or misconduct, may require a formal investigation.

   2.   **Service Complaints:**  Depending upon the severity of the allegation, such complaints may require a formal investigation.  Should a service complaint be so severe as to merit a formal investigation, it will then be labeled as an Internal Investigation.

   3.   **Administrative Investigations:**  The more serious allegations usually require a formal investigation and may include the advisement of rights pertaining to an administrative investigation which is known as the Garrity Warning.

B.   Supervisory personnel are authorized to investigate ~~violations involving~~ allegations of:

   1.   Minor violations of policy and procedure;

   2.   Allegations of rudeness to citizens;

   3.   Insubordination;

   4.   Tardiness or abuse of leave.

C.   A comprehensive investigative report shall be prepared on all investigations.  This report will include:

   1.   A summary of the complaint or alleged act of misconduct.

   2.   A description of the incident, physical evidence, and other pertinent information.

   3.   Non-edited investigative statements.

   4.   Evaluation of the complaint with a statement indicating what can or cannot be substantiated.

D.   Investigations by supervisory personnel shall be forwarded through their Chain-of-Command for review to ensure service complaints are resolved satisfactorily.  A comprehensive investigative report, LOT to include, applicable Douglas Factors will be completed and submitted to the OPS Commander as soon as possible.  In those cases where delays are anticipated, the OPS Commander will be notified.

E.   The OPS shall conduct investigations into:

   1.   Civil liability suits against members of the Department.

   2.   Administrative investigations for other agencies within the concurrent jurisdiction of the SPD, at the direction of the Chief of Police.

   3.   Allegations of corruption.

   4.   Gross misconduct.

   5.   Allegations of the use of excessive force or brutality.

KANG 001335

EXHIBIT 13

6. Use of deadly force and firearms.

7. Violations of civil rights.

8. Allegations of criminal misconduct.

9. Incidents requiring investigation that are extremely lengthy, time consuming, involve multiple units or divisions, or when other investigative resources are unavailable.

10. All other Administrative Investigations assigned by the Chief of Police.

F. All administrative investigations should be completed within ninety days of the dated assigned. Any delays should be cleared through the OPS Commander. If the case is not resolved within ninety days the complainant will be notified in writing of the case status.

## III. RELIEF FROM DUTY

A. When an employee's continued presence at work may be a detriment to the efficiency of the Department or to public safety, the Chief of Police or his designee may place an employee on administrative leave with pay during the investigation process.

B. When such action is taken, the supervisor or commander responsible for making the notification shall notify the employee in writing and shall submit that notification to the appropriate Division Commander.

C. When an employee is placed on Administrative Leave pending an administrative investigation either the Internal Affairs Office or the employee's commanding officer will retrieve and secure the person's firearms and badges. Upon completion of the investigation the Chief of Police or designee will determine the reinstatement of the items.

## IV. COMPLAINT PROCESS

A. Allegations of police misconduct are received as complaints from both citizens and SPD personnel. All complaints against the SPD and its personnel will be documented and investigated, including anonymous complaints.

B. Citizens wishing to register a complaint will be referred to the employee's immediate supervisor. If the immediate supervisor is unavailable, a supervisor within the employee's division shall be notified.

C. The supervisor processing the complaint will record pertinent information regarding the complaint on the Complaint Form (SPD Form 1044w).

D. All complaints will be investigated, including complaints where the complainant is unwilling to complete or sign the complaint form.

E. The complaint shall be documented and, as soon as practical, the supervisor must telephone or e-mail the OPS for a control/tracking number.

F. Upon receipt of a complaint the OPS Office will provide the complainant with documentation the complaint has been received and provide a description of the process.

G. Once a tracking number has been assigned and a brief synopsis given to the OPS Investigator, it will be determined by the OPS Commander if the investigation will be conducted by a supervisor of this Department or by an OPS Investigator.

KANG 001336

EXHIBIT 13

H. The person recording the complaint shall provide the complainant with a copy of the Complaint Form.

I. When an employee is notified that they have become the subject of an OPS investigation, the employee shall be issued a written or electronic notice of the allegation and the employee's rights and responsibilities relative to the investigation.

## V. INVESTIGATIVE PROCEDURES

A. The complainant shall be interviewed as soon as practical regarding the complaint. The recorded complaint interview will be retained in the same manner as established for the internal file from which it was taken.

B. The Complainant shall be asked to read and sign the Complaint Form.

C. The Complainant shall write the complaint on pages two (2) through four (4) of the Complaint Form and additional pages may be added if necessary.

D. The supervisor shall conduct a preliminary investigation, including interviewing the complainant and any witnesses readily available in person. The supervisor shall also advise the subject employee of the complaint, when appropriate.

E. An effort will be made to locate and interview each person who may be a witness or have information relevant to the incident.

F. When an employee is under investigation and subject to a formal interview, the interview shall be conducted under the following conditions:

1. When practical, appropriate Commanders should be notified when one of their subordinates is to be interviewed by an OPS Investigator.

2. Interviews of SPD employees should be scheduled during the employee's normal duty hours, when practical.

3. Employees will be compensated for interviews conducted at times other than normal duty hours.

4. Employees being interviewed or writing a statement concerning an administrative investigation may not have an attorney, supervisor, or Commander present.

5. The interview should take place in the Office of Professional Standards or any place necessary in order to complete the mission.

6. The employee will be informed of the name and rank of the interviewer and all other persons present during the interview.

7. The employee will be informed of the nature of the investigation before the interview begins.

8. The employee will be informed of all the complainant(s), unless there is a compelling reason not to do so.

9. The interview should be audio/digital recorded by the interviewer.

10. Questions asked during the interview should be relevant to the investigation and should be within the area of knowledge the employee is thought to possess.

11. If an interview extends into a normal mealtime, the interview should be suspended while the employee has a meal period.

KANG 001337

**EXHIBIT 13**

12. If the interview continues beyond the normal tour of duty, the employee should be allowed to make phone calls to notify such persons as necessary.

13. Employees will be allowed to use toilet facilities as necessary.

G. In addition, an employee may be required to:

1. Be photographed, to participate in a lineup, and/or to submit a financial disclosure statement when the actions are material to a particular OPS investigation being conducted by the SPD.

2. Submit to a medical or laboratory examination, at the SPD's expense, when the examination is specifically directed and narrowly related to a particular OPS investigation being conducted by the SPD.

3. Submit to a polygraph examination in the course of an OPS investigation. The use of the polygraph will be restricted to those issues narrowly related to a particular administrative investigation. Generally, the citizen or witness must submit to and pass the polygraph examination before such examination will be considered for the employee.

4. An employee shall be ordered not to divulge any information about the interview until the disposition of the investigation, if the progress of the investigation would be otherwise hampered.

5. Employees may not refuse to provide a statement to the OPS. Refusal shall result in immediate suspension, and the OPS Commander shall immediately notify the Chief of Police.

H. All complaint investigations will be completed, regardless if the employee retires or resigns prior to the conclusion of the investigation.

1. When an employee retires or resigns prior to the conclusion of the investigative findings, the employee's separation status will reflect either:

   a. Retired – Pending IA Investigation

   b. Resigned – Pending IA Investigation

## VI. DISCIPLINE REVIEW PANEL

A. Upon completion of an Administrative Investigation (AI), the Office of Professional Standards (OPS) will forward the completed investigation to the involved employee's chain of command.

B. When an investigation is distributed for review, OPS will schedule a Discipline Review Panel (DRP) meeting within 14 calendar days of sending the AI to the chain of command.

C. Reviewers shall forward questions concerning the investigation to OPS two (2) business days prior to the DRP, allowing OPS the opportunity to find answers prior to the DRP meeting.

D. The chain will send their independent findings to OPS at least one (1) business day prior to the DRP meeting.

1. If all are in agreement that the allegation is exonerated, not sustained, or unfounded, the meeting will be cancelled.

KANG 001338

**EXHIBIT 13**

2. If the allegation is sustained or there is any disagreement among the chain, the DRP will meet to discuss the findings.

E. The DRP consists of the Assistant Chief, Major, employee's commander, lieutenant, and sergeant.

F. The DRP meeting will be chaired by the Assistant Chief.

G. The DRP will first come to a consensus as to the finding for each allegation. After a consensus is reached, the DRP will discuss recommendations concerning the range for the sustained violation(s). The recommendations are limited to:

1. Option 1: Verbal counseling to written reprimand.

2. Option 2: Suspension to termination.

H. If the DRP is unable to reach a consensus as to the findings for the allegation(s) the reason (s) for the dissention(s) will be documented and forwarded to the Chief of Police or his/her designee for review and resolution.

I. The employee's commander shall complete a Letter of Transmittal summarizing the findings, complete Douglas Factors, and recommended discipline within two (2) business days of the DRP.

1. If the recommendation is for Option 1, the discipline recommendation and Letter of transmittal will be forwarded to the Major for concurrence and final determination of discipline.

2. If the recommendation is for Option 2, OPS shall schedule a mitigation hearing within twenty-one (21) calendar days of the DRP and the Letter of Transmittal will be provided to the Chief of Police.

**J. Mitigation Hearing**

1. Present during this hearing are the Chief of Police, Assistant Chief, Major OPS Commander, OPS Investigator, involved employee's Commander, and involved employee.

2. This hearing will be conducted by the Chief and is the employee's opportunity to present mitigating information they would like to be considered prior to a final discipline decision being made.

3. This hearing shall be recorded by OPS and forwarded to the members of the DRP within one (1) calendar day of the hearing for their review and consideration prior to making a final recommendation concerning discipline.

**K. Final Discipline**

1. Final discipline review meeting will be set within seven (7) calendar days of the mitigation hearing.

2. Present during this meeting are:

i. Chief of Police

ii. Assistant Chief

iii. Employee's Chain of Command

iv. OPS Commander

KANG 001339

EXHIBIT 13

       v.    OPS Investigator

3. This is the opportunity for the employee's chain of command to make final recommendations concerning discipline and discuss issues raised during the mitigation hearing.

4. The final decision rests with the Chief of Police and is based upon all available information provided during the discipline review process.

**L. Investigative Findings**

1. The LOT and Douglas Factors, with the disciplinary action, shall be forwarded to OPS for record-keeping purposes.

2. OPS shall be responsible for informing the employee of the discipline imposed and ensuring the employee understands the required actions. The subject officer shall receive a complete copy of the investigative file.

3. If the complaint is sustained and the penalty is a written reprimand or greater, the subject officer can respond, either verbally or in writing, within 3 days, to the allegations (Cleveland Board of Education v Loudermill).

4. When discipline is issued, the employee will be notified of their right to appeal under the City of Savannah Policy (HR-020A).

5. If the employee fails to appeal to the City Manager, this non-response will constitute a waiver of the right to appeal and the discipline will be imposed.

6. Final disciplinary action reports (DAR) shall be forwarded to OPS for record-keeping purposes.

## VII. DISPOSTION

A. Investigations into allegations of policy violations or employee misconduct will conclude with one of the following findings:

2. **EXONERATED** - The investigation supported the conclusion that the incident did occur, but the employee's actions were legal, proper, and reasonable.

3. **UNFOUNDED** – The investigation supported the conclusion that the employee did not engage in the alleged conduct and did not violate a rule by doing so.

4. **POLICY FAILURE** - Policy or procedure does not properly address the allegation or procedure which led to the alleged conduct and the investigation reveals recommended policy or procedural changes.

5. **NOT SUSTAINED** - The investigation didn't prove or disprove the alleged conduct.

6. **SUSTAINED** - The investigation supported the conclusion that the employee engaged in the alleged conduct and violated a rule by doing so.

B. Appropriate disciplinary action will be taken, when warranted, and a complete file maintained by the SPD Office of Professional Standards.

C. Investigative findings for those employees that have since retired or resigned will be forwarded to the Chief of Police or designee. Depending upon the final disposition of the investigation the Chief of Police or designee will change the former employee's separation status accordingly.

KANG 001340

**EXHIBIT 13**

D. Upon conclusion of the investigation, the involved employee(s) will receive, in writing, notification of the results of the investigation.

   1. This will also include those employees that have retired or are no longer employed with the Savannah Police Department.

      a. This notification will be done by certified mail and with a return/receipt.

## VIII. OFFICE OF PROFESSIONAL STANDARDS ROLE IN CRIMINAL INVESTIGATIONS

A. If during the course of an Administrative Investigation there appears that there is, or that there may have been, a violation of criminal law, the investigation by the OPS may be suspended and the Chief of Police promptly notified.

B. No further administrative investigative effort will normally be made until after the Chief of Police has determined whether to assign the matter for criminal investigation.

C. Employees under investigation for alleged criminal law violations will be afforded those rights guaranteed by the Constitution of the United States and the policies and procedures of the SPD.

D. Generally, criminal investigations will be conducted by the appropriate investigative unit or agency unless the OPS is directed by the Chief of Police to conduct the criminal investigation.

E. Deadly force cases will be investigated in accordance with the SPD's Use of Force policy (General Order #ADM-007).

## IX. MISSED COURT, TRAINING, ~~VEHICLE MAINTENANCE~~

I. The OPS shall receive notices for unexcused absences from supervisors who coordinate court, training, or vehicle maintenance for their respective units. Once received, the OPS will record the alleged unexcused absence and notify the employee's Commander.

J. The Commander or designee of the subject employee has 30 days to investigate the allegation and return the appropriate finding and/or penalty to the OPS.

K. If the finding is Sustained, the Commander or designee must recommend the appropriate pre-determined penalty for the employee and forward that recommendation to the Assistant Chief for approval, rejection or modification. These penalties have been set by the Command Staff, and are listed below:

SPD Personnel who are **unexcused** from training, court, or appointments with vehicle maintenance will receive the following:

| First offense: | Verbal Counseling |
|---|---|
| Second Offense: | Written Reprimand |
| Third Offense: | 1 Day Suspension |
| Fourth Offense: | 3 Day Suspension |
| Fifth Offense: | Chief's Office |

KANG 001341

EXHIBIT 13

Each category will stand alone, not consolidated.

**Example:**

| Unexcused absence from court | Written Reprimand |
|---|---|
| Unexcused absence from training | Written Reprimand |
| Unexcused absence from court (second violation) | 1 Day suspension |

*Time Frame*: After two (2) years the penalty enhancement drops off, however, the disciplinary file remains. [In other words, if you have a failure to appear (Court) in January 2007 and then a failure to appear in January 2008; in January 2009 the first one drops off. If you have a third failure to appear in February 2009, then you have two penalties.]

**Example:**     Written Reprimand for court: Jan. 2007
1 Day Suspension for court: Jan. 2008
Jan. 2007 penalty drops off: Jan. 2009.
Failure to appear in Feb. 2009: 1 Day Suspension.

## X. RUDENESS COMPLAINTS

A. Rudeness complaints will generally be classified as a Service Complaint. Depending upon the severity of the allegation, such complaints may require a formal investigation. Should a Service complaint be so severe as to merit a formal investigation, it will then be labeled as an Administrative Investigation.

B. When appropriate, the Precinct/Unit supervisor shall conduct the investigation, including interviewing the complainant as soon as practical regarding the complaint and any witnesses readily available in person. The supervisor shall also advise the subject employee of the complaint.

C. If the finding is Sustained (all other findings do not apply), the Commander or designee must give the appropriate pre-determined penalty to the employee. These penalties have been set by the Command Staff, and are listed below:

SPD Personnel who have sustained rudeness complaints will receive the following:

| First offense: | Written Reprimand |
|---|---|
| Second Offense: | 1 Day Suspension |
| Third Offense: | 3 Day Suspension |
| Fourth Offense: | Chief's Office |

*Time Frame*: After two (2) years the penalty enhancement drops off, however, the disciplinary file remains. [In other words, if you have a sustained rudeness complaint on January 1, 2011 and another in January 2, 2013; the January 1, 2011 will drop off and does not apply to the progressive discipline above. If you have another in February 2013, then you have two applicable offenses and a 1 day suspension would apply.]

## XI. ADMINISTRATIVE INVESTIGATION FILES [CALEA 52.1.2]

A. The OPS shall be responsible for maintaining all records regarding administrative investigations within the Office of Professional Standards.

KANG 001342

EXHIBIT 13

B. The OPS shall take all proper precautions to ensure the security of these records. These records shall be stored separate and apart from personnel records.

C. All complaints received by any member of the Department, against the Department or an employee, shall be assigned a complaint control number. OPS will assign control numbers and will enter them into a computer database.

D. OPS shall prepare a file for every complaint assigned. The file shall contain the original report, audio tapes of OPS interviews, incident reports, photographs, and other pertinent documentation.

E. Folders shall be filed numerically by control number and kept secure while in the custody and control of OPS.

F. No one may access the files without the permission from the Chief of Police or the OPS Commander.

G. No portion of the file shall be copied or reproduced by anyone other than the OPS personnel.

H. For record keeping efficiency, information contained in the log book and card files may be computerized.

## XII. OFFICE OF PROFESSIONAL STANDARDS MONTHLY AND ANNUAL REPORTS

A. The OPS Commander, or designee, will prepare a monthly report that will be due at the end of each month. The report will be provided to the Chief of Police and will detail the:

1. Number of complaints against sworn and non-sworn employees of the SPD.

2. Nature of the complaints identified by the type of Department violations.

3. Disposition of the complaints.

4. Number of Use of Force Reports received from Division Commanders during the month, including the number of incidents in which the use of force resulted in an individual being treated at a hospital.

B The OPS Commander, or designee, will prepare an annual report at the end of each year based upon information in the previous year's monthly reports. The annual report is for dissemination to the public and to SPD employees upon request.

## XIII. EARLY INTERVENTION SYSTEM

A. The SPD has the responsibility to its employees and to the community to identify and assist employees that show symptoms of job-related stress and/or performance deficiencies. An Early Intervention System has been developed to provide a systematic review of complaints received by the SPD, and use of force incidents. It is designed to highlight tendencies in regard to complaints and use of force incidents that may otherwise be overlooked by the Department.

B. The first and second line supervisors are crucial to a successful Personnel Early Warning System program. They should always be cognizant of their employees and watch for signs of performance issues.

C. If a supervisor becomes aware of a problem with an employee that warrants

KANG 001343

**EXHIBIT 13**

immediate attention, he or she should not wait for the employee to be identified by the Personnel Early Warning System before taking action to rectify the situation.

D. These may include but are not limited to:

1. Excessive sick leave usage

2. Excessive injuries

3. Displays of emotional hostility

4. Excessive accidents

5. Excessive tardiness

6. Alerts triggered by the Early Warning System

E. An annual report will be prepared by the OPS, outlining personnel complaints, use of force incidents, and will contain the names of employees who have received three or more OPS investigations within a rotating 365-day period or receive any ALERTS for Use of Force.

F. The OPS Case Management System will give an ALERT for 3 or more OPS investigations within a rotating 365-day period and 3 or more Use of Force Reports within a 90-day period.

1. The annual report will provide a brief profile of the complaints and use of force incidents.

2. Profile for the complaints will include the employee's name, payroll number, name of complainant, nature of the complaint, and disposition (if known).

3. Profile for use of force incidents will include the employee's name, payroll number, subject's name, date of incident, nature of incident, and extent of injury, if any.

G. Report data will be disseminated monthly to the appropriate supervisors for review. A summary of supervisory review findings will be submitted to the Office of Professional Standards. The concerned Commander or designee and the employee's supervisor will jointly make a final determination based on an assessment of the report data and other relevant criteria.

H. Determinations will result in the following alternative measures:

1. Referral to Employee Assistance Program (EAP), the City Psychologist, or other approved practitioner for counseling or referral assistance.

2. Participation in stress reduction programs.

3. Corrective action.

4. Training/Remedial Training.

5. Reassignment

6. Suspension of outside employment authorizations

I. The Employee Profile System establishes a data collection source profiling SPD employees to identify patterns of stress-induced or performance problems.

J. Profiles will document specified criteria for assessment:

KANG 001344

EXHIBIT 13

1. Compliance.

2. Use of Force incidents.

3. Commendations.

4. Corrective actions.

5. Promotional status change.

K.  Immediate supervisors, as deemed necessary, will review profile reports. The concerned Commander or designee will review profile reports annually, in conjunction with other criteria, to identify problems.

L.  Based on profile reports and relevant data, the following actions may be taken.

M.  Referral to the EAP or City Psychologist for counseling or additional referral.

1. Participation in stress reduction training either voluntarily of mandatory.

2. Corrective action.

3. Assessment that no problem exists, terminating further action.

N.  All ALERTS will be maintained within the OPS Case Management System.

L.  All levels of supervision will be responsible for ensuring that the OPS is aware of all complaints against, commendations awarded, and each incident of use of force involved by each employee under their command. This is to ensure accuracy in compiling profiles.

M.  All levels of supervision can make recommendations of remedial training in instances where remedial or additional training can correct the behavior. In these situations, the OPS will still be notified of the recommendation.

N.  The OPS Commander will prepare a yearly report evaluating the effectiveness of the early warning system and make recommendations for any changes to the Chief of Police.

This General Order supersedes all written directives issued prior to 10/30/2019, pursuant to Office of Professional Standards.

> **BY ORDER OF:**
> **Original Signature on File**
>
> _____
> **Roy Minter, Jr.**
> **Chief of Police**

KANG 001345

**EXHIBIT 13**







*SavannahPD.org*

<u>INTER-DEPARTMENT MEMO</u>

**TO:**    Roy Minter Jr., Police Chief

**THRU:**    Lenny B. Gunther, Assistant Police Chief

            Devonn Adams. Field Operations Major

**FROM:**    Michelle Halford, Captain, Southside Commander

**SUBJECT:**    OPS # 20-0058,20-0059, and 20-0060

**DATE:**    September 9, 2020

---

In reference to the above referenced OPS investigation, I submit the following regarding Officer Adrian Gates.

On Wednesday September 9 at 1330 PM a disciplinary review board convened by Assist Chief Gunther to review this investigation and make recommendations.

The board consisted of the following members:

    Assistant Chief Lenny B. Gunther, Field Operations

    Major DeVonn Adams, Field Operations

    Michelle Halford, Southside Commander & Scribe

    Darold Holmes, Southside Lieutenant

    Andrew Arnsdorff, Southside Sergeant

    Richard Wiggins, Sergeant of Office of Professional Standards

The disciplinary board met in private and discussed the investigation. Based on the information contained within the case file, BWC, and incident report we found that the incident report contained several untruthfulness statements and polices violations. Officer Gates has been employed with the Savannah Police Department since December 26, 2016. He has previous discipline to include several suspensions and written reprimand.

The board sustained following allegations against Officer Adrian Gates:

**OPS 20-0058**

EXHIBIT 13

**ADM-018, Searches and Seizures**

- Consent Search

**ADM-004, Oath of Office, Ethics, and Conduct**

- Arresting and Dealing with Law Violators
- Knowledge of Laws and Rules
- Questions of Citizens
- Truthfulness/Honesty

**OPS# 20-0059**

*OPS-067, Body Worn Camera*

- *Activation and Deactivation of BWC*

*OPS-049, Incident Reporting*

- *Preliminary Incident Reports*

*ADM-015, Outside Employment*

- *Maximum Number of Allowable Hours*

*ADM-004, Oath of Office, Ethics, and Conduct*

- *Truthfulness/Honesty*
- *Treatment of Others*
- *Duty Time*
- *Fitness for Duty (Sleeping)*
- *Officer Availability*

**OPS# 20-0060**

**OPS-015, Arrest Protocol**

- Arrest with a Warrant

**ADM-018, Searches and Seizures**

- **Search Incident to Arrest**

**ADM-004, Oath of Office, Ethics, and Conduct**

- Arresting and Dealing with Law Violators
- Knowledge of Laws and Rules
- Incompetence

The disciplinary board **did not** sustain the following allegation against officer Gates:

*ADM-004, Oath of Office, Ethics, and Conduct*

- Address and Telephone Number

EXHIBIT 13

The discussion then shifted to discipline. During this discussion, we discussed the seriousness of each policy violations. The board determined the appropriate discipline for Officer Adrian Gates is **Termination**. We also determined that Officer Bradshaw will receive additional coaching and mentoring for her policy violations.

### Douglas Factors

1) **MMH**  The nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; **Officer Gates knowingly lied to his supervisor about the incident involving the arrest of Mr. Padgett and about the sleeping while on duty.**

2) **MMH** The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; **Numerous contacts with the public as a precinct beat/patrol officer.**

3) **MMH**  The employee's past disciplinary record; **Officer Gates has received several suspensions and written reprimand for policy violations.**

4) **MMH**  The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability **Officer Gates has been employed with the Savannah Police Department since December 26, 2016.**

5) **MMH**  The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties; **Due to his Dishonesty, Officer Gates  can no longer serve as a Savannah Police officer.**

6) **MMH** Consistency of the penalty with those imposed upon other employees for the same or similar offenses: **Termination due to untruthfulness issues has been the standard of the Savannah Police department.**

7) **MMH**  Consistency of the penalty with any applicable agency table of penalties; **Termination is the appropriate penalty for untruthfulness.**

8) **MMH**  The notoriety of the offense or its impact upon the reputation of the agency; **Every time this officer testifies in court, he will have to disclose that he has been**

**EXHIBIT 13**

**dishonest. His previous sustained complaints have been on the local news and has cause an embarrassment for our department.**

9) **MMH** The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; **Officer Gates recently just served a 40 hour suspension for similar policy violations. Officer Gates should have known that honesty and integrity are the foundation of law enforcement and held in high regard with the Savannah Police Department.**

10) **MMH** Potential for the employee's rehabilitation; **Termination was recommended.**

11) **MMH** Mitigating circumstances surrounding the offense such as unusual job tension, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; **None**

12) **MMH** The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others; **Holding employees accountable will deter others from doing the same violation.**

I hereby certify that I have considered the twelve (12) Douglas Factors as indicated above (with my initial next to each factor) for possible mitigation of the penalty. *Michelle Halford*

EXHIBIT 13

DEPOSITION OF:  LIEUTENANT RICHARD WIGGINS /TJD

I do hereby certify that I have read all questions propounded to me and all answers given by me on August 29, 2022, taken before Thomas J. Dorsey, and that:

_____ 1)  There are no changes noted.
_____ 2)  The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. _____ Line No. _____ should read:_____
_____
The reason for the change is
_____

Page No. _____ Line No. _____ should read: _____
_____
The reason for the change is
_____

Page No. _____ Line No. _____ should read:_____
_____
The reason for the change is
_____

Page No. _____ Line No. _____ should read:_____
_____
The reason for the change is
_____

Page No. _____ Line No. _____ should read:_____
_____
The reason for the change is
_____

Page No. _____ Line No. _____ should read:_____
_____
The reason for the change is
_____

EXHIBIT 13

DEPOSITION OF: LIEUTENANT RICHARD WIGGINS /TJD

Page No. _____ Line No. _____ should read:_____
_____
The reason for the change is
_____

Page No. _____ Line No. _____ should read:_____
_____
The reason for the change is
_____

Page No. _____ Line No. _____ should read:_____
_____
The reason for the change is
_____

Page No. _____ Line No. _____ should read:_____
_____
The reason for the change is
_____

Page No. _____ Line No. _____ should read:_____
_____
The reason for the change is
_____

If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to this
deposition.

_____
LIEUTENANT RICHARD WIGGINS

Sworn to and subscribed before me,
This the _7th_ day of _September_ , 20_22_.

_____
Notary Public
My commission expires: _____

> JESSICA GROVE
> NOTARY PUBLIC
> CHATHAM County
> State of Georgia
> My Comm. Expires JULY 18, 2026

Please forward corrections to:

Gilbert & Jones, Inc.
7505 Waters Avenue, Suite F3
Savannah, GA 31406
(912) 355-1061

Gilbert & Jones