EXHIBIT 17

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DANIEL KANG,              )
                          ) CIVIL ACTION NO.
            Plaintiff,    )
                          ) 4:21-CV-111-WTM-CLR
       vs.                )
                          )
THE MAYOR AND ALDERMEN OF THE )
CITY OF SAVANNAH and ROY W.   )
MINTER, JR., Chief of Police  )
for the City of Savannah,     )
Georgia, In His Individual    )
and Official Capacities,      )
                              )
            Defendants.       )
_____)

VIDEOCONFERENCE DEPOSITION OF

LIEUTENANT JOSEPH TOTH

August 31, 2022

2:40 p.m.

218 West State Street
Savannah, Georgia

Thomas J. Dorsey, RPR, CCR-2781

Gilbert & Jones
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520

gilbertandjones1@gmail.com
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
Savannah, GA 31406

EXHIBIT 17

2

|   |   |
|---|---|
| 1 | **APPEARANCES OF COUNSEL** |
| 2 |   |
|   | On behalf of the Plaintiff: |
| 3 |   |
|   | MICHAEL G. SCHIAVONE, ESQ., (BY VIDEOCONFERENCE) |
| 4 | Schiavone Law Group, P.C. |
|   | 1111 Bull Street |
| 5 | Savannah, Georgia  31401 |
|   | (912)232-2646 |
| 6 | js_law@bellsouth.net |
| 7 | JAMES H. WILSON III, ESQ. |
|   | Savage, Turner, Pinckney, Savage & Sprouse |
| 8 | 102 East Liberty Street, 8th Floor |
|   | Savannah, Georgia  31401 |
| 9 | (912)231-1140 |
|   | jwilson@savagelawfirm.net |
| 10 |   |
| 11 | On behalf of the Defendant The Mayor and Aldermen of |
|   | The City of Savannah: |
| 12 |   |
|   | PATRICK T. O'CONNOR, ESQ. |
| 13 | PATRICIA T. PAUL, ESQ. |
|   | Oliver Maner LLP |
| 14 | 218 West State Street |
|   | Savannah, Georgia  31401 |
| 15 | (912)236-3311 |
|   | pto@olivermaner.com |
| 16 |   |
| 17 | On behalf of the Defendant Roy W. Minter, Jr.: |
| 18 | TAYLOR L. DOVE, ESQ. |
|   | Hunter Maclean |
| 19 | 200 East St. Julian Street |
|   | Savannah, Georgia  31401 |
| 20 | (912)695-6984 |
|   | tdove@huntermaclean.com |
| 21 |   |
| 22 | Also Present: |
| 23 | Daniel Kang |
|   | Jamar Bacon |
| 24 | Mike Arango, (By Videoconference) |
| 25 | - - - |

**Gilbert & Jones**

EXHIBIT 17

## Page 3

(Reporter disclosure made pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia.)

LIEUTENANT JOSEPH TOTH, having first been duly sworn, was examined and testified as follows:

MR. SCHIAVONE: Okay. This is the deposition of Joe Toth pursuant to the Civil -- Federal Civil Rules of Civil Procedure. All objections except to the form are reserved. Is that okay?

MR. O'CONNOR: That is agreeable. And Lieutenant Toth will reserve reading and signing.

MR. SCHIAVONE: All right.

EXAMINATION
BY MR. SCHIAVONE:

Q. Would you state your name, please, for the record?

A. Yes, sir. It's Lieutenant Joseph Laszlo Toth Jr., Savannah Police Department.

Q. All right, Lieutenant Toth. Can you tell me what your duties are at the Savannah Police Department?

Gilbert & Jones

## Page 4

A. I'm currently the -- I guess the second in command of the strategic investigation section which consists of the gang unit, gun unit, the two SIU teams and the TFOs that are assigned to the federal agencies.

Q. And what were your duties, if you can remember, in 2019, 2020?

A. I had the same duties. I had a different commander and we were assigned under criminal investigations at that time.

Q. All right. Were you the head of the SIS warrant squad?

A. Yes, sir, for a short time.

Q. All right. Can you recall what that period of time was?

A. I came over to the unit. I was reassigned in February of 2020 and have been there since.

Q. Since then?

A. Yes, sir.

Q. All right.

A. Since February 2020.

Q. And back during that period was Dan Kang and Mike Arango -- were they part of that unit?

A. Yes, sir. They were part of the warrant squad.

Gilbert & Jones

## Page 5

Q. And were they brought into that squad from CNT?

A. I have limited understanding of -- of that part of it because we didn't work together at those times. I know I had spoken to them previously. I know they were at CNT. After I was promoted to lieutenant I was moved to central precinct where they were there for a short period of time and then I guess that's -- at some point they created warrant squad, but I didn't have any direct knowledge of that.

Q. And when you took that responsibility for that squad, there wasn't any policies in effect, was there, for that squad and how to perform their duties?

A. Not specific to them, no.

Q. And do you remember Sergeant Arango being concerned that there was a lack of policy and a lack of manpower and equipment shortfalls?

A. I do.

Q. And do you recall that they actually -- he actually prepared a policy that was considered by superiors might be implemented for the -- for that unit?

A. Yes, I was.

Gilbert & Jones

## Page 6

Q. And was that ever implemented and made part of the policy by the chief?

A. At the time that I was there before the unit I guess disbanded it had not.

Q. And so tell me, what training were you given and what training were these officers given on the execution of warrants particularly for serious violent offenders, arrest warrants and how to do that, the danger involved and how to deal with suspects? Was there any training given these officers?

A. Yes, sir.

Q. Tell me about that. What was the training?

A. Well, they were specifically, if I'm not mistaken, all five of them at the time -- I'm not sure. Marlow left at one point, so they were down to four. They were all SWAT trained. They've all -- I believe they all attended the SWAT school. They've also been involved in numerous high-risk warrants and things like that in the department.

Q. All right. With the training and the SWAT unit and the high risk, would that be the same training that they would use in the execution of the warrant?

Gilbert & Jones

EXHIBIT 17

**7**

1 A. It would depend on whether or not SWAT was
2 actually called for and approved for them to act as a
3 SWAT team.
4 Q. Well, so then why would all that training
5 be relevant to the SIS warrant procedure?
6 A. As far as skill sets, tactics. Some of
7 the tactics are the same. Whether or not you employ
8 a full SWAT team to come out and exercise a warrant
9 or something of that nature would be -- would be
10 different.
11 Q. Well, when -- when these officers were
12 asked to go and execute these warrants, was there a
13 deficiency in the manpower?
14 Let me give you an example. I'm a
15 criminal lawyer. I had a client that was accused of
16 murder. There was an arrest warrant for his arrest.
17 He came to my office, wanted to surrender himself, so
18 I contacted SPD. I spoke with the lead detective and
19 told him that this individual was at my office and
20 that we wanted to turn him in and he would be here at
21 my office. Well, the next thing I know, there's got
22 to be -- I don't know -- three or four car loads of
23 marshals, SPD, a lead detective, a number of other
24 officers, quite a few officers that entered my office
25 in order to execute that warrant.

Gilbert & Jones

**8**

1 Now, my understanding is that the SS --
2 the SIS squad back when you took it over, there --
3 they may have what, three, four officers and that was
4 it to go and do this job?
5 MR. O'CONNOR: Object to the form.
6 Q. (By Mr. Schiavone) Is that a fair
7 statement?
8 MR. O'CONNOR: Object to the form. You
9 can answer.
10 I assume, Mike, you want him to answer
11 that last question, not the first one?
12 MR. SCHIAVONE: Right, the last one. I
13 was just giving an example.
14 Q. (By Mr. Schiavone) How many officers came
15 to deal with a serious violent, potentially violent
16 offender that there was a warrant accusing him of a
17 very dangerous offense?
18 MR. O'CONNOR: You can answer subject to
19 the objection.
20 THE WITNESS: Okay. Could you ask me the
21 question one more time so I can be specific?
22 Q. (By Mr. Schiavone) Well -- well, it
23 appeared to me that they didn't -- and this is not a
24 question. This is an example.
25 They knew that I was an officer of the

Gilbert & Jones

**9**

1 court, that I was an attorney, and I am voluntarily
2 surrendering my client because I was told there was
3 an arrest warrant for my client's arrest for the
4 charge of murder signed by a superior court judge.
5 And I understood that they are obligated to execute
6 the warrant and that's why I contacted them.
7 I -- when they came to my office, I was
8 told that it was protocol and procedure for this many
9 officers because of the training and the need to be
10 sure that they were all safe, that I was safe, and
11 that everybody in my office was safe. Yet my
12 understanding of this warrant squad back when you
13 took it over didn't have hardly any people, any men,
14 manpower to go out and do the same thing that they
15 did at my office. And I get it. I understand why
16 that kind of policy and procedure would be in place.
17 So my question to you is, your squad --
18 and I'm not saying that you did anything wrong, but
19 your squad was undermanned, wasn't provided
20 resources, wasn't provided equipment, the type of
21 equipment that they would need. My understanding is
22 that they weren't given -- hold on one second. Let
23 me look at my note.
24 Yeah. My understanding is that other than
25 deadly force there's other forms of force that could

Gilbert & Jones

**10**

1 be used in order to get a suspect into custody if the
2 situation arises. Among those are pepper balls, the
3 super SOC. My understanding is all that was taken
4 away from them when they entered the SIS warrant
5 squad. Isn't that true?
6 MR. O'CONNOR: I'm going to object to the
7 part before the question you just asked to the
8 form.
9 Q. (By Mr. Schiavone) Weren't those items
10 taken away from them?
11 A. If they were, that didn't happen when I
12 was there that I recall. The -- there was some
13 question at some point about pepper ball and its use,
14 but I have a hard time answering that question just
15 for the simple fact I don't recall if they -- what
16 they may have taken away and what they didn't. It
17 wasn't when I was there. I wasn't made aware of it.
18 Q. Well, they weren't provided things like
19 masks in light of COVID, HIV, TB, spit guards. They
20 weren't provided any of these, were they?
21 A. Yes.
22 Q. When were they provided those?
23 A. They were provided -- so we were informed
24 that we had masks coming in right around the start of
25 COVID. When the -- it took a little time to get them

Gilbert & Jones

EXHIBIT 17

**11**

1 in. When I was notified one day that the -- I think
2 it was Tracy Waldo was issuing them out. She had to
3 leave early. I couldn't get over there in time to
4 get them. I picked them up the second day because
5 there was some concern by members of the unit of
6 COVID.
7     At that point I provided them with that.
8 We also -- there were numerous things that were
9 brought up during a conversation between me and
10 Sergeant Arango shortly after I got there about their
11 needs. I have -- each one of those needs I've tried
12 to fulfill.
13     We did get them spit masks. We got them
14 for the whole unit. I don't recall the date. I can
15 just tell you that it was done. We also -- whether
16 it was computers. They had talked about certain mics
17 that they wanted. I asked them if they would send me
18 an RFE, which is a request for expenditure for those
19 items. I don't recall how that ended up, but...
20     Q.    All right. But most of these items were
21 not provided to them when they went out to execute
22 the arrest warrant for Darryl Faitele, were they? It
23 was after the fact?
24     A.    It may have been. I don't recall the time
25 frame of those individual items. I know that it was

Gilbert & Jones

**12**

1 brought to my attention that they needed things like
2 personnel cars and other items, and I did what I
3 could at my position to try to get those items for
4 them.
5     Q.    All right. Now, a lot of those items, for
6 instance, the pepper spray or pepper ball, these --
7 these would all be objects that could be used to
8 de-escalate the situation, correct, when you're going
9 to arrest someone?
10     A.    Yes. They're tools that we use to -- to
11 assist in making the arrest to use what -- you know,
12 reasonable force.
13     Q.    Right.
14     And you weren't -- you weren't in your
15 position when the Pernell Drayton case occurred, were
16 you? Does that ring a bell?
17     A.    It rings a bell, but I believe that was
18 before my time.
19     Q.    All right. All right. And in reference
20 to that case, your name came up. That happened in
21 20 -- 2019. I think, is that Exhibit 5? And if you
22 could show him Exhibit 5 for me.
23     A.    I have it.
24     Q.    All right. Let me look and see what page
25 it is. I think it's the fourth page in. It's got a

Gilbert & Jones

**13**

1 list of actions in reference to that case.
2     A.    That's correct.
3     Q.    Do you see that?
4     A.    Yes, sir.
5     Q.    All right. So -- so this, as I understand
6 it, this was a use-of-force form that apparently
7 officers have to file if any type of force is used in
8 the course of the arrest. Does that sound fair?
9     A.    Yeah, it's part of a -- a complete file,
10 yes, sir.
11     Q.    All right. Even if no one complains about
12 it, right?
13     A.    That's correct.
14     Q.    You know, like a citizen or somebody else?
15     A.    That's correct.
16     Q.    Is that -- is that correct?
17     And that appears to be what occurred in
18 this case. What I don't understand is it looked like
19 the process was Dan -- Dan Kang used a -- the SOC
20 method to secure this particular individual because
21 apparently he was not listening to the commands.
22 There were -- I don't know that you ever looked at
23 the video or the factors that required them to do
24 that in order to secure his arrest, but,
25 nevertheless, it appears that his sergeant who at the

Gilbert & Jones

**14**

1 time was Arango had to review it and he made a
2 finding that the force was justified and that no
3 department policy had been violated. Then apparently
4 that goes up to Lieutenant Gavin. I'm sorry.
5     A.    Garvin.
6     Q.    Garvin -- I'm sorry -- who apparently
7 doesn't do anything according to this which doesn't
8 make any sense to me. That was on 8/13/2019. The
9 incident happened on August 3rd, 2019. Then nothing
10 happens with the lieutenant. It goes and eventually
11 it gets to Lieutenant Barefield. This is some time
12 in February of 2020 and nothing is done. Nobody
13 accepts the conclusions of Sergeant Arango and at
14 some point it comes to you, it looks like.
15     A.    Yes, sir, it did.
16     MR. O'CONNOR: Hang on. I object to the
17     form. You can answer.
18     Q.    (By Mr. Schiavone) Do you recall
19 receiving this?
20     A.    I do.
21     Q.    All right.
22     A.    So just to go back one step before me
23 where you explained that Lieutenant Garvin didn't do
24 anything with it. It says in here from Garvin to
25 Sergeant Arango that he was requesting the ARS

Gilbert & Jones

EXHIBIT 17

## Page 15

reports and memo outlining the details behind the use of force. In other words, those were not included in what he submitted that needed to be for it to move forward.

Q. All right.

A. I'm just explaining that just because we do a memorandum from the supervisor. Once the supervisor reviews it there's a memorandum they produce on a use of force, not a show of force, just a use of force. From that point then it moves forward once the BWC's attached and the police reports and things like this.

Once -- once the chief terminated Sergeant Arango his blue team box, which evidently had additional items in it, was forwarded to me from Lieutenant Barefield. And when I looked at those items I noticed that it had already been previously been sent to Lieutenant Garvin and it was before I got there. Therefore that should have been reviewed and completed by Lieutenant Garvin, not by me, unless I was ordered to do so.

Q. All right. And but Lieutenant Garvin did do a finalized, didn't he? I mean, I don't see it in here.

A. Right.

Gilbert & Jones

## Page 16

Q. But he did do it.

A. I can't answer that. All I can tell you is --

Q. Well --

A. -- what the responses are in here. And because once it came to me, like I said, it was under him being the commander of the unit and it was sent back to him for completion, to my understanding.

Q. All right. And that was sent by you back to him?

A. No. I'm not sure. I know that here it says it was closed out by IAPro User Lieutenant David Barefield and the incident was rerouted to Lieutenant Joseph Toth. The -- then it was sent. So at that point I guess, yeah, I did forward it according to this log, because Sergeant Arango wasn't here. Corporal Kang wasn't here. I forwarded it to -- I don't know. I talked to Captain Gay at some point, but we forwarded it to Sergeant Collard since he was also very familiar with, you know, the techniques that they used for him to review it. He then sent it back to me. I think I ended up talking to Captain or Lieutenant Barefield at the time and I think it was reassigned. But I can't -- he would have to answer that.

Gilbert & Jones

## Page 17

Q. Well, since they had been fired at that point, no longer employees, why wouldn't somebody contact Garvin and accept whatever his conclusions were? I mean, we're going into almost two years.

A. Right. And I can't answer that. I don't know what occurred. I know that once they were gone the file was still open. It needs to be closed out for completion, and I don't know who handled that.

Q. Well, when you tried to send it to Sergeant Collard he made it clear, it looks like.

A. Correct.

Q. This is a year old and I was not present or assigned to this unit. Not sure it would be ethical for me to investigate this matter.

That's pretty strong language. I mean, this looks like there's something going on now in the department since these two guys had been fired.

I mean, why -- why would you send this to Collard? It wasn't his case. He has nothing to do with it.

MR. O'CONNOR: Object to the form. You can answer subject to the objection.

THE WITNESS: Okay. The -- it requires a sergeant who's investigating the complaint or -- excuse me -- the use of force to do the

Gilbert & Jones

## Page 18

memorandum. I don't recall if I talked with Captain Gates specifically on this. I talked to him about everything, but -- previously and I sent it to him for his expertise on the matter so that we had that document that's needed in the -- in the blue team entry that's required.

Q. (By Mr. Schiavone) All right. What was the date of that on that form that you sent it to Collard?

A. It looks like 8/3/2020 at 1420 hours.

Q. All right. And do you see anything else done?

A. There's a routing number 6 which is from Collard to me on 8/26/2020 at 11:35.

Q. All right.

A. And I think we had discussed it verbally where he said he didn't feel comfortable, and I understood what he had to say.

Q. All right. Were you aware that in April of 2021 quite a -- quite a long time after that last entry that Minter apparently ordered that Garvin do a letter of transmittal and another report? Were you aware of that?

A. No, sir.

MR. O'CONNOR: Object to form. You can

Gilbert & Jones

EXHIBIT 17

**Page 19**

1 answer.
2 　　THE WITNESS: No, sir. I was not. I
3 don't believe I was included in anything else
4 other than what we're up to here.
5 　　Q. (By Mr. Schiavone) All right. Then
6 you -- you were involved in the Darryl Faitele
7 investigation?
8 　　A. I was their supervisor at the time.
9 Yes, sir.
10 　　Q. All right. So you would have been
11 involved -- were you involved in the internal affairs
12 procedure?
13 　　A. I don't believe so. I don't recall if
14 they questioned me or talked to me at any point
15 during that, during their investigation. Once it's
16 turned over to them, you know, we kind of step back
17 and don't discuss the case anymore.
18 　　Q. Well, when's the next time you were
19 contacted about the case when they -- when internal
20 affairs became involved?
21 　　A. I can't be sure.
22 　　Q. Did -- were you required or did you review
23 the video of that incident?
24 　　A. I did.
25 　　Q. All right. Did you see anyone commit a

Gilbert & Jones

**Page 20**

1 crime in that video?
2 　　A. Could you be more specific?
3 　　Q. Yeah, anybody in the video. Did you see
4 anybody in the video commit a crime?
5 　　A. I don't know that I could answer that
6 question. I was looking at it from a --
7 　　Q. You're --
8 　　A. Well --
9 　　Q. You're a police officer.
10 　　A. Absolutely. I think that there were --
11 with regards to the incident itself I think that
12 there were things that could have been done
13 differently, but I'm looking at it from hindsight,
14 you know, on a video. I don't have the whole
15 perspective that the officers on scene would have
16 had. I couldn't see things that they saw around them
17 that they may have, you know, acted a certain way
18 towards, if that makes sense.
19 　　Q. Well, did you see them do anything wrong?
20 　　A. This is -- this is -- this is where it
21 gets tough for me for the simple fact that there's --
22 there's not a lot of patience. I think there could
23 have been more patience in it. Did they do things
24 wrong by policy? I believe that's correct. I know
25 they did, yes.

Gilbert & Jones

**Page 21**

1 　　Q. Well, enough to be fired?
2 　　A. That's not my call to make. I know -- I
3 know I made a rec -- I know I made a recommendation
4 and that --
5 　　Q. Right. What was that?
6 　　A. It was for suspension time.
7 　　Q. Five days for Kang and 15 for Arango?
8 　　A. That sounds about right. I haven't seen
9 the document in a while, but yes, sir.
10 　　Q. And was that consistent with other cases
11 and similar consequences when violating those
12 policies? Did y'all review other -- other cases to
13 make sure you're consistent?
14 　　A. Not -- not to my knowledge. I know that
15 we had a conversation about it between Major Adams,
16 myself, all those that were in the disciplinary
17 hearing. We all agreed that there were policy
18 violations, and based on those pol -- policy
19 violations we made recommendations and came up with
20 an agreement on what we felt would be reasonable in
21 this case as far as a suspension.
22 　　Q. All right. Well, let me see if this
23 brings back your memory in reference to the video.
24 　　The unit is sent out. They have a warrant
25 for the arrest of an individual charged with a

Gilbert & Jones

**Page 22**

1 violent offense, aggravated assault. They have a
2 general description in the paperwork that is given to
3 them. They have a light-skinned black male. They
4 have an address of where he presumably lives. They
5 go to that address. While they're knocking on the
6 door the super or maintenance man comes up to them
7 and asks them why they were there. They tell them
8 the name of the suspect, Darryl Faitele. He says --
9 I mean, Khalil Kelly. I'm sorry. I get confused on
10 it -- that Kelly lives there and/or did live there
11 but that he had moved to an apartment above in the
12 same complex. It's in -- it's in during the day so
13 broad daylight. So they're told the address that
14 he's moved to. So they have -- they have confirmed
15 this is where the suspect lives. They have a lawful
16 warrant by a superior court judge telling them to put
17 this person, literally his body into custody based
18 upon the -- the warrant. They go into the common
19 area. As they're walking through the common area you
20 can clearly see they're police officers. A
21 light-skinned black male and woman come up to the
22 rail at the second story, looks down at them and then
23 hurries into the apartment which is the address for
24 Kelly. He fits Kelly's description.
25 　　Now they -- would you agree at that point

Gilbert & Jones

EXHIBIT 17

## Page 23

1 that now that the officers had been recognized that
2 creates a very dangerous and serious?
3     MR. O'CONNOR: Object to form. You can
4 answer subject to the objection.
5     THE WITNESS: Yes, sir.
6 Q. (By Mr. Schiavone) I mean --
7 A. Also, he's on a second story which gives
8 him an advantage over the officers, yes.
9 Q. Absolutely.
10 So -- so -- so these officers have to make
11 quick decisions, don't they, in reference on how to
12 handle this?
13 A. Yes.
14 Q. All right. And when they get up to the
15 door, now they -- they know two people are in the
16 room. They don't know who else is in the room.
17 Would you -- I mean, it seems to me
18 executing arrest warrants if officers are going to
19 get killed, this is one of the more dangerous
20 situations. Would you agree with that?
21 A. I would agree.
22 Q. Executing arrest warrants?
23 A. I would agree that it is a dangerous
24 situation, yes, sir, knowing the information you knew
25 on the -- on the suspect that you're looking for

## Page 24

1 being involved in aggravated assault, yes.
2 Q. All right. So they get the door open and
3 on the video -- I mean, you know, it speaks for
4 itself. These officers see that there's more than
5 two people in the room. There may be three, four,
6 five, six. In fact, I think there were seven.
7 At that point they're really in a
8 dangerous situation, aren't they, with seven
9 different individuals in this room?
10 A. I'll agree.
11 Q. And in the room is what appears to be an
12 AR-15 which is a deadly weapon, isn't it? We hear
13 about this gun on the news all the time. It's a
14 military weapon. It could have killed those officers
15 immediately. Is that a fair statement? I mean, are
16 you familiar with that gun?
17 A. I do recall that weapon. I don't know at
18 what point it was seen, but yes. I agree that that
19 could have posed a problem for them.
20 Q. All right. And so they got -- they
21 have -- they're looking to secure Kelly. On the
22 video Arango yells out Kelly's name three times. The
23 suspect that they recognize from a distance,
24 light-skinned black male comes moving toward them.
25 At that point this is a dangerous

## Page 25

1 situation, isn't it?
2 A. I'll agree, yes.
3 Q. And the officer, Arango, yells out to this
4 individual get down on the ground. He tells the
5 individual to do that three times. The individual
6 keeps coming at him.
7 Has the officer done anything wrong at
8 this point based on your training for this unit?
9 A. If he's ordering somebody to come to him
10 and to get on the ground, they have reason to believe
11 that this is the individual that's wanted and all the
12 other circumstances surrounding it, he has every
13 right to detain that individual and confirm his
14 identity, yes.
15 Q. All right. Wouldn't you agree that the
16 individual's failure to obey the officer is an
17 obstruction, a misdemeanor, committed in the
18 officer's presence three times?
19     MR. O'CONNOR: Object to form and to legal
20 conclusion. Subject to the objection, you can
21 answer.
22 Q. (By Mr. Schiavone) Well, you as an
23 officer, if you direct someone to do something -- you
24 have a lawful right to do it -- and they refuse,
25 that's obstruction, isn't it?

## Page 26

1     MR. O'CONNOR: The same objection.
2 Q. (By Mr. Schiavone) How long have you been
3 an officer?
4 A. For 28 years, sir.
5 Q. How many times have you arrested people
6 for obstruction?
7 A. A few.
8 Q. All right. When you tell someone to do
9 something and they refuse to do it in a very
10 dangerous situation, isn't that obstruction as you
11 understand Georgia law?
12 A. If the officer had -- if -- well, let's
13 say this: If Corporal Kang and Sergeant Arango felt
14 as though he had obstructed them at that point -- I
15 remember seeing the video and it's been a long time
16 ago. When I did I remember he did come out. He
17 was -- he was -- my understanding was he was being
18 compliant to a point. I don't know the time frame
19 from when the commands were given versus what he did.
20 I'm not saying it was unreasonable based on the fact
21 that there were all these other individuals that
22 allege -- that were actually in the apartment. For
23 them to gain control, you know, it's a -- it's a
24 discretionary call on his behalf whether or not he
25 wants to say that this individual committed

Gilbert & Jones

EXHIBIT 17

**Page 27**

obstruction or not.

Q. All right.

A. If that makes --

Q. But failure -- failure of the individual to obey the order get on the ground, if other people had weapons in the room, his life would be in danger as well as the officers' because he's blocking the officers. Isn't -- wouldn't that be a fair statement?

A. Yes, sir. I agree with that.

Q. They have to secure -- they have to secure everyone -- don't they? -- for their safety, for the people in the room's safety and for the public's safety? Isn't that what they're taught, even SWAT officers?

A. Well, you have to maintain control while you're in that situation. And if that means -- and you had two other detectives that were inside, actually inside that were maintaining control of those individuals inside the residence after Mr. Faitele was, you know, put down on the ground.

Q. All right. Did you see them do anything improper by putting them down at that point after asking three times to get on the ground and having already called the name of the suspect and he is --

Gilbert & Jones

**Page 28**

he is responding to it? Doesn't that make logical sense? He sees you from the -- he sees you on the porch. He's light-skinned black male. He rushes back into the apartment as if he recognizes you may be there for him. When you open the door and you yell out the name of the suspect in the warrant he's the one that responds to it. I mean, it seems even as -- I'm a criminal defense lawyer. It seems to me at that point he's -- he's the guy potentially in the warrant. And when he doesn't get on the ground, my client has committed an obstruction of them being able to do their job and execute a lawful warrant. I'd be thinking I've got big problems in defending this guy.

Now, they get him -- they get him down. He is struggling. He's not obeying them. They finally get his hands cuffed and they sit him up and when they ask him his name it's basically, you know, fuck you, motherfucker. That's my name. Okay? Is that on obstruct -- is that -- is that an obstruction --

MR. O'CONNOR: Object to the form.

Q. (By Mr. Schiavone) -- at that point --

MR. O'CONNOR: Object to the form of --

Q. (By Mr. Schiavone) -- as an officer when

Gilbert & Jones

**Page 29**

you ask somebody their name if they -- if they give you a false name?

MR. O'CONNOR: Object to the form of the closing argument -- I'm sorry -- question.

Q. (By Mr. Schiavone) Is that an obstruction? I've had plenty of my clients -- or is that a false statement? I've had plenty of my clients charged with false statements by police officers when asked their name.

MR. O'CONNOR: The same objection.

Q. (By Mr. Schiavone) Is that a crime, Lieutenant?

THE WITNESS: Am I answering?

MR. O'CONNOR: If you can. That's --

THE WITNESS: Okay.

MR. O'CONNOR: That's up to you.

THE WITNESS: I -- I think that they had every right to detain that young man. If he did not act in a certain way then they had every right to detain him. And if they decided that he committed an obstruction then they have the discretion to charge him with that -- with that -- with that obstruction.

Q. (By Mr. Schiavone) All right. I think that's fair, Lieutenant.

Gilbert & Jones

**Page 30**

Then he begins spitting on them, blood on them. Is that a simple battery? You know, they're worried about COVID. They're worried about HIV, these officers. I mean, they're -- they're first-line responders. They're worried about TB. I mean, that could have serious consequences to these officers' safety, couldn't it?

A. It could, and -- and I understand that that upset them. And I remember seeing on the video that Sergeant Arango pointed out that -- I don't remember if it was his shoe or his pant or something had a blood droplet on it he made reference to in the video.

Q. All right, Lieutenant. So after this event occurred, do you remember being ordered by was it Captain Gay or Lieutenant Gay back then? Do you remember?

A. It was Captain Gay was my immediate commander.

Q. All right. Do you remember him contacting you and telling you that he didn't want these officers to charge Faitele with those crimes?

A. I do not.

Q. Do you recall telling Arango not to do it?

A. I -- I recall Sergeant Arango and I had a

Gilbert & Jones

EXHIBIT 17

**Page 31**

conversation the day of at the hospital after he brought Mr. Faitele in for treatment and he said that he was not going to do -- he wanted to charge him with obstruction but wasn't going to do it at this time because of COVID and the jail wouldn't take him. And I agreed with him. We really couldn't move any further forward with that at that point because of the jail situation and COVID.

Q. All right. Just give me one second.

Do you recall after they had been put on administrative leave a week later contacting Arango and telling him that you had been directed by Gay not -- for him not to criminally charge Faitele?

A. I do not. I'm not saying that a hundred percent that didn't occur, but I -- I don't recall that.

I know at some point there was conversation about charging. I just don't remember during the internal investigation while they had it.

Q. And did you ask -- if you did do that, do you recall conversations with Gay that this was coming from Chief Minter?

A. Not specifically, no, sir.

Q. All right. If you had been told to tell Sergeant Arango not to do that, why -- why would an

Gilbert & Jones

**Page 32**

officer be told not to charge somebody with a crime?

A. That's hard -- that's hard to answer, because, you know, I give my guys discretion. Unless they've made a really bad mistake that's up to them to make a charge or not. They're the one that has to bring it before the Court, not me. I'll give them guidance, but I don't -- I don't recall it being the way that you're saying as far as, you know, an order coming from the chief. I don't know if I -- I don't recall that myself.

Q. Well, if you were ordered by Gay to do that --

A. If he had --

Q. -- wouldn't you have questioned -- wouldn't you have questioned Gay as to why you were being ordered to tell a police officer not to arrest somebody who committed a crime?

A. I'm sure we would have had the discussion, yes, sir.

Q. All right.

A. Yes, I would have asked. I mean, I'm very inquisitive. I wouldn't have just said, oh, okay. Yes, sir, and gone about my day.

Q. Well, if that happened -- and you're saying you just don't remember, but if it did happen,

Gilbert & Jones

**Page 33**

did you ever find -- do you remember ever hearing why you may have been ordered to tell Arango not to do that?

MR. O'CONNOR: Object to form. You can answer.

THE WITNESS: Okay.

I honestly don't recall. I don't want to say something that's -- that would be, you know, wrong in this case or that I don't recall. I don't want to speculate.

Q. (By Mr. Schiavone) All right. Just give me one second.

A. Yes, sir.

(Pause.)

THE REPORTER: Same transcript orders as yesterday?

MR. O'CONNOR: Yes for us.

MR. DOVE: (Nods head.)

THE REPORTER: Same thing?

MR. WILSON: (Nods head.)

MR. SCHIAVONE: Hey, I'm sorry. I lost the pic -- I lost the picture and everything.

Q. (By Mr. Schiavone) So Lieutenant -- it's Lieutenant -- is that right? -- or Captain? I'm sorry.

Gilbert & Jones

**Page 34**

A. No, it's Lieutenant. Yes, sir.

Q. All right. Lieutenant Toth, why did you have a particular problem -- a problem with Officer Kang?

A. I don't understand what that question means.

Q. Were you during this period, were you upset with Kang about other things than this particular case?

A. I wouldn't say upset with. There was a situation that was brought to my attention that happened around St. Patrick's Day weekend, I think, when he was assigned to SWAT. It was a little incident in our building.

Q. All right. Well, let me ask you, you sent these rec -- recommendations to Chief Minter. Were you aware that they were following -- seeing a draft policy on how they did the investigation rather than policies that were already implemented with -- with the police department? Were you aware of that, the chief was?

MR. DOVE: Object to form.

THE WITNESS: I can say that I know what the policy was at the time. I don't know what he was utilizing at that time. I know that I

Gilbert & Jones

EXHIBIT 17

**Page 35**

1  was sent something in reference to the
2  mitigation hearing and at some point Sergeant
3  Arango had sent me a text asking me what -- what
4  this was, what the mitigation hearing was. And
5  I told him I don't know. This is the first time
6  I've heard of it. And I think I referred him to
7  get with Lieutenant Barefield because I had no
8  knowledge of it myself. It was new.
9     MR. SCHIAVONE: All right. So you had
10  never heard of a mitigation hearing in the -- in
11  the appeal process under the Savannah policies?
12  I think that I could tell you -- can you show
13  him Exhibit 1 and Exhibit 2?
14     MR. O'CONNOR: The court reporter will
15  pull them. Yes.
16  Q.  (By Mr. Schiavone) If you'll take a look
17  at that. Exhibit 1, as I understand it, was the
18  existing policy. Exhibit 2 was a draft policy that
19  had never been implemented. Do you -- have you ever
20  seen Exhibit 2?
21     MR. O'CONNOR: Object to form. But you
22  can answer.
23     THE WITNESS: If it was not sent out to us
24  for review then no, I have not. And I -- I
25  don't understand why this date on here is

**Page 36**

1  crossed out. Does that mean it's a draft or --
2  Q.  (By Mr. Schiavone) My understanding is
3  that was -- that was a draft.
4  A.  Okay. No, if it hadn't been completed and
5  revised then we wouldn't have seen it or I wouldn't
6  have seen it.
7  Q.  All right. You had been in internal
8  affairs before, hadn't you?
9  A.  Yes, sir.
10  Q.  At some point in your career?
11  A.  Yes, sir. Yeah, I was.
12  Q.  So you know how the process works?
13  A.  Yes, sir.
14  Q.  Now, is every police officer including the
15  chief required to follow policy?
16  A.  We are required to follow policy. Yes,
17  sir.
18  Q.  Does that include the chief?
19  A.  I would think so if he's the leader of the
20  organization, yes, sir.
21  Q.  And would it be consistent for the
22  superior officer to not follow policy but expect the
23  subordinate officers to follow policy? That wouldn't
24  make sense, would it --
25  A.  No. That would be --

**Page 37**

1  Q.  -- in your mind?
2  A.  No. That would be an example of not
3  leading by example.
4  Q.  And that would be a violation of policy,
5  wouldn't it?
6  A.  Yes, sir.
7  Q.  And in this case there -- in Exhibit 1
8  this is to put the officers on notice as to what
9  their rights are -- isn't it? -- and what to expect
10  and how the process works in terms of the
11  investigation?
12     MR. O'CONNOR: Object to the form. You
13  can answer.
14     THE WITNESS: Yes, sir. This is one way
15  to explain it to them so that there's no
16  surprises.
17  Q.  (By Mr. Schiavone) Okay. And these
18  officers should be able to rely on that policy that
19  they'll be given due process and treated fairly like
20  everyone else. Would that be a fair statement in the
21  implemation of -- the implementation of the policy?
22  A.  Yes.
23  Q.  And part of that policy, as I understand
24  it, it requires the Douglas Factors to be considered.
25  And do you know what the Douglas Factors are?

**Page 38**

1  A.  I don't -- I don't have them memorized,
2  but, yes, I'm familiar with. It's a tool to help
3  weigh discipline and whether or not, you know, the
4  officer can be saved.
5  Q.  And the -- there was also a progressive
6  punishment that's in the city policy. Are you
7  familiar with that?
8  A.  The progressive discipline policy, yes,
9  sir.
10  Q.  All right. And all of those are supposed
11  to be followed under that policy, aren't they?
12  A.  To my understanding, yes.
13  Q.  All right. But there's nothing in
14  Exhibit 1 that I'm aware of that creates a mitigation
15  hearing. Like you, that was the first I'd ever heard
16  of it.
17  A.  Yes, sir.
18  Q.  So if the chief was creating his own
19  policy and creating mitigation hearings and things of
20  that nature, that would be to the disadvantage of the
21  officer if it hadn't been implemented as an existing
22  policy, wouldn't it?
23     MR. O'CONNOR: Object --
24     MR. DOVE: Object to form.
25     MR. O'CONNOR: The same objection.

Gilbert & Jones

1  Go ahead.
2        THE WITNESS: I'm trying to think of the
3  right way to answer this. Not the right way,
4  but the way to answer this.
5        I would think that it's not in the policy
6  it's something new that we're doing. It could
7  be a way to determine more information from the
8  officer without using Douglas Factors. I
9  don't -- I can't really answer that question.
10 I...
11 Q.   (By Mr. Schiavone) Well, what's the --
12 what's the sense in having policy if you don't follow
13 it?
14 A.   Absolutely. I agree with that.
15 Q.   All right. And if you have a draft that
16 has never been implemented, how -- do you think
17 that's fair --
18 A.   No.
19 Q.   -- to you or to any other officer?
20 A.   No, I do not.
21 Q.   Yeah.
22      And so were you surprised when Minter
23 didn't accept your recommendations on punishment in
24 the Faitele case and went straight to termination?
25 A.   I was surprised, yes.

Gilbert & Jones

---

40

1  Q.   And my -- would it be fair to say that
2  y'all looked at all of the different punishments and
3  followed the procedures in making your
4  recommendation?
5  A.   I would hope that we did, yes.
6  Q.   All right. Just give me one second.
7  A.   Yes, sir.
8        (Pause.)
9        MR. SCHIAVONE: Pat, that's all the
10 questions I have of him. Thanks.
11      MR. O'CONNOR: Okay. I have no questions
12 for the City.
13      MR. DOVE: I do not have any questions as
14 well.
15      MR. O'CONNOR: That's it.
16      MR. SCHIAVONE: Lieutenant Toth, thank
17 you.
18      THE WITNESS: All right. Thank you,
19 Mr. Schiavone.
20      (Deposition concluded at 3:30 p.m.)
21      (Pursuant to Rule 30(e) of the Federal
22 Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
23 signature of the witness has been reserved.)
24
25

Gilbert & Jones

---

41

CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA:
COUNTY OF EFFINGHAM:

I hereby certify that the foregoing transcript was reported as stated in the caption and the questions and answers thereto were reduced to writing by me; that the foregoing 40 pages represent a true, correct, and complete transcript of the evidence given on August 31, 2022, by the witness, LIEUTENANT JOSEPH TOTH, who was first duly sworn by me.

I certify that I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c); I am a Georgia Certified Court Reporter here as an employee of Gilbert & Jones, Inc. who was contacted by Savage & Turner to provide court reporting services for the proceedings; I will not be taking these proceedings under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and by the attached disclosure form I confirm that neither I nor Gilbert & Jones, Inc. are a party to a contract prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board.

This 3rd day of September 2022.

_____
THOMAS J. DORSEY, CERTIFIED COURT REPORTER, 2781

Gilbert & Jones

---

42

DISCLOSURE OF NO CONTRACT

I, Debbie Gilbert, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Gilbert & Jones, Inc. was contacted by Savage & Turner to provide court reporting services for these proceedings and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board for the taking of these proceedings.

There is no contract to provide reporting services between Gilbert & Jones, Inc. or any person with whom Gilbert & Jones, Inc. has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

This 3rd day of September 2022.

_____
Debbie Gilbert, FIRM REPRESENTATIVE
Gilbert & Jones, Inc.

Gilbert & Jones

EXHIBIT 17

**43**

DEPOSITION OF: LIEUTENANT JOSEPH TOTH /TJD

I do hereby certify that I have read all questions propounded to me and all answers given by me on August 31, 2022, taken before Thomas J. Dorsey, and that:

___ 1) There are no changes noted.
___ 2) The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is
_____

Page No. _____ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. _____ Line No. ___ should read:_____
_____
The reason for the change is
_____

**Gilbert & Jones**

**44**

DEPOSITION OF: LIEUTENANT JOSEPH TOTH /TJD

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

_____
LIEUTENANT JOSEPH TOTH

Sworn to and subscribed before me,
This the ___ day of _____, 20__.

_____
Notary Public
My commission expires: _____

Please forward corrections to:

Gilbert & Jones, Inc.
7505 Waters Avenue, Suite F3
Savannah, GA 31406
(912) 355-1061
**Gilbert & Jones**