EXHIBIT 21

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DANIEL KANG,                        )
                                    )
                Plaintiff,          )   CIVIL ACTION NO.:
                                    )
        vs.                         )   4:21-cv-111-WTM-CLR
                                    )
THE MAYOR AND ALDERMEN OF           )
THE CITY OF SAVANNAH and            )
ROY W. MINTER, JR., CHIEF           )
OF POLICE FOR THE CITY OF           )
SAVANNAH, GEORGIA, in his           )
individual and official             )
capacities,                         )
                                    )
_____Defendants.        )

DEPOSITION OF

PATRICK MONAHAN

11:09 a.m.

September 2, 2022

Oliver Maner
218 West State Street
Savannah, Georgia

Annette Pacheco, RPR, RMR, CCR-B-2153

## Gilbert & Jones
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520

*gilbertandjones1@gmail.com*
**912.264.1670**

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
Savannah, GA 31406

EXHIBIT 21

2

```
 1                    APPEARANCES OF COUNSEL

 2     On behalf of the Plaintiff:

 3          BRENT J. SAVAGE, Esq.
            SAVAGE TURNER PINCKNEY SAVAGE & SPROUSE
 4          102 East Liberty  Street
            Savannah, Georgia  31401
 5          912-231-1140
            bsavage@savagelawfirm.net
 6
            MICHAEL G. SCHIAVONE, Esq. (By videoconference)
 7          1111 Bull Street
            Savannah, Georgia  31401
 8          912-232-2646

 9
       On behalf of the Defendant The Mayor and Aldermen of
10     the City of Savannah:

11          PATRICIA TANZER PAUL, Esq.
            OLIVER MANER
12          218 West State Street
            Savannah, Georgia  31401
13          912-236-3311
            ppaul@olivermaner.com
14

15     On behalf of the Defendant Roy W. Minter, Jr., Chief
       of Police for the City of Savannah, Georgia, in his
16     individual and official capacities:

17          SHAWN A. KACHMAR, Esq.
            HUNTER, MACLEAN, EXLEY & DUNN
18          200 East Saint Julian Street
            Savannah, Georgia  31401
19          912-236-0261
            skachmar@HunterMaclean.com
20

21
       Also Present:  Jamar Bacon
22                     Daniel Kang

23

24                         - - -

25


                       GILBERT & JONES
```

EXHIBIT 21

**3**

### INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| Examination by Mr. Schiavone | 4 |
| Examination by Mr. Savage | 35 |
| Examination by Mr. Kachmar | 74 |
| Examination by Mr. Savage | 78 |

- - -

GILBERT & JONES

---

**4**

1     (Reporter disclosure made pursuant to
2 Article 10.B of the Rules and Regulations of the
3 Board of Court Reporting of the Judicial Council
4 of Georgia.)
5     PATRICK MONAHAN,
6 having been first duly sworn, was examined and
7 testified as follows:
8     MR. SCHIAVONE:  All right.  This is the
9 deposition of Pat Monahan taken pursuant to
10 notice pursuant to the Federal Rules of Civil
11 Procedure for all purposes.  I'm going to
12 reserve objections except for the form of the
13 question?
14     MS. PAUL:  Yes.
15     MR. KACHMAR:  We agree.
16     MR. SCHIAVONE:  Great.  All right.
17     EXAMINATION
18 BY MR. SCHIAVONE:
19     Q.    Mr. Monahan, would you state your full
20 name for me, please.
21     A.    Patrick Chang Monahan.
22     Q.    And are you still with the City of
23 Savannah?
24     A.    No, sir, I'm not.  I retired in November
25 2019.

GILBERT & JONES

---

**5**

1     Q.    All right.  And how many years were you
2 the city manager?
3     A.    I did not count it in years.  I count it
4 in months.  18 months.
5     Q.    18 months?
6     A.    Year and a half.
7     Q.    Year and a half.  Okay.
8     A.    It just seemed like it.
9     Q.    I need to try to get an understanding a
10 little bit about the way policies are implemented.
11 The City of Savannah has policies, is that correct,
12 that applies to city employees?
13     A.    Yes, sir.
14     Q.    Now, are police officers considered city
15 employees?
16     A.    Yes, sir.
17     Q.    And so the police department, which would
18 include everyone employed there, including the chief,
19 would be controlled by the city policies?
20     A.    Yes, sir.
21     Q.    And are those city policies promulgated by
22 your office, the human -- would it be human resources
23 or would it be by the city council?
24     A.    Usually the procedures and policies are
25 recommended by the human resources department and

GILBERT & JONES

---

**6**

1 then approved by the city manager who actually signs
2 a statement as to -- as to the enactment of that
3 policy.
4     Q.    And when you were city manager, is the
5 human resources, is that where you work?  Is that --
6 you were above that?
7     A.    Yes, sir.
8     Q.    Were you the boss of that, that
9 department?
10     A.    Yes, sir.  As I recall, I think 12
11 department heads reported directly to me.  Probably
12 too many, but, yes, human resources was one of the
13 departments.  And the human resources director
14 reported directly to the city manager.
15     Q.    All right.  And that would include the
16 chief at the time, Chief Minter.
17     A.    Yes.  The chief of police also reported
18 directly to the city manager.
19     Q.    All right.  And the policies, did you
20 say -- is there -- who promulgates those policies for
21 the city portion?
22     A.    The city manager assumes responsibility
23 for those policies and procedures that affect all
24 city employees as an organizational-wide policy and
25 procedure.

GILBERT & JONES

EXHIBIT 21

**7**

1 Q. All right. Maybe you can help me out with
2 this. Do you draft those policies or do you have
3 somebody in that -- when you were there, did you have
4 somebody in that office draft policy?
5 A. Usually the originating department would
6 draft the policy. And considering the -- if it was
7 an organizational-wide and affecting personnel
8 matters, then it would be drafted by the human
9 resources director. But usually they were not
10 presented cold to me. I had input into how they were
11 being drafted and then, of course, I signed the final
12 form.
13 Q. All right. And did each of these
14 departments have individual policies for the
15 departments?
16 A. Yes, sir. That is possible.
17 Q. All right. And my understanding -- I've
18 seen them -- is that the Savannah police had policies
19 that were implemented?
20 A. Yes, sir.
21 Q. And those policies, before they became
22 applicable to the employees, were they sent to human
23 resources to be reviewed?
24 A. I'm thinking before I answer. And I don't
25 know. I don't know.
**GILBERT & JONES**

**8**

1 Q. Well, who's responsible for those
2 policies? I mean, do they apply to city employees.
3 Would your office at the time be responsible?
4 A. No, sir. Not -- not for a departmental
5 policy.
6 Q. All right.
7 A. You know, I assumed responsibility --
8 Q. I'm sorry?
9 A. I assumed responsibility for the
10 organization. So organizational-wide policies I
11 would sign, but I would not sign the particular
12 policies for each department and how employees
13 discharge their duties. That would be up to the
14 department head.
15 Q. Well, what if the department policy
16 conflicts with the city policy? Which one takes
17 precedent?
18 A. Well, of course, the city policy would.
19 Q. All right. And this is an example. My
20 understanding, and I don't have it in front of me to
21 show you, but in terms of discipline and making
22 decisions as to an employee's conduct, does city
23 policy have a progressive policy? It's called
24 progressive -- and there may have been another term
25 for it.
**GILBERT & JONES**

**9**

1 A. Yes, sir. In our business, we talk about
2 progressive policy. But I think there are also
3 degrees of interpretation of that policy. For
4 example, it's one -- it's one to talk about a
5 progressive policy for an employee who shows up late
6 for work. But then it's totally different
7 progressive policy for an employee who steals, for
8 example. You know, I don't compare those as the
9 same. I think there are different degrees in terms
10 of how that policy is applied.
11 Q. Well, when that policy with the city is
12 applied, is the supervisor, superior individual that
13 is making -- is that made by you or by somebody in
14 the city department that --
15 A. The department head --
16 Q. -- that would apply that?
17 A. The department -- excuse me. I didn't
18 mean to rush into it.
19 Q. No. That's all right.
20 A. The department head assumes responsibility
21 for any disciplinary action. But under the city's
22 personnel procedures and ordinance, those appeals --
23 an employee can appeal any disciplinary action, and
24 those go to the city manager.
25 Excuse me. Let me clarify I that.
**GILBERT & JONES**

**10**

1 Q. Go ahead.
2 A. During my administration, the appeals came
3 to me. The prior city manager delegated that
4 responsibility to other executive-level employees.
5 But I considered them so important that I wanted all
6 appeals directed to me.
7 Q. All right. As I understood that
8 progressive policy with the city was that the
9 individual was to go through that progressive policy
10 in reaching determinations as to sanctions. Is that
11 a fair statement?
12 A. Yes, sir, when -- when progressive
13 disciplinary procedure's applied.
14 Q. And that would have been a requirement
15 that Chief Minter would have been required to do --
16 A. Yes sir.
17 Q. -- before he took action against an
18 employee in the police department?
19 A. Yes, sir. But as I tried to explain
20 before, there are, I think, degrees of how the
21 progressive policy gets applied.
22 Q. All right. And when he applies that city
23 policy to an employee, is there a written document
24 generated by him?
25 A. Yes, sir.
**GILBERT & JONES**

EXHIBIT 21

**11**

1   Q.   All right.  So there should be a written
2   document with the city as to Dan Kang and
3   Mike Arrango in reference to the chief's decision to
4   terminate them.  That should be in your office or
5   Ed's office?
6   A.   That would be in the chief's office.  And
7   if there's an appeal, then that is elevated to the
8   city manager.
9   Q.   All right.  Now, let me change course for
10  a second.
11       There are a number of officers filed, I'll
12  call it a group complaint to human resources that was
13  signed by, I think, over 70 officers.  Do you recall
14  that?
15  A.   Yes, sir.  For some reason I thought it
16  was 80, but if you say 70, I'll --
17  Q.   Well, it could be.  It could be.
18       Do you have a general idea of when you
19  received that?
20  A.   I don't remember the specific date.  I
21  can't even remember the approximate date.  I do
22  remember what happened after I received it, but I do
23  not remember a particular date.
24  Q.   All right.  And what year did you say you
25  retired?  I'm sorry?

GILBERT & JONES

**12**

1   A.   I retired November 2nd, 2020.
2   Q.   2020.  All right.  So you would have
3   received this complaint, and it listed a number of
4   problems that these officers believe they had with
5   Chief Minter; is that correct?
6   A.   Yes, sir.  That was the form of the
7   complaint.
8   Q.   All right.  And when a -- when a
9   complaint, is that -- is the same process where
10  there's a complaint made against an individual police
11  officer -- in this case it was dealing with the
12  chief -- is the same process applied?
13  A.   When it involves a department head and
14  it's of a critical nature as to the complaint, then I
15  personally handled it.
16  Q.   All right.  So would you do an
17  investigation the same way the investigations were
18  done as to Dan Kang and Mike Arrango?
19  A.   No, sir.  I think those investigations
20  were performed by the office of performance -- Office
21  of Professional Standards.  And that's what -- what
22  we used to refer to in the old days as internal
23  affairs.  So internal affairs looked into the matter
24  involving Corporal Kang and Sergeant Arrango.
25  Q.   All right.  And you were aware that

GILBERT & JONES

**13**

1   Arrango was one of the moving forces behind the group
2   complaint?
3   A.   I did not know that.
4   Q.   Well, were you -- you had the complaint.
5   So you must have seen the names of the officers.
6   That Kang and Arrango were part of that?
7   A.   Yes, sir.  All I did was I took the
8   complaint when I first received it and I numbered how
9   many of a particular rank filed or signed the
10  complaint.
11       I focused more on the captains.  And so I
12  made a decision that I would personally interview all
13  the captains.  I did not go below the captain rank
14  to -- I thought about the lieutenants, but as I
15  recall, there were a number of, maybe a dozen or so
16  lieutenants, and I just didn't have the time to
17  interview, personally interview that many.  So I did
18  focus on the captains.
19  Q.   Have you ever had a complaint filed like
20  that in the time that you were city manager with that
21  many different officers, including superior officers
22  against the chief?  Against a chief?
23  A.   As I recall, I only received two
24  complaints about executive levels who reported to me,
25  executive-level employees who reported to me.  One

GILBERT & JONES

**14**

1   was the chief and one was another department.
2   Q.   All right.  So did you consider this to be
3   a significant issue?
4   A.   Yes, I did.
5   Q.   All right.  And when you received the
6   complaint, did you contact Chief Minter?
7   A.   No, I did not.
8   Q.   All right.  Was he ever put on notice that
9   there had been a complaint filed against him?
10  A.   As I recall, he received a copy of it.
11  But I --
12  Q.   He received --
13  A.   Not from me, though.
14  Q.   I'm sorry?
15  A.   Not from me.
16  Q.   Not from you?
17  A.   No.
18  Q.   Who would have sent him a copy of the
19  complaint?
20  A.   I don't know, but I do know that he was
21  aware of it.
22  Q.   All right.  Did you have discussions with
23  him about it?
24  A.   Not at that time I did not.
25  Q.   But at some point did you?

GILBERT & JONES

**Page 15**

1    A.    Yes.  After -- I'll go ahead and lay out a
2  sequence for you.
3    Q.    Yes, sir.
4    A.    I received the complaint.  I met with --
5         MR. SAVAGE:  Let me put this on the
6  record.  You can't -- I know he said something
7  you don't like, but you can't get in his face.
8         MR. SCHIAVONE:  You can't do that.
9         MR. SAVAGE:  It doesn't matter.
10        THE WITNESS:  I wasn't paying attention.
11        MS. PAUL:  I didn't get in his face.
12        MR. SAVAGE:  Well, you are.  That hurts
13  your defense.  But he's a truthful guy.
14        THE WITNESS:  Yeah.
15        MR. SAVAGE:  You got right over on him to
16  say --
17        THE WITNESS:  You can ask my wife.  I
18  don't always pay attention to what's going on.
19        MS. PAUL:  Let me put on the record.
20        THE WITNESS:  I didn't even notice.
21        MS. PAUL:  Let me put on the record.
22  Mr. Monahan is here to answer questions that are
23  posed to him.  And one question at a time.
24  And --
25        THE WITNESS:  Okay.
        GILBERT & JONES

**Page 16**

1         MR. SAVAGE:  And you're a good, honorable
2  lawyer.  That struck me.  I'll put that on the
3  record.  How about that?
4         MS. PAUL:  Thank you.
5         THE WITNESS:  I was trying to answer
6  your --
7         MS. PAUL:  Wait for the question.
8         THE WITNESS:  Okay.
9    Q.    (By Mr. Schiavone)  You were going to tell
10  me sequentially what happened, I think.  Is that what
11  you said?
12   A.    Yes, sir.
13   Q.    Would you do that for me.
14   A.    Okay.  I received a complaint.  I noted it
15  as serious.  I called up the human resources
16  director, Jeff Grant.  He and I talked about it.  We
17  met and we decided a course of action to take.
18        And the first course of action was to find
19  an independent investigator.  No different than if it
20  was internal affairs looking at a police officer.
21  But then to hire an independent investigator to look
22  at the complaints and then report back to the city
23  manager.  And then Mr. Grant and I would decide the
24  next course of action.
25        So we talked about a couple different
        GILBERT & JONES

**Page 17**

1  possibilities.  He mentioned a couple names to me.
2  And the city hired Susan Cox from Statesboro.  We
3  talked about a couple Savannah attorneys but decided
4  not to because of our need to find an objective
5  reviewer from outside this jurisdiction.
6         So Mrs. Cox looked at all the complaints.
7  Noted to me that there seemed to be some apparent --
8  I don't want to use the word "conspiracy," but said
9  that a number of the complaints used the same exact
10  language, the same exact verbiage, and she thought
11  that was a little unusual.
12        So then Mr. Grant and I then met and
13  discussed her work.  You know, unfortunately, I did
14  not ask her at the time how long this process would
15  take.  It took a lot far longer than I could.  I was
16  leaving the City of Savannah but I did want to get
17  this issue wrapped up before the next city manager
18  assumed responsibility.
19        So I did meet with Mr. Grant and he and I
20  discussed a course of action to follow.
21   Q.    All right.  As I understand it, each one
22  of the officers was required to give an individual
23  complaint; is that correct?
24   A.    Yes, sir.  Yes.  I don't know that they
25  were required.  They did send in individual
        GILBERT & JONES

**Page 18**

1  complaints.
2    Q.    All right.  And my understanding is Kang
3  as well as Arrango both did that?
4    A.    I don't know that for a fact.  I mean, I
5  don't recall that I even saw their names.  As I said,
6  I paid more attention to the lieutenants and captains
7  than I did any of the others.
8    Q.    All right.  And Cox, did she do a written
9  report with recommendations of what action should be
10  taken against the chief, if any?
11   A.    Yes.
12   Q.    And would that document be with the human
13  resource office?
14   A.    I don't know if it's filed specifically in
15  the office, but I do know that Jeffrey Grant, the
16  human resource director, received it.
17   Q.    All right.  Give me one second.  Now, at
18  some point you became aware of an appeal on the part
19  of Dan Kang as well as Mike Arrango; is that correct?
20   A.    Yes, sir.  It was presented to me in
21  writing.
22   Q.    All right.  And let me see if I
23  understand.  On those appeals, when they get to your
24  level, is it just you and the individual officer?
25   A.    No, sir.  It's done in -- I would call it
        GILBERT & JONES

EXHIBIT 21

19

1  more of a hearing process involving the city manager,
2  the, I'll call them appellants, for lack of a better
3  word, the chief of police and usually the internal
4  affairs office.
5  Q.    All right.  And those would normally be
6  the only people present?
7  A.    Yes, sir.
8  Q.    But in their cases, you allowed the chief
9  to be there, didn't you?
10  A.    The chief always -- no.  I mentioned the
11  chief.  The chief always attended those.
12  Q.    All right.  And tell me what do you
13  receive in reference to the appeal to review?
14  A.    I receive -- it's on a city form and it is
15  the appellants stating why they are appealing.  And
16  usually there's backup material from the -- from the
17  internal affairs office based on their investigation.
18      It also includes the chief's cover letter
19  of why he took the particular action that he was --
20  that he took.
21  Q.    All right.  And you would create a file in
22  reference to each officer?
23  A.    The internal affairs office did.
24  Q.    No.  I'm talking about once it got to your
25  office, the documents that you received to review,

20

1  would you create a file of that be kept in your
2  office?
3  A.    Yes, sir.  But I didn't keep individual
4  files on every case that I heard.  I usually would,
5  when I reviewed the files in this particular case, I
6  devoted considerable amount of time to review the
7  Body Cam and take notes.
8      So, yes, I did put them in a file called
9  "Appeals."  I think I called it "Appeals."  I don't
10  remember what I called it.
11  Q.    All right.  And if those files exist, they
12  would be in the human resource department?
13  A.    No, sir.  They would be in my office.
14  When I realized that, I talked to -- talked to the
15  attorneys and I produced those for the attorneys and
16  I produced those for you.  And I understand that
17  attorneys have since submitted those to you.
18  Q.    All right.  Now, when policies are
19  created, the employees are expected to follow those
20  policies; is that correct?
21  A.    Yes, sir.
22  Q.    Just give me one second, please.  I'll be
23  right back to you.
24  A.    Okay.
25      MR. SCHIAVONE:  Can someone -- they have

21

1  all the exhibits there.  Can someone give him
2  Exhibit 1 and Exhibit 2?
3      MR. SAVAGE:  Who has them?
4      MR. SCHIAVONE:  Pat had them at the last
5  deposition, all the depositions.  Do you have
6  them there?
7      MS. PAUL:  They are with the court
8  reporter.
9      MR. SAVAGE:  Yeah, you got a court
10  reporter that's new and doesn't have the
11  exhibits, Mike.
12      MR. SCHIAVONE:  Oh, you're kidding me.
13      MR. SAVAGE:  I think Sean may have them.
14  Do you have them?  Why don't we take a break and
15  get them from over there.
16      MR. SCHIAVONE:  I don't have them.
17      MR. SAVAGE:  Their office is right around
18  the corner, Dennis, that's right.
19      MR. SCHIAVONE:  I'm confused, Brent.
20      MR. SAVAGE:  I mean, the problem is we
21  have a different court reporter.  And nobody
22  told this court reporter to have the exhibits
23  from the last deposition.
24      MR. SCHIAVONE:  Is it from the same
25  office?

22

1      MR. SAVAGE:  Yeah, they're from the same
2  office.  I think Dan thinks he's got them.
3      MR. SCHIAVONE:  If Dan's got copies of
4  them.
5      MR. SAVAGE:  I think so, yeah.  Let
6  Mr. Monahan look at them and they can read into
7  the report what the title is of Exhibit 1 and
8  what the title is to Exhibit 2 so we have a
9  record of that.
10      MR. KACHMAR:  And read the Bates number.
11      MR. SAVAGE:  Oh, Bates.  Okay.
12      THE WITNESS:  Do you want me to read all
13  of them?
14      MR. SAVAGE:  No, just the title.  Exhibit
15  1 is whatever the title is.
16  A.    Exhibit 1, SPD General Order, GO No.
17  OPS-106:  Office of Professional Standards.
18  Effective 9/25/2004.  Several revisions.  Final
19  revision 12/13/2000 -- excuse me.  August 29th, 2018.
20      MR. KACHMAR:  Is there a Bates number on
21  the bottom right?
22      THE WITNESS:  It says page 1 of 12, Kang
23  001321.
24      MR. KACHMAR:  Kang 001321?
25      THE WITNESS:  Yes.

EXHIBIT 21

**23**

1         MR. SAVAGE: And I would just do it like
2 Sean did. I'd read the Bates stamp number on
3 the bottom. Exhibit 2 is.
4         THE WITNESS: Yeah. Exhibit 2 is Kang
5 001333.
6     Q. (By Mr. Schiavone) Mr. Monahan, if you'll
7 look at what y'all are considering Exhibit 1, it's
8 OPS-016. If you look over on the top page on the
9 right side, it has the last date 8/29/2018. Do you
10 see that?
11     A. Yes, sir.
12     Q. All right. My understanding is that was
13 the existing policy at the time that these cases with
14 Dan Kang and Michael Arrango occurred. If you look
15 at Exhibit 2, it appears to be the same policy but
16 it's not. It turns out to be a draft policy that was
17 never implemented.
18         MR. KACHMAR: Object to the form.
19         MS. PAUL: Object.
20     Q. (By Mr. Schiavone) If you notice at the
21 top right, 10/30/2019 is marked out. Is that the
22 document that you have?
23     A. It's marked out as 10/30/2019?
24     Q. Yes, sir.
25     A. Yes.

**24**

1     Q. Do you see that?
2     A. Yes, sir.
3     Q. Do you see that? I'm sorry.
4     A. Yes, sir, I do.
5     Q. Okay. All right. Now, my understanding,
6 and for these officers and all Savannah police
7 officers, they are required to know the policies.
8 Does that sound like a fair statement?
9     A. Yes, sir.
10     Q. And would you agree that that includes the
11 superior officers up to and including the chief?
12     A. Yes, sir.
13     Q. And if the chief violates policy, who
14 reprimands him? Who fires him or who suspends him?
15     A. Are you suggesting violation of this, of
16 the departmental policy or an organizational policy?
17     Q. Yes, sir. Yes, sir. The same way they
18 hold every other officer accountable to violations of
19 these policies, when the chief does it, who holds him
20 responsible?
21         MR. KACHMAR: Object to the form.
22         MS. PAUL: Object to the form.
23     A. Let me -- I'm trying to struggle a little
24 bit with what you're asking me. So you're asking --
25 you're asking me that if the chief violates a

**25**

1 departmental policy, who holds him accountable?
2     Q. (By Mr. Schiavone) Yes, sir.
3     A. A departmental policy. Not an
4 organizational policy.
5     Q. The Savannah Police Department policies
6 that we're looking at here. These exhibits.
7     A. And how would the city manager know that?
8     Q. Well, I'm asking you. I'm asking who
9 holds the chief responsible.
10     A. The city manager holds the chief of police
11 responsible for the discharge of his duties.
12     Q. All right.
13     A. However --
14         MS. PAUL: I object.
15     A. But we're talking about departmental
16 policy.
17     Q. (By Mr. Schiavone) Yeah, we are talking
18 about departmental. But Officer Kang and Officer
19 Arrango were held responsible and punished based upon
20 violations of policy. Now, you've already testified
21 that everyone is held responsible to know these
22 policies and are controlled by them, including the
23 chief.
24     My question to you is: Who holds the
25 chief responsible when he doesn't follow policy?

**26**

1         MR. KACHMAR: Object to the form.
2     A. I'm struggling a little bit about this
3 because I agree with you that there are policies and
4 procedures that are promulgated by the chief and
5 ultimately signed by the chief.
6     And I also agree with you that those
7 procedures and policies should published or put in
8 writing, and that they should be discussed in
9 meetings, squad meetings, whatever, so that -- so
10 that all the personnel become familiar with them.
11     But I don't think -- I mean, I disagree
12 with you about whether the application of this policy
13 applies in this case. Because, I mean, it doesn't --
14 for example, does the chief -- excuse me. Go ahead.
15     Q. (By Mr. Schiavone) I'm sorry.
16         MR. SAVAGE: If you want to finish --
17     Q. (By Mr. Schiavone) Nobody is disputing
18 that he did not follow Exhibit 1, which was, in fact,
19 the policy that was in force at the time. He created
20 apparently a draft policy, which is Exhibit 2, and he
21 followed that policy unbeknownst to any of these
22 officers or anyone else because it was not a policy
23 that had been implemented. So he violated policy by
24 doing that, Mr. Monahan.
25     I'm trying to understand why he has the

**Page 27**

1 right to do that and who would punish him for doing
2 that?
3          MR. KACHMAR:  Object to the form.
4          MS. PAUL:  Object to the form.
5     Q.   (By Mr. Schiavone)  Why would officers be
6 punished for not following policy, but he's not, and
7 then creates his own policy?
8          MS. PAUL:  Object to the form.
9          MR. KACHMAR:  Object to the form.
10    A.   I think I am trying to struggle in my own
11 mind that you're asking why the chief of police
12 should write policies and procedures for every
13 circumstance involving the personnel who report to
14 him.  Because I don't see that the chief needing to
15 write a policy that condones pressing a man's skull
16 into concrete as a -- as a -- as a violation of
17 departmental policy.
18    Q.   (By Mr. Schiavone)  Nobody's asking you
19 that.
20    A.   I think there are certain standards of
21 conduct that every police officer should know.
22    Q.   Mr. Monahan, I'm not asking you to give me
23 your opinion.  I'm asking you about policy right now.
24 All right?
25    A.   Okay.

**Page 28**

1     Q.   And he followed a draft policy that was
2 not part of the police department's policies.  Is
3 that a violation of policy?
4          MR. KACHMAR:  Object to the form.
5          MS. PAUL:  Object to the form.
6     Q.   (By Mr. Schiavone)  I mean, Mr. Monahan,
7 if you took a city policy and created a draft that
8 had not been implemented yet, would you violate
9 policy by using that policy and expecting everybody
10 else to be controlled by that policy even though it
11 was not implemented?
12    A.   I've not seen these before.  I've not read
13 through.  I don't know what the differences are.  I
14 don't know if the differences are significant, if
15 it's a comma or a colon.  I don't know.  I've not
16 read.
17    Q.   Well, all of this was sent --
18         MR. SAVAGE:  Wow.
19    Q.   -- supposedly sent to you on the appeal
20 for you to review.  If you look at the policy that
21 was in effect, Policy 2018, page 2-J.  "The OPS will
22 forward all disciplinary action records, DA alerts to
23 the city's human resource department for its
24 recordkeeping purposes."
25         So presumably, this all would have been

**Page 29**

1 sent to you for you to consider, your office to
2 consider, and you should have looked at in your
3 review of these two officers.  And what we've come to
4 find out is that he used a draft policy that didn't
5 exist and took actions against these officers based
6 on that draft policy, that they couldn't even find
7 when they looked up the policies because it didn't
8 exist yet.
9          MR. KACHMAR:  Object to the form.
10         MS. PAUL:  Object to the form.
11    A.   So I'm rereading what you just read and it
12 said, "will be sent to the city's human resources
13 department for recordkeeping purposes."
14    Q.   Right.  So you would have had every
15 disciplinary action taken by the Savannah Police
16 Department.  That should be in your office?
17    A.   No, sir.
18    Q.   Well, that's what it says.
19    A.   I heard appeals.  It says, "the human
20 resources office."  It doesn't say the city manager.
21    Q.   Well, I understand.  But you're over the
22 human resource department, aren't you?
23    A.   Sir, do you know how many countless
24 records are produced by the City of Savannah every
25 day?  Are you expecting all those get sent to the

**Page 30**

1 city manager?
2     Q.   I don't know.  That's what this policy
3 says.
4     A.   It doesn't.  I'm reading the policy.  It
5 says to the city's human resources department.  It
6 doesn't say anything about to the city manager.
7     Q.   I just told you.  You're over the human
8 resource department, aren't you?
9     A.   I'm over 12 -- I was over directly 12
10 reports.  I'm over 2500 employees.  I was over 2500
11 employees.
12    Q.   So you would have had access to that if
13 you chose to look at it, wouldn't you?
14    A.   I have access -- the city manager has
15 access to any records he so chooses.
16    Q.   Okay.  So would the chief -- is the chief
17 allowed to use a draft policy that was never
18 implemented?  Is he allowed to do that when he takes
19 action against his officers?
20         MR. KACHMAR:  Object to the form.
21    A.   As I said, I think the chief has the right
22 to promulgate policies and procedures, but I also
23 think he should have those published and then
24 distributed among the personnel of the department.
25 And those should be discussed in meetings.

EXHIBIT 21

**31**

1    Q.    (By Mr. Schiavone)  All right.  Are you
2  aware of what the Douglas Factors are?  Have you ever
3  heard that?
4    A.    Actually, I just heard it from --
5          MS. PAUL:  Object to the form.
6    A.    Oh, yeah.  Excuse me.
7          MS. PAUL:  Please don't discuss
8  attorney/client --
9    A.    Yes.  You're right.  Yes.
10   Q.    (By Mr. Schiavone)  Well, you've already
11 answered it.  So y'all have already discussed the
12 Douglas Factors?
13         MS. PAUL:  Object.  Object.  Object to
14 form.
15   A.    Yes.
16         MR. SCHIAVONE:  You object to what?  That
17 he's already told me?
18         MS. PAUL:  I object to your question.
19   A.    I made a mistake.  It was attorney/client
20 privilege.
21   Q.    (By Mr. Schiavone)  All right.  But you
22 know what the Douglas Factors are apparently; is that
23 correct?
24   A.    I would say, without getting into details,
25 I got probably a 60-second lesson.

**32**

1    Q.    Well, if you look at Exhibit 1, which is
2  the policy that was implemented.
3          MS. PAUL:  Object.
4    Q.    (By Mr. Schiavone)  The Douglas Factors
5  and a letter of transmittal are required in that
6  policy.  Okay?  You can look at it and see, but it's
7  required in the policy.
8          And in the actions taken by the chief as
9  to Dan Kang and Mike Arrango, these Douglas Factors
10 were not done.  The policy in existence was not
11 followed by the chief and the superior officers and
12 no letter of transmittal.  So they violated policy.
13 They violated their own policy by not following
14 policy.
15         Explain to me about how that's fair to
16 these officers or to anybody employed by the Savannah
17 Police Department.
18         MS. PAUL:  Object to the form.
19         MR. KACHMAR:  Object to the form.
20   Q.    (By Mr. Schiavone)  What good are policies
21 if people don't follow them?
22         MR. KACHMAR:  Object to the form.
23         MS. PAUL:  Object to the form.
24   A.    I don't disagree with your statement about
25 the need for policies, particularly in the discharge

**33**

1  of public safety duties.  And I don't disagree -- I
2  don't disagree that those policies should be
3  distributed among the office so that all the officers
4  and the other departmental personnel are familiar
5  with them.
6          However, I do disagree that you're
7  applying these policies to the way that Corporal Kang
8  and Sergeant Arrango and their disciplinary
9  proceedings.
10   Q.    Well, Mr. Monahan, if the policy, before
11 it gets to you, requires that they do the Douglas
12 Factors because that goes to punishment.  That goes
13 to the heart of what happened to these officers.
14         If they don't follow the policy and
15 incrementally make sure that no action severe than is
16 necessary for violation of the policy, if that's not
17 followed, how on earth is that fair to these
18 employees to be terminated and fired?
19         MR. KACHMAR:  Object to the form.
20         MS. PAUL:  Object to the form.
21   A.    You know, I can't speak to the Douglas
22 Factors.
23   Q.    (By Mr. Schiavone)  Yes, sir.
24   A.    I'm not familiar with them.  But I did
25 review the tape.  I reviewed the Body Cam tape.  I

**34**

1  reviewed the report from the internal affairs office.
2  I spent almost two hours prior to my meeting with
3  them reviewing the -- doing my due process, my due
4  diligence and reviewing the facts of this case.
5          And I made my determination to uphold the
6  chief based on the facts of the case.
7    Q.    But you're upholding the chief who didn't
8  follow policy for it to get to your office.
9    A.    That was not the --
10         MR. KACHMAR:  Object to the form.
11   A.    -- that was not the basis for my decision.
12   Q.    (By Mr. Schiavone)  Well, I'm not -- you
13 know, your decision is your decision.  But before it
14 gets to you to make a decision, doesn't the city,
15 doesn't the police department, don't they have to
16 follow policy first before it gets to you?
17   A.    I heard --
18         MR. KACHMAR:  Object to the form.
19   A.    -- probably with all -- within all
20 departments maybe six appeals of discipline.  I never
21 once asked did you follow the procedural
22 requirements.  I never did.  I looked at the facts of
23 the case.
24   Q.    (By Mr. Schiavone)  All right.  Would it
25 concern you if they didn't follow policy?

EXHIBIT 21

## 35

1    A.    I think it depends on the policy.

2    Q.    So --

3    A.    And --

4    Q.    So the city and the chief can pick

5    whatever policies or nonexistent policies when they

6    take actions as severe as termination, they can do

7    whatever they want?  Is that what you're telling me?

8    A.    No, sir.

9          MR. KACHMAR:  Object to the form.

10   A.    No, sir.

11   Q.    (By Mr. Schiavone)  I mean, what good are

12   policies if you aren't required to follow them?

13         MR. KACHMAR:  Object to the form.

14         MS. PAUL:  Object to the form.

15   A.    Are you expecting an answer?

16   Q.    (By Mr. Schiavone)  All right.  I'll move

17   on.  Mr. Monahan, I'll move on.  Just give me one

18   second.  I'll be right back.

19         MR. SCHIAVONE:  Brent, can y'all take a

20   break?  Can you step out and give me a call?

21         MR. SAVAGE:  Yeah, sure.

22         (Recess from 11:46 a.m. to 11:54 a.m.)

23         MR. SAVAGE:  Mike has no further

24   questions.  I'll limit it to a half hour.

25                    EXAMINATION

                    GILBERT & JONES

## 36

1    BY MR. SAVAGE:

2    Q.    Mr. Monahan, I know you.  And if you don't

3    understand any questions, tell me.  If you think I'm

4    being over the line, you tell me and I'll try to get

5    back within the lines.

6          Dan Kang works for me.  And I think it's

7    tragic with the crime going on in this thing.  When

8    you said that somebody pushed somebody's face in the

9    cement, who was that?

10         MS. PAUL:  Object to the form.

11         MR. KACHMAR:  Object to the form.

12   A.    What I saw in the video, that was

13   Sergeant Arrango.

14   Q.    (By Mr. Savage)  Okay.  Did you have

15   anything to do with trying to get Kang indicted?

16   A.    Absolutely not.

17   Q.    Yeah.  You're aware that various police

18   officers -- you've never served as a police officer?

19   A.    No, sir, I haven't.  But my brother served

20   for 40 years.

21   Q.    Was he consulted on this case?

22   A.    Absolutely not.

23   Q.    Okay.

24   A.    Although I did talk to him from time to

25   time about police matters, I did not talk to him

                    GILBERT & JONES

## 37

1    about this specific case.

2    Q.    Do you know about Darryl Faitele, who was

3    the guy who made the complaint?  Or his mother made

4    the complaint.

5    A.    I only know him from the video I saw on

6    the Body Cam.

7    Q.    So what we're doing is we're firing a guy

8    from -- his fairly's from Korea.  He worked hard.  He

9    was a --

10   A.    No different than me.

11   Q.    I don't doubt.

12   A.    I was born in Seoul.

13   Q.    Yeah.  So was my son-in-law.

14   A.    So I'm going to stop answering unless you

15   ask a question.

16   Q.    Yeah.  My son-in-law's an investment

17   banker in New York and he's a great guy.  So his

18   children are my grandchildren.

19         What did Kang do wrong, in your mind, to

20   get him fired from a job?

21   A.    I'll give you a couple examples from what

22   I saw on the Body Cam.

23   Q.    Okay.

24   A.    Somewhere about two minutes after the

25   original encounter with the suspect --

                    GILBERT & JONES

## 38

1    Q.    Faitele?

2    A.    Yes, sir.

3    Q.    Uh-huh.

4    A.    He pulled the identification from

5    Mr. Fulton, Faitele.

6    Q.    Right.

7    A.    He did not report that to his subordinate.

8    He looked at it.  He didn't say that, you know, this

9    is -- this is not our suspect.  At least provide an

10   alibi to maybe further question of whether they had

11   the right guy.  He didn't do that.

12         So from that point -- well, actually

13   things did not escalate from that point.  Personally

14   I don't take issue with the way they took down

15   Mr. Faitele.  He came to the door --

16   Q.    He's a thug.

17   A.    Well, he came to the -- well, I'm not

18   going to call anybody names.  He came to the door.

19   He did not comply with the officer's commands.  They

20   took him down to the ground and they handcuffed him.

21   Q.    My problem --

22   A.    I get that.  I mean, I get it.

23   Q.    You're aware that police officers

24   testified in this proceeding earlier this week that

25   they did nothing wrong.  Todd, did you ever -- are

                    GILBERT & JONES

EXHIBIT 21

39

1 you aware of that?
2  A.  No, sir.
3      MR. KACHMAR:  Object to the form.
4      MS. PAUL:  Object to the form.
5  A.  No, sir, I was not.
6      MR. KACHMAR:  I just have a --
7  Q.  (By Mr. Savage) I mean --
8      MR. KACHMAR:  Mr. Savage, hold on.
9      MR. SAVAGE:  Okay.
10     MR. KACHMAR:  He was answering your first
11 question and you're interspersing.
12     MR. SAVAGE:  This is catastrophic for this
13 person.
14     MR. KACHMAR:  Okay.  Object to the form
15 again.  I'll just ask let him finish answering
16 questions.
17     MR. SAVAGE:  Got it.
18     MR. KACHMAR:  Thank you.
19  A.  And then I saw officers acting with
20 malice, including Mr. Kang.  There was a point in the
21 video where Mr. --
22  Q.  (By Mr. Savage) With malice?
23     With malice.
24     MR. KACHMAR:  Objection.
25  A.  They were angry.  They were angry.  They
                GILBERT & JONES

40

1 were angry against his noncompliance.  He was
2 handcuffed.  Yes.
3  Q.  (By Mr. Savage) Was he spitting on him?
4  A.  He did spit.  He did spit.
5  Q.  Was this the height of COVID?
6  A.  It was the height of COVID.
7  Q.  Was your city providing proper PPE to
8 these officers?
9  A.  We were trying.  The markets were very
10 difficult.  I went through extraordinary measures to
11 try to provide those PPP.  I negotiated a special
12 deal with Nine Line to provide additional masks when
13 we couldn't get masks from anywhere else.
14  Q.  Look, I'm not here to -- I'm bitterly
15 disappointed in getting rid of Mr. Kang.  He's my
16 client and my friend.  But I'm not here to hit at you
17 as far as a person.
18  A.  So at one point Mr. Kang is -- to go back
19 to your original question.
20  Q.  Right.  What did he do wrong?
21  A.  So at one point, Mr. -- he was angry.  He
22 was physically angry.  And so at one point he was
23 separated from Mr. Faitele and then tried to charge
24 back and had to be restrained against approaching
25 him.
                GILBERT & JONES

41

1  Q.  So he deserved to be fired?  I mean, you
2 got Minter --
3      MS. PAUL:  Object to the form.
4  A.  He -- he is --yes.  He was complicit with
5 Sergeant Arrango.  At times he could have taken his
6 sergeant aside, as I have done with my supervisors,
7 and you talk to them.  I've had county managers angry
8 in public meetings and I have taken the county
9 manager aside to talk to him.  And that's what I mean
10 by deescalating the situation.  He had that
11 opportunity.
12  Q.  (By Mr. Savage) So he deserves to get
13 fired.  Did he have any problems before?
14     MR. KACHMAR:  Object to the form.
15  A.  I don't know.
16  Q.  (By Mr. Savage) Did you check on that?
17 We don't want a nuclear bomb people.  We would like
18 to see who's been a good officer.
19  A.  He said --
20     MS. PAUL:  Wait.  Wait for the question.
21  Q.  (By Mr. Savage) Did you look at his prior
22 record?
23     MR. KACHMAR:  Object to the form.
24  A.  No, I did not.
25  Q.  (By Mr. Savage) Okay.
                GILBERT & JONES

42

1  A.  I mean, he described himself as a stellar
2 officer.  I accepted that.
3  Q.  So we just fire him.  How do you think
4 that crime has been in the last few years since we
5 fired Arrango and Kang?
6      MS. PAUL:  Object to the form.
7  A.  I doubt seriously you can connect the
8 dots --
9  Q.  (By Mr. Savage) Okay.
10  A.  -- on just those two.
11  Q.  Okay.  I mean, it's all over the city that
12 Minter had on the -- on his desk, and he would never
13 get the second policy, Exhibit 2 to your deposition,
14 passed.  And people within the city are saying that
15 he never should have been allowed to do this.  Would
16 you disagree with that?
17     MR. KACHMAR:  Object to the form.
18     MS. PAUL:  Object to the form.
19  A.  When you say "people within," I don't know
20 who that is.
21  Q.  (By Mr. Savage) Do you know Faitele's
22 record, the person you championed in this case?
23     MR. KACHMAR:  Object to the form.
24     MS. PAUL:  Object to the form.
25  Q.  (By Mr. Savage) I mean, he put a gun in a
                GILBERT & JONES

1  guy's mouth.  So we fire people.  He can't get a job
2  anywhere in police work or anything else.  And
3  Faitele, who's got multiple felony records, with four
4  stitches in his chin with you guys giving no PPE
5  equipment to these guys.  And I understand what
6  you're saying I couldn't get it.
7          Did Minter have PPE equipment sitting in
8  his office --
9          MR. KACHMAR:  Object to the form.
10     Q.   (By Mr. Savage) -- while you send these
11 guys out to arrest really rough characters?
12         MS. PAUL:  Object to the form.
13         MR. KACHMAR:  Object to the form.
14     Q.   (By Mr. Savage)  Did they have PPE
15 equipment?  Would you be concerned that I might be
16 getting COVID because a guy's spitting on me?
17         MR. SAVAGE:  Object to the form.
18         MS. PAUL:  Object to the form.
19     Q.   (By Mr. Savage)  Would you?
20     A.   Yes, sir.  I would be concerned about
21 their -- about their welfare.
22     Q.   (By Mr. Savage)  Did they have PPE
23 equipment then?
24     A.   I don't know.
25     Q.   You understand that you've said -- one of

1  the things I went out and talked to Schiavone about,
2  because they know the video, is who's he talking
3  about put a guy's face in the cement?
4          He said there is no thing in the cement,
5  anybody put somebody's face in the cement.  I mean,
6  this cost these people their livelihoods.  And I know
7  you thought you were taking it seriously.
8          Have you ever had Minter, a guy with a --
9  do you consider he had a conflict of interest --
10         MR. KACHMAR:  Object to the form.
11     Q.   (By Mr. Savage) -- because of the fact
12 that these guys, they're the first two names on the
13 petition against him?
14         MR. KACHMAR:  Object to the form.
15         MS. PAUL:  Object to the form.
16     A.   I did not know that when I made my
17 decision.
18     Q.   (By Mr. Savage)  Well, who's supposed to
19 do their homework?
20     A.   I did my homework, sir.  I spent two hours
21 reviewing the tape, reviewing the internal affairs
22 report.  I spent a considerable amount of time
23 because I took it seriously.  Just as I did every
24 appeal that came to me.
25     Q.   Did you ever overturn Minter?

1     A.   Excuse me?
2     Q.   Did you ever overturn Minter?
3     A.   Yes, sir.  Twice.
4     Q.   Which cases?
5     A.   There was a disciplinary case involving an
6  officer of which I overturned.
7     Q.   Was he white or black?
8     A.   He was white.  He was Caucasian.  Excuse
9  me.  He was Caucasian.
10     Q.   What's the guy's name?
11     A.   I don't want to talk about personnel
12 matters.  I don't want to talk -- unless I'm
13 compelled to, I'm not going to mention his name.  I'm
14 not going to mention any of the names of any of the
15 appeals I heard.  I just don't do that.  Just like
16 with Chief Minter.  I don't bring that out in public.
17     Q.   I'm not mad.  We're going to go back.  I
18 mean, this is a disgrace for a man who has that
19 thing, 80 officers against him -- you've never heard
20 of that before -- is allowed to give these
21 recommendations to fire these people.  That's a
22 classic conflict of interest.  Would you agree with
23 that what I just described?
24         MS. PAUL:  Object to the form.
25         MR. KACHMAR:  Object to the form.

1     Q.   (By Mr. Savage)  If he knows that these
2  officers have signed petitions against him, he
3  shouldn't be in a chain that decides their
4  discipline, should he?
5          MR. KACHMAR:  Object to the form.
6          MS. PAUL:  Object to the form.
7     A.   I disagree.
8     Q.   (By Mr. Savage)  That's fine.  Toth, do
9  you know him?
10     A.   No, sir.
11     Q.   As I understand it, I haven't been in
12 these depositions, two officers said that they
13 testified, I mean, testified that these guys did the
14 right thing.
15         Are you aware of conversations where
16 Minter told police officers, who I believe under oath
17 will testify in this case, that he would never
18 promote anybody like Kang who dared to sign a
19 petition against him?  Are you aware of that?
20         MS. PAUL:  Object to the form.
21         MR. KACHMAR:  Object to the form.
22     A.   No.
23     Q.   (By Mr. Savage)  Would you take a second
24 harder look if you know that he's being told to pass
25 Exhibit 2, that policy, but he ain't going to do it.

EXHIBIT 21

47

1 He's just sitting, freewheeling, that's on the corner
2 of his desk. And he's going around telling senior
3 officers that I'm never going to promote anybody on
4 that petition.
5       MS. PAUL: Object to the form.
6       Q.    (By Mr. Savage) Would you say that's
7 still okay to be involved in the process?
8       MS. PAUL: Object to the form.
9       MR. KACHMAR: Object to the form.
10      A.    As attorneys often say, it's hearsay. I
11 didn't hear it, so I can't judge.
12      Q.    (By Mr. Savage) Assume those facts are
13 true. I'll prove them to you. That he went to
14 senior officers -- a senior officer and said that I'm
15 never promoting anybody off there. If you had known
16 that information, do you think he should have been
17 involved in the chain to discipline these guys?
18      MS. PAUL: Object to the form.
19      MR. KACHMAR: Object to the form.
20      Q.    (By Mr. Savage) I think it's a yes or no
21 question.
22      A.    Repeat it again.
23      Q.    Assuming for the purposes of this question
24 only that Minter told a senior officer in the police
25 department he was going to never promote anybody who

GILBERT & JONES

48

1 signed that petition against him, do you think he
2 should have been allowed to be in the chain of
3 command that put this guy on the street?
4       MR. KACHMAR: Object to the form.
5       MS. PAUL: Object to the form.
6       A.    It's one thing to say it, but now if, you
7 know, a form comes across someone's desk to make a
8 decision on a promotion, that's when I'd make the
9 judgment.
10      Q.    (By Mr. Savage) Okay. So it's okay?
11      MS. PAUL: Object to the form.
12      A.    I didn't say that.
13      MR. KACHMAR: Object to the form.
14      Q.    (By Mr. Savage) This is a joke that he's
15 out there to get the federal job. Have you ever had
16 anybody leave your employment with the city -- as you
17 said, you had 2500 people -- to go campaign for a
18 federal job?
19      MR. KACHMAR: Object to the form.
20      MS. PAUL: Object to the form.
21      A.    I don't think that's relevant to what
22 we're talking about today. So no comment.
23      Q.    (By Mr. Savage) Well, I think it's
24 relevant. I mean, you're championing Darryl Faitele
25 and Roy Minter.

GILBERT & JONES

49

1       MS. PAUL: Object to the reform.
2       A.    If you're asking me whether employees have
3 left for other pursuits, absolutely.
4       Q.    (By Mr. Savage) No. He campaigned for
5 it. He didn't have an offer.
6       A.    I don't know what that means "campaign for
7 it."
8       Q.    Me neither. But I don't want to be
9 deceived. They let him go. They wanted him out.
10      A.    I don't know that.
11      MS. PAUL: Object to the form.
12      MR. KACHMAR: Object to the form.
13      Q.    (By Mr. Savage) Have you heard that?
14      A.    No, sir, I have not heard that. And I go
15 to -- I meet with Jay Melder, the city manager, on
16 occasion once a month.
17      Q.    Uh-huh.
18      A.    We've never talked about the chief.
19      Q.    Now, you put a lot of stock in Ms. Cox.
20 Do you understand her relationship with Grant? Had
21 she ever worked with him before?
22      MR. KACHMAR: Object to the form.
23      A.    No.
24      Q.    (By Mr. Savage) How much was her bill?
25      A.    I don't know.

GILBERT & JONES

50

1       Q.    People paying her bill, Minter, his
2 department, wanted these guys gone; fair?
3       MS. PAUL: Object to the form.
4       MR. KACHMAR: Object to the form.
5       A.    The way you express it is rather harsh.
6       Q.    (By Mr. Savage) My father lost his job
7 and he tried to dress well. He had an eighth grade
8 education. You don't understand what it does to
9 people to lose their job. I mean, you know, they
10 become suicidal.
11      For you to champion Darryl Faitele and
12 Roy Minter to say I'm going to throw out two guys
13 with records that have no blemishes on them at all,
14 and I'm going to say they did the wrong thing to
15 Faitele who's spitting on them.
16      Who do you think has more knowledge about
17 being a police officer, lieutenants and captains in
18 the Savannah Police Department or you?
19      MS. PAUL: Object to the form.
20      MR. KACHMAR: Object to the form.
21      A.    Go back to your earlier statement. I
22 don't like the use of the word "champion." So repeat
23 the other part, your question.
24      Q.    (By Mr. Savage) Who do you think has more
25 experience in how -- they're on the SWAT team. Do

GILBERT & JONES

1  you think they're arresting nice guys?
2          MS. PAUL:  Object to the form.
3          MR. KACHMAR:  Object to the form.
4     A.    I admit that that's probably the most
5  difficult job within the police department.
6     Q.    (By Mr. Savage)  So he overreacted and I'm
7  going to take your job from you, Officer Kang.  You
8  understood that was the net effect of what you did,
9  did you not?
10    A.    And I struggled with that.  I struggled
11 with the fact that two career officers would be
12 losing their jobs.  It entered my mind.
13    Q.    What you said when you talked to Ms. Paul,
14 who's a very good lawyer, is I didn't know about the
15 Douglas Factors until you explained them to me.
16 That's street talk for it.
17          Do you understand that those were very
18 important to have been complied with by Minter and
19 they weren't complied with in this case?
20          MR. KACHMAR:  Object to the form.
21          MS. PAUL:  Object to the form.
22    A.    I don't know that.
23    Q.    (By Mr. Savage)  I mean, we have the
24 former head of the Georgia State Patrol, Gary Vowell,
25 and Rolfe, who these guys know, from the GBI what was

1  Minter go?
2          MR. KACHMAR:  Object to the form.
3          MS. PAUL:  Object to the form.
4     A.    I did not hear that.
5     Q.    (By Mr. Savage)  That they wanted him out?
6     A.    I heard that he -- I mean, I read that he
7  resigned.
8     Q.    There's lots of resignations.  I'm in the
9  Lee Smith case and I don't even know where that's
10 going.  I don't know how anybody can work for boards.
11 And I don't know how you did it.  If you look at my
12 co-alumnus, Michael Brown, I mean, I think he's a lot
13 happier to be away from this stuff.
14          But, I mean, have you been -- I don't want
15 to know what you were told, but have you been told
16 that other officers, ranking officers in that police
17 department said I don't care what Mr. Monahan did?
18 I've been in there for decades and they didn't do a
19 thing wrong.  What do you have to say to those guys?
20          MR. KACHMAR:  Object to the form.
21          MS. PAUL:  Object to the form.
22    A.    I don't understand that question.
23    Q.    (By Mr. Savage)  I think it's easy enough
24 to understand.  Other people have contradicted you.
25 You've never worked as a police officer?

1  done to these people is despicable.
2          MR. KACHMAR:  Is that a question?
3          MR. SAVAGE:  No.  That's a good objection,
4  though.
5     Q.    (By Mr. Savage)  Tell me what you know
6  about Faitele and him spitting on them.  How did that
7  appear?  They had no PPE.  We have agreed on that.
8     A.    Uh-huh.
9     Q.    That's how COVID is communicated.  Should
10 they have stopped him from spitting on them or should
11 they have just said spit at me, buddy?
12          MR. KACHMAR:  Object to the form.
13    A.    Repeat that.  I'm not so sure --
14    Q.    (By Mr. Savage)  Did they have a right in
15 your mind -- I called up Bates Lovett to start this
16 case.  And I bitterly talked about Minter and his
17 conflict of interest.  He said, "I don't really care
18 about that.  Mr. Monahan's the guy that got rid of
19 these guys.  So we're sticking with him."
20          MR. KACHMAR:  Object to the form.
21          MS. PAUL:  Object to the form.
22    A.    I upheld the chief's -- I upheld the
23 chief's decision.
24    Q.    (By Mr. Savage)  I mean, this city is on
25 fire with guns.  And you've never heard that they let

1     A.    No, sir.
2     Q.    Right.  Clearly you've never worked as a
3  SWAT officer?
4     A.    No, sir.
5     Q.    What was their job that day?
6     A.    To serve warrant.  To serve a warrant.
7     Q.    On Khalil Kelly; right?
8     A.    Yes, sir.
9     Q.    Do you know they were --
10    A.    As I recall, that was the name.
11    Q.    Do you know they were told by the
12 people -- some of the people at that apartment that
13 that was Khalil Kelly up there when they got with
14 Faitele?
15    A.    I did not see that part of the video where
16 any such encounter occurred.  I do -- I do recall
17 there was somebody that he -- that the officers
18 encountered initially who said that I think he lives
19 up there.
20    Q.    Uh-huh.
21    A.    But I don't know that anyone saw
22 Mr. Faitele and identified him as -- as -- as the
23 other person.
24    Q.    What do you know about your police chief
25 going over to the district attorney's office and

EXHIBIT 21

1 trying to get Kang and Arrango indicted?

2         MR. KACHMAR: Object to the form.

3         MS. PAUL: Object to the form.

4    A.   I do not know anything.

5    Q.   (By Mr. Savage) Now, have you finished

6 everything that Officer Kang did that gave you peace

7 of mind to get rid of him?

8    A.   Yes. Except -- except that I, you know,

9 I -- I have always supported the police department

10 as -- don't shake your head at me like that. You

11 don't know anything about me, sir.

12    Q.   I'm not --

13    A.   Yeah, you shook your head.

14    Q.   I'm not disparaging --

15    A.   I have always supported the police

16 department. Okay? And I'll explain how, if you let

17 me.

18         First and foremost, my brother is a career

19 law enforcement officer. I respect what he does more

20 so than what I ever did in my life because he put his

21 life on the front line for the community where I grew

22 up.

23    Q.   Do you know how many times he's been shot

24 at?

25         MR. KACHMAR: Mr. Savage, let me finish

               GILBERT & JONES

1 the question.

2         MR. SAVAGE: I had that thought.

3         MR. KACHMAR: Let him finish.

4    A.   I have received commendations from the

5 Chatham County Police Department, the Chatham County

6 Sheriff's Department and the counternarcotics team

7 because of my support from police officers. While as

8 city manager, I attended every ribbon cutting, I

9 mean, every ribbon pinning, every promotion for any

10 new officers or those who advanced in their careers.

11    Q.   (By Mr. Savage) Okay.

12    A.   I recommended the classification

13 compensation study to bring their pay up to parity

14 with our benchmark communities.

15         And I also implemented, on my own accord,

16 an equity pay plan to make sure that subordinates did

17 not earn more than the persons who they reported to.

18         When Kevin Ansari was murdered, on my

19 first day of work, I personally wrote a $500 check to

20 his widow so she could pay off her mortgage. So,

21 yes, I do have a personal -- a personal belief in and

22 support of our law enforcement community. More so,

23 I'd say, than most city managers.

24    Q.   And that included supporting Officer Kang

25 until you put him out?

               GILBERT & JONES

1    A.   Yes, sir. I did support him until

2 circumstances arose that I felt it's necessary to

3 terminate him.

4    Q.   This is political.

5    A.   It's not.

6         MR. KACHMAR: Object to the form.

7         MS. PAUL: Object to the form.

8    Q.   (By Mr. Savage) Now, does it bother you

9 that I'm representing, as a lawyer, that I've got a

10 witness who's going to say that Minter said, "I'm

11 never going to promote any of those people" and you

12 never knew it? Or that doesn't bother you?

13         MR. KACHMAR: Object to the form.

14         MS. PAUL: Object to the form.

15    Q.   (By Mr. Savage) It's a yes or no

16 question.

17         MR. KACHMAR: Object to the form.

18    A.   No, it does not bother me.

19    Q.   (By Mr. Savage) Okay.

20    A.   I know you by reputation and I know you're

21 going to defend him to the best of -- or in this

22 case, you're going to recognize his complaint to the

23 best of your ability. I have no problem with that.

24 I have no problem with you defending former Corporal

25 Kang.

               GILBERT & JONES

1    Q.   They've been sued civilly by your guy

2 Faitele. You understand he's filed a civil suit?

3         MS. PAUL: Object to the form of the

4 question.

5         MR. KACHMAR: Object to the form.

6    Q.   (By Mr. Savage) Do you understand that in

7 that civil suit that the city is the defendant, and

8 they've put in there that they didn't do anything

9 wrong, Kang and Arrango? Do you understand that?

10         MS. PAUL: Object to the form of that

11 question.

12         MR. KACHMAR: Object to the form.

13    A.   No, I did not know that.

14    Q.   (By Mr. Savage) But you're the man,

15 according to Bates Lovett. It was your decision.

16         MR. KACHMAR: Object to the form.

17    Q.   (By Mr. Savage) He said, "Don't talk to

18 me about Minter and all of his stuff."

19    A.   I upheld the chief's decision, yes.

20    Q.   What do you know about the problems Minter

21 had at the end of last year with all this in the

22 newspaper about morale and stuff?

23    A.   I don't know.

24    Q.   You met with the -- what was your purpose

25 for meeting with the city manager? Did it deal with

               GILBERT & JONES

EXHIBIT 21

**59**

1 police issues at all?
2    A.   No, sir.
3    Q.   Has he ever expressed to you that Minter's
4 a problem?
5        MS. PAUL: Object to the form.
6    A.   No, sir.
7    Q.   (By Mr. Savage) This city's been lit up.
8    A.   We do not talk about the organization when
9 we meet.
10    Q.   Minter, were you aware that he was going
11 around to meetings and talking about Kang and Arrango
12 and ongoing investigations?
13    A.   No.
14    Q.   And you said you went out there with the
15 officer, and I admire that. I mean, nobody could
16 think less of that.
17        Have you ever been indicted by a grand
18 jury and had to sit and watch whether or not you got
19 put in jail for trying to do things? I mean, they
20 tried to indict about Kang based on, in some measure,
21 I think on what you did.
22        MR. KACHMAR: Object to the form.
23    Q.   (By Mr. Savage) Was that okay with you?
24        MR. KACHMAR: Object to the form.
25        MS. PAUL: Object to the form.

GILBERT & JONES

**60**

1    A.   You asked whether I've had to sit through
2 grand jury.
3    Q.   (By Mr. Savage) Have you been the subject
4 of a grand jury --
5    A.   No.
6    Q.   Can you imagine what that does to a person
7 like this? He's got an aeronautical engineering
8 degree from the University of Illinois. I mean,
9 you're familiar with Darryl Gates, aren't you?
10        MS. PAUL: Object to the form.
11    A.   You mean the singer?
12    Q.   (By Mr. Savage) No. I'm talking about a
13 guy that Minter kept on there, a black officer, for
14 months and he was accused of committing crimes. Did
15 that ever approach you?
16    A.   No, sir.
17        MS. PAUL: Object to the form.
18    A.   It did not.
19    Q.   (By Mr. Savage) I mean, you know there's
20 such a thing as reverse discrimination. The Georgia
21 Ports Authority just paid me $900,000 on the
22 Karl Nell case where he said when they would have
23 meetings of retirees, that's a meeting of the Ku Klux
24 Clan, the white operators.
25        MR. KACHMAR: Is there a question?

GILBERT & JONES

**61**

1        MR. SAVAGE: Yeah, I'm going. I'm not as
2 young as you. I got to pace myself.
3    Q.   (By Mr. Savage) But you do have both, I
4 mean, they have both very good lawyers here. But
5 I -- there's so many ways this could have been
6 handled differently than ruin a guy like Dan Kang.
7        Tell me what you -- you don't know
8 anything about Faitele's background, do you?
9    A.   No, I do not.
10    Q.   Do you know if they knew things about his
11 background and knew that he had been involved in
12 holding guns on people in the last few months?
13        MR. KACHMAR: Object to the form.
14    Q.   (By Mr. Savage) How do you react if you
15 know that you have Faitele there, know that he is a
16 major criminal in this community, know that he is --
17 that these guys know it when they're out there with
18 him, know that he has held guns on people? Are you
19 familiar what he did at Tony's Steakhouse putting a
20 gun in somebody's mouth?
21        MR. KACHMAR: Object to the form.
22    A.   No, I do not. But what you're telling me
23 is they knew Faitele before they arrived there?
24    Q.   (By Mr. Savage) They know about it after
25 they get his --

GILBERT & JONES

**62**

1    A.   After. Okay. After.
2    Q.   Does it bother you at all? I think these
3 guys have studied this film really hard. That you've
4 testified under oath that somebody -- I've got rid of
5 them because they pushed their face in the cement
6 because it's on the video, and it's not on the video.
7 Does that bother you?
8        MS. PAUL: Object to the form.
9        MR. KACHMAR: Object to the form.
10    A.   I saw the video.
11    Q.   (By Mr. Savage) Uh-Huh. We've seen it.
12 You'd do it again if you were the city manager. You
13 have no problem with what the city did putting this
14 guy on the street?
15        MR. KACHMAR: Object to the form.
16    A.   I would not express it that way, but I
17 would -- I would make the same decision.
18    Q.   And it doesn't trouble you at all that
19 Minter is going around saying I'm not going to
20 promote any of these people that exercised their
21 First Amendment right to express problems with me.
22 80 police officers. How big is the police
23 department, 450?
24        MR. KACHMAR: Object to the form.
25        MS. PAUL: Object to the form.

GILBERT & JONES

1    A.    600.

2    Q.    (By Mr. Savage) It's 600 now?

3    A.    It's 600 personnel. Sworn personnel is

4  probably closer to the number you cited.

5    Q.    Yeah. So you got 20 percent of the people

6  saying this is a bad guy. He lasted three years.

7    A.    Not to correct you --

8        MR. KACHMAR:  Object to the form.

9    A.    -- but I think that's 15 percent.

10   Q.    (By Mr. Savage) Okay. Well, 15. I'll

11 stick with that. That's a lot of people.

12   A.    Yes, sir. And I took it seriously and

13 I --

14   Q.    You'd do it again to these people. I

15 understand.

16   A.    No. The course I took to when I received

17 the complaint, I've already expressed what that was.

18   Q.    You know, Minter's trying to hide behind

19 he doesn't know what's in the complaint. That's why

20 Ms. Paul was looking at you.

21       MS. PAUL:  I object to that.

22       MR. KACHMAR:  Object to the form.

23   A.    I don't know whether he does or not. I

24 thought he received a copy of it.

25   Q.    (By Mr. Savage) When it was delivered

1  saying I'm not going to -- I'm going to retaliate

2  against people who signed that petition.

3        MR. KACHMAR:  Object to the form.

4        MS. PAUL:  Object to the form.

5    Q.    (By Mr. Savage) And I'm never going to

6  promote them.

7        MR. KACHMAR:  Object to the form.

8    A.    When I met with him about the management

9  improvement plan that I had planned to implement

10 before I left, I did not because I had to leave

11 rather suddenly. I, you know, I told him those areas

12 that -- that were related to me by Mrs. Cox as well

13 as my discussions in general, not mentioning any

14 names, with the captains I interviewed and told him

15 that would be part of the management improvement

16 plan. And I think he was surprised.

17   Q.    (By Mr. Savage) Who cares what he thinks.

18 I mean, in the sense he came into this community.

19 The streets are on fire at this point. And he's

20 going around those officers telling senior officers,

21 officer, that I'm going to get back at these people

22 and retaliate.

23       Do you support people that do that to

24 people that write petitions?

25       MS. PAUL:  Object to the form of the

1  there; right? I mean, you would think a good police

2  chief if he's being criticized by 15 percent of his

3  officers would want to know what the heck's in there;

4  fair?

5        MR. KACHMAR:  Object to the form.

6    Q.    Make sense?

7        MR. KACHMAR:  Object to the form.

8    Q.    Or maybe it doesn't in your world.

9        MS. PAUL:  Object to the form.

10       MR. KACHMAR:  Object to the form.

11   A.    Yes, it does.

12   Q.    (By Mr. Savage) Yeah. Okay.

13 Michael Brown, do you have respect for him as a city

14 manager?

15   A.    Yes, I do.

16   Q.    Would you have respect for his opinion in

17 this case?

18   A.    Yes. But I also say that the city manager

19 ultimately makes the final decision.

20   Q.    But, I mean, the -- you were asked -- this

21 wasn't a de novo hearing. De novo means from the

22 start. What did Minter say in your meeting?

23       MR. KACHMAR:  Object to the form.

24       MS. PAUL:  Object to the form.

25   Q.    (By Mr. Savage) The guy who's out there

1  question.

2        MR. KACHMAR:  Object to the form.

3    A.    I don't know that that happened.

4    Q.    (By Mr. Savage) Well, I'm asking you to

5  assume it happened. And telling you why did you let

6  him be in the chain of command to get rid of this

7  guy?

8        MR. KACHMAR:  Object to the form.

9        MS. PAUL:  Object to the form.

10   A.    I did not know Corporal Kang's name was on

11 the petition.

12   Q.    (By Mr. Savage) That petition's a big

13 deal. Did you look at it when you got it?

14   A.    Yes, sir. I told you I took it seriously.

15   Q.    They're the first two names on the

16 petition; right, Dan?

17   A.    I did not know him.

18   Q.    Are you first two or what? What number

19 are you? You can tell me tell me.

20       MR. KANG:  Like 13.

21   Q.    (By Mr. Savage) 13. Okay.

22   A.    I did not know him.

23   Q.    You --

24   A.    I did not -- I mean, first time I saw him

25 was in that video. I paid attention to --

# EXHIBIT 21

1  Q.  The video?

2  A.  -- the lieutenants and above.

3  Q.  Who else told you to get rid of him?

4  A.  What I seen on the petition.  No.

5  MS. PAUL:  Object to the form of the

6  question.

7  Q.  (By Mr. Savage) So it was your decision?

8  A.  Yes, sir, to uphold the chief.

9  Q.  I mean, one of the questions --

10  Greg Hodges is a great lawyer in this firm -- is do

11  you think it's important before you make a decision

12  to have all the information?

13  A.  As I recall, the report from the Office of

14  Professional Standards, which internal affairs was,

15  was rather voluminous.  I read through the entire

16  report.  I looked at the video for two hours.  I

17  thought about it.  I thought about the impact on

18  those two career officers who had -- who had -- who

19  had a future with the department.

20  Q.  They risked their lives to serve us on the

21  worst of the worst, the SWAT team.

22  A.  I agree.  I agree.

23  Q.  Maybe I'm more of a moderate.  I just

24  don't like nuking people.  Did you understand he was

25  shot at multiple times in the years before and that

GILBERT & JONES

1  he might have post-traumatic stress disorder?  Did

2  that come up?

3  MR. KACHMAR:  Object to the form.

4  A.  Yes, sir.

5  Q.  (By Mr. Savage) So did you consult a

6  physician or anybody and say, I think he overreacted?

7  I've never been a police officer.  Multiple officers

8  have testified under oath in this case that they

9  didn't do a thing wrong.

10  Do you think that's something that I ought

11  to take into account that he's been shot at serving

12  the people in this community and he might have PTSD

13  and maybe I ought to be more moderate?  Did you ever

14  do that?

15  MS. PAUL:  Object to the form of the

16  question.

17  MR. KACHMAR:  Object to the form.

18  A.  I did take note of that and I did note the

19  fact that he was seeking counseling for it.

20  Q.  (By Mr. Savage) So we'll fire you.  What

21  happened to his insurance after you fired him to get

22  counseling?

23  A.  I don't know.

24  Q.  Do you care?

25  A.  Yes, sir.  Of course, I care.

GILBERT & JONES

1  Q.  What do you think happened?  He has no

2  insurance.

3  MR. KACHMAR:  Object to the form.

4  MS. PAUL:  Is that a question?

5  Q.  (By Mr. Savage) He can't get counseling.

6  The hell with it.  You were nice enough to let me do

7  it.  This is one of the finest people I've ever known

8  in my life.  And you got people on that police

9  department like Darryl Gates who are criminals that

10  Minter turned his back on because he's black and

11  he's -- he's using you --

12  MR. KACHMAR:  Is there a question here?

13  Q.  -- as his flunky to get rid of people.

14  A.  Well, I disagree.

15  MR. KACHMAR:  No.  No.  Is there a

16  question?

17  MR. SAVAGE:  Oh.

18  A.  I disagree with that assessment, by the

19  way.  Two of the appeals came from African-American

20  officers that he recommended termination.

21  Q.  (By Mr. Savage) Did you ever look at

22  Darryl Gates's file?

23  A.  No, sir, I have not.

24  Q.  And who stood up for him and who went

25  against recommendations that he be fired?  Minter?

GILBERT & JONES

1  MR. KACHMAR:  Is that a question?

2  Q.  (By Mr. Savage) Have you ever looked at

3  his file?

4  A.  No.  I've not seen his file.

5  MR. KACHMAR:  Are you taking a break,

6  Mr. Savage?

7  MR. SAVAGE:  I'm calling Schiavone.  I'll

8  probably beat up what he wants me to do.

9  So . . .

10  MR. KACHMAR:  We're on the record.  Can we

11  take a two-minute break.

12  (Recess from 12:26 p.m. to 12:29 p.m.)

13  Q.  (By Mr. Savage) You understand that

14  officers recommended a five-day suspension for Kang,

15  do you not?

16  A.  I do recall that there was a review in

17  which it was -- I'm trying to remember who was on it.

18  The assistant chief.

19  Q.  That's the chief now?

20  A.  Yes.  He was on it.

21  Q.  Have you ever --

22  A.  Major Adams.

23  Q.  I'm sorry.  What's his name?  Gunther?

24  A.  Yes.

25  Q.  Have you ever talked to him about what he

GILBERT & JONES

EXHIBIT 21

71

1 thinks about the chief?
2    A.    No.
3    Q.    Minter?
4    A.    No.
5    Q.    So they recommended five days. Tell me
6 about the citizen review committee. Is that part of
7 the city charter that he can have a citizen review
8 committee, or any policies and procedures, I'm sorry,
9 in place on that day that he can go to the citizens
10 review panel?
11    A.    Yes. But that review panel is not -- that
12 decision's not binding on the city manager.
13    Q.    I know. But it's like a wave, man.
14    A.    Uh-huh. He was entitled to pursue that as
15 a -- as a further appeal.
16    Q.    Uh-huh. Do you understand how disoriented
17 you get when you've lost your career? I mean, Korean
18 people are very good citizens. They're hard workers.
19 Do you know what kind of stigma this puts on him and
20 his Korean community in Chicago?
21        MR. KACHMAR: Object to the form.
22    A.    I can't venture even to answer that.
23    Q.    (By Mr. Savage) Who offered -- who said
24 he ought to be suspended for five days? And why are
25 you in a better position as far as experience of what

GILBERT & JONES

72

1 SWAT team officers do with no PPE provided by the
2 city for being spit on, what the standard of care
3 there is?
4        MR. KACHMAR: Object to the form.
5        MS. PAUL: Object to form.
6    A.    I still don't understand that question.
7 Tell me what --
8    Q.    (By Mr. Savage) You have police officers
9 that recommend Officer Kang take five days. Get
10 suspended; right? You remember that?
11    A.    Uh-huh.
12    Q.    Why are you in a better position than
13 those police officers who made that recommendation to
14 fire him?
15        MR. KACHMAR: Object to the form.
16    A.    Because I'm the city manager. Because I
17 was the city manager.
18    Q.    (By Mr. Savage) Okay.
19    A.    I would -- excuse me.
20    Q.    Go ahead.
21    A.    I would venture I spent more time on this
22 case than that panel did.
23    Q.    It doesn't help us. It's an eyewash what
24 he's lost, his career and his job. And you
25 understood that.

GILBERT & JONES

73

1        MR. KACHMAR: Object to the form.
2    Q.    (By Mr. Savage) Did you talk to anybody
3 about what SWAT officers have to do?
4    A.    I know what SWAT officers have to do.
5    Q.    Have you ever talked to him about him
6 being shot from this city?
7    A.    No.
8    Q.    Do you think that people that have been
9 shot at in the course of trying to protect our
10 citizens should have been cut a little bit of a break
11 when Faitele is a -- do you know what Faitele's
12 criminal record is?
13        MR. KACHMAR: Object to the form.
14    A.    I did not know. I do not know.
15    Q.    (By Mr. Savage) Do you know if they knew?
16        MR. KACHMAR: Object to the form.
17    Q.    (By Mr. Savage) This is a dangerous man.
18        MS. PAUL: Object to the form.
19    Q.    (By Mr. Savage) Do you know how much time
20 he spent in prison?
21    A.    I do not know.
22    Q.    Is this the headline? City manager goes
23 with Darryl Faitele and throws out two people with
24 spotless records following the recommendation of a
25 police chief who has clear conflict of interest in

GILBERT & JONES

74

1 it. What's wrong with that headline?
2        MR. KACHMAR: Object to the form.
3        MS. PAUL: Object to the form.
4    A.    I won't answer.
5    Q.    (By Mr. Savage) Okay.
6    A.    I mean, I can't answer.
7    Q.    You won't. So I got it. Thank you.
8        MR. KACHMAR: Are you done?
9        MR. SAVAGE: Yeah. Thank you.
10        MS. PAUL: Do you have any questions?
11        MR. KACHMAR: I have just a few questions
12    for you, Mr. Monahan.
13        EXAMINATION
14 BY MR. KACHMAR:
15    Q.    Mr. Savage and Mr. Schiavone asked you
16 questions about the group complaint that Officer Kang
17 and other officers signed. Do you recall those
18 questions?
19    A.    Yes, sir.
20    Q.    Okay. Do you have personal knowledge of
21 whether Chief Minter saw the signatures on that group
22 complaint or was aware of the individual people who
23 signed the group complaint before he made the
24 decision to terminate Mr. Kang?
25    A.    No, I do not.

GILBERT & JONES

EXHIBIT 21

## 75

1     Q.   Okay. Do you have personal knowledge of
2 whether Chief Minter was aware of or saw Mr. Kang's
3 or Officer Kang's individual complaint prior to
4 Chief Minter's decision to terminate Mr. Kang?
5     A.   No, I do not.
6     Q.   Within the city structure, did the chief
7 of police have discretion to make personnel decisions
8 regarding individuals within the police department?
9     A.   Yes.
10     MR. SAVAGE: Let me object.
11     A.   Absolutely.
12     MR. SAVAGE: Okay. The form of the
13 question, which is --
14     MR. KACHMAR: What's the objection?
15     MR. SAVAGE: The discretion. I mean,
16 that's a legal conclusion.
17     MR. KACHMAR: Okay.
18     Q.   (By Mr. Kachmar) What was your answer?
19     A.   So if the question was does the city --
20 does the chief of police have discretion to manage
21 within his department, personnel matters including,
22 absolutely, yes.
23     Q.   Okay. You were asked some questions
24 earlier about policy and following policy, and I
25 think you said something along the lines of the city

GILBERT & JONES

## 76

1 doesn't draft a policy for every situation that might
2 arise.
3     A.   I did say that.
4     Q.   Okay. So let me ask the more general
5 question. You said you supervise, I think, 12
6 departments?
7     A.   Directly.
8     Q.   Directly.
9     A.   Yes.
10     Q.   All right. If a situation arose within
11 that department that wasn't directly addressed by a
12 policy, did those department heads have the ability
13 to make a personnel decision if policy didn't
14 directly address that situation?
15     MR. SAVAGE: Let me object to the form of
16 the question.
17     MR. KACHMAR: What's your objection?
18     MR. SAVAGE: The objection is that it --
19 this is Minter doing it. And you got to have
20 somebody who's a conflict.
21     MR. KACHMAR: I object to your talking
22 objection. You can answer the question.
23     A.   Yes.
24     Q.   (By Mr. Kachmar) Okay. You were asked
25 some questions about the city's progressive

GILBERT & JONES

## 77

1 discipline policy. I think the word "discipline"
2 wasn't used. I'm using that.
3     A.   Uh-huh.
4     Q.   But just my understanding of progressive
5 discipline is if somebody commits an infraction at
6 work, there's generally a process of escalated
7 discipline, maybe a verbal warning, then a written
8 warning, then a suspension, then a termination,
9 something along those lines. Are you familiar with
10 that form of discipline policy within an
11 organization?
12     A.   Yes. And I have followed it my entire
13 career.
14     Q.   Okay. Well, my question is: Did the city
15 have a progressive discipline policy?
16     A.   Yes.
17     Q.   Okay. Did the city also reserve the right
18 to deviate from the progressive discipline policy
19 given specific situations?
20     MR. SAVAGE: Let me object to that.
21 That's going to be a matter of these procedures.
22     Q.   (By Mr. Kachmar) You can answer.
23     A.   Yes. Yes. And as I explained, I think
24 there are degrees of those infractions and the
25 application of the disciplinary --

GILBERT & JONES

## 78

1     Q.   Okay.
2     A.   -- of the process.
3     Q.   So if an employee within the City of
4 Savannah with a 20-year spotless record embezzled a
5 million dollars from the city, would the city be able
6 to terminate that person or would they have to first
7 give them whatever the first step of the progressive
8 discipline policy is?
9     MR. SAVAGE: Let me object to that
10 question. That has nothing to do with it unless
11 you're calling this man a thief.
12     Q.   Okay. You can answer.
13     MR. SAVAGE: A million dollars
14 embezzlement?
15     Q.   (By Mr. Kachmar) You can answer the
16 question.
17     A.   Yes. I'm not calling him a thief. I'm
18 answering Mr. Kachmar's question.
19     Q.   Okay.
20     A.   And I used that in my example I spoke of
21 earlier.
22     MR. KACHMAR: That's all I have.
23     EXAMINATION
24 BY MR. SAVAGE:
25     Q.   Why don't you think Minter should have

GILBERT & JONES

EXHIBIT 21

1 gotten a copy of the -- is there a normal routing
2 when a complaint is made against the police chief
3 that it gets to him in some expeditious fashion --
4      MR. KACHMAR: Object to the form.
5   Q.  (By Mr. Savage) -- for him to look at?
6      MR. KACHMAR: Object to the form.
7      MS. PAUL: Object to the form of the
8 question.
9   Q.  (By Mr. Savage) Because what they're
10 doing is just try to set up a defense that he didn't
11 retaliate because for months he never knew he signed
12 it because he didn't even bother to look at the
13 complaints. Isn't that stuff routed to the police
14 chief if it deals with his department?
15      MR. KACHMAR: Object to the form.
16   A.  If it had his name on it.
17   Q.  (By Mr. Savage) Well shouldn't this have
18 been routed? He's the subject of it.
19   A.  And that's one of the reasons I would not
20 send it to him directly.
21   Q.  Oh, you wouldn't?
22   A.  I did not.
23   Q.  Uh-huh.
24   A.  I hired an investigator, or I led the
25 responsibility of hiring an investigator.

GILBERT & JONES

1   Q.  So you never showed it to him. How long
2 did you study this with people saying we've got
3 pressing problems? Have you ever heard of 80 police
4 officers, 15 percent -- you're better at math than
5 me -- signing stuff against Minter or any other
6 police officer in the history of your doing this?
7      MR. KACHMAR: Object to the form.
8      MS. PAUL: Object to the form.
9   A.  No, sir.
10   Q.  (By Mr. Savage) So this is a big deal.
11   A.  Yes, sir. I took it seriously.
12   Q.  So you sit back and let me hire Susan Cox
13 who knows Grant from before. Grant suggested her,
14 didn't he?
15   A.  He mentioned three names.
16   Q.  She was one of them?
17   A.  I also equally decided that she should be
18 selected because she was from outside the community.
19 I wanted as much objectivity as I could.
20   Q.  Uh-huh. What was her bill?
21   A.  I do not know.
22   Q.  Over a hundred thousand?
23   A.  I said that earlier. I do not know.
24   Q.  Well, I mean, I thought you would know
25 ranges.

GILBERT & JONES

1   A.  No. The bill went to Mr. Grant.
2   Q.  And he paid it?
3   A.  I -- I'm assuming but I don't know.
4   Q.  Uh-huh. Have you ever had a department
5 head, who has a pending investigation going on
6 against him for the 15 percent of the officers have
7 said he's done numerous things wrong, decide on
8 people in their department as to whether or not they
9 should be fired or not?
10      MR. KACHMAR: Object to the form.
11   Q.  (By Mr. Savage) Where there's a pending
12 investigation going on?
13   A.  No, sir.
14      MR. SAVAGE: That's all I got. Thank you.
15      MR. KACHMAR: No further questions.
16      (Deposition concluded at 12:40 p.m.)
17      (Pursuant to Rule 30(e) of the Federal
18 Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
19 signature of the witness has been reserved.)
20
21
22
23
24
25

GILBERT & JONES

CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA:
COUNTY OF CHATHAM:

    I hereby certify that the foregoing
transcript was reported as stated in the caption and
the questions and answers thereto were reduced to
writing by me; that the foregoing 81 pages represent
a true, correct, and complete transcript of the
evidence given on Friday, September 2, 2022, by the
witness, PATRICK MONAHAN, who was first duly sworn by
me.

    I certify that I am not disqualified
for a relationship of interest under
O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
Reporter here as an employee of Gilbert & Jones, Inc.
who was contacted by Brent J. Savage, Esquire, to
provide court reporting services for the proceedings;
I will not be taking these proceedings under any
contract that is prohibited by O.C.G.A. 15-14-37(a)
and (b) or Article 7.C. of the Rules and Regulations
of the Board; and by the attached disclosure form I
confirm that neither I nor Gilbert & Jones, Inc. are
a party to a contract prohibited by
O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the
Rules and Regulations of the Board.

    This 14th day of September, 2022.

_____
Annette Pacheco, CCR-B-2153

GILBERT & JONES

EXHIBIT 121

**83**

## DISCLOSURE OF NO CONTRACT

1

2      I, Debbie Gilbert, do hereby disclose
3 pursuant to Article 10.B of the Rules and Regulations
of the Board of Court Reporting of the Judicial
Council of Georgia that Gilbert & Jones, Inc. was
4 contacted by Brent J. Savage, Esquire, to provide
court reporting services for these proceedings and
5 there is no contract that is prohibited by O.C.G.A.
15-14-37(a) and (b) or Article 7.C. of the Rules and
6 Regulations of the Board for the taking of these
proceedings.

7

8      There is no contract to provide reporting
services between Gilbert & Jones, Inc. or any person
9 with whom Gilbert & Jones, Inc. has a principal and
agency relationship nor any attorney at law in this
10 action, party to this action, party having a
financial interest in this action, or agent for an
11 attorney at law in this action, party to this action,
or party having a financial interest in this action.
12 Any and all financial arrangements beyond our usual
and customary rates have been disclosed and offered
13 to all parties.

14      This 14th day of September, 2022.

15

16      _Debbie Gilbert_

17      _____
     Debbie Gilbert, FIRM
     REPRESENTATIVE
     Gilbert & Jones, Inc.

18
19
20
21
22
23
24
25

GILBERT & JONES

---

**84**

1 DEPOSITION OF: PATRICK MONAHAN/AP

2      I do hereby certify that I have read all
3 questions propounded to me and all answers given by
me on September 2, 2022, taken before
Annette Pacheco, and that:

4

5 ___ 1) There are no changes noted.
___ 2) The following changes are noted:

6

7      Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or the Official Code of Georgia
8 Annotated 9-11-30(e), both of which read in part:
Any changes in form or substance which you desire to
9 make shall be entered upon the deposition...with a
statement of the reasons given...for making them.
10 Accordingly, to assist you in effecting corrections,
please use the form below:

11 Page No. ___ Line No. ___ should read:_____

12 Reason for Change_____

13 Page No. ___ Line No. ___ should read:_____

14 Reason for Change_____

15 Page No. ___ Line No. ___ should read:_____

16 Reason for Change_____

17 Page No. ___ Line No. ___ should read:_____

18 Reason for Change_____

19 Page No. ___ Line No. ___ should read:_____

20 Reason for Change_____

21 Page No. ___ Line No. ___ should read:_____

22 Reason for Change_____

23 Page No. ___ Line No. ___ should read:_____

24 Reason for Change_____

25

GILBERT & JONES

---

**85**

1 DEPOSITION OF: PATRICK MONAHAN/AP

2 Page No. ___ Line No. ___ should read:_____

3 Reason for Change_____

4 Page No. ___ Line No. ___ should read:_____

5 Reason for Change_____

6 Page No. ___ Line No. ___ should read:_____

7 Reason for Change_____

8 Page No. ___ Line No. ___ should read:_____

9 Reason for Change_____

10 Page No. ___ Line No. ___ should read:_____

11 Reason for Change_____

12 Page No. ___ Line No. ___ should read:_____

13 Reason for Change_____

14

15 If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to this
16 deposition.

17      _____
     PATRICK MONAHAN

18

19 Sworn to and subscribed before me,
This the ___ day of _____, 20__.

20 _____
Notary Public
21 My commission expires: _____

22

23 Please forward corrections to:

24      Gilbert & Jones, Inc.
     P. O. Box 14515
     Savannah, GA 31416
25      (912) 355-0320

GILBERT & JONES