EXHIBIT 22

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DANIEL KANG, )
      Plaintiff, )
      ) CIVIL ACTION NO.:
  v. ) 4:21-CV-111-WTM-CLR
      )
THE MAYOR AND ALDERMEN OF )
THE CITY OF SAVANNAH and ROY )
W. MINTER, JR., Chief of )
Police for the City of )
Savannah, Georgia, in his )
Individual and Official )
Capacities, )
      )
_____Defendants.)

DEPOSITION OF

PATRICK MONAHAN

April 13, 2023
3:34 p.m.

218 West State Street
Savannah, Georgia

Mynjuan P. Jones, RPR, CCR-B-1422



Gilbert & Jones
Certified Court Reporters
P.O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520
gilbertandjones1@gmail.com
912.264.1670
P.O. Box 14515 (31416)
7505 Waters Avenue, F3
Savannah, GA 31406

## Page 2

**APPEARANCES OF COUNSEL**

On behalf of the Plaintiff:

  BRENT J. SAVAGE, Esq.
  Savage Turner
  102 East Liberty Street
  8th Floor
  Savannah, Georgia 31401

On behalf of the Defendant The Mayor and Aldermen of the City of Savannah:

  PATRICK T. O'CONNOR, Esq.
  PATRICIA T. PAUL, Esq.
  Oliver Maner
  218 West State Street
  Savannah, Georgia 31401

On behalf of the Defendant Roy W. Minter, Jr.:

  SHAWN A. KACHMAR, Esq.
  Hunter Maclean
  200 East St. Julian Street
  Savannah, Georgia 31401

Also Present:
Daniel Kang
Octavio Arango
Stephens Preston
Jessica Savage

- - -

## Page 3

**INDEX TO EXAMINATIONS**

| Examination | Page |
|---|---|
| Examination by Mr. Savage | 4 |

- - -

## Page 4

  (Reporter disclosure made pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia.)

  MR. SAVAGE: Why don't we just usual stipulation and swear in Mr. Monahan. I'll be happy to cover him for his time. He shouldn't have to show up at my request all the time.

  MR. O'CONNOR: He's here as a fact witness. We'll agree to the same stipulations we've been doing in these depositions and he will read and sign. You can just send it to me.

  PATRICK MONAHAN,
having been first duly sworn, was examined and testified as follows:

      EXAMINATION

BY MR. SAVAGE:

  Q.    Just for the record your name, please.

  A.    Patrick Chang Monahan.

  Q.    Were you ever made aware that the FBI in their other office in Peoria, Arizona, had called the City of Savannah about problems that they perceived in the hiring of Minter?

  A.    No.

  Q.    Were you aware that the city attorney's

EXHIBIT 22

## Page 5

1  office met with the FBI in Savannah to go over
2  whether Minter should be hired and told former city
3  manager Hernandez -- Hernandez told them it was too
4  late to go into these problems that the FBI had
5  voiced from the Peoria, Arizona office about Minter
6  to the FBI in Savannah because they had already
7  obligated themselves to hire Minter?
8      A.   No, sir, I was not aware.  As you pointed
9  out, Mr. Hernandez preceded me, and in my four days I
10 sat with him, he never mentioned it once.
11     Q.   That never came up in any conversations
12 with anybody at the City that, you know, from the
13 beginning we were told by the FBI that there were
14 problems with Minter that originated from his area
15 where he had a former job?
16     A.   Those facts were never discussed with me
17 and I was not aware of them until you just mentioned
18 them.
19     Q.   It happened.  Have you ever hired anybody,
20 I mean, independent of this, who the FBI at their
21 former location had expressed grave doubts about
22 their integrity?
23          Have you ever hired anybody for a position
24 where the FBI, where they had formerly worked,
25 expressed grave doubts about their integrity?

GILBERT & JONES

## Page 6

1      A.   No, sir.
2      Q.   We've since had the chance to take Diane
3  McLeod's deposition in this case.  You know
4  Ms. McLeod I'm sure?
5      A.   I do not know her.
6      Q.   She's head of the CARES.
7      A.   I know about her position but I do not
8  know her.
9      Q.   She voiced on a number of statements that
10 she was not told the whole truth, and when I told her
11 what I believe the whole truth is, she said I should
12 have been told these things.
13          Were you ever told that Minter had
14 violated Mr. Kang's constitutional rights in
15 investigating him?
16     A.   No, sir.
17          MR. KACHMAR:  Object to the form.
18     Q.   (By Mr. Savage)  Would that have made a
19 difference to you?  In other words, what I think is
20 happening to you, I know you're -- it bothers me that
21 this happened and it bothers me that you're in this
22 because Dana Braun is a really good friend of yours
23 and he's a good friend of mine.
24          I have a high respect for him and he has a
25 very high respect for you so I take it, but to be

GILBERT & JONES

## Page 7

1  part of this thing bothers me.
2          That's not important for you.  But what
3  I'm trying to express to you this afternoon is I want
4  you to understand certain things you were never told.
5          If you had been made aware that Mr. Kang's
6  constitutional rights had been violated on a number
7  of occasions in the investigation that led to his
8  termination, would you have felt comfortable being
9  the appeals court?
10          MR. O'CONNOR:  Object to form.  You can
11     answer subject to the objection.
12          THE WITNESS:  I just need to be cautious
13     when you propose an "if" question because I
14     don't know.  I mean, I can't say.
15          I don't know all the circumstances, the
16     facts.  I haven't read anything, so I'm just
17     going by what you're telling me.  I don't know
18     if that's the case or not.
19     Q.   (By Mr. Savage)  I'll show you.  The mayor
20 testified in his deposition that he felt
21 constitutional rights had been violated of Dan Kang.
22          MR. O'CONNOR:  Object to form.
23     Q.   (By Mr. Savage)  And let me talk about
24 that.  I'll go to very clear things.  Dan Kang was
25 never read his Miranda rights.  The IA file where

GILBERT & JONES

## Page 8

1  they investigated him the whole way was handed over
2  to his criminal prosecutors.  Mayor Johnson agreed
3  that that should not happen.  Do you know --
4      A.   I am not aware of that.
5      Q.   Would you feel comfortable saying I'm
6  going to bless this proceeding knowing he was never
7  given his constitutional rights and knowing this, I
8  mean, this is a city policy where it says that no
9  further administrative effort will normally be made
10 until the chief of police determine whether to assign
11 the matter for criminal investigation.  That is if
12 there appears to be a criminal violation of the law.
13 The investigation of OPS may be suspended by the
14 chief of police promptly.
15          Did you know that from the beginning
16 Captain Barefield felt that there would be a criminal
17 prosecution of Dan Kang?
18     A.   I did not know that.
19          MR. O'CONNOR:  Let me make my objection.
20     Just pause after the question.  Object to the
21     form.  Now you can answer.
22     Q.   (By Mr. Savage)  I think both these
23 lawyers are very good lawyers, all three of them,
24 Patty and Pat, but I was going to say Mr. Kachmar as
25 well.  I didn't want to cut anybody out.

GILBERT & JONES

EXHIBIT 22

## Page 9

But this is very troubling. Faitele is a criminal, and I know that when you talk in altruistic terms that criminals should have as much right and people that hold guns to people's heads should have as much rights as police officers and we get rid of bad police officers.

This is the policy to which I'm referring. Employees under investigation related to criminal violations will be afforded those constitutional rights guaranteed by the -- civil rights guaranteed by the constitution of the United States.

Do you know he was never read any rights but they took the IA investigations and used it to prosecute him?

MR. KACHMAR: Object to the form.

MR. O'CONNOR: Object to form.

Q. (By Mr. Savage) Would you feel comfortable sitting on appeal if his constitutional rights had been violated by him not ever having --

A. As I said before, I need to be cautious about "if" questions because I can't say. I mean, I don't know the totality of the situation.

Yes, I do agree that his constitutional rights should remain intact. He is a citizen and he deserves that.

## Page 10

Q. Would you have passed on his being fired if you knew that his constitutional rights had been violated prior to the time that you heard his appeal?

A. I never heard that as any point of contention from him during his presentation, from Sergeant Arango --

Q. They're not constitutional lawyers.

A. But they should have raised that issue if they felt concern about due process, in their presentation to me anyway.

Q. So it's okay for me to pass on people's rights because you're the fall guy for the City. That's what Bates Lovett is saying. He said --

A. That comes with the job.

MR. O'CONNOR: Don't comment on debates. Just answer questions.

THE WITNESS: Okay.

MR. O'CONNOR: I will object to the form of a question that is a comment as opposed to a question.

THE WITNESS: Well, I would appreciate questions.

MR. O'CONNOR: Let him finish. Let Mr. Savage finish, then you can respond.

Q. (By Mr. Savage) Did anybody ever tell you

## Page 11

Barefield, from the beginning, who was in the IA investigation prior to the chain of command hearing, had said we thought we had a possible criminal case against Kang to start with?

A. I never heard that.

Q. But you're blaming Kang. It's okay for Barefield to break internal policies. This is Policy Number 8 on Page Number 8 of the office of professional standards, role in criminal investigations.

It's okay for us to do it and it's Kang's fault, who's an aeronautical engineer, for him not to raise these things. I got it. That's what you're saying to me, right? What a city.

Now, does it bother you that he was never read his Miranda rights, assuming for the purpose of this question that Barefield said we thought we had a criminal prosecution to start with?

A. If there were -- I'm not hearing any objection. If there were pending criminal charges, yes, he should have been read his --

Q. How about if you had proposed one? That's what your policy says. Do you know your policy?

A. No, sir, I do not.

Q. Did you know it then? When you passed on

## Page 12

them and said they should be fired, did you know the policies of the city police department?

A. No, I did not know them in detail.

Q. Well, did you look at them?

A. No, I did not look at those in detail. They were not presented to me.

Q. Well, whose fault is that?

A. There was no question about it.

Q. Whose fault is that? Kang's? You're fighting for your life, so it's your fault. I mean, this guy served four tours of duty to protect me and you and he got treated like hell.

Let's go over more constitutional violations. My whole point is you never should have fired this man, knowing or with any kind of diligence, knowing their constitutional rights had been wholesaled, wholesaled.

MR. O'CONNOR: Object to form.

Q. (By Mr. Savage) I mean, did you ever talk to Tim Dean who prosecuted Kang and couldn't get an indictment who admitted to us that -- I had a real problem with this whole thing. I don't know what they were doing. Did you ever hear that from the district attorney's office?

A. I did not hear anything. I was not

EXHIBIT 22

## Page 13

1  involved at all in any criminal investigation or any
2  criminal charges.
3      Q.  Well, you went to the news conference?
4      A.  Yes, sir.
5      Q.  Now --
6      A.  I went to the news conference as an
7  observer at the invitation of the mayor. I
8  intentionally stayed away from the cameras.
9          And when the mayor motioned to me that he
10 wanted me to say something, I shook my head and said
11 no, I did not think that was my place.
12     Q.  When the investigation is completed, did
13 you ever know that this never happened? "Commander
14 shall write a letter of transmittal." That's a
15 shall.
16         Did you ever know that that obligation on
17 the City of Savannah had never been done for these
18 people, a letter of transmittal that outlines the
19 charges? Did you know that when you said they should
20 be fired?
21     A.  That was not part of the package from the
22 office of professional standards.
23     Q.  Well, if you're the head knocker, you
24 should know the policies, fair? Head guy?
25     A.  As I mentioned previously, each department

GILBERT & JONES

## Page 14

1  is responsible for developing and enforcing those
2  policies. There are, I don't know, somewhere in the
3  neighborhood of 46 city departments. 12 of those
4  reported to me directly. You can't expect me to know
5  the policies of every single department.
6      Q.  How about the policies of the police
7  department which is a major department and you're
8  passing on firing people, should you know the
9  policies that should have been observed leading up to
10 their firing when you pass on them?
11     A.  I rely upon the office of professional
12 standards to prepare a factual package presenting --
13 that's internal affairs. Okay. I'll just call it
14 internal affairs from this point forward. Everyone
15 seems more familiar with that term.
16         So I depend upon internal affairs to
17 present the package, the fact finding. No, that was
18 not part of any fact finding that internal affairs
19 presented --
20     Q.  Should you have known it? We did not
21 follow our own policies in firing this guy and we
22 want you to pass on this. Should you have known they
23 didn't follow their own policies?
24     A.  My question is --
25         MR. O'CONNOR:  Object to the form of the

GILBERT & JONES

## Page 15

1  question.
2      Q.  (By Mr. Savage) Go ahead.
3      A.  My question back is why didn't they
4  present that to me if it was such an integral issue
5  to their defense.
6      Q.  So it's their fault?
7      A.  Well, equally.
8      Q.  So equally then it's the police
9  department --
10         MR. O'CONNOR:  Do not debate. Your job is
11 to answer questions. Don't take the bait and
12 get into a debate. That's not what --
13         THE WITNESS:  I don't want to debate him
14 anyway.
15         MR. O'CONNOR:  You're here to answer
16 questions truthfully, so do that.
17         THE WITNESS:  Okay.
18     Q.  (By Mr. Savage) The second thing, when
19 the investigation is completed, the Douglas Factors
20 will be placed in the investigative file and
21 forwarded to the OPS. Did you ever see any Douglas
22 Factors?
23     A.  I did not.
24     Q.  Do you know what they are?
25     A.  Yes, sir.

GILBERT & JONES

## Page 16

1      Q.  Why didn't you say I'm not passing on an
2  appeal? I mean, to us as lawyers -- and lawyers are
3  not all bad. Certainly the City's lawyers are good
4  people.
5          An appeal means that you're passing on
6  what happened before you. Is that kind of what you
7  were doing?
8      A.  Yes.
9      Q.  So if what happened before you is corrupt,
10 how can you bless it by firing Kang? I don't get
11 that.
12         Do you know how with a corrupt
13 investigation that fails to follow the United States
14 constitution, that fails to follow the internal
15 standards of the City, that you can say they should
16 be gotten rid of or should you not do that?
17         MR. KACHMAR:  Object to the form.
18         MR. O'CONNOR:  Object to form.
19         THE WITNESS:  As I said before, and I know
20 it sounds like I'm a broken record, but I can
21 only judge based on what I saw in the material,
22 in the package from internal affairs, and their
23 presentation. I weighed both of them and I came
24 to my decision.
25     Q.  (By Mr. Savage) And you can them. And

GILBERT & JONES

EXHIBIT 22

Page 17

 1  where does your brother work? You said he was a
 2  police officer --
 3     A.   He's retired.
 4     Q.   From where?
 5     A.   St. Lucie County Sheriff's Department.
 6     Q.   Let me get one of the guys out of there to
 7  see what they think of what happened here. Because I
 8  know that you depended on this --
 9     A.   I did not talk to him about this case.
10     Q.   I understand. You said my brother is a
11  police officer.
12     A.   Yes.
13     Q.   What was done was wrong and I wish some
14  people would say it was wrong. That's essentially
15  what Diane McLeod did, in my opinion, not in theirs,
16  said, you know, I didn't know these things, I wish I
17  had, it wasn't right.
18          Did you know that Minter was there being a
19  prosecutor in front of CARES?
20          MR. KACHMAR: Object to the form.
21          THE WITNESS: I did not know what happened
22     during that CARES meeting, CARES committee
23     meetings.
24          I never attended a single meeting. I
25     never talked to any members of the CARES

Page 18

 1     committee. I never talked to Mrs. McLeod. I
 2     never talked to the mayor about it.
 3          So, no, I do not know. That was within
 4     the mayor's purview to appoint an ad hoc
 5     committee as he has done others, as I recall,
 6     eight in total.
 7     Q.   (By Mr. Savage) The idea is good. Minter
 8  controls this whole city. I mean, you've got a guy
 9  that the FBI is calling our city about, saying this
10  is a very suspect guy, that the FBI in Savannah gets
11  involved with and you guys let him lead you around by
12  the nose, and that's not good.
13          You know, I don't know why I have to tell
14  you about these FBI things. It's not good. I mean,
15  I'm not getting paid by the City.
16          You know or any reading would have shown
17  you, reading through the file, that there was never
18  Douglas Factors done on Kang. That's a violation of
19  City policy.
20          If there were no Douglas Factors done on
21  Kang, that's a violation of City policy. Can we
22  agree on that much?
23          MR. KACHMAR: Object to the form.
24          THE WITNESS: As I said, I don't know all
25     the circumstances.

Page 19

 1     Q.   (By Mr. Savage) Should you as a judge? I
 2  mean, judges have got to know rules. You're an
 3  appellant judge.
 4     A.   Well, I'm sure in a courtroom the judge
 5  depends upon both the plaintiff's attorney and
 6  defending attorney.
 7     Q.   But he's depending on the guy knowing the
 8  rules.
 9     A.   I'm sure.
10     Q.   I just think it's bad to blame Kang. I
11  mean, you know, you have -- I don't know. I told
12  you, I mean, my son-in-law is Korean. I have a lot
13  of respect. You guys have accomplished a lot working
14  hard.
15          And I'm probably not a good lawyer for
16  this case. I'll put it on the record. Because I
17  wouldn't sue you and I probably should because I have
18  respect for what I know about you. But this is not
19  right, what went on.
20          I mean, at the end of my career like I am
21  I've got to say, you know, I'll look at the global
22  picture, which is what Douglas does. Mr. Monahan was
23  a good person but he wasn't a good person when he did
24  this to these people but he's basically a good
25  person. That's what I believe.

Page 20

 1          So it doesn't matter if the Douglas
 2  Factors were followed or not by the City, breaking
 3  their own rules, I still have a right to fire him,
 4  right? Is that --
 5          MR. O'CONNOR: Object to the form.
 6          MR. KACHMAR: Object to the form.
 7     Q.   (By Mr. Savage) Go ahead. This is a very
 8  bad situation.
 9          MR. O'CONNOR: Can you clarify the
10     question.
11     Q.   (By Mr. Savage) Yes. You never saw any
12  Douglas Factors, yet you went ahead knowing the
13  Douglas Factors had not been followed and you fired
14  him?
15     A.   I know that during Mr. Kang's presentation
16  to me he went in depth in talking about his
17  background which I think reflected the
18  professionalism of his career, and even in my opening
19  statement in addressing both of them I told them how
20  tough it was on me because of their highly decorated
21  careers and I kept that in balance. I kept that
22  weight in balance with all the other factors I
23  considered.
24     Q.   What's going to happen to John Q Public
25  when this hits? They'll try to get out on summary

GILBERT & JONES

5 of 16 sheets                    Page 17 to 20 of 61                    04/22/2023 01:52:58 PM

EXHIBIT 22

## Page 21

 1  judgment.  That you'll be the champion of bad people,
 2  Faitele, against good people.
 3         This city is on fire with guns.  Faitele
 4  went to the government and collected $20,000 in PPP
 5  money?  Did you know that?  He made up a barbershop
 6  that didn't exist.
 7     A.  I read that in a deposition that you took.
 8     Q.  Does that matter?  Do you weigh things
 9  like you're supposed to do on Douglas Factors, that a
10  guy is standing up for this country and we're going
11  to champion people that put guns in people's mouths,
12  that cheat the government.
13         He's in jail right now.  He's in jail
14  right now for all these things.  But let's get rid of
15  these people.  The buck stopped with you in this
16  case.
17     A.  I only consider the facts that are
18  presented to me.
19     Q.  Are you starting to understand you didn't
20  get all the facts?  Can you be that fair with me?
21  You didn't know about the Douglas Factors.  You
22  didn't know about the letters of transmittal not
23  being used.  You didn't know about Barefield saying
24  there's going to be a criminal prosecution we thought
25  from the beginning.

## Page 22

 1         MR. KACHMAR:  Object to the form.
 2     Q.  (By Mr. Savage)  I'm looking for somebody
 3  to be fair, in a rough justice sense.  I mean, Shawn
 4  represents Gulfstream now.  I used to represent them
 5  for a long time, and I remember in a case that we
 6  mock tried, Don Myer, who was general counsel at
 7  Gulfstream, writing down on a piece of paper it's all
 8  about rough justice, and he was right.
 9         Where's the rough justice for this man?
10  Are you so afraid that the constituency of Faitele
11  was going to cause problems in the city that you
12  wholesale a police officer?
13     A.  I did not even consider that.
14     Q.  I mean, you've got the head of the CARES
15  committee -- let's look at this.  Why don't you as
16  the ex-city manager go back to the city manager and
17  say we ought to prosecute Minter, bring him up like
18  we did with Kang and Arango, because Minter lied to
19  the CARES commission, saying that the criminal
20  investigation had been concluded on Kang and Arango
21  when it hadn't even been started.  That's why he
22  didn't want the GBI in.  The real reason he didn't
23  want the GBI in is because he wanted to get them and
24  he wanted nobody like the GBI being fair to them.
25  Did you understand that he lied to the CARES

## Page 23

 1  commission?
 2         MR. KACHMAR:  Object to the form.
 3         THE WITNESS:  I don't need to remind you
 4     that I -- criminal charges are not within the
 5     purview of the city manager nor the former city
 6     manager.  That would be up to the district
 7     attorney.
 8     Q.  (By Mr. Savage)  Here's one thing that
 9  blew the mayor's mind that was part of this ensemble.
10  On the CARES commission was Michael Edwards.  Michael
11  Edwards decided and voted to send Kang to the
12  district attorney's office to get him indicted and
13  then ended up being the prosecutor.  Does that strike
14  you as wrong?  It struck the mayor as wrong.
15     A.  I think that's the district attorney's
16  call.
17     Q.  But that's okay.  So we're going to set
18  up -- I think Schiavone has got a good thing.  Kind
19  of private, you know, groups that act as -- you know,
20  pass on people's guilt or innocence and will put on
21  those things district attorneys who are later going
22  to prosecute them.  That's corrupt.  Do you know that
23  much about the law?
24     A.  No, I do not.
25     Q.  That's okay.  We have people like Edwards

## Page 24

 1  who I like.  I mean, he's quick.  It's a joke over
 2  there.  And the City has turned into just a joke.
 3  It's not your fault but it's a problem with these
 4  guns.
 5         Have you ever heard of a person being on a
 6  private commission to indict somebody who ends up
 7  being the prosecutor?
 8         MR. O'CONNOR:  Object to the form.
 9     Q.  (By Mr. Savage)  Have you ever heard of
10  that?
11     A.  I've never heard of that but there are a
12  lot of things I've never heard of.
13     Q.  Well, it's not funny.
14     A.  I'm not saying it's funny --
15     Q.  How about Minter's buddy Adrian Gates, do
16  you know about him?
17         MR. KACHMAR:  Object to the form.
18         THE WITNESS:  You asked me that during the
19     deposition.  I do not know anything about the
20     former officer.
21     Q.  (By Mr. Savage)  Well, you facilitated the
22  corruption of Minter in my mind in this sense.
23  Minter is friends with him and he has a
24  recommendation by the chain of command to get rid of
25  Gates and he gives him five days.

EXHIBIT 22

## Page 25

1 Q. This American hero, can you give me that
much, that people that serve four tours of duty in
the Middle East are American heros, that take fire
for our country?
5 A. He should be thanked for his duties.
6 Q. Well, you thanked him. That he gets
canned because Minter flips it. Are you aware of
Minter telling various officers, senior command
people, that I'm going to get the people that signed
that petition?
11 MR. KACHMAR: Object to the form.
12 THE WITNESS: I've heard that as a rumor
from you.
14 Q. (By Mr. Savage) Did you ask about it?
15 A. No, I did not. I'm specifically
prohibited against looking at unanimous letters and
looking at rumors.
18 Q. How about Garvin, did you talk to him as
to about what he knows about this?
20 A. Absolutely not.
21 Q. Do you trust Garvin?
22 A. I think highly of him, yes, I do.
23 Q. Did you talk to him about what you were
going to do to Kang?
25 A. Absolutely not.

GILBERT & JONES

## Page 26

1 Q. How long did it take you to make your mind
up that you were going to can them in favor of
Faitele?
4 A. I think I told you during my deposition I
probably spent -- first of all, I decided to make the
decision myself. Unlike Mr. Hernandez, my
predecessor, who delegated those responsibilities to
others in the office, I took it upon myself to hear
every personnel complaint.
10 And in this particular case because of the
volume, I mean, it's 75 to 90 pages of the report
from the office of professional standards, internal
affairs, I read through that report --
14 Q. Did they recommend him to be terminated?
15 A. They're only fact finding. And you know
that. I reviewed the video cam in the entirety and
then went back and looked at it a second time. So I
would say I spent approximately two hours reviewing
their case before they made their appeal to me.
20 Q. What did he do wrong in the video cam?
21 A. You want -- well, let me talk generally
about it.
23 Q. I want to talk about him. I mean, one of
my motions is going to be cut out all the cursing of
Arango. He didn't curse a lot.

GILBERT & JONES

## Page 27

1 A. First of all, I told you in my deposition
I was not troubled by the fact they took down
Mr. Faitele. He did not agree with their commands.
He did not show his hands. He deserved to be taken
down. I understand the risk there. I don't have an
issue with that.
7 Q. Let me ask you this. Were you part of the
group that said don't prosecute Faitele because he's
our guy?
10 A. No.
11 Q. Do you understand that that happened here?
12 A. I don't know that.
13 MR. KACHMAR: Object to form.
14 Q. (By Mr. Savage) Did you see Faitele say
to Arango if I see your daughter, I'm going to mess
her up? That's a felony. Why wasn't he prosecuted?
You're the city manager. Did you suggest he be
prosecuted?
19 A. The city manager has 14 areas of
responsibility. Prosecuting criminal cases is not
one of them.
22 Q. It's Minter who the FBI told --
23 A. No. That's the district attorney.
24 MR. O'CONNOR: Don't debate. Answer
questions.

GILBERT & JONES

## Page 28

1 Q. (By Mr. Savage) At that meeting I asked
Diane McLeod was it explored at all that Minter had
failed to follow policy and procedure in terminating
Kang. No. Were you ever told that?
5 MR. KACHMAR: Object to the form.
6 THE WITNESS: No, I was not.
7 Q. (By Mr. Savage) Wouldn't you like to know
that, being a fair person?
9 MR. KACHMAR: Object to the form.
10 Q. (By Mr. Savage) You have a legacy here.
11 A. I consider myself a fair person.
12 Q. Would you have liked to have known that he
failed to follow City policy in terminating him?
14 MR. KACHMAR: Object to the form.
15 THE WITNESS: Based on what you're telling
me, I did receive an incomplete picture but I
don't know that that would have changed the
outcome.
19 Q. (By Mr. Savage) So let's bless what the
City does. Let's bless what Minter who the FBI is
concerned about and let's let him lead us around by
the nose. Got it.
23 How about Sharif Lockett, do you know who
he is?
25 A. Only through the deposition.

GILBERT & JONES

EXHIBIT 22

## 29

1  Q. Lockett said it's an anti-police group put
2  together by the mayor. He's got a prosecutor who
3  ends up giving himself some business, Edwards, who
4  decides to have this man, Kang, prosecuted. Does
5  that seem right to you?
6  A. No comment.
7  Q. Under what provision does the mayor have
8  the right to form a CARES group?
9  A. Directly within the charter, probably no
10 specific authority although just under the general
11 category he is the head of the city. It says that
12 specifically in the City's charter.
13 Q. They ought to be sued. Because they never
14 had any type of thought pattern that knew that they
15 were being handed -- Minter shows up. I mean, Minter
16 is bad.
17        And he shows up and says this is
18 atrocious, this is the worst thing I've ever seen.
19 He never mentions that Arango's daughter is
20 threatened. He never mentions that Faitele is a
21 known criminal, that he's a menace to society.
22        Do you know how many times he tried to
23 choke to death his girlfriend and you guys are
24 championing him?
25        MR. KACHMAR: Objection.
             GILBERT & JONES

## 30

1        MR. O'CONNOR: Object to the form.
2  Q. (By Mr. Savage) Do you know how many
3  times that --
4        MR. KACHMAR: Objection.
5        THE WITNESS: No, but you have mentioned
6     that previously.
7  Q. (By Mr. Savage) I would be ashamed to do
8  what I did to Kang, especially at the benefit of
9  Faitele. That's the way I was raised. And I think
10 that's the way you were raised. I'd be ashamed of
11 it.
12        But I'd stand up and say I've got a good
13 reputation, he's not going to do anything to me but
14 I'm going to stand up finally for Kang.
15        I mean, Larry calls his mother. I mean,
16 she's an immigrant. I mean, his brother worked
17 for -- what's the big thing out there in the West
18 Coast? Amazon? Your sister. They accomplished
19 something like you did.
20        Can you imagine Larry lying to her and
21 saying I'm a member of the city attorney's office?
22        MR. O'CONNOR: Object to form. And FYI,
23    he categorically denied that in his deposition
24    today that you were not at.
25        MR. SAVAGE: I understand that but
             GILBERT & JONES

## 31

1  Ms. Kang is going to come and testify to it.
2  Q. (By Mr. Savage) What do you understand
3  the CARES committee did coming out of that meeting?
4  Recommended the prosecution of them?
5  A. I do not know.
6  Q. Did their committee meeting predate your
7  firing of Kang?
8  A. I do not know.
9  Q. You know, I love Bates. I think he's a
10 good guy, but I don't like this, where they're making
11 you the fall guy. And don't have any question about
12 that.
13        I mean, from the beginning when I talked
14 about this case, he said I don't care what rules we
15 followed or didn't follow, Monahan is who we're
16 sticking with.
17        You're a fall guy here. And if you think
18 it's okay -- do you think it's okay for them to
19 wholesale rules, lead him to be fired and then you
20 bless it?
21        We don't follow constitutional, you know,
22 rights that he had, we don't follow the City rules
23 and then we fire him, do you think that's okay?
24        We fire you for not following our rules
25 when we don't follow any of our rules. Is that what
             GILBERT & JONES

## 32

1  our city is about? You think that's okay?
2        MR. KACHMAR: Object to the form.
3        THE WITNESS: No comment.
4        MR. O'CONNOR: Hang on.
5  Q. (By Mr. Savage) No, no comment is not
6  good enough.
7        MR. O'CONNOR: Object to the form. Go
8     ahead.
9        THE WITNESS: One, the city manager's
10    responsibility is to hear appeals, employee
11    appeals.
12 Q. (By Mr. Savage) But you need to make sure
13 that what led to the appeal was done fairly, fair?
14 Sir?
15 A. Completion of facts would be helpful.
16 Q. Huh?
17 A. Completion of facts would be helpful.
18 Q. Whose job is that?
19 A. That is in the preparation of the fact
20 finding by the office of professional standards,
21 internal affairs.
22 Q. Did they tell you we broke all our rules?
23 We broke our rule on no letter of transmittal. We
24 broke our rule on no Douglas Factors. We broke our
25 rule on going forward with an investigation, knowing
             GILBERT & JONES

EXHIBIT 22

**Page 33**

1  this would lead to criminal charges.  We broke our
2  rule not allowing these guys to appeal to a citizen's
3  committee because they had pending criminal charges,
4  they couldn't do that.  Should you have known all
5  that?
6              MR. KACHMAR:  Object to the form.
7              MR. O'CONNOR:  Object to form.
8              THE WITNESS:  I can only consider the
9      facts that are presented to me, including from
10     these two gentlemen, these two officers, former
11     officers.
12     Q.    (By Mr. Savage)  I mean, I never heard of
13 this kind of stuff.  Minter is under the gun.  Six of
14 ten captains said he's bad.  The FBI said he's bad.
15           Have you ever talked to Hernandez about
16 what he was involved in here?
17     A.    No.
18           MR. KACHMAR:  Object to the form.
19     Q.    (By Mr. Savage)  He lied, Minter, saying
20 that the criminal investigation to them had been over
21 so we don't need the GBI in.
22           Did you know Diane McLeod said why don't
23 you bring the GBI in?
24           MR. KACHMAR:  Object to the form.
25           MR. O'CONNOR:  Hold on.  It is

GILBERT & JONES

**Page 34**

1      inappropriate to ask the witness to comment on
2      the veracity of another witness's testimony.
3      Q.    (By Mr. Savage)  The question stands.
4            MR. O'CONNOR:  Go ahead.
5            THE WITNESS:  Ask it again.
6      Q.    (By Mr. Savage)  He lied to the --
7      A.    Not the statement.  What was the question?
8      Q.    That's the question.  Did you know that he
9  lied to them, saying the criminal investigation of
10 Kang and Arango is concluded so we don't need the
11 GBI, knowing that the criminal investigation --
12           MR. KACHMAR:  Object to the form.
13           THE WITNESS:  No, sir, I don't know
14     anything he presented to the CARES committee.
15     Q.    (By Mr. Savage)  Was he on the CARES
16 committee?
17     A.    I do not know.
18     Q.    Should he be there?  I mean, he controlled
19 you guys.
20     A.    I mean, I do not know how he -- I do not
21 know what form he participated other than he appeared
22 to --
23     Q.    You know McLeod?
24     A.    -- and I only know that from the
25 deposition.

GILBERT & JONES

**Page 35**

1      Q.    Why am I having to spend all this money to
2  tell you that it's essentially an unfair process?
3            Was this a secret committee?  Do you know
4  Minter told Sharif Lockett you'd better not say
5  anything about what happened here?
6            MR. KACHMAR:  Object to the form.
7      Q.    (By Mr. Savage)  Is that the way the City
8  conducts business?
9      A.    I do not know anything about that
10 committee's activities, questions, areas of
11 interests, areas of focus.  I do not know anything
12 about --
13     Q.    I think it's illegal.  I mean, that's why
14 he asked you is there anything in the City charter
15 allowed them to do this.
16           MR. O'CONNOR:  If there's a question, you
17     can answer it.
18     Q.    (By Mr. Savage)  And the really lousy
19 thing is what they're going to do in this case, if
20 Minter gets stuck in it, in the end the City is going
21 to say I'm not sure you've got coverage.
22           And I'm not going to do that to you.  You
23 have a better reputation.  But what they would do to
24 you if they brought a lawsuit -- if they want to do
25 it, I'll recommend to them not but I'm not going to

GILBERT & JONES

**Page 36**

1  do it.  Is they'll say I'm not sure you've got
2  coverage.  That's what Blackburn used to do.
3            In other words, all these CARES committee
4  people who recommend with the sitting -- I'm sorry,
5  recommend with Michael Edwards on the commission
6  who's going to be a prosecutor in this case, he
7  prosecutes him and he's on the CARES committee.  Does
8  that strike you as fundamentally wrong?
9            MR. O'CONNOR:  Object to form.
10           THE WITNESS:  I would be concerned about
11     that.
12     Q.    (By Mr. Savage)  Yes.  And I like Edwards.
13 I mean, I think he's basically a good person but I
14 don't like what happened here.
15           But they're all going to say -- if they
16 fire me and get another lawyer and sue you, they're
17 going to say I don't know if you've got coverage.
18 Great place.
19           Now, here is Sharif Lockett, which is post
20 your deposition, Michael Edwards was also on the
21 CARES committee but did not specifically remember if
22 he was there on that particular day.  I have a roster
23 now.
24           The CARES committee was anti-police.
25 That's the way they got prosecuted.  A lot of

GILBERT & JONES

EXHIBIT 22

## Page 37

1 disagreements by many of the members.
2     Did you know that Lockett considered this
3 was -- I guess it's like Portland or Seattle kind of
4 a branch in our city, that they're anti-police, get
5 rid of policing?
6   A.  As I said previously, I know nothing about
7 the CARES committee other than what you've told me
8 and what I read in depositions.
9     I did not know about any matters the
10 committee discussed, its area of focus, its' areas of
11 concerns. I didn't know any of that.
12   Q.  So you've looked at the tape, I mean, the
13 body cam?
14   A.  Yes, sir. Yes, I have. I have not looked
15 at it in probably, I don't know, two and a half years
16 or so.
17   Q.  Did you know that in order to get, what's
18 that stuff, 404B, stuff to really try to conspire,
19 Minter went back and got tape of a guy named Parnell
20 Drayton that had been passed on by the City and dug
21 it up and handed it over to the city prosecutor to
22 get similar acts, where the City had already said
23 that's okay. That's how much Minter wanted to get
24 these guys. Did you know he did that?
25   MR. KACHMAR: Object to the form.

## Page 38

1   THE WITNESS: No, sir.
2   Q.  (By Mr. Savage) We're about to witness
3 one of the most atrocious things I've ever seen in my
4 police career.
5     Should Minter be in the CARES committee?
6 Do they have any rules where Minter is in there
7 saying we're about to witness the most atrocious
8 thing -- I said in law enforcement, and Lockett says
9 he believed that they objectively were reasonable in
10 their behavior, but you don't believe that?
11   A.  As I said previously, I don't know what
12 happened in the CARES committee. I was not part of
13 that. That was part of the legislative functions of
14 the mayor. That did not involve the city manager's
15 office.
16   Q.  I thought it was a city manager
17 government. Can they get these private groups to
18 recommend against other citizens that they be
19 prosecuted and you don't know about it?
20   A.  It's called a council manager form of
21 government and the manager is the chief executive
22 officer.
23     He's not involved in the legislative
24 affairs of the city intentionally. And I've been in
25 local government for 30 plus years and it's not

## Page 39

1 unusual for a chairman or a mayor to appoint an ad
2 hoc committee to take a look at special issues.
3     I mean, I can think of dozens of examples
4 in my period, going back to Charlie Brooks and the
5 Chatham County commission, appointing the air quality
6 task force, recreational task forces. I mean, they
7 call them task forces.
8     I don't know what -- they just called it
9 the CARES committee. The mayor just called it the
10 CARES committee. You know, CARES is probably an
11 acronym for something. I have no idea what it means.
12   Q.  Well, how about is our city supposed to
13 keep things secret? You know, Minter told Sharif
14 Lockett not to say anything about what happened in
15 the CARES committee. Is that what we're about in the
16 city or is that a problem?
17   MR. O'CONNOR: Object to the form.
18   MR. KACHMAR: Object to the form.
19   Q.  (By Mr. Savage) You've got a CARES
20 committee. He tells -- he's Lockett's boss. Don't
21 you say a damn thing about what happened in this
22 meeting. Is that okay?
23   MR. KACHMAR: Object to form.
24   THE WITNESS: I don't know of any
25 communication between the former chief and any

## Page 40

1 member of the department. I do not know.
2   Q.  (By Mr. Savage) Should he have told him
3 that? I mean, it's a city committee meeting. Don't
4 mention a thing. It's going to be secret.
5   MR. KACHMAR: Object to the form.
6   Q.  (By Mr. Savage) Minter shouldn't have
7 even been there. There was no discussion by Minter
8 who shows up and says that he didn't follow official
9 policies in presenting the claim and having these
10 guys fired. He never told you that either.
11     Would you agree with Lockett, that that
12 wasn't a good thing, that he knows he didn't follow
13 the policies, he has these guys fired not following
14 his own policies and he never reveals that to you as
15 the appeals judge? Is that okay?
16   A.  I will agree he never said anything to me.
17   Q.  Was that right? Take a stance. I mean,
18 you have a chance to give some salvation to people
19 that are down. I would love to be in your shoes.
20   A.  I made my decision.
21   Q.  And damn if I ever revisit it, right?
22 There's no discussion by Minter that he failed to
23 give a letter of transmittal. You never knew that,
24 did you?
25   A.  I did not.

EXHIBIT 22

**Page 41**

1  Q.   You should have known, right?
2       MR. KACHMAR:  Object to the form.
3  Q.   (By Mr. Savage)  Well, you know.
4  A.   That's a no.
5  Q.   No, you shouldn't have known?  I got it.
6  It's their job.  Have you ever heard of the City
7  firing somebody while they violate their
8  constitutional rights?
9       MR. KACHMAR:  Object to the form.
10      THE WITNESS:  No, I do not.
11 Q.   (By Mr. Savage)  Shouldn't do that, should
12 you?
13 A.   I think every citizen deserves their
14 constitutional rights.
15 Q.   So the answer to my question is, no, you
16 shouldn't fire a person if you violate their
17 constitutional rights in the process --
18 A.   I just prefer it the way I stated it.
19 Q.   Well, I want you to say it for real.  I
20 mean, I --
21 A.   No comment.
22 Q.   Okay.  Did anybody ever mention to you
23 that he had PTSD, that he had been shot at six times
24 representing this city?  And there's no Douglas
25 Factors.  To hell with that, Savage.
        GILBERT & JONES

**Page 42**

1  A.   He mentioned it.  He presented it.
2  Q.   What did you put in that, that they
3  violated City policy?  You understand they violated
4  the City policy, and if you had done your homework,
5  you would have known that at the time, right?
6       MR. KACHMAR:  Object to the form.
7  Q.   (By Mr. Savage)  Sir?
8  A.   No comment.  You're expecting me to know
9  things I can't possibly know if not presented to me.
10 Q.   Would you have liked to have known that?
11      MR. KACHMAR:  Object to the form.
12      THE WITNESS:  I would like to know all the
13 facts before I make a decision.
14 Q.   (By Mr. Savage)  Well, that's one of the
15 facts, isn't it, they didn't follow policy; fair or
16 no?
17 A.   I don't know.
18 Q.   Well, I'm asking you to assume that they
19 didn't follow policy.  I've got Garvin's deposition
20 right here.  He says it.  Do you have respect for
21 Garvin?
22 A.   Once again when you say if or assume, I
23 can't respond.
24 Q.   I think a judge will make you respond.  I
25 want you to assume that here's your guy.  The guy in
        GILBERT & JONES

**Page 43**

1  the streets is going to say how worst does a city
2  get.  This is a good person and the responsibility
3  was with you.
4       I would feel like hell if I were you, what
5  you did to this man.  But that doesn't seem to bother
6  you.
7       There's your guy.  Let's champion him but
8  screw these people.  And it's a direct result of one
9  of the things that you did to these officers who have
10 stellar careers.
11      You admit they had stellar careers?  Do
12 you know one thing this man did wrong in the how many
13 years?  Seven?  Look at them, what you did to him.
14      MR. O'CONNOR:  Objection.
15      THE WITNESS:  I acknowledged it.
16 Q.   (By Mr. Savage)  But you just followed
17 Minter's lead.  Did you ever read these?  You're the
18 head guy.  Can you imagine a judge being on there and
19 saying I don't know the rules I'm supposed to follow.
20      You didn't know the rule that there's
21 supposed to be, when the investigation is committed,
22 there be a letter of transmittal and complete Douglas
23 Factors.  You let Minter lead you around by the nose.
24 I would never feel proud of that.
25      MR. O'CONNOR:  Object to the form.
        GILBERT & JONES

**Page 44**

1  Q.   (By Mr. Savage)  Since you don't know the
2  rules, let me go through them more with you.  The
3  letters of transmittal.  Was there anything
4  prohibiting you from looking at the rules?
5       Did you ask anybody what rules were they
6  supposed to follow before I become the head
7  executioner?
8  A.   Wanting to phrase it in the terms of an
9  executioner, that is just -- I don't even want to
10 comment.
11 Q.   Well, ask him (indicating).  You don't
12 know him.  I would feel like hell if I did this to
13 another human being.
14      The letter of transmittal and Douglas
15 Factors recommended disciplinary action shall be
16 forwarded to the OPS for record keeping purposes.
17 That wasn't in the file you got from OPS.  But you
18 don't know the rules so you wouldn't know that you
19 didn't get it.
20      MR. O'CONNOR:  Object to the form.
21      THE WITNESS:  Did either of these two
22 gentlemen present that to me?
23 Q.   (By Mr. Savage)  It's their fault.  Let's
24 blame everybody else.  Let's not take
25 self-responsibility.  That's the kind of people that
        GILBERT & JONES

EXHIBIT 22

## Page 45

1 got this country in trouble.
2      Let's not take that I didn't follow the
3 rules, that I didn't know the rules. It's their
4 fault.
5      Can you imagine what it was like to be a
6 proud person? He's an aeronautical engineer here.
7 This city has had -- you went with Faitele who's a
8 liar, a criminal, who tried to strangle his
9 girlfriend to death twice, and you ruined his life.
10  A.  I upheld the decision of the chief of
11 police --
12  Q.  Well, he's corrupt. Did you know that?
13      MR. KACHMAR: Object to the form.
14  Q.  (By Mr. Savage) Would you consider people
15 who don't follow the rules corrupt, who takes people
16 like Gates and let them go on when he's visiting
17 drugs and guns in their neighborhoods? Did Minter
18 ever explain that to you?
19      MR. KACHMAR: Object to the form.
20      THE WITNESS: I don't know Chief Minter
21   other than through his work as a chief in my 18
22   months with the City of Savannah --
23  Q.  (By Mr. Savage) Well, why did you take
24 his word for these things?
25      Let's talk about Todd. These guys got to

## Page 46

1 have their head on a swivel. Because every time I
2 take a senior officer they're telling me
3 repeatedly -- and they're not used to this.
4      They're great lawyers, all of them, all
5 three of them. They're saying we broke all our
6 rules. I'm saying, well, why the hell didn't Monahan
7 know these things? They said I don't know. If I'm
8 the judge, I want to know the rules. Does that make
9 sense to you?
10  A.  If you're a judge.
11  Q.  What were you? I think that they had
12 every right to retain that young man, to detain him.
13 Do you agree with that?
14      I mean, you don't have any basis to say
15 this. You don't know what you're doing in cop work,
16 do you?
17  A.  I don't understand the question.
18  Q.  Well, you don't read the rules, what the
19 police department is. I mean, what right did you
20 have to be the ultimate judge?
21  A.  Because it was a personnel appeal and
22 that's the city manager's responsibility.
23  Q.  Why haven't they been given their rights
24 to go -- there's a process beyond that; is there not?
25 Citizen review panel?

## Page 47

1  A.  Yes.
2  Q.  You understand that was taken away from
3 them, don't you?
4      MR. KACHMAR: Object to the form.
5      MR. O'CONNOR: Object to the form.
6      THE WITNESS: I don't know that they
7   pursued it.
8  Q.  (By Mr. Savage) Did you tell them you had
9 a right to go? Or were you one of the guys who said
10 because you're under criminal prosecution you don't
11 have a right to go to the citizen review panel?
12      MR. O'CONNOR: Object to the form.
13      THE WITNESS: You know I wouldn't say
14   anything like that.
15  Q.  (By Mr. Savage) I don't believe you would
16 but I don't know.
17      Is every person, including the police
18 chief, required to follow policy? Did you know when
19 you hung these guys out to dry that he hadn't
20 followed all theses policies or am I the guy that had
21 to tell you?
22      MR. KACHMAR: Object to the form.
23  Q.  (By Mr. Savage) Sir?
24  A.  You're the one who's telling me based on
25 your interpretation.

## Page 48

1  Q.  But you tell me. You look at this. Did
2 they follow this rule when Barefield says we consider
3 they're going to have criminal problems? This is
4 Rule 8A, B, and C. Did they follow this rule? Take
5 your time and read it. It's the first time you're
6 reading it, isn't it?
7  A.  I'll go back to my original comment. If
8 they felt as though their due process was violated,
9 why didn't they bring that up during the hearing.
10  Q.  It's their fault. Don't blame me who's
11 got their life in their hands. Don't blame me. I
12 hate that type of behavior. I don't want to accept
13 responsibility. Don't blame me for not knowing the
14 rules. It's your fault. You are in a situation in
15 your life where you're struggling. They put you on
16 the front of the paper. It's their fault.
17  A.  Mr. Kang presented a rather detailed
18 PowerPoint presentation. I can't say I remember all
19 the details of it, but I do remember I was impressed
20 because that's the first time I've ever seen one in
21 any sort of administrative appeal.
22  Q.  Were you afraid of Minter?
23  A.  No.
24  Q.  Do you plan to call Hernandez or the city
25 attorney's office about this FBI thing I'm telling

EXHIBIT 22

1 you?
2    A.   I don't even know how to get in touch with
3 the former city manager. The only time I've seen
4 Chief Minter was I ran the Run For Heros run in
5 Pooler and I saw him for probably all of 30 seconds.
6    Q.   Do you know they were misled by the person
7 at the apartment complex and told that Khalil Kelly
8 was in the place where actually Faitele was? Did
9 that factor into your thinking at all?
10    A.   I remember a point in the video with the
11 body camera on, when they approached a gentleman, and
12 I don't know who he was, and asked about Kelly, and I
13 do remember he pointed and said something about he's
14 up there.
15       I don't remember all the details. Like I
16 said, it's probably been three years since I've --
17    Q.   Did you talk to that guy?
18    A.   No. Why would I talk to him?
19    Q.   Why would you read the rules? I mean, I
20 think those are basic things. Did you ever read the
21 policies and procedures used to can Dan Kang before
22 you canned him? Yes or no? That's an easy question.
23    A.   As I have told you before -- no, there's
24 no such thing as easy questions with you. As I told
25 you before, there are more than 50 departments with
                GILBERT & JONES

50

1 their own set of procedural requirements, protocols,
2 rules. No, I did not read all of them. I did not
3 read --
4    Q.   Did you read any of them?
5    A.   I read the City's manual, yes.
6    Q.   Is that the police manual?
7    A.   No. That's the human resources.
8    Q.   Did you read the points that applied to
9 them? That would have been Douglas Factors, Lotts
10 Factors, if you think there's a criminal
11 investigation, you stop.
12    A.   You've asked me that before and I've
13 answered it previously.
14    Q.   Yes. Okay. This was graduated
15 punishment. Now, you like Gavin, right?
16    A.   I respect him.
17    Q.   Would it have bothered you if Minter told
18 Gavin that anybody who signed that petition is never
19 going to be promoted?
20       MR. KACHMAR: Object to the form.
21    Q.   (By Mr. Savage) Would that bother you?
22       MR. KACHMAR: Object to the form.
23    Q.   (By Mr. Savage) Do you think you should
24 have known that?
25       MR. KACHMAR: Object to the form.
                GILBERT & JONES

51

1       THE WITNESS: As I recall reading
2 now-Assistant Chief Gavin's deposition, that's
3 not what he said.
4    Q.   (By Mr. Savage) Are you proud of what you
5 did to Kang?
6    A.   No comment.
7    Q.   No. I want you to answer the question.
8    A.   No comment. Proud has nothing to do with
9 it. Pride has nothing to do with this issue.
10    Q.   Would you do it again knowing what you
11 know today?
12    A.   Yes, sir.
13    Q.   Wow. That they didn't follow any of the
14 rules, that they broke the constitution. What a
15 great American.
16       MR. KACHMAR: Object to the form.
17    Q.   (By Mr. Savage) You would do it again?
18 Is that what you're telling me?
19       MR. O'CONNOR: Object to the form.
20       THE WITNESS: I would reach the same
21    conclusion.
22    Q.   (By Mr. Savage) Based on what? It's okay
23 in this city to break rules, break the constitution
24 of the United States to fire people and then I,
25 Monahan, will absolve you and say it's okay?
                GILBERT & JONES

52

1       MR. O'CONNOR: Object to form.
2       MR. KACHMAR: Object to the form.
3    Q.   (By Mr. Savage) You can never do that and
4 break the constitutional rights of people and then
5 fire them.
6    A.   Are you asking me a question?
7    Q.   Can you do that, break their
8 constitutional rights in the process and then fire
9 them based on breaking their constitutional rights
10 that lead you to that conclusion?
11       MR. O'CONNOR: You've asked that
12    question --
13       MR. KACHMAR: Object to the form.
14       MR. SAVAGE: I'm done.
15       MR. O'CONNOR: -- three or four times.
16    He's answered it over and over. We are actually
17    covering a lot of the same ground we covered in
18    the first one, but we're trying to get through
19    this.
20       Object to the form. Answer it if you can
21    and let's move on.
22    Q.   (By Mr. Savage) What a city. You absolve
23 people who break constitutional rights and say I'm
24 going to fire him anyhow.
25       Do you know anything about the
                GILBERT & JONES

EXHIBIT 22

## Page 53

1 constitution of this country?
2    A.   Yes, sir. I happen to know a lot about
3 the constitution.
4    Q.   Was it right to not advise them of their
5 Miranda rights when they knew they were going to
6 prosecute them? No. Do you know that much about the
7 constitution?
8        MR. KACHMAR: Object to the form.
9    Q.   (By Mr. Savage) That's in the police
10 department procedure, that you should stop the
11 investigation unless you get special permission from
12 the police to continue it?
13    A.   I've not been in the classroom in a long
14 time but I think that's the Fourth Amendment.
15    Q.   Assume that happened and that that's okay
16 for you then to fire them, if they --
17    A.   Referring to counsel. I don't want to get
18 into a debate with you about it.
19    Q.   Well, I want you to answer the question.
20    A.   What is the question?
21    Q.   The question is it's okay to fire them
22 knowing, assuming that they violated the
23 constitution --
24    A.   There you go again. I said no if's and no
25 assuming. That's not fair to me. That's not fair to
GILBERT & JONES

## Page 54

1 the collection of facts. You're asking just a wild
2 question.
3    Q.   I'm asking the questions that are all the
4 facts.
5        MR. KACHMAR: Object to the form.
6        THE WITNESS: No comment.
7        MR. SAVAGE: Well, I'm going to adjourn
8    the deposition and seek a court order to get him
9    to answer questions. He's not going to run
10    me --
11        MR. O'CONNOR: Hold on. Let me handle
12    this part.
13        What question do you contend he's not
14    answering?
15        MR. SAVAGE: The question is that if he
16    knows -- because he doesn't read anything. He
17    didn't read the rules --
18        MR. O'CONNOR: Brent, just ask the
19    question without giving a speech.
20        MR. SAVAGE: -- which is was it okay not
21    to read him his Miranda rights, to have him sign
22    a Garrity.
23    Q.   (By Mr. Savage) Do you know what Garrity
24 is? That you wouldn't use anything against him. And
25 break it and send it over to the district attorney.
GILBERT & JONES

## Page 55

1 What's Garrity say?
2        MR. O'CONNOR: I'm going to object to the
3    part up to what does Garrity say. Go ahead, if
4    you know.
5        THE WITNESS: No, I don't know.
6    Q.   (By Mr. Savage) And you're the judge.
7 Garrity says that you've got to answer our questions
8 but nothing will be used against you.
9        What your friend Minter did is take what
10 was done by IA and hand it over to the district
11 attorney, in direct violation of Garrity. But you
12 don't do anything about him.
13        MR. KACHMAR: Object to the form.
14        THE WITNESS: When you refer to him as my
15    friend, we had a professional relationship.
16    That was it.
17    Q.   (By Mr. Savage) He's a disgrace and you
18 know it. Have you ever seen a situation where he
19 serves a period of months and six out of eight
20 captains, six out of ten captains sign a petition
21 against him?
22    A.   I interviewed those captains.
23    Q.   Where are those notes?
24    A.   Those notes are in the City's files.
25    Q.   He was aware of all this stuff. Have you
GILBERT & JONES

## Page 56

1 read Dekmar's deposition, their expert?
2    A.   He was not aware that I was interviewing
3 the captains.
4    Q.   No, no. The chief was aware of the
5 petitions against him. He never should have been
6 involved.
7        You think I could bring a complaint to the
8 JQC, Judicial Qualifications Commission, and that
9 judge sit on my cases? Would that seem fair to you?
10        MR. KACHMAR: Object to the form.
11        THE WITNESS: I do not know that he read
12    the petition or know about any of the names on
13    the petition. Yes, he was aware because it was
14    in the media.
15    Q.   (By Mr. Savage) It was on TV stations.
16    A.   I got a call from WTOC. I got a call from
17 WSAV. I'm assuming if they called me they called the
18 chief.
19    Q.   Dekmar, your expert that they're paying
20 for for your former city, said that if he didn't know
21 it and the city manager didn't bring it to his
22 attention and make him read the thing, something is
23 wrong with the city.
24        Don't you want to learn if you have all
25 these people, 70-something officers, why didn't you
GILBERT & JONES

EXHIBIT 22

## Page 57

```
1   bring it to his attention?
2       A.   78 officers.  As I told you previously, I
3   discussed it with the human resources director.  We
4   talked about a path forward.  That was to bring in an
5   objective outside investigator.
6       Q.   Let's spend $80,000 with her.
7       A.   And I told you previously I did not know
8   how much it cost.  That was handled through the human
9   resources department.
10          MR. SAVAGE:  He's going to trial.  I
11      wouldn't sleep at night but I'm a different
12      person than you and you're a different person
13      than I thought you were.  Take care of yourself.
14      At least say I'm sorry I did something to you,
15      Kang.
16          MR. O'CONNOR:  This is not the time for
17      that.
18          (Deposition concluded at 4:33 p.m.)
19  (Pursuant to Rule 30(e) of the Federal Rules of Civil
20  Procedure and/or O.C.G.A. 9-11-30(e), signature of
21  the witness has been reserved.)
```

GILBERT & JONES

## Page 58

**CERTIFICATE OF COURT REPORTER**

STATE OF GEORGIA:
COUNTY OF CHATHAM:

I hereby certify that the foregoing transcript was reported as stated in the caption and the questions and answers thereto were reduced to writing by me; that the foregoing 57 pages represent a true, correct, and complete transcript of the evidence given on Thursday, April 13, 2023, by the witness, PATRICK MONAHAN, who was first duly sworn by me. I certify that I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c); I am a Georgia Certified Court Reporter here as an employee of Gilbert & Jones, Inc. who was contacted by Savage Turner to provide court reporting services for the proceedings; I will not be taking these proceedings under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and by the attached disclosure form I confirm that neither I nor Gilbert & Jones, Inc. are a party to a contract prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board.

This 20th day of April, 2023.

_____
Mynjuan Jones, RPR, B-1422

GILBERT & JONES

## Page 59

**DISCLOSURE OF NO CONTRACT**

I, Debbie Gilbert, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Gilbert & Jones was contacted by Savage Turner to provide court reporting services for these proceedings and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board for the taking of these proceedings. There is no contract to provide reporting services between Gilbert & Jones, Inc., or any person with whom Gilbert & Jones, Inc., has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

This 20th day of April, 2023.

_____
Debbie Gilbert, FIRM REPRESENTATIVE
Gilbert & Jones, Inc.

GILBERT & JONES

## Page 60

DEPOSITION OF: PATRICK MONAHAN /mpj

I do hereby certify that I have read all questions propounded to me and all answers given by me on April 13, 2023, taken before Mynjuan Jones, and that:

___ 1) There are no changes noted.
___ 2) The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is:
_____
Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is:
_____
Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is:
_____
Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is:
_____
Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is:
_____

GILBERT & JONES

EXHIBIT 22

61

```
 1   DEPOSITION OF:  PATRICK MONAHAN /mpj

 2   Page No. _____ Line No. _____ should read:_____

 3   _____
     The reason for the change is:
 4   _____

 5   Page No. _____ Line No. _____ should read:_____

 6   _____
     The reason for the change is:
 7   _____

 8   Page No. _____ Line No. _____ should read:_____

 9   _____
     The reason for the change is:
10   _____

11   Page No. _____ Line No. _____ should read:_____

12   _____
     The reason for the change is:
13   _____

14   Page No. _____ Line No. _____ should read:_____

15   _____
     The reason for the change is:
16   _____

17   If supplemental or additional pages are necessary,
     please furnish same in typewriting annexed to this
18   deposition.
                          _____
19                              PATRICK MONAHAN

20   Sworn to and subscribed before me,
     This the _____ day of _____, 20___.
21
     _____
22   Notary Public
     My commission expires: _____
23
     Please forward corrections to:
24                  Gilbert & Jones
                    P. O. Box 14515
25                  Savannah, GA 31416
                    (912) 264-1552

              GILBERT & JONES
```