EXHIBIT 26

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| DANIEL KANG, ) | |
| ) | CIVIL ACTION NO. |
| Plaintiff, ) | |
| ) | 4:21-CV-111-WTM-CLR |
| vs. ) | |
| ) | |
| THE MAYOR AND ALDERMEN OF THE ) | |
| CITY OF SAVANNAH and ROY W. ) | |
| MINTER, JR., Chief of Police ) | |
| for the City of Savannah, ) | |
| Georgia, In His Individual ) | |
| and Official Capacities, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

VIDEOCONFERENCE DEPOSITION OF

JEFFREY GRANT

August 29, 2022

2:59 p.m.

218 West State Street
Savannah, Georgia

Thomas J. Dorsey, RPR, CCR-2781

**Gilbert & Jones**
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
*Brunswick*, GA 31520

*gilbertandjones1@gmail.com*
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
*Savannah*, GA 31406

EXHIBIT 26

2

1    **<u>APPEARANCES OF COUNSEL</u>**

2

    On behalf of the Plaintiff:
3
        MICHAEL G. SCHIAVONE, ESQ., (BY VIDEOCONFERENCE)
4       Schiavone Law Group, P.C.
        1111 Bull Street
5       Savannah, Georgia  31401
        (912)232-2646
6       js_law@bellsouth.net

7       JAMES H. WILSON III, ESQ.
        Savage, Turner, Pinckney, Savage & Sprouse
8       102 East Liberty Street, 8th Floor
        Savannah, Georgia  31401
9       (912)231-1140
        jwilson@savagelawfirm.net

10

11  On behalf of the Defendant The Mayor and Aldermen of
    The City of Savannah:
12
        PATRICK T. O'CONNOR, ESQ.
13      PATRICIA T. PAUL, ESQ.
        Oliver Maner LLP
14      218 West State Street
        Savannah, Georgia  31401
15      (912)236-3311
        pto@olivermaner.com

16

17  On behalf of the Defendant Roy W. Minter, Jr.:

18      SHAWN A. KACHMAR, ESQ.
        Hunter Maclean
19      200 East St. Julian Street
        Savannah, Georgia  31401
20      (912)695-6984
        skachmar@huntermaclean.com

21

22  Also Present:

23      Daniel Kang
        Jamar Bacon
24
                        - - -
25

**Gilbert & Jones**

EXHIBIT 26

## Page 3

INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| By Mr. Schiavone | 4 |
| By Mr. Kachmar | 23 |

## Page 4

(Reporter disclosure made pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia.)

JEFFREY GRANT, having first been duly sworn, was examined and testified as follows:

MR. SCHIAVONE: Okay. This is the deposition of Jeff Grant taken pursuant to the Federal Rules of Civil Procedure. All objections are reserved except to the form of the question.

MR. O'CONNOR: That's agreeable. And Mr. Grant will reserve reading and signing.

MR. SCHIAVONE: All right. Great.

MR. KACHMAR: Agreed for Chief Minter too.

MR. SCHIAVONE: Great. Thank you.

EXAMINATION

BY MR. SCHIAVONE:

Q. Would you state your name, please, for the record?

A. Jeffrey Grant.

Q. And how are you employed, Mr. Grant?

A. I'm the HR director at the City of Savannah.

## Page 5

Q. Can you tell me what -- what does that entail? What are your duties?

A. I oversee the compensation. I oversee benefits and retirement. I oversee learning and organizational development. I oversee employee relations as well as I oversee projects related to HR management.

Q. And what's the -- Savannah Police Department, how -- how is that structured in relation to the City and the department of human resources? Are they just an appendage of the City?

A. Well, we're broken up into seven service centers. So we have police is one of our service centers. Fire's one of our service centers, community services, infrastructure and development, municipal operations as well as governance and strategic services. So police department is one of our service centers.

Q. And are each one of those departments, are they controlled by the policies of the City of Savannah?

A. They are, yes.

Q. All right. And that includes the progressive discipline policy at the City?

A. That is correct, yes.

## Page 6

Q. And are you aware of what I mean by that?

A. Yes. I'm aware of that, yes.

Q. All right. And that's a number of stages that should be considered before an employee is terminated?

A. That's correct, yes.

Q. All right. Now, at some point you're aware of this case of Dan Kang and Michael Arango?

A. I'm familiar with them, yes.

Q. All right. And at some point about 75 officers filed what I'll call a group human resource complaint about Chief Minter. Were you aware of that?

A. Yes.

Q. And when that was filed, what's the procedure in handling that? What happens after -- does that go to you directly first?

A. The way it works is, yes, it comes to human resources. At the time we had a -- it's a conflict resolution program, and all of those officers or at least majority of them filed to our office, yes.

Q. All right. There was a general complaint filed and then individual complaints?

A. That is correct.

EXHIBIT 26

## Page 7

1  Q. All right. That was a significant number,
2  wasn't it, a significant number of officers
3  complaining about Chief Minter's conduct?
4  MR. O'CONNOR: Object to form. You can
5  answer subject to the objection. If you can
6  answer, go ahead.
7  THE WITNESS: It's -- it's more than
8  we've -- we've had before, yes.
9  Q. (By Mr. Schiavone) That was about 77
10 officers?
11 A. That was probably around 56, 57 who
12 actually submitted, yes.
13 Q. How long have you been with -- with the
14 City?
15 A. I've been with the City for four years.
16 Q. All right. And during -- so you would
17 have been with the City what, two years when back in
18 2020? When was this? This was in 2020?
19 A. That's correct, yes.
20 Q. All right. And just in those two-year
21 period then, had you ever seen anything like this
22 before in your office?
23 A. I have not.
24 Q. All right. Was this considered by you a
25 big deal at that point?

Gilbert & Jones

## Page 8

1  A. I mean, it was -- I mean, it was -- it was
2  a larger-than-usual submission, yes.
3  Q. All right. Well, so what would be the
4  procedure once you received it? What do you do when
5  you received it?
6  A. In this case we actually contracted out
7  with an attorney to conduct the inquiry. We
8  submitted all of the submissions to that attorney for
9  review, yeah.
10 Q. When you say we, who's we?
11 A. The City of Savannah, the office of human
12 resources, yes.
13 Q. All right.
14 A. Yeah.
15 Q. All right. What other individual would
16 have been involved with that decision?
17 A. Oh, the city manager, of course. Yeah,
18 obviously the city manager, you know, weighed into
19 that and as well as the city attorney's office, yes.
20 Q. All right. And you worked under the city
21 manager?
22 A. Yes, sir.
23 Q. Now, do you answer to him directly or to
24 someone else?
25 A. I do, directly to the city manager.

Gilbert & Jones

## Page 9

1  Q. All right. So when you received these
2  complaints by these officers, did you contact
3  Mr. Monahan?
4  A. At some point. It's been a while, but,
5  yes, I would have contacted him. That's correct,
6  yes.
7  Q. All right. And who made the decision to
8  hire outside counsel?
9  A. That was Mr. Monahan, yes.
10 Q. And would the mayor and the city council
11 have to okay this?
12 A. No.
13 Q. All right. Where would the funds come to
14 pay that lawyer?
15 A. I'm -- I'm not sure where out of the
16 budget it came from, yeah.
17 Q. Well, I mean, is that -- does the city
18 manager have the authority to make those kinds of
19 decisions when money's to be spent? He doesn't have
20 to go to somebody, to the city council or someone
21 like that?
22 A. It's under his purview.
23 Q. His purview?
24 A. Yeah.
25 Q. All right. And was the request for her to

Gilbert & Jones

## Page 10

1  do a complete investigation with recommendations?
2  A. That's correct. It was to review the
3  inquiries and -- and then provide a summary of those
4  inquiries and -- and to look into it as well too,
5  yes.
6  Q. And did she find -- find merit to the
7  complaints?
8  A. She provided a summary of findings and
9  more of a -- more so themes of that kind of resinated
10 from the complaints and -- and that was -- that was a
11 part of her role.
12 Q. Well, who made the final decision and what
13 action was taken against the chief, if any?
14 A. The city manager made the final decision.
15 Q. All right. Do you know what that decision
16 was?
17 A. The city manager made a list of -- he
18 identified a list of findings that he discussed with
19 the chief and talked with the chief in regards and
20 then also communicated it to those who made the
21 complaint.
22 Q. So no action was taken in reference to his
23 job? What, just do better? Don't use retribution
24 against other officers?
25 MR. O'CONNOR: Object to the form.

Gilbert & Jones

EXHIBIT 26

**Page 11**

1  MR. KACHMAR: Object to the form.
2  MR. O'CONNOR: That's three questions,
3  Mike.
4  MR. SCHIAVONE: Right, right.
5  Q. (By Mr. Schiavone) I mean, there were
6  allegations of retribution against officers. Didn't
7  that concern y'all?
8  A. The city manager -- that's -- that's his
9  purview.
10  Q. Well, when officers, when he -- when the
11  chief after that took action against officers who
12  there were allegations of violating policy, if some
13  of those were officers that filed these complaints,
14  didn't y'all believe that it was a conflict for the
15  chief to be the one to make those decisions?
16  MR. KACHMAR: Object to the form.
17  Q. (By Mr. Schiavone) You'd already had
18  allegations of retribution against officers. Now you
19  have officers who there's allegations against that
20  sign the group complaint and individual complaint.
21  Arango and Kang were two of them.
22  When their cases came up on appeal, wasn't
23  there a conflict of interest for the chief to make
24  the final decision?
25  MR. KACHMAR: Object to the form.
Gilbert & Jones

**Page 12**

1  Q. (By Mr. Schiavone) Why didn't you hire an
2  attorney or someone separate to make those
3  determinations because of the allegations of
4  retribution?
5  MR. KACHMAR: Object to the form.
6  MR. O'CONNOR: The same objection.
7  MR. SCHIAVONE: Yeah.
8  Q. (By Mr. Schiavone) But why didn't -- why
9  didn't you recommend that to Mr. -- to the city
10  manager that this wouldn't be fair for him to make
11  these determinations on these officers in light of
12  the allegations of retribution?
13  A. I -- in my role I followed the policy
14  according to the City, and that's the -- there's a
15  particular process that we follow for all employees.
16  Q. So there was no discussion concerning
17  whether or not the chief could be fair to these
18  officers in making recommendations which in this case
19  was termination? Wasn't there some concern about the
20  conflict of interest at that point?
21  MR. KACHMAR: Object to the form.
22  MR. O'CONNOR: The same objection.
23  THE WITNESS: Yeah, once again, we -- we
24  followed the process at the City of Savannah,
25  yeah.
Gilbert & Jones

**Page 13**

1  Q. (By Mr. Schiavone) Well, is the process
2  not to consider that?
3  A. Now, could you clarify what you're -- what
4  you're really asking?
5  Q. Well, you told me you follow policy.
6  A. Yeah.
7  Q. I mean, do you have any obligation to make
8  sure the process is fair?
9  A. Through -- through the processes at the
10  City that's -- that's -- that's what we do with the
11  office of human resources, is we follow that.
12  Q. Follow -- yeah, that it should be fair.
13  Does conflict of interest ever enter into
14  that policy in your determinations?
15  A. I'm not aware of any conflict of interest,
16  so...
17  Q. Well, if you had officers that said that
18  the chief was acting out of retribution against them
19  in promotions and in many other ways and then those
20  officers get accused of something, of violating
21  policy, you don't think it ever occur or didn't, it
22  wouldn't occur to you that there might be a conflict
23  of interest at that point?
24  MR. KACHMAR: Object to the form.
25  THE WITNESS: Yeah, I'm not -- I'm not
Gilbert & Jones

**Page 14**

1  aware of any conflict of interest, so sorry.
2  Q. (By Mr. Schiavone) All right. Does the
3  manage -- does the city manager or do you, do y'all
4  have the power to have appointed somebody impartial
5  to make determinations on these officers when there
6  was an allegation of violating policy?
7  MR. KACHMAR: Object to the form.
8  THE WITNESS: And you're referencing to --
9  could you clarify the question?
10  Q. (By Mr. Schiavone) Kang, Kang and Arango.
11  A. I'm -- I'm -- I'm not sure what you're
12  really asking of me, yeah.
13  Q. I'm asking --
14  A. Yeah.
15  Q. -- when you see that you have 70-some
16  officers making numerous allegations of retribution,
17  of not following procedures, not following policy,
18  and then two of those officers in that petition are
19  accused of violating policy and they are brought
20  before you on appeal because the chief doesn't follow
21  the recommendation of his subordinate officers, none
22  of which recommended termination, didn't it occur to
23  you at that time that the chief couldn't be impartial
24  to these two officers?
25  MR. KACHMAR: Object to the form.
Gilbert & Jones

EXHIBIT 26

**Page 15**

1  MR. O'CONNOR: You can only answer what
2  you know, so if you know --
3  THE WITNESS: Yeah.
4  MR. O'CONNOR: -- then answer his
5  question.
6  Q. (By Mr. Schiavone) So it never occurred?
7  That never occurred to you?
8  A. In our process at the City of Savannah, I
9  mean, we -- we have a -- you know, an entire appeal
10 process. All departments go through it and -- and it
11 goes through each of the stages all the way up to the
12 city manager, yeah.
13 Q. All right. When -- when Kang and Arango's
14 cases came to you, how would they have come to you
15 after the chief didn't follow the recommendations of
16 his subordinate officers and order termination? How
17 would those cases come to you?
18 A. Typically what would happen is the chief
19 would have a recommendation or his determination
20 which direction he would be going and he'd provide
21 the -- you know, any documents related to that to
22 review and ensure that, you know, if there's anything
23 out of City policy.
24 Q. All right. Well, let me -- let me go into
25 that then on these documents.

Gilbert & Jones

**Page 16**

1  I'd ask them to hand you Exhibit 1 and
2  Exhibit 2.
3  MR. O'CONNOR: There's 1. There's 2.
4  Q. (By Mr. Schiavone) Take a look at that.
5  Exhibit 1 was the existing policy of the Savannah
6  Police Department. Exhibit 2 is a draft policy that
7  had never been implemented.
8  Would the chief be allowed to create his
9  own policy and follow that rather than the policies
10 implemented? Does he have a right to create his own
11 policies?
12 A. Well, we have policies that -- yes. There
13 are policies within the police department in which
14 are established by the chief of police, yeah.
15 Q. Right, but what if -- what if it's a
16 policy that is just a draft. It's never been
17 implemented and he proceeds on the draft and not on
18 the existing policy. The chief's not allowed to do
19 that, is he?
20 MR. O'CONNOR: Object to the form.
21 THE WITNESS: Yeah.
22 MR. O'CONNOR: Go ahead if you can.
23 Q. (By Mr. Schiavone) Is he allowed to do
24 that?
25 A. These are departmental policies. These

Gilbert & Jones

**Page 17**

1  would be governed by the chief of police so they
2  have -- they have a process in place in which they
3  administer that.
4  Q. Were you given these two policies and told
5  that he didn't follow the existing policy, Exhibit 1?
6  That in fact he followed the draft policy in
7  Exhibit 2? Were you given those and told that on the
8  appeal of Kang and Arango?
9  A. I was not.
10 Q. All right. So you weren't given that
11 information and don't -- don't employees of the City
12 of Savannah have a right to rely on the existing
13 policies in force at the time of their case?
14 A. Yes. I mean, any policies that are
15 actively being used, correct.
16 Q. All right. And the process lays out
17 basically a due process process, doesn't it, to give
18 the officers due process?
19 A. Yes. The City of Savannah processes a due
20 process, yes.
21 Q. All right. And doesn't everyone have to
22 follow the existing policy that works for the City of
23 Savannah?
24 MR. KACHMAR: Object to the form.
25 THE WITNESS: The policies that we have in

Gilbert & Jones

**Page 18**

1  place, yes.
2  Q. (By Mr. Schiavone) Yeah. So does
3  every -- does every employee have to follow that
4  including you and the city manager?
5  MR. KACHMAR: Object to the form.
6  THE WITNESS: Yes.
7  Q. (By Mr. Schiavone) All right. Now, were
8  you given -- do you know what the Douglas Factors
9  are?
10 A. I'm familiar with them.
11 Q. All right. Were you ever given the
12 findings in writing of the Douglas Factors found in
13 Kang or Arango's case?
14 A. I do not -- I do not remember, no. I
15 can't recall, no.
16 Q. All right. All right. If that was
17 required by policy, wouldn't you have required that
18 that information be given to y'all in the appeal?
19 A. Once again, these are -- these are
20 departmental policies, so we -- in my role it would
21 be more so the overarching City of Savannah policies.
22 These are departmental policies that are -- that are
23 governed by the police department, yeah.
24 Q. All right. But the chief is required to
25 do the progressive discipline policy of the City,

Gilbert & Jones

EXHIBIT 26

**Page 19**

1  isn't he?
2       MR. KACHMAR: Object to the form.
3       THE WITNESS: Correct.
4    Q. (By Mr. Schiavone) And did you receive
5  the written document showing where he followed that
6  policy on Kang and Arango?
7    A. I -- I can't recall on that, yeah.
8    Q. All right. Have you ever seen that
9  document?
10   A. And which document are you speaking of?
11   Q. The progressive determination that the
12 chief and the Savannah Police followed in making a
13 determination as to Kang and Arango as to punishment.
14   A. I mean, I can't -- I can't recall. I
15 mean, I know there's two -- I know they were big
16 files, so, I mean, yes. I mean, I think that I
17 received files on what his determinations were going
18 to be, but as it pertains to like a specific
19 document, no, I -- I don't recall that, no.
20   Q. Well, was part of your duties to meet with
21 Arango and Kang in their appeal?
22   A. Not me. I facilitated the process. That
23 would be, once it gets to the city manager, yes. The
24 city manager would be the person they meet with.
25   Q. Would be the person?

Gilbert & Jones

**Page 20**

1    A. Yes, sir.
2    Q. But you'd be the one that would supply him
3  with the documents to review for the appeal?
4    A. We would, yes. We would provide that to
5  the city manager, yes, from the police department.
6    Q. All right.
7    A. So the police department would provide.
8    Q. From the police department?
9    A. Yes, that's correct.
10   Q. And do you have a package somewhere that
11 would show everything that was supplied to you that
12 you supplied to the city manager, Mr. Monahan?
13   A. I mean, it could be -- it could be in the
14 e-mail. I mean, there -- it could have been sent
15 hard copy. I would not necessarily have a copy of
16 that, not the full packet.
17   Q. Well --
18   A. Yeah. That would be at the police
19 department.
20   Q. But wouldn't there be a file open once the
21 appeal was -- was filed and all the documents sent to
22 your office? Wouldn't there be a file open and all
23 of this be put in that file for Kang's appeal and for
24 Arango's appeal?
25   A. There -- there -- there would be. There

Gilbert & Jones

**Page 21**

1  would be a file that would have the final
2  determination by the city manager, yes.
3    Q. Wouldn't it also contain all the documents
4  that were considered and sent to you by the police
5  department?
6    A. We would have that electronically, yes.
7    Q. All right. So -- so we can get access to
8  that somewhere?
9    A. We could. I'd have to ask for IT for
10 that, but, yes.
11      MR. SCHIAVONE: All right. Now, give me
12   one second.
13      (Pause.)
14   Q. (By Mr. Schiavone) Would you have
15 requested of the Savannah Police Department to give
16 you copies of similar other conduct and the
17 punishments that were meted out in relation to those
18 cases to compare to the Kang and Arango punishment
19 pursuant to the progressive requirements of the City
20 of Savannah on punishment?
21   A. No, I don't -- I don't remember that, no.
22   Q. So, to your knowledge, no one requested
23 that, either you or the city manager?
24   A. I can -- I cannot remember that, yeah.
25 No.

Gilbert & Jones

**Page 22**

1       MR. SCHIAVONE: One second.
2       (Pause.)
3    Q. (By Mr. Schiavone) Were you involved with
4  any of the press conferences held by the mayor and
5  the chief, Minter, and the DA at the time, Meg Heap,
6  in reference to Kang and Arango's cases?
7    A. I was not.
8       MR. SCHIAVONE: All right. If I could --
9    could we just take a break real quick? I may be
10   done.
11      MR. O'CONNOR: Sure.
12      (Recess taken from 3:21 p.m. to 3:30 p.m.)
13   Q. (By Mr. Schiavone) Mr. Grant --
14   A. Yes.
15   Q. -- can you tell me, when you received this
16 appeal and all the paperwork that you've indicated
17 you had received for the appeal, what conversation
18 did you have with the city manager when you turned
19 this over to him? Anything? Can you tell me?
20   A. No. I didn't have any conversations, not
21 that I can recall, with him, yeah.
22      MR. SCHIAVONE: All right. All right.
23   That's all the questions I've got, Pat.
24      MR. O'CONNOR: The City has no questions
25   for Mr. Grant.

Gilbert & Jones

EXHIBIT 26

## 23

1  MR. KACHMAR:  I have a couple questions,
2  Mr. Grant.
3      THE WITNESS:  Yes.
4      MR. KACHMAR:  I represent Chief Minter.
5             EXAMINATION
6  BY MR. KACHMAR:
7      Q.  Under the City's progressive discipline
8  policy, does the City reserve the right to skip one
9  or more steps?
10     A.  They do.
11     Q.  So --
12     A.  They do.
13     Q.  Go ahead.  Sorry.  Finish your answer.
14     A.  I was going to say, depending on the
15  severity, yes.
16     Q.  Okay.  When you received a copy of the --
17  the group complaint as it was referred to earlier and
18  then also Mr. Kang's individual complaint, did you at
19  any time prior to the decision to terminate
20  Mr. Kang's employment, did you give a copy of either
21  signed complaint to Chief Minter?
22     A.  No.
23     Q.  Are you aware of anyone that gave a copy
24  of either of the signed complaints to Chief Minter?
25     A.  No.

**Gilbert & Jones**

## 24

1      Q.  At some point prior to the termination,
2  did you ever ask Chief Minter about any of the
3  allegations in either Mr. Kang's individual complaint
4  or the group complaint?
5      A.  Could you repeat that again one more time?
6      Q.  Yeah.
7      At any time prior to the decision to
8  terminate Mr. Kang's employment, did you ask Chief
9  Minter --
10     A.  Oh, no.
11     Q.  -- about any of the allegations in
12  Mr. Kang's individual complaint or in the group
13  complaint?
14     A.  No, no.
15     MR. KACHMAR:  No further questions.
16     MR. SCHIAVONE:  All right.  Thank y'all.
17     MR. O'CONNOR:  Thank you, Mike.  We'll see
18  you later.  Take care.
19     MR. SCHIAVONE:  All right.  All right,
20  Pat.
21     THE WITNESS:  All right.  Thanks.  Good
22  seeing you again, Mike.
23     MR. SCHIAVONE:  Thank you.
24     THE WITNESS:  Good seeing you again.
25     MR. SCHIAVONE:  Thank you, Mr. Grant.

**Gilbert & Jones**

## 25

1      THE WITNESS:  All right.  Thanks.
2      (Deposition concluded at 3:32 p.m.)
3      (Pursuant to Rule 30(e) of the Federal
4  Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
5  signature of the witness has been reserved.)

**Gilbert & Jones**

## 26

1            CERTIFICATE OF COURT REPORTER
2
3  STATE OF GEORGIA:
4  COUNTY OF EFFINGHAM:
5
6          I hereby certify that the foregoing
   transcript was reported as stated in the caption and
7  the questions and answers thereto were reduced to
   writing by me; that the foregoing 25 pages represent
8  a true, correct, and complete transcript of the
   evidence given on August 29, 2022, by the witness,
9  JEFFREY GRANT, who was first duly sworn by me.
          I certify that I am not disqualified
10 for a relationship of interest under
   O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
11 Reporter here as an employee of Gilbert & Jones, Inc.
   who was contacted by Savage & Turner to provide court
12 reporting services for the proceedings; I will not be
   taking these proceedings under any contract that is
13 prohibited by O.C.G.A. 15-14-37(a) and (b) or
   Article 7.C. of the Rules and Regulations of the
14 Board; and by the attached disclosure form I confirm
   that neither I nor Gilbert & Jones, Inc. are a party
15 to a contract prohibited by O.C.G.A. 15-14-37(a) and
   (b) or Article 7.C. of the Rules and Regulations of
16 the Board.
         This 31st day of August 2022.
17

18                       *Thomas J. Dorsey*
19
20
21  _____
22  THOMAS J. DORSEY, CERTIFIED COURT
    REPORTER, 2781
23
24
25

**Gilbert & Jones**

EXHIBIT 126

## DISCLOSURE OF NO CONTRACT

I, Debbie Gilbert, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Gilbert & Jones, Inc. was contacted by Savage & Turner to provide court reporting services for these proceedings and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board for the taking of these proceedings.

There is no contract to provide reporting services between Gilbert & Jones, Inc. or any person with whom Gilbert & Jones, Inc. has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

This 31st day of August 2022.

*Debbie Gilbert*

_____
Debbie Gilbert, FIRM REPRESENTATIVE
Gilbert & Jones, Inc.

Gilbert & Jones

---

DEPOSITION OF: JEFFREY GRANT /TJD

I do hereby certify that I have read all questions propounded to me and all answers given by me on August 29, 2022, taken before Thomas J. Dorsey, and that:

___ 1) There are no changes noted.
___ 2) The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is
_____

Page No. _____ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. _____ Line No. ___ should read:_____
_____
The reason for the change is
_____

Gilbert & Jones

---

DEPOSITION OF: JEFFREY GRANT /TJD

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is
_____

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

_____
JEFFREY GRANT

Sworn to and subscribed before me,
This the ___ day of _____, 20__.

_____
Notary Public
My commission expires: _____

Please forward corrections to:

Gilbert & Jones, Inc.
7505 Waters Avenue, Suite F3
Savannah, GA 31406
(912) 355-1061

Gilbert & Jones