EXHIBIT 27

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DANIEL KANG,                          )
                                      )  CIVIL ACTION NO.
          Plaintiff,                  )
                                      )  4:21-CV-111-WTM-CLR
     vs.                              )
                                      )
THE MAYOR AND ALDERMEN OF THE         )
CITY OF SAVANNAH and ROY W.           )
MINTER, JR., Chief of Police          )
for the City of Savannah,             )
Georgia, In His Individual            )
and Official Capacities,              )
                                      )
          Defendants.                 )
_____)

VIDEOCONFERENCE RULE 30(b)(6) DEPOSITION OF

THE CITY OF SAVANNAH POLICE DEPARTMENT

BY ASSISTANT CHIEF ROBERT GAVIN

March 7, 2023

10:36 a.m.

218 West State Street
Savannah, Georgia

Thomas J. Dorsey, RPR, CCR-2781

## Gilbert & Jones
### Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
*Brunswick, GA 31520*

*gilbertandjones1@gmail.com*
**912.264.1670**

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
*Savannah, GA 31406*

EXHIBIT 27

1           <u>APPEARANCES OF COUNSEL</u>

2

3

On behalf of the Plaintiff:

4

    MICHAEL G. SCHIAVONE, ESQ., (BY VIDEOCONFERENCE)

5     Schiavone Law Group, P.C.
    1111 Bull Street

6     Savannah, Georgia  31401
    (912)232-2646

7     js_law@bellsouth.net

8

    MATTHEW BRADLEY, ESQ.

9     Savage, Turner, Pinckney, Savage & Sprouse
    102 East Liberty Street, 8th Floor

10    Savannah, Georgia  31401
    (912)231-1140

11    mbradley@savagelawfirm.net

12

13    On behalf of the Defendant The Mayor and Aldermen of
    The City of Savannah:

14

    PATRICK T. O'CONNOR, ESQ.

15    PATRICIA T. PAUL, ESQ.
    Oliver Maner LLP

16    218 West State Street
    Savannah, Georgia  31401

17    (912)236-3311
    pto@olivermaner.com

18

    JENNIFER N. HERMAN, DEPUTY CITY ATTORNEY

19    City of Savannah
    2 East Bay Street

20    Savannah, Georgia  31401
    (912)525-3100

21    jherman@savannahga.gov

22

23

24

25

Gilbert & Jones

EXHIBIT 27

**3**

1  On behalf of the Defendant Roy W. Minter, Jr.:

2      SHAWN A. KACHMAR, ESQ.
       Hunter Maclean
3      200 East St. Julian Street
       Savannah, Georgia  31401
4      (912)695-6984
       skachmar@huntermaclean.com

5

6
   Also Present:

7
       Octavio Arango, (By Videoconference)

8                      - - -

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Gilbert & Jones**

---

**4**

1              INDEX TO EXAMINATIONS

2  Examinations                              Page

3
   By Mr. Schiavone                          11
4                                            62
   By Mr. Kachmar
5                                            65
   By Mr. Schiavone

6

7

8                      - - -

9
              INDEX TO EXHIBITS
10
   Exhibit    Description                    Page
11
12  1       Defendant the mayor and          7
           aldermen of the City of
13         Savannah's objections to
           plaintiff's third amended
14         notice to take 30(b)(6)
           deposition of the City of
15         Savannah Police Department

16  2       OPS-016                          21

17  3       Document entitled City of        28
           Savannah Conflict Resolution
18         Program

19  4       Fourth amended notice            62
20

21

22

23      (Original Exhibits 1 through 4 have been
   attached to the original transcript.)
24
25

**Gilbert & Jones**

---

**5**

1       (Reporter disclosure made pursuant to
2  Article 10.B. of the Rules and Regulations of the
3  Board of Court Reporting of the Judicial Council of
4  Georgia.)
5       ASSISTANT CHIEF ROBERT GAVIN,
6  having first been duly sworn, was examined and
7  testified as follows:
8       MR. SCHIAVONE:  All right.  This is the
9  deposition, 30(b)(6) deposition, taken pursuant
10  to notice for all purposes pursuant to the
11  Federal Rules of Civil Procedure.  We'd reserve
12  all objections except to form of the question.
13  Is that --
14       MR. O'CONNOR:  That's agreeable except we
15  have filed some objections to the notice, Mike,
16  in writing last week so you guys would have
17  advance warning, we wouldn't be springing
18  something on you here.  And some of these topics
19  were exceedingly broad and kind of vague, so we
20  filed an objection on y'all.
21       MR. SCHIAVONE:  Did Brent or anybody
22  respond to that?
23       MR. O'CONNOR:  Have not.
24       MR. SCHIAVONE:  Because I've never seen
25  it.

**Gilbert & Jones**

---

**6**

1       MS. PAUL:  I would have sent it by e-mail
2  when I did it.
3       MR. O'CONNOR:  No.  We have gotten no
4  response but --
5       MR. SCHIAVONE:  Yeah.  I mean, nobody made
6  me aware of that.
7       MR. O'CONNOR:  Well, it was sent to -- we
8  can send you a copy right now if you want us to.
9       MR. SCHIAVONE:  Yeah, if we could.  Can
10  you e-mail that to me?  I apologize, but I was
11  not made aware of it.
12       MR. O'CONNOR:  It's no problem.  It's --
13       MS. PAUL:  It's not.  You were sent it on
14  March 1.  Let's see the time of the e-mail and
15  you can just pull it up.  It's at 1708.
16       MR. SCHIAVONE:  1708?
17       MS. PAUL:  Yeah, as official time.
18       MR. O'CONNOR:  2:08.
19       MR. KACHMAR:  5:08.
20       MS. PAUL:  5:08.
21       MR. O'CONNOR:  Something, something like
22  that.
23       THE WITNESS:  It's that military time that
24  will get you.
25       MR. O'CONNOR:  I was born at an Army

**Gilbert & Jones**

---

EXHIBIT 27

**7**

1  hospital, and that was the extent of my military
2  service.
3      MR. SCHIAVONE: Can y'all e-mail that to
4  me?
5      MR. O'CONNOR: Sure.
6      MR. KACHMAR: I have it here.
7      MR. SCHIAVONE: Do you have my office
8  e-mail?
9      MR. O'CONNOR: Shawn's going to forward it
10  to you right now.
11      Why don't we just make it an exhibit to
12  the deposition too? Is that agreeable, Mike?
13  I'm going to give the court reporter a copy to
14  attach to the deposition as an exhibit.
15      THE WITNESS: You're muted, Mike.
16      MR. O'CONNOR: You're muted.
17      MR. SCHIAVONE: I said, that's fine.
18      (Exhibit 1 was marked for identification.)
19      MR. KACHMAR: Mike, I just sent it.
20      MR. O'CONNOR: Mike, while you're looking
21  at it, I'm also going to say for the record --
22      MS. PAUL: I don't know that he's there.
23      MR. KACHMAR: He's not there.
24      MR. BRADLEY: I think he went to print it
25  off.

**8**

1      MR. O'CONNOR: Okay. I'll wait.
2      (Recess taken from 10:38 a.m. to 10:47
3  a.m.)
4      MR. O'CONNOR: All right. Are you back,
5  Mike?
6      MR. SCHIAVONE: Yeah, I'm back. All
7  right. So like on these objections when we get
8  to those questions, you know, normally you
9  object and then you allow the person to answer.
10  Is that the way it's going to work? Or you
11  object to these -- me questioning at all in
12  those areas?
13      MR. O'CONNOR: I'll have to -- I'll have
14  to decide whether to object to your question
15  when we get to it.
16      But let's take the very first one. Any
17  contact with Roy Minter and third parties
18  including but not limited to the Downtown
19  Business Association as to the investigation to
20  the Darryl Faitele incident of April 14th, 2020.
21      There's no -- that is so broad. There is
22  no good way for the City to be prepared to tell
23  you about any contacts that Roy Minter and third
24  parties may have had. There's no way for us to
25  gather that information. That's the subject --

**9**

1  that's the basis for the objection.
2      Now, you can ask if he knows of any
3  contacts, but we are not going to be able to
4  answer for any contacts, which I read it to mean
5  who all did he talk to and who did third parties
6  talk to. We don't even know who the third
7  parties are, Mike.
8      MR. SCHIAVONE: Right.
9      MR. O'CONNOR: So I'm not going to
10  instruct him not to answer. But if you ask a
11  broad question like that, I'll probably object
12  to it --
13      MR. SCHIAVONE: Right. Okay. Well, let's
14  just --
15      MR. O'CONNOR: -- and then let him answer
16  it the best he can.
17      MR. SCHIAVONE: -- see how -- yeah. Let's
18  just -- let's just go -- you know, go through it
19  and see how --
20      MR. O'CONNOR: Yeah.
21      MR. SCHIAVONE: -- how it unfolds; okay?
22  All right? So has he been sworn?
23      MR. O'CONNOR: He has.
24      MR. SCHIAVONE: All right. Good.
25      Chief Gavin, you were already deposed as

**10**

1  just as a witness in the case. Was it just --
2  do y'all remember, was it this case, the federal
3  case, or the state case.
4      MS. PAUL: Well, last I recall -- was
5  Bates here?
6      MR. KACHMAR: I think Taylor was here, so
7  I think it was the federal case.
8      MR. O'CONNOR: It was this case, Mike.
9      MR. SCHIAVONE: Okay. Then I just want
10  the record to reflect that he is testifying now
11  as the designated person on behalf of the
12  City -- on behalf of the Savannah Police
13  Department -- is that correct? -- for the
14  purposes of this deposition?
15      MR. O'CONNOR: Well, one of the things we
16  put in this objection was the Savannah Police
17  Department is not a legal entity, so we have
18  presumed there what you intended to send us was
19  a notice to the City of Savannah. And so he is
20  the designee of the City of Savannah, which is
21  the defendant --
22      MR. SCHIAVONE: Okay.
23      MR. O'CONNOR: -- for purposes of this
24  deposition.
25      MR. SCHIAVONE: All right. That's fine.

EXHIBIT 27

**11**

1    Okay.  That's fine.
2         EXAMINATION
3    BY MR. SCHIAVONE:
4    **Q.    Can I just say Chief Gavin?  Or should I**
5    **keep saying Assistant Chief Gavin?**
6    A.    Yeah, Chief Gavin.  Gavin's fine.  It
7    doesn't matter.  I'm with you.
8    **Q.    Okay.  Have you had an opportunity to --**
9    **and I assume you have -- to look at all these**
10   **questions that were presented as part of this notice**
11   **to take your deposition?**
12   A.    Yes, sir, I have.
13       MR. O'CONNOR:  Mike, I did -- I'm sorry.
14   I started to do this and then I realized you
15   were away.  I want to say one other thing for
16   the record.
17       When we filed this objection it was to the
18   third amended notice, because at that point in
19   time -- we filed this on March 1.  The last
20   notice we had gotten was the third amended
21   notice.  Since then we've gotten a fourth
22   amended notice which is essentially the same.
23   There are a few little tweaks between the third
24   and fourth, so it's our intent that these
25   objections would apply to both the third and

**12**

1    fourth amended notice of 30(b)(6) deposition.
2        MR. SCHIAVONE:  I'm -- I'm personally at a
3    disadvantage, because I didn't prepare it.  I
4    didn't prepare these notices, so I don't know if
5    there's change -- if there's any changes between
6    the third and fourth.
7        MR. O'CONNOR:  Very little.  We reviewed
8    them carefully and the changes were minimal, so
9    the objection --
10       MR. SCHIAVONE:  My point is that, as the
11   record now stands, the only objections were to
12   the third and they would not apply to the fourth
13   unless you prepared a response to the fourth.
14       MR. O'CONNOR:  No.  I don't think we had
15   to file a written objection at all, because, as
16   you just said, all objections are reserved
17   except as to form of question.  We stipulate to
18   that in every single deposition.  The only
19   reason we did a written objection was to give
20   you guys a heads-up before we got here.  It was
21   really out of courtesy.  We didn't have to do it
22   in written form.
23       And so what I'm saying is on the record
24   here today I'm incorporating those same
25   objections to the fourth notice without filing

**13**

1    an amended notice of objection.
2        MR. SCHIAVONE:  Right.  The only problem I
3    have with that is that there may be something
4    different in the fourth, and I'm not in a
5    position to make those determinations right now,
6    so that's the reason why -- otherwise I would
7    agree.  But, because of that, I don't think I
8    can agree to that, so...
9        MR. O'CONNOR:  Well, I don't --
10       MR. SCHIAVONE:  You know, for the purpose
11   of the record, for whatever that's worth,
12   whatever that means.
13       MR. O'CONNOR:  All right.  Well, on top of
14   the written objection, as we've already
15   discussed, we have reserved objections.
16       MR. SCHIAVONE:  Yes, sir.
17       MR. O'CONNOR:  But our goal here today is
18   to answer your questions and be done with this
19   deposition so we don't have to come back.  So
20   I'm not trying to be obstreperous or some other
21   fancy legal word.  I'm just trying to state
22   objections so that there's no surprise and we
23   don't get a, hey, we didn't know about these
24   objections.  Let's do this again in two weeks.
25   Our goal is to get this done and answer as many

**14**

1    questions as we can today.
2        MR. SCHIAVONE:  Only speaking for myself.
3    I cannot promise you that Brent will see it the
4    same way I do.
5        MR. O'CONNOR:  Well, let's proceed with
6    the deposition.
7        MR. SCHIAVONE:  Okay.
8        MR. O'CONNOR:  We reserved objections.  We
9    filed a written notice.  I've stated for the
10   record that we're incorporating that again to
11   the fourth, and we've reserved objections.  So
12   let's go ahead.
13       MR. SCHIAVONE:  Okay, Pat.  Thank you.
14   **Q.    (By Mr. Schiavone)  Assistant Chief Gavin,**
15   **do you have that, the questions in front of you?**
16   **It might be easier for me to start him**
17   **with No. 1.  Any communications with former Chief**
18   **Minter following the proper Savannah Police**
19   **Department procedures and recommending the firing of**
20   **Daniel Kang and Octavio Arango.**
21   **Are there any -- did you find any**
22   **communications between the City, I guess, and Chief**
23   **Minter in reference to that question?**
24   A.    No, sir, we did not.
25   **Q.    All right.  Do you have an answer to that**

EXHIBIT 27

**15**

1 question other than that?
2     A.    Just what's been -- what's been testified
3 to in the depositions for this case.
4     Q.    All right.  Question No. 2, the reasons
5 Roy Minter left the position with the City of
6 Savannah as police chief.  Was Chief Minter fired?
7     A.    He was not.  He was -- he left to pursue
8 U.S. Marshal position.
9     Q.    All right.  To your knowledge, was he
10 forced to resign?
11     A.    The City found no evidence that there was
12 a -- that he was forced.  The city manager advised us
13 that he was leaving on his own volition.
14     Q.    All right.  Before he resigned, was there
15 any communications about him being nominated for the
16 U.S. Marshal's position through the City of Savannah
17 and the police department?
18     A.    There were rumors.  I think there may have
19 been some new stories prior to the announcement.
20     Q.    Was there any communications in existence,
21 e-mails, text messages, anything of that nature?
22     A.    Not until he officially was nominated.  He
23 sent an e-mail out to the department advising that he
24 was nominated for the position.
25     Q.    All right.  So there's an e-mail out there

Gilbert & Jones

**16**

1 in existence?
2     A.    Yes, sir.
3     Q.    All right.  Would there be more than one
4 e-mail in reference to that?
5     A.    No, sir.
6     Q.    All right.  In reference to him resigning,
7 would there be e-mails in reference to that?
8     A.    There was one e-mail that he was leaving
9 to pursue the U.S. Marshal position.
10     Q.    All right.  Question No. 3 dealt with
11 whether Roy Minter followed the approved policies of
12 the City of Savannah when he disciplined Officer Kang
13 in the Darryl Faitele case.
14           Did he follow proper procedure?
15     A.    He did.
16     Q.    All right.  Can you tell me what -- what
17 that policy is, as you understand it?
18     A.    Well, he followed the City of Savannah
19 progressive disciplinary process which allows for him
20 to make a determination on discipline, allow for an
21 appeal to the city manager, and then, you know, if
22 after the city manager that person is -- can then
23 take that appeal to the civil service board.
24     Q.    Should -- now, when you say that, have you
25 gone back and reviewed the policies he followed?

Gilbert & Jones

**17**

1     A.    Yes.
2     Q.    All right.  Are you aware that he didn't
3 follow the existing policy, that he followed a draft
4 policy that he created?
5     A.    Well, I was -- as for the City, the City's
6 disciplinary policy, that was -- that's what I was
7 speaking to on --
8     Q.    Well, are you aware that, for instance,
9 the Douglas Factors are required by the City policy,
10 aren't they?
11     A.    Yes, sir.
12     Q.    And when you reviewed the City policy, are
13 you aware that he didn't follow the Douglas Factors?
14     A.    That's a -- that's a Savannah Police
15 policy and then there's the City of Savannah
16 disciplinary policy.
17     Q.    Right.  Are you aware he didn't follow
18 either?
19     A.    The Douglas Factors aren't noted in the
20 City of Savannah policy.
21     Q.    All right.  Was he required to follow the
22 Douglas Factors?
23     A.    Well, as the chief of police, he has
24 discretion to.
25     Q.    He has the discretion not to follow

Gilbert & Jones

**18**

1 policy?
2     A.    Well, he has the discretion to amend
3 policy as he sees fit.
4     Q.    And where does that come from?
5     A.    That's --
6     Q.    What policy gives him that right to
7 follow -- well, let me go back and first come to an
8 understanding of process.  Who creates policy?
9     A.    The police department creates the policy.
10     Q.    All right.  And whose responsibility in
11 the police department is it to create policy?
12     A.    Chief of police.
13     Q.    All right.  And does he have someone
14 designated to prepare the written policy for him?
15     A.    He does.
16     Q.    And who does that?
17     A.    It could be the accreditations manager,
18 and if that person is not present, it could be the
19 assistant chiefs.
20     Q.    Right.
21     A.    It could be himself.  He could do it
22 himself.
23     Q.    Once he does a draft policy, how does that
24 become the policy of the police department?
25     A.    He can -- we send that through a review

Gilbert & Jones

1 committee for any recommendations. Then it goes to
2 the accreditation manager who would then put it into
3 policy form, and then that gets pushed out to the
4 department through PowerDMS and officers then can
5 read, know what the changes are to that policy, and
6 they can sign off that they have knowledge of the
7 changes to that policy.
8     **Q.   All right.  Look at -- I think it was**
9 **part of -- I guess it was filed with the materials**
10 **and will be Exhibit D.  Do y'all have that?**
11     A.   Yes, sir.
12     MR. SCHIAVONE:  I think that has been
13 marked as an exhibit in some of the other
14 depositions, Pat, but I know we don't always
15 have the same court reporter.
16     MR. O'CONNOR:  Are you working off the
17 fourth amended notice, Mike, or the third?
18     MR. SCHIAVONE:  Yeah, I think so.  Yes,
19 sir.
20     MR. O'CONNOR:  Which one?
21     MR. SCHIAVONE:  I think the fourth amended
22 notice.
23     MS. PAUL:  I don't think that had
24 exhibits.
25     MR. SCHIAVONE:  Were there not exhibits

**Gilbert & Jones**

---

**20**

1 attached?
2     MR. BRADLEY:  Right.  They're the same
3 from the third.
4     MS. PAUL:  But I don't think it had
5 exhibits at the end.
6     MR. BRADLEY:  No.
7     MR. O'CONNOR:  All right.  So the one that
8 had exhibits, Mike, was the third.  Matthew has
9 just confirmed, so...
10     MR. SCHIAVONE:  All right.  I think those
11 are the same exhibits.
12     MR. O'CONNOR:  But what we're saying is,
13 there were no exhibits attached to the fourth.
14     MR. SCHIAVONE:  All right.
15     MR. O'CONNOR:  So the exhibits he's
16 looking at are identical to the fourth.  If you
17 want him to just -- if you want us to make a
18 copy or attach a copy of this third amended
19 notice with the exhibits to the deposition,
20 that's agreeable.
21     MR. SCHIAVONE:  Well, we can just get that
22 Exhibit D marked as an exhibit and I'll question
23 him, you know, from that as an exhibit.  That
24 would be OPS-016.
25     MR. O'CONNOR:  Okay.

**Gilbert & Jones**

---

**21**

1     THE WITNESS:  Yeah.
2     MR. SCHIAVONE:  Can we get that marked as
3 a plaintiff's exhibit?
4     MR. O'CONNOR:  I'm going to let him mark
5 my copy.
6     MR. BRADLEY:  Here, I have it.
7     (Exhibit 2 was marked for identification.)
8     **Q.   (By Mr. Schiavone) Can you identify**
9 **Plaintiff's Exhibit 1 for me?**
10     A.   Yes.
11     MR. O'CONNOR:  Actually, Mike, it will be
12 Exhibit 2 because 1 --
13     THE WITNESS:  Is the objections.
14     MR. SCHIAVONE:  Was the notice?
15     MR. O'CONNOR:  It was not the plaintiff's
16 exhibit; it was my objections.  I believe we're
17 just marking these as exhibits without saying if
18 they're plaintiff's or defendants'.
19     MR. SCHIAVONE:  All right.  Exhibit 2.
20     MR. O'CONNOR:  Yes.
21     (Inaudible.)
22     MR. O'CONNOR:  Mike, can you identify for
23 us who's speaking?
24     MR. SCHIAVONE:  Mike Arango.
25     MR. O'CONNOR:  Okay.  Anyone else present

**Gilbert & Jones**

---

**22**

1 there with you?
2     MR. SCHIAVONE:  No, no.
3     MR. O'CONNOR:  Thank you.
4     (Inaudible.)
5     THE REPORTER:  Am I supposed to put that
6 on the record?
7     MR. O'CONNOR:  Mike, the court reporter's
8 wondering if he should be taking down what you
9 guys are saying.
10     MR. SCHIAVONE:  No.  Is he ready after
11 looking at the exhibit?
12     THE WITNESS:  Yes, sir.
13     **Q.   (By Mr. Schiavone) All right.  Was that**
14 **the existing policy at the time --**
15     A.   Yes, sir.
16     **Q.   -- that the actions were taken against**
17 **Kang and Arango?**
18     A.   Yes, sir, it was.
19     **Q.   All right.  And you in your previous**
20 **deposition you were shown the draft policy that the**
21 **chief followed, weren't you?**
22     A.   I was aware of it.  I don't remember if I
23 was shown the draft policy or not.
24     **Q.   All right.  And does the answer that you**
25 **gave me in reference to this -- has that changed now**

**Gilbert & Jones**

**EXHIBIT 27**

**23**

1  that he's required to follow the existing policy, not
2  a draft policy?
3      MR. O'CONNOR:  My objection, Mike, is that
4      he's wearing a different hat today, so I'll
5      object to the form.
6      MR. SCHIAVONE:  Okay.  Are you telling me
7      the City of Savannah's testimony is that the
8      police don't have to follow existing policy?  Is
9      that the position of the City of Savannah?
10      MR. O'CONNOR:  That's not what he
11      testified to, but I'll let him answer it.
12      Q.    (By Mr. Schiavone)  Tell me again what
13  your answer was to my first question.
14      A.    Yes, sir.  I said that the chief can --
15  can make a change to policy whenever he wants.
16      Q.    All right.  And in this case did he follow
17  the proper procedures to change the draft policy to
18  make it policy?
19      A.    No, he did not.
20      Q.    All right.  And is it the City of
21  Savannah's position that the police department has
22  to -- the chief has to follow the existing policies
23  like call the officers?
24      A.    Yes.
25      Q.    All right.  So that would include the

**24**

1  requirements to follow the Douglas Factors as well as
2  doing a letter of transmittal under that existing
3  policy, Exhibit 2?
4      A.    Yes, sir.
5      Q.    All right.  Now, if the chief fails to
6  follow existing policy, who monitors his conduct?
7  Does the City of Savannah have a policy in effect
8  that he could be reprimanded or action could be taken
9  against the chief when he fails to follow policy?
10      MR. O'CONNOR:  Object to the form.  That
11      was multiple questions.
12      Q.    (By Mr. Schiavone)  Well, is the chief of
13  police as well as the assistant chief of police, are
14  you as well as the chief required to follow the
15  policy of the Savannah Police Department?
16      A.    Yes, sir, we are.
17      Q.    All right.  And if you fail to follow
18  policy, who takes action against you or the chief
19  when you fail to follow policy?
20      A.    In reference to me being the assistant
21  chief, the chief can take action against me.
22      Q.    All right.  Who has the authority?
23      A.    The City.
24      Q.    And does it come from the City of Savannah
25  to take action against the chief when he fails to

**25**

1  follow policy?
2      A.    Yes, sir.  And that falls under the city
3  manager.
4      Q.    All right.  And, to your knowledge, before
5  the chief left office, did the City of Savannah take
6  any action to punish him for failure to follow policy
7  in this case against Officer Kang and Officer Arango?
8      A.    No, sir.
9      Q.    All right.  And do you know why the City
10  would not have taken action against the chief when
11  they were made aware of it?
12      MR. O'CONNOR:  I'm going to object to the
13      question on the ground that it's not in the
14      topics that were given for him to be prepared to
15      answer.
16      MR. SCHIAVONE:  That's fine.
17      Q.    (By Mr. Schiavone)  Can you answer the
18  question for me, Chief?
19      A.    I cannot.  I wasn't in that discussion
20  with the city manager, and I'd reference whatever he
21  was -- testified to in his deposition.
22      Q.    All right.  Did you review any documents
23  in reference to the hiring of Susan Cox?
24      A.    Yes.
25      Q.    And did you bring copies of any of these

**26**

1  documents with you to the deposition?
2      A.    I did not.
3      Q.    All right.  And do you know who hired
4  Susan Cox for the City?
5      A.    That came through the human resources
6  department.
7      Q.    And who in that department would have made
8  that decision?
9      A.    I believe Jeff Grant.
10      Q.    All right.  And does that hiring in terms
11  of her payment, does that have to go to city council?
12      A.    Don't believe so.  I believe that can be
13  done through emergency purchase by the city manager.
14      Q.    All right.  And, to your knowledge, did
15  the City determine if she interviewed every officer
16  who signed the HR complaint?
17      A.    She did not.
18      Q.    And do you know which officers, if any,
19  she did interview?
20      A.    I don't know.  I don't have that list, but
21  I know it was not all of them.
22      Q.    And did she make a finding of fact as a
23  result of her investigation and present it to the
24  City of Savannah?
25      A.    She did.

**27**

1    Q.    All right.  And did she give any
2  recommendation as to the action to be taken against
3  Chief Minter?
4    A.    I don't recall what the exact wording was
5  on the document.  If I can look at it I can refresh
6  my memory.
7    Q.    Can you tell me what you recall?
8    A.    I know that there was -- mediation was
9  part of that, but I know individualized complaints
10  were made along with the -- the one with the -- the
11  large group.  I know she interviewed people within
12  that group, but I can't -- I can't recall the
13  recommendation at this point in time.
14    Q.    To your knowledge, was Officer Kang or
15  Officer Arango interviewed by Ms. Cox?
16    A.    I do not believe so.
17    Q.    And was her findings sent to Chief Minter
18  after the City received it?
19    A.    I can find no verification of that.
20    Q.    You didn't find any documents or anything
21  that reflected that, e-mails or anything like that?
22    A.    No, sir.
23    MR. SCHIAVONE:  All right.  Okay.  I guess
24  it was attached to Exhibit C which was Exhibit A
25  which I think was the HR complaint.  Do y'all

**28**

1  have a copy of that that I can get marked as
2  Exhibit 3?
3    MR. O'CONNOR:  You're talking about
4  Exhibit C?
5    MR. SCHIAVONE:  It was Exhibit A, I
6  believe.  Yeah, it's the -- Matt, it's the City
7  of Savannah conflict resolution with all the
8  signatures.
9    MR. O'CONNOR:  Yes, we have a copy.
10    MR. SCHIAVONE:  If I didn't -- and I
11  probably didn't.  Can I get the fourth amended
12  notice to take deposition marked as an exhibit
13  for the purposes of the record?
14    MR. O'CONNOR:  Have you got that?
15    MR. BRADLEY:  I have one that's marked up
16  with all my notes, so I can't make that an
17  exhibit.
18    MR. O'CONNOR:  All right.  Let's take it
19  step by step.  I'm going to hand to the court
20  reporter the City of Savannah conflict
21  resolution program document that's got the
22  attached signature pages, and that will be 3.
23    THE REPORTER:  (Nods head.)
24    (Exhibit 3 was marked for identification.)
25    MR. O'CONNOR:  Mike, we'll have to go make

**29**

1  a copy of the fourth notice, because nobody's
2  got one.
3    MR. SCHIAVONE:  All right.  We can do it
4  later.  That's fine.
5    Assistant Chief Gavin, take a look at
6  Exhibit 3.  Take a second and review it.
7    MR. O'CONNOR:  Off the record.
8    (Discussion off the record.)
9    THE WITNESS:  Yes, sir.
10    Q.    (By Mr. Schiavone)  In the former city
11  manager Pat Monahan's deposition he stated Roy Minter
12  was provided a copy of the HR complaint along with
13  the completed individual responses.  Did you see
14  where that was done?
15    MR. KACHMAR:  Object to the form.
16    Q.    (By Mr. Schiavone)  By the City, by
17  Patrick Monahan?
18    MR. KACHMAR:  Object to the form to the
19  extent that's not an accurate --
20    MR. SCHIAVONE:  I'm sorry?
21    MR. KACHMAR:  I object to the form to the
22  extent that's not an accurate representation of
23  the testimony.
24    Q.    (By Mr. Schiavone)  Well, did you go back
25  and can you tell me what you found?  Is there an

**30**

1  e-mail that shows if that Exhibit 3 and the responses
2  were sent to the chief, Minter?
3    A.    I'm not aware of that e-mail.
4    Q.    And do you have any knowledge as to when
5  that was sent to Chief Minter?
6    MR. KACHMAR:  Object to the form to the
7  extent it misrepresents the city manager's
8  testimony.
9    Q.    (By Mr. Schiavone)  Did you see anything
10  that reflected that?
11    A.    No, sir.
12    MR. SCHIAVONE:  All right.  In reference
13  to No. 6, that's one of the first ones that
14  y'all had an objection, I believe?
15    MR. O'CONNOR:  Yes.
16    MR. SCHIAVONE:  Just let me -- let me ask
17  the question and then put your objections on the
18  record.
19    Q.    (By Mr. Schiavone)  Did you find any
20  e-mails or anything that the City was copied where
21  Roy Minter contacted the Downtown Business
22  Association or any other organization as to the
23  investigation into the Darryl Faitele incident on
24  April 14th, 2020?
25    MR. O'CONNOR:  I'll just incorporate the

EXHIBIT 27

## 31

1  objection that we made to No. 6 that's on
2  Exhibit 1. Subject to that, he can try and
3  answer it.
4      THE WITNESS: Not that I'm aware of.
5  No, sir.
6      MR. SCHIAVONE: All right. Exhibit -- do
7  we have -- Exhibit B was the video of the
8  incident, I believe. Did we have that attached
9  to something, Matthew?
10     MR. BRADLEY: I think. No, it wasn't.
11     MS. PAUL: (Shakes head.)
12     MR. SCHIAVONE: I'm assuming that was
13  already introduced at some of the other
14  depositions.
15     MS. PAUL: It was not an attachment to the
16  third.
17     MR. BRADLEY: Okay. Yeah, it wasn't
18  attached.
19     MR. O'CONNOR: It was definitely used in
20  some of the depositions. I'm not sure if it was
21  made an exhibit or not, Mike.
22     Q. (By Mr. Schiavone) Assistant Chief Gavin,
23  did you ever review the video --
24     A. I did.
25     Q. -- of the incident? You did review it?

Gilbert & Jones

## 32

1      A. I did, sir.
2      Q. All right. And in reference to, you know,
3  Chief Minter contacting third -- well, what I would
4  consider third parties, people not associated with
5  the police department or the district attorney's
6  office, did you find anything in the City where
7  anything that would show documents where Minter
8  showed that video of the Faitele incident to outside
9  sources other than the district attorney's office?
10     A. Yes. The video was shown to the CARES
11  Committee.
12     Q. And would that -- would that have been a
13  normal procedure with the police department and the
14  City of Savannah of an ongoing criminal
15  investigation, to release evidence?
16     A. No.
17     Q. Did you see any documents in which the
18  City may have contacted the chief as to why he would
19  be showing this footage to an outside source of a
20  pending criminal case?
21     A. I did not.
22     Q. All right. Did you see any documents that
23  show where the City took an active role in the
24  showing of that video to, in this instance it would
25  have been CARE, where they along with the chief

Gilbert & Jones

## 33

1  agreed to show the video to this organization?
2      A. I know the chief showed it to the
3  organization.
4      Q. All right. The -- was there anything in
5  the City of Savannah records that -- where they
6  received the PowerPoint presentation that Minter
7  created in reference to showing this video to CARE or
8  any other organization?
9      A. Not that I can recall.
10     Q. Have you ever seen the PowerPoint
11  presentation?
12     A. I have not.
13     Q. All right. Were there any documents or
14  anything that indicate who called the press
15  conference on the courthouse steps in reference to
16  this case against Kang at that time and Mike Arango?
17     A. I don't -- I don't -- I don't have
18  knowledge of who called for it. I know that there
19  was one.
20     Q. All right. Would that have been normal
21  procedure of the police department, to hold press
22  conferences in reference to a pending criminal case
23  and discussing it?
24     A. That's a broad question, but, I mean,
25  we've talked about criminal cases that are in

Gilbert & Jones

## 34

1  progress or showed video or surveillance video or
2  pieces like that. So in that aspect we have done
3  that while an investigation was going on many of
4  times.
5      Q. All right. Did you see any e-mails or
6  other communications in the records of the City of
7  Savannah between the mayor or anyone else and the
8  Chief Minter in reference to that -- to that press
9  conference? Dates? Times? Who would be there?
10  What would be said? Anything of that nature?
11     A. Not that I recall seeing, sir, no.
12     Q. All right. And did you ever review the
13  PowerPoint that Minter created in reference to this
14  case?
15     A. No, sir.
16     Q. All right. Do you know if there were any
17  documents at the City of Savannah that reflected part
18  of that presentation included slides concerning
19  George Floyd, Breonna Taylor and the Arbery
20  incidents?
21     A. No, sir.
22     Q. And do you know why there would be any
23  relevance of those cases to be presented to CARE or
24  anyone else as part of the criminal investigation?
25     A. No, sir.

Gilbert & Jones

EXHIBIT 27

**35**

1    Q.    Do you know of any reason that the City
2  would be involved in presenting those cases to CARE
3  or anyone else in reference to a pending criminal
4  case?
5    A.    No, sir.
6    Q.    Do you believe it was ethical for Chief
7  Minter or even the mayor of the City of Savannah to
8  have held that press conference or discuss this
9  matter with anyone outside of the police department
10  or the district attorney's office?
11    MR. O'CONNOR:  I'm going to object to that
12    question as being outside the scope of the
13    30(b)(6) notice.
14    MR. SCHIAVONE:  All right.
15    Q.    (By Mr. Schiavone) Do you know of
16  anything?  I understand there's an objection.
17    MR. O'CONNOR:  If you can answer, answer.
18    If it's something you're not prepared for you,
19    you can tell him that.  It's up to you to answer it
20    if you can.
21    THE WITNESS:  I would say that it's -- it
22    would be hard for me to put that into terms, but
23    it would be -- I don't want to say whether
24    ethics, but it would be outside the norm of
25    somewhat prejudicial.

**Gilbert & Jones**

**36**

1    Q.    (By Mr. Schiavone) Did you see any
2  records at the City of Savannah where local attorney
3  Julie Wade had recorded the presentation and believed
4  Minter was acting inappropriately as well as the City
5  in reference to this matter?
6    MR. O'CONNOR:  I'm going to make the same
7    objection as I did before, Mike, to that one is
8    outside the scope of the notice.  But, subject
9    to my objection, you can answer if you can.
10    THE WITNESS:  Not that I'm familiar.
11    Q.    (By Mr. Schiavone) Did you see any
12  e-mails, text messages or letters or anything or
13  recorded conversations of any communications between
14  Daniel Kang and the Darryl Faitele incident with the
15  City of Savannah?
16    A.    Not that I'm aware of, sir.
17    Q.    All right.  Did you see with the City of
18  Savannah any personnel files of Daniel Kang, Octavio
19  Arango, Joseph Toth, Richard Wiggins, or Torrance
20  Gavin -- Garvin?  I'm sorry.
21    A.    I know they were submitted per request and
22  that they're in the possession of the human resources
23  director.
24    Q.    All right.  Were they requested as part of
25  the investigation in the Kang and the Arango matter

**Gilbert & Jones**

**37**

1  when you looked at the documents?
2    A.    I'm confused on the question.  Are you
3  saying were they -- were they requested by you?  Or
4  were they used for --
5    MR. SCHIAVONE:  By the City.
6    MR. O'CONNOR:  Object to form, Mike.  Can
7    you rephrase that?
8    Q.    (By Mr. Schiavone) Well, you saw those
9  files were with the City of Savannah?
10    A.    Yes, sir.  They're in the possession of
11  the City of Savannah.
12    Q.    All right.  Do you know who requested
13  those files based on your review of the documents of
14  the City?
15    A.    No.  I'm not familiar with who requested
16  them.
17    Q.    Would there be any e-mails or anything in
18  there that would indicate that?
19    A.    Not that I -- I can recall seeing.  If you
20  have something to refresh my memory I don't have
21  anything in front of me.
22    Q.    Yeah.  I don't think I can get into all
23  this other stuff.
24    All right.  In your review of the City
25  documents, were there any statements attributed to

**Gilbert & Jones**

**38**

1  Chief Minter in which he made reference to anyone to
2  sign Exhibit -- the HR exhibit, which one was that?
3    MS. HERMAN:  3.
4    Q.    (By Mr. Schiavone) 3?  Did you see any
5  communications from Roy Minter to the City in
6  reference to any of the officers that signed the
7  complaint?
8    A.    No, sir.
9    Q.    Did you see any complaints other than that
10  to Exhibit 3 that were in written form that were
11  filed against Chief Minter as police chief by any
12  other sources, anyone else?
13    A.    No, sir, I did not.
14    Q.    Did you see any adopted policies by the
15  City of Savannah or the police department which
16  allowed the Savannah CARES Committee to review the
17  disciplinary actions taken against Daniel Kang or
18  anyone else?
19    A.    No, sir.
20    Q.    Did you see in reviewing the City of
21  Savannah documents any complaints, dispositions or
22  actions taken against Adrian Gates?
23    A.    Yes.
24    Q.    And would there have been any e-mails or
25  any other documents that reflect communications

**Gilbert & Jones**

1 between the City of Savannah, anyone in the City of
2 Savannah, and the chief concerning Adrian Gates?
3     A.   E-mails in reference to Gates?
4     Q.   **E-mails, text messages.**
5     A.   Not that I'm aware of.
6     Q.   **Any documents?**
7     A.   No, sir. I saw --
8     Q.   **No, sir?**
9     A.   -- the disciplinary files.
10     Q.   **Just the files themselves?**
11     A.   Yes, sir.
12     Q.   **All right. How about as to Latrelle**
13 **Goodine?**
14     A.   I saw the disciplinary files.
15     Q.   **All right. No other documents similar to**
16 **what I asked on Adrian Gates?**
17     A.   No, sir.
18     Q.   **All right. Were there any documents,**
19 **comments, criticisms, e-mails of any nature**
20 **criticizing having Savannah CARES Committee review**
21 **the Kang and Arango case?**
22     A.   No, not that I'm aware of.
23     Q.   **Did you see any documents with the City of**
24 **Savannah between City of Savannah, Chief Minter or**
25 **Meg Heap from the district attorney's office in**

---

1 reference to the CARE Committee?
2     A.   No, sir.
3     MR. SCHIAVONE: Can we take a quick break,
4 just one second, Pat?
5     MR. O'CONNOR: Yes, sure. We can go off
6 the record now.
7     (Recess taken from 11:33 a.m. to 11:44
8 a.m.)
9     Q.   **(By Mr. Schiavone) Assistant Chief Gavin,**
10 **to your knowledge, do you know with the City of**
11 **Savannah who reviewed the video of this incident?**
12     A.   I know -- internally?
13     Q.   **Yes, sir.**
14     A.   I know it was the -- those who were on the
15 board, the chief, the assistant chief at the time,
16 Chief Gunther, Major Adams.
17     Q.   **And what was -- what was your rank at the**
18 **time?**
19     A.   Major.
20     Q.   **Major; all right. Would you have been in**
21 **that loop to review it?**
22     A.   I was not.
23     Q.   **Okay. But at some point subsequently you**
24 **did review it?**
25     A.   Yes, sir.

---

1     Q.   **I mean, was that part of your duties?**
2     A.   It was in preparation for the depositions.
3     Q.   **Okay. The Savannah Police Department,**
4 **that's just an appendage of the City of Savannah. Do**
5 **you know how that works? Do they answer to the City**
6 **of Savannah, their policies and the way the police**
7 **department functions?**
8     A.   Yes.
9     Q.   **When the Savannah Police Department**
10 **creates policies, do they have to be reviewed by**
11 **somebody at the City of Savannah?**
12     A.   They do not.
13     Q.   **I'm sorry?**
14     A.   They do not.
15     Q.   **Maybe not?**
16     A.   No. I said, they do not.
17     MR. ARANGO: They do not.
18     MR. SCHIAVONE: They do not; okay.
19     Q.   **(By Mr. Schiavone) To your knowledge,**
20 **when the Savannah Police Department created the**
21 **Warrant Squad, was there any policies in place as to**
22 **creating that squad?**
23     A.   There was not a policy, no, sir.
24     Q.   **All right. Would there have been anything**
25 **with the City of Savannah that would have reflected**

---

1 the creation of the Warrant Squad?
2     A.   No, sir.
3     Q.   **All right. And, to your knowledge, was**
4 **the City aware that Arango and Kang and the rest of**
5 **the unit had drafted a potential policy to be**
6 **considered for the Warrant Squad?**
7     A.   Not that I'm familiar with.
8     Q.   **If the policy they had created had been**
9 **sent to the accreditation, can you explain to me what**
10 **that procedures is? Is that part of the policy**
11 **process?**
12     A.   So if a draft policy was submitted for
13 review it would have gone to the accreditation
14 manager and then the accreditation manager normally
15 would have pushed that through the executive command
16 staff depending on what it was and where it fell. It
17 could fall to everybody from a captain and above or
18 it could just be the executive command staff being
19 the assistant chiefs and the chief or it could be the
20 majors, assistant chief, and the chief.
21     Q.   **Would that -- does that process -- does**
22 **that include people at the City of Savannah?**
23     A.   No.
24     Q.   **HR? Anyone?**
25     A.   Normally no.

EXHIBIT 27

**43**

1  Q.  All right.  Should there have been a
2  policy in place for the Warrant Squad?
3  A.  A policy to govern, I mean, I don't
4  understand the question necessarily.  There's
5  directives and there's standard operating procedures
6  and then there's policies.  I don't know what policy
7  would have --
8  Q.  It would have been all -- I guess all of
9  the policies.  Well, let me get a little bit more
10  specific.
11  What is your understanding would be the
12  purpose of a Warrant Squad?
13  A.  So the Warrant Squad's focus was to
14  identify prolific offenders, those who were involved
15  in violent actions, also domestic violence, felonies.
16  So more keying on the felony and the shooters and
17  attempting to serve those who have warrants on them
18  already.
19  Q.  All right.  Had you ever served on a
20  Warrant -- maybe not called a Warrant Squad, but out
21  serving arrest warrants?
22  A.  Yes.
23  Q.  All right.  When you did that, was there
24  any policy in place at the Savannah Police
25  Department?

**44**

1  A.  No.  I mean, what you're talking about is
2  iterations of different job and performance things
3  that you would have to do.  Every police officer has
4  the ability to serve a warrant.  The ones that are
5  designated in the way that they were designated in
6  this case was to key in on specific offenders who
7  were involved in recent crimes or believed to be, you
8  know, creating an ongoing violence throughout the
9  city.  So they would key in on those prolific
10  offenders.  But over the years and throughout my
11  career we've had many iterations of a Warrant Squad
12  without there being a policy for a Warrant Squad.
13  Q.  Was there -- before this incident, was
14  there a -- what they consider an old Warrant Squad,
15  COT-U?
16  A.  COT-U.
17  Q.  COT-U?
18  A.  COT-U, yes.
19  Q.  All right.  So there was a Warrant Squad
20  at some point previously --
21  A.  Yes.
22  Q.  -- designated?
23  A.  There have been --
24  Q.  And was there -- would there have been
25  policies in reference to that --

**45**

1  MR. O'CONNOR:  Mike --
2  MR. SCHIAVONE:  -- squad?
3  MR. O'CONNOR:  -- let me object to the
4  form.  You cut him off there.  I think he was
5  going to --
6  MR. SCHIAVONE:  I'm sorry.
7  THE WITNESS:  No, no.  I was just going to
8  say that there's been many iterations of that.
9  COT-U was one that not only did that but had
10  other duties to include, you know, as
11  intelligence portion of COT-U and there were
12  several other pieces that were.  And, again,
13  that comes from who's in charge.
14  Q.  (By Mr. Schiavone)  All right.  Here's
15  what I'm getting at:  The City of Savannah would have
16  required that there be some kind of policy in
17  reference to the execution of arrest warrants of
18  serious violent offenders?
19  A.  No, sir.
20  Q.  So they wouldn't have required any kind of
21  policy?
22  A.  No.
23  Q.  All right.  In this particular case, would
24  you agree that serving these types of warrants are
25  dangerous?  The officer's safety could be at peril?

**46**

1  A.  Yes, sir, all -- yeah, any -- all these
2  type of interactions put officers in danger.
3  Q.  All right.  Let me see if I can get an
4  understanding of how it's done.
5  This squad in particular, they've given a
6  warrant that has a general description of the
7  individual, lists where he lives and designates the
8  serious offense, and it's a warrant signed by a
9  judge.
10  Does directing the officer to place that
11  person's body in custody, is that normally how you
12  receive the warrant?
13  A.  Yes, sir, through the courts.  You know,
14  through many different means.  But they come through
15  the court and they come from a judge's signature.
16  Q.  All right.  And is that lawful as your
17  understanding of the law?
18  A.  Yes, sir.
19  Q.  So when they go to serve that, if they go
20  to the address that's designated in the warrant, are
21  they act -- in your capacity and would the City of
22  Savannah consider them be acting lawfully?
23  A.  Yes, sir.
24  Q.  And when they go up to the residence and
25  they enter the residence, is that a -- would --

1  under -- if there was an existing policy, is there
2  training that these officers are supposed to receive
3  on how they proceed once they do that?
4       A.    They're given training from when they
5  first become a police officer through multiple
6  different facets as to what your legal ability is to
7  enter a residence, whether you need a search warrant,
8  whether you're in hot pursuit.  So all of those
9  pieces are -- are trained and taught as a police
10  officer.
11      Q.    Right.
12            So if the officer, the door is opened and
13  there's a number of individuals in there, is that a
14  potentially dangerous situation?
15      A.    Are you -- in reference to this incident
16  specifically?
17      Q.    Well, any incident where you have a lawful
18  warrant for the arrest of an individual.  You're at
19  his address that's designated in the warrant and you
20  have a lawful warrant.  When he gets to the residence
21  and the door's opened and there's a number of
22  individuals in there, are officers trained on what to
23  do?
24      A.    I mean, if you have the legal right to be
25  where you're at, yeah.  We --

1       Q.    Yes, sir.
2       A.    We train officers on how to control threat
3  and how to use officer safety.  I mean, these are --
4       Q.    All right.
5       A.    -- standard --
6       Q.    If the officer yelled out the name of the
7  individual in the warrant once the door was
8  immediately opened and an individual starts coming
9  toward them and they told that individual to get on
10  the ground, would that have been lawful in your mind,
11  their actions?
12            MR. O'CONNOR:  Let me object, Mike, to
13      being outside the scope.  If you can direct me
14      to which topic you're on here maybe that would
15      help.  Maybe I can --
16            MR. SCHIAVONE:  It deals with the Warrant
17      Squad.  It was No. 21.
18            What I'm trying to establish is that at
19      some point the City of Savannah, and I'll get to
20      the City, but the City had to make a
21      determination these officers were not acting
22      correctly and would justify their firing.  So I
23      want to find out from him as the City
24      representative his understanding if the officers
25      were acting lawfully when they did that.

1            MR. O'CONNOR:  All right.  I'm looking at
2      21, and it does not extend as far as you are
3      going.  So I'll just object to it being outside
4      the scope and allow him to answer subject to my
5      objection.
6            MR. SCHIAVONE:  All right.
7       Q.    (By Mr. Schiavone)  So if the officers
8  told the individual whose name is in the warrant and
9  that person whoever it was starts coming at them at
10  that point and they order that person to get on the
11  ground, in your mind, would the officers have been
12  acting lawfully?
13      A.    Okay.  So you're -- what you're saying, if
14  the person named in that warrant is in front of you
15  and you're telling him what to do then and they are
16  refusing to do that and you're within that arm's
17  reach of them, then yes.
18      Q.    All right.  And if they fail to comply
19  with the officer's lawful order, would that
20  constitute an obstruction crime?
21      A.    Yes.
22            MR. O'CONNOR:  And let me object.
23            THE WITNESS:  I mean, you know, I'm trying
24      to --
25            MR. O'CONNOR:  Let me object to the extent

1  you're calling for legal conclusions as well.
2  Go ahead.
3            THE WITNESS:  I'm just -- you're -- you're
4      giving me a scenario without -- I don't have all
5      the other pieces.
6       Q.    (By Mr. Schiavone)  Well, you viewed the
7  video?
8       A.    I did.
9       Q.    You said you viewed the video?
10      A.    I did.
11      Q.    You saw when the door was opened the
12  officers yelled out the name of the individual in the
13  warrant, didn't you?
14      A.    Yes, sir.
15      Q.    And you saw this individual proceeding
16  toward them, didn't you?
17      A.    I did.
18      Q.    And you heard them order at least three
19  times for him to get on the ground, didn't you?
20      A.    I did.
21      Q.    All right.  And at the point that he
22  refused to get on the ground, did they have a right
23  to require him to get on the ground and obey those
24  lawful orders three times?
25      A.    Yes.

EXHIBIT 27

**51**

1    Q.    And when he didn't, did they have a right
2 to secure his person?
3    A.    Yes, they had the right to -- to use the
4 minimum amount of force necessary to -- to effect
5 that arrest.
6    Q.    All right.  Did you see anything that
7 exceeded a reasonable amount of force when they
8 placed him down on the ground at that point?
9    A.    No, I did not.
10   Q.    All right.  So at that point he would have
11 been under arrest for obstruction.  They had a right
12 to arrest him, didn't they?
13   A.    So, all right.  Well, this is where
14 your -- your -- this is not the person with the
15 warrant.  So if I --
16   Q.    Yeah.  But would that matter if when they
17 yelled out the name of the person this man responded?
18        MR. O'CONNOR:  Object to form.
19        THE WITNESS:  That man did not respond
20   that I am him.  I just want to --
21   Q.    (By Mr. Schiavone)  No.
22   A.    -- be clear.  I want to be clear,
23 Mr. Schiavone, about what you're saying, because --
24   Q.    Yeah, yeah.  But what I'm saying is --
25   A.    Just because I walk towards --

Gilbert & Jones

**52**

1    Q.    -- they don't --
2    A.    -- you doesn't give me --
3    Q.    They don't --
4        MR. O'CONNOR:  Mr. Schiavone, let me --
5    Q.    (By Mr. Schiavone)  The officers only
6 have --
7        MR. O'CONNOR:  -- object.
8    Q.    (By Mr. Schiavone)  -- the name of the
9 individual and a broad description.
10       MR. O'CONNOR:  I'm going to object to you
11   not allowing him to finish his question.
12       MR. SCHIAVONE:  I'm sorry.
13       MR. O'CONNOR:  His answer, rather.
14       THE WITNESS:  And I understand where
15   you're trying to get to.  What I'm saying,
16   though, is if -- if -- replace him with a female
17   or the mother or someone and they start walking
18   towards you and you tell them to stop.  They
19   don't have to stop.  They're in their home and
20   they're not the person.  So --
21   Q.    (By Mr. Schiavone)  No, I understand.
22   A.    -- I want to be clear.
23   Q.    I understand that, but in this case --
24   A.    Go ahead.
25   Q.    -- they only had -- they only had the name

Gilbert & Jones

**53**

1 of an individual.
2        MR. O'CONNOR:  Mr. Schiavone, we cannot
3   get anywhere if you keep cutting him off.
4   You've got to allow him to finish his answer.
5        MR. SCHIAVONE:  All right.
6        MR. O'CONNOR:  This is not a criminal case
7   over in court; okay?  You're going to have to
8   let him finish his answer.  Go ahead.
9        THE WITNESS:  No, sir.  All I'm saying is
10  that we have to do our due diligence.  We have
11  to -- and, like I said, it's what you reasonably
12  know at the time that it's occurring.
13       And I believe they believed they had the
14  subject in question and he was walking towards
15  them and he was not listening to them.  And so
16  they took him down to the ground and to effect
17  that arrest, and I believe that all of those
18  portions of that are correct.
19       But you're saying do they have the ability
20  to just do that, and I want to be clear.  It's
21  what they know at the time.  And at the time
22  they believed they had Khalil Kelly there, and
23  so they were reacting to that action.
24   Q.    (By Mr. Schiavone)  All right.  So, as I
25 understand what you're saying, is that they acted

Gilbert & Jones

**54**

1 reasonably in their actions in the video?
2    A.    Yes, sir.
3    Q.    All right.  So if -- if he failed -- and
4 the reason why I'm trying to get to this is, if they
5 didn't do anything improper and they had a right to
6 secure him once he failed to obey their direction to
7 get on the ground which would constitute an
8 obstruction and this was presented to the City, did
9 you see anything in the City or did anyone tell the
10 City that these officers hadn't done anything
11 improper?
12       MR. O'CONNOR:  Object to the form.  You
13  can answer subject to the objection.
14       THE WITNESS:  You asked for my -- for the
15  City's opinion on that.
16   Q.    (By Mr. Schiavone)  Right.
17       At some point somebody had to make,
18 I guess, the determination to contact the DA's office
19 and pursue a criminal case against these officers.
20   A.    That would be the chief of police.
21   Q.    Right.  And -- and if -- as law
22 enforcement officers, if you review that video, that
23 that initial confrontation they'd done everything
24 proper.  There wasn't anything illegal in their
25 actions and this person obstructed justice, at that

Gilbert & Jones

EXHIBIT 27

**55**

1  point they hadn't committed any crime, anything to be
2  fired about, did they?
3     MR. O'CONNOR:  Object to form.  You may
4  answer.
5     THE WITNESS:  By -- by -- by taking that
6  action of the person coming towards them they
7  believed to be him, no, they did not.
8     Q.    (By Mr. Schiavone)  All right.  And to
9  your knowledge, do you see any documents, e-mails,
10  conversations, anything in the city records in which
11  that was discussed with the chief of why there was --
12  he was pursuing a criminal case against these
13  officers?
14     A.    I saw no documentation on that.
15     Q.    All right.  Did you see any documents with
16  the City, anything that indicates how this matter
17  went from the police department to the district
18  attorney's office?  Was there a referral or anything
19  about a criminal prosecution?
20     A.    The chief made that determination.
21     Q.    All right.  Is that the normal procedure?
22  I mean, you know, there's hundreds of cases at the
23  police department.  Do they all have to go through
24  the chief?
25     A.    Yes, for criminal.

**Gilbert & Jones**

**56**

1     Q.    So all --
2     A.    For criminal.
3     Q.    All criminal cases?
4     A.    Yeah, if something is deemed to be
5  criminal, that the chief is then given that decision
6  on whether to send that to the district attorney's
7  office.
8     Q.    Okay.  Did you see anything with the City
9  that reflected any document that would show that
10  Darryl Faitele had committed perjury in his
11  deposition in reference to Paycheck Protection
12  Program, fraud, committing fraud?
13     A.    No, sir.
14     Q.    All right.  Did you see anything with the
15  City of Savannah and the police department in
16  reference to distribution of personal protection
17  equipment for these officers at the time of COVID and
18  at the time this happened in reference to protecting
19  the police officers or attempting to protect the
20  police officers?
21     A.    Yes.
22     Q.    Was that -- can you tell me what that
23  reflected, what it said?
24     A.    There was information pushed out by the
25  city manager and also over a several-month span along

**Gilbert & Jones**

**57**

1  with social media and pieces like that.
2     Q.    Would that -- would those documents and
3  that information, did -- was that before this
4  incident?
5     A.    I believe there was one memo from the city
6  manager to all city employees prior to this incident.
7     Q.    All right.  Were you aware that the SWAT
8  team as well as this Warrant Squad were not provided
9  any protection --
10     A.    Yes, sir.
11     Q.    -- before they were asked?
12     So did that violate any policy of the City
13  of Savannah at that time?
14     A.    No, sir.  It was not mandatory at the
15  time.
16     Q.    To your knowledge, has there ever been any
17  cases at the Savannah Police Department where people
18  placed in custody that might be bleeding have spit
19  blood on police officers and been charged?
20     A.    Yes, sir.
21     Q.    Do you have any idea how many cases may
22  have been out there that that happened?
23     A.    Through my entire career I've seen
24  multiple, but two that come to mind were involving
25  Officer Farmer and Officer Lockett.

**Gilbert & Jones**

**58**

1     Q.    All right.  Would you as a -- would you
2  consider it when someone does that to another
3  individual, be it a police officer or anybody else,
4  that that could constitute a simple battery?
5     A.    Yes, sir.
6     Q.    Or some form of a crime?
7     A.    Yes, sir.
8     Q.    All right.  And would it be the policy of
9  the police department that the officer has a right to
10  defend themselves from that?
11     A.    Policy allows for you to take, you know,
12  reasonable action to protect yourself.
13     Q.    Yes, sir.
14     A.    It also states that you can't hit a or
15  strike a handcuffed prisoner.
16     Q.    All right.  Do you have a right to prevent
17  him from continuing to spit on you to control him?
18     A.    Yes.
19     Q.    All right.  Did you see any documents that
20  were provided to Pat Monahan before he made his
21  decision to terminate Kang where all this information
22  was presented to him from the police department?
23     A.    Everything that was in the deposition of
24  Mr. Monahan.
25     Q.    Are you aware and was there any documents

**Gilbert & Jones**

1  in the City of Savannah, did Chief Minter take any
2  action against any of the officers that had signed
3  the human resource complaint besides Kang and Arango?
4      MR. KACHMAR:  Object to the form.  I'm not
5  sure what you mean by any action.  To the extent
6  you can answer, you can answer.
7      Q.   (By Mr. Schiavone)  Any discipline?
8  Firing?  Demotion?
9      A.   I'm sure there were people that
10 coincide -- that there were actions that coincided
11 with people that were on the list, but...
12     Q.   All right.  Did you see any documents
13 where the City reviewed any of those actions taken by
14 the chief?
15     A.   I reviewed the -- the disciplinary files
16 of the people involved in this case.
17     Q.   All right.  Did you see any documents at
18 the City of Savannah where Chief Minter contacted
19 them before he referred this case to the district
20 attorney's office?
21     A.   I don't know who they is.
22     Q.   I'm sorry?
23     A.   I don't know who you're referencing.
24     Q.   Well, before -- they would have been the
25 City of Savannah, the mayor, the city manager.

Gilbert & Jones

1           Did you see any documents where it was
2  discussed prior to Chief Minter going to the district
3  attorney's office?
4      A.   No, sir.
5      Q.   All right.  Did you see any documents with
6  the City of Savannah in the creation of this CARE
7  organization?
8      A.   Just the media, and I believe there was a
9  City of Savannah document pushed out when they
10 created CARES.
11     Q.   Did you see any documents that show any
12 other cases that were presented to this group,
13 CARE group, other than Kang and Arango?
14     A.   No, sir.
15     Q.   Do you know, is the CARE -- this
16 organization or group, do they still exist?
17     A.   I'm not aware.  I don't believe they met,
18 so I don't know if it's been disbanded, but I haven't
19 heard that it was.
20     MR. O'CONNOR:  And let me just say that's
21 outside the scope or he would have been prepared
22 to answer that.
23     Q.   (By Mr. Schiavone)  All right.  Did you
24 see any documents of any nature that reflected that
25 Chief Minter complied with all standards and/or

Gilbert & Jones

1  policies of the City of Savannah?
2      MR. KACHMAR:  Object to the form.
3      THE WITNESS:  No, sir.
4      Q.   (By Mr. Schiavone)  Did you see any
5  documents indicating of any nature by the City of
6  Savannah that Chief Minter was using improper
7  policies in the disciplining of Kang and Arango?
8      A.   No, sir.
9      MR. SCHIAVONE:  Okay.  Let me take a real
10 quick second.  I may be done.
11     MR. O'CONNOR:  Okay.
12     (Pause.)
13     MR. SCHIAVONE:  Pat, I think that's it for
14 me.  Can we get the notice I guess we were
15 talking about?
16     MR. O'CONNOR:  Yes.
17     MR. SCHIAVONE:  May I have that marked?
18     MR. O'CONNOR:  Yeah.  Shawn's going to
19 e-mail it to me.  I'll copy it and give it to
20 the court reporter.
21     MR. SCHIAVONE:  Great.  Thank you, Pat.
22     MR. O'CONNOR:  I've got it in my computer
23 already.  Let's finish the deposition and then
24 I'll get a copy for our court reporter.
25     Are you going to have any questions,

Gilbert & Jones

1  Shawn?
2      MR. KACHMAR:  Yeah.  Mike, are you done?
3      MR. SCHIAVONE:  Yes, I am.
4      MR. KACHMAR:  Pat, did the City have any
5  questions for him?
6      MR. O'CONNOR:  No.
7      (Exhibit 4 was marked for identification.)
8           EXAMINATION
9  BY MR. KACHMAR:
10     Q.   Chief Gavin, good morning.  My name is
11 Shawn Kachmar.  I'm an attorney representing Chief
12 Minter.  I just had a few questions for you.
13     First, at some point the actions that
14 happened with Mr. Faitele involving Officer Kang were
15 sent for or a criminal investigation was started; is
16 that correct?
17     A.   Correct.
18     Q.   Okay.  And was Lieutenant Larry the person
19 assigned to conduct that criminal investigation?
20     A.   Yes, sir.
21     Q.   Okay.  Do you recall when Lieutenant Larry
22 was given the assignment to conduct that
23 investigation?
24     A.   I would have to refer to the page, to the
25 investigative narrative.  I don't remember off the

Gilbert & Jones

1  top of my head.  I'm sorry.

2      Q.   Okay.  Would you have any reason to
3  disagree with me if I said that those documents and
4  previous testimony in this case showed that he was
5  assigned that investigation after Officer Kang was
6  terminated?

7      A.   I would agree to that.

8      Q.   Okay.  In fact, the incident involving
9  Mr. Faitele in this case occurred in mid-April 2020,
10  correct?

11      A.   Correct.

12      Q.   And Officer Kang was terminated in --
13  July 17 he was given suspension or notice of
14  termination, correct?

15      A.   Correct.

16      Q.   Okay.  Did Chief Minter have the
17  discretionary authority to make discipline decisions
18  for officers in the police department?

19      A.   Yes.

20      Q.   And that includes deviating from
21  recommendations from folks in the chain of command
22  below him; is that correct?

23      A.   Correct.

24      Q.   You were asked some questions earlier
25  about the draft policy versus the existing policy.

1  chain of command in this case did provide some
2  review and recommendations?

3      THE WITNESS:  Sorry.  This is my good ear.
4  Mr. Schiavone?  Mr. Schiavone?  Mr. Schiavone,
5  we can hear you.  We can hear you.

6      MR. SCHIAVONE:  I'm sorry?

7      THE WITNESS:  We can hear you.

8      MS. PAUL:  You're not muted.

9      THE WITNESS:  We can hear you.  You're not
10  muted.

11      MR. SCHIAVONE:  Okay.  Got you.

12      THE WITNESS:  Okay.  Sorry.  I couldn't
13  hear.  This is my good ear.

14      Q.   (By Mr. Kachmar)  Yeah, sorry.

15      So my -- the question was, in fact, in
16  this case there was input on sustained or not from
17  Officer Kang's chain of command, correct?

18      A.   Correct.

19      MR. KACHMAR:  Okay.  That's all I have.

20      MR. O'CONNOR:  We have no questions.

21      MR. SCHIAVONE:  I have to figure out how
22  to work this damn thing.  Just a couple
23  follow-up.

24      EXAMINATION
25  BY MR. SCHIAVONE:

1  Do you recall those questions?

2      A.   I do.

3      Q.   Would you agree that the draft policy
4  contains sections requiring a mitigation hearing and
5  requiring input from an officer's chain of command
6  that were not in the officially-adopted policy?

7      A.   When you say recommendations, they were to
8  allow for them to make a determination of sustained
9  or not sustained or any of those other findings.
10  There was no -- under the draft policy, there was no
11  determination of discipline.  That was solely for the
12  chief.

13      Q.   And I apologize for an inartful statement.
14  The question I want to ask is, the draft policy had
15  language allowing for some input from chain of
16  command?

17      A.   Yes.

18      Q.   Okay.  And the draft policy also had
19  language regarding a mitigation hearing, correct?

20      A.   Correct.

21      Q.   Okay.  And, in fact, Officer Kang had a
22  mitigation hearing on June 24th of 2020; is that
23  correct?

24      A.   Correct.

25      MR. KACHMAR:  Okay.  And, in fact, the

1      Q.   Assistant Chief Gavin, was it the normal
2  policy that when there was allegations of criminal
3  conduct that's going to be pursued against a police
4  officer that either the GBI or some other impartial
5  agency is brought in to do the investigation?

6      A.   That's up to the chief.

7      Q.   Has that always been done --

8      A.   The chief makes that --

9      Q.   -- at the police department?

10      A.   The chief makes that determination.
11  Normally and what we've done through prior practice
12  was to bring the GBI in.

13      Q.   All right.  And were you told or did
14  anyone at the City or anyone told why that wasn't
15  done in this case?

16      A.   No.

17      Q.   And the procedure on the internal affairs
18  investigation, isn't that supposed to end if they see
19  any criminal conduct?

20      A.   It allows for that determination to be
21  made by the chief.

22      Q.   But they're supposed to stop their
23  investigation if they see any evidence of criminal
24  conduct?

25      A.   And notify the chief.  But the chief can

**EXHIBIT 27**

**67**

1  make --
2  **Q.  And notify the chief, right?**
3  A.  Yeah.  And the chief can make that
4  determination to continue.
5  **Q.  All right.  And in reviewing the documents**
6  **that were sent to the City, there was no**
7  **determination done by internal affairs that they saw**
8  **any criminal conduct, wasn't there?**
9  A.  Whatever was testified to by Captain
10  Barefield or Lieutenant Wiggins in their depositions.
11  **Q.  And when policies become effective, are**
12  **they placed on a system to where all officers have**
13  **access?**
14  A.  Yes, sir.
15  **Q.  And isn't it true this draft policy was**
16  **never published to the officers?**
17  A.  That's true.
18  **Q.  Of any officers?  So the officers would**
19  **have no notice, no due process of what was contained**
20  **in the draft policy, would they?**
21  MR. KACHMAR:  Object to the form.
22  MR. O'CONNOR:  Object to form.
23  **Q.  (By Mr. Schiavone)  I mean, to your**
24  **knowledge, were they ever sent, was Kang or Arango**
25  **ever sent the draft policies?**

Gilbert & Jones

**68**

1  A.  No, sir.
2  **Q.  Before any action was taken?**
3  A.  No, sir.
4  **Q.  And anything contained in the draft**
5  **policy, wouldn't the officer have a right to be put**
6  **on notice of what to expect?**
7  A.  Yes.
8  **Q.  And you're aware that in the draft policy**
9  **the mitigation process was optional, that these**
10  **officers were not given any notice that that concept**
11  **even existed?**
12  MR. KACHMAR:  Object to the form.
13  MR. O'CONNOR:  Object to form.  It's a
14  compound question.
15  **Q.  (By Mr. Schiavone)  Well, the mitigation**
16  **process was not contained in the Exhibit 2 -- is that**
17  **correct? -- the existing policy?**
18  A.  No, sir.
19  **Q.  All right.  So if the draft policy had not**
20  **been published, these officers or no officer would**
21  **have any knowledge of what that even meant, would**
22  **they?**
23  A.  No, sir.
24  **Q.  And even under the draft policy, aren't**
25  **the officers supposed to be informed of the**

Gilbert & Jones

**69**

1  disciplinary findings?
2  A.  No.  The disciplinary actions that are
3  being accused.
4  **Q.  Right.  But aren't they supposed to be put**
5  **on notice of what those actions were?**
6  A.  Yes.
7  **Q.  What those findings are?**
8  A.  Under the draft policy.
9  **Q.  Are you aware they were never put on**
10  **notice in this case?**
11  MR. O'CONNOR:  Object to form.
12  MR. KACHMAR:  Object to the form.
13  THE WITNESS:  I'm aware to what they
14  testified to, yes.
15  MR. SCHIAVONE:  All right.  And -- I think
16  that's it.  Thanks.
17  MR. O'CONNOR:  Thank y'all.
18  THE REPORTER:  Transcripts?
19  MS. HERMAN:  No.
20  MS. PAUL:  One Min-U-Script is usually
21  sent to Pat for the City.
22  THE REPORTER:  Shawn, remind me what you
23  wanted again.
24  MR. KACHMAR:  Mini digital.  Thank you.
25  THE REPORTER:  Savage wants to order?

Gilbert & Jones

**70**

1  MR. BRADLEY:  Just a PDF, searchable PDF
2  will be great.
3  (Deposition concluded at 12:25 p.m.)
4  (Pursuant to Rule 30(e) of the Federal
5  Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
6  signature of the witness has been reserved.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Gilbert & Jones

EXHIBIT 127

## Page 71

**CERTIFICATE OF COURT REPORTER**

STATE OF GEORGIA:

COUNTY OF EFFINGHAM:

I hereby certify that the foregoing transcript was reported as stated in the caption and the questions and answers thereto were reduced to writing by me; that the foregoing 70 pages represent a true, correct, and complete transcript of the evidence given on March 7, 2023, by the witness, ASSISTANT CHIEF ROBERT GAVIN, who was first duly sworn by me.

I certify that I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c); I am a Georgia Certified Court Reporter here as an employee of Gilbert & Jones, Inc. who was contacted by Savage Turner to provide court reporting services for the proceedings; I will not be taking these proceedings under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and by the attached disclosure form I confirm that neither I nor Gilbert & Jones, Inc. are a party to a contract prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board.

This 8th day of March 2023.

_____

THOMAS J. DORSEY, CERTIFIED COURT REPORTER, 2781

Gilbert & Jones

## Page 72

**DISCLOSURE OF NO CONTRACT**

I, Debbie Gilbert, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Gilbert & Jones, Inc. was contacted by Savage Turner to provide court reporting services for these proceedings and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board for the taking of these proceedings.

There is no contract to provide reporting services between Gilbert & Jones, Inc. or any person with whom Gilbert & Jones, Inc. has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

This 8th day of March 2023.

_____

Debbie Gilbert, FIRM REPRESENTATIVE

Gilbert & Jones, Inc.

Gilbert & Jones

## Page 73

DEPOSITION OF: ASSISTANT CHIEF ROBERT GAVIN /TJD

I do hereby certify that I have read all questions propounded to me and all answers given by me on March 7, 2023, taken before Thomas J. Dorsey, and that:

___ 1)  There are no changes noted.

___ 2)  The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. _____ Line No. ___ should read:_____

The reason for the change is _____

Page No. _____ Line No. ___ should read: _____

The reason for the change is _____

Page No. _____ Line No. ___ should read:_____

The reason for the change is _____

Page No. _____ Line No. ___ should read:_____

The reason for the change is _____

Page No. _____ Line No. ___ should read: _____

The reason for the change is _____

Gilbert & Jones

## Page 74

DEPOSITION OF: ASSISTANT CHIEF ROBERT GAVIN /TJD

Page No. ___ Line No. ___ should read: _____

The reason for the change is _____

Page No. ___ Line No. ___ should read: _____

The reason for the change is _____

Page No. ___ Line No. ___ should read: _____

The reason for the change is _____

Page No. ___ Line No. ___ should read: _____

The reason for the change is _____

Page No. ___ Line No. ___ should read: _____

The reason for the change is _____

Page No. ___ Line No. ___ should read: _____

The reason for the change is _____

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

_____

ASSISTANT CHIEF ROBERT GAVIN

Sworn to and subscribed before me,
This the ___ day of _____, 20__.

_____

Notary Public

My commission expires: _____

Please forward corrections to:

Gilbert & Jones, Inc.
7505 Waters Avenue, Suite F3
Savannah, GA 31406
(912) 355-1061

Gilbert & Jones

**EXHIBIT 27**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| DANIEL KANG, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 4:21-cv-111-RSB-CLR |
| v. | ) | |
| | ) | |
| THE MAYOR AND ALDERMEN | ) | |
| OF THE CITY OF SAVANNAH, and | ) | |
| ROY W. MINTER, JR., Chief of Police | ) | |
| for the City of Savannah, Georgia, in his | ) | |
| Individual Capacity, | ) | |
| | ) | |
| Defendants. | ) | |

<u>DEFENDANT THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH'S
OBJECTIONS TO PLAINTIFF'S THIRD AMENDED NOTICE TO TAKE
30(B)(6) DEPOSITION OF THE CITY OF SAVANNAH POLICE DEPARTMENT</u>

Comes now The Mayor and Aldermen of the City of Savannah (the "City"), one of the Defendants herein, and objects to Plaintiff's Third Amended Notice to Take 30(b)(6) Deposition of the City of Savannah Police Department.

The City objects to Plaintiff's Third Amended Notice on the grounds that "the City of Savannah Police Department" is not a legal entity subject to deposition per FRCP 30(b)(6)("In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity . . . The named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; . . .")

Assuming *arguendo* the City had been designated as the entity subject to deposition per FRCP 30(b)(6), the City would have the following additional objections:

1



EXHIBIT 27

6.     <u>Any contacts with Roy Minter and third parties, including, but not limited to, the</u> <u>Downtown Business Association, as to the investigation into the Darryl Faitele incident of April</u> <u>14, 2020;</u>

The City objects to this topic area as overbroad, vague, and it exceeds the scope of permissible discovery.

7.     <u>The content of any communication about Daniel Kang, as to the Darryl Cornelius</u> <u>Faitele incident;</u>

The City objects to this topic area as overbroad, vague, and it exceeds the scope of permissible discovery.

8.     <u>Any dealings with Darryl Cornelius Faitele and/or his mother about the incident on</u> <u>April 14, 2020;</u>

The City objects to this topic area as overbroad, vague, and it exceeds the scope of permissible discovery.

9.     <u>The personnel files and the contents of the personnel files of: a. Daniel Kang b.</u> <u>Octavio Arango c. Joseph Toth d. Richard Wiggins e. George Gundich;</u>

The City objects to this topic area as overbroad, unduly burdensome, vague, the documents which may be contained within the files would speak for themselves, and it exceeds the scope of permissible discovery.

13.     <u>All dealings with the defendants about the indictment of Daniel Kang;</u>

The City objects to this topic area as overbroad, vague, and it exceeds the scope of permissible discovery.

24.     <u>The criminal records, including arrest, for Darryl Cornelius Faitele, Khalil Kelly</u> <u>and/or any witness listed on CITY00133, attached as Exhibit "C";</u>

EXHIBIT 27

The City objects to this topic area as calling for documents which may not be obtained from third parties and/or are privileged, it is overbroad, vague, and it exceeds the scope of permissible discovery.

36.    Any document or information which indicates whether Roy Minter complied with any and all other standards and/or policies of the City of Savannah Police Department;

The City objects to this topic area as overbroad, vague, and it exceeds the scope of permissible discovery.

37.    Any discussions regarding whether Roy Minter was using improper policies in disciplining Daniel Kang and Michael Arango;

The City objects to this topic area as overbroad, vague, and it exceeds the scope of permissible discovery.

38.    Any communication with Patrick Monahan about the following: a. Roy Minter using improper policy b. the Internal Affairs investigation revealing possible criminal charges c. that there had been no letter of transmittal, such as was afforded to Adrian Gates d. that at the very beginning, Michael Arango and Daniel Kang should have been aware of these charges.

The City objects to this topic area as overbroad, vague, and it exceeds the scope of permissible discovery.

This _1st_ day of March, 2023.

/s/ R. Bates Lovett
R. BATES LOVETT
City Attorney
Georgia Bar No. 459568

3

**EXHIBIT 27**

/s/ Jennifer N. Herman
JENNIFER N. HERMAN
Deputy City Attorney
Georgia Bar No. 327017

OFFICE OF THE CITY ATTORNEY
P. O. Box 1027
Savannah, Georgia  31402
(912) 525-3092 telephone
(912) 525-3267 facsimile
BLovett@savannahga.gov
Jherman@savannahga.gov

OLIVER MANER LLP

/s/ Patrick T. O'Connor
PATRICK T. O'CONNOR
Georgia Bar No. 548425

/s/ Patricia T. Paul
PATRICIA T. PAUL
Georgia Bar No. 697845

218 W. State Street
P. O. Box 10186
Savannah, Georgia  31412
(912) 236-3311
pto@olivermaner.com
ppaul@olivermaner.com

Attorneys for Defendant
The Mayor and Aldermen of the
City of Savannah

**EXHIBIT 27**

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have on this day served a copy of the foregoing upon the following

by email: kpinckney@savagelawfirm.net; lhatcher@savagelawfirm.net; js_law@bellsouth.net;

skachmar@huntermaclean.com; tdove@huntermaclean.com.

This *1st* day of March, 2023.

OLIVER MANER LLP

*/s/ Patricia T. Paul*
PATRICIA T. PAUL
Georgia State Bar No. 697845

218 W. State Street
P. O. Box 10186
Savannah, Georgia 31412
(912) 236-3311
ppaul@olivermaner.com

Attorneys for Defendant
The Mayor and Aldermen of the
City of Savannah

5


| **GO # OPS-016:** | **EFFECTIVE:** | 09/25/2004 |
|---|---|---|
| **OFFICE OF PROFESSIONAL STANDARDS** | **REVISED:** 10/21/2009 | 11/30/2011 |
| | 10/19/2010 | 02/02/2012 |
| | 03/21/2011 | 03/05/2014 |
| | 07/16/2014 | 04/18/2016 |
| | 12/13/2016 | 08/29/2018 |

## PURPOSE

The purpose of this directive is to establish guidelines for the investigation of complaints against employees of the Savannah Police Department (SPD). All complaints will be thoroughly investigated to determine the appropriate finding.

## POLICY

A system to investigate and review complaints is essential to establish and maintain the public's confidence and trust, and to protect our citizens from police misconduct. This same system will also protect the integrity and the rights of all SPD employees. Citizens are encouraged to bring forward legitimate complaints regarding policy violations and misconduct by all SPD personnel. SPD personnel will act in a courteous and professional manner when receiving complaints from citizens. SPD personnel will assist and cooperate in the processing of citizen complaints. It shall be the policy of the SPD to investigate all complaints against its employees and to maintain an Office of Professional Standards Unit which will thoroughly, expeditiously, and impartially investigate all complaints involving the Department's integrity.

When an employee's continued presence at work would be a detriment to the efficiency of the Department or to public safety, the Chief of Police or his designee may place an employee on administrative leave with pay during the investigation process. When such action is taken, the supervisor or commander responsible for making the notification shall notify the employee in writing and shall submit that notification to the appropriate Division Commander.

## PROCEDURE

### I. OFFICE OF PROFESSIONAL STANDARDS

    A. The Office of Professional Standards (OPS) is organized under the Office of the Chief of Police. The OPS Commander reports directly to the Chief of Police. [CALEA 52.1.3]

    B. The OPS coordinates and exercises staff supervision over complaint investigations and/or allegations of policy violations and misconduct against Department employees from all sources.

    C. The OPS serves as the SPD's control agent in all citizen complaints; recording complaints when received, reviewing completed investigations for thoroughness, objectivity, and accuracy, and establishing and maintaining a complete case file on each complainant.

EXHIBIT 27

D. The OPS shall be responsible for recording, registering, and controlling all alleged or suspected policy violations and misconduct complaints against the employees of the SPD. The confidentially of internal investigation files shall be maintained in accordance with public records law.

E. The OPS Commander shall be directly responsible for the Office of Professional Standards function and shall report all complaints involving violations of the law, use of force incidents involving serious injury or death, and conduct involving moral turpitude directly to the Chief of Police, or designee, without delay. [CALEA 52.2.2]

F. The OPS shall have the authority to interview any employee, use facilities and equipment, and review any record or report of the SPD in order to facilitate the just resolution of all complaint investigations.

G. Recognizing that complaint investigations are conducted under the immediate authority of the Chief of Police, SPD personnel shall cooperate with and assist the OPS during investigations.

H. The OPS Investigators will be knowledgeable of all processes involved in the investigation of complaints, administering of discipline, and all applicable rules, orders, directives, and procedures.

I. The OPS will develop and maintain a database of all SPD complaints. Disciplinary Actions taken as a result of an Administrative Investigation or a Citizen Complaint will be entered into the OPS database/computer file. A copy of the Disciplinary Action Record, notification letters, and all other associated documentation will be filed with the completed case file. All discipline records will be maintained in accordance with the State of Georgia records retention laws.

J. The OPS will forward all Disciplinary Action Records (DAR) to the City's Human Resource Department for record-keeping purposes.

K. The OPS will apprise the Chief of Police of the status or progress of disciplinary actions that are under appeal or that may develop into an appeal.

L. The OPS will make observations or recommendations to the Chief of Police concerning any modification or improvement in disciplinary procedures, legislative updates or practices, as well as needed training based upon trends and tendencies that have been identified.

M. The OPS will monitor sensitive cases that may affect future policies or actions and will make appropriate recommendations for change.

N. The OPS will serve as the liaison with other entities involved in the disciplinary process including, but not limited to, the Chief of Police, the District Attorney's Office, The City Attorney's Office, the County Attorney's Office, and the City of Savannah Human Resources Department.

O. The OPS investigates complaints against the SPD employees. OPS investigators are responsible for the investigation. They are strictly fact finders. They DO NOT make recommendations regarding findings or penalty. The employee's Commander is the first to make a recommendation regarding the finding of the case, and the recommended penalty.

P. To expedite the closure of internal complaints, the OPS may assign a day for

**EXHIBIT 27**

the Command Staff to discuss and review completed cases.

Q. The OPS Investigators will be assigned to a Precinct/Division to attend Community meetings (Outreach) and to be a liaison between SPD personnel regarding the complaint process through final disposition.

## II.  COMPLAINT INVESTIGATIONS

A.  All complaints and discipline files can be classified under one of the following three areas:

   1.  **Supervisory Discipline:** This type of discipline is usually generated through the first line supervisor, and depending on the violation or misconduct, may require a formal investigation.

   2.  **Citizen Complaints:** Depending upon the severity of the allegation, such complaints may require a formal investigation. Should a citizen's complaint be so severe as to merit a formal investigation, it will then be labeled as an Internal Investigation.

   3.  **Internal Investigations:** The more serious allegations usually require a formal investigation and may include the advisement of rights pertaining to an administrative investigation which is known as the Garrity Warning.

B.  Supervisory personnel are authorized to investigate violations involving: [CALEA 52.2.1 a]

   1.  Minor violations of policy and procedure;

   2.  Allegations of rudeness to citizens;

   3.  Insubordination;

   4.  Tardiness or abuse of leave.

C.  A comprehensive investigative report shall be prepared on all investigations. This report will include:

   1.  A summary of the complaint or alleged act of misconduct.

   2.  A description of the incident, physical evidence, and other pertinent information.

   3.  Non-edited investigative statements.

   4.  Evaluation of the complaint with a statement indicating what can or cannot be substantiated.

   D.  Investigations by supervisory personnel shall be forwarded through their Chain-of- Command for review to ensure citizen complaints are resolved satisfactorily. A comprehensive investigative report, LOT to include, applicable Douglas Factors will be completed and submitted to the OPS Commander as soon as possible. In those cases where delays are anticipated, the OPS Commander will be notified.

E.  The OPS shall conduct investigations into: [CALEA 52.2.1b]

   1.  Civil liability suits against members of the Department.

**EXHIBIT 27**

2.  Internal investigations for other agencies within the concurrent jurisdiction of the SPD, at the direction of the Chief of Police.

3.  Allegations of corruption.

4.  Gross misconduct.

5.  Allegations of the use of excessive force or brutality.

6.  Use of deadly force and firearms.

7.  Violations of civil rights.

8.  Allegations of criminal misconduct.

9.  Incidents requiring investigation that are extremely lengthy, time consuming, involve multiple units or divisions, or when other investigative resources are unavailable.

10. All other Administrative Investigations assigned by the Chief of Police.

F.  All complaint investigations should be completed within ninety days of the dated assigned. [CALEA52.2.3] Any delays should be cleared through the OPS Commander. If the case is not resolved within ninety days the complainant will be notified in writing of the case status. [CALEA 52.2.4b]

## III.    RELIEF FROM DUTY [CALEA 52.2.7]

A.  When an employee's continued presence at work may be a detriment to the efficiency of the Department or to public safety, the Chief of Police or his designee may place an employee on administrative leave with pay during the investigation process.

B.  When such action is taken, the supervisor or commander responsible for making the notification shall notify the employee in writing and shall submit that notification to the appropriate Division Commander.

C.  When an employee is placed on Administrative Leave pending an internal investigation either the Internal Affairs Office or the employee's commanding officer will retrieve and secure the person's firearms and badges. Upon completion of the investigation the Chief of Police or designee will determine the reinstatement of the items.

## IV.    COMPLAINT PROCESS

A.  Allegations of police misconduct are received as complaints from both citizens and SPD personnel. All complaints against the SPD and its personnel will be documented and investigated, including anonymous complaints. [CALEA 52.1.1]

B.  Citizens wishing to register a complaint will be referred to the employee's immediate supervisor. If the immediate supervisor is unavailable, a supervisor within the employee's division shall be notified.

C.  The supervisor processing the complaint will record pertinent information regarding the complaint on the Complaint Form (SPD Form 1044w).

D.  All complaints will be investigated, including complaints where the complainant is unwilling to complete or sign the complaint form.

E.  The complaint shall be documented and, as soon as practical, the supervisor must

**EXHIBIT 27**

telephone or e-mail the OPS for a control/tracking number.

F.    Upon receipt of a complaint the OPS Office will provide the complainant with documentation the complaint has been received and provide a description of the process. [CALEA 52.2.4a]

G.    Once a tracking number has been assigned and a brief synopsis given to the OPS Investigator, it will be determined by the OPS Commander if the investigation will be conducted by a supervisor of this Department or by an OPS Investigator.

H.    The person recording the complaint shall provide the complainant with a copy of the Complaint Form.

I.    When an employee is notified that they have become the subject of an OPS investigation, the employee shall be issued a written or electronic notice of the allegation and the employee's rights and responsibilities relative to the investigation. [CALEA 52.2.5]

## V.   INVESTIGATIVE PROCEDURES

**A.**    The complainant shall be interviewed as soon as practical regarding the complaint. The recorded complaint interview will be retained in the same manner as established for the internal file from which it was taken.

B.    The Complainant shall be asked to read and sign the Complaint Form.

C.    The Complainant shall write the complaint on pages two (2) through four (4) of the Complaint Form and additional pages may be added if necessary.

D.    The supervisor shall conduct a preliminary investigation, including interviewing the complainant and any witnesses readily available in person. The supervisor shall also advise the subject employee of the complaint, when appropriate.

E.    An effort will be made to locate and interview each person who may be a witness or have information relevant to the incident.

F.    When an employee is under investigation and subject to a formal interview, the interview shall be conducted under the following conditions:

1.    When practical, appropriate Commanders should be notified when one of their subordinates is to be interviewed by an OPS Investigator.

2.    Interviews of SPD employees should be scheduled during the employee's normal duty hours, when practical.

3.    Employees will be compensated for interviews conducted at times other than normal duty hours.

4.    Employees being interviewed or writing a statement concerning an internal investigation may not have an attorney, supervisor, or Commander present.

5.    The interview should take place in the Office of Professional Standards or any place necessary in order to complete the mission.

6.    The employee will be informed of the name and rank of the interviewer and all other persons present during the interview.

7.    The employee will be informed of the nature of the investigation before the interview begins.

EXHIBIT 27

8. The employee will be informed of all the complainant(s), unless there is a compelling reason not to do so.

9. The interview should be audio/digital recorded by the interviewer.

10. Questions asked during the interview should be relevant to the investigation and should be within the area of knowledge the employee is thought to possess.

11. If an interview extends into a normal mealtime, the interview should be suspended while the employee has a meal period.

12. If the interview continues beyond the normal tour of duty, the employee should be allowed to make phone calls to notify such persons as necessary.

13. Employees will be allowed to use toilet facilities as necessary.

G. In addition, an employee may be required to: [CALEA 52.2.6]

1. Be photographed, to participate in a lineup, and/or to submit a financial disclosure statement when the actions are material to a particular OPS investigation being conducted by the SPD.

2. Submit to a medical or laboratory examination, at the SPD's expense, when the examination is specifically directed and narrowly related to a particular OPS investigation being conducted by the SPD.

3. Submit to a polygraph examination in the course of an OPS investigation. The use of the polygraph will be restricted to those issues narrowly related to a particular internal investigation. Generally, the citizen or witness must submit to and pass the polygraph examination before such examination will be considered for the employee.

4. An employee shall be ordered not to divulge any information about the interview until the disposition of the investigation, if the progress of the investigation would be otherwise hampered.

5. Employees may not refuse to provide a statement to the OPS. Refusal shall result in immediate suspension, and the OPS Commander shall immediately notify the Chief of Police.

H. All complaint investigations will be completed, regardless if the employee retires or resigns prior to the conclusion of the investigation.

1. When an employee retires or resigns prior to the conclusion of the investigative findings, the employee's separation status will reflect either:

a. Retired – Pending IA Investigation

b. Resigned – Pending IA Investigation

## VI. INVESTIGATIVE FINDINGS

A. When the investigation is completed, Commanders shall write a Letter of Transmittal (LOT) and complete the Douglas Factors, which will be placed in the investigative file and forwarded to the OPS. The Letter of Transmittal will include a written conclusion of fact explaining the basis for the decision (recommended finding and/or penalty). [52.2.8]

B. Commanders will use discretion in considering aggravating or mitigating circumstances, as well as discipline history, in arriving at their recommendation.

**EXHIBIT 27**

C. The LOT and Douglas Factors, with the recommended disciplinary action, shall be forwarded to the OPS for record-keeping purposes. OPS will forward the investigative file with the LOT to the next Command Officer in the Chain-of-Command. Once received, the Commander has 10 days to complete the LOT. This process will continue until it reaches the Chief of Police, or designee, for final review and approval.

D. Once a finding is reached, the subject officer will be notified by the investigating Division Commander, or designee. The subject officer shall receive a complete copy of the investigative file.

E. If the complaint is sustained and the penalty is above a written reprimand, the subject officer can respond, either verbally or in writing, within 3 days, to the allegations (Cleveland Board of Education v Loudermill).

F. When discipline is issued the employee will be notified of their right to appeal under the City of Savannah Policy (HR-020A).

G. If the employee fails to appeal to the City Manager, this non-response will constitute a waiver of the right to appeal and the discipline will be imposed.

H. Final disciplinary action reports (DAR) shall be forwarded to the OPS for recordkeeping purposes.

## VII. DISPOSTION

A. Investigations into allegations of policy violations or employee misconduct will conclude with one of the following findings:

1. **EXONERATED** - The investigation supported the conclusion that the incident did occur, but the employee's actions were legal, proper, and reasonable.

2. **UNFOUNDED** – The investigation supported the conclusion that the employee did not engage in the alleged conduct and did not violate a rule by doing so.

3. **POLICY FAILURE** - Policy or procedure does not properly address the allegation or procedure which led to the alleged conduct and the investigation reveals recommended policy or procedural changes.

4. **NOT SUSTAINED** - The investigation didn't prove or disprove the alleged conduct.

5. **SUSTAINED** - The investigation supported the conclusion that the employee engaged in the alleged conduct and violated a rule by doing so.

B. Appropriate disciplinary action will be taken, when warranted, and a complete file maintained by the SPD Office of Professional Standards.

C. Investigative findings for those employees that have since retired or resigned will be forwarded to the Chief of Police or designee. Depending upon the final disposition of the investigation the Chief of Police or designee will change the former employee's separation status accordingly.

D. Upon conclusion of the investigation, the involved employee(s) will receive, in writing, notification of the results of the investigation.

EXHIBIT 27

1. This will also include those employees that have retired or are no longer employed with the Savannah Police Department.

    a. This notification will be done by certified mail and with a return/receipt.

## VIII. OFFICE OF PROFESSIONAL STANDARDS ROLE IN CRIMINAL INVESTIGATIONS

A. If during the course of an Internal Administrative Investigation there appears that there is, or that there may have been, a violation of criminal law, the investigation by the OPS may be suspended and the Chief of Police promptly notified.

B. No further administrative investigative effort will normally be made until after the Chief of Police has determined whether to assign the matter for criminal investigation.

C. Employees under investigation for alleged criminal law violations will be afforded those rights guaranteed by the Constitution of the United States and the policies and procedures of the SPD.

D. Generally, criminal investigations will be conducted by the appropriate investigative unit or agency unless the OPS is directed by the Chief of Police to conduct the criminal investigation.

E. Deadly force cases will be investigated in accordance with the SPD's Use of Force policy (General Order #ADM-007).

## IX. MISSED COURT, TRAINING, VEHICLE MAINTENANCE

A. The OPS shall receive notices for unexcused absences from supervisors who coordinate court, training, or vehicle maintenance for their respective units. Once received, the OPS will record the alleged unexcused absence and notify the employee's Commander.

B. The Commander or designee of the subject employee has 15 days to investigate the allegation and return the appropriate finding and/or penalty to the OPS.

C. If the finding is Sustained, the Commander or designee must recommend the appropriate pre-determined penalty for the employee and forward that recommendation to the Assistant Chief for approval, rejection or modification. These penalties have been set by the Command Staff, and are listed below:

SPD Personnel who are unexcused from training, court, or appointments with vehicle maintenance will receive the following:

| First offense: | Written Reprimand |
|---|---|
| Second Offense: | 1 Day Suspension |
| Third Offense: | 3-Day Suspension |
| Fourth Offense: | Chief's Office |

**EXHIBIT 27**

Each category will stand alone, not consolidated.

**Example:**

| | |
|---|---|
| Unexcused absence from court | Written Reprimand |
| Unexcused absence from training | Written Reprimand |
| Unexcused absence from court (second violation) | 1 Day suspension |

*Time Frame*:  After two (2) years the penalty enhancement drops off, however, the disciplinary file remains.  [In other words, if you have a failure to appear (Court) in January 2007 and then a failure to appear in January 2008; in January 2009 the first one drops off.  If you have a third failure to appear in February 2009, then you have two penalties.]

**Example:**    Written Reprimand for court:  Jan. 2007
    1-Day Suspension for court:  Jan. 2008
    Jan. 2007 penalty drops off:  Jan. 2009.
    Failure to appear in Feb. 2009:  1-Day Suspension.

## X.   RUDENESS COMPLAINTS

**A.**  Rudeness complaints will generally be classified as a Citizen Complaint.  Depending upon the severity of the allegation, such complaints may require a formal investigation.  Should a citizen's complaint be so severe as to merit a formal investigation, it will then be labeled as an Internal Investigation.

**B.**  When appropriate, the Precinct/Unit supervisor shall conduct the investigation, including interviewing the complainant as soon as practical regarding the complaint and any witnesses readily available in person.  The supervisor shall also advise the subject employee of the complaint.

**C.**  If the finding is <u>Sustained</u> (all other findings do not apply), the Commander or designee must give the appropriate pre- determined penalty to the employee.  These penalties have been set by the Command Staff, and are listed below:

SPD Personnel who have <u>sustained</u> rudeness complaints will receive the following:

| | |
|---|---|
| First offense: | Written Reprimand |
| Second Offense: | 1 Day Suspension |
| Third Offense: | 3-Day Suspension |
| Fourth Offense: | Chief's Office |

*Time Frame*:  After two (2) years the penalty enhancement drops off, however, the disciplinary file remains.  [In other words, if you have a <u>sustained</u> rudeness complaint on January 1, 2011 and another in January 2, 2013; the January 1, 2011 will drop off and does not apply to the progressive discipline above.  If you have another in February 2013, then you have two applicable offenses and a 1 day suspension would apply.]

## XI.   ADMINISTRATIVE INVESTIGATION FILES [CALEA 52.1.2]

A.  The OPS shall be responsible for maintaining all records regarding internal investigations within the Office of Professional Standards.

EXHIBIT 27

B. The OPS shall take all proper precautions to ensure the security of these records. These records shall be stored separate and apart from personnel records.

C. All complaints received by any member of the Department, against the Department or an employee, shall be assigned a complaint control number. OPS will assign control numbers and will enter them into a computer database.

D. OPS shall prepare a file for every complaint assigned. The file shall contain the original report, audio tapes of OPS interviews, incident reports, photographs, and other pertinent documentation.

E. Folders shall be filed numerically by control number and kept secure while in the custody and control of OPS.

F. No one may access the files without the permission from the Chief of Police or the OPS Commander.

G. No portion of the file shall be copied or reproduced by anyone other than the OPS personnel.

H. For record keeping efficiency, information contained in the log book and card files may be computerized.

## XII. OFFICE OF PROFESSIONAL STANDARDS MONTHLY AND ANNUAL REPORTS

A. The OPS Commander, or designee, will prepare a monthly report that will be due at the end of each month. The report will be provided to the Chief of Police and will detail the:

1. Number of complaints against sworn and non-sworn employees of the SPD.

2. Nature of the complaints identified by the type of Department violations.

3. Disposition of the complaints.

4. Number of Use of Force Reports received from Division Commanders during the month, including the number of incidents in which the use of force resulted in an individual being treated at a hospital.

B. The OPS Commander, or designee, will prepare an annual report at the end of each year based upon information in the previous year's monthly reports. The annual report is for dissemination to the public and to SPD employees upon request. [CALEA 52.1.5]

## XIII. EARLY INTERVENTION SYSTEM

A. The SPD has the responsibility to its employees and to the community to identify and assist employees that show symptoms of job-related stress and/or performance deficiencies. An Early Intervention System has been developed to provide a systematic review of complaints received by the SPD, and use of force incidents. It is designed to highlight tendencies in regard to complaints and use of force incidents that may otherwise be overlooked by the Department. [CALEA 35.1.9a]

**EXHIBIT 27**

B. The first and second line supervisors are crucial to a successful Personnel Early Warning System program. They should always be cognizant of their employees and watch for signs of performance issues. [CALEA 35.1.9d]

C. If a supervisor becomes aware of a problem with an employee that warrants immediate attention, he or she should not wait for the employee to be identified by the Personnel Early Warning System before taking action to rectify the situation.[CALEA 35.1.9 b.d]

D. These may include but are not limited to:[CALEA 35.1.9d]

   1. Excessive sick leave usage

   2. Excessive injuries

   3. Displays of emotional hostility

   4. Excessive accidents

   5. Excessive tardiness

   6. Alerts triggered by the Early Warning System

E. An annual report will be prepared by the OPS, outlining personnel complaints, use of force incidents, and will contain the names of employees who have received three or more OPS investigations within a rotating 365-day period or receive any ALERTS for Use of Force.

F. The OPS Case Management System will give an ALERT for 3 or more OPS investigations within a rotating 365-day period and 3 or more Use of Force Reports within a 90-day period.

   1. The annual report will provide a brief profile of the complaints and use of force incidents.

   2. Profile for the complaints will include the employee's name, payroll number, name of complainant, nature of the complaint, and disposition (if known).

   3. Profile for use of force incidents will include the employee's name, payroll number, subject's name, date of incident, nature of incident, and extent of injury, if any.

G. Report data will be disseminated monthly to the appropriate supervisors for review. A summary of supervisory review findings will be submitted to the Office of Professional Standards. The concerned Commander or designee and the employee's supervisor will jointly make a final determination based on an assessment of the report data and other relevant criteria.

H. Determinations will result in the following alternative measures:

   1. Referral to Employee Assistance Program (EAP), the City Psychologist, or other approved practitioner for counseling or referral assistance.

   2. Participation in stress reduction programs.

   3. Corrective action.

   4. Training/Remedial Training. [CALEA 35.1.9e]

   5. Reassignment

EXHIBIT 27

6. Suspension of outside employment authorizations

I. The Employee Profile System establishes a data collection source profiling SPD employees to identify patterns of stress-induced or performance problems.

J. Profiles will document specified criteria for assessment:

1. Compliance.

2. Use of Force incidents.

3. Commendations.

4. Corrective actions.

5. Promotional status change.

K. Immediate supervisors, as deemed necessary, will review profile reports. The concerned Commander or designee will review profile reports annually, in conjunction with other criteria, to identify problems.

L. Based on profile reports and relevant data, the following actions may be taken.

M. Referral to the EAP or City Psychologist for counseling or additional referral.

1. Participation in stress reduction training either voluntarily of mandatory.

2. Corrective action.

3. Assessment that no problem exists, terminating further action.

N. All ALERTS will be maintained within the OPS Case Management System.

O. All levels of supervision will be responsible for ensuring that the OPS is aware of all complaints against, commendations awarded, and each incident of use of force involved by each employee under their command. This is to ensure accuracy in compiling profiles. [CALEA 31.5.9b]

P. All levels of supervision can make recommendations of remedial training in instances where remedial or additional training can correct the behavior. In these situations, the OPS will still be notified of the recommendation.

Q. The OPS Commander will prepare a yearly report evaluating the effectiveness of the early warning system and make recommendations for any changes to the Chief of Police.

This General Order supersedes all written directives issued prior to 08/29/2018, pursuant to Office of Professional Standards.

> **BY ORDER OF:**
> **Original Signature on File**
>
> ———————————————
> **Mark Revenew**
> **Interim**
> **Chief of Police**

**EXHIBIT 27**

**CITY OF SAVANNAH**
**CONFLICT RESOLUTION PROGRAM**

The City of Savannah is committed to the process of assisting employees and supervisors in resolving conflict. Conflict is a normal part of human interaction. Most conflicts are resolved by people learning to work more effectively with each other. The City encourages its employees to seek informal resolution to all workplace conflict; however, there are times when conflict does not get resolved and escalation leads to anger, bitterness, and a breakdown in communication. In the workplace this can lead to further problems with morale and work performance. The City's Conflict Resolution Program provides employees and supervisors with guidelines on how to resolve conflict informally. The program also outlines the process to follow when informal resolution to workplace conflict has been ineffective and formal assistance is requested from the Employee Relations Coordinator.

**Resolving Workplace Conflict (Informal)**

**Employee Responsibilities**

Employees are encouraged to be responsible in their communication and behavior at work. When a conflict arises, employees are encouraged to:

☐ Approach the other person to determine if the other person is willing to talk.
☐ Avoid blaming and "name calling" when talking about the problem.
☐ Avoid soliciting others to take sides in the conflict.
☐ Be a good listener and understand the other's point of view.
☐ Look for areas of agreement and mutual concerns.
☐ Offer an apology if appropriate but don't discount personal feelings.
☐ Be firm about individual interests but be flexible on the solution.

In addition to these guidelines, the City offers classes in conflict resolution and workplace communication and encourages all employees to attend.

**Supervisor Responsibilities**

Supervisors are also encouraged to assist employees in resolving conflicts at work. To do this, supervisors should:

☐ Encourage employees to discuss differences and concerns
☐ Listen to problems without becoming defensive or emotional.
☐ Avoid gossip and discussion of one employee about another.
☐ Empower employees to discuss conflict with each other.
☐ Sit in on discussions and help employees find resolution if needed.
☐ Be open to creative solutions to conflict.

Supervisors are also encouraged to take classes designed to improve their communication and conflict resolution skills.



**EXHIBIT 27**

### Employee Assistance Program (EAP) Involvement

*Self-referrals:* If an individual employee has been unable to resolve a workplace conflict, the employee may seek guidance and consultation from the Employee Assistance Program Coordinator. The EAP Coordinator will conduct an initial assessment in order to ascertain the influences of other personal or work-related factors that may be impacting the conflict. If an employee seeks help with conflict resolution from the EAP, all information relayed to the EAP Coordinator is strictly confidential, except when mandated reporting is required by law or if an employee provides written permission to release information.

*Supervisory Referrals:* If a supervisor is aware that there is a conflict between or among employees that is affecting work performance, including the morale of the department, the supervisor should counsel the employees individually regarding the conflict, encouraging the employees to work out the disagreement. If the conflict is not resolved and continues to be a problem, the supervisor should meet again individually with each employee and inform the employee that he or she is making a referral to the EAP in order to assist the employee with resolving the conflict. Should the employee refuse/decline the referral and the conflict persists then further disciplinary action may be warranted by the supervisor based on the associated work performance issues. The EAP Coordinator will confirm with the supervisor whether the employee attended the first session. No other information will be released without the employee's written consent.

*Mandatory Referrals:* Mandatory referrals to the EAP for employee conflicts are reserved for those infractions which upon occurrence are so serious that termination from employment is a high probability. Examples of such infractions include but are not limited to: a conflict involving any physical altercation or a serious verbal threat of harm. In these cases, employees must follow-through with the EAP referral or immediate termination will result.

### Employee Assistance and Employee Relations Involvement

*In-house Mediation:* Mediation services to assist in the resolution of employee conflict may be provided by either the EAP Coordinator or the Employee Relations Coordinator, depending on several factors. If an employee has utilized EAP services beyond the initial evaluation and/or in the past has had a counseling relationship with the current EAP Coordinator, then the Employee Relations Coordinator will be the designated mediator. The EAP Coordinator may provide mediation services if there is no current or past counseling relationship with either of the employees involved in the conflict. This is to insure that neutrality and therefore the integrity of the process is maintained.

Mediation works the best when the conflict is between employees on the same peer level. It does not work as well for a conflict between employees on different work levels such as a supervisor and an employee, although there are exceptions. Mediation to resolve a conflict between an employee and a supervisor will only occur when there are limited options for resolution, and the supervisor's authority is protected.

### Employee Relations Involvement for Team/Workgroup Conflicts

Mediation services to assist in the resolution of conflict involving an entire team, work group or department may be provided by the Employee Relations Coordinator. Department supervisors

EXHIBIT 27

and above may request conflict resolution services for teams or groups. The Employee Relations Coordinator will conduct an initial assessment with the requesting supervisor or manager, and if necessary, with the team, to gather pertinent information. All employees on the team must participate in the conflict resolution process. The findings are confidential and used to develop and implement a management approved course of action and/or specific training programs to resolve team conflict. Instances of team conflict include but are not limited to: New and transitional management; changing processes and systems; team work issues; team performance and motivation; building a team; and team communication. The Employee Relations Coordinator may at times, involve the Employee Assistance Coordinator, Human Resources staff, and/or department director, with the employee(s) written permission to release information.

## Formal/External Mediation

In some cases, employee conflicts may be referred to the Mediation Center by either the EAP or Employee Relations Coordinator. The Mediation Center is an outside agency that assists in a more formal mediation by trained mediators in order to assist in resolving conflicts. A formal mediation can be mandated by management when work performance issues are evident because of the conflict. In these instances, the department will be responsible for any costs associated with the mediation. When the Employee Relations Coordinator or the EAP Coordinator and the department director agree to use formal mediation, the process proceeds as follows:

- The department director will make the referral to the EAP or the Employee Relations Coordinator
- The EAP or Employee Relations Coordinator will schedule and coordinate the mediation with the Mediation Center.
- The department director will be advised as to whether the parties willingly take part in the mediation
- The process will be discontinued if either party refuses to cooperate or if disputants don't follow the process.
- The mediator will work with both parties to come to an agreement to resolve the conflict.
- A written statement of this agreement will be given to management and to the employees.
- The employees will be held accountable to follow agreement.

**For additional information on the City of Savannah's Conflict Resolution Program, contact:**
**Anthony Caston, Employee Relations Coordinator**
**City of Savannah**
**Human Resources Department**
**P.O. Box 1027**
**Savannah, GA 31402**
**(912) 651.6484 Office Phone**
**(912) 433.3413 Cell Phone**
**(912) 525.1648 Confidential Fax**

Rev. 1/10/2019

**EXHIBIT 27**

# Statement of Workplace Conflict

Employee's Name: <u>Commanders, Supervisors, Officers and Employees of the Department both exempt and</u>
<u>Non-exempt</u>
Dept. <u>Savannah Police Department</u>

1. Date, time and location the event or discussion took place:

<u>August of 2018 to Present</u>

2. Give a brief statement of your workplace conflict including names of all parties involved and any persons who witnessed the conflict:   (Stick to the facts)

This request is being made on behalf of the listed participants by way of their signatures (see attached) as employees of the City of Savannah Police Department to address a series of complaints against Chief Roy Minter and his failures to abide by both the City of Savannah's Employee Standards and Leadership Principles. All signee's have done so of their own free will and agreed to the request of a Formal/External Mediation to be conducted as part of the City of Savannah's Conflict Resolution Program, as this complaint encompasses the entire workgroup. This workgroup includes Commanders, Supervisors, Officers and Civilian Employee's both Exempt and Non-exempt that request to have their concerns and grievances aired and mediated as a unified front to cover the below listed complaints on Chief Roy Minter's leadership and adherence to City policy.

All employees associated with this request will be at the ready to give personal accounts and examples of the violations:

HR-035 Employee Relations Program
1. City Values
2. Code of Conduct
7. Supervisory Conduct requirements


Chief Roy Minter has conducted himself in a manner contradictory to these policies and its subsections through:

- A series of threats aimed at members of command staff and supervisors of units in group settings. Threats of removal from rank. Threats of removal from command. Threats of removal from units. These threats were placed as a warning to all to not disappoint him and implant fear in the rank and file.

- Intimidation and admonishing to instill embarrassment as a tool and instill his power in numerous meetings where officers, supervisors and commanders were publically belittled in front of peers and subordinates. Criticism without growth, coaching or intelligent strategizing led to confusion and a disharmonious level of communication between specialized units, staff and command.

- Selective positional movements with no standardized measure of success or failure to bring about said transfers and an unwillingness to discuss changes with the effected personnel or command.

- Selective "Open Door" policy which has limited access to officers who needed to communicate issues and concerns but were denied access while others had unlimited access.

**EXHIBIT 27**

- Lack of communication and a distancing from responsibility in the matters of promotions, transfers and policies. A refusal to put his name to decisions that affect the department as a whole to avoid liability or blame.

- Separation of command decisions during critical incidents. Does not assume control over what he sees as an issue and attacks decisions at a later time. Failure to act in chaotic situations.

- Failure to plan for the safety and security or the department by the ways of supplies and equipment. No foresight to equip the officers with safety gear for critical incidents

- Inability to communicate the focus, strategies and goals of the department. Ever changing practices, designs and orders which have led to a department with no collective mission statement and a fragmented series of leaders that plan for avoidance of command due to a lack of team unity.

- Failure to listen to the needs of specialized units whose very mission relies upon training and equipment which leaves them vulnerable operating outside of the standard federal and state levels. Increased level of expectation with limited resources given when requested.

- Favoritism in the levels of promotion and specialized positions. Created positions for loyalty instead of skill and those of skill removed from positions to make way for those of favor. No adherence to probationary periods or posting of job positions.

- Inconsistent punishment levels for like violations through an OPS system designed to be biased but now operates with the Chiefs absolute control. Relieved Office or Professional Services of all counter balances of leadership.

- Unable to create a strategy surrounding the community he is in.

- No focus on the logistical needs of specific units or divisions. Implements a one size fits all mentality.

- Untrue statements made to public, politicians, media and Employee's concerning the effectiveness, strategies, morale, manpower and readiness of the department.

- Implementation of unnecessary projects and technology lacking benefit to the objectives of the department.

- Increasing workload upon supervisors, detectives and officers to impose his personal agenda with no explanation as to the goal. Lack of empathy for the assignments already placed upon employees.

- Renaming and reallocating of resources for pet projects believed to be ineffective and solely for personal growth

- Unfocused training practices that do not train and develop for the future of the department

- Complete breakdown of communication between levels of command staff to mid-level supervision and employee's creating confusion and multiple varying procedures depending on the precinct or unit. Much of this due to the attitudes displayed toward individuals that are pivotal to the command and control.

- Outright disrespect shown to members of staff which leads to dissention and an overwhelming distancing by members of the department to remain out of the target zone.

**EXHIBIT 27**

- Lack of structure and stability generated through his leadership and an inability to develop trust, honesty and open communication.

- Created a fractured team focused on survival of his administration rather than the goals to protect and serve.

3. Please list the steps you have taken to resolve this conflict:

Due to the various members on the complaint and request for mediation this question would be best answered through the process and cannot be fully listed in this section.

Employees Signature: See below and attached forms          Date: 4-10-20 thru 4-15-20

**Please complete and return to the Human Resources Employee Assistance Coordinator.**

Rev. 10/28/10

1. Employee Printed Name and Signature: VOID
2. Employee Printed Name and Signature: VOID
3. Employee Printed Name and Signature: CPT George Grundich  CPT _____
4. Employee Printed Name and Signature: _____
5. Employee Printed Name and Signature: _____
6. Employee Printed Name and Signature: Capt W Haeisel
7. Employee Printed Name and Signature: _____ Lt. Fred Baldwin
8. Employee Printed Name and Signature: _____ Lt. Raymond Retzer
9. Employee Printed Name and Signature: _____ 1856, G. GROOT
10. Employee Printed Name and Signature: Sgt Octavio Arango  Sgt _____ 00173
11. Employee Printed Name and Signature: APO Ronald S. Reagin _____ #1207
12. Employee Printed Name and Signature: CPL Brandon Lord _____ 00363
13. Employee Printed Name and Signature: CPL Daniel H Kang _____ 12043
14. Employee Printed Name and Signature: CPL. Sharif Lockett _____ 61577

# EXHIBIT 27

15. Employee Printed Name and Signature: Robert D Manners Jr Sgt. Robert D Manners Jr  4342

16. Employee Printed Name and Signature: STAR APO J. Davey  61963

17. Employee Printed Name and Signature: J. Gaule / 63dc3

18. Employee Printed Name and Signature: SGT P. Collard  10567

19. Employee Printed Name and Signature: Officer P. Iatrou  62888

20. Employee Printed Name and Signature: Officer J Went  65200

21. Employee Printed Name and Signature: Det. A Gorman  62657

22. Employee Printed Name and Signature: Detective Tori May  62715  Tori a. May

23. Employee Printed Name and Signature: APO Nicholas G. Marlow  62724

24. Employee Printed Name and Signature: Det Molly Montgomery  62483

25. Employee Printed Name and Signature: DET. BENJAMIN VALDIVIESO  62463

26. Employee Printed Name and Signature: Det. Derek Korte Derek Korte  62711

27. Employee Printed Name and Signature: Sgt Tchit-Frese, Russell  10027

28. Employee Printed Name and Signature: LT Darold Holmes D Darold Holmes  1598

29. Employee Printed Name and Signature: Cpl. MATT Russell  11025

30. Employee Printed Name and Signature: Cpl Jase Gallagher  61838

31. Employee Printed Name and Signature: LT Keith L. Edwards  1302

32. Employee Printed Name and Signature: Sgt Christopher Hewett  #1763

33. Employee Printed Name and Signature: CPL Erika Tremblay  #11337

34. Employee Printed Name and Signature: Jordan Hoff  63710

35. Employee Printed Name and Signature: David Curtis  63763

36. Employee Printed Name and Signature: Officer Joe Eblin  63764

37. Employee Printed Name and Signature: OFC Robert Preker  63563

38. Employee Printed Name and Signature: OFC Jeremy Lambert  63089

39. Employee Printed Name and Signature: Elizabeth Harrell  11818

40. Employee Printed Name and Signature: John Alberts  61435

**EXHIBIT 27**

41. Employee Printed Name and Signature: Scott Henderson    #1798

42. Employee Printed Name and Signature: Alfredo Saenz de Viteri    10950

43. Employee Printed Name and Signature: Joseph Supple    63774

44. Employee Printed Name and Signature: Melanie DuBose    102559

45. Employee Printed Name and Signature: Scott Bill    10565

46. Employee Printed Name and Signature: David Owens    1280

47. Employee Printed Name and Signature: Chris Talley    #5912

48. Employee Printed Name and Signature: James Hutcherson

49. Employee Printed Name and Signature: Nicholas C. Melfe    00285

50. Employee Printed Name and Signature: Sgt. Jeffrey Oliver    5769

51. Employee Printed Name and Signature: Sgt. Rebekah Pankey    11457

52. Employee Printed Name and Signature: Sgt Brian Spence    #10972

53. Employee Printed Name and Signature: APO Allison Stahl    #04105

54. Employee Printed Name and Signature: Cpl Ronald Neslin    61159

55. Employee Printed Name and Signature: Ofc David Carrier    63000

56. Employee Printed Name and Signature: Ofc Joshua Orlansky    63117

57. Employee Printed Name and Signature: Ofc Michael Grossman    63512

58. Employee Printed Name and Signature: APO Joseph Orabets    62148

59. Employee Printed Name and Signature: CPL Austin Foraker    11867

60. Employee Printed Name and Signature:    CD365

61. Employee Printed Name and Signature: Sgt Tiffany Manuel    00063

62. Employee Printed Name and Signature: Sgt Bryony Harris    Sgt B. Harris    10798

63. Employee Printed Name and Signature: Sgt Eric Dukarski    #10026

64. Employee Printed Name and Signature: Cpl Bryan Lee    11719

65. Employee Printed Name and Signature: Det Mason Hamm    11324

66. Employee Printed Name and Signature: Sgt Ron Capper    #5915

**EXHIBIT 27**

67. Employee Printed Name and Signature: Cpl. Anthony Ravita _Anthony Ravita_

68. Employee Printed Name and Signature: APO Samantha Heard _63101_

69. Employee Printed Name and Signature: Cpl Edward _1334_

70. Employee Printed Name and Signature: Sgt. SEAN Carr _Sean Carr 3832_

71. Employee Printed Name and Signature: Cpl. Michael Dobson _#5086_

72. Employee Printed Name and Signature: Sanford Stephens _Sanford Stephens_

73. Employee Printed Name and Signature: Cpl. Chester Balmer _Cpl Balmer_

74. Employee Printed Name and Signature: Gates, Aerial _Cpl_

75. Employee Printed Name and Signature: Det. Sherry Conway

76. Employee Printed Name and Signature: APO Travis Duncan

77. Employee Printed Name and Signature: Sgt. Zang _1208_

78. Employee Printed Name and Signature: _____

79. Employee Printed Name and Signature: _____

80. Employee Printed Name and Signature: _____

81. Employee Printed Name and Signature: _____

82. Employee Printed Name and Signature: _____

83. Employee Printed Name and Signature: _____

84. Employee Printed Name and Signature: _____

85. Employee Printed Name and Signature: _____

86. Employee Printed Name and Signature: _____

87. Employee Printed Name and Signature: _____

88. Employee Printed Name and Signature: _____

89. Employee Printed Name and Signature: _____

90. Employee Printed Name and Signature: _____

91. Employee Printed Name and Signature: _____

92. Employee Printed Name and Signature: _____

**EXHIBIT 27**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

DANIEL KANG,

      Plaintiff,

-vs-

THE MAYOR AND ALDERMEN OF
THE CITY OF SAVANNAH and ROY
W. MINTER, JR., Chief of Police for the
City of Savannah, Georgia, In His
Individual and Official Capacities,

      Defendants.

Civil Action No. 4:21-cv-111-WTM-
CLR


**JURY TRIAL DEMANDED**

**FOURTH AMENDED NOTICE TO TAKE 30(B)(6) DEPOSITION
OF THE CITY OF SAVANNAH
POLICE DEPARTMENT**

      PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of

Civil Procedure, the Plaintiff in the above referenced action will take the deposition of

The City of Savannah Police Department at the offices of Oliver Maner, LLP, 218 W. State

Street, Savannah, Georgia beginning at 10:30 a.m. on March 7, 2023, and continuing from

day to day before a duly authorized court reporter for all purposes allowed by the Federal

Rules of Civil Procedure. The purpose of this amendment is to correct typos regarding

item 9 subsection E and in item 25. Item 9(e) should be Torrence Garvin instead of

George Gundich. Item 25 should read Paycheck Protection Program (PPP) fraud instead

of personal protection equipment (PPE).

**EXHIBIT**

**4**

3/7/23  TD

EXHIBIT 27

The City of Savannah Police Department is required to designate one or more

officers, employees, or former officers or employees to testify as to the following matters:

1.  Any communication with former Chief Roy Minter about following proper Savannah Police Department procedures in recommending the firing of Daniel Kang or Octavio M. Arango;

2.  The reason(s) Roy Minter left his position with the City of Savannah as police chief;

3.  Whether Roy Minter and/or the City of Savannah were following approved policies of the City of Savannah when Dan Kang was disciplined and fired for his actions *vis-a-vis* Darryl Cornelius Faitele. Assuming Roy Minter and/or the City of Savannah were following approved policies when they disciplined and then fired Daniel Kang, what were the policies of Savannah Police Department in place at that time;

4.  The review by Susan Cox of the former law firm of Edenfield, Cox & Bruce into the firing of Daniel Kang and Octavio M. Arango;

5.  The routing of Exhibit "A" to City personnel. This should include any communication to or from Roy Minter about Exhibit "A";

6.  Any contacts with Roy Minter and third parties, including, but not limited to, the Downtown Business Association, as to the investigation into the Darryl Faitele incident of April 14, 2020;

7.  The content of any communication about Daniel Kang, as to the Darryl Cornelius Faitele incident;

8.  Any dealings with Darryl Cornelius Faitele and/or his mother about the incident on April 14, 2020;

9.  The personnel files and the contents of the personnel files of:

    a.  Daniel Kang;

    b.  Octavio Arango

EXHIBIT 27

       c.     Joseph Toth

       d.     Richard Wiggins

       e.     Torrence Garvin

10.    Any knowledge of statements attributed to Roy Minter that anyone who signed Exhibit "A" would have a difficult time getting promoted at the Savannah Police Department;

11.    All complaints reduced to a written form against Roy Minter while he was the Police Chief of the City of Savannah;

12.    Any adopted policies of the City of Savannah Police Department which permitted the Savannah CARES committee to review the disciplining of Daniel Kang;

13.    All dealings with the defendants about the indictment of Daniel Kang;

14.    Complaints, and the disposition of same, about the following police officers:

       a.     Adrian Gates

       b.     Latrelle Goodine

15.    Any written criticisms of having the Savannah CARES committee used in the Kang case;

16.    Any document which authorized the Savannah CARES committee be used in Savannah Police Department issues.

17.    Any contacts and the substance of same between the City of Savannah and any representative of the Chatham County District Attorney's Office about the indictment of Daniel Kang and/or the facts surrounding same;

18.    The names of any officers who were suffering from PTSD per the Savannah Police Department, had a clean record and had an incident where the disciplinary review board recommended a five day suspension and the officer was fired, like Officer Kang was fired;

EXHIBIT 27

19. Where in the video ("Exhibit "B"") of the events of April 14, 2020 does it show Officer Arango pushed Faitele's face into the cement;

20. When Savannah Police Department created the Warrant Squad, what policies, training, personnel and/or equipment were allocated to it;

21. Who ordered the creation of the Warrant Squad and what were the policies in place between April 14, 2020 and the date of the firing of Daniel Kang related to that Squad;

22. Any dissent registered by any officer of the Savannah Police Department about the firing and attempted indictment of Daniel Kang;

23. Who decided from the City of Savannah and/or Chatham County District Attorney's Office to seek the indictment of Daniel Kang;

24. The criminal records, including arrest, for Darryl Cornelius Faitele, Khalil Kelly and/or any witness listed on CITY00133, attached as Exhibit "C";

25. Any steps taken by the City of Savannah or the City of Savannah Police Department to investigate Darryl Cornelius Faitele for perjury and/or Paycheck Protection Program (PPP) fraud, as disclosed in Mr. Faitele's deposition on October 28, 2022;

26. The distribution of personal protection equipment ("P.P.E.") to minimize the spread of COVID-19 existing on April 14, 2020 and what had been distributed to Roy Minter, Robert Larry, Mayor Johnson, City Manager Monahan and Daniel Kang. This should include any evidence of the distribution of said P.P.E' and warnings about the transmission of COVID-19 generated or transmitted by the Savannah Police Department as of April 14, 2020;

27. Whether the City of Savannah Police Department arrested anyone for spitting bloody excretions at any individual, including police officers, in the last 3 years and what were the disposition of these charges;

28. All information provided to Pat Monahan as to Daniel Kang prior to his upholding the termination of Daniel Kang;

EXHIBIT 27

29.  Any official statements issued by the City of Savannah in regard to the use of masks to prevent the spread of COVID-19 made between March 1, 2020 and the date of the firing of Daniel Kang;

30.  The present employment status of all individuals listed on Exhibit "A" on pages <u>Kang</u> 958 through <u>Kang</u> 961

31.  Any communication with Lieutenant David Barefield and/or Sergeant Richard Wiggins, of the Savannah Police Department about whether they believed possible criminal charges would be filed against Daniel Kang and/or Michael Arango;

32.  When any contacts and the substance of same between the City of Savannah Police Department and any representative of the Chatham County District Attorney's Office about possible criminal charges against Daniel Kang and/or Michael Arango occurred;

33.  Any communication and the substance of same between CARES, the City of Savannah Police Department and/or any representative of the Chatham County District Attorney's Office regarding the criminal investigation and the indictment of Daniel Kang and/or the facts surrounding same;

34.  Considering Lieutenant Barefield testified that he believed Kang and Arango committed criminal acts, what his duty was to report this conduct to the Chief of Police (see Exhibit "D");

35.  Any document or information which indicates whether VIII.  OFFICE OF PROFESSIONAL STANDARDS ROLE IN CRIMINAL INVESTIGATION Sections A-D of Exhibit "A" were complied with;

36.  Any document or information which indicates whether Roy Minter complied with any and all other standards and/or policies of the City of Savannah Police Department;

37.  Any discussions regarding whether Roy Minter was using improper policies in disciplining Daniel Kang and Michael Arango;

38.  Any communication with Patrick Monahan about the following:

   a.  Roy Minter using improper policy

EXHIBIT 27

    b.      the Internal Affairs investigation revealing possible criminal charges

    c.      that there had been no letter of transmittal, such as was afforded to Adrian Gates

    d.      that at the very beginning, Michael Arango and Daniel Kang should have been aware of these charges.

THIS THE 6th day of March, 2023

SAVAGE & TURNER, P.C.

By:    /s/ Brent J. Savage
        Brent J. Savage
        Georgia Bar No. 627450
        Kathryn Hughes Pinckney
        Georgia Bar No. 376110

102 East Liberty Street, 8th Floor
Post Office Box 10600
Savannah Georgia 31412
Phone: (912) 231-1140
Fax: (912) 232-4212
kpinckney@savagelawfirm.net

EXHIBIT 27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the within and foregoing Plaintiff's Fourth Amended Notice to Take 30(b)(6) Deposition of The City of Savannah Police Department by emailing a copy of the same to:

*Attorneys for Defendant The Mayor and Aldermen of the City of Savannah*:
R. Bates Lovett
Jennifer N. Herman
blovett@savannahga.gov
jherman@savannahga.gov

Patrick T. O'Connor
Patricia T. Paul
K. Elizabeth Holland
pto@olivermaner.com
ppaul@olivermaner.com
eholland@olivermaner.com

*Attorneys for Defendant Chief Minter*:
Shawn A. Kachmar
Taylor L. Dove
skachmar@huntermaclean.com
tdove@huntermaclean.com

**THIS THE <u>6</u><sup>th</sup> DAY OF March, 2023**

SAVAGE & TURNER, P.C.

By:     /s/ ***Brent J. Savage***
Brent J. Savage
Georgia Bar No. 627450
Kathryn Hughes Pinckney
Georgia Bar No. 376110

102 E. Liberty St., 8th Floor
Post Office Box 10600
Savannah, Georgia 31412
(912) 231-1140 (T)
(912) 232-4212 (F)