IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| DANIEL KANG,<br><br>Plaintiff,<br><br>vs.<br><br>THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH and ROY W. MINTER, JR., Chief of Police for the City of Savannah, Georgia, In His Individual and Official Capacities,<br><br>Defendants. | CIVIL ACTION NO.<br><br>4:21-CV-111-WTM-CLR |

VIDEOCONFERENCE DEPOSITION OF

CAPTAIN GEORGE GUNDICH

August 29, 2022

12:56 p.m.

218 West State Street
Savannah, Georgia

Thomas J. Dorsey, RPR, CCR-2781

Gilbert & Jones
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
*Brunswick*, GA 31520

*gilbertandjones1@gmail.com*
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
*Savannah*, GA 31406

## APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

MICHAEL G. SCHIAVONE, ESQ., (BY VIDEOCONFERENCE)
Schiavone Law Group, P.C.
1111 Bull Street
Savannah, Georgia 31401
(912)232-2646
js_law@bellsouth.net

JAMES H. WILSON III, ESQ.
Savage, Turner, Pinckney, Savage & Sprouse
102 East Liberty Street, 8th Floor
Savannah, Georgia 31401
(912)231-1140
jwilson@savagelawfirm.net

On behalf of the Defendant The Mayor and Aldermen of The City of Savannah:

PATRICK T. O'CONNOR, ESQ.
PATRICIA T. PAUL, ESQ.
Oliver Maner LLP
218 West State Street
Savannah, Georgia 31401
(912)236-3311
pto@olivermaner.com

On behalf of the Defendant Roy W. Minter, Jr.:

SHAWN A. KACHMAR, ESQ.
Hunter Maclean
200 East St. Julian Street
Savannah, Georgia 31401
(912)695-6984
skachmar@huntermaclean.com

Also Present:

Daniel Kang
Jamar Bacon

- - -

EXHIBIT 32

INDEX TO EXAMINATIONS


| Examination | Page |
|---|---|
| By Mr. Schiavone | 4 |
| By Mr. Kachmar | 35 |


- - -

INDEX TO EXHIBITS


| Exhibit | Description | Page |
|---|---|---|
| 4 | Bates Nos. Kang 000953-6113 | |


(Original Exhibit 4 has been attached to the original transcript.)





(Reporter disclosure made pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia.)

CAPTAIN GEORGE GUNDICH,

having first been duly sworn, was examined and testified as follows:

MR. SCHIAVONE: All right. This is the deposition of -- is it Captain?

THE WITNESS: Yes, sir.

MR. SCHIAVONE: -- of Captain George Gundich pursuant to the Federal Rules of Civil Procedure. Are all objections reserved except to form of the question?

MR. O'CONNOR: Yes, they are. And Captain Gundich will reserve reading and signing as well.

MR. SCHIAVONE: All right. Fine.

MR. KACHMAR: Chief Minter agrees to reserve too.

EXAMINATION

BY MR. SCHIAVONE:

Q. All right, Captain. Give me -- for the record, just give me your full name and your rank.

A. Sure. It's Captain George C. Gundich.





Q. All right, Captain. And how are you employed?

A. With the Savannah Police Department, City of Savannah.

Q. How long have you been with the Savannah Police Department?

A. Just shy of 23 years.

Q. When are you retiring? That's a long time.

A. Just shy of two years.

Q. Two years, got you.

And back, I think, around in April of 2020, what was your position then?

A. I was a captain of the eastside precinct, precinct command.

Q. All right. Let me ask you a couple questions about your understanding of policy.

My understanding is the Savannah Police Department has policies that apply to everyone employed from the chief on down. Would that be a fair statement?

A. Correct.

Q. And everyone is expected to be knowledgeable of all those policies?

A. Correct.





Q. And there would be a central location that an officer or anyone employed by the Savannah Police Department could go to in order to familiarize themselves with the policies?

A. Yes, sir.

Q. All right. Is there a -- I don't know if it's a presumption, but is everyone expected to be controlled by the policies including the chief?

A. Correct. There's also the City policy that states that.

Q. All right. And I know the procedure when officers are alleged to have violated policy. Are you familiar with that process, how that works generally as a captain of 23 years?

A. Yes, sir.

Q. How -- what's your understanding of that process?

A. Process pre a few years ago and what we're back to now it was pretty simple. We followed either a complaint would come in or if we came across something we would complete the beginning stages of the investigation on our side. If it was below the rank of sergeant, sergeant would start preliminary, would go up through the lieutenant to do the LOT, letter of transmittal.

Let me back up a little bit. We get an OPS number. We could contact them directly, either lieutenant or captain usually, just for tracking purposes and then we would handle -- anything that wasn't criminal we would handle that investigation at our level.

Once the LOT was done there's sections on that LOT for each commander on the way up the chain to put in their findings, whether they agree or disagree.

You would also place in -- Douglas Factors were -- were kind of added in with the change of the policy by Chief Lumpkin at the time which set certain parameters for us to place other comments in on how it affected whether this would be something we could correct the behavior of. It was very specific depending how much time you wanted to put in and which ones correlated with the incident. We'd fill all that in, make our recommendations on what we believe the punishment should be and then send it up.

On rare occasions you would have a meeting to go over it if you had people that didn't agree with the overall. If sergeants all the way up agreed with the punishment that's usually what happened followed by that policy. If there was some





disagreement you'd have the opportunity to meet in a group, command staff, the officers, supervisors and Internal Affairs and you'd go through the process to see why or why not this may have been either a policy failure, they broke policy, or whether they were cleared of any wrongdoing.

MR. SCHIAVONE: And I don't know if they have the exhibits from the last deposition.

MR. O'CONNOR: They're here.

MR. SCHIAVONE: Can we use those in this deposition, Pat?

MR. O'CONNOR: Yes. I appreciate just if you do any new ones just continuation of numbers so we don't have --

MR. SCHIAVONE: Okay.

MR. O'CONNOR: -- 15 Exhibit 1's.

MR. SCHIAVONE: That's fine.

MR. O'CONNOR: All right. He's got the exhibits here.

MR. SCHIAVONE: All right.

Q. (By Mr. Schiavone) If you'll look at those. Exhibit No. 1 is the -- well, you can tell me. If you recognize it if you could tell me.

A. Yes, sir.

Q. And is that basically the policy that you





just outlined to me?

A. Basically, yes. I'd have to read it to get the exact specifics.

Q. Right.

A. But yes. That's pretty much how we followed things for years.

Q. All right. And when -- when -- who creates policy? Or does someone create it? How does that work?

A. We have right now a group, your core leaders that get together and go through as we change policy. The original policies have always kind of been set. There was somebody assigned policy changes. They would go through, try to find best practice and see if anything had -- wording had to be changed or it would be a collective. If say I found something where it was a policy failure it would go through -- the accreditation manager would also handle going through the policies. Then it would go to Internal Affairs and all the way up the chain.

It used to be a point where we'd have an agreement upon most of the command staff to kind of say if there was going to be a change to make sure we put in our -- our two cents on it, and then finally the chief would sign off on that policy to





essentially make it legitimate.

Q. Okay. And then that policy would be placed on the whatever server that's used so that everyone would be aware what the policy is and that they have to follow that policy now?

A. Correct.

We have several different places that you could find it on, keeps up current. If there's ever any changes to the policy or deviation, anything that wording is changed, it is always sent out through a PowerDMS which everybody signs for electronically to say that you read the policy, understood it, and you would sign it to hold you accountable for the knowledge of that policy.

Q. All right. And would everyone be able to expect that they would have the benefit of all the due process portions of Exhibit 1 as an employee if some action was taken against him?

MR. KACHMAR: Object to the form.

Q. (By Mr. Schiavone) Or her?

MR. KACHMAR: Object to the form.

THE WITNESS: It would be -- supposed to read in a way where everybody can understand what their rights are, what the whole system is for disciplinary process so you understand all

the way through not only yourself but everybody in the structure as well, sergeants, lieutenants and above, pretty well documented on how you would know the process would go.

Q. (By Mr. Schiavone) But before the chief -- as I understand it, before the chief or anyone else could rely on a policy, it would have to be implemented and made part of a permanent policy?

A. Yes.

Q. So if they change things generally?

A. Yeah. If anything was changed it would have to go through all the way through the process, be signed off upon and then go into working order. Until then the policy would be whatever that prior policy was. If you're working on a policy, until that is finalized and signed off on, you still operate under the past policy.

Q. All right. So no one could then proceed and rely on a draft policy that hadn't been implemented?

A. No. That would -- that would not be the proper process.

Q. And if someone did, would that be a violation of policy?

A. I think then it would be because you'd be





more into the line of practice over policy which is what gets you in the most trouble.

Q. All right. And that -- everyone that works for the police department including the chief are expected to follow the existing policy, aren't they?

A. Correct.

Q. And who would punish the chief if he didn't? Do you know how that works?

A. The only one it would fall upon would be the city manager.

Q. Would be the city manager?

A. (Nods head.)

MR. SCHIAVONE: So that gets me to if Dan could get the group HR complaint that was filed. Can we get that marked as Exhibit 3?

MR. O'CONNOR: It would be -- you've already been through 3.

MR. SCHIAVONE: I thought we just had 1 and 2.

MR. O'CONNOR: No, you had 3. 3 was the memo.

MR. SCHIAVONE: Okay. Then 4. I'm sorry.

MR. WILSON: 3 was the Douglas Factor memo?





MR. O'CONNOR: Yeah.

(Exhibit 4 was marked for identification.)

MR. O'CONNOR: Let us look at that first. We've seen these three. Okay.

Q. (By Mr. Schiavone) I'd ask you if you'd take a look at Exhibit 4 and see if you can recognize that.

A. Yes, sir.

Q. Can you explain to me what that is?

A. This was the conflict resolution program that the City once had. I believe it's been taken out of policy since then.

Initially how this all began was I had met with the chief three different times trying to correct some behaviors, some problems I saw that was brewing in the department. When it comes to making a complaint at different levels there's not one set for dealing with somebody above your rank, especially when most of the internal issues stop at the chief of police. So I had to research for what fell under HR and reached out to Anthony Caston with HR after I found this policy to ask him if there was any way we could avoid going through multiple individual complaints and -- and due to the fact this one name that you could do a group complaint I found this





after failed attempts of talking to Minter trying to get change. I was kind of the spokesperson for a number of people, so I decided after I was told that if they had a problem that they needed to come forward. I reached out to everybody with this policy through HR, and we kind of completed a group complaint at the time.

I controlled who was signing it in my office so it didn't kind of disappear and start going around and nobody was pushed or forced to sign it or feel threatened. So everything stayed in my hand the entire time. We kind of let word of mouth get out besides those I talked to.

I kept it for maybe about two days, two and a half days. I really didn't want it to swelter out there long and start getting people pushing back. So after that time period I set and people came up, those are the amount of signatures we came up with. Everybody I kept up with for the final draft of the bullet points which I thought was the most accurate way to get all those points across that people were having issues with and sent that up to the HR and the city manager.

Q. All right. Officer Kang as well as Sergeant Arango were two of the officers that did

sign the complaint?

A. Correct.

Q. And in the complaint there were listed a number of issues. One was threats, intimidation admonishment against individuals under his command?

A. Yes, sir.

Q. Was that occurring? Was the chief doing that to individuals in the -- in the police department?

A. Yes, quite often.

Q. And -- and there were complaints about how he was treating officers?

A. Yes, sir.

Q. Was there retribution against officers?

A. I'd need responsibilities to confirm. The behavior kind of to the command staff I saw more of it. Anything else on individual officers there was some pushback on it. I've seen it firsthand. You know, the behaviors in group settings between peers, around peers and subordinates where this would happen. So I'd say I probably witnessed it dozens of times at specific detectives, different ranks, different officers in very public settings.

Q. Would some of those retributions be done by the chief directly?





A. Yes. There was a lot of threats of moves, people losing their positions.

You know, if you had specifics I could probably bring some to mind, but there were a number of -- of -- all the people that spoke on these problems was why I added these bullet points in. It was a number of people that felt like they didn't get positions, didn't get fair shakes to get promoted, things along that line. The list kind of goes on. It would be very vague.

You know, you give me specific names I could say where that happened. Certain units that did not get the push that they needed to, you know, be successful, certain precincts that weren't allowed the ability to be successful.

Q. Did the chief ever say to you that anyone that signed that petition would never get promoted?

A. No. I only heard that through a rumor.

Q. Through a rumor; all right.

And all of these complaints when this was filed was -- did you hear or receive any feedback from the chief or anybody else --

A. Not at all.

Q. -- since it was filed?

A. No. Just HR's simple response was just





that we're going to take a look into it and the actual initial was to make it harder. Even though it was outlined in their policy you could do a group complaint, it became a battle of wills of let's see how many we can get rid of that signed this by getting back to us after, uh, maybe about a week Jeff Grant stated that everybody had to do their own individual complaint. Everybody kind of pushed back on that, but I reached out to everybody and said just go ahead and do individuals. If that's what they want to play around the system, that's what we did.

After that we heard back. I believe Mr. Monahan may have sent out an e-mail saying that, you know, they're going to take this serious and hire an outside source to look into the problem. But any input from HR directly to any of us or from command staff did not exist.

Q. And are you aware if an outside source was hired to look into it?

A. Yes. They did hire -- I don't know. I can't remember her name right now. She was out of Statesboro.

Q. Susan Cox?

A. Yes.

Q. Does that sound correct?





A. Yes, that's it.

Q. All right.

A. But she only interviewed a very minor number of people. I was one of them, but I think maybe I heard four or five others out of that whole list were actually interviewed.

Q. And are you as of today, are you still waiting for them to have made a decision --

A. Um --

Q. -- even though the chief -- even though the chief's gone?

A. It would have been nice.

Q. Did they ever make a decision on them?

A. No, not at all. There was -- on Mr. Monahan's last day he sent out an e-mail that he was setting up a structure and a plan to correct what he saw was bad behavior, bad leadership from Minter. And he was going to be held -- he actually called me personally and said that he promised that, you know, Michael Brown when he came in was going to keep up on this and any other problems to contact, you know, him directly even though he was retired to tell him that, you know, things weren't going, reach out to Mr. Brown so we could see if there was any positive change coming from this.

EXHIBIT 32



So there was an addressment but no closure whatsoever, and nothing was ever really done to follow up on that, that plan that was in place to correct all of these problems.

Q. All right. Now, Captain, you were aware that Kang and Arango were CNT at one point?

A. Yes, sir.

Q. And were they transferred back before this was filed or after --

A. It was before.

Q. -- Exhibit 4 was filed?

A. It was before.

Q. All right. And do you know what -- what area of the police department they were put in at that point, like different sections or something?

A. Yeah. That's where the confusion kind of came in. I know I remember talking to them when they were getting pulled out. It seemed like they were picked very specifically to be a warrant squad.

Q. Well, explain -- explain to me what a warrant squad is, Captain.

A. Well, that would be the problem. We never really had just something that says warrant squad. We've had a couple different units in the past. We have our -- our TFO positions that are with the U.S.





Marshals that work with them on a warrant squad. We've had a TRAP unit in the past that did some warrant service. A warrant squad in itself the closest we had was one that was called the Career Officer Tracking Unit existed 15 to 20 years ago. I think it may have been 20 years ago, was about the last time we had a specific unit to just deal with fugitives.

Q. And with executing arrest warrants issued by a judge, you know, be it a state court judge or superior court judge, especially if it was to arrest someone for violent offenses, is that a very dangerous job --

A. Yes.

Q. -- when you're executing that warrant?

A. Yes. It falls under the high-risk category. CNT, SWAT, TRAP at the time were the main three units that would handle this.

The unit I currently run right now which is the strategic investigation section handles that as well. Something that you need training, manpower specific. Anything that's high risk is levied out in different policies in the department, part of SWAT, part of SIS, very specific on it. But it does reach that factor where you have to have general





guidelines, actually specific guidelines to handle these things in a proper way, not just put a team together.

Q. I know that I've had clients charged with murder that a warrant had been issued for their arrest and I've contacted the detective, told them that I had the individual in my office and that I wanted to surrender him. When the police got here there would be five, six or seven officers, some from the Marshals office, even though I'm an attorney -- they knew who I was -- and that I was voluntarily surrendering, but they still sent that kind of manpower.

Is that because of the dangers -- dangerousness of no matter who it is when you're actually going to execute the warrant and arrest the individual?

A. Absolutely. I've -- I've managed units like this probably about 15 or more years of my career since being a star corporal. It is always one of the most hectic, highly planned, dangerous thing. Any warrant service you do or even going after fugitives even in a vehicle, you know, no matter what it's going to be takes operational plans. It takes multiple undercover officers, uniformed officers,





every bit of support you possibly can.

The teams I run right now generally depending upon the person we're looking for will increase the manpower. The purpose of wanting as many people out there is to cover the arrest, cover the avenues of escape, cover safety to the public. You have to be ready for every possible scenario that can go wrong. So you have to have enough to handle the building, entry team, presurveillance and transport after the arrest.

Q. All right. At the time that this, these officers were assigned -- I guess it's called the SIS warrant squad? Does that sound like what it would have been called at the time?

A. I -- I think it finally got to that point. I could be corrected on this, but I don't think it started out that way. I think they were first attached to a precinct. But as a warrant squad it was a citywide warrant squad but they were attached, I think, to central precinct.

Q. Was there any policies in place at that time --

A. No.

Q. -- for these officers to -- to know exactly how this should be done?

A. No, it was -- it was actually very confusing and they reached out to me for assistance. They -- they worked for me in CNT. Safety aspect of doing these type of warrants, CNT or fugitives, they knew they had the manpower there. They had the support, and, you know, we would cancel operations left and right. So they were feeling a little uneasy about how they were being pushed forward, especially at the front end when they weren't even connected to the SIS team at all. It was just the five of them, I believe, and then one had left not far into that.

They didn't have the equipment, so I was able to help them get computers. They actually didn't have a place to stay. I had an extra office at the eastside precinct so I told them they could set up there. I know they were having issues with their command trying to get equipment they needed. So I was able to get them some computers. They had a place to work. That didn't last long, and at some point they pulled them to, I believe, central precinct and put them over there.

They were getting a lot of the runaround of not knowing who they report to or really where they fell because you either have to fall into a tactical unit or the patrol, and they were being told





at one point follow patrol procedures and then they were being told to follow essentially SWAT procedures. You can't have both. It has to be one specific unit that handles that type of thing. You know, there's aspects of -- of your patrol policies that SWAT will follow, but overall SWAT policy is SWAT policy. They have their own policy. SIS had their own policy. But as far as a fugitive squad was a separate entity that did not have its own policy at the time.

So they tried to do the right thing and began trying to write their own policy so they could show what they needed for manpower, equipment to do it safer. So I helped them find the COTU unit I mentioned. I was able to find that policy way in the archives, the TRAP policy and a couple others, and they actually took the time putting it all together and asked me to proofread it. And after that they sent it up through their chain of command which also changed so much. I'm going to say it was Major Herron at the time. At some point it was Captain Gay. They kind of changed supervisors here and there a lot too, so I wasn't sure. I wasn't in their direct chain of command, so I had limited abilities to help push it further than that.





Being in charge of the precinct was a whole different animal, so I tried to help them from the kind of the shadows there to help them get on track so they can do things more safely, because I could see that this was not being handled in a right way. You never have supervisors being part of an entry team unless it's just no other way around it. It was unsafe actions.

The reason you do the amount of people we do on a fugitive warrant or even a search warrant is because you're not only trying to keep the officers safe; you're trying to keep the public safe and you're trying to even keep the suspect safe. You know, the more manpower you have the more shock and awe you do the less likely they are to turn into violence to have to use force.

I'm in charge of the SWAT team right now as well and marching them into the hundreds of -- of nondeadly force activations they've had over the years because of the way they go in. They go in with the full team. They go in knowing what they need to do having every aspect covered, and that's kind of how it all should be done.

When I got to CNT I had to make some changes there, so this is kind of near and dear to my





heart, because I saw some safety things that were wrong there of them taking trying to get drugs over the protection of life, their own, the suspect's, the public, and I made changes there. So that's how we operated. And for them to get pulled from CNT where things were being handled safely and get thrown into that was causing a lot of issues, and that's why I helped them to try to get that policy set.

Q. At some point did -- did you review the video of what occurred in this case?

A. I finally did, yes.

Q. And the -- the officers, as I understand it, had, were given an arrest warrant for a violent offender, I think, for aggravated assault. They had a general description in the warrant light-skinned black male with an address.

A. Right.

Q. And this was during the day, I believe. It wasn't a night execution of the warrant.

But they went to the address. They went to the apartment, as I understand it, that was in the warrant and was told by the super or someone that that individual didn't -- had lived in that apartment but he had moved to an apartment upstairs and gave them that address. And they walked into the common

EXHIBIT 32



area and a light-skinned black male and woman came out of that apartment up to the rail and saw them. You know, there was four or five officers, saw them heading toward the stairs, and they rushed back into that apartment that was given as to where this man was located.

So when they got up to the apartment and the door was open, I believe Sergeant Arango yelled out the name of the man in the warrant, and the same light-skinned black male started coming toward Officer Arango and the other officers. And they yelled at that individual to show his hands and to get down on the ground. I think they -- I think they yelled that three times. This individual never obeyed the -- the order to get down on the ground at that point.

I'd like to know, I mean, would that be an obstruction at that point no matter who the person was, whether they were the suspect or anyone else when they were given a lawful order to get down on the ground at that point?

A. Yes.

MR. O'CONNOR: Hang on. Object to the form. You can answer subject to my objection. Go ahead.





THE WITNESS: Oh.

Being in that situation a number of times, whenever you're dealing with violent individuals like that there isn't a lot of time for deescalation, so you need to be forward, forceful to get them to comply to avoid having to use deadly force or more force that's necessary. So, yes, and any amount after -- after a lawful order. And at that point they believed they had a lawful reason to be there. They thought it was him that they would -- that he should have complied faster at that point.

And you have to understand from the type of work they've done with SWAT, this was essentially going in with a tenth of what you would with a SWAT team. And -- and when you use force in those situations it's completely different. It's trying to -- to -- to get control for the safety of everybody involved. So 99 times out of a hundred everybody complies immediately, gets on the ground. And when you've got multiple other subjects in the house, you have to be able to get that person under control and then move on through to make sure there's no other ambush, no other issues coming





up.

So I would say that was -- that falls under the line of obstruction. I've done it before. You know, there are times when you have time to say five, six, seven, eight times get on the ground, get on the ground and try to deconflict. This was not one of those situations.

Q. (By Mr. Schiavone) And then at some point I know that there was some bad language used, like, for instance, when this individual was asked his name, I think it was basically fuck you, mother fucker's my name or something to that effect.

So is it unusual for people that you're looking for -- for -- for arresting because of a crime to give false names, have false IDs --

A. Yes, sir.

Q. -- in order to avoid -- avoid being recognized as the individual that you're looking for under the warrant?

A. Literally I have to watch ever body-worn camera of my guys every time they use force, have to make arrests, and it's frustrating for me watching it when they're lying and we know it's them on that. So, yes, it happens every day.





Q. And at some point after they sat him up and were trying to determine if he was in fact the individual in the warrant, he began spitting on these officers and he hit Arango. He hit Kang and -- and my understanding was that because of the lack of equipment -- this was -- this was during COVID, that you also would have issues of HIV and tuberculosis. I mean, there's a number of things that officers have to be careful of on a daily basis of -- of -- because they're first-line people. And my understanding was that they couldn't even get or were not even given masks to cover their -- their faces during the COVID period that we would normally have when they went out to execute the warrant because of lack of equipment. Is that true or is that your recollection?

MR. KACHMAR: Object to the form.

THE WITNESS: That is true. That actually was one of my tipping points for pushing to the city manager the first time. He actually refused -- Minter refused to allow us to even wear a mask if purchased themselves. You know, it was part of one of my original first complaints. So we were not only not given that equipment; we were told we could not wear it on the onset of COVID.

The spitting was a whole 'nother problem. At the staff meeting I brought up spit shields which is a pretty common device most departments have. I tried to order them for my precinct. I was told to hold off. We need to do it for the whole department and we need to see which ones are going to be more beneficial. That took another nine, ten months. And at that point I don't think any of the specialized units were ever given any of the spit shields to also protect from that happening.

And we have them now. Matter of fact, after this incident we suddenly got a whole bunch of them and -- and we use them, but no to the COVID masks, and there wasn't anything kind of practically available to -- to put on the suspect either.

Q. (By Mr. Schiavone) Are you familiar with the chief and his connection to The Maxwell Group?

A. Yes.

Q. Do you know what that is? Can you explain that to me?

A. I kind of think it's the scientology of the business world. It's -- it's a professional group of speakers for any number of topics. I know





he sat on the board. Somebody had sent me the link showing him one of their board members. I think they have hundreds of board members from reading up on it, but it's a -- it's a teaching and lecture group that travels around. I think there's a lot of quid pro quo that goes around. I kind of made a complaint on this myself. I think there's a conflict of interest.

I know enough about the group to know that I don't like the way it operates. Yes, they have some good speakers, but this was something he was involved with, and I think they started pulling that into our department which I did think was an ethical issue.

Q. And is there a policy or procedure that -- whether or not the chief or any officers should have press conferences about pending criminal cases and commenting on the cases to the public?

A. Yes. I couldn't cite the policy offhand. I've got like three different ones that it might be falling under, but we have very specific things about sharing criminal cases publicly as well as how to deal with the media. But I couldn't tell you offhand exactly where that policy would fall.

Q. And were you aware that the chief had





contacted the district attorney's office directly specifically about prosecuting Kang and Arango?

A. I did hear that.

Q. And were you aware of a number of press or conferences that he had with the mayor and the DA at the time, Meg Heap, in reference to this case?

A. Yes, I watched those.

Q. And was that unusual? I mean, that --

A. I thought it was very unusual.

Any time we're dea -- I mean, we don't really divulge things about criminal cases that we're working. We don't divulge Internal Affairs complaints. There may be a -- a very minor press release to just say something's being looked into. I thought this one was very theatrical, over the top. I couldn't understand from my side of the fence of how you would share so much information for something that's a now pending criminal case that you want to do or a pending civil suit to come. So to me it -- theatrics would be the perfect word I would use for this. It was very unusual.

Q. And were you ever in Internal Affairs at any point in the 23 years?

A. As working in Internal Affairs or being through?





Q. Yes. Yeah, working in Internal Affairs or anything like that?

A. No, no.

Q. All right. Were you familiar with the investigation of Gates and some of the allegations in that case?

A. More so after the fact. You know, heard little things here and there, but really the things that started to come out in the news. You know, I keep up on all that, so I think I know more about it now.

I knew a little bit when Sergeant Arango had asked me for advice of who to go to with the initial complaint about the gang connection, and Sergeant Arango was actually the one who took that complaint up to Internal Affairs to get it started. But as far as the internal workings of the investigation, I didn't have any part of that.

MR. SCHIAVONE: All right. Can we just take a short break? I may be done, almost done.

MR. O'CONNOR: Yeah.

MR. SCHIAVONE: All right. Thank you.

(Recess taken from 1:36 p.m. to 1:44 p.m.)

MR. SCHIAVONE: All right. I think that's all the questions I have at this point.

EXHIBIT 32

MR. O'CONNOR: All right. We have no questions for the City.

MR. KACHMAR: Chef Minter has one question.

EXAMINATION

BY MR. KACHMAR:

Q. Captain, would you agree that community relations is a component of the chief of police's job?

A. Yes, to a point.

MR. KACHMAR: That's all I have.

MR. O'CONNOR: Okay.

MR. SCHIAVONE: All right. Thank you. Thank you, Captain.

(Deposition concluded at 1:44 p.m.)

(Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), signature of the witness has been reserved.)





CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA:
COUNTY OF EFFINGHAM:

I hereby certify that the foregoing transcript was reported as stated in the caption and the questions and answers thereto were reduced to writing by me; that the foregoing 35 pages represent a true, correct, and complete transcript of the evidence given on August 29, 2022, by the witness, CAPTAIN GEORGE GUNDICH, who was first duly sworn by me.

I certify that I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c); I am a Georgia Certified Court Reporter here as an employee of Gilbert & Jones, Inc. who was contacted by Savage & Turner to provide court reporting services for the proceedings; I will not be taking these proceedings under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and by the attached disclosure form I confirm that neither I nor Gilbert & Jones, Inc. are a party to a contract prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board.

This 31st day of August 2022.

_______________________________

THOMAS J. DORSEY, CERTIFIED COURT REPORTER, 2781





DISCLOSURE OF NO CONTRACT

I, Debbie Gilbert, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Gilbert & Jones, Inc. was contacted by Savage & Turner to provide court reporting services for these proceedings and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board for the taking of these proceedings.

There is no contract to provide reporting services between Gilbert & Jones, Inc. or any person with whom Gilbert & Jones, Inc. has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

This 31st day of August 2022.

_______________________________

Debbie Gilbert, FIRM REPRESENTATIVE
Gilbert & Jones, Inc.





DEPOSITION OF: CAPTAIN GEORGE GUNDICH /TJD

I do hereby certify that I have read all questions propounded to me and all answers given by me on August 29, 2022, taken before Thomas J. Dorsey, and that:

___ 1) There are no changes noted.
___ 2) The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. ___ Line No. ___ should read:_______
_____________________________
The reason for the change is
__________________________________________________

Page No. ___ Line No. ___ should read: _______
__________________________________________________
The reason for the change is
__________________________________________________

Page No. _____ Line No. ___ should read:_______
_____________________________
The reason for the change is

Page No. ___ Line No. ___ should read:_______
_____________________________
The reason for the change is

Page No. ___ Line No. ___ should read:_______
_____________________________
The reason for the change is

Page No. _____ Line No. ___ should read:_______
_____________________________
The reason for the change is
_____________________________

EXHIBIT 32

DEPOSITION OF: CAPTAIN GEORGE GUNDICH

Page No. ___ Line No. ___ should read:________

The reason for the change is ____________________

Page No. ___ Line No. ___ should read:________

The reason for the change is ____________________

Page No. ___ Line No. ___ should read:________

The reason for the change is ____________________

Page No. ___ Line No. ___ should read:________

The reason for the change is ____________________

Page No. ___ Line No. ___ should read:________

The reason for the change is ____________________

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

________________________
CAPTAIN GEORGE GUNDICH

Sworn to and subscribed before me,
This the ___ day of _______, 20__.

____________________________
Notary Public
My commission expires: ____________

Please forward corrections to:

Gilbert & Jones, Inc.
7505 Waters Avenue, Suite F3
Savannah, GA 31406
(912) 355-1061

**Gilbert & Jones**