EXHIBIT 34

## MEMORANDUM

**TO:** JEFF GRANT

**FROM:** SUSAN W. COX

**SUBJECT:** SUMMARY OF OFFICER COMPLAINTS

**DATE:** AUGUST 2, 2020

**CC:** BATES LOVETT, ESQ.

Jeff: At your request, I have reviewed all of the fifty-six (56) complaints made about Police Chief Minter pursuant to the City's grievance policy. While some of the complaints deal with incidents that are probably specific only to the particular officer making the complaint, many of the complaints are similar to each other and fall into some very broad categories.

The purpose of this report is to give Chief Minter the opportunity to respond to the issues and incidents that form the basis of the complaints that were made, while attempting to protect the identity of the individuals making the particular complaint. To that end, I will refer to all persons who made a complaint as "officers," regardless of his or her rank or position in the department. I acknowledge that my "categorizations" are somewhat arbitrary and overlap in some respects, but this ended up being the best way to summarize this many complaints. Please note that many of the complaints were on more than one topic, so the totals often reflect complaints by the same officer on more than one topic. Some officers had very, very detailed descriptions of the underlying events that form the basis of the complaints; others only made general comments and offered few specifics. However, the following areas were all mentioned by more than one officer:

1. **March 19, 2020 Directive Sent to the Department Concerning Masks and Personal Protective Equipment.**

   Thirty-nine (39) individuals complained about an email reportedly sent to the department concerning wearing masks and/or personal protective equipment. The email was dated March 19, 2020. Although officers were expected to attempt to control the crowds that were in Savannah for St. Patrick's Day, they were not allowed to wear masks or any other form of protective equipment, even if they provided it themselves.

   In addition, officers complain that no effort has been made to provide them with appropriate personal protective equipment and that

EXHIBIT 34

communication about the pandemic has been inadequate. Lysol wipes and sprays were insufficient to provide sanitation at the precincts. As one officer noted, his precinct did not get any N95 masks until April, 24, 2020. In addition, "[c]urrently our quartermaster does not have hand sanitizer in stock. We are provided a [H]ome [D]epot bucket with homemade hand sanitizer that has a foul odor." Officers were left to obtain their own masks and supplies.

Several officers expressed concern that there is, apparently, no comprehensive plan for policing during a pandemic. Several officers also felt that Chief Minter's statements to the City and news media were not accurate and did not reflect the situation the department was dealing with.

It should be noted that other complaints were made about the lack of equipment unrelated to the pandemic. For example, one officer complained that the equipment issued for the SWAT team is woefully inadequate and provided specific examples. Other SWAT team members say the members are forced to spend their personal funds on body armor, lights, gun sites, and ammunition because they can't get these items through the department. An additional complaint about SWAT equipment was made:

Multiple requests for essential equipment, weapons, vital weapon components, vehicles, and personnel have been denied by Chief Minter and AC Price. The SPD SWAT Team is classified as a Tier 1 team. This means that we have to maintain a standard which includes a specified number of personnel, equipment, training, and capabilities. As a Tier 1 team, we are required and expected to be proficient in hostage with 20-year-old upper receivers. Rifle optics, high powered scopes, and precision sniper rifles are regularly failing from overuse and age, and are not being replaced. Every RFE sent from SWAT Command to Chief Minter and AC Price has been denied without explanation. After the police demerger, the Chatham County Police Department claimed and seized multiple vital items from the SPD SWAT Team. These items included rifles, submachine guns, scopes, and vehicles, and none of these items have been replaced, with every request sent through SWAT chain of command being denied by Chief Minter and AC Price.

Another officer says that he has been unable to get traffic cones and other safety equipment. Another says they have ballistic helmets but no vests. Another notes that the ballistic helmets are three years over their expiration date. Still another notes that they have requested CID vests to be worn when serving or executing warrants and so far, this request has not been filled.

2. **Promotion and Testing Issues.**
Thirty-three (33) officers complained about promotion and testing for promotion issues. All officers voicing complaints on this topic expressed a general concern that promotions are not handled equitably, for a variety of reasons.

CITY00718

EXHIBIT 34

For example, one officer complained that the November 10, 2019 promotions were in violation of prior policies.

One officer stated that to his/her knowledge, Chief Minter has not conducted a single performance review since he took office. Another complained that in January, 2020, a department-wide email was sent that stated that the Advanced Patrol Officer rank was no longer available and the Corporal rank was frozen due to re-evaluating requirements for promotion. At the time the complaint was made, this issue had not been resolved, preventing officers from being promoted. Chief Minter has stated there will be a "cap" on the number of corporals throughout the department but no specifics have been provided on either the basis for the cap or the standards to attain the rank of corporal.

In addition, a new pay scale was introduced in January, 2020. According to one officer, this new pay scale put officers in a "step" and the step was the basis for their pay rate. There was no explanation as to how the steps were created or how each officer's step was determined. This officer says that when Chief Minter was asked to explain it during a roll call, he could not.

One officer provided this information:

**Sergeant Testing and Promotions**
Chief Minter has ultimate responsibility for the process of creating a list of eligible, promotional applicants for the rank of sergeant, then making such promotions. Given the raise in both salary and career advancement, these are coveted promotions. However, the entire process which created the current sergeant eligibility list, the lack of communication and department transparency and the obvious lack of ethics in the selection of promotions since has been an embarrassment to the department.
A) Instead of checking and updating the written test, Chief Minter decided to use a written test which was not current to SPD and was a prior test created under the SCMPD before Minter's hiring. The test itself displayed the SCMPD logo. The test was challenged and points were given, bringing some from failing the test to passing.
1. No list of scores or pass/fail was ever produced and disseminated to those within the process
2. The amount of points given to each person or the questions that were contested was never provided

B) The sergeant assessment used policies provided by the SPD HR department. Officers were asked to select a policy and give a "roll-call training" on the subject while assessors would ask questions related to the chosen policy. One policy that officers could choose was the Social Media policy for the SPD Public Information Office and contained directives for the handling of the department's social media presence and who has the authority to post on the departments behalf, among other items. This policy in itself would not be a topic for a "roll-call training" as it does not pertain to anyone on patrol as they are not members of the Public Information Office. Furthermore, the assessors asked questions which did not relate to this policy. The questions asked were for a separate SPD policy which directs the individual officer on conduct related to personal social media presence.

EXHIBIT 34

C) Once the assessment was completed there was mass confusion and misinformation over how the ranking was being decided. Originally, officers were informed that it would be a combination of the written test score and the assessment score (As every other sergeant promotional process the department has conducted has been done in the past, since my hiring.). Then we were given a ranking solely based on the assessment. These scores were given by email individually. No eligibility list was ever produced and disseminated to those within the process or the department as a whole.

D) I was given the rank of [redacted to protect officer's identity]. Through word of mouth I discovered that there was 25 eligible officers to be promoted.

E) Officers were then informed that a Chief's interview was to be conducted as an additional step to the promotion process.
1. The chief was not present.
2. Some questions asked were vague and very open ended.
3. Any proof of what was said was completely dependent upon notes taken by ranking officers present.
4. No eligibility list was ever produced and disseminated to those within the process or the department as a whole.

Another officer provided this additional information on this topic:

During the testing phase several candidates did not pass the test until questions were removed from the test. Candidates that did not initially pass the test were promoted in the first wave of promotions, in competitive examinations this cannot occur. During the Assessment phase all candidates were scored and ranked in a competitive numerical order. While the first three highest scoring candidates were selected, candidates that ranked in the high 20's at bottom of the rankings were promoted over several that were ranked in the single digits. During the Assessment phase all candidates were scored and ranked in a competitive numerical order. Promotions were not ascertained by competitive examinations, but rather by arbitrary decision making. At no point did candidates submit a resume, and the interview process was only composed of four questions by members of the command staff. Scored testing and a ranked assessment process compromised two thirds of the promotional process and the weight of the scores and rankings were minimized. The minimization of these factors are not in accordance with City of Savannah Civil Service Act and Human Resources Policy I-IR-004-5 or PNL-003.

Evidently, there were also issues with the appeal process after the test:

- During the original promotional process the test date and assessment dates were set. Due to the process being put on hold and a new standard set, the test was rushed and the assessment was also rushed through. As if to give no-one time to review and grievance to process. The test itself was questioned as far as the content of some of the questions. Applicants were allowed three days to appeal any questions on the test. But with the content of the test and the number of applicants the failed the test, the Department/City only had two copies and answer keys for the test for review. The review

EXHIBIT 34

had to be done at the City's Personnel Department. We then had to email the assessment center our appeal questions by a deadline. I appealed 9 questions and sent the questions in on two separate emails. One email had four questions and the other had five questions. The assessment center only reviewed the first email with four questions. I questioned why the other email was not reviewed and got no answer from personnel of the Chief's office. I was only told to contact the assessment center.

Another officer notes that all African American candidates seeking to move from lieutenant to captain were told they failed the test, but they were denied the opportunity to see their scores.

Another officer complains that only certain people are offered interviews for various positions while other candidates were not given that opportunity.

### 3. Leadership/Communication

Twenty-four (24) officers complained about Chief Minter's leadership style and communication skills. An example:

- Retention is an issue within the department, due to lack of ineffective upward communication. There is a divide between the officers who are willing to express their concerns verbally and those who remain silent because they are scared of retaliation. A lot of officers have left the department because their concerns were not taken seriously or addressed properly through feedback.
- Lack of organizational structure has created confusion pertaining to career ladder advancement. This is due to the lack of downward communication especially to those who were in a position to be promoted before and after the pay step implementation. I was made aware by my commander that the decision has not been made on what the requirements will be. I was informed by the Chief at a representing meeting, which Chief Price is working on it, but nothing has been communicated recently. My career advancement is my future and should be a concern.

Other officers complained that Chief Minter leads by intimidation and threats – threats of removal from rank or command and threats of removal from units. Chief Minter is accused of publicly belittling or criticizing his supervisors and commanders in the presence of their peers. This has allegedly occurred during C.A.R.E meetings as well as other occasions. Specific examples of when this has occurred were related by several officers.

Another officer complains that the Employee Relations Team, which is supposed to ensure that Chief Minter responds to officer issues, has failed to be responsive to officer questions.

Several others complain that he distances himself from taking responsibility for transfers and promotions and fails to communicate about those issues. Another complains that he lacks the ability to communicate the focus, strategies and goals of the department. While the Chief has told the department that his

EXHIBIT 34

focus is Gangs, Guns and Drugs, he has never offered a detailed plan or strategy on how to address these issues.

Other leadership issues are reflected in complaints that are summarized in the other topics such as Personnel.

### 4. Personnel/Specialty Units

Twenty-three (23) officers complained about how specialized units have been treated. One officer says the Violent Crime Task Force has been plagued with issues since its creation in November, 2019. Vacancies have not been filled, the officers do not get any of the benefits of other specialized units, such as cell phone and clothing allowances, and requests for software and equipment have been ignored.

One officer complained that some captains and lieutenants were transferred from specialized positions for not having sufficient patrol experience, yet other officers with less patrol experience were transferred into the specialized units.

From another officer's Complaint:
**Selection to Specialized Units**
Since Chief Minter's arrival, at least two specialized units have been created that were never opened to all members of the department. These units, known as SWIFT (warrant squad) and the Violent Crimes Task Force (VCTF) were staffed without department wide announcement, depriving many of the opportunity for career advancement. Members of the VCTF who were not previously given the title of Detective or specialized training and equipment were provided these benefits without ever having to compete for the privilege.
CID panel interviews were conducted to establish a eligibility and ranking list which to choose officers to fill detective positions.
1. No eligibility list was ever produced and disseminated to those within the process or the department as a whole.
2. Positions were filled immediately after the interviews before any list could have been made.
3. At least one officer that did not interview at all was placed in a detective position then orders cut weeks after the transfer.

Another officer complains that punishment is inconsistent, with Chief Minter retaining officers who should be terminated or giving them unpaid leave instead of termination. Others say that the Chief demonstrates favoritism in who is promoted or placed in specialized positions. Another says that positional movements are made with no standardized measure of success.

Another officer complains that he has been subjected to a hostile work environment and that Chief Minter has done nothing to rectify the situation.

Another complains that CID has been short-staffed for the entire time Chief Minter has been in office. A member of the Warrant Squad makes the same

CITY00722

EXHIBIT 34

complaint and notes that their vehicles are ill-suited for their task. Another states that Chief Minter fails to listen to the needs of the specialized units and as a result, these units are lacking in the necessary equipment and training.

Another officer attributes the lack of communication to the Chief's decision to communicate with certain staff members to the exclusion of others.

### 5. False Statements to Public/Politicians

Fourteen (14) officers complained that Chief Minter made false statements to the City and to the public. Most of these complaints arise out of Chief Minter stating that the department was short by only 40 officers, but in fact, the department was short-staffed on a daily basis. According to one officer, the department has positions for 600 officers and at the time this complaint was made, only 423 officers were employed. Another officer noted that in an August 2020 interview on WSAV, Chief Minter stated that the department was only 40 officers short. This officer says that the reality was that the department was over 100 officers short; that Chief Minter justified his number by counting cadets in the Academy and Patrol School and individuals who had been hired but had not been to the Academy.

Another officer complained that Chief Minter told the media that officers had protective masks when, in fact, they did not.

Another officer complained that in response to the increased homicide rate in January, Chief Minter stated he was increasing the operational days for the Violent Crime Task Force to seven days a week. In reality, the VCTF had been operating this way since November, 2019, so there was no "increase."

### 6. Reversal of Orders Concerning Uniforms and Beards

Ten (10) officers complained about Chief Minter's about-face on officer uniforms and beards. In August, 2018, it was reported that Chief Minter stopped by to introduce himself and stated that he would not be changing the policy on Class C uniforms or beards. Another officer reported that on March 19, 2020, Chief Minter sent a department-wide email that since the dry cleaners were closing due to the pandemic, C uniforms could include khaki pants. On March 24, 2020, Chief Minter sent a follow-up email that C uniforms would no longer be allowed and that Class B uniforms would be mandatory. One officer noted that in making this decision, Chief Minter has never worked patrol in a climate like Savannah, Georgia.

On April 10, 2020, a department-wide email was sent that beards and/or goatees would no longer be allowed except for officers in the specialized units. Subsequently, the VCTF members were told they could no longer have beards or goatees. The officers expressed concern that they could be disciplined for failing to follow uniform and appearance directives, which directives were changing frequently. In addition, as two officers noted, allowing officers to

CITY00723

EXHIBIT 34

grow beards can be good for morale and does not cost the department anything.

### 7. Hurricane Dorian

Nine (9) officers complained about Chief Minter's handling of the duty roster for Hurricane Dorian on September 4-5, 2019. His actions were summarized by one officer as follows:

There was a lack of coherent instructions and planning, which lead to morale problems. Initially we were instructed to report for 12 hour A/B rotations with cancelled days off. Approximately 1 hour before the oncoming shift was to arrive, we were told that we would not be allowed to return home. This posed an issue for those with childcare, pets, or other family situations. We were instructed that it was not sure if we would be compensated for being required to stay. A short time later we were told that we could go home. The back and forth in the meantime created a distrust that the command staff had concerns about anything other than funding.

Another officer notes that during this time, they could not get a clear answer on whether they would receive Hazard Pay and whether officers were to shelter in place. The shelter-in-place decision was made as the storm was passing, but they were never told how the Hazard Pay issue had been resolved.

### 8. Training

Five (5) officers complained about the lack of training. One noted that while SWAT is expected to perform a multitude of tactical duties, very little training is provided for those duties. Another SWAT member noted that the lack of current gear and equipment makes their training more difficult.

Another officer notes that training is mandatory for officers to seek promotion but the necessary training is not offered to allow officers to move up in rank.

### 9. Reversing Internal Affairs/officer on *Giglio* List

Although only four (4) officers complained about this incident, it is a matter of concern. This issue is summarized as follows:

In August 2019, as the [position redacted to protect officer's identity] I was advised of an employee that was required to report to the Office of Professional Standards. I was later advised that the employee had been placed on administrative leave pending an investigation.

During that investigation, that employee was found to have violated several policies. A disciplinary review board was held with the officer's chain of command. The recommendation for termination of the employee was reached by the board for the employees violations.

EXHIBIT 34

The recommendation was sent to the Chief's office. I was then notified that the chief disagreed with the board's findings and the recommendation for termination of the employee. Furthermore, the chief did not terminate the employee and handed him a 40 hour suspension even though the employee violated several policies, most importantly ADMIN-004 Oath of Office, Ethics and Conduct. The employee was transferred to a patrol assignment.

In speaking with others, I was notified that the Chatham County DA Office was investigating the employee. I was advised that the district attorney's office recommended that the employee no longer be able testify in court proceedings. The employee was then placed on a specific no testify list. Shortly thereafter, I was advised that the chief contacted the DA's office and reportedly requested that the employee be taken off of the list because he did not agree with the investigations findings.

Cpt. Tobar was the commander of the Office of Professional Standards during this investigation. Reportedly, he questioned the chief's decision concerning the employee being investigated and also the suspension versus termination. Cpt. Tobar was ultimately reassigned and relieved of his duties as the unit commander. It gives the appearance that Cpt. Tobar was removed from his position for questioning the chief.

The other three officers raising this issue confirm the basis for this complaint; i.e., Chief Minter reversed the termination decision, transferred this officer to patrol, and contacted the DA's office to reverse the decision that the officer could not testify.

10. **Miscellaneous**

One officer made a complaint that the Chief violated a policy by not addressing an anonymous complaint, but another officer addressed this same situation and stated that the Chief did respond by contending the complaint was not made against him (Minter).

Another officer complained about Chief Minter, but it appears that his real grievance dates from an event that occurred in January 2015 and that he feels resulted in an unjust punishment. His complaint against Chief Minter is that the Chief has refused to meet with him and rectify what he considers to be an unjust outcome of the earlier event.

In conclusion, while I have not delineated every specific complaint made by the officers, I believe that I have covered the general areas of concern encompassed in the complaints I reviewed. Please let me know if you need anything further from me on this issue.