EXHIBIT 35

# SAVANNAH POLICE
### To Serve, Protect and Build Trust

*SavannahPD.org* 

## MEMORANDUM

To: Pat Monahan City Manager

Thru:

From: Roy W. Minter, Jr. Chief of Police

Date: October 2, 2020

Subject: Summary of Officer Complaints

Pat,

The following is my response to the report of complaints that were forwarded to our Human Resources Department earlier this year.
.

1. **March 19, 2020 Directive Sent to the Department Concerning Masks and Personal Protective Equipment**.
    a. **Thirty-nine (39) individuals complained about an email reportedly sent to the department concerning wearing masks and/or personal protective equipment. The email was dated March 19, 2020. Although officers were expected to attempt to control the crowds that were in Savannah for St. Patrick's Day, they were not allowed to wear masks or any other form of protective equipment, even if they provided it themselves.**

   Response

   I am not aware of, nor have I been able to find an email that I authored where officers were advised that they were not allowed to wear masks during St. Patrick's celebrations. Also, I have reviewed notes from a conference call on March 20, 2020 with executive staff members. During this call, the following information was documented in the call notes.

   *"If officers have and want to wear a face mask when out on a call they can. However, there are shortages of masks and priority for additional masks will go to those in the healthcare industry. CDC advises that masks are beneficial in stopping the transmission of the virus if worn by the infected individual – not the healthy individual."*

EXHIBIT 35

I think it is also important to note that we only had two reported positive cases during this time. These employees reported they believe they contracted the virus from their spouse and not from work related duties.

b. **In addition, officers complain that no effort has been made to provide them with appropriate personal protective equipment and that communication about the pandemic has been inadequate. Lysol wipes and sprays were insufficient to provide sanitation at the precincts. As one officer noted, his precinct did not get any N95 masks until April 24, 2020. In addition, "[c]urrently our quartermaster does not have hand sanitizer in stock. We are provided a [H]ome [D]epot bucket with homemade hand sanitizer that has a foul odor." Officers were left to obtain their own masks and supplies.**

Response

A review of my communication to department members verifies that I started forwarding information to department members as soon as I became aware of this pandemic. Please review the attached emails for additional information concerning this communication.

Also, as I am sure you know, there was a severe worldwide shortage of PPE during this pandemic. All city departments experienced a shortage of PPE due to the lack of availability of critical equipment such as masks, gloves and sanitizer. When this equipment was available it was distributed immediately. Also, hand sanitizer was obtained from a local distributor and distributed using various containers.

c. **Several officers expressed concern that there is, apparently, no comprehensive plan for policing during a pandemic. Several officers also felt that Chief Minter's statements to the City and news media were not accurate and did not reflect the situation the department was dealing with.**

Response

SPD was the first department in this area to complete and implement a comprehensive *COVID-19 (Coronavirus) Response and Operations Plan (see attached).* This plan was posted for all members to review and included the following information

# SAVANNAH POLICE DEPARTMENT

## COVID-19 (Coronavirus) Response and Operations Plan

EXHIBIT 35

# Roy W. Minter Jr., Chief of Police

**INTRODUCTION** ........................................................................................................ 4
    PURPOSE .................................................................................................................. 6
    APPLICABILITY AND SCOPE ..................................................................................... 6
    PUBLIC INFORMATION .............................................................................................. 6

**ABOUT COVID-19** ..................................................................................................... 8
    HISTORY .................................................................................................................... 8
    SYMPTOMS AND TRANSMISSION ............................................................................ 8

**OPERATIONAL PHASES** ......................................................................................... 10
    **INTER-PANDEMIC (PHASES 1 & 2)** ...................................................................... 10
        SUMMARY OF KEY EVENTS AND ACTIONS .................................................. 10
        HEADQUARTERS AND COMMAND STAFF ..................................................... 10
        OPERATIONS AND INVESTIGATIONS ............................................................. 10
        MANAGEMENT SERVICES ................................................................................ 11

    **PANDEMIC ALERT (PHASES 3, 4, AND 5)** .......................................................... 12
        SUMMARY OF KEY EVENTS AND ACTIONS .................................................. 12
        MANAGEMENT SERVICES ................................................................................ 12

    **PANDEMIC (PHASE 6)** ........................................................................................... 14
        SUMMARY OF KEY EVENTS AND ACTIONS .................................................. 14
        OPERATIONS AND INVESTIGATIONS ............................................................. 14
        MANAGEMENT SERVICES ................................................................................ 15

**PROTECTION OF PERSONNEL** ............................................................................ 16
    PROTECTION FROM EXPOSURE ............................................................................ 16
    RECOMMENDED PERSONAL PROTECTIVE EQUIPMENT (PPE) ........................ 16
    POST ARREST / POST TRANSPORT ...................................................................... 16
    CLOSE CONTACT DURING APPREHENSION ...................................................... 17

**CALLS FOR SERVICE** ............................................................................................ 18
    PRE-SCREENING OF CALLS BY CHATHAM DISPATCH ..................................... 18
    CALL MINIMIZATION PLAN ...................................................................................... 18
    VIDEO CALL REPORTING ....................................................................................... 18
    PHONE CALL REPORTING ..................................................................................... 19

EXHIBIT 35

**SUSPENSION OF SERVICES** 20
    OTHER PROTECTIVE MEASURES 20

**DUTY HOURS FOR OFFICERS** 22
    TELECOMMUTING 22
    ALTERNATE DUTY LOCATIONS 23

**QUARANTINE OF EXPOSED OFFICERS** 23

**PROCESSING OF ARRESTEES** 26
    MISDEMEANORS (NON-DOMESTIC VIOLENCE) 26
    FELONY 26
    POST ARREST / POST TRANSPORT 26

In addition to this response plan, we also implemented the following actions to inform and support our employees.

- Uniform modifications – officers were authorized to wear their Class C uniforms (polo shirts and khaki pants) during the pandemic due to dry cleaning concerns.
- Call minimalization – online reporting was implemented for certain crimes and accidents
- Referral support services (Chaplains, EAP and other services) were provided for SPD members and our families.
- Online patrol briefings using our new SmartForce program was implemented. We were also featured in a national email by SmartForce for our innovation in using this program.
- Daily conference call notes were posted in SmartForce so all department members could access this information.
- Remote Report Center (RRC) – SPD members are still handling reports for low priority report calls over the phone or via video conferencing. To date, the RRC has handled over 3,000 calls.
- On March 30 - a Chaplain Prayer Line was activated for department members and our families
- On April 14 - a video message from Chief Minter updating department members on COVID-19 was recorded and posted for

EXHIBIT 35

    members to view

I think it is also important to note that I received requests from several agencies requesting copies of our response and exposure plans.

I did not make any statements that I am aware of to the City or the media that did not accurately reflect our response to this pandemic situation.

  d. **It should be noted that other complaints were made about the lack of equipment unrelated to the pandemic. For example, one officer complained that the equipment issued for the SWAT team is woefully inadequate and provided specific examples. Other SWAT team members say the members are forced to spend their personal funds on body armor, lights, gun sites, and ammunition because they can't get these items through the department. An additional complaint about SWAT equipment was made:**
**Multiple requests for essential equipment, weapons, vital weapon components, vehicles, and personnel have been denied by Chief Minter and AC Price. The SPD SWAT Team is classified as a Tier 1 team. This means that we have to maintain a standard which includes a specified number of personnel, equipment, training, and capabilities. As a Tier 1 team, we are required and expected to be proficient in hostage with 20-year-old upper receivers. Rifle optics, high powered scopes, and precision sniper rifles are regularly failing from overuse and age and are not being replaced. Every RFE sent from SWAT Command to Chief Minter and AC Price has been denied without explanation. After the police demerger, the Chatham County Police Department claimed and seized multiple vital items from the SPD SWAT Team. These items included rifles, submachine guns, scopes, and vehicles, and none of these items have been replaced, with every request sent through SWAT chain of command being denied by Chief Minter and AC Price.**

  <u>Response</u>

  This equipment request was never forwarded to me. This matter was handled appropriately by Assistant Chief Price. Stephenie recently advised me that she discussed this matter with the SWAT team supervisor (Sgt. Collard) in April and advised him that she would work with the team to establish a schedule for purchasing replacement equipment. This is currently being done and has been communicated to the SWAT team (see attached).

5

KANG 000646

EXHIBIT 35

    e. **Another officer says that he has been unable to get traffic cones and other safety equipment. Another says they have ballistic helmets but no vests. Another notes that the ballistic helmets are three years over their expiration date. Still another notes that they have requested CID vests to be worn when serving or executing warrants and so far, this request has not been filled.**

<u>Response</u>

Traffic "triangle" devices were purchased late last year and distributed to each precinct. Due to concerns about these devices, the precinct captains requested that we purchase traffic cones. These cones have been purchased and distributed to the precincts. This matter was assigned to Major Gavin by A/C Price. I was not involved in this process.

The purchase of ballistic helmets was approved by City Council on June 6, 2019. This information was communicated to the entire department shortly after this meeting. These helmets have been purchased and distributed to department personnel.

Captain David Gay has informed me that CID personnel were advised they could contact Quartermaster for issuance of vests. Captain Gay recently advised me that this matter has been resolved. This issue was handled appropriately by Captain Gay and I was not aware of this request.

2. **Promotion and Testing Issues**
   a. **Thirty-three (33) officers complained about promotion and testing for promotion issues. All officers voicing complaints on this topic expressed a general concern that promotions are not handled equitably, for a variety of reasons. For example, one officer complained that the November 10, 2019 promotions were in violation of prior policies.**

<u>Response</u>

All promotional testing conducted during my administration has involved and been reviewed by our Human Resources Department. I would need more information on these concerns to adequately respond to this issue.

    b. **One officer stated that to his/her knowledge, Chief Minter has not conducted a single performance review since he took office. Another complained that in January 2020, a department-wide email was sent that stated that the Advanced Patrol Officer rank was no longer available and the Corporal rank was frozen due to re-evaluating requirements for promotion. At the time the complaint was made, this**

6

EXHIBIT 35

**issue had not been resolved, preventing officers from being promoted. Chief Minter has stated there will be a "cap" on the number of corporals throughout the department, but no specifics have been provided on either the basis for the cap or the standards to attain the rank of corporal.**
**In addition, a new pay scale was introduced in January 2020. According to one officer, this new pay scale put officers in a "step" and the step was the basis for their pay rate. There was no explanation as to how the steps were created or how each officer's step was determined. This officer says that when Chief Minter was asked to explain it during a roll call, he could not.**

Response
When I arrived in 2018, I was advised that performance evaluations were not being conducted for any department members. A new performance evaluation system is currently being drafted and we expect to have this system in place by early 2021. Also, a new probationary evaluation system is currently in place for all newly promoted supervisors.

Department emails were sent out earlier this year concerning the Advanced Police Officer and Corporal ranks. The number of corporal positions has been reduced from 168 to 145. Also, at my request, Assistant Chief Price held several "listening sessions" with department members to assist with establishing qualifications and the testing process for the corporal position. These listening sessions were completed in March and the corporal testing process started on August 26.

Information on the new pay scale was provided to all department personnel in January 2020. This information included an informational sheet and a pay formula calculation document. Everyone was also advised that they could contact HR if they had specific questions regarding the new pay structure.

c. **One officer provided this information:**
   **Sergeant Testing and Promotions  Chief Minter has ultimate responsibility for the process of creating a list of eligible, promotional applicants for the rank of sergeant, then making such promotions. Given the raise in both salary and career advancement, these are coveted promotions. However, the entire process which created the current sergeant eligibility list, the lack of communication and department transparency and the obvious lack of ethics in the selection of promotions since has been an embarrassment to the department.  A) Instead of checking and updating the written test, Chief Minter decided to use a written test which was not current to SPD and was a prior test created under the SCMPD before Minter's hiring. The test itself displayed the SCMPD logo. The test was**

7

KANG 000648

EXHIBIT 35

challenged, and points were given, bringing some from failing the test to passing. 1. No list of scores or pass/fail was ever produced and disseminated to those within the process 2. The amount of points given to each person or the questions that were contested was never provided   B) The sergeant assessment used policies provided by the SPD HR department. Officers were asked to select a policy and give a "roll-call training" on the subject while assessors would ask questions related to the chosen policy. One policy that officers could choose was the Social Media policy for the SPD Public Information Office and contained directives for the handling of the department's social media presence and who has the authority to post on the departments behalf, among other items. This policy in itself would not be a topic for a "rollcall training" as it does not pertain to anyone on patrol as they are not members of the Public Information Office. Furthermore, the assessors asked questions which did not relate to this policy. The questions asked were for a separate SPD policy which directs the individual officer on conduct related to personal social media presence.  C) Once the assessment was completed there was mass confusion and misinformation over how the ranking was being decided. Originally, officers were informed that it would be a combination of the written test score and the assessment score (As every other sergeant promotional process the department has conducted has been done in the past, since my hiring.). Then we were given a ranking solely based on the assessment. These scores were given by email individually. No eligibility list was ever produced and disseminated to those within the process or the department as a whole.  D) I was given the rank of [redacted to protect officer's identity]. Through word of mouth I discovered that there was 25 eligible officers to be promoted.
E) Officers were then informed that a Chief's interview was to be conducted as an additional step to the promotion process.  1. The chief was not present.  2. Some questions asked were vague and very open ended.  3. Any proof of what was said was completely dependent upon notes taken by ranking officers present.  4. No eligibility list was ever produced and disseminated to those within the process or the department as a whole.

Another officer provided this additional information on this topic:
During the testing phase several candidates did not pass the test until questions were removed from the test. Candidates that did not initially pass the test were promoted in the first wave of promotions; in competitive examinations this cannot occur. During the Assessment phase all candidates were scored and ranked in a competitive numerical order. While the first three highest scoring candidates were selected, candidates that ranked in the high 20's at bottom of the rankings were promoted over several that were ranked in the single

EXHIBIT 35

**digits. During the Assessment phase all candidates were scored and ranked in a competitive numerical order. Promotions were not ascertained by competitive examinations, but rather by arbitrary decision making. At no point did candidates submit a resume, and the interview process was only composed of four questions by members of the command staff. Scored testing and a ranked assessment process compromised two thirds of the promotional process and the weight of the scores and rankings were minimized. The minimization of these factors are not in accordance with City of Savannah Civil Service Act and Human Resources Policy I-IR-004-5 or PNL-003. Evidently, there were also issues with the appeal process after the test:**

**• During the original promotional process, the test date and assessment dates were set. Due to the process being put on hold and a new standard set, the test was rushed, and the assessment was also rushed through. As if to give no-one time to review and grievance to process. The test itself was questioned as far as the content of some of the questions. Applicants were allowed three days to appeal any questions on the test. But with the content of the test and the number of applicants the failed the test, the Department/City only had two copies and answer keys for the test for review. The review had to be done at the City's Personnel Department. We then had to email the assessment center our appeal questions by a deadline. I appealed 9 questions and sent the questions in on two separate emails. One email had four questions and the other had five questions. The assessment center only reviewed the first email with four questions. I questioned why the other email was not reviewed and got no answer from personnel of the Chief's office. I was only told to contact the assessment center.**
**Another officer notes that all African American candidates seeking to move from lieutenant to captain were told they failed the test, but they were denied the opportunity to see their scores.**

**Another officer complains that only certain people are offered interviews for various positions while other candidates were not given that opportunity.**


Response
I did not review any of the testing material for the sergeant's process. This process was assigned to Assistant Chief Price and she handled this process. The error of listing SCMPD on testing material was an oversight by the testing company. It should also be noted that a new vendor has been selected for future testing processes. This contract was approved at the

9

KANG 000650

EXHIBIT 35

June 11, 2020 City Council meeting.

I believe any concerns regarding scoring, points, an eligibility list or the appeal process should be referred to HR for an appropriate response. Also, any concerns regarding the assessment center exercises could have been addressed via the appeals process.

To my knowledge, no one was advised that the sergeant's process would involve a "Chief's interview." The candidates were advised that an interview panel would be part of the process. The following SPD and HR personnel were members of this interview panel:
- Major Devonn Adams
- Captain Michelle Halford
- Captain Cary Hill
- Lt. Andre Jackson
- Lt. Hiram Rivera
- Collen Forrester – HR

I have no knowledge of any captain promotional candidates being informed that they failed a test or requesting to review any scores.

Everyone who passed the initial testing process for Sergeant, Lieutenant and Captain were interviewed as part of this process.

3. **Leadership/Communication**
   a. **Twenty-four (24) officers complained about Chief Minter's leadership style and communication skills. An example: Retention is an issue within the department, due to lack of ineffective upward communication. There is a divide between the officers who are willing to express their concerns verbally and those who remain silent because they are scared of retaliation. A lot of officers have left the department because their concerns were not taken seriously or addressed properly through feedback.**

Response

I am not aware of anyone who has left the department due to communication issues. Most resignation memos I have reviewed list relocation, employment opportunities with other agencies and family matters as their reasons for leaving the department. Many of these resignations occurred prior to our new compensation package.


Retaliation - I am not sure what the basis of this allegation is, but I have not threatened or retaliated against anyone at any time during my career. I am also not aware of any allegations of threats or retaliation that have been filed with our HRD or the City Manager's Office. SPD also has a grievance process and I am not aware of any grievances that have filed by members of the department for

EXHIBIT 35

these allegations.

    b. **Lack of organizational structure has created confusion pertaining to career ladder advancement. This is due to the lack of downward communication especially to those who were in a position to be promoted before and after the pay step implementation. I was made aware by my commander that the decision has not been made on what the requirements will be. I was informed by the Chief at a representing meeting, which Chief Price is working on it, but nothing has been communicated recently. My career advancement is my future and should be a concern.**

<u>Response</u>

4. Please refer to response #2 (**Promotion and Testing Issues**) regarding the Corporal promotional process for my response to this inquiry.

    a. **Other officers complained that Chief Minter leads by intimidation and threats – threats of removal from rank or command and threats of removal from units. Chief Minter is accused of publicly belittling or criticizing his supervisors and commanders in the presence of their peers. This has allegedly occurred during C.A.R.E meetings as well as other occasions. Specific examples of when this has occurred were related by several officers.**

<u>Response</u>

I have not "belittled" or "threatened" anyone during our CARE meetings or any other time. I have been clear on what my expectations are for being aware of and addressing criminal activity and traffic enforcement concerns during these meetings. This communication is always communicated in professional manner and I have only received one complaint from a command staff member concerning his view of my questions. This matter was reviewed and resolved by our HRD via the conflict resolution process. SPD also has a grievance process and I am not aware of any grievances that have been filed by members of the department for these allegations.

    b. **Another officer complains that the Employee Relations Team, which is supposed to ensure that Chief Minter responds to officer issues, has failed to be responsive to officer questions.**

<u>Response</u>

I created the Employee Representative Group about a year ago to enhance communication with line level personnel. Each area of the department has designated a representative for this group. The goal of this program is to provide

11

EXHIBIT 35

a forum for these representatives to discuss various issues/concerns/rumors with the chief. ERG members submit most of their questions prior to the meeting and these questions are addressed during the meeting. ERG members have been advised that they can follow up with me directly for any unresolved issues and a couple of them have taken advantage of this opportunity. Since many of the questions discussed during these meetings are precinct based, I am in the process of transitioning these meetings to precinct level discussions. I believe it is also important to note that I have not received any complaints from any ERG members concerning group communication issues.

- c. **Several others complain that he distances himself from taking responsibility for transfers and promotions and fails to communicate about those issues. Another complains that he lacks the ability to communicate the focus, strategies and goals of the department. While the Chief has told the department that his focus is Gangs, Guns and Drugs, he has never offered a detailed plan or strategy on how to address these issues.**

Response

Since my appointment, I have made communication a top priority for my administration. I constantly remind department members that I have an open-door policy and that I am always willing to meet and discuss any issues with department members. I also respond to crime scenes, attend numerous community events with department members, and have worked patrol shifts to increase my availability and communication with department members.

Our focus and goals for our Gangs, Guns and Drugs strategy is discussed during every crime reduction meeting. I agree that a detailed plan has not been distributed to SPD members. The main reason for this is because Assistant Chief Gunther requested that I allow the precinct captains the opportunity to develop their own strategy for these areas (Gangs, Guns and Drugs). Although their plans appear to be adequate, I agree that a document outlining this strategy should be completed. A/C Gunther is currently working on this document.

5. **Personnel/Specialty Units**
    a. **Twenty-three (23) officers complained about how specialized units have been treated. One officer says the Violent Crime Task Force has been plagued with issues since its creation in November 2019. Vacancies have not been filled, the officers do not get any of the benefits of other specialized units, such as cell phone and clothing allowances, and requests for software and equipment have been ignored. One officer complained that some captains and lieutenants were transferred from specialized positions for not having sufficient patrol experience, yet other officers with less patrol experience were transferred into the specialized units. From another officer's**

EXHIBIT 35

**Complaint: Selection to Specialized Units** Since Chief Minter's arrival, at least two specialized units have been created that were never opened to all members of the department. These units, known as SWIFT (warrant squad) and the Violent Crimes Task Force (VCTF) were staffed without department wide announcement, depriving many of the opportunity for career advancement. Members of the VCTF who were not previously given the title of Detective or specialized training and equipment were provided these benefits without ever having to compete for the privilege. CID panel interviews were conducted to establish a eligibility and ranking list which to choose officers to fill detective positions. 1. No eligibility list was ever produced and disseminated to those within the process or the department as a whole. 2. Positions were filled immediately after the interviews before any list could have been made. 3. At least one officer that did not interview at all was placed in a detective position then orders cut weeks after the transfer. Another officer complains that punishment is inconsistent, with Chief Minter retaining officers who should be terminated or giving them unpaid leave instead of termination. Others say that the Chief demonstrates favoritism in who is promoted or placed in specialized positions. Another says that positional movements are made with no standardized measure of success. Another officer complains that he has been subjected to a hostile work environment and that Chief Minter has done nothing to rectify the situation. Another complains that CID has been short-staffed for the entire time Chief Minter has been in office. A member of the Warrant Squad makes the same complaint and notes that their vehicles are ill-suited for their task. Another states that Chief Minter fails to listen to the needs of the specialized units and as a result, these units are lacking in the necessary equipment and training. Another officer attributes the lack of communication to the Chief's decision to communicate with certain staff members to the exclusion of others.

<u>Response</u>

Our Criminal Investigations Division (CID) is supervised by Major Adams and Captain David Gay. The following response to this complaint was prepared by Captain Gay.

**From:** David Gay <DGay@Savannahga.Gov>
**Sent:** Tuesday, September 1, 2020 4:58 PM
**To:** Lenny Gunther <LGunther@Savannahga.Gov>
**Subject:** Follow-up

I just realized I never sent this to you.

EXHIBIT 35

- As of 8/25/2020, one SIS member did not have a cell phone. Lt. Toth is in the process of getting this detective a city issued smart phone.
- As a general practice, SPD specialized units do not publicize an "eligibility list." Lists remain active until exhausted, all viable candidates have been selected or a specified timeframe.
- The complaint also alleges that transfers occurred prior to the creation of the list. This is inaccurate as a list was created prior to any selection and transfers.
  - Everyone who is permanently in SIS should receive a clothing allowance check. If they do not receive a check, all they have to do is notify their chain of command and it will be addressed. A small group of temporary transfers were recently approved, and they will not be receiving clothing allowance checks.

Major Adams and Captain Gay consult with me often about vacancies and recommendations to expand CID operations. I continue to provide them with the latitude to manage this area and develop strategic plans for their command. I am currently working with Major Adams and Captain Gay to ensure any CID concerns are addressed.

6. **False Statements to Public/Politicians**
   a. **Fourteen (14) officers complained that Chief Minter made false statements to the City and to the public. Most of these complaints arise out of Chief Minter stating that the department was short by only 40 officers, but in fact, the department was short-staffed on a daily basis. According to one officer, the department has positions for 600 officers and at the time this complaint was made, only 423 officers were employed. Another officer noted that in an August 2020 interview on WSAV, Chief Minter stated that the department was only 40 officers short. This officer says that the reality was that the department was over 100 officers short; that Chief Minter justified his number by counting cadets in the Academy and Patrol School and individuals who had been hired but had not been to the Academy.**

   b. **Another officer complained that Chief Minter told the media that officers had protective masks when, in fact, they did not.**

   c. **Another officer complained that in response to the increased homicide rate in January, Chief Minter stated he was increasing the operational days for the Violent Crime Task Force to seven days a week. In reality, the VCTF had been operating this way since November 2019, so there was no "increase."**

EXHIBIT 35

Response

a. Our authorized strength for sworn officers has been 536 since the demerger. I am sure that when I was asked about staffing the question involved actual <u>vacancies</u>. Individuals who are in the academy or have been hired and are attending the Recruit Orientation Course (ROC) are filled positions and are not classified as vacancies.
b. I do not recall telling the media that we had protective masks when we did not have this equipment. If additional information is available on this statement I can check to see if masks had been issued at that time.
c. I believe I advised Council that the VCTF was working a schedule that provides coverage for seven days a week. I do not believe anyone was concerned about when this schedule began, but that we were deploying additional resources to address the increase in violent crime.

7. **Reversal of Orders Concerning Uniforms and Beards**
   a. **Ten (10) officers complained about Chief Minter's about-face on officer uniforms and beards. In August 2018, it was reported that Chief Minter stopped by to introduce himself and stated that he would not be changing the policy on Class C uniforms or beards. Another officer reported that on March 19, 2020, Chief Minter sent a department-wide email that since the dry cleaners were closing due to the pandemic, C uniforms could include khaki pants. On March 24, 2020, Chief Minter sent a follow-up email that C uniforms would no longer be allowed and that Class B uniforms would be mandatory. One officer noted that in making this decision, Chief Minter has never worked patrol in a climate like Savannah, Georgia.**
   b. **On April 10, 2020, a department-wide email was sent that beards and/or goatees would no longer be allowed except for officers in the specialized units. Subsequently, the VCTF members were told they could no longer have beards or goatees. The officers expressed concern that they could be disciplined for failing to follow uniform and appearance directives, which directives were changing frequently. In addition, as two officers noted, allowing officers to grow beards can be good for morale and does not cost the department anything.**

Response

Below is a copy of the emails that were forwarded to SPD members on March 19 and April 6, 2020.

**3-19-20**

SPD Team,
Due to the fact that many dry cleaners are closing, and our work environment may be changing soon, I am temporarily authorizing our former Class C uniforms (polo shirts and khaki pants) for wear. Department members who still have these uniforms may start

KANG 000656

EXHIBIT 35

wearing them again effective **3/20/20 at 0600 hrs.** These uniforms are authorized for on and off-duty work hours. No new purchases or issuance of Class C's are authorized at this time.

This order will remain in effect until further notice.

*Roy W. Minter, Jr.*
**Chief of Police**

**4-6-20**

SPD Team,

As the number of COVID-19 cases continue to rise in our state and Chatham County, the safety and welfare of first responders remains a significant concern. As you are aware, law enforcement personnel in New York, Detroit, Chicago, Tybee Island and many other cities have been diagnosed with this virus. Unfortunately, and tragically several of these agencies have also lost some of these brave first responders.

In response to this pandemic crisis, our city leadership remains committed to providing you with important PPE equipment. Last week we received our first delivery of N95 masks. In anticipation of deployment of these masks, I am <u>temporarily</u> amending our Uniform and Appearance Policy.

Effective April 10th, beards and goatees are no longer authorized except with the permission of the Chief of Police or his designee. Department members assigned to task forces, CNT or other covert assignments are exempt from this policy at this time.

This policy will be effective April 10th at 0600 hours and will remain in effect until further notice.

Thanks in advance for your understanding, patience and hard work during this difficult time.

Stay safe!

*Roy W. Minter, Jr.*
**Chief of Police**

**These are the only emails I sent to department members regarding uniforms and appearance during this time.**

8. **Hurricane Dorian**
    a. **Nine (9) officers complained about Chief Minter's handling of the duty**

16

EXHIBIT 35

roster for Hurricane Dorian on September 4-5, 2019. His actions were summarized by one officer as follows: **There was a lack of coherent instructions and planning, which lead to morale problems. Initially we were instructed to report for 12-hour A/B rotations with cancelled days off. Approximately 1 hour before the oncoming shift was to arrive, we were told that we would not be allowed to return home. This posed an issue for those with childcare, pets, or other family situations. We were instructed that it was not sure if we would be compensated for being required to stay. A short time later we were told that we could go home. The back and forth in the meantime created a distrust that the command staff had concerns about anything other than funding.**

b. **Another officer notes that during this time, they could not get a clear answer on whether they would receive Hazard Pay and whether officers were to shelter in place. The shelter-in-place decision was made as the storm was passing, but they were never told how the Hazard Pay issue had been resolved.**

Response

a. I admit that there was some confusion concerning what department personnel were told about their work schedules during this hurricane operation. I also recall the conversation about whether officers would be required to shelter in place at the end their shifts, due to concerns regarding them being able to return the next day for their shifts. As the document states, this matter was resolved quickly after I consulted with HR personnel assigned to the EOC.

b. I am not aware of any discussion regarding hazard pay during this operation.

9. **Training**
   a. **Five (5) officers complained about the lack of training. One noted that while SWAT is expected to perform a multitude of tactical duties, very little training is provided for those duties. Another SWAT member noted that the lack of current gear and equipment makes their training more difficult. Another officer notes that training is mandatory for officers to seek promotion, but the necessary training is not offered to allow officers to move up in rank.**

Response

Our SWAT team establishes their own training curriculum. The team trains twice a month and this training is mandatory for SWAT team members. I am not aware of any issues with our SWAT team, but I will follow up with their chain of command to research this information.

Training classes are available for all SPD members seeking promotional opportunities.

KANG 000658

EXHIBIT 35

10. **Reversing Internal Affairs/officer on Giglio List**
    a. **Although only four (4) officers complained about this incident, it is a matter of concern. This issue is summarized as follows:**
    b. **In August 2019, as the [position redacted to protect officer's identity] I was advised of an employee that was required to report to the Office of Professional Standards. I was later advised that the employee had been placed on administrative leave pending an investigation.**
    c. **During that investigation, that employee was found to have violated several policies. A disciplinary review board was held with the officer's chain of command. The recommendation for termination of the employee was reached by the board for the employees violations.**
    d. **The recommendation was sent to the Chief's office. I was then notified that the chief disagreed with the board's findings and the recommendation for termination of the employee. Furthermore, the chief did not terminate the employee and handed him a 40-hour suspension even though the employee violated several policies, most importantly ADMIN-004 Oath of Office, Ethics and Conduct. The employee was transferred to a patrol assignment.**
    e. **In speaking with others, I was notified that the Chatham County DA Office was investigating the employee. I was advised that the district attorney's office recommended that the employee no longer be able testify in court proceedings. The employee was then placed on a specific no testify list. Shortly thereafter, I was advised that the chief contacted the DA's office and reportedly requested that the employee be taken off the list because he did not agree with the investigation's findings.**
    f. **Cpt. Tobar was the commander of the Office of Professional Standards during this investigation. Reportedly, he questioned the chief's decision concerning the employee being investigated and also the suspension versus termination. Cpt. Tobar was ultimately reassigned and relieved of his duties as the unit commander. It gives the appearance that Cpt. Tobar was removed from his position for questioning the chief.**

<u>Response</u>

Most of this statement involves information concerning a personnel matter. Therefore, I do not believe it would be appropriate for me to discuss this matter in a public document.

Captain Tobar was reassigned to the Training Unit at the request of Assistant Chief Price to assist with management of our increasing training demands. I determined that Captain Tobar was only assisting with the administrative duties for the Office of Professional Standard (OPS) and that Lt. Barefield could handle these duties. Captain Tobar is fully aware of why he was reassigned, and that this reassignment

EXHIBIT 35

was not related to any concern or dissatisfaction with his previous duties as the OPS Captain.

11. **Miscellaneous**
    a. **One officer made a complaint that the Chief violated a policy by not addressing an anonymous complaint, but another officer addressed this same situation and stated that the Chief did respond by contending the complaint was not made against him (Minter).**
    b. **Another officer complained about Chief Minter, but it appears that his real grievance dates from an event that occurred in January 2015 and that he feels resulted in an unjust punishment. His complaint against Chief Minter is that the Chief has refused to meet with him and rectify what he considers to be an unjust outcome of the earlier event.**

Response

I believe this concern is addressed by the statements listed in this inquiry.

Conclusion

As stated, many of the concerns listed in this report were addressed by executive staff members and were not forwarded to me. Also, we have weekly executive staff (captains and above) meetings to ensure issues/concerns, such as those listed in this complaint are discussed and addressed. During the pandemic we continue to hold these meetings virtually. I believe several of the issues listed in this report were discussed during our meetings or could have been addressed if they were presented during our meetings.

Finally, I will continue to work on improving communication in the department using various communication channels and in-person communication (when possible). I have also contacted our Human Resources Department concerning scheduling additional training classes for command staff to improve department communication and enhance leadership skills. I will also participate in this training.

19

KANG 000660