

# CASE NUMBER
# 19-0384



**Roy Minter**, CHIEF OF POLICE

**KANG 000205**



SavannahPD.org

# Internal Affairs Case Accountability Log

## OPS # 19-0384

|  | Print Name | Signature | Date |
|---|---|---|---|
| Relinquished By: | Lt R. Larry III | | |
| Received By: | | | |
| Relinquished By: | | | |
| Received By: | | | |
| Relinquished By: | | | |
| Received By: | | | |
| Relinquished By: | | | |
| Received By: | | | |
| Relinquished By: | | | |
| Received By: | | | |

KANG 000206



SavannahPD.org

# Internal Affairs Case Accountability Log

## OPS # 19-0384

|  | **Print Name** | **Signature** | **Date** |
|---|---|---|---|
| Relinquished By: | Lt. R. Lary | | |
| Received By: | | | |
| Relinquished By: | | | |
| Received By: | | | |
| Relinquished By: | | | |
| Received By: | | | |
| Relinquished By: | | | |
| Received By: | | | |
| Relinquished By: | | | |
| Received By: | | | |



# CASE NUMBER
## 19-0384



**Roy Minter**, CHIEF OF POLICE

**KANG 000208**



## SAVANNAH POLICE
To Serve, Protect and Build Trust

SavannahPD.org

# Office of Professional Standards

| | |
|---|---|
| **1. OPS NUMBER:** | **19-0384** |
| **2. INCIDENT DATE**: | **August 12, 2019** |
| **3. COMPLAINANT:** | **Internal Investigation** |

| **4. OFFICER(S) INVOLVED** | **ASGN** | **YRS OF SERV** | **DUTY STATUS** |
|---|---|---|---|
| A. Adrian Gates | SIU/Gang Unit | 2 years 11 months | Active |

**Chain of Command (At the time of the incident)**

Sgt. James Hutcherson
Lt. Torrance Garvin
Captain David Gay

## 5. GENERAL ORDER(S) APPLICABALE TO INVESTIGATION:

**SPD GO # ADM-004 Oath of Office, Ethics, and Conduct**

KANG 000209

# Table of Contents



1    Investigator's Report

2    Complainant's statement (s)

3    Witness Statements (s)

4    Witness Employee Statements(s)

5    Subject Employee statement
Subject Employee History

6    Official Documents

7    Additional Information

8    Closure Report(s)

9    General Order(s)

10    N/A

KANG 000210



SavannahPD.org

# SECTION 1

Investigator's Report

By:

Lt. Robert Larry III

**KANG 000211**



**SAVANNAH POLICE**
To Serve, Protect and Build Trust

*SavannahPD.org*

## ADMINISTRATIVE INVESTIGATION
### Incident Report

| | |
|---|---|
| **OPS NUMBER:** | 19-0384 |
| **EMPLOYEE:** | Officer Adrian Gates |
| **DATE:** | 11-8-19 |
| **INVESTIGATOR:** | Sgt. Robert Larry III |

I was assigned this investigation by OPS Commander Captain Alexander Tobar and Lt. David Barefield involving an SPD Officer Adrian Gates and his possible association with a subject named Traivon Feldman-Harris and family. Traivon Feldman-Harris was arrested for Armed Robbery on July 5th 2019 and a subsequent search warrant was executed by SIU investigators at 1807 Fitzgerald Street. While on scene Tamika Gaines who resides at 1807 Fitzgerald was very vocal about one of the SIU investigators later identified as Adrian Gates. Her concerns were shared with SIU Sgt. Arango and were related to Officer Gates and his association with the Harris family (Traivon Harris, Javon Harris and Vinnecia Harris).

**(There are numerous emails related to this case and those emails were added to this casefile and can be located in Section 6 under the Official Documents portion of this casefile.)**

SIU supervisor Sean Sueaquan also had concerns about Officer Gates and his failure to be where he was instructed to be and in light of these allegations he (Cpl. Sueaquan) was instructed to retrieve any jail recordings from Feldman-Harris during his stay at the CCDC. The recordings were sent to Captain Alex Tobar along with details of where to hear key/important parts of the conversations. The conversations appeared to be between Feldman-Harris and his family and Officer Gates' name was mentioned during these calls

In recording **P9_5033_87_20190707175520 Recording #1** at the 14:45 minute mark Feldman-Harris can be heard saying, "keep hollering at Gates bro see what that N (N-word) has to do. His mother can be heard telling him to be careful about what he says on the phone because the calls are recorded.

In recording **P9_5033_132_20190707183923 Recording #2** at the 15:15 minute mark Feldman-Harris can be heard saying, "I tried to talk to Gates before them crackers even grabbed me bro and them mutherfuckin' crackers beat my ass,

1

KANG 000212




SavannahPD.org

them crackers beat my ass. Man I been calling Gates name brah when them crackers first tried to lock me up boy, I been screaming that man name." Feldman-Harris and his mother Ms. Harris can be heard confirming Gates told them he didn't know who he was because he cut his hair. Feldman-Harris also implies that if he had been by himself he would have shot at officers.

In recording **P12_5033_114_20190709164008 Recording #3** at the 4:10 minute mark Feldman-Harris can be heard asking, "What Gates hollering about" and Ms. Harris replies that she hadn't spoken to him yet, but she had been talking to some lawyers.

In recording **P17_5033_103_20190710210808 Recording #4** at the 6:25 minute mark Feldman-Harris can be heard asking, "Ya'll been hollering at Gates and shit and an unknown male replies "unintelligible-been hollering at Gates." The unknown male tells him to not talk about this stuff and that "they will hang up" and the phone calls are being recorded.

**In recording P21_5033_31_20190710222557 Recording #5** at the 6:38 minute mark Feldman-Harris can be heard asking his mother Mrs. Harris, "Have you been talking to Gates" and she replies, "What I told you, stop talking over this phone." She also makes a comment about asking someone to help to find what towing company has Mr. Harris' car. She says, "I can ask him and he asked, "Who Gates" and she replies, "Nooooooo."

**The 5 emailed jail recordings were burned onto a disk and later added to this casefile. The disk can be located in Section 6 under the Official Documents portion of this casefile.**

On August 22, 2019 at 1600 hours I received a phone call from Detective Cpl. Kaishawn Samuels who advised that Ms. Tamika Gaines contacted him and she was afraid. She told him that an officer had come to her place of business (Jones Red and White) at 3310 Ogeechee Road and that he was dressed in all black and she felt intimidated. Ms. Gaines stated that she called a family member who is a police officer and also told them what happened. I later spoke to Detective Cpl. Samuels about this incident and he stated that he believes the police officer Ms. Gaines contacted was Detective Cpl. Casondra Lawton of the SPD Financial Crimes Unit. I obtained Ms. Gaines phone number from Det. Samuels and I spoke to her. She explained the officer who had come to her job had a badge on, but was dressed strange and was wearing all black and a hoodie. She advised that he asked her to step outside and when she did so she asked to see his badge again. She also stated that she dialed the number of a family member and told Officer Gates she was putting the conversation on speaker phone. She advised that Officer Gates seemed hesitant when she did

2



**SAVANNAH POLICE**

To Serve, Protect and Build Trust

*SavannahPD.org*

that and he told her she didn't have to do it. She advised he acted nervous and left abruptly. I asked Ms. Gaines if she would come to the office to meet with me and she agreed to meet me at the OPS office at 0900 hours on 8-23-19 (Ms. Gaines never showed for our scheduled meeting).

I later obtained a formal written statements from both Detective Cpl. Casondra Lawton and Detective Cpl. Kaishawn Samuels regarding this particular incident. Detective Cpl. Casondra Lawton's formal statement can be read below;



**SAVANNAH POLICE**

SavannahPD.org

**EMPLOYEE STATEMENT**

| DATE | 11/15/2019 | TIME | 2000 hours |
|------|-----------|------|-----------|
| NAME | Casondra Lawton | ASSIGNMENT | CID |

As directed by *General Order # ADM-004, Oath of Office, Ethics and Conduct*;

**Section 10 — Cooperation:** Is essential to effective law enforcement. Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation.

**Section 11 — Truthfulness:** SPD employees will be truthful at all times whether under oath or not, unless otherwise necessary in the performance of a police task. This will include, but not be limited to, instances when employees are being questioned, interviewed or are submitting reports.

DATE AND TIME OF INCIDENT      August 22, 2019

LOCATION OF INCIDENT

EXPLAIN IN DETAIL WHAT HAPPENED      My sister Tamika Gaines contacted me on August 22, 2019 in reference to a police officer that was at her job dressed in all black following her around in the store. She was upset and crying. She told me that she was scared and she didn't know what he was going to do to her. I told her to calm down and call the police and let them know what was going on. I never asked her what the officer name was. I never heard him say anything to her. I had a lot of things going on so I forgot to call her back to see what happened with the officer that came to her job

Page 1 of 2

SPD Form 10400 (Revised 02/2018)

3

KANG 000214



*SavannahPD.org*



**EMPLOYEE STATEMENT**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_Casondra Lawton_____

**Signature of Employee**                          Date **11/15/19**

Page _2__ of _2__

SPD FORM 1046w (Revised 02/2018)

4

**KANG 000215**



*SavannahPD.org*

I next contacted SIU Lt. Torrance Garvin and advised him to contact Officer Gates and to inquire if he had been at the Red and White on Ogeechee Road. He advised that Gates had been there and I explained that Officer Gates needed to leave that location and he is to have no further contact with Ms. Gaines. I also advised that Officer Gates needed to come to the OPS office tomorrow at 1000 hours. Officer Gates called me moments later to inquire what the meeting was about and I advised that I would explain tomorrow morning.

On July 12, 2019 I spoke to the Robbery Unit supervisor Ryan Bevil about concerns he had about SPD Officer Adrian Gates and his possible association with a robbery suspect his unit was investigating. He stated that Det. Marcus Henderson came to him with the concerns and I informed Sgt. Bevil we (OPS) were currently looking into the allegations and to provide me with what he knows. Sgt. Bevil provided an email about his concerns and they were added to this case file (Section 6). The email can be and read below;

Sent from my iPhone

On Jul 12, 2019, at 3:43 PM, Ryan Bevil <RBevil@savannahga.gov> wrote:

Sir,

This e-mail is in reference to Ofc. Adrian Gates of the Gang Unit. On 7-12-19 Det. Marcus Henderson advised me that he needed to speak to me in private about an issue. He stated that he was on a call on Fitzgerald Street while I was out on FMLA. During that call Ofc. Gates showed up to the scene from the Gang Unit to assist in the investigation. The target location where Det. Henderson was located was being searched. During that time Ofc. Gates went to another hose not involved in the incident as of yet, and revealed the details of that case to the occupants of that residence. Det. Henderson found out this information through subsequent interviews. Also, during that same day of the search a person was arrested and interviewed. The suspect was advised that he could not use the phone, and that was relayed to Ofc. Gates. While in the interview (recorded) the suspect advised Ofc. Gates that he was not allowed to call anyone. At that time Ofc. Gates told the suspect what's the number you want me to call?

This is a brief synopsis of the events without any clear detail, because during the time of the incident I was out of work. In speaking with Det. Henderson, I asked was Ofc. Gates revealing information knowingly, maliciously, or did lack the proper training or experience? Det. Henderson advised that he did not know, but there was too may inconsistencies that rose his suspicion of a dirty cop. Det. Henderson just wanted to notify his chain of command and as an advisory to the unit.

After our conversation concluded I saw Cpl. Sueaquan (the acting supervisor of the Gang Unit) and inquired about this issue to see if he had some insight on the issue. He advised that in the past other issues have arisen and was reported to the proper channels.

5

KANG 000216



# SAVANNAH POLICE
To Serve, Protect and Build Trust

*SavannahPD.org*

Also, Cpl Sueaquan was called by Captain Tobar and asked some specific information about Ofc. Gates. So, he assumed that IA was looking into the issue.

Once my conversation concluded I contacted Sgt. Larry of IA and advised him of the advents listed above. He advised that he could not find any open cases for Ofc. Gates, however to send the recipients of this e-mail this message.

Again, I do not have any personal knowledge of the incident. The purpose of the communication is if there is an active investigation on Ofc. Gates Det. Henderson should be contacted for a statement that may add or disprove any suspicion if that is the case.

If you need any further contact or information from me please call me on any of my three numbers listed below.

Sgt. Ryan E. Bevil
Robbery Unit
912-651-6694 #2206 (office)
912-438-0126 (work cell)
912-695-2323 (personal cell)

On August 23, 2019 I formally interviewed Officer Adrian Gates. He was advised Garrity and OPS Form 016 and he stated he understood both forms. I asked him to explain what happened yesterday. He stated that he had been getting information that Ms. Gaines' sons had been threatening Ms. Harris and her sons. He went to both residences and no one was there. He then went to Jones Red and White on Ogeechee Road which is where Ms. Gaines works to speak to her. He stated that it wasn't anything formal and he was dressed with a jacket over his uniform and he didn't want it to seem like he was pulling her from work. He spoke to the manager and showed her his badge and requested to speak to Gaines. The manager said no problem and she told Ms. Gaines the officer needs to talk to you. They walked outside and he introduced himself to her. She asked to see his badge and he showed it to her and she stated I didn't know who you were. He told her he was there to talk to her about the people down the street and Ms. Gaines replied she thought that situation was over. He told her that he just wanted to talk to about what was going on and she said it was over and that she was calling the detective now. He stated he tried to tell her this isn't anything formal and she could turn the phone off. He stated she told him no, then said my phone is off. He told her I saw you put the call on speaker and she showed him the phone screen. She told him I've got things to do at work and he told her okay go back inside and he left. I asked what time he got to the house and he said 5 to 5:30. He stated that he arrived at Red and White around 5:15. I asked the names of Ms. Gaines' 2 sons and he stated he didn't know. I then asked what was Ms. Harris first name and he stated, "Um they call her B, I call her Ms. Harris". I asked him again if he knew her first name and he said no. I

6

KANG 000217



asked for her address and he stated that he didn't know it but, it was on Fitzgerald Street. I asked why not give the address when holding out and he stated he was taught this by the other gang investigators, to only give a street name, not a numerical address. I explained that was against policy and that if he was investigating shooting, what happens if something happens, how can we find you? I added that if he was meeting a CI, I get it, and he interrupted and stated that's what Ms. Harris' son Javon served as. He then said Javon Harris is his eyes and his ears and that he is undocumented.

I asked how many sons Ms. Harris has and he said three or four. I asked if Javon lives with Ms. Harris and he stated yes, as far as he knew so I asked if Javon lives there why you don't know the address. He replied, "I don't know the number I just know how to get there." I asked again if he knew any of her other sons and he stated he didn't know their names. He later referred to one of the sons as Tre' and that Robbery Detective Marcus Henderson called him and told him that Tre' stated he was not going to talk to them unless he came. He told Detective Henderson he would respond and when he arrived he spoke to Tre' (Travon Feldman-Harris). Tre' told him he didn't know why he was there and he didn't know what was going on. He told Henderson that Tre' claims not to know what was going on so he and Detective Henderson informed him. Feldman-Harris was interviewed and denied having knowledge of any robbery. Feldman-Harris also told him and Detective Henderson that they could not interview the other two subjects that were arrested who were Ms. Gaines' two sons.

A search warrant was later executed at Ms. Gaines' home and Lt. Garvin told him to get the names and the information of two people who were present. One person was Ms. Harris and the other was Ms. Gaines. When he tried to obtain Ms. Gaines' info she refused and he told Lt. Garvin what she stated. He stated that Harris showed him a text allegedly from Ms. Gaines sons threatening to throw a brick through her window and to rob the residence. Ms. Harris told him she was staying with a friend out of fear and that Ms. Gaines' son's believed her son Tre' had set them up. Officer Gates showed me the text/screen shots Ms. Harris had provided him and Officer Gates stated, Lt I got these to bring to you. I asked about the number I saw attached to the screen shots 1 (305) 300-1985 and he confirmed that was Ms. Harris' number. I reviewed the screen shots and it appeared that there was an issue between the families. I asked if this was related to gang activity. He advised that Javon's name came up as possibly being in a gang referred to as "Jefe" and that when he asked Javon about it he said no I'm not but I know some people who are.

Officer Gates stated he went to speak to Ms. Gaines with good intentions and he wanted to stop any shootings from occurring. I asked why Ms. Gaines refused to give him her information after the search warrant and he said she was upset. I asked why he went to her job instead of waiting until she got home, he said he wasn't thinking about it that way. He stated that Ms. Gaines told him she

7



# SAVANNAH POLICE
To Serve, Protect and Build Trust



*SavannahPD.org*

thought he was a robber based on his appearance. I again asked why he was dressed like that and he stated he didn't want to make a scene. I explained that he made a scene anyway when he showed the manager his badge and pulled Ms. Gaines outside. I asked why he did this and he again said he wasn't thinking about it that way. I told him that Ms. Gains felt she is being harassed and Gates replied that was not his intention.

I asked how many interactions he had with Ms. Gaines and he stated the one at the search warrant and the one at her job. I asked how many he had with Ms. Harris and he stated quite a few. I asked how many, he said about eight or nine times after their house was hit with a search warrant. I asked how they met and he stated Ms. Harris told him that Javon was getting into trouble so he told her he would take Javon under his wing. He stated that he met Javon back when he was on patrol and that they are also from Miami like himself. When asked if he knew them prior to his employment here he said no. He also recalled back in March while assigned to the gang unit Officer Andrew Wynn told him that Javon Harris was a "Blood." I asked if he knew Javon was a "Blood" when his mother asked him to keep him out of trouble and he said no. I asked why he was going over to the residence eight times after it had been hit with a search warrant and he stated because Javon was giving him information. I asked if anyone knew Javon Harris was his semi CI and he stated Cpl. Sueaquan knew. I asked if he texted them his location when he went to meet Harris and he stated no, there were times that he just went. I asked if he could see how that would be an issue and he replied yes but he was looking at it that this guy is giving him info. I asked what kind of info he was giving and he stated he knew the identity of the heads of gang and other members. I asked if his supervisor knew what he was doing and he said yes and when asked how long he would stay at the Harris residence he stated he was there for a couple minutes to an hour or two. He acknowledged that his supervisor doesn't know every time he goes. He stated he always met with Javon outside and never went inside.

I asked if he associates with Ms. Harris' other sons including Tre' and he stated no and that the other sons only know him as Gates. I asked who had his cell number and he stated Javon and his mother Ms. Harris. I then asked if Ms. Gaines' sons are in a gang and he said he didn't know. He stated when intel pamphlets come out he would sit with Javon and ask if he knew the individuals. He would then set up fake social media accounts to gather info. I then asked when he gathers the information who does he give it to and he said no one. I asked why not and he stated Sgt. Hutcherson told him the same thing, that he should be sharing the info. Gates initially stated that he didn't know how to perform this task then later said when he was assigned in the unit in March that he was instructed to identify gang members, then write it up. I asked who gave him his instructions and he stated Sgt. Puhala. I then confronted him with the inconsistencies of his statement and asked if he was given instructions to write it up, that he failed to do it. He acknowledged he failed to do it. I asked where he

8

KANG 000219



**SAVANNAH POLICE**
To Serve, Protect and Build Trust

*SavannahPD.org* 

kept the info he did gather and he stated that it was at his house. I asked why is it at your house instead of in the office, he replied that the info might be in the car. I asked about the group text he was sending out to members of his unit and there was communication between him and other members. I asked when was the last time he went to Ms. Harris' home, he stated yesterday but they didn't talk. He stated that she has his personal phone number. I asked to see the text between he and Javon and he stated he doesn't have them anymore. I asked if he was sure and he stated he was, "very sure" and showed me his phone. I asked to see the text exchanges for "B" and he did not wish to share them because it was on his personal phone. I explained that I didn't care if they were seeing each other and I only wanted to see the exchanges. He then allowed me to see the text between them and I saw the name "Boobie Harris" attached to the text. I asked if that was Ms. Harris' name and he stated yes (Officer Gates had previously stated he only knew her as "B"). I reviewed the text and there was exchanges between Officer Gates and Ms. Harris that were of importance.

7-8-19  2:14 PM
On one text Ms. Harris asked, "Bra is it was possible for them to charge him with this stuff they got out that house."

7-26-19-19  12:06 AM
Officer Gates ask Ms. Harris, "Javon there" and she responds he was and he replies "This nigga."

7-26-19  12:29  AM
Ms. Harris sends Officer Gates Traivon's full name and DOB.    (During the interview I asked why she sent it and he stated he asked her for it)

8-15-19  6:40 PM
Ms. Harris text Officer Gates, "You in the impala" and he replies "Yep."  She then text, "can I get in" and he replies "Yea".

8-15-19  12:55

I observed a SPD link that said financial card transaction fraud and when you click on the link it sent me to the SPD/CrimeStoppers page.  It also showed a picture of a black male standing at a gas pump of an Enmark gas station and it appears he is pumping gas.  The post is asking for any information regarding this subject fraudulently using a stolen debit card on two occasions.  Officer Gates response was, "SMH."

**The screen shots of the text exchanges are as follows;**

9

KANG 000220



← (BH) **Boobie Harris**

**7/6/19 7:40 PM**

BH Bra this Boobie when you get a chance slide up on me

**7/8/19 11:18 AM**

BH What's up bra have you heard anything else bout trai

**7/8/19 2:14 PM**

BH Bra is it possible for them to charge him with that stuff they got out that house

**7/10/19 3:26 PM**

BH Ya boy to go to jail

**7/26/19 12:05 AM**

U home?

**7/26/19 12:06 AM**

BH Yes

**7/26/19 12:06 AM**

Javon there?



KANG 000222



← BH **Boobie Harris**

7/26/19 12:10 AM

I been sittin in front of ya crib for a
minute now... I'm on the phone

7/26/19 12:10 AM

BH  Ok

7/26/19 12:29 AM

BH  Traivon Feldman-Harris
10-14-1999

8/9/19 3:31 AM

BH  Call me when you get this
message

8/13/19 2:10 PM

BH  Slide threw when u can

8/15/19 6:28 PM

U home?

8/15/19 6:29 PM

BH  No oaks of branlewoods

8/15/19 6:29 PM

Ok let me know when u get home

KANG 000223









KANG 000227



**8/15/19 11:13 PM**

I was minding the wrong business n bam saw some shit that made my head spin

**8/18/19 12:55 AM**

http://savannahpd.org/spd-detectives-seek-suspect-in-financial-card-transaction-fraud/

**8/18/19 1:03 AM**

Smh

**8/18/19 1:04 AM**

Crazy

**8/22/19 7:38 PM**

Call me

**8/22/19 7:49 PM**

KANG 000228



KANG 000229



savannahpd.org/spd-detective

# SAVANNAH POLICE

< Previous    Next >

**SPD Detectives Seek Suspect In Financial Card Transaction Fraud**

SAVANNAH, GA (August 8, 2019) – Southside Precinct detectives are seeking to identify a subject caught on surveillance footage using a stolen credit card.

The black male subject was seen using the credit card at the Enmarket, 4202 Montgomery Street July 25. He then immediately attempted to use the card again at Circle K, 4315 Ogeechee Road. The card had previously been reported stolen from a vehicle at a residence on White Bluff Road.

KANG 000230



11:16

the credit card at the Enmarket, 4202 Montgomery Street July 25. He then immediately attempted to use the card again at Circle K, 4315 Ogeechee Road. The card had previously been reported stolen from a vehicle at a residence on White Bluff Road.

The suspect was wearing dark pants, black shoes and no shirt when the incident occurred. He was traveling in a Nissan Altima.

Anyone with information on the incident is asked to contact Southside Precinct detectives at (912) 351-3403. Information can also be forwarded to CrimeStoppers at (912) 234-2020. Tipsters remain anonymous and may qualify for a cash reward.



11:16

the credit card at the Enmarket, 4202 Montgomery Street July 25. He then immediately attempted to use the card again at Circle K, 4315 Ogeechee Road. The card had previously been reported stolen from a vehicle at a residence on White Bluff Road.

The suspect was wearing dark pants, black shoes and no shirt when the incident occurred. He was traveling in a Nissan Altima.

Anyone with information on the incident is asked to contact Southside Precinct detectives at (912) 351-3403. Information can also be forwarded to CrimeStoppers at (912) 234-2020. Tipsters remain anonymous and may qualify for a cash reward.

KANG 000232

asked to ~~~
detectives at (912) 351-34U3. ~~~
can also be forwarded to CrimeStoppers
at (912) 234-2020. Tipsters remain
anonymous and may qualify for a cash
reward.





**The screen shots were added to this casefile and can be located in Section 6 of this casefile.**

Our interview continued and we discussed his actions. He stated his intentions were to prevent the kids from killing each other and it wasn't received that way. He asked if I thought he was untruthful to me and I said I had to evaluate everything first. I explained that he needed to tell me everything he knows and he stated there was nothing he needed to add. I asked if there was anything he failed to tell me about Ms. Harris' sons and he said no. He stated that when her boys get into trouble, she calls him. I asked about the credit card fraud link and I asked if Javon had been arrested or charged and he stated, "I don't know." I asked if he should know that his semi-CI is involved in anything and he said yes. I had him pull up the text and CrimeStoppers link again and asked if he told Ms. Harris to tell her son Javon to turn himself in and he replied that he didn't say anything about it. He then changed his account and said he did tell her (Ms. Harris) to turn himself in. I asked if I could take a picture of the text and he said okay. When went over his instructions from his supervisor and he said he had no further information to added.

**This first interview was terminated and was added to this casefile. It can be located in Section 5 of this case file**

I received a call from Officer Gates who stated that he wished to talk to me about something. I asked him why didn't he say anything to the detectives about Javon and he replied he wanted to stay out of it. I told him to return to my office and he was re-interviewed at approximately 15:34 hours. Officer Gates stated he wanted me to know that it may look like he's covering something up but he isn't. He stated that he's never hid anyone or been in trouble with law enforcement prior to coming here. He stated he would, "take it on the chin" for not going to Southside Pct. Detectives (for not reporting Javon's identity to detectives). He said Ms. Harris sent him the link because she was scared. He said Lt., yes I dropped the ball, and I should have gone to Southside Pct. Detectives and told them that may be that is Javon in the photo. He stated looking back on it, it looks crazy. I asked if I hadn't confronted him about the text, would he have said anything and he stated, no sir. I told him it doesn't look good to know the identity of a guy who committed a felony and you don't say anything. I asked what his job duties were and he stated, "Obey the law." I asked if he saw a crime what should he do, and he replied, "Report it." I told him that he should have told any supervisor the identity of the suspect and asked if he failed to share the information he got from Javon and he replied yes sir. I told him he would have to explain his actions. He stated if he was hiding something he would not have

10



**SAVANNAH POLICE**

To Serve, Protect and Build Trust

*SavannahPD.org*

allowed me to see his phone. I told him I have had a lot of CI's but never allowed their mother to get in the car with me.

I told him I have concerns about this and that there are somethings he shouldn't be doing for example meeting with your CIs and his mother without contacting his supervisor. He advised he didn't tell his supervisors on this occasion but had done it by text on some occasions. He showed me his text from his phone on July 5th 2019, on July 24th 2019, and on July 30th 2019. I asked if he went to Ms. Harris' home on those days and he stated he did and it was to talk to Javon. I asked why Traivon told robbery Detective Marcus Henderson he would only talk to him and he stated he didn't know. I asked if Tre' expected him to help him out with anything and he stated no. I asked if he told anyone about the intel he gathered and he stated yes, with Sueaquan, but it was after the search warrant. I confronted him with his first response that he only shared some intel with SIU gang detective Andrew Wynn and he stated that I asked if he wrote it out, and he said no. He first stated that he showed Sueaquan a folder of Instagram accounts he had gathered and Sueaquan told him to keep doing what he's doing. He later said Sueaquan wouldn't look at his packet. He stated when he left the first interview he felt like he knows how it looks. He stated that he and Tre interacted with one another the day he was arrested. He stated he had no other interactions with Tre and that they never spoke on the phone or otherwise. I told him I was curious how a guy he never met would know him then call out his name if they never met, and he replied I don't know but maybe Javon told him. He again stated he never met or saw Tre'.

**This second interview was terminated and was later added to this casefile. It can be located in Section 5.**

I conducted a search of Officer Gates' police vehicle and found an open box of Novelty Fetish Urine. The contents were empty and when I asked what it was, he replied, "I don't know what that is." Upon looking into the product's use one purpose is to deceive a urinalysis drug test.

11

**KANG 000235**





A photo of the box and where it was found in his car (the passenger seat back compartment) was taken and can be located in Section 6 of this casefile.

12



I spoke to Det. Marcus Henderson about his concerns and he later provided me with a formal statement and a copy of the interview.  Det. Henderson's formal statement can be read in its entirety in Section 4 of this casefile and is listed below;



## EMPLOYEE STATEMENT

DATE:   11/15/2019                              TIME:   12:30 PM

NAME:   Marcus Henderson                ASSIGNMENT:   CID Robbery Unit

---

**As directed by *General Order # ADM-004, Oath of Office, Ethics and Conduct*:**

**Section 1G – Cooperation: Is essential to effective law enforcement.  Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation.**

**Section 1I – Truthfulness:  SPD employees will be truthful at all times whether under oath or not, unless otherwise necessary in the performance of a police task.  This will include, but not be limited to, instances when employees are being questioned, interviewed or are submitting reports.**

---

DATE AND TIME OF INCIDENT:   July 5th, 2019

LOCATION OF INCIDENT:   1807 Fitzgerald St.

EXPLAIN IN DETAIL WHAT HAPPENED:   On July 5th, 2019 around 1400 hours Traivon

Feldman-Harris was arrested for his Armed Robbery warrant (CRN 190628036).

Feldman-Harris was brought to SPD Headquarters to be interviewed. I was off duty at the time

and was notified by detectives he was arrested.

I came in to talk to Feldman-Harris but he told me he did not want to speak with me, however,

he requested another detective by name, Detective Gates. At first I believed Detective Gates

had experience with Feldman-Harris before since he was assigned to the Gang Unit. I believed

Feldman-Harris was working with a group of people and they formed their own gang. I called

Detective Gates and I asked him to speak with Feldman-Harris. Detective Gates told me he was

familiar with the male.

Page __1__ of __5__
SPD FORM 1046w (Revised 02/2018)

13

KANG 000237



*SavannahPD.org*



### EMPLOYEE STATEMENT

Detective Gates came to SPD Headquarters and I briefed him on the investigation. I told him
Feldman-Harris was arrested for Armed Robbery and he was refusing to speak to me. I wanted
Detective Gates to get Feldman-Harris to confess to the robbery as well as give up the getaway
driver involved in the robbery. I also told Detective Gates that the robbery unit is currently
securing Search Warrants for various residences that the suspect could be hiding evidence. We
are trying to reduce Feldman-Harris' communication with anyone so his associates could not
discard of any evidence, i.e. the firearm and the clothing the suspect was wearing.

Detective Gates told me he knew Feldman-Harris and his family. He knew them from when he
lived in Miami. He told me Feldman-Harris' mother ("Boobie" as Detective Gates called her)
lived at 1836 Fitzgerald St. and his brother, Javon Harris, was currently living in Jacksonville,FL.
I thought Javon Harris was the getaway driver in the robbery but Detective Gates' statement
led me to believe differently since Javon was in Florida. I learned later Javon was actually living
in Savannah with his mother at 1836 Fitzgerald St. He was pulled over by officers the same day
Traivon Feldman-Harris was arrested.

Detective Gates went into the interview room with Feldman-Harris while I remained outside. A
short time later, Detective Gates exited the room and told me that Feldman-Harris wanted to
know what he was being charged with. I re-entered the room and attempted to interview
Feldman-Harris again. I advised him of his charges and Feldman-Harris refused to confess.

Afterward, Detective Gates started questioning me about the evidence I have against
Feldman-Harris. He even wanted to see the video from the Shell Gas Station. I felt apprehensive
about the questions and I started to feel that Detective Gates was more friendly with
Feldman-Harris than I initially thought. I refused to show him the video.

I asked the transporting officer to hold off on taking Feldman-Harris to CCDC so we could
reduce his ability to make phone calls. I went to 1807 Fitzgerald St. to meet with Detective King
and Detective Samuell who were actively executing a Search Warrant at 1807 Fitzgerald St.

Page __2__ of __5__

SPD FORM 1046w (Revised 02/2018)

14

KANG 000238





### EMPLOYEE STATEMENT

Detective Samuell was working an Armed Robbery investigation that occurred at the Fairfield Inn (CRN 190704122). He acquired information that led him to believe Feldman-Harris was staying at 1807 Fitzgerald St. (rather than 1836 Fitzgerald St.) and there was contraband in the residence. When officers located Feldman-Harris, he was driving the suspect vehicle (gold Nissan Altima) that was associated with the Fairfield Inn robbery. The weapon involved in the robbery was also located in the vehicle. We later learned that Feldman-Harris lied about his address to lead the police to the wrong address.

While I was at the residence I spoke to the homeowner, Tamika Gaines. She told me she was aware of Feldman-Harris' criminal activity and she provided me details about various interactions she had with him. Gaines then told me she was upset that one of our detectives was talking to "Boobie" at 1836 Fitzgerald St. She overheard the conversation the detective and Boobie had about her house. She also heard Boobie telling the detective that they arrested her son. The detective was surprised and he told her he did not recognize her son at first. Boobie told the detective that her son shaved his hair. Feldman-Harris used to have long dreads. Although Gaines did not tell me a name, I believed she was referring to Detective Gates.

When I returned to my office to type up my report, I reviewed the video recording of the interview with Feldman-Harris. I gained concern about Detective Gates involvement with my investigation when I listened to his conversation with Feldman-Harris. Feldman-Harris told Detective Gates that I did not allow him to contact anyone. Detective Gates asked Feldman-Harris who he wanted to call. Feldman-Harris gave Detective Gates a contact to call. It seemed like Detective Gates was going to fulfill this request which upset because I told Detective Gates that I did not want Feldman-Harris making phone calls. At this time, I do not know if Detective Gates called anyone for Feldman-Harris.

Due to Detective Gates actions on Fitzgerald St., at Headquarters, and his familiarity with Feldman-Harris and his family, I was very concerned that he had or would compromise my investigation. I brought my concern to Sgt. Bevil.

Page __3__ of __5__

SPD FORM 1046w (Revised 02/2018)

KANG 000239



*SavannahPD.org*



*SavannahPD.org*

## EMPLOYEE STATEMENT

On July 18th, 2019 a Search Warrant was executed at 1836 Fitzgerald St. but detectives did not locate any evidence/contraband.

August 12th, 2019 I received Feldman-Harris CCDC jail calls. Some of the conversation on multiple calls consisted of Feldman-Harris asking his mother to talk to Detective Gates about his charge (Call title: P9_5033_87_20190707175520). Another phone call, Feldman-Harris told his mother he tried to talk to Detective Gates when arrested. Detective Gates talked to Vinnecia Harris (mom) and told her he did not recognize Feldman-Harris because he cut his hair. Detective Gates told Feldman-Harris the same thing during the interview (Call title: P9_5033_132_20190707183923). Another phone call, Feldman-Harris asked his mother if she spoke to Detective Gate yet. Vinnecia told him she has not. Feldman-Harris was also worried about the Search Warrant at 1807 Fitzgerald St. and he was worried about 1836 Fitzgerald St. Vinnecia stated she "took care of it" (Call title: P12_5033_114_20190709164008). Another phone call, Feldman-Harris asked his mother again if she talked to Detective Gates about getting his car out of impound (Call title: P17_5033_103_20190710210808). Another call, Feldman-Harris asked his mother if she talked to Detective Gates. Vinnecia told Feldman-Harris to stop talking over the phone about the investigation (Call title: P21_5033_31_20190710222557). Another call, Feldman-Harris told his mother to talk to Detective Gates about getting his keys back (Call title: P9_5033_106_20190720113727).

On August 14th, 2019 Tamika Gaines and her son, Brandon Leon, came to SPD Headquarters for an interview. During the interview, Gaines began talking about a "crooked" police officer. She claimed the officer was talking to Javon and Vinnecia the day the police arrested Feldman-Harris. Gaines knew the officer is from Miami. Gaines heard the officer talking to Vinnecia in a low voice as if to conceal their conversation. The officer told Vinnecia, "I did not know that was your son." Vinnecia responded, "Yeah, that is my son. He cut his hair." Gaines Was standing beside them and she heard their conversation. Gaines advised me that Feldman-Harris used to have long dreads. Gaines asked the officers conducting the Search Warrant at her house why the officer was talking to Vinnecia ("Boobie"). She complained that

Page __4__ of __5__

SPD FORM 1046w (Revised 02/2018)

16

**KANG 000240**



*SavannahPD.org*



*SavannahPD.org*

### EMPLOYEE STATEMENT

the officer was telling Vinnecia what was happening at her house. Gaines believed the officer

told Vinnecia to get rid of any evidence the police were looking for. Gaines believed Vinnecia

knew everytime Feldman-Harris or Javon were listed in a report because the officer would tell

Vinnecia about it. Gaines described the officer as a dark skin black male. The officer goes to

Vinnecia's residence regularly. The officer was always driving a brown Ford Crown Victoria. It

appeared to be a detective's car. He was wearing regular clothes with a baseball cap. Vinnecia

and the officer were having a conversation for three hours that day.

I notified Sgt. Bevil and Lt. Larry about the jail calls and the interview.

On August 22nd, 2019 around 1700 hours I heard Detective Gates hold out over the air on a

Signal 4 on Fitzgerald St. No address was given. A few minutes later, Detective Samuell

received a phone call from Tamika Gaines. According to Detective Samuell, Gaines was upset

and crying on the phone. She told Detective Samuell that Detective Gates came to her job

wearing a hoodie. He told Gaines she had better stop her drama with 1836 Fitzgerald St.

Gaines seemed frightened when she told Detective Samuell about the encounter.

Detective Samuell contacted Sgt. Hutcherson and asked him if he was aware Detective Gates

was on Fitzgerald St. Sgt. Hutcherson told Detective Samuell he was not aware of any

assignment at the location. Detective Samuell then contacted Lt. Larry.

**Signature of Employee**

11/18/19
**Date**

Page __5__ of __5__

SPD FORM 1046w (Revised 02/2018)

17

KANG 000241



**SAVANNAH POLICE**
To Serve, Protect and Build Trust

*SavannahPD.org*

Det. Kaishawn Samuels provided a statement regarding his phone call and interaction with Ms. Gaines. In his statement he listed Det. James King as a witness that Ms. Gaines stated that a black officer whom frequents the Harris' home warned them of a pending search warrant and the Harris' were told to, "get the guns out the house". Det. Samuel's formal statement can be read in its entirety in Section 4 of this casefile and is listed below;



**SAVANNAH POLICE**
To Serve, Protect and Build Trust

*SavannahPD.org*

## EMPLOYEE STATEMENT

DATE: 11/22/19                    TIME: 1400

NAME: Kaishawn Samuell          ASSIGNMENT: CID / Robbery

---

**As directed by *General Order # ADM-004, Oath of Office, Ethics and Conduct*:**

**Section 1G – Cooperation: Is essential to effective law enforcement. Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation.**

**Section 1I – Truthfulness: SPD employees will be truthful at all times whether under oath or not, unless otherwise necessary in the performance of a police task. This will include, but not be limited to, instances when employees are being questioned, interviewed or are submitting reports.**

---

DATE AND TIME OF INCIDENT:   August 22nd, 2019, at approximately 1130 hours

LOCATION OF INCIDENT:   SPD HQ

EXPLAIN IN DETAIL WHAT HAPPENED:   On the above date and time, I received a phone call from Tamika Gaines. Ms. Gaines sounded excited and as if she was crying. She stated that a plain clothes officer, wearing a dark colored hoodie on his head was at her job. She stated that the officer identified himself as officer Gates. Ms. Gaines told me that the officer was questioning her about an ongoing situation that she was having with her neighbors at 1836 Fitzgerald Street. Ms. Gaines told me that she felt intimidated and scared. She told me that when she asked the officer if she needed to call me (she knew I was handling the investigation), that he told her not to call me and left the business. I immediately informed my Supervisor and the internal affairs unit of the situation. Ms. Gaines stated that it was the same officer that she had saw at 1836 Fitzgerald Street recently.

On July 5th, 2019, at approximately 1730 hours, during the execution of a search warrant at Ms.

Page 1 of 3
SPD FORM 1046w (Revised 02/2018)

18

**KANG 000242**



*SavannahPD.org*

# SAVANNAH POLICE

*SavannahPD.org*

## EMPLOYEE STATEMENT

Gaines's residence. Ms. Gaines informed Detective King, of the Robbery Unit, that there was a

black officer in plain clothes, at 1836 Fitzgerald Street. She stated that the officer was telling

the residents at 1836 Fitzgerald Street to get the guns out of the house.

-------------------------------------END OF STATEMENT-----------------------------------------

Page __2__ of __3__

SPD FORM 1046w (Revised 02/2018)

KANG 000243





**EMPLOYEE STATEMENT**

_CPL Kaishawn Samuell_00360_
**Signature of Employee**

____11/22/2019____
**Date**

Page __3__ of __3__

SPD FORM 1046w (Revised 02/2018)

20

**KANG 000244**



*SavannahPD.org*

Det. James King provided a statement regarding his interaction with Ms. Gaines. In his statement, he states that Ms. Gaines told him that the Harris' were warned to get rid of evidence and that this same black detective was sharing information with the Harris family. Det. King's formal statement can be read in its entirety in Section 4 of this casefile and is listed below;



*SavannahPD.org*

## EMPLOYEE STATEMENT

| DATE: 11/22/19 | TIME: 3:30 PM |
|---|---|
| NAME: James King | ASSIGNMENT: CID |

As directed by *General Order # ADM-004, Oath of Office, Ethics and Conduct*:

**Section 1G – Cooperation:** Is essential to effective law enforcement. Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation.

**Section 11 – Truthfulness:** SPD employees will be truthful at all times whether under oath or not, unless otherwise necessary in the performance of a police task. This will include, but not be limited to, instances when employees are being questioned, interviewed or are submitting reports.

DATE AND TIME OF INCIDENT:     July 5, 2019 at approx. 5:30 PM

LOCATION OF INCIDENT:     1807 Fitzgerald Street

EXPLAIN IN DETAIL WHAT HAPPENED:     I on the listed date and time responded to 1807 Fitzgerald Street to stand by for the execution of a search warrant. While guarding the home, I spoke with Ms. Tamika Gaines, the mother of suspect Brandon Leon. She informed me of Travon Harris and his criminal acts. While on the subject, she mentioned that when Travon Harris got pulled over in the traffic stop that led to the search warrant "An officer call his mom (Travon's Mother) and told her what happened giving her the ups to do what?" I responded to "To ditch the evidence" and she responded "Yes." She then stated that the officer was telling Travon's mom everything that was happening at her address. She stated that "one of your Detectives were letting her know everything that was going down." I asked her which officer and she stated, "the black man." She did not know his name. She stated that the officer is mutual friends with the mother and called her as soon and Travon was stopped by police. This is the reason she got off work. I was unable to determine which officer she was referring to due to my

Page____of____

SPD FORM 1046w (Revised 02/2018)

21

**KANG 000245**



**SAVANNAH POLICE**

To Serve, Protect and Build Trust

*SavannahPD.org*

**SAVANNAH POLICE**

*SavannahPD.org*

## EMPLOYEE STATEMENT

task of securing the home. This was recorded by my BWC.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Page ____ of ____

SPD FORM 1046w (Revised 02/2018)

22

**KANG 000246**



**SAVANNAH POLICE**
To Serve, Protect and Build Trust
*SavannahPD.org*



**SAVANNAH POLICE**
To Serve, Protect and Build Trust
*SavannahPD.org*

### EMPLOYEE STATEMENT

_James King____
**Signature of Employee**

____11/22/19_____
**Date**

Page ____of____

SPD FORM 1046w (Revised 02/2018)

23

KANG 000247



**On December 2, 2019 I formally interviewed Officer Adrian Gates. He was advised Garrity and OPS Form #016 and he stated he understood both forms.**

I explained that I had some follow-up questions regarding this investigation and his prior interviews. He was asked if he had any questions and he asked to see the complaint against him. I informed him the complaint from Ms. Gaines was via phone, but told him I have been provided witness statements. I told him as I ask questions I would allow him to see. We went over the portion of the investigation when he failed to provide police with Javon Harris' name regarding the Crimestoppers lookout. We discussed him meeting with a CI without his supervisor's knowledge and meeting with him alone. We also discussed him meeting with his CI's mother alone and her getting in the car with him and how these things could have been handled differently. I told him there was an allegation that he told Ms. Harris to dispose of evidence. I showed him both employee witness statements from Det. James King and Det. Kaishawn Samuels regarding those allegations and he denied doing so. I asked if he told Ms. Harris to get rid of the evidence and he stated no. He denied speaking to Ms. Harris that day and he stated he told Traivon Harris to call his mother, but that was it. I asked if he made any phone calls on behalf of Travon after his arrest and he stated no. He was allowed to read Det. Marcus Henderson's employee statement and when asked about the allegations he denied them. He denied giving Ms. Harris any information and he denied making any phone calls. I asked if Travon Harris gave him any phone numbers to call he stated he didn't recall and he didn't know.

I asked if other than on July 5th when he was arrested, if he had ever met Traivon Harris. He stated other than seeing him at the house; he was introduced by his mother as this is my son from Miami. He stated he never met the Harris family until he came to Savannah. I asked Officer Gates, "so you met him" and he replied yeah. I asked Officer Gates again if he met Traivon Harris and he said yes she introduce me to her son. I confronted him about his earlier statement that he never met Traivon Harris before and he said it wasn't like that. Officer Gates then tried to explain that he didn't know who he was but acknowledged that they met. I told him that in his prior statement he told me repeatedly that he never met any of her sons and he replied she never told me hey this is my son Tre it was, "that's my son Tre in passing." I asked were you mistaken and he said it wasn't a formal greeting. Officer Gates tried to explain that he did not consider this as a meeting even though Traivon's mother introduced them to each other. I asked about the inconsistencies regarding his first statement regarding Ms. Harris' identity. He stated that she told him her name was B and later said it was Boobie and that's what he saved it in his phone as. At one point he said she told him her name was B but in 2018 she told him her name was

24

**KANG 000248**



Boobie I asked again why he didn't tell me that when I initially asked. He stated he didn't know her name and he said he apologized.

We went over his failure to reveal Javon's identity and that I felt that somehow this family became intertwined with him. I told him that it appears that somehow he made some poor choices regarding them and he stated uh huh. He went on to say that after sitting home for five months thinking about this, "Lt. so do I." I asked if he got too close and he stated no he wasn't too close but because he, "visited them so much that's how I got Hefe gang." He explained when he got the Crime Stoppers link regarding Javon and he didn't want to get in trouble because he was working off-duty. He stated that he was already under investigation for off-duty and had just been interviewed. When Ms. Harris sent the link to him he opened it looked at it briefly and sent her SMH. He stated that he didn't want anyone to see him on his phone in the club thinking he was f-ing around. I confirmed that he got the link from Ms. Harris on 8-18-19 and saw the photos of Javon. He stated that the link didn't get the attention it would have because he was not in the right head space due to a recent death of a friend.

I asked Officer Gates if he, "compromised himself when dealing with this family", and he replied yes. I asked him to tell me how he compromised himself and he stated that there are things he should have handled differently. I asked him to be specific and he stated by going to Ms. Gaines' job, not using his camera, trying to mentor Javon, a lot of things. I then allowed him to listen to some excerpts of Harris's jail recordings and afterwards I asked why his name was mentioned. He stated that Traivon was probably desperate and that maybe he thought that he could help him because he helped Javon. I told him his name was mentioned six times on six different occasions and that it didn't look good. I asked if he could see how this looks like he is compromised and he said absolutely, but things aren't always what they seem and Travon was yelling out his name because he thought he could help him. Officer Gates stated that he had no knowledge of the robbery and didn't share any information. I asked him why he texted Ms. Harris asking for Travon's full name and DOB and he replied he didn't know why he asked for it. We then went over several sections of the ADM-004 Oath of office, ethics and conduct policy specifically the section that read;

*"I will never permit my personal feelings to influence my decisions. I will enforce the law courteously and appropriately without fear of favor, malice, or ill will, never employing unnecessary force and never accepting gratuities."*

When asked if he violated this portion of the policy and he stated when it came to Javon, yes it was personal.

Officer Gates denied violating the below listed portions of the policy;

25

KANG 000249



*"Not knowingly engage in acts or activities which are disgraceful or unbecoming to a City Employee.*

*Not do anything which may be in conflict with the interests of the City or which would hurt our ability to do our jobs.*

*Be careful in the use of information acquired in the course of our duties."*

He was asked, didn't he have a duty to report Javon to the Southside Precinct Detectives? He said yes, but that the policy reads knowingly. I asked about the second portion, "*Not do anything which may be in conflict with the interests of the City or which would hurt our ability to do our jobs*" and whether or not he did his job. He acknowledged that he should have picked up the phone and notified the detectives. I asked him for a yes or no response and he said he couldn't say yes or no and that it wasn't that simple. I asked about number 3, "*Be careful in the use of information acquired in the course of our duties*" and he denied violating that portion of the policy.

We went to review the Oath of Honor portion and he again denied divulging information to unauthorized persons. We looked at the General Standards of Conduct portion specifically, "*SPD employees will conduct their private and professional lives in such a manner as to avoid negative reflection upon themselves*" and when asked if he violated this portion of the policy he stated absolutely. I asked in doing that, your actions could have been altered correct? He replied, correct. I asked if there were things he could have done differently and he replied absolutely. I asked if he confirmed or denied that he violated that portion of the policy and he stated he confirms he violated that portion.

*Unacceptable conduct, whether on duty or off duty, includes, but is not limited to, arrest or conviction of any felony, arrest or conviction of any misdemeanor involving moral turpitude, or violation of any statue, law or official regulation, rule or order or commission of any act which compromise the public trust necessary for employment.*

I asked if he violated this portion of the policy and he stated it was deeper than yes or no. He stated that the reason he went to the Red and White was to prevent the shooting from happening. He stated if you exclude the shooting regarding compromising the public trust it would be frowned upon, but the shooting happened and he was trying to prevent it from happening. If the public found out the shooting happened while he was under investigation then it would be looked at differently.

We looked at **Impartiality** - *SPD employees, while charged with consistent and practical enforcement of the law, must remain completely impartial toward all persons coming to the attention of the SPD. Exhibiting partiality for or against a*

26

KANG 000250



# SAVANNAH POLICE
To Serve, Protect and Build Trust

SavannahPD.org

*person because of race, creed, or influence is unprofessional conduct. Similarly, unwarranted interference in the private business of others, when not in the interest of justice, is unprofessional conduct and prohibited.*

I asked if he remained impartial when it came to Javon and he stated no.

I asked if he violated the Truthfulness portion of the policy and he stated no.

I asked if he violated the **Associating with Criminals** portion of the policy which reads,*"SPD employees shall avoid regular associations with persons who are known to engage in criminal activity where such associations will undermine the public trust and confidence in them or the SPD. This rule does not prohibit those associations that are necessary to the performance of official duties, or where such associations are unavoidable because of the SPD employee's personal or family relationships."*

Officer Gates stated that he didn't know that the Harris family were criminals and I asked if a house was hit with a search warrant in relation to an armed robbery, why would he continue to go there eight times. He stated that he did this to gain info about a gang and because Javon was not involved in the armed robbery he felt it was appropriate. He denied violating that portion of the policy.

I then asked about the General Responsibilities portion of this policy, *"Within the corporate limits of the City of Savannah, SPD Officers shall at all times take appropriate action to:*

*1. Protect life and property.*
*2. Preserve the peace.*
*3. Prevent crime.*
*4. Detect and arrest violators of the law.*
*5. Enforce all Federal, State, and local laws and ordinances within the jurisdiction of the SPD.*

Officer Gates denied violating that portion of the policy. He was asked if he had anything to add and he stated that given the opportunity, we would, "get a better officer." He stated that he wouldn't put his badge or feeding his family in jeopardy. He stated after trying to help Javon he saw Instagram posts of him smoking weed and holding guns. He stated he would never share information and he knew doing so would get him let go. I explained the process and let him know all information would be in the casefile. He asked if I spoke to Ms. Harris and asked her if he shared info and I said no. I also explained there are other factors involved in this case that will be looked at.

**The 3rd interview was terminated and Officer Gates' audio-taped statement was added to this case file and can be located in Section 5 of this casefile.**

KANG 000251



On December 3, 2019 I spoke to Ms. Tamika Gaines about the allegations she made to SPD Robbery Detectives about Officer Gates being "crooked." She confirmed that she lives at 1807 Fitzgerald Street and at one point her family and the Harris family were close. An incident happened at school and they started to drift away. She stated that she did make those statements about Officer Gates to the detectives and she stated she had. She based this on what took place in July when a search warrant was executed on her home. She stated that while at work she received a phone call from a friend who stated that her home was surrounded by the police. She got a ride to the location but due to all the cars she had to exit the vehicle down the street and then walk towards her home. She advised observed Officer Gates and Ms. Harris down the street from her home talking about the incident. As she walked up Ms. Harris told her don't go down there stay here and let's see what happens. She heard them discussing that he didn't know that was her son referring to "Tre" and he looked different. She advised she was upset because she felt if her home is being "invaded" why is he down the street talking to Ms. Harris while all the other officers are at her home. I asked, other than hearing him say I didn't know that was your son and he got a haircut if anything else was shared?

She recalls Ms. Harris inquiring about getting the car back when Traivon was arrested and Officer Gates told her he would look into it. She also said that he was discussing what was found in the car and that a gun was found. I asked if he was specific about what was found in the car and she said no. She said when she heard him giving information to Ms. Harris she walked to her home and told several officers what was taking place. I then asked if he (Officer Gates) told Ms. Harris the police found a gun in the car and she said no she didn't hear that part. I asked if he told Ms. Harris about the initial traffic stop and she stated yes. I asked if she knew if they had a relationship and she didn't know. She advised that Ms. Harris would talk about him and the fact that he was from Miami. She said he would come to Ms. Harris' home on several occasions and he was driving a brown Crown Vic. I asked if she and Gates had spoken and she said no. She then recalls him conducting a traffic stop on her and she felt it was harassment. When she asked why was she stopped, he told her he got a report she was drinking in her car. I asked if she witnessed Officer Gates sharing with Ms. Harris what was found in the car and she said no. I asked if she told anyone that she warned Ms. Harris about any guns and she stated she did tell officers that, but she said it was out of spite. I asked if she had any personal knowledge that he had done that and she said no. She felt he had no right discussing anything about her home to him and when I asked what he said, she said she couldn't remember. I asked if she had any information about Officer Gates discussing any guns, evidence or the robbery and she said no. She advised that she recalled there were texts between Ms. Harris and that Ms. Harris referred to Officer Gates as her detective friend and he was telling her everything about her

28

KANG 000252



**SAVANNAH POLICE**
To Serve, Protect and Build Trust

*SavannahPD.org*

son. She advised she would try to locate the texts on her other cell phone and provide it for me.

**The interview was terminated and Ms. Gaines' audio-taped statement was added to this case file and can be located in Section 3 of this casefile.**

I contacted Ms. Vinnecia Harris to obtain a statement from her and she agreed to do so. She was asked if Officer Gates had met any of her sons and she said yes but it was a, "hi and bye." She advised that he never shared any info with her and that she asked him to be a mentor to her son Javon. She said she and Officer Gates met while in Savannah while on a call.

**The interview was terminated and Ms. Harris' audio-taped statement was added to this case file and can be located in Section 3 of this casefile.**

29

**KANG 000253**



# SAVANNAH POLICE
To Serve, Protect and Build Trust

*SavannahPD.org*

## ******************Facts and Findings**************************

- I was assigned this investigation by OPS Commander Captain Alexander Tobar and Lt. David Barefield involving an SPD Officer Adrian Gates and his possible association with a subject named Traivon Feldman-Harris and his family.

- My investigation revealed that jail recordings existed in which Officer Adrian Gates' name was mentioned.

- My investigation revealed that there were questionable text exchanges between Officer Gates and Ms. Harris.

- When asked questions regarding his involvement with the Harris family Officer Gates denied any wrong doing.

- Officer Gates acknowledged that he failed to share the identity of his undocumented CI regarding a credit card fraud case to Southside Detectives.

- Officer Gates initially told me he didn't know the whole name of Ms. Harris but her name is in his cell phone is listed as "Boobie Harris."

- Officer Gates acknowledged that he failed to notify his supervisors each time he was meeting with either his CI or Ms. Harris and he was never accompanied by another officer.

- Officer Gates initially stated he didn't share the intel he gathered then stated he showed it to Cpl. Sueaquan.

- Officer Gates stated he never met Traivon Harris before July 5, however in the third interview he stated he had met him.

- Officer Gates and I went over several sections of the ADM-004 Oath of office, ethics and conduct policy specifically the section that read;

- "I will never permit my personal feelings to influence my decisions. I will enforce the law courteously and appropriately without fear of favor, malice, or ill will, never employing unnecessary force and never accepting gratuities." When asked if he violated this portion of the policy and he stated yes it was personal.

30



*SavannahPD.org*

- I asked if he remained impartial when it came to Javon and he stated no and confirmed he violated that portion of the policy.

- I asked if he violated the Truthfulness portion of the policy and he stated no.

- I asked if he violated the Associating with Criminals portion of the policy and he stated no.

- Statements were obtained from other SPD detectives that seemed to imply Officer Gates maybe sharing info and or telling individuals to hide evidence. These statement were based on statements made by Ms. Tamika Gaines.

- Upon speaking to Ms. Gaines about the allegations she made, she stated that she made these statements out of spite. She had no direct knowledge that Officer Gates warned or shared intel with Ms. Harris. She did hear the two talking about the incident prior to Traivon's arrest.

- Ms. Vinnecia Harris advised when she was asked if Officer Gates had met any of her sons and she said yes he met all four of them but it was a, "hi and bye." She advised that he never shared any info with her and that she asked him to be a mentor to her son Javon. She said she and Officer Gates met while in Savannah while on a call.


**END REPORT**


31

**KANG 000255**



SavannahPD.org

# SECTION 2
# Complainant Statement
# (None)

**KANG 000256**



**SavannahPD.org**

# SECTION 3
# Witness Statement(s)

1. **Tamika Gaines (1-Audio-taped statement)**
2. **Vinnecia Harris (1-Audio-taped statement)**

**KANG 000257**



# SECTION 4

## Witness Officer Statements

**3. Det. Casondra Lawton (typed statement)**
**4. Det. Marcus Henderson (typed statement)**
**5. Det. James King (typed statement)**
**6. Det. Kaishawn Samuell (typed statement)**

KANG 000258



# **SAVANNAH POLICE**
To Serve, Protect and Build Trust

*SavannahPD.org*

## **EMPLOYEE STATEMENT**

DATE: 11/15/2019 _____ TIME: 2000 hours _____

NAME: Casondra Lawton _____ ASSIGNMENT: CID _____

---

**As directed by *General Order # ADM-004, Oath of Office, Ethics and Conduct*:**

**Section 1G – Cooperation: Is essential to effective law enforcement. Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation.**

**Section 1I – Truthfulness: SPD employees will be truthful at all times whether under oath or not, unless otherwise necessary in the performance of a police task. This will include, but not be limited to, instances when employees are being questioned, interviewed or are submitting reports.**

---

DATE AND TIME OF INCIDENT: August 22, 2019 _____

LOCATION OF INCIDENT: _____

EXPLAIN IN DETAIL WHAT HAPPENED:  My sister Tamika Gaines contacted me on

August 22, 2019 in reference to a police officer that was at her job dressed in all black following

her around in the store. She was upset and crying. She told me that she was scared and she didn't

know what he was going to do to her. I told her to calm down and call the police and let them

know what was going on. I never asked her what the officer name was. I never heard him say

anything to her. I had a lot of things going on so I forgot to call her back to see what happened

with the officer that came to her job.

_____

_____

_____

_____

_____

Page__1__of__2__

SPD FORM 1046w (Revised 02/2018)

KANG 000259



**SAVANNAH POLICE**
To Serve, Protect and Build Trust
SavannahPD.org

## EMPLOYEE STATEMENT

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Page ____ of ____

SPD FORM 1046w (Revised 02/2018)

KANG 000260



## EMPLOYEE STATEMENT

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Page ____ of ____

SPD FORM 1046w (Revised 02/2018)

KANG 000261



**SAVANNAH POLICE**
To Serve, Protect and Build Trust
*SavannahPD.org*

## EMPLOYEE STATEMENT

_Casondra Lawton_____

**Signature of Employee**

Date **11/15/19**

Page _2___of _2__

SPD FORM 1046w (Revised 02/2018)

**KANG 000262**



# SAVANNAH POLICE
To Serve, Protect and Build Trust

*SavannahPD.org*

## EMPLOYEE STATEMENT

DATE: 11/15/2019                    TIME: 12:30 PM

NAME: Marcus Henderson            ASSIGNMENT: CID Robbery Unit

---

**As directed by *General Order # ADM-004, Oath of Office, Ethics and Conduct*:**

**Section 1G – Cooperation: Is essential to effective law enforcement. Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation.**

**Section 1I – Truthfulness: SPD employees will be truthful at all times whether under oath or not, unless otherwise necessary in the performance of a police task. This will include, but not be limited to, instances when employees are being questioned, interviewed or are submitting reports.**

---

DATE AND TIME OF INCIDENT:     July 5th, 2019

LOCATION OF INCIDENT:    1807 Fitzgerald St.

EXPLAIN IN DETAIL WHAT HAPPENED:     On July 5th, 2019 around 1400 hours Traivon

Feldman-Harris was arrested for his Armed Robbery warrant (CRN 190628036).

Feldman-Harris was brought to SPD Headquarters to be interviewed. I was off duty at the time

and was notified by detectives he was arrested.

I came in to talk to Feldman-Harris but he told me he did not want to speak with me, however,

he requested another detective by name, Detective Gates. At first I believed Detective Gates

had experience with Feldman-Harris before since he was assigned to the Gang Unit. I believed

Feldman-Harris was working with a group of people and they formed their own gang. I called

Detective Gates and I asked him to speak with Feldman-Harris. Detective Gates told me he was

familiar with the male.

Page__1__of__5__

SPD FORM 1046w (Revised 02/2018)

KANG 000263



*SavannahPD.org*

## EMPLOYEE STATEMENT

Detective Gates came to SPD Headquarters and I briefed him on the investigation. I told him Feldman-Harris was arrested for Armed Robbery and he was refusing to speak to me. I wanted Detective Gates to get Feldman-Harris to confess to the robbery as well as give up the getaway driver involved in the robbery. I also told Detective Gates that the robbery unit is currently securing Search Warrants for various residences that the suspect could be hiding evidence. We are trying to reduce Feldman-Harris' communication with anyone so his associates could not discard of any evidence, i.e. the firearm and the clothing the suspect was wearing.

Detective Gates told me he knew Feldman-Harris and his family. He knew them from when he lived in Miami. He told me Feldman-Harris' mother ("Boobie" as Detective Gates called her) lived at 1836 Fitzgerald St. and his brother, Javon Harris, was currently living in Jacksonville,FL I thought Javon Harris was the getaway driver in the robbery but Detective Gates' statement led me to believe differently since Javon was in Florida. I learned later Javon was actually living in Savannah with his mother at 1836 Fitzgerald St. He was pulled over by officers the same day Traivon Feldman-Harris was arrested.

Detective Gates went into the interview room with Feldman-Harris while I remained outside. A short time later, Detective Gates exited the room and told me that Feldman-Harris wanted to know what he was being charged with. I re-entered the room and attempted to interview Feldman-Harris again. I advised him of his charges and Feldman-Harris refused to confess.

Afterward, Detective Gates started questioning me about the evidence I have against Feldman-Harris. He even wanted to see the video from the Shell Gas Station. I felt apprehensive about the questions and I started to feel that Detective Gates was more friendly with Feldman-Harris than I initially thought. I refused to show him the video.

I asked the transporting officer to hold off on taking Feldman-Harris to CCDC so we could reduce his ability to make phone calls. I went to 1807 Fitzgerald St. to meet with Detective King and Detective Samuell who were actively executing a Search Warrant at 1807 Fitzgerald St.

Page __2__ of __5__

SPD FORM 1046w (Revised 02/2018)

KANG 000264



## SAVANNAH POLICE
To Serve, Protect and Build Trust

*SavannahPD.org*

## EMPLOYEE STATEMENT

Detective Samuell was working an Armed Robbery investigation that occurred at the Fairfield Inn (CRN 190704122). He acquired information that led him to believe Feldman-Harris was staying at 1807 Fitzgerald St. (rather than 1836 Fitzgerald St.) and there was contraband in the residence. When officers located Feldman-Harris, he was driving the suspect vehicle (gold Nissan Altima) that was associated with the Fairfield Inn robbery. The weapon involved in the robbery was also located in the vehicle. We later learned that Feldman-Harris lied about his address to lead the police to the wrong address.

While I was at the residence I spoke to the homeowner, Tamika Gaines. She told me she was aware of Feldman-Harris' criminal activity and she provided me details about various interactions she had with him. Gaines then told me she was upset that one of our detectives was talking to "Boobie" at 1836 Fitzgerald St. She overheard the conversation the detective and Boobie had about her house. She also heard Boobie telling the detective that they arrested her son. The detective was surprised and he told her he did not recognize her son at first. Boobie told the detective that her son shaved his hair. Feldman-Harris used to have long dreads. Although Gaines did not tell me a name, I believed she was referring to Detective Gates.

When I returned to my office to type up my report, I reviewed the video recording of the interview with Feldman-Harris. I gained concern about Detective Gates involvement with my investigation when I listened to his conversation with Feldman-Harris. Feldman-Harris told Detective Gates that I did not allow him to contact anyone. Detective Gates asked Feldman-Harris who he wanted to call. Feldman-Harris gave Detective Gates a contact to call. It seemed like Detective Gates was going to fulfill this request which upset because I told Detective Gates that I did not want Feldman-Harris making phone calls. At this time, I do not know if Detective Gates called anyone for Feldman-Harris.

Due to Detective Gates actions on Fitzgerald St., at Headquarters, and his familiarity with Feldman-Harris and his family, I was very concerned that he had or would compromise my investigation. I brought my concern to Sgt. Bevil.

Page __3__ of __5__

SPD FORM 1046w (Revised 02/2018)

KANG 000265



**SAVANNAH POLICE**
To Serve, Protect and Build Trust

*SavannahPD.org*

## EMPLOYEE STATEMENT

On July 18th, 2019 a Search Warrant was executed at 1836 Fitzgerald St. but detectives did not locate any evidence/contraband.

August 12th, 2019 I received Feldman-Harris CCDC jail calls. Some of the conversation on multiple calls consisted of Feldman-Harris asking his mother to talk to Detective Gates about his charge (Call title: P9_5033_87_20190707175520). Another phone call, Feldman-Harris told his mother he tried to talk to Detective Gates when arrested. Detective Gates talked to Vinnecia Harris (mom) and told her he did not recognize Feldman-Harris because he cut his hair. Detective Gates told Feldman-Harris the same thing during the interview (Call title: P9_5033_132_20190707183923). Another phone call, Feldman-Harris asked his mother if she spoke to Detective Gate yet. Vinnecia told him she has not. Feldman-Harris was also worried about the Search Warrant at 1807 Fitzgerald St. and he was worried about 1836 Fitzgerald St. Vinnecia stated she "took care of it" (Call title: P12_5033_114_20190709164008). Another phone call, Feldman-Harris asked his mother again if she talked to Detective Gates about getting his car out of impound (Call title: P17_5033_103_20190710210808). Another call, Feldman-Harris asked his mother if she talked to Detective Gates. Vinnecia told Feldman-Harris to stop talking over the phone about the investigation (Call title: P21_5033_31_20190710222557). Another call, Feldman-Harris told his mother to talk to Detective Gates about getting his keys back (Call title: P9_5033_106_20190720113727).

On August 14th, 2019 Tamika Gaines and her son, Brandon Leon, came to SPD Headquarters for an interview. During the interview, Gaines began talking about a "crooked" police officer. She claimed the officer was talking to Javon and Vinnecia the day the police arrested Feldman-Harris. Gaines knew the officer is from Miami. Gaines heard the officer talking to Vinnecia in a low voice as if to conceal their conversation. The officer told Vinnecia, "I did not know that was your son." Vinnecia responded, "Yeah, that is my son. He cut his hair." Gaines Was standing beside them and she heard their conversation. Gaines advised me that Feldman-Harris used to have long dreads. Gaines asked the officers conducting the Search Warrant at her house why the officer was talking to Vinnecia ("Boobie"). She complained that

Page __4__ of __5__

SPD FORM 1046w (Revised 02/2018)

KANG 000266



## EMPLOYEE STATEMENT

the officer was telling Vinnecia what was happening at her house. Gaines believed the officer

told Vinnecia to get rid of any evidence the police were looking for. Gaines believed Vinnecia

knew everytime Feldman-Harris or Javon were listed in a report because the officer would tell

Vinnecia about it. Gaines described the officer as a dark skin black male. The officer goes to

Vinnecia's residence regularly. The officer was always driving a brown Ford Crown Victoria. It

appeared to be a detective's car. He was wearing regular clothes with a baseball cap. Vinnecia

and the officer were having a conversation for three hours that day.

I notified Sgt. Bevil and Lt. Larry about the jail calls and the interview.

On August 22nd, 2019 around 1700 hours I heard Detective Gates hold out over the air on a

Signal 4 on Fitzgerald St. No address was given. A few minutes later, Detective Samuell

received a phone call from Tamika Gaines. According to Detective Samuell, Gaines was upset

and crying on the phone. She told Detective Samuell that Detective Gates came to her job

wearing a hoodie. He told Gaines she had better stop her drama with 1836 Fitzgerald St.

Gaines seemed frightened when she told Detective Samuell about the encounter.

Detective Samuell contacted Sgt. Hutcherson and asked him if he was aware Detective Gates

was on Fitzgerald St. Sgt. Hutcherson told Detective Samuell he was not aware of any

assignment at the location. Detective Samuell then contacted Lt. Larry.

**Signature of Employee**

**Date** 11/18/19

Page __5__ of __5__

SPD FORM 1046w (Revised 02/2018)

KANG 000267



# SAVANNAH POLICE
To Serve, Protect and Build Trust

*SavannahPD.org*

## EMPLOYEE STATEMENT

DATE:  11/22/19  TIME:  3:30 PM

NAME:  James King  ASSIGNMENT:  CID

---

**As directed by *General Order # ADM-004, Oath of Office, Ethics and Conduct*:**

**Section 1G – Cooperation:  Is essential to effective law enforcement.  Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation.**

**Section 1I – Truthfulness:  SPD employees will be truthful at all times whether under oath or not, unless otherwise necessary in the performance of a police task.  This will include, but not be limited to, instances when employees are being questioned, interviewed or are submitting reports.**

---

DATE AND TIME OF INCIDENT:  July 5, 2019 at approx. 5:30 PM

LOCATION OF INCIDENT:  1807 Fitzgerald Street

EXPLAIN IN DETAIL WHAT HAPPENED:  I on the listed date and time responded to 1807 Fitzgerald Street to stand by for the execution of a search warrant. While guarding the home, I spoke with Ms. Tamika Gaines, the mother of suspect Brandon Leon. She informed me of Travon Harris and his criminal acts. While on the subject, she mentioned that when Travon Harris got pulled over in the traffic stop that led to the search warrant "An officer call his mom (Travon's Mother) and told her what happened giving her the ups to do what?" I responded to "To ditch the evidence" and she responded "Yes." She then stated that the officer was telling Travon's mom everything that was happening at her address. She stated that "one of your Detectives were letting her know everything that was going down." I asked her which officer and she stated, "the black man." She did not know his name. She stated that the officer is mutual friends with the mother and called her as soon and Travon was stopped by police. This is the reason she got off work. I was unable to determine which officer she was referring to due to my

Page____of____

SPD FORM 1046w (Revised 02/2018)

KANG 000268



**SAVANNAH POLICE**
To Serve, Protect and Build Trust

SavannahPD.org

## EMPLOYEE STATEMENT

task of securing the home. This was recorded by my BWC.

Page _____ of _____

SPD FORM 1046w (Revised 02/2018)



**SavannahPD.org**

## EMPLOYEE STATEMENT

_James King___
**Signature of Employee**

_____11/22/19_____
**Date**

Page ____ of ____

SPD FORM 1046w (Revised 02/2018)

**KANG 000270**



# SAVANNAH POLICE

To Serve, Protect and Build Trust

*SavannahPD.org*

## EMPLOYEE STATEMENT

DATE: 11/22/19                    TIME: 1400

NAME: Kaishawn Samuell            ASSIGNMENT: CID / Robbery

---

**As directed by *General Order # ADM-004, Oath of Office, Ethics and Conduct*:**

**Section 1G – Cooperation: Is essential to effective law enforcement. Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation.**

**Section 1I – Truthfulness: SPD employees will be truthful at all times whether under oath or not, unless otherwise necessary in the performance of a police task. This will include, but not be limited to, instances when employees are being questioned, interviewed or are submitting reports.**

---

DATE AND TIME OF INCIDENT:    August 22nd, 2019, at approximately 1130 hours

LOCATION OF INCIDENT:    SPD HQ

EXPLAIN IN DETAIL WHAT HAPPENED:    On the above date and time, I received a phone call from Tamika Gaines. Ms. Gaines sounded excited and as if she was crying. She stated that a plain clothes officer, wearing a dark colored hoodie on his head was at her job. She stated that the officer identified himself as officer Gates. Ms. Gaines told me that the officer was questioning her about an ongoing situation that she was having with her neighbors at 1836 Fitzgerald Street. Ms. Gaines told me that she felt intimidated and scared. She told me that when she asked the officer if she needed to call me (she knew I was handling the investigation), that he told her not to call me and left the business. I immediately informed my Supervisor and the internal affairs unit of the situation. Ms. Gaines stated that it was the same officer that she had saw at 1836 Fitzgerald Street recently.

---

On July 5th, 2019, at approximately 1730 hours, during the execution of a search warrant at Ms.

Page__1__of__3__

SPD FORM 1046w (Revised 02/2018)

KANG 000271



**SAVANNAH POLICE**
To Serve, Protect and Build Trust

*SavannahPD.org*

## EMPLOYEE STATEMENT

Gaines's residence. Ms. Gaines informed Detective King, of the Robbery Unit, that there was a

black officer in plain clothes, at 1836 Fitzgerald Street. She stated that the officer was telling

the residents at 1836 Fitzgerald Street to get the guns out of the house.

--------------------------------------END OF STATEMENT--------------------------------------------------

Page _2_ of _3_

SPD FORM 1046w (Revised 02/2018)

KANG 000272



# SAVANNAH POLICE
To Serve, Protect and Build Trust
SavannahPD.org

## EMPLOYEE STATEMENT

_CPL Kaishawn Samuell_00360_
**Signature of Employee**

_____11/22/2019_____
**Date**

Page _3_ of_3_

SPD FORM 1046w (Revised 02/2018)

KANG 000273



SavannahPD.org

# SECTION 5

## Subject Officer's Prior Discipline History

## Subject Officer Statement(s)

## 7. Ofc. Adrian Gates (3-Audio-taped interviews)

**KANG 000274**



## Ptl Adrian J. Gates - Personal Info

| | | | |
|---|---|---|---|
| **Home Address :** | 1901 Kingstown Dr 105<br>Savannah, GA 31404 | | |
| **Assignment (Unit) :** | SPD/Police Chief/Criminal Investigations Division/SARIC | | |
| **Emergency Shift :** | | **Shift :** | A-shift |
| **Work Phone :** | 651-6560 | **Days Off :** | Tue, Wed |
| **Home Phone :** | None | **Cell Phone :** | 305-494-0073 |
| **Contact Phone :** | 305-785-1571 | **Pager :** | |
| **Contact Name :** | Rhonda Gates | **Relationship :** | Mother |
| **Comments :** | Emerg Address: 2020 NE 169th Street #111 - Miami, FL | | |
| **Last Name :** | Gates | **First Name :** | Adrian |
| **Middle Name :** | J. | **Surname (Jr, III) :** | |
| **Rank (lookup) :** | Ptl | **Title (Civilian) :** | |
| **Badge Number :** | 0 | **Sworn / Civilian :** | Sworn |
| **Street Number :** | 1901 | **Street Direction :** | |
| **Street Name :** | Kingstown | **Street Type :** | Dr |
| **Apt Number :** | 105 | **City :** | Savannah |
| **State (lookup) :** | GA | **ZIP :** | 31404 |
| **Payroll Number :** | 63099 | **Activity :** | 4210 |
| **Social Security :** | -- | **Birth Date :** | 10/27/1986 |
| **Operator License # :** | G320-010-86-387-0 | **Employ Date :** | 12/26/2016 |
| **Licensing State :** | FL | **Term Status :** | |
| **License Expires :** | 10/27/2019 | **Term Date :** | |
| **Eye Color :** | BRO | **Hair Color :** | BLK |
| **Race :** | Black | **Sex :** | Male |
| **Height :** | 5'9" | **Weight :** | 185 |
| **Degree Earned :** | | **College Hours :** | |
| **Image Date :** | 01/04/2017 | | |
| **Photograph :**<br>(rich text field) | A GATES 63099.jpg | | |

KANG 000275



SavannahPD.org

## Lieutenant David Barefield, Commander
## Internal Affairs

Prior Discipline:

### Officer Adrian Gates

**Date**                **Violation**                **Discipline**

# (None)

1

**KANG 000276**



SavannahPD.org

# NOTIFICATION OF GENERAL ORDER # OPS-16:
# OFFICE OF PROFESSIONAL STANDARDS

You have been notified that an administrative investigation is being conducted to determine if you actions constitute a violation of Department Policy and/or Procedures. Pursuant to General Order # OPS-016: Office of Professional Standards, you are hereby notified that under sections:

## V. INVESTIGATION PROCEDURES
H.   All complaint investigations will be completed, regardless if the employee retires or resigns prior to the conclusion of the investigation.

1.   When an employee retires or resigns prior to the conclusion of the investigative findings, the employee's separation status will reflect either:

a.   Retired – Pending IA Investigation

b.   Resigned – Pending IA Investigation

## VII. DISPOSITION
C.   Investigative findings for those employees that have since retired or resigned will be forwarded to the Chief of Police or designee. Depending upon the final disposition of the investigation the Chief of Police or designee will change the former employee's separation status accordingly.

D.   Upon conclusion of the investigation, the involved employee(s) will receive, in writing, notification of the results of the investigation.

1.   This will also include those employees that have retired or are no longer employed with the Savannah-Chatham Metropolitan Police Dept.

a.   This notification will be done by certified mail and with a return receipt.

**I have read and understand the above information.**

SIGNATURE: _Al. Llot_   DATE: _8/23/19_   TIME: _9:30_

WITNESS: _____   DATE: _____   TIME: _____

_Al. Llot_   _8/23/19_   _3:34_

SCMPD Form # 2016w 7/14

KANG 000277



**SAVANNAH POLICE**

To Serve, Protect and Build Trust

*SavannahPD.org*

## NOTIFICATION OF ADMINISTRATIVE INVESTIGATION

TO: Adrian Gates

FROM: Sgt. R. Larry III

DATE/TIME: 8-23-19 0930hours

RE: OPS # 19-0384

You are hereby notified that an administrative investigation is being conducted to determine if your actions in the incident outlined below constitute a violation of Department Policy and/or Procedures.

COMPLAINANT'S NAME: Internal

LOCATION OF INCIDENT:

DATE OF INCIDENT: Various

ALLEGATION(S): Conduct

## GARRITY WARNING

You are being questioned as part of an official administrative investigation by the Savannah Police Department. You will be asked questions specifically, directly, and narrowly related to the performance of your official duties or fitness for duty. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of this State and the Constitution of the United States, including the right not to be compelled to incriminate yourself. If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental discipline that could result in the termination of your employment. If you do answer questions, neither your statements nor any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceedings regarding the matter being investigated. However, if you provide false or misleading statements or information in this investigation, such evidence may be used against you in any subsequent criminal proceeding. All statements may be used against you in relation to any subsequent disciplinary action.

**I have read and understand the information above. My statement is being given pursuant to a Departmental administrative investigation.**

SIGNATURE: _____  DATE: 8/23/19  TIME: 9:50

WITNESS: _____  DATE: _____  TIME: _____

8/23/19    3:34

SCMPD FORM 1045w (06/01/07) CALEA 52.1.6

KANG 000278



**SAVANNAH POLICE**
To Serve, Protect and Build Trust

*SavannahPD.org*

# NOTIFICATION OF GENERAL ORDER # OPS-16:
# OFFICE OF PROFESSIONAL STANDARDS

You have been notified that an administrative investigation is being conducted to determine if you actions constitute a violation of Department Policy and/or Procedures. Pursuant to General Order # OPS-016: Office of Professional Standards, you are hereby notified that under sections:

## V. INVESTIGATION PROCEDURES

H. All complaint investigations will be completed, regardless if the employee retires or resigns prior to the conclusion of the investigation.

1. When an employee retires or resigns prior to the conclusion of the investigative findings, the employee's separation status will reflect either:

a. Retired – Pending IA Investigation

b. Resigned – Pending IA Investigation

## VII. DISPOSITION

C. Investigative findings for those employees that have since retired or resigned will be forwarded to the Chief of Police or designee. Depending upon the final disposition of the investigation the Chief of Police or designee will change the former employee's separation status accordingly.

D. Upon conclusion of the investigation, the involved employee(s) will receive, in writing, notification of the results of the investigation.

1. This will also include those employees that have retired or are no longer employed with the Savannah-Chatham Metropolitan Police Dept.

a. This notification will be done by certified mail and with a return receipt.

**I have read and understand the above information.**

SIGNATURE: _____  DATE: _12/2/19_  TIME: _11:25_

WITNESS: _____  DATE: _____  TIME: _____

SCMPD Form # 2016w 7/14

KANG 000279



# SAVANNAH POLICE
To Serve, Protect and Build Trust

*SavannahPD.org* 

## NOTIFICATION OF ADMINISTRATIVE INVESTIGATION

TO: _Officer Adrian Gates_

FROM: _Lt R. Larry_

DATE/TIME: _12-19    1121_

RE: _19 - 0384_

---

You are hereby notified that an administrative investigation is being conducted to determine if your actions in the incident outlined below constitute a violation of Department Policy and/or Procedures.

COMPLAINANT'S NAME: _Internal_

LOCATION OF INCIDENT: _Various_

DATE OF INCIDENT: _2-5-19_

ALLEGATION(S): _Conduct_

---

## GARRITY WARNING

You are being questioned as part of an official administrative investigation by the Savannah-Chatham Metropolitan Police Department. You will be asked questions specifically, directly, and narrowly related to the performance of your official duties or fitness for duty. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of this State and the Constitution of the United States, including the right not to be compelled to incriminate yourself. If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental discipline that could result in the termination of your employment. If you do answer questions, neither your statements nor any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceedings regarding the matter being investigated. However, if you provide false or misleading statements or information in this investigation, such evidence may be used against you in any subsequent criminal proceeding. All statements may be used against you in relation to any subsequent disciplinary action.

**I have read and understand the information above. My statement is being given pursuant to a Departmental administrative investigation.**

SIGNATURE: _____  DATE: _12/2/19_  TIME: _1:24 AM_

WITNESS: _____  DATE: _____  TIME: _____

SCMPD FORM 1045w (06/01/07) CALEA 52.1.6

**KANG 000280**



*SavannahPD.org*

# SECTION 6

## Official Documents

8. **Screen Shot Photos of text exchanges between Officer Gates and Ms. Vennecia Harris**

9. **Related Text and Email Correspondence**

10. **Jail Recordings/Jail Call Details**

11. **Javon Harris Phoenix info sheet**

12. **Photos of X-Stream Urine Box/ Photo of location found**



11:04

← BH **Boobie Harris**

**7/6/19 7:40 PM**

BH Bra this Boobie when you get a
chance slide up on me

**7/8/19 11:18 AM**

BH What's up bra have you heard
anything else bout trai

**7/8/19 2:14 PM**

BH Bra is it possible for them to
charge him with that stuff they got
out that house

**7/10/19 3:26 PM**

BH Ya boy to go to jail

**7/26/19 12:05 AM**

U home?

**7/26/19 12:06 AM**

BH Yes

**7/26/19 12:06 AM**

Javon there?

**KANG 000282**



11:04              73%

← (BH) **Boobie Harris**

U home?

7/26/19 12:06 AM

BH    Yes

7/26/19 12:06 AM

Javon there?

7/26/19 12:07 AM

BH    He was

7/26/19 12:07 AM

This nigga

7/26/19 12:07 AM

BH    On his way now

7/26/19 12:08 AM

Ok

7/26/19 12:08 AM

BH    You bout to slide through

7/26/19 12:10 AM

I been sittin in front of ya crib for a

KANG 000283



← (BH) **Boobie Harris**

7/26/19 12:10 AM

I been sittin in front of ya crib for a minute now... I'm on the phone

7/26/19 12:10 AM

BH   Ok

7/26/19 12:29 AM

BH   Traivon Feldman-Harris
     10-14-1999

8/9/19 3:31 AM

BH   Call me when you get this message

8/13/19 2:10 PM

BH   Slide threw when u can

8/15/19 6:28 PM

U home?

8/15/19 6:29 PM

BH   No oaks of branlewoods

8/15/19 6:29 PM

Ok let me know when u get home

KANG 000284





8/15/19 6:37 PM

BH  By the house

8/15/19 6:37 PM

I'm in this parking lot at Wells Fargo

8/15/19 6:38 PM

BH  Ok bout to turn in now

8/15/19 6:40 PM

BH  You in the impala

8/15/19 6:40 PM

Yep

8/15/19 6:40 PM

Can I get in

8/15/19 6:41 PM

Yea

8/15/19 6:41 PM

Come over here

KANG 000286





← (BH) **Boobie Harris**

8/15/19 9:23 PM

U knew ALL this time and ain't said SHIT

8/15/19 9:23 PM

**BH** Ayyyeeee I knew you will find out some how

8/15/19 9:56 PM

**BH** I know somebody was gonna bite that chocolate

8/15/19 9:58 PM

She probably playin too 👀

8/15/19 10:00 PM

**BH** We will see

8/15/19 11:09 PM

**BH** Who yo daddy

8/15/19 11:12 PM

What

KANG 000288



**8/15/19 11:13 PM**

*I was minding the wrong business n bam saw some shit that made my head spin*

**8/18/19 12:55 AM**

http://savannahpd.org/spd-detectives-seek-suspect-in-financial-card-transaction-fraud/

**8/18/19 1:03 AM**

Smh

**8/18/19 1:04 AM**

Crazy

**8/22/19 7:38 PM**

Call me

**8/22/19 7:49 PM**

KANG 000289



KANG 000290



savannahpd.org/spd-detective

# SAVANNAH POLICE

<. Previous    Next >

SPD Detectives Seek Suspect In Financial
Card Transaction Fraud

SAVANNAH, GA (August 8, 2019) –
Southside Precinct detectives are seeking
to identify a subject caught on
surveillance footage using a stolen credit
card.

The black male subject was seen using
the credit card at the Enmarket, 4202
Montgomery Street July 25. He then
immediately attempted to use the card
again at Circle K, 4315 Ogeechee Road.
The card had previously been reported
stolen from a vehicle at a residence on
White Bluff Road.

**KANG 000291**



11:16

the credit card at the Enmarket, 4202 Montgomery Street July 25. He then immediately attempted to use the card again at Circle K, 4315 Ogeechee Road. The card had previously been reported stolen from a vehicle at a residence on White Bluff Road.

The suspect was wearing dark pants, black shoes and no shirt when the incident occurred. He was traveling in a Nissan Altima.

Anyone with information on the incident is asked to contact Southside Precinct detectives at (912) 351-3403. Information can also be forwarded to CrimeStoppers at (912) 234-2020. Tipsters remain anonymous and may qualify for a cash reward.

KANG 000292



11:16

the credit card at the Enmarket, 4202 Montgomery Street July 25. He then immediately attempted to use the card again at Circle K, 4315 Ogeechee Road. The card had previously been reported stolen from a vehicle at a residence on White Bluff Road.

The suspect was wearing dark pants, black shoes and no shirt when the incident occurred. He was traveling in a Nissan Altima.

Anyone with information on the incident is asked to contact Southside Precinct detectives at (912) 351-3403. Information can also be forwarded to CrimeStoppers at (912) 234-2020. Tipsters remain anonymous and may qualify for a cash reward.



asked to c—
detectives at (912) 351-3403. —
can also be forwarded to CrimeStoppers
at (912) 234-2020. Tipsters remain
anonymous and may qualify for a cash
reward.

KANG 000294

## ert Larry

| | |
|---|---|
| From: | Sean Sueaquan |
| Sent: | Friday, July 19, 2019 12:41 AM |
| To: | Robert Larry |
| Cc: | Alexander Tobar; David Barefield |
| Subject: | Jail Calls 1 of 2 |
| Attachments: | P9_5033_87_20190707175520.wav; P9_5033_132_20190707183923.wav; P12_5033_114_ 20190709164008.wav; P17_5033_103_20190710210808.wav |

Attached are 4 of 5 pertinent calls made by

**NAME:** FELDMAN-HARRIS, TRAIVON TOREK (P1907090)
**PARTY ID:** 4843035
**WRNTS:**
**DOB:** 10/14/1999
**SSN:** [Click for SSN]
**RACE/SEX:** B/M
**FBI #:**
**STATE #:**
**BOOKED.:** 07/05/2019
**CELL:** 9D



### Arrests and Charges

| Date | Number | Agency | Time | CRN | Details |
|---|---|---|---|---|---|
| 7/5/2019 | AR19070231 OTN - 8841824942 | SAVANNAH PD | 14:00 | 190628036 | A & B |
| 07/05/2019 | 16-8-41 ARMED ROBBERY | | REC | | |
| 07/11/2019 | 16-9-35 RECEIPT OF GOODS & SERVICE FRAUDULENTLY | | REC | | |
| 07/11/2019 | 16-9-33 FIN TRANS CARD FRAUD | | REC | | |

The 5th file was too big so I will send in another email [Jail Calls 2 of 2]

1

KANG 000295

**Robert Larry**

| | |
|---|---|
| **om:** | Sean Sueaquan |
| **Sent:** | Friday, July 19, 2019 9:54 AM |
| **To:** | Robert Larry |
| **Subject:** | Re: Jail Calls 1 of 2 |

Will do...I go in at 5:30

On Jul 19, 2019, at 9:34 AM, Robert Larry <RLarry@savannahga.gov> wrote:

Good Morning,

Can you provide me with all phone numbers associated with this individual and his circle including his mom. Any addresses you have as well so his AVL can be checked

Thanks,
You can call me at 9126678763 if you need to talk to me.

**From:** Sean Sueaquan
**Sent:** Friday, July 19, 2019 12:41 AM
**To:** Robert Larry <RLarry@Savannahga.Gov>
**Cc:** Alexander Tobar <ATobar@Savannahga.Gov>; David Barefield <DBarefield@Savannahga.Gov>
**Subject:** Jail Calls 1 of 2

Attached are 4 of 5 pertinent calls made by

<image001.jpg>

The 5th file was too big so I will send in another email [Jail Calls 2 of 2]

<image002.png>

1

**KANG 000296**

## Robert Larry

| | |
|---|---|
| **From:** | Sean Sueaquan |
| **Sent:** | Friday, July 19, 2019 12:41 AM |
| **To:** | Robert Larry |
| **Cc:** | David Barefield; Alexander Tobar |
| **Subject:** | Jail Calls 2 of 2 |
| **Attachments:** | P21_5033_31_20190710222557.wav |

Here is the 5th call

KANG 000297

## Robert Larry

| | |
|---|---|
| ‑om: | Marcus Henderson |
| ‑ent: | Tuesday, August 13, 2019 2:53 PM |
| To: | David Barefield; Robert Larry |
| Subject: | Traivon Feldman-Harris jail communication data |

Good afternoon,

I have attached my notes from the calls I have listened to so far. I apologize of grammar/spelling errors. Call notes in Bold font reference Officer Gates. When reviewing the audio, you will hear the following names:

Buddah = Javon Harris (Traivon's brother)
Sandra Harris (Traivon's grandmother)
Krystal Singleton (Traivon's wife)
Vinnecia Harris (Traivon's mother)

- **P9_5033_87_20190707175520 called 305-300-1985 (Vinnecia Harris)**
  - ○ **Traivon called Vinnecia and Javon. Traivon believed his "Army recruiter (Sgt. Oliver)" is going to "snatch" him out of the jail. Traivon got into a fight with someone over a Peanut Butter and Jelly sandwich. Traivon stated the Nissan Altima is his car. Jakia's phone was in the car. Traivon asked his family to holler at Gates. Traivon started talking about how the streets "Blitzed" Brandon's crib but the call timer was expiring.**
- **P9_5033_132_20190707183923 called 305-713-8037 (Krystal Singleton)**
  - ○ **Krystal is Traivon's wife. Seems like they have been through some problems. Traivon admits he is at fault for his arrest. Called out Gates name to the officers while he was resisting arrest with police. Gates spoke with Vinnecia and he told her he did not recognize Traivon at first because he cut his hair. Gates told Traivon the same thing when they were in the interview room together. He stated he did not run from the police because Jakia and Brandon were in the car. Traivon stated he would have "did them folks and kill them" if he wasn't with Jakia and Brandon.**
- P12_5033_114_20190708094825 called Vinnecia Harris
  - ○ Traivon told the Public Defender that he was in Miami around the time of the robbery where he took his brothers and cousins.
- **P12_5033_114_20190709164008 called Vinnecia Harris**
  - ○ **Port Wentworth tried to talk to Traivon but he requested a lawyer present. He stated he believed the detective wanted to talk to him about "them cards". Talked about the property/search warrant at Brandon's house and Vinnecia stated she "took care of it". Traivon asked what Gates told her. Vinnecia stated she hasn't talk to Gates yet. Grandma Sandra was put on the phone. Vinnecia and Traivon think Brandon is accusing him of crimes so Brandon could clear his name. Vinnecia stated the police did not have any evidence. Traivon stated that he was worried about the Cash App evidence and Vinnecia stated the charge could be dropped down to a theft.**
- P3_5033_56_20190710183355 called Vinnecia Harris
  - ○ Nothing important
- **P17_5033_103_20190710210808 called Vinnecia Harris**
  - ○ **Traivon threatened to kill people in the jail because they are harassing him. Traivon wanted his car from the impound. Traivon asked Javon if they "hollered" at Gates yet. Javon's response was inaudible. Traivon claimed he did not know who was talking but when he gets out he will "knock him" (possibly referencing to hurting or killing the person).**

1

KANG 000298



**SAVANNAH POLICE**
To Serve, Protect and Build Trust

*SavannahPD.org*

| | |
|---|---|
| To: | Robert Larry, Lieutenant |
| From: | Sean Sueaquan, Corporal |
| Reference: | Adrian Gates' investigation into "Jefe" Gang |
| Date: | Monday August 25, 2019 |

On or about June 11, 2019, Detective [DET] Andrew Wynn uncovered information about Rondall NEWSOME, who was listed as a suspect of a shooting/home invasion that was documented under 190610121.

More specifically, DET Wynn linked NEWSOME to Instagram account - https://www.instagram.com/jefemafia2x/ and provided this and other information, via email, to other members, of the "Gang Unit" to include DET Adrian Gates. ~ Attachment Page 2 Attachment

*NOTE: At the time [June 2019], DET Gates had been with the Gang Unit for approximately three or four months and had not been assigned a specific "Group" and or "Gang".*

As the Acting Supervisor of the Gang Unit, I replied to DET Wynn's email [Reply to All] and asked DET Gates to *"starting looking into Jefe Gang"* ~ Attachment Page 1

Approximately forty-three [43] minutes later – June 12, 2019 at 12:25 P.M., DET Gates replied to my email explaining he had never been trained and asked for guidance. ~ Attachment Page 1

At 12:40 P.M., I forwarded/replied to DET Gates response to other members of the Gang Unit, to include DET Tiffany Fraser, with "*Tiffany when you get back can you help Gates with Jefe Gang".* ~ Attachment Page 1
*NOTE: DET Tiffany Fraser, a seasoned Gang Detective, was off on June 12, and was scheduled to return on June 13, 2019. It should also be noted that at 11:51 A.M., approximately thirty-four [34] minutes before DET Gates' initial response, DET Brian Smith directed DET*

P.O. Box 8032 • Savannah, Georgia 31412 • 912-652-6500 • Fax 912-651-3645 • www.savannahpd.org

KANG 000299

*Gates to "CRN 180607040", and explained it may have some useful information in regards to Jefe (2x)".* ~ Attachment Page 4

TEXT MESSAGE THREAD

During a conversation with Lt. Larry on August 23, 2019, I was asked if, in the past, DET Gates communicated to me that when DET Gates was in the Liberty City area. I explained that all members of the Gang Unit utilize a specific "group - message thread", which, in addition to sharing information, is also used for "accountability".

The following, are the dates and times [if available] where DET Gates posted in the "message thread" that he would be in "Liberty City" area:

*NOTE: Between June 12, 2019 [the date DET Gates was assigned to investigate "Jefe gang"] and June 25, DET Gates makes no mentioned in the "message thread" that he will be in the Liberty City area*

| June 25, 12:58 AM | *"Dressing down tomorrow evening.  Gonna go check out some Jefe guys"* |
| | ~ Attachment Page 7 |
| July 5, 2:11 PM | *"FYI: Lt. Garvin wants us at 1801 Fritzerald SWIFT unit is locking down* |
| | *the house"… "Don't go ON Fitzgerald get in the area"* |
| | ~ Attachment Page 12 |
| July 24, 2:54 PM | *"I'll be out in Liberty City again this evening"* ~ Attachment Page 14 |
| July 30 | *"In Liberty City"* ~ Attachment Page 15 |
| August 14, 4:10 PM | *"Gonna be in Liberty City this evening"* – Attachment Page 17 |

*NOTE: Evidently the "setting" on my cellphone are configured to delete "messages" after an unknown date and I was unable to access any messages prior July 24, 2019.  I commandeered another Detectives phone and able to extract the messages described above for his memo.*

Attachment

KANG 000300

## Sean Sueaquan

| | |
|---|---|
| **From:** | SSueaquan@Savannahga.Gov |
| **Sent:** | Wednesday, June 12, 2019 12:40 PM |
| **To:** | AGates@Savannahga.Gov; AWynn@Savannahga.Gov; BSmith02@Savannahga.Gov; BHoller@Savannahga.Gov; DNewman@Savannahga.Gov; DSquicciarini@Savannahga.Gov; JHesting@Savannahga.Gov; nmelke@Savannahga.Gov; SSueaquan@Savannahga.Gov; TFraser@Savannahga.Gov |
| **Subject:** | RE: information |

Tiffany when you get back can you help Gates with "Jefe" gang

**From:** Adrian Gates
**Sent:** Wednesday, June 12, 2019 12:25 PM
**To:** Sean Sueaquan <SSueaquan@Savannahga.Gov>
**Subject:** Re: information

*GATES RESPONSE TO RB'S ASSIGNMENT JEFE GANG*

Sueaquan,

I've never been given a GANG/GROUP to investigate, nor have I been trained on how to do so. Can you advise me on the steps to take in doing said investigation.

-------- Original message --------
From: Sean Sueaquan <SSueaquan@Savannahga.Gov>
Date: 6/12/19 11:41 AM (GMT-05:00)
To: Adrian Gates <AGates@Savannahga.Gov>, Andrew Wynn <AWynn@Savannahga.Gov>, Brian Smith02 <BSmith02@Savannahga.Gov>, Bryan Holler <BHoller@Savannahga.Gov>, Daniel Newman <DNewman@Savannahga.Gov>, Danny Squicciarini <DSquicciarini@Savannahga.Gov>, Jacob Hesting <JHesting@Savannahga.Gov>, Nicholas Melke <nmelke@Savannahga.Gov>, Sean Sueaquan <SSueaquan@Savannahga.Gov>, Tiffany Fraser <TFraser@Savannahga.Gov>
Subject: FW: information

Gates can you starting looking into this Jefe gang        ← *GATES IS ASSIGNED TO INVESTIGATE JEFE GANG*

I just made a folder in the share drive....if any else comes across stuff...pictures etc. can you put it in here
Reminder please tag/name any pictures you save like this [example]

**Dorian HEYWARD** is the person linked to the IG account
**20190201** is the date this picture/screen capture was posted [48m prior to this picture being screen captured]
**IG gutta jitt** is the Instagram account
**Keep this 40 stapped to my hip** is extra...you can put whatever you want here

KANG 000301



ORIGINAL EMAIL
FROM DET WYNN
TO THE GANG UNIT.

Thanks

---

**From:** Andrew Wynn
**Sent:** Wednesday, June 12, 2019 12:55 AM
**To:** Sean Sueaquan <SSueaquan@Savannahga.Gov>; Tiffany Fraser <TFraser@Savannahga.Gov>; Danny Squicciarini <DSquicciarini@Savannahga.Gov>; Jacob Hesting <JHesting@Savannahga.Gov>; Adrian Gates <AGates@Savannahga.Gov>; Andrew Wynn <AWynn@Savannahga.Gov>; Nicholas Melke <nmelke@Savannahga.Gov>; Daniel Newman <DNewman@Savannahga.Gov>; Brian Smith02 <BSmith02@Savannahga.Gov>; Bryan Holler <BHoller@Savannahga.Gov>
**Subject:** information

In reference to last night shooting (06/10/19) I started to look into one of the suspect Rondall Newsome. While looking on Instagram I came also this page @officaljefenine (jefemafia2x) as I continue to look through the page I saw a pictures of Mr. Rondall Newsome. Mr. Rondall posted on his Instagram story at 2:45 am (06/11/19) "Done let a nigga shoot me" I first heard about Jefe gang during the fall of 2018 when an incident occurred with Kawan Williams who is a suspected member of Jefa gang. After that incident I didn't hear anything else about Jefe gang until these past shooting

in Liberty City.  From looking at Mr. Rondall Newsome Instagram page he has several pictures with Kawan Williams and Shavari Williams (Papa) who is also a suspected member of Jefa gang. I just felt like we should keep a lookout for Mr. Rondall Newsome and Jefe

His Instagram @officaljefenine

3

KANG 000303

**Robert Larry**

| | |
|---|---|
| **From:** | ATobar@Savannahga.Gov |
| **Sent:** | Friday, July 12, 2019 4:49 PM |
| **To:** | RBevil@Savannahga.Gov |
| **Cc:** | DBarefield@Savannahga.Gov; RLarry@Savannahga.Gov |
| **Subject:** | Re: case information |

Thank you for your email and Det. Henderson will be contacted.

Sent from my iPhone

On Jul 12, 2019, at 3:43 PM, Ryan Bevil <RBevil@savannahga.gov> wrote:

Sir,

This e-mail is in reference to Ofc. Andrian Gates of the Gang Unit. On 7-12-19 Det. Marcus Henderson advised me that he needed to speak to me in private about an issue. He stated that he was on a call on Fitzgerald Street while I was out on FMLA. During that call Ofc. Gates showed up to the scene from the Gang Unit to assist in the investigation. The target location where Det. Henderson was located was being searched. During that time Ofc. Gates went to another hose not involved in the incident as of yet, and revealed the details of that case to the occupants of that residence. Det. Henderson found out this information through subsequent interviews. Also, during that same day of the search a person was arrested and interviewed. The suspect was advised that he could not use the phone, and that was relayed to Ofc. Gates. While in the interview (recorded) the suspect advised Ofc. Gates that he was not allowed to call anyone. At that time Ofc. Gates told the suspect what's the number you want me to call?

This is a brief synopsis of the events without any clear detail, because during the time of the incident I was out of work. In speaking with Det. Henderson, I asked was Ofc. Gates revealing information knowingly, maliciously, or did lack the proper training or experience? Det. Henderson advised that he did not know, but there was too may inconsistencies that rose his suspicion of a dirty cop. Det. Henderson just wanted to notify his chain of command and as an advisory to the unit.

After our conversation concluded I saw Cpl. Seuquan (the acting supervisor of the Gang Unit) and inquired about this issue to see if he had some insight on the issue. He advised that in the past other issues have arisen and was reported to the proper channels. Also, Cpl Seuquan was called by Captain Tobar and asked some specific information about Ofc. Gates. So, he assumed that IA was looking into the issue.

Once my conversation concluded I contacted Sgt. Larry of IA and advised him of the advents listed above. He advised that he could not find any open cases for Ofc. Gates, however to send the recipients of this e-mail this message.

Again, I do not have any personal knowledge of the incident. The purpose of the communication is if there is an active investigation on Ofc. Gates Det. Henderson should be contacted for a statement that may add or disprove any suspicion if that is the case.

If you need any further contact or information from me please call me on any of my three numbers listed below.

1

KANG 000304

## Sean Sueaquan

| | |
|---|---|
| From: | SSueaquan@Savannahga.Gov |
| Sent: | Wednesday, June 12, 2019 5:15 PM |
| To: | BSmith02@Savannahga.Gov; AGates@Savannahga.Gov; AWynn@Savannahga.Gov; BHoller@Savannahga.Gov; DNewman@Savannahga.Gov; DSquicciarini@Savannahga.Gov; JHesting@Savannahga.Gov; nmelke@Savannahga.Gov; TFraser@Savannahga.Gov |
| Subject: | RE: information |

I concur, Smith's 40 page report 180607040_003 does have useful information.
However comma some would argue that you will need Rand McNally's to help to decipher it.

Smith, when you get back, can you draft an **Executive** Summary of said report. In other words in bullet format by each Gang

**From:** Brian Smith02
**Sent:** Wednesday, June 12, 2019 11:51 AM
**To:** Sean Sueaquan <SSueaquan@Savannahga.Gov>; Adrian Gates <AGates@Savannahga.Gov>; Andrew Wynn <AWynn@Savannahga.Gov>; Bryan Holler <BHoller@Savannahga.Gov>; Daniel Newman <DNewman@Savannahga.Gov>; Danny Squicciarini <DSquicciarini@Savannahga.Gov>; Jacob Hesting <JHesting@Savannahga.Gov>; Nicholas Melke <nmelke@Savannahga.Gov>; Tiffany Fraser <TFraser@Savannahga.Gov>
**Subject:** RE: information

ates, CRN **180607040** may have some useful information in regards to **Jefe** (2x).

**From:** Sean Sueaquan
**Sent:** Wednesday, June 12, 2019 11:42 AM
**To:** Adrian Gates <AGates@Savannahga.Gov>; Andrew Wynn <AWynn@Savannahga.Gov>; Brian Smith02 <BSmith02@Savannahga.Gov>; Bryan Holler <BHoller@Savannahga.Gov>; Daniel Newman <DNewman@Savannahga.Gov>; Danny Squicciarini <DSquicciarini@Savannahga.Gov>; Jacob Hesting <JHesting@Savannahga.Gov>; Nicholas Melke <nmelke@Savannahga.Gov>; Sean Sueaquan <SSueaquan@Savannahga.Gov>; Tiffany Fraser <TFraser@Savannahga.Gov>
**Subject:** FW: information

Gates can you starting looking into this Jefe gang

I just made a folder in the share drive....if any else comes across stuff...pictures etc. can you put it in here
Reminder please tag/name any pictures you save like this [example]

**Dorian HEYWARD** is the person linked to the IG account
**20190201** is the date this picture/screen capture was posted [48m prior to this picture being screen captured]
**IG gutta jitt** is the Instagram account
**Keep this 40 stapped to my hip** is extra...you can put whatever you want here

KANG 000305



Thanks

**From:** Andrew Wynn
**Sent:** Wednesday, June 12, 2019 12:55 AM
**To:** Sean Sueaquan <SSueaquan@Savannahga.Gov>; Tiffany Fraser <TFraser@Savannahga.Gov>; Danny Squicciarini <DSquicciarini@Savannahga.Gov>; Jacob Hesting <JHesting@Savannahga.Gov>; Adrian Gates <AGates@Savannahga.Gov>; Andrew Wynn <AWynn@Savannahga.Gov>; Nicholas Melke <nmelke@Savannahga.Gov>; Daniel Newman <DNewman@Savannahga.Gov>; Brian Smith02 <BSmith02@Savannahga.Gov>; Bryan Holler <BHoller@Savannahga.Gov>
**Subject:** information

In reference to last night shooting (06/10/19) I started to look into one of the suspect Rondall Newsome. While looking on Instagram I came also this page @officaljefenine (jefemafia2x) as I continue to look through the page I saw a pictures of Mr. Rondall Newsome. Mr. Rondall posted on his Instagram story at 2:45 am (06/11/19) "Done let a nigga shoot me" I first heard about Jefe gang during the fall of 2018 when an incident occurred with Kawan Williams who is a

suspected member of Jefa gang. After that incident I didn't hear anything else about Jefe gang until these past shooting in Liberty City.  From looking at Mr. Rondall Newsome Instagram page he has several pictures with Kawan Williams and Shavari Williams (Papa) who is also a suspected member of Jefa gang. I just felt like we should keep a lookout for Mr. ondall Newsome and Jefe

His Instagram @officaljefenine

KANG 000307



KANG 000308





KANG 000310



KANG 000311



KANG 000312



KANG 000313



KANG 000314



KANG 000315



KANG 000316



Melke's car has been towed

Tue, Aug 6, 8:06 PM

+1 (912) 210-8036

Going straight to 10am open range tomorrow

Sean Sueaquan

Wynn and I will be at the SIS presentation at 10

For those of us who need to qualify please try and go tomorrow

According to Paige's email these are the times for tomorrow:

8am
10am
1pm



KANG 000318



KANG 000319

## Robert Larry

**From:**       David Barefield
**Sent:**       Friday, October 18, 2019 3:19 PM
**To:**         Robert Larry
**Cc:**         Alexander Tobar
**Subject:**    Gates

Lt. Larry,

We are being asked for the Gates' file. Have you been able to access the files or is there anything that I can do to help assist with getting you the files?



**Lieutenant David Barefield**
**Savannah Police Department**
**Office of Professional Standards**
**Office (912) 691-6237 Cell (912) 677-0440**
**dbarefield@savannahga.gov**
**SavannahPD.org** | **Facebook** | **Twitter**

1

**KANG 000320**

**Robert Larry**

**From:** David Barefield
**Sent:** Tuesday, October 29, 2019 1:48 PM
**To:** Robert Larry
**Subject:** FW: Jail Calls 1 of 2
**Attachments:** P9_5033_87_20190707175520.wav; P9_5033_132_20190707183923.wav; P12_5033_114_20190709164008.wav; P17_5033_103_20190710210808.wav



**Lieutenant David Barefield**
**Savannah Police Department**
**Office of Professional Standards**
**Office (912) 691-6237 Cell (912) 677-0440**
**dbarefield@savannahga.gov**
**SavannahPD.org | Facebook | Twitter**

**From:** Sean Sueaquan
**Sent:** Friday, July 19, 2019 12:41 AM
**To:** Robert Larry <RLarry@Savannahga.Gov>
**Cc:** Alexander Tobar <ATobar@Savannahga.Gov>; David Barefield <DBarefield@Savannahga.Gov>
**Subject:** Jail Calls 1 of 2

Attached are 4 of 5 pertinent calls made by

**NAME:** FELDMAN-HARRIS, TRAIVON TOREK **(P1907090)**
**PARTY ID:** 4843035
**WRNTS:**
**DOB:** 10/14/1999
**SSN:** Click for SSN
**RACE/SEX:** B/M
**FBI #:**
**STATE #:**
**BOOKED.:** 07/05/2019
**CELL:** 9D

**▼ Arrests and Charges**

| Date | Number | Agency | Time | CRN | Details |
|------|--------|--------|------|-----|---------|
| 7/5/2019 | AR19070231 OTN - 88418249942 | SAVANNAH PD | 14:00 | 190628036 | A & B |
| 07/05/2019 | 16-8-41 ARMED ROBBERY | | REC | | |
| 07/11/2019 | 16-9-35 RECEIPT OF GOODS & SERVICE FRAUDULENTLY | | REC | | |
| 07/11/2019 | 16-9-33 FIN TRANS CARD FRAUD | | REC | | |

The 5th file was too big so I will send in another email [Jail Calls 2 of 2]

1

KANG 000321

## Robert Larry

**From:** David Barefield
**Sent:** Tuesday, October 29, 2019 1:48 PM
**To:** Robert Larry
**Subject:** FW: Jail Calls 2 of 2
**Attachments:** P21_5033_31_20190710222557.wav



**Lieutenant David Barefield**
**Savannah Police Department**
**Office of Professional Standards**
**Office (912) 691-6237 Cell (912) 677-0440**
**dbarefield@savannahga.gov**
**SavannahPD.org | Facebook | Twitter**

**From:** Sean Sueaquan
**Sent:** Friday, July 19, 2019 12:41 AM
**To:** Robert Larry <RLarry@Savannahga.Gov>
**Cc:** David Barefield <DBarefield@Savannahga.Gov>; Alexander Tobar <ATobar@Savannahga.Gov>
**Subject:** Jail Calls 2 of 2

Here is the 5th call

1

**KANG 000322**

## Robert Larry

**From:** David Barefield
**Sent:** Monday, November 4, 2019 3:10 PM
**To:** Robert Larry
**Subject:** Re: Gates

Thank you sir

**Lieutenant David Barefield**
**Savannah Police Department**
**Office of Professional Standards**
**Office** (912) 691-6237 **Cell** (912) 677-0440
dbarefield@savannahga.gov
SavannahPD.org | Facebook | Twitter

> On Nov 4, 2019, at 3:08 PM, Robert Larry <RLarry@savannahga.gov> wrote:
>
> yes sir definitely
>
> ---
>
> **From:** David Barefield
> **Sent:** Monday, November 04, 2019 2:55 PM
> **To:** Robert Larry
> **Subject:** Gates
>
> Lt. Larry,
>
> Do you think you will be able to interview Gates this week?
>
> Thank you,
>
>
> <image001.png>
>
> **Lieutenant David Barefield**
> **Savannah Police Department**
> **Office of Professional Standards**
> **Office (912) 691-6237 Cell (912) 677-0440**
> dbarefield@savannahga.gov
> SavannahPD.org | Facebook | Twitter

1

**KANG 000323**

## Robert Larry

**From:**     David Barefield
**Sent:**     Wednesday, November 6, 2019 9:03 AM
**To:**       Robert Larry
**Subject:**  RE: Gates

Can you provide a timeline of when you will interview Gates and have the file completed?

Thank you sir,



**Lieutenant David Barefield**
**Savannah Police Department**
**Office of Professional Standards**
**Office (912) 691-6237 Cell (912) 677-0440**
**dbarefield@savannahga.gov**
**SavannahPD.org | Facebook | Twitter**

**From:** Robert Larry
**Sent:** Monday, November 4, 2019 3:09 PM
**To:** David Barefield <DBarefield@Savannahga.Gov>
**Subject:** RE: Gates

yes sir definitely

**From:** David Barefield
**Sent:** Monday, November 04, 2019 2:55 PM
**To:** Robert Larry
**Subject:** Gates

Lt. Larry,

Do you think you will be able to interview Gates this week?

Thank you,



**Lieutenant David Barefield**
**Savannah Police Department**
**Office of Professional Standards**
**Office (912) 691-6237 Cell (912) 677-0440**
**dbarefield@savannahga.gov**
**SavannahPD.org | Facebook | Twitter**

1

## Robert Larry

| | |
|---|---|
| **From:** | SSueaquan@Savannahga.Gov |
| **Sent:** | Saturday, July 20, 2019 1:57 AM |
| **To:** | RLarry@Savannahga.Gov |
| **Subject:** | RE: Jail Calls 1 of 2 |

**Telephone Numbers**

[305] 300-1985 – Possibly Vinnecia or Denisa HARRIS/TARVER [Traivon FELDMAN-HARRIS' mother]
[305] 713-8037 – Krystal SINGLETON [Traivon FELDMAN-HARRIS' wife]
[912] 661-5399 – Jakyia LAW [Arrested with Traivon FELDMAN-HARRIS on 7/5/2019]
[786] 626-3930 – Devin XAVIER [Lives at 1836 Fitzgerald, same address as Traivon FELDMAN-HARRIS]
[786] 769-3041 – Angela TARVER [Possibly Traivon FELDMAN-HARRIS' grandmother]
[912] 224-3691 – Tamika GAINES [mother of Brandon GAINES, who I believe is a suspect in the armed robbery]
[786] 468-3577 – Javon HARRIS [younger brother of Traivon FELDMAN-HARRIS]

**Addresses**

1836 Fitzgerald Street – Traivon FELDMAN-HARRIS' address
1807 Fitzgerald Street – residence of Brandon GAINES, who I believe is a suspect in the armed robbery
1804 Tuskeegee Street – Jakyia LAW's address – arrested with FELDMAN-HARRIS on 7/5/19

**COS Vehicle** – 8475 [See note below]
Work Telephone #     [912] 210-8036
Personal                  [305] 494-0073

The date these allegations were made - July 5, 2019, he showed up at the traffic stop that FELDMAN-HARRIS was arrested on. CAD shows him "holding out" at 14:05 HRS. It would be interesting to see where his vehicle was before this time and if either of his phones received any calls from the numbers listed above.

In addition, Robbery planned and executed a search warrant at 1836 Fitzgerald on July 18, 2019.
This information was kept from him, but my understanding is he got wind of it the previous day, unknown exactly what time.
Again, it would be interesting to see if he made any calls to any of these numbers on July 17 – July 18 and or if his vehicle was in that area.

**NOTE:** Last week Monday July 8 thru Friday July 12, he was at a Gang Conference at the Marriot. I noticed his vehicle [8475] was parked at PCT 2 all week and later learned he had a "loaner", but I do not know the vehicle number. To avoid any suspicion I did not want to ask him for the "loaner" vehicle number, and I do not know when he switched back to vehicle 8475.

In addition, the same day, after these allegations were made, he mentioned to me that he was "working" with a source in that area [I am assuming Fitzgerald Street] but I did not ask nor did he mention the source's name or exact address.

Also worth noting, everyone in the Gang Unit has been told repeatedly, to let me know where they are, when they are "out and about" [in the field].

More specifically, the Gang Unit has a text message thread, where they are supposed to text where they will be....not specific address but general area.
He has never personally told me, nor has he ever sent a text message indicating he was ever in the Liberty City area.

1

## Robert Larry

| | |
|---|---|
| **From:** | SSueaquan@Savannahga.Gov |
| **Sent:** | Wednesday, July 24, 2019 12:21 AM |
| **To:** | RLarry@Savannahga.Gov |
| **Subject:** | RE: Jail Calls 1 of 2 |

I have reviewed calls from July 11 thru July 17 and his name is NOT mentioned.

The loaner he currently has is 5492

**From:** Robert Larry
**Sent:** Friday, July 19, 2019 9:35 AM
**To:** Sean Sueaquan <SSueaquan@Savannahga.Gov>
**Subject:** RE: Jail Calls 1 of 2

Good Morning,

Can you provide me with all phone numbers associated with this individual and his circle including his mom.  Any addresses you have as well so his AVL can be checked

Thanks,
You can call me at 9126678763 if you need to talk to me.

**From:** Sean Sueaquan
**Sent:** Friday, July 19, 2019 12:41 AM
**To:** Robert Larry <RLarry@Savannahga.Gov>
**Cc:** Alexander Tobar <ATobar@Savannahga.Gov>; David Barefield <DBarefield@Savannahga.Gov>
**Subject:** Jail Calls 1 of 2

Attached are 4 of 5 pertinent calls made by

**NAME:** FELDMAN-HARRIS, TRAIVON TOREK **(P1907090)**
**PARTY ID:** 4843035
**WRNTS:**
**DOB:** 10/14/1999
**SSN:**     Click for SSN
**RACE/SEX:** B/M
**FBI #:**
**STATE #:**
**BOOKED.:** 07/05/2019
**CELL:** 9D

### Arrests and Charges

| Date | Number | Agency | Time | CRN | Details |
|---|---|---|---|---|---|
| 7/5/2019 | AR19070231 OTN - 88418249942 | SAVANNAH PD | 14:00 | 190628038 | A & B |

| | | | |
|---|---|---|---|
| 07/05/2019 | 16-8-41 | ARMED ROBBERY | REC |
| 07/11/2019 | 16-9-35 | RECEIPT OF GOODS & SERVICE FRAUDULENTLY | REC |
| 07/11/2019 | 16-9-33 | FIN TRANS CARD FRAUD | REC |

1

KANG 000326



**Subject:** case information
**Date:** 2019-07-12 16:43:33
Download
**From:** RBevil@Savannahga.Gov
**To/Cc:** ATobar@Savannahga.Gov +

Help

**View Message**        **View Source**

Sir,

     This e-mail is in reference to Ofc. Andrian Gates of the Gang Unit. On 7-12-19 Det. Marcus Henderson advised me that he needed to speak to me in private about an issue. He stated that he was on a call on Fitzgerald Street while I was out on FMLA. During that call Ofc. Gates showed up to the scene from the Gang Unit to assist in the investigation. The target location where Det. Henderson was located was being searched. During that time Ofc. Gates went to another hose not involved in the incident as of yet, and revealed the details of that case to the occupants of that residence. Det. Henderson found out this information through subsequent interviews. Also, during that same day of the search a person was arrested and interviewed. The suspect was advised that he could not use the phone, and that was relayed to Ofc. Gates. While in the interview (recorded) the suspect advised Ofc. Gates that he was not allowed to call anyone. At that time Ofc. Gates told the suspect what's the number you want me to call?

     This is a brief synopsis of the events without any clear detail, because during the time of the incident I was out of work. In speaking with Det. Henderson, I asked was Ofc. Gates revealing information knowingly, maliciously, or did lack the proper training or experience? Det. Henderson advised that he did not know, but there was too may inconsistencies that rose his suspicion of a dirty cop. Det. Henderson just wanted to notify his chain of command and as an advisory to the unit.

     After our conversation concluded I saw Cpl. Seuquan (the acting supervisor of the Gang Unit) and inquired about this issue to see if he had some insight on the issue. He advised that in the past other issues have arisen and was reported to the proper channels. Also, Cpl Seuquan was called by Captain Tobar and asked some specific information about Ofc. Gates. So, he assumed that IA was looking into the issue.

     Once my conversation concluded I contacted Sgt. Larry of IA and advised him of the advents listed above. He advised that he could not find any open cases for Ofc. Gates, however to send the recipients of this e-mail this message.

**KANG 000327**

**Subject:** RE: Disable city access
**Date:** 2019-08-26 11:23:50
Download
**From:** RLarry@Savannahga.Gov
**To/Cc:** DBarefield@Savannahga.Gov

Help

**View Message**     **View Source**

Thank you Sir

**From:** David Barefield
**Sent:** Monday, August 26, 2019 10:35 AM
**To:** Robert Larry <RLarry@Savannahga.Gov>
**Subject:** Re: Disable city access

This has already been done

**Lieutenant David Barefield**

**Savannah Police Department**

**Office of Professional Standards**

**Office (912) 691-6237 Cell (912) 677-0440**

**dbarefield@savannahga.gov**

**SavannahPD.org | Facebook | Twitter**

On Aug 26, 2019, at 10:34 AM, Robert Larry <RLarry@savannahga.gov> wrote:

KANG 000328

**Subject:** Re:
**Date:** 2019-08-28 10:15:09
Download
**From:** DBarefield@Savannahga.Gov
**To/Cc:** RLarry@Savannahga.Gov +

Help

**View Message**     **View Source**

Okay. Is the text searchable or did you have to browse through them?

**Lieutenant David Barefield**
**Savannah Police Department**
**Office of Professional Standards**
**Office (912) 691-6237 Cell (912) 677-0440**
**dbarefield@savannahga.gov**
**SavannahPD.org | Facebook | Twitter**

On Aug 28, 2019, at 10:12 AM, Robert Larry <RLarry@savannahga.gov> wrote:

Sir, I just got through 115 pages of Traivon Harris' jail text no mention of Gates

**KANG 000329**

**Subject:**  RE:
**Date:**  2019-08-28 10:20:43
Download
**From:**  RLarry@Savannahga.Gov
**To/Cc:**  DBarefield@Savannahga.Gov +

Help

**View Message**          **View Source**

Had to read through all 115 pages.  That's what I was doing most of yesterday and just finished just now.  There is no search engine.  His mom's texting stuff like don't talk to anyone except your lawyer, and his girlfriend and he sexting but that's pretty much it.  No mention of the crime or Gates

**From:** David Barefield
**Sent:** Wednesday, August 28, 2019 10:15 AM
**To:** Robert Larry <RLarry@Savannahga.Gov>
**Cc:** Alexander Tobar <ATobar@Savannahga.Gov>
**Subject:** Re:

Okay. Is the text searchable or did you have to browse through them?

**Lieutenant David Barefield**

**Savannah Police Department**

**Office of Professional Standards**

**Office (912) 691-6237 Cell (912) 677-0440**

**dbarefield@savannahga.gov**

**SavannahPD.org | Facebook | Twitter**

On Aug 28, 2019, at 10:12 AM, Robert Larry <RLarry@savannahga.gov> wrote:

**KANG 000330**

Subject:    Re:
Date:       2019-08-28 10:22:27
            Download
From:       DBarefield@Savannahga.Gov
To/Cc:      RLarry@Savannahga.Gov +

Help

**View Message**       **View Source**

Thank you

**Lieutenant David Barefield**
**Savannah Police Department**
**Office of Professional Standards**
**Office (912) 691-6237 Cell (912) 677-0440**
**dbarefield@savannahga.gov**
**SavannahPD.org | Facebook | Twitter**

On Aug 28, 2019, at 10:20 AM, Robert Larry <RLarry@savannahga.gov> wrote:

Had to read through all 115 pages. That's what I was doing most of yesterday and just finished just
now. There is no search engine. His mom's texting stuff like don't talk to anyone except your lawyer,
and his girlfriend and he sexting but that's pretty much it. No mention of the crime or Gates

**From:** David Barefield
**Sent:** Wednesday, August 28, 2019 10:15 AM
**To:** Robert Larry <RLarry@Savannahga.Gov>
**Cc:** Alexander Tobar <ATobar@Savannahga.Gov>
**Subject:** Re:

Okay. Is the text searchable or did you have to browse through them?

Lieutenant David Barefield

**Subject:** Re: case information
**Date:** 2019-07-12 16:49:23
Download
**From:** ATobar@Savannahga.Gov
**To/Cc:** RBevil@Savannahga.Gov +

Help

**View Message**     **View Source**

Thank you for your email and Det. Henderson will be contacted.

Sent from my iPhone

On Jul 12, 2019, at 3:43 PM, Ryan Bevil <RBevil@savannahga.gov> wrote:

Sir,

This e-mail is in reference to Ofc. Andrian Gates of the Gang Unit. On 7-12-19 Det. Marcus Henderson advised me that he needed to speak to me in private about an issue. He stated that he was on a call on Fitzgerald Street while I was out on FMLA. During that call Ofc. Gates showed up to the scene from the Gang Unit to assist in the investigation. The target location where Det. Henderson was located was being searched. During that time Ofc. Gates went to another hose not involved in the incident as of yet, and revealed the details of that case to the occupants of that residence. Det. Henderson found out this information through subsequent interviews. Also, during that same day of the search a person was arrested and interviewed. The suspect was advised that he could not use the phone, and that was relayed to Ofc. Gates. While in the interview (recorded) the suspect advised Ofc. Gates that he was not allowed to call anyone. At that time Ofc. Gates told the suspect what's the number you want me to call?

This is a brief synopsis of the events without any clear detail, because during the time of the incident I was out of work. In speaking with Det. Henderson, I asked was Ofc. Gates revealing information knowingly, maliciously, or did lack the proper training or experience? Det. Henderson advised that he did not know, but there was too may inconsistencies that rose his suspicion of a dirty cop. Det. Henderson just wanted to notify his chain of command and as an advisory to the unit.

KANG 000332

**Subject:** Re:
**Date:** 2019-08-28 10:15:09
Download
**From:** DBarefield@Savannahga.Gov
**To/Cc:** RLarry@Savannahga.Gov +

Help

---

**View Message** **View Source**

Okay. Is the text searchable or did you have to browse through them?

**Lieutenant David Barefield**
**Savannah Police Department**
**Office of Professional Standards**
**Office (912) 691-6237 Cell (912) 677-0440**
**dbarefield@savannahga.gov**
**SavannahPD.org | Facebook | Twitter**

On Aug 28, 2019, at 10:12 AM, Robert Larry <RLarry@savannahga.gov> wrote:

Sir, I just got through 115 pages of Traivon Harris' jail text no mention of Gates

KANG 000333

EXHIBIT 38

| Subject: | Ofc. Adrian Gates Leave Request | Help |
|---|---|---|
| Date: | 2019-08-28 12:32:05 Download | |
| From: | RLarry@Savannahga.Gov | |
| To/Cc: | tthompson02@Savannahga.Gov + | |

**View Message**          **View Source**

Mrs. Thompson,

I was told that you handle the SIU leave.  Ofc. Adrian Gates called me and he wishes to use 4 hours Comp
Time on Friday 9-6-19 and 8 hours VAC on Monday 9-9-19.

As you know he is on Admin Leave.

Thank you

Larry

| | Date\Time Example 20181201 1530 | Pertinent audio file[s] Insert downloaded file name here | Destination # Number Dialed | Linked to - Name of person CCDC inmate called if known | Remarks |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | 20190707 1755 | P9_5033_87_20190707175520 Pay attention to 14:45 mark | 3053001985 | **Vinnecia HARRIS** 1836 Fitzgerald Street | **FELDMAN** admit |
| 3 | 20190707 1839 | P9_5033_132_20190707183923 Pay attention to 15:15 mark | 3057138037 | UF8037 and 3 way call to **FELDMAN's** mother | UF8037 identific **SGT Oliver** is FEl |
| 4 | 20190708 0948 | P12_5033_110_20190708094825 | 3053001985 | **Vinnecia HARRIS** 1836 Fitzgerald Street | FELDMAN expla FEDLMAN woul FEDLMAN adde this incidnet oc |
| 5 | 20190709 1640 | P12_5033_114_20190709164008 Pay attention to 4:10 mark | 3053001985 | **Vinnecia HARRIS** 1836 Fitzgerald Street | FELDMAN expla did not talk...lat "cars" |
| 6 | 20190710 1833 | P3_5033_56_20190710183355 | 3053001985 | **Vinnecia HARRIS** 1836 Fitzgerald Street | not pertinent |
| 7 | 20190710 2108 | P17_5033_103_20190710210808 Pay attention to 6:25 mark | 3053001985 | **Vinnecia HARRIS** 1836 Fitzgerald Street | FELDMAN'S wife start Cemo |
| 8 | 20190710 2225 | P21_5033_31_20190710222557 Pay attention to 6:38 mark | 3053001985 | **Vinnecia HARRIS** 1836 Fitzgerald Street | Pertinent |
| 9 | 20190711 1811 | P12_5033_66_20190711181135 | 3053001985 | **Vinnecia HARRIS** 1836 Fitzgerald Street | FELDMAN expla Confirmed throu |
| 10 | 20190711 1828 | P13_5033_120_20190711182832 | 3053001985 | **Vinnecia HARRIS** 1836 Fitzgerald Street | not pertinent |
| 11 | 20190712 1606 | P6_5033_71_20190712160616 | 3053001985 | **Vinnecia HARRIS** 1836 Fitzgerald Street | not pertinent |

3

**KANG 000335**

**Subject:** FW: Traivon Feldman-Harris jail communication data
**Date:** 2019-09-05 03:25:43
Download
**From:** MHenderson@Savannahga.Gov
**To/Cc:** DBarefield@Savannahga.Gov;
RLarry@Savannahga.Gov

Help

**View Message**         **View Source**

I forgot to share this,

On August 14th, 2019 I conducted an interview with Tamika Gaines and her son, Brandon Leon, in reference to the Armed Robbery investigation. During the interview, Gaines started talking about a "crooked cop" but she did not know his name. She knew he was from Miami. I can provide a copy of this interview. The subject starts at 12:39 and ends at 12:45.

**From:** Marcus Henderson
**Sent:** Tuesday, August 13, 2019 2:53 PM
**To:** David Barefield <DBarefield@Savannahga.Gov>; Robert Larry <RLarry@Savannahga.Gov>
**Subject:** Traivon Feldman-Harris jail communication data

Good afternoon,

I have attached my notes from the calls I have listened to so far. I apologize for grammar/spelling errors. Call notes in Bold font reference Officer Gates. When reviewing the audio, you will hear the following names:

Buddah = Javon Harris (Traivon's brother)

Sandra Harris (Traivon's grandmother)

. . . . . . . . . . . . . .

**KANG 000336**

| | |
|---|---|
| **Subject:** | Traivon Feldman-Harris jail communication data |
| **Date:** | 2019-08-13 14:52:49 |
| | Download |
| **From:** | MHenderson@Savannahga.Gov |
| **To/Cc:** | DBarefield@Savannahga.Gov; |
| | RLarry@Savannahga.Gov |

<span style="float:right">Help</span>

**View Message**    **View Source**

Good afternoon,

I have attached my notes from the calls I have listened to so far. I apologize of grammar/spelling errors. Call notes in Bold font reference Officer Gates. When reviewing the audio, you will hear the following names:

Buddah = Javon Harris (Traivon's brother)

Sandra Harris (Traivon's grandmother)

Krystal Singleton (Traivon's wife)

Vinnecia Harris (Traivon's mother)

**P9_5033_87_20190707175520 called 305-300-1985 (Vinnecia Harris)**

o **Traivon called Vinnecia and Javon. Traivon believed his "Army recruiter (Sgt. Oliver)" is going to "snatch" him out of the jail. Traivon got into a fight with someone over a Peanut Butter and Jelly sandwich. Traivon stated the Nissan Altima is his car. Jakia's phone was in the car. Traivon asked his family to holler at Gates. Traivon started talking about how the streets "Blitzed" Brandon's crib but the call timer was expiring.**

**P9_5033_132_20190707183923 called 305-713-8037 (Krystal Singleton)**

o **Krystal is Traivon's wife. Seems like they have been through some problems. Traivon admits he is at fault for his arrest. Called out Gates name to the officers while he was resisting arrest**

| | |
|---|---|
| **Subject:** | Officer Adrian Gates Admin Leave |
| **Date:** | 2019-08-23 17:11:05 |
| | Download |
| **From:** | RLarry@Savannahga.Gov |
| **To/Cc:** | + DBarefield@Savannahga.Gov;<br>ATobar@Savannahga.Gov;<br>LGunther@Savannahga.Gov;<br>SPrice@Savannahga.Gov; RMinter@Savannahga.Gov |

Help

**View Message**     **View Source**

To all, SIU Officer Adrian Gates has been placed on Administrative Leave pending further notice.

KANG 000338

| Subject: | RE: Javon Harris |
|---|---|
| Date: | 2019-08-26 13:09:51 |
| | Download |
| From: | RCooper01@Savannahga.Gov |
| To/Cc: | RLarry@Savannahga.Gov |

Help

**View Message**     **View Source**

Thanks for the info. Det. Saxon will follow-up on this and I'll look into the zone request.

*Det. R. Cooper*

*Savannah Police Department*

*Southside Precinct Criminal Investigations*

*Office: (912) 525-3100 ex. 1234*

*Cell: (912) 661-3222*

**From:** Robert Larry
**Sent:** Monday, August 26, 2019 1:07 PM
**To:** Richard Saxon <RSaxon@Savannahga.Gov>; Rodney Cooper01 <RCooper01@Savannahga.Gov>; Shinita Young <syoung@Savannahga.Gov>
**Cc:** David Barefield <DBarefield@Savannahga.Gov>; Alexander Tobar <ATobar@Savannahga.Gov>
**Subject:** Javon Harris

Sorry forgot to add this

**KANG 000339**

**Subject:** RE: ID Subject in video
**Date:** 2019-08-28 14:15:53
Download
**From:** RSaxon@Savannahga.Gov
**To/Cc:** + RLarry@Savannahga.Gov;
syoung@Savannahga.Gov;
RCooper01@Savannahga.Gov;
KGreene@Savannahga.Gov;
BJohnson@Savannahga.Gov +

Help

---

**View Message**        **View Source**

Thank you for this information, I also believe it is most likely Mr. Harris in the video however after consulting with the D enough to charge him.

The posting can be removed at this time, thanks

**From:** Robert Larry
**Sent:** Monday, August 26, 2019 1:03 PM
**To:** Shinita Young <syoung@Savannahga.Gov>; Rodney Cooper01 <RCooper01@Savannahga.Gov>
**Cc:** Richard Saxon <RSaxon@Savannahga.Gov>; Alexander Tobar <ATobar@Savannahga.Gov>; David Barefield <I
**Subject:** ID Subject in video

Lt. Young, Cpl. Cooper, Det. Saxon

http://savannahpd.org/spd-detectives-seek-suspect-in-financial-card-transaction-fraud/

The individual in this photo is probably Javon Harris. See below

**Subject:**
**Date:**     2019-09-20 14:49:51
           Download
**From:**    RLarry@Savannahga.Gov
**To/Cc:**   DBarefield@Savannahga.Gov

Help

---

**View Message**     **View Source**

OPS# 19-0394 Adrian Gates Case

KANG 000341

EXHIBIT 38

| | Date\Time Example 20181201 1530 | Pertinent audio file[s] Insert downloaded file name here | Destination # Number Dialed | Linked to - Name of person CCDC inmate called if known | Remarks |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | 20190707 1755 | P9_5033_87_20190707175520 Pay attention to 14:45 mark | 3053001985 | Vinnecia HARRIS 1836 Fitzgerald Street | FELDMAN adm⊢ |
| 3 | 20190707 1839 | P9_5033_132_20190707183923 Pay attention to 15:15 mark | 3057138037 | UF8037 and 3 way call to FELDMAN's mother | UF8037 identifi⊢ SGT Oliver is FE⊢ |
| 4 | 20190708 0948 | P12_5033_110_20190708094825 | 3053001985 | Vinnecia HARRIS 1836 Fitzgerald Street | FELDMAN expla FELDMAN woul⊢ FEDLMAN adde⊢ this incidnet oc⊢ |
| 5 | 20190709 1640 | P12_5033_114_20190709164008 Pay attention to 4:10 mark | 3053001985 | Vinnecia HARRIS 1836 Fitzgerald Street | FELDMAN expla did not talk...lat "cars" |
| 6 | 20190710 1833 | P3_5033_56_20190710183355 | 3053001985 | Vinnecia HARRIS 1836 Fitzgerald Street | not pertinent |
| 7 | 20190710 2108 | P17_5033_103_20190710210808 Pay attention to 6:25 mark | 3053001985 | Vinnecia HARRIS 1836 Fitzgerald Street | FELDMAN'S wif⊢ start Cemo |
| 8 | 20190710 2225 | P21_5033_31_20190710222557 Pay attention to 6:38 mark | 3053001985 | Vinnecia HARRIS 1836 Fitzgerald Street | Pertinent |
| 9 | 20190711 1811 | P12_5033_66_20190711181135 | 3053001985 | Vinnecia HARRIS 1836 Fitzgerald Street | FELDMAN expla Confirmed thro⊢ |
| 10 | 20190711 1828 | P13_5033_120_20190711182832 | 3053001985 | Vinnecia HARRIS 1836 Fitzgerald Street | not pertinent |
| 11 | 20190712 1606 | P6_5033_71_20190712160616 | 3053001985 | Vinnecia HARRIS 1836 Fitzgerald Street | not pertinent |

2

KANG 000342

# Defendant Record

Go Back

Add DIN to Line-Up

Find Like Defendant



Chatham County Sheriff P1908119

**DIN:**
P1908119
**PARTY ID:**
4853738
**NAME:**
HARRIS, JAVON LAMIK
**DOB:**
10/22/2000 (Age: 19)
**RACE/SEX:**
BLACK / M
**FBI #:**
541970EH5
**STATE #:**
4910968X
**BOOKED:**
10/22/2019
**DCH:**
10/23/2019 - BND/SAVANNAH BAIL X2
**WARRANTS:**

KANG 000343

## − ARREST & CHARGE HISTORY

Back to top

| ARREST # | DATE - TIME | OTN | ARRESTING AGENCY | CRN # | WHERE? | | DETAILS |
|----------|-------------|-----|------------------|-------|--------|--|---------|
| AR19100879 | 10/22/2019 - 14:44 | 88419568591 | SAVANNAH PD | 190804059 | 1836 FITZGERALD ST | | BKG FORM |

| | CHARGE — SEVERITY — DESCRIPTION | AGENCY | CHARGE DATE | BOND | BAIL | NOTES |
|--|--------------------------------|--------|-------------|------|------|-------|
| | 16-8-18 — F — ENTERING AUTOMOBILE OR OTHER MOTOR VEHICLE WITH INTENT TO COMMIT THEFT OR FELONY | | 10/22/2019 | 3500 | 4050 | |
| | 16-5-23 — M — SIMPLE BATTERY | | 10/22/2019 | 1000 | 1300 | |

| ARREST # | DATE - TIME | OTN | ARRESTING AGENCY | CRN # | WHERE? | | DETAILS |
|----------|-------------|-----|------------------|-------|--------|--|---------|
| AR19080360 | 08/09/2019 - 0158 | 88418681466 | GSP SAVANNAH | INHS41-2019 | 516 MM4 | | BKG FORM |

| | CHARGE — SEVERITY — DESCRIPTION | AGENCY | CHARGE DATE | BOND | BAIL | NOTES |
|--|--------------------------------|--------|-------------|------|------|-------|
| | 40-6-391(a)(2) — M — DUI - DRIVING UNDER THE INFLUENCE OF DRUGS | | 08/09/2019 | 3500.00 | 4050.00 | |
| | 40-6-48 — M — Failure To Maintain Lane | | 08/09/2019 | SEE 1 | 0.00 | |
| | 40-5-30(c) — M — Restricted License Violation | | 08/09/2019 | SEE 1 | 0.00 | |

## − INCARCERATION HISTORY

KANG 000344

Ask Phoenix - DIN Individual Info

Back to top

| INCARCERATION # | IN DATE - TIME | OUT DATE - TIME | DISCHARGE INFO |
|---|---|---|---|
| 2019100876 | 10/22/2019 - 1555 | 10/23/2019 - 17:19 | BND/SAVANNAH BAIL X2 |
| 2019080359 | 08/09/2019 - 0314 | 08/09/2019 - 15:03 | BND/SAVANNAH BAIL |

## − WARRANT INFO

Back to top

| WARRANT # | AGENCY | CHARGE | ISSUED ON | ISSUED BY | STATUS |
|---|---|---|---|---|---|

## − ADDRESS HISTORY

Back to top

| DATE | TYPE | CONTACT | ADDRESS | PHONE |
|---|---|---|---|---|
| 08/09/2019 | PRIMARY | detainee | 1836 FITZGERALD STREET SAVANNAH, GA 31405 | 305 300 1985 |
| 08/09/2019 | EMPLOYER | UNEMPLOYED | | |
| 08/09/2019 | EMERGENCY | VINNENCIE HARRIS | SAME AS DETAINEE UN | 305 300 1985 |
| 08/09/2019 | PRIOR | detainee | UN | |

## − ALIASES

Back to top

KANG 000345

| LAST NAME | FIRST NAME | MIDDLE NAME |
|-----------|------------|-------------|

## − GANGS

Back to top

| GANG NAME |
|-----------|

## − GANG AFFILIATIONS

Back to top

| DIN | LAST NAME | FIRST NAME | MIDDLE NAME | STREET NAME |
|-----|-----------|------------|-------------|-------------|

## − PHYSICAL ATTRIBUTES

Back to top

| Height: | 5 ft 11 in |
|---------|------------|
| Weight: | 160 |
| Hair Color: | BLACK |
| Eye Color: | BROWN |
| Race: | BLACK |
| Military: | none |

KANG 000346



KANG 000347

## DIRECTIONS:
(SINGLE USE ONLY, once opened and heated must discard after SINGLE use)

1. Shake well, unscrew cap and remove foil seal (discard seal). Place bottle in the middle of your microwave for 10-15 seconds to ensure temperature strip reads between 94-100 degrees F. If temperature strip doesn't read right away don't be alarmed, the sample is either too cold or hot, give it a few seconds, if temperature is not met reheat for 5-10 seconds to get temperature to 94-100 degrees. You can re-heat bottle as many times that day only to meet your needs, product is only good for 24 to 48 hours once opened.

2. After heating, screw on flip cap provided and shake bottle to eliminate any sediment on the bottom of the bottle.

3. Remove the enclosed heat pad from the plastic pouch and shake well to activate heat. Next attach heat pad with the enclosed rubber band on the side of the bottle on the opposite side of temperature strip (this will ensure proper temperature reading). Leave heating pad on the bottle since it will last up to 8 hours.

NO MICROWAVE? NO PROBLEM. To heat this product, simply attach the supplied heat pad directly to the bottle, on the opposite side of the temperature strip and store bottle close to your body. Depending on ambient temperature product could take up to 1 hour to reach optimal range of 94-100 degrees.

**WARNING:** This product is not intended for unlawful use and is not intended for human consumption. Keep product away from children, kit contains small plastic parts, harmful if swallowed. Consumer agrees to all applicable Federal, State and Local Laws concerning the legal use of this product.

XSTREAM FETISH URINE USES:
• ADULT FETISH • SILLY PRANKS • SCIENTIFIC USES • URINE THERAPY
• DEER OR ANIMAL ATTRACTANT/REPELLENT (requires additives not included)

TOXIN FREE • EASY-TO-USE • NO MIXING • UNISEX

KANG 000348



KANG 000349



KANG 000350



WELCOME VISITOR YOU CAN LOGIN OR CREATE AN ACCOUNT.

HOME    SHOP    WHY XSTREAM FETISH URINE    ABOUT FETISH URINE    CONTACT



# XStream Fetish Urine 3oz
## $24.95

Please note that discount coupons cannot be used with existing internet specials.

Please note that discount coupons cannot be used with existing internet specials.

A proper blend of Creatinine, pH levels, and other normal human urine components with a specific gravity that makes it incredibly similar to naturally emitted urine. XSTREAM FETISH URINE has thoroughly been tested in a lab before being given to consumers and 100% toxin free. It is easy-to-use and requires no mixing; this product is male/female compatible.

Kit Includes:

KANG 000351

- 3oz Fetish Urine Sample
- Bottle with Squirt Cap
- Heat Pad
- Rubber Band
- Temperature Strip
- Heat Induction Cap

Fetish Urine is laboratory-made urine that is not naturally secreted from the human body and can be used for a variety of reasons. Even though there are multiple brands of fetish urine available, a good brand of fetish urine consists of proper creatinine levels, a specific gravity, necessary balanced pH levels, and other components of human urine that will closely resemble natural human urine. To make fetish urine look and feel more authentic, it can be heated 90-100 degrees Fahrenheit (depending on which brand it is) so the sample seems like it was emitted from the body. Fetish urine can be used both by man and women for whatever reason they use.

WARNING: This product is not intended for unlawful use and is not intended for human consumption. Keep product away from children, kit contains small plastic parts, harmful if swallowed. Consumer agrees to all applicable Federal, State and Local Laws concerning the legal use of this product.

KANG 000352

Recommended uses: ● Adult Fetish ●
Silly Pranks ● Scientific Uses ● Urine
Therapy ● Deer or Animal
Attractant/Repellent (requires additives
that are not included)

1 | ADD TO CART



Category: Uncategorized Tags: Urine, xstream-
fetish-urine

**Description**

**Additional information**

**Reviews (0)**

**XStream Fetish Urine 3oz**

A proper blend of Creatine, pH levels, and other
normal human urine components with a specific gravity
that makes it incredibly similar to naturally emitted
urine. XSTREAM FETISH URINE has thoroughly been
tested in a lab before being given to consumers and
100% toxin free. It is easy-to-use and requires no
mixing; this product is male/female compatible.

12/3/2019

KANG 000353

Kit Includes:

- 3oz Fetish Urine Sample

- Bottle with Squirt Cap

- Heat Pad

- Rubber Band

- Temperature Strip

- Heat Induction Cap

## **DIRECTIONS:** *(SINGLE USE ONLY, once opened and heated must discard after SINGLE use)*

1. Shake well, unscrew cap and remove foil seal (discard seal). Place bottle in the middle of your microwave for 10-15 seconds to insure temperature strip reads between 94-100 degrees F. If temperature strip doesn't read right away don't be alarmed, the sample is either too cold or hot, give it a few seconds, if temperature is not met reheat for 5-10 seconds to get temperature to 94-100 degrees.

2. After heating, screw on flip cap provided and shake bottle to eliminate any sediment on the bottom of the bottle.

3. Remove the enclosed heat pad from the plastic pouch and shake well to activate heat. Next attach heat pad with the enclosed rubber band on the side of

**KANG 000354**

the bottle on the opposite side the temperature strip (this will insure proper temperature reading). Leave heating pad on the bottle since it will last up to 8 hours. You can re-heat as many times as you like to meet your needs and remember a comfortable temperature is 94-100 degrees.

NO MICROWAVE ? NO PROBLEM. To heat this product, simply attach the supplied heat pad directly to the bottle, on the opposite side of the temperature strip and store bottle close to your body. Depending on ambient temperature product could take up to 1 hour to reach optimal range of 94-100 degrees.

| HOME | SHOP | MY | | TRACKING | SHIPPING | CONTACT |
| ACCOUNT | PRIVACY POLICY | | | TERMS & CONDITIONS | | |

**Warning:** This product is not intended for unlawful use and is not intended for human consumption. Keep product away from children, kit contains small plastic parts, harmful if swallowed. Consumer agrees to all applicable Federal, State and Local Laws concerning the legal use of this product.

**Health Disclaimer** Harmful if swallowed. Do not get in eyes. If in Eyes: Hold open and rinse slowly and gently with water for 15-20 minutes. Remove contact lenses, if present, after first 5 minutes then continue rinsing. Call a Poison Control Center or doctor for treatment advice. DO NOT swallow product. If Swallowed: Call a Poison Control Center or doctor immediately for treatment advice. Do not induce vomiting unless told to do so by a Poison Control Center or doctor. Do not give anything by mouth to an unconscious person.

KANG 000355

**Legal Disclaimer:** The XSTREAM Fetish Urine products are sold as novelty urine. XSTREAM Fetish Urine accepts no responsibility for any subsequent use and application of any of these products. This does not affect your statutory rights.

©2019 X-Urine. All Rights Reserved. Website Design by The Web Squad.

**KANG 000356**



SavannahPD.org

**SECTION 7**
**Additional Information**
**(None)**

**KANG 000357**



**SAVANNAH POLICE**

To Serve, Protect and Build Trust

*SavannahPD.org*

# SECTION 8

## Closure Report

## 13. Adrian Gates



**SAVANNAH POLICE**

To Serve, Protect and Build Trust

*SavannahPD.org*

**Office of Professional Standards**

---

## ADMINISTRATIVE INVESTIGATION
### Closure Report

| | |
|---|---|
| **OPS CASE NUMBER:** | 19-0384 |
| **EMPLOYEE NAME:** | Ofc. Adrian Gates |
| **DATE:** | November 10, 2019, |
| **TO:** | Chief Roy Minter |
| **FROM:** | Sgt. Robert Larry III |

Allegation: SPD GO ADM-004

On **July 19, 2019,** an Internal Investigation was initiated regarding Savannah Police Department employee, Officer Adrian Gates and his actions on July 5, 2019. Officer Gates Payroll #63099 was employed by the Savannah Police Department on December 26, 2016. At the time the incident occurred, the employee's assignment was with the SIU/Gang Unit under the command of Captain David Gay.

| **SOP APPLICABLE** | **CLOSURE** |
|---|---|
| **SPD GO # ADM-004 Oath of Office, Ethics, and Conduct** | |
| | |
| | |

| | | |
|---|---|---|
| **ACTION TAKEN:** | | |
| **DAYS SUSPENDED:** | | |
| **REDUCTION IN RANK:** | | |
| **RETAINING:** | | |
| **SIGNATURE:** | | **DATE:** |
| **Roy Minter, Chief of Police** | | |

KANG 000359



SavannahPD.org

# SECTION 9

## General Orders

**14.  SPD GO # ADM-004 Oath of Office, Ethics, and Conduct**

**KANG 000360**

**SPD GENERAL ORDER**                                   **ADMINISTRATION**

| **GO # ADM-004** | **EFFECTIVE DATE:** | **04/09/2004** |
|---|---|---|
| **OATH OF OFFICE, ETHICS, AND CONDUCT** | **REVISION DATES:** | **10/04/2006** |
| | **08/26/2010** | **08/29/2011** |
| | **09/07/2011** | **07/20/2012** |
| | **09/18/2014** | **02/09/2015** |
| | **08/19/2016** | **08/31/2016** |
| | | **12/29/2016** |
| | | **04/23/2018** |

#### PURPOSE

The purpose of this directive is to ensure that Department personnel are aware of the actions and attitudes expected of them and to provide members of the public with a general standard by which they can measure the performance of the Department.

#### POLICY

All Savannah Police Department (SPD) sworn personnel shall take and subsequently abide by an oath of office to enforce the Constitution and laws of the United States, the Constitution and laws of the State of Georgia, and the ordinances of Chatham County and the City of Savannah, as well fulfilling their duty based on the Law Enforcement Code of Ethics.

It shall be the policy of the SPD to comply with State and Federal law and to preserve and protect the constitutional rights of the community. It shall further be the policy of the SPD that all sworn personnel will abide by the Canon of Ethics as set forth in this directive. Pursuant to the Home Rule provisions for counties of the Constitution of the State of Georgia, and the Savannah City Council requires SPD Police Officers to take and abide by the following Savannah Police Department Oath of Office prior to sworn status:

*I, _____, do solemnly swear or affirm that I will uphold and defend the Constitution of the United States of America; that I will faithfully uphold, and defend the Constitution and Statutes of the State of Georgia; that I will faithfully uphold, and defend the Charter and the Ordinances of the City of Savannah; that I will faithfully discharge all of the duties and obligations of my office, and that I will faithfully observe all the rules, orders and regulations of the Savannah Police Department.*

*I do further swear or affirm that I am not the holder of any unaccounted for public money due this state or any other political subdivision or authority there of; that I am not the holder of any office of trust under the government of the United States, any other State, or any foreign state which, by the laws of the state of Georgia, I am prohibited from holding; and that I am otherwise qualified to hold the office of a police officer according to the Constitution and the laws of Georgia.*

*I do further swear or affirm that, as a police officer, I will faithfully follow the orders of the*

---

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 1 of 17*

**KANG 000361**

*Chief of Police, and I will faithfully serve and protect all citizens conscientiously, and without malice or partiality, to the best of my ability.*

*I accept the law enforcement code or canon of ethics as my standard of conduct while on or off duty and swear to faithfully abide by and defend the same.*

*So help me God.*

[CALEA 1.1.1]

SPD Police Officers will observe the principles as set forth in the Canons of Law Enforcement Ethics. All sworn employees of the SPD will abide by the **Law Enforcement Code of Ethics**:

*As a law enforcement Officer, my fundamental duty is to serve mankind; to safeguard life and property; to protect the innocent against deception; the weak against oppression; and the peaceful against violence or disorder; and I will respect the constitutional rights of all men to LIBERTY, EQUALITY, and JUSTICE.*

*I will live my private life as to be an example to all. I will develop self-restraint and be constantly mindful of the welfare of others.*

*I will be exemplary in obeying the laws of the land and the regulations of the Savannah-Chatham Metropolitan Police Department. I will remain courageous calm in the face of scorn, danger, or ridicule.*

*I will never permit my personal feelings to influence my decisions. I will enforce the law courteously and appropriately without fear of favor, malice, or ill will, never employing unnecessary force and never accepting gratuities.*

*I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will strive constantly to achieve these objectives and ideals, dedicating myself before God to my chosen profession.* [CALEA 1.1.2]

All non-sworn employees will be aware of and comply with the following **Code of Ethics for City Employees:**

*As City employees we shall...*

*Exhibit pride and loyalty in all matters pertaining to the City and each other. However, we shall not knowingly be a party to any illegal or improper activity.*

*Not knowingly engage in acts or activities which are disgraceful or unbecoming to a City Employee.*

*Not do anything which may be in conflict with the interests of the City or which would hurt our ability to do our jobs.*

*Not accept gifts, goods, services, or materials of value from a customer, supplier, vendor representative, or other individual.*

*Be careful in the use of information acquired in the course of our duties.*

---

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 2 of 17*

KANG 000362

*We will not use confidential information for any personal gain nor in any manner which would be against the law or damaging to the City's welfare.*

*Maintain high standards of competence, dignity and fairness*

Every employee will receive documented training concerning the code of ethics at a minimum biennially. All new employees will receive training in their first thirty days of employment. Training may be in the form of roll call, shift briefing, or a formal classroom setting. [CALEA 1.1.2]

The following Oath of Honor will be recited at all training sessions and will open all SPD ceremonies.

*On my honor,*
*I will never betray my office,*
*my integrity, my character,*
*or the public trust.*
*I will always have*
*the courage to hold myself*
*and others accountable for our actions.*
*I will always uphold the constitution,*
*my community and the agency I serve.*

All on or off duty, sworn and civilian, employees of the SPD must at all times conduct themselves in a manner which does not bring discredit to themselves, the SPD, or the City of Savannah. Therefore, the following rules will be adhered to without discretion.

## DEFINITIONS

These definitions shall apply to the use of such terms herein as well as to the use of such terms in all other Departmental contexts, unless a different definition is specifically set forth in another document.

**ACTING:** Serving temporarily in a position to which the employee is not ordinarily assigned, usually in a position of higher authority and having all the authorities, responsibilities, and duties of the higher position applicable to the acting employee.

**ADMINISTRATIVE LEAVE**: A condition in which, for the convenience of the Department, an employee is relieved of his responsibility to report for duty or exercise police authority.

**ADMINISTRATIVE ORDER**: Written order issued by the Chief of Police as a guiding source of reference to procedural matters involving administration of departmental or city policies.

**APPOINTMENT**: The designation of a person by the appointing authority to any position within the Department.

**ASSIGNMENT**: Any personnel placement made by established authority.

**AUTHORITY:** Legal or rightful power; a right to command or act.

**CHAIN OF COMMAND:** Ascending or descending order of rank.

**COMMANDING OFFICER:** Any employee holding a command position of commission.

**CONFIDENTIAL:** Secret, not to be divulged to unauthorized persons.

---

KANG 000363

**CONTROLLED SUBSTANCE:** As defined by the Georgia State Criminal Code.

**DEPARTMENT:** The Savannah Police Department.

**DIRECTIVES:** An authoritative instruction or order, which governs policy; procedures, rules, or regulations, whether issued verbally, electronically or in written form

**DISMISSAL:** The act of terminating the employment of an employee.

**DIVISION ORDERS:** Standing orders that contain a purpose statement, a policy statement, and standard operating procedures, and may be issued by the Chief of Police, a Division Commander, or designee. Division Orders are applicable only to the issuing Division.

**DUTY:** Includes those tasks required by law, authoritative instruction, one's assignment, rank or status.

**EMPLOYEE:** All sworn and non-sworn personnel working for the SPD.

**ESTABLISHED AUTHORITY:** Legal or rightful power to command or have command over; this Includes supervisory and administrative authority.

**EXTRA-DUTY:** - Outside employment wherein the use of law enforcement powers are anticipated.

**GENDER:** The use of the masculine gender shall also include, when appropriate, the female gender, unless otherwise specified.

**GENERAL ORDER:** Written orders issued by the Chief of Police outlining policy or procedure on matters, which affect the entire department. A General Order is the most authoritative current directive issued by the Department and may be used to amend, supersede, or cancel any other rule, regulation, or order. General Orders are permanent department policy and remain in full force and effect until amended, superseded, or cancelled by the Chief of Police.

**IMMEDIATELY:** As soon as possible without unnecessary delay.

**INSUBORDINATION:** The willful disobedience of a lawful order issued by any commanding officer or disrespectful, mutinous, rebellious, insolent, or abusive language or action *toward* any commanding officer.

**LAWFUL ORDER:** Any written or oral directive issued by any commanding officer to any subordinate or group of subordinates in the course of police duty which is not in violation of any law or ordinance or any Department rule, procedure or instruction. (An order, which may be challenged at a later date, must be obeyed at the time of issuance.)

**MALFEASANCE:** The doing of an unlawful act in office.

**MAY:** The word "may" as used herein shall mean that the action indicated is permissible.

**MEMBER:** Any person duly appointed to the Department as a sworn police officer, police recruits are included in this definition.

**MISFEASANCE:** The wrongful doing of a lawful act in office.

**NEGLECT OF DUTY:** The failure to give suitable attention to the performance of duty. The failure to take appropriate action on the occasion of a crime, disorder, or other act or condition requiring police attention. The failure to perform duties as required.

**OFF DUTY:** That period of time, that excludes the assigned work period during which an

---

**KANG 000364**

employee would not normally be required to actively engage in the performance of his assigned duties.

**OFF-DUTY EMPLOYMENT** - Outside employment wherein the use of law enforcement powers is not anticipated.**OFFICER IN CHARGE:** The member having the highest rank. Members of the same rank shall assume charge according to the date of appointment to that rank unless otherwise ordered by the Chief of Police or designated authority.

**ON DUTY:** That period of time when an employee is actively engaged in the performance of his assigned duties.

**ORDER:** An order is a command; a directive (either oral or written) given by one in authority and directed to a subordinate.

**PERSONALLY RESPONSIBLE:** A duty or responsibility that falls upon an individual himself. The responsibility cannot be conveyed or assigned to another.

**POLICY:** Any governing principle, broad plan, or course of action, either oral or written, designed to accomplish the Department's goals.

**PRIVILEGE:** A condition, which is not, a basic right but which is granted at the discretion of the Department.

**PROCEDURE:** The official method of dealing with any given situation as prescribed by General Orders, Special Orders, Administrative Orders, procedural manuals, training communications or other directives.

**REPORT:** A written communication unless otherwise specified.

**RIGHT:** A condition specifically outlined by law, administrative directive or contractual agreement.

**RULES AND REGULATIONS:** The terms "rules and regulations" as used herein are interchangeable since both indicate basic internal departmental directives. They refer to broad precepts of authority, responsibility or conduct. They carry the full force and effect of a direct order from the Chief of Police and stand until cancelled, amended or superseded by a direct written order of the Chief of Police.

**SHALL/WILL:** The words "shall" or "will" shall indicate that action specified is mandatory.

**SICK LEAVE:** That period during which an employee is excused from duty for illness or injury under the applicable provisions of current General Orders and City of Savannah Policy.

**SPECIAL ORDER:** A written directive issued by established authority outlining instructions covering particular situations.

**SUPERVISOR:** Any person designated to act in a supervisory capacity, whether permanent or "acting" in a temporary appointment.

**SUSPENSION:** The act of temporarily denying an employee the privilege of performing his duties.

**PROCEDURE**

**I.   GENERAL STANDARDS OF CONDUCT**

    A.   SPD employees will conduct their private and professional lives in such a manner as to avoid negative reflection upon themselves, the department or their chosen

---

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 5 of 17*

**KANG 000365**

profession. Unacceptable conduct, whether on duty or off duty, includes, but is not limited to, arrest or conviction of any felony, arrest or conviction of any misdemeanor involving moral turpitude, or violation of any statue, law or official regulation, rule or order or commission of any act which compromise the public trust necessary for employment. To further the principle of professional law enforcement SPD employees will adhere to the following rules. [CALEA 26.1.1]

1. **Conduct Unbecoming** – The conduct of a public employee, on or off duty, reflects upon the SPD. The SPD shall investigate complaints and/or a circumstance suggesting an SPD employee has engaged in conduct unbecoming and shall impose disciplinary action when appropriate.

2. **Incompetence** - SPD employees shall maintain sufficient competency to properly perform their duties and to assume the responsibilities of their position. SPD employees shall perform their duties in a manner which will tend to maintain standards and establish efficiency in carrying out the functions and objectives of the Department. Incompetence may be demonstrated by repeated poor evaluations or a written record of repeated infractions of the rules, regulations, manuals or directives.

3. **Impartiality** - SPD employees, while charged with consistent and practical enforcement of the law, must remain completely impartial toward all persons coming to the attention of the SPD. Exhibiting partiality for or against a person because of race, creed, or influence is unprofessional conduct. Similarly, unwarranted interference in the private business of others, when not in the interest of justice, is unprofessional conduct and prohibited.

4. **Truthfulness/Honesty**: Employees shall not willfully, intentionally, or knowingly depart from the truth OR in any way be deceptive, provide misrepresentations, falsification, deliberately or intentionally omit or misrepresent material facts when giving testimony, providing information (orally or in writing), or reporting in connection with any official duties. This includes the submission of fictitious or inaccurate reports or the falsification or misrepresentation of any facts or circumstance in official agency records. Upon the order of a superior, employees shall truthfully answer all questions specifically directed and narrowly related to the scope of employment and operations of the agency.

5. **Treatment of Others** - Employees shall treat citizens, superiors, subordinates and associates with respect. They shall be courteous and civil at all times in their relationships with one another and in the presence of the public; employees will be referred to by rank.

    a. Employees shall not engage in offensive or harassing conduct, verbal or physical, towards fellow employees, supervisors or the public during work hours or off-duty hours.

    b. No employee will speak disrespectfully of any nationality, race, sex, or religion.

---

KANG 000366

c.   No employee will engage in grossly indecent or vulgar talk which would detract from the efficient operation of the SPD or create an uncomfortable work environment.

d.   No employee will create, or pass on either verbally or electronically any malicious rumors concerning other employees that is knowingly false or designed to speak disparagingly of others or department operations.

e.   When answering telephone calls on department phones or in response to your duties, you must identify yourself by: Rank (if applicable), name and your department or unit. You shall be courteous, respect and attentive throughout the interaction. If requested, name and payroll number will be given to requester in a courteous manner.

6.  **Insubordination** - SPD employees will perform their duties as required or directed by law, Department rule, policy, order, and directive or by a verbal order of a superior officer. The willful disobedience of a lawful order issued by any commanding officer or disrespectful, mutinous, rebellious, insolent, or abusive language or action toward any commanding officer will be considered insubordination and subject to discipline.

7.  **Chain of Command** – No employees will bypass any supervisor within their Chain of Command in routine matters. Should the employee have a grievance or wishes to report illegal or improper conduct involving their immediate supervisor they may go directly to the next person in line. This does not apply to immediate emergency notifications.

8.  **Cooperation** – Cooperation is essential to effective law enforcement. Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation.

9.  **Questions of Citizens** - All employees will answer questions posed by citizens in a courteous manner or if unable to supply an answer, will make every effort to secure the answer. If requested, name and payroll number will be given to requester in a courteous manner and department identification displayed. This precludes officers working in an undercover capacity from revealing their identity when it would jeopardize their mission.

10.  **Divulging Information** - Employees shall not divulge police information to which they have access or which may come to their attention, nor shall they make available any information contained in police records, radio communications, photographs, computers, teletypes or other files or information in any form whatsoever. For purpose of this section, all department information is to be considered confidential unless otherwise provided by current directives or directed by a supervisor. This section does not apply to orders that are of such a nature that they must be communicated to others.

11.  **Uniform Requirements** – No employee of the SPD will wear SPD uniforms at any time except when on active duty or on special occasions or assignments, including approved extra-duty employment. No employees will allow anyone beyond sworn members of the department to wear any uniform items.

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 7 of 17*

12. **Duty Time** – Employees will report for work on time and ready to perform their job. They will remain at their work station or assignment until relieved appropriately.

   a. Employees will not devote any of their "on duty" time to any activity other than that which relates to police work unless permission is granted by competent authority.

   b. Employees will not read magazines, papers books, etc. in public view that are not within the scope of their assigned duties.

   c. Employees will not conduct personal business to include operating a private business during duty hours

13. **Misappropriation of Property** - No employees of the SPD will appropriate for their own use any lost, found, or stolen property. No employees will convert to their own use any property of the City of Savannah or property held by the SPD.

14. **Absent Without Leave (AWOL)** - SPD employees will not be absent from duty without first submitting the appropriate paperwork or making the proper notification. Failure to do so will be considered AWOL. Leaving an assignment or duty post without permission will be considered AWOL. Arriving late without authorization will be considered tardiness and will subject the employee to possible discipline.

   a. Failure to report for duty "AWOL" is punishable by a minimum of a three (3) day suspension.

   b. Failure to respond to a call back or other mandatory staffing requirements (such as St. Patrick's Day, Fourth of July, Rock-n-Roll Marathon, etc.) is punishable by a minimum of a five (5) day suspension.

15. **Address And Telephone Numbers** - Immediately upon reporting for duty in a new unit, employees will record their correct residence address and telephone number with their Commanding Officer. Employees are required to have a telephone in the place where they reside. Changes in address or telephone number will be reported to their Commanding Officer within 24 hours of the change.

   a. SPD employees will not release to the public or any public agency the restricted home telephone number of any other employee of the Department without authorization from a superior Officer of the rank of Sergeant or higher. They will also not release the pager number or cell phone number of department pagers and cell phones without the same permission.

   b. SPD employees will not use the Department address on any motor vehicle registration or operator's license.

16. Conflicts of Interest

   a. **Contributions** - No employee will seek or be obliged to make contributions in money, service, or otherwise for any political purpose.

   b. **Political Activity** - No sworn employee, while on duty or in uniform, will engage in political activity or discussion on behalf of, or against, any

---

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 8 of 17*

KANG 000368

candidate or political question. This does not mean that employees are prohibited from exercising their legal voting right.

c. **Not to Recommend Services** - Employees will not recommend or suggest to anyone in the course of their duties the employment or name of any towing firm, funeral director, or other tradesman or inform such tradesmen of any situation wherein their services might be sought.

d. **Interfering with the Course of Justice** - Employees will not take part in, or be concerned with, either directly or indirectly, any compromise or arrangement with any person for the purpose of permitting an accused person to escape penalty for their wrong doing. No employees will seek to interfere with the course of justice for the purpose of obstructing justice. Information of any negotiation between an accused or their representative and the accuser or any witness will be disclosed to the proper superior or to the presiding officer of a court or hearing.

e. **Recommendation for Disposition of Cases** - Employees will not make recommendations for the disposition of any case pending in the courts without the consent of the Office of the Chief of Police.

f. **Statements Concerning Liability** - Employees will not make any oral or written statement to anyone concerning liability in connection with the operation of police vehicles or performance of other police duty, unless specially authorized to do so by the Chief of Police.

g. **Gifts and Favors** - Employees of the SPD will not seek, directly or indirectly, or accept any gift, present, or gratuity from any person, firm, group of persons, or relatives, friends, or employees of the same, on the basis of their employment with the SPD.

h. **Games of Chance** – Participating in games of chance, card playing, or gambling, including the purchase of lottery tickets is prohibited while on duty or in a police uniform. This excludes activities that are part of a legitimate criminal investigation.

i. **Associating with Criminals** - SPD employees shall avoid regular associations with persons who are known to engage in criminal activity where such associations will undermine the public trust and confidence in them or the SPD. This rule does not prohibit those associations that are necessary to the performance of official duties, or where such associations are unavoidable because of the SPD employee's personal or family relationships

j. **Other Transactions** - SPD employees are prohibited from buying or selling anything of value from or to any complainant, suspect, witness, defendant, prisoner, or other person involved in any case which has come to their attention or which arose out of their departmental employment, except as may be specifically authorized by the Chief of Police.

k. **Nepotism** – No employee will supervise either directly or indirectly any person to whom they are related to. (Refer to City Policy for details)

---

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 9 of 17*

**KANG 000369**

B.  Commanders and supervisors shall insure that employees under their command perform their duties appropriately

1.  Commanders and supervisors will provide efficient, effective and meaningful direction to subordinates and assist and instruct subordinates in the performance of their duties.

2.  Commanders and supervisors who overlook condone or fail to take actions on incompetence or misconduct on the part of their employees shall be guilty of neglect of duty and subject to discipline.

## II.  FITNESS FOR DUTY STANDARDS

A.  Employees are expected to maintain a degree of physical fitness which enables them to perform the physical activity, required by their job classification and assignment.

B.  Employees may be compelled to take a physical and/or mental examination at City of Savannah expense, with cause, only to confirm the employees' continued fitness to perform the tasks of their assignments and to inform them of their general physical condition, not to identify employees with disabilities who are otherwise able to perform their assigned duties, with or without reasonable accommodation. [CALEA 22.3.1]

C.  The nature of some specific positions or responsibilities may necessitate periodic specific health screenings, such as those for crime scene personnel, firearms instructors, or range technicians who are repeatedly exposed to hazardous chemicals or lead contaminates.

D.  SPD employees will not at any time be intoxicated while on duty.

1.  Employees will not consume intoxicants while off duty to the extent that evidence of such consumption is apparent when reporting for duty or to the extent that their ability to perform their duty is impaired. Employees will not consume intoxicants while on duty, unless necessary in the performance of a police task and then only with the specific permission and supervision of a commissioned officer and never in uniform.

2.  SPD employees will not use controlled substances, narcotics or hallucinogens, except when prescribed in the treatment of the employee by a licensed physician or dentist.  When controlled substances, narcotics or hallucinogens are prescribed, the employee will notify their supervisor immediately.

3.  SPD employees will not bring, place, or permit to be brought or placed, or allow to be kept in any building, location, or vehicle within or under the control of the SPD any intoxicant, exhilarant, hypnotic, hallucinogen, or narcotic except in the performance of police duties as required by regulations or orders or when it is needed for prompt administration by orders of a licensed physician.

E.  Civilian employees are prohibited from bringing firearms into any building operated by SPD of the City of Savannah with the exception of evidence or an approved training session.

F.  SPD employees are prohibited from sleeping while on duty

---

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 10 of 17*

KANG 000370

G. SPD employees will not conduct private business to include operating a privately owned business during duty hours.

H. **Smoking** - Employees will not smoke or use tobacco products in view of the public, in any office operated by the City of Savannah, or in any police vehicle. Those employees hired under a no tobacco use agreement are prohibited from using tobacco products.

I. **Sick Leave**

　　1. SPD employees utilizing a sick day shall contact (or have a representative contact) the on duty precinct supervisor or their unit supervisor (or designee) each day they call in sick.

　　　　a. In the event that you are unable to contact the on duty supervisor or your unit supervisor you may move up your chain of command until proper notification is made.

　　2. SPD employees needing to utilize a sick day will be required to call in (or have a representative call in) each day, at least one hour prior to their reporting time.

　　　　a. When calling in, the supervisor must be made aware of your regular days off and the names of all immediate supervisors (when applicable).

　　　　b. Supervisors will not inquire as to the nature of the illness nor will they relay any information concerning the nature of the illness to others should the person checking off tell them.

　　3. The Supervisor receiving notification will ensure that an electronic leave request is completed, immediately after notification.

　　　　a. The employee's immediate supervisor(s) and Police Personnel will be included in the routing of the electronic leave request.

　　4. SPD employees who have checked off sick may not work off duty or outside employment until they have returned to duty for at least one shift.

J. Employees will report any injury on duty to their supervisor in accordance with requirements set by the City of Savannah Risk Management.

## III. PROFESSIONAL LIFE STANDARDS

I. **Limitation of Authority** - The first duty of an SPD Officer, as upholder of the law, is to know the bounds the law established for its enforcement. The SPD Officer must, therefore, be aware of the limitations and proscriptions which the people, through law, have imposed as a primary responsibility.

## IV. PROFESSIONAL LIFE STANDARDS

I. **Limitation of Authority** - The first duty of an SPD Officer, as upholder of the law, is to know the bounds the law established for its enforcement. The SPD Officer must, therefore, be aware of the limitations and proscriptions which the people, through law, have imposed as a primary responsibility.

J. **General Responsibilities** – Within the corporate limits of the City of Savannah, SPD Officers shall at all times take appropriate action to:

---

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 11 of 17*

KANG 000371

1. Protect life and property.

2. Preserve the peace.

3. Prevent crime.

4. Detect and arrest violators of the law.

5. Enforce all Federal, State, and local laws and ordinances within the jurisdiction of the SPD.

K. **Knowledge of Laws and Rules** - SPD employees are required to establish and maintain a working knowledge of laws and ordinances enforced within the City of Savannah, the rules and policies of the SPD and the City of Savannah, and the orders of the SPD and Divisions thereof. In the event of improper action or breach of discipline, it will be presumed that the employee was familiar with the law, rule, or policy in question.

L. **Taking Police Action** - SPD employees are required to take appropriate police action toward aiding fellow police officers and members of the public exposed to danger or in a situation where danger might be impending. Based on the facts of the situation, the failure to take appropriate police action may be considered neglect of duty which is a serious offense in the realm of discipline and could result in termination.

M. **Arresting and Dealing With Law Violators** - SPD Officers shall use powers of arrest strictly in accordance with the law and with due regard for the rights of the citizen concerned.

N. **Police Action Based on Legal Authority –** The requirement that legal justification be present imposes a limitation on an Officer's actions. An Officer must act reasonably within the limits of authority as defined by statute and judicial interpretation

O. **Who is to Take Action** - The administrative delegation of the enforcement of certain laws and ordinances to particular units of the Department does not relieve employees of other units from the responsibility of taking prompt, effective police action within the scope of those laws and ordinances when the occasion so requires. Employees assigned to special duties are not relieved from taking proper action outside the scope of their specialized assignment when necessary.

P. **Responding to Calls** - SPD employees will respond without delay to all calls for police assistance from citizens or other employees. Emergency calls take precedence; however, all calls will be answered as soon as possible, consistent with normal safety precautions and traffic laws. Failure to answer a call for police assistance promptly, without justification, is misconduct.     Except under the most extraordinary circumstances, or when otherwise directed by competent authority, no employee will fail to answer any telephone or radio call directed to him.

Q. **Rendering Medical Aid** – SPD Officers will immediately summon the assistance of Emergency Medical Services for any person that an officer encounters as sick or injured to include use of force incidents. No request for EMS by a citizen will be denied.

---

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 12 of 17*

KANG 000372

R.  **Officer Availability** - SPD employees on duty will not conceal themselves, except when necessary to perform an assigned duty. They will be immediately and readily available to the public during duty hours.

S.  **Clarification of Assignment** - SPD employees in doubt as to the nature or details of their assignment will seek such clarification from their supervisors by going through the chain of command.

T.  **Reporting Accidents** - Accidents involving SPD personnel, property, and/or equipment must be reported as soon as possible.

U.  **SPD Property and Equipment** – SPD employees are responsible for the proper care of Department property and equipment assigned to them. Damaged or lost property may subject the responsible individual to reimbursement charges and appropriate disciplinary action. SPD employees shall not use Department equipment or property except as assigned by an authorized supervisor.

V.  **Damaged/Inoperative Property or Equipment** - SPD employees shall immediately report any loss of or damage to Department property assigned to or used by them to their immediate supervisor. The immediate supervisor shall be notified of any defects or hazardous conditions existing to any Department equipment or property.

W.  **Presumption of Responsibility** - In the event that SPD property is found bearing obvious evidence of damage that has not been reported, it shall be prima facie evidence that the last person using the property or vehicle was responsible. This presumption shall also apply to lost or missing property.

X.  **Arrests** - When making arrests, members will strictly observe the laws of arrest and the following provisions:

1.  Only necessary restraint to assure safe custody and the safety of the officer shall be employed.

2.  The arresting officer is responsible for the safety and protection of the arrested person while in his/her custody. The officer shall notify the transportation officers of any injury apparent illness or other condition which indicates the arrested person may need special care.

3.  The arresting officer is responsible for the security of the personal property in the possession of the arrested person or under his/her control at the time of arrest. Except for vehicles, this responsibility transfers to the transportation officers when they accept custody of the arrested person.

Y.  **Identification** - Except when impractical or unfeasible, or where the identity is obvious, Officers will identify themselves by displaying their badge before taking police action. Officers will provide their name and/or rank and/or payroll number and display their department issued identification whenever requested.

Z.  **Transporting Persons in Police Vehicles** – Private Citizens may be transported in SPD vehicles only when necessary to accomplish a police purpose. Such transportation will be done in conformance with SPD policy and with the approval of a supervisor.

AA.  **Orders** - Orders from a superior to a subordinate will be in clear and understandable language, civil in tone, and issued in pursuit of SPD business.

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 13 of 17*

1. **Inappropriate Orders** - No command or supervisory Officer will knowingly issue an order which is in violation of any law, ordinance, or Department rule. Employees who are given orders they feel to be unjust or contrary to rules and regulations must first obey the order to the best of their ability and then may proceed to appeal as provided below.

2. **Unlawful Orders** - Obedience to an unlawful order is never a defense to an unlawful action. Therefore, no employee is required to obey any order which is contrary to Federal or State, law or local ordinance. Responsibility for refusal to obey an order rests with the employee. Employees will be strictly required to justify their actions.

3. **Action upon receiving unlawful Orders** - SPD employees receiving an unlawful, unjust, or improper order will, at the first opportunity, report in writing to the Chief of Police through official channels. This report will contain the facts of the incident and the action taken. Appeals for relief from such orders may be made at the same time. Extra-departmental action regarding such an appeal will be conducted through the office of the Chief of Police.

4. **Conflicting Orders** - Upon receipt of an order conflicting with any previous order or instruction, the employee should advise the individual giving the second of the conflicting instruction. If so directed, the latter command will be obeyed first. Orders will be countermanded, or conflicting orders will be issued only when reasonably necessary for the good of the Department.

BB. **Conflict of Policy** - If an occasion arises where an SPD General Order and a City of Savannah policy are in direct conflict the City of Savannah policy shall supersede the Department.

CC. **Reporting Violations of Laws, Ordinances, Rules Or Orders** - Any employee who becomes aware of possible misconduct by another employee of SPD will immediately report the incident to a supervisor or directly to the Office of Professional Standards.

1. Any employee that observes serious misconduct will take appropriate action to cause the misconduct to immediately cease regardless of rank.

2. Any employee who is determined to have had such knowledge mentioned above and failed to report or attempt to prevent the conduct is subject to disciplinary action.

3. Retaliation against any other employee or member of the public, who reports, discloses, divulges or otherwise brings to the attention of appropriate authority any facts or information relative to the alleged violation of any law, ordinance or rule or regulation is strictly prohibited.

DD. **Medical Care** - Employees shall ensure that any injured or ill person is given the opportunity for medical care.

EE. **Payment of Debts** - All employees of the SPD will promptly pay their legal debts. Failure to do so will subject the offender to SPD disciplinary action.

FF. **Testimony in Civil Cases** - No sworn employee of the SPD will testify in any civil case in court unless legally summoned to do so or unless they have received permission or order from the Chief of Police.

---

*SPD GO # ADM-004 Oath of Office, Ethics, and Conduct / Page 14 of 17*

KANG 000374

GG. **Use of Private Vehicles** - Sworn employees will not patrol their post or cover their assignment with a private vehicle unless they have been authorized to do so by competent authority.

HH. **False Information on Records** - Employees of the SPD will not make false official reports or knowingly or willingly enter or cause to be entered into any SPD books, records, or reports any inaccurate, false, or improper police information or material matter.

II. **Loitering** -During their tour of duty, employees of the SPD will not loiter in cafes, bars, restaurants, theaters, service stations, or other public businesses, unless the employee is working undercover. Other than those transacting police business, employees will not be permitted to loiter in or about police buildings.

JJ. **Withholding Evidence** - Employees of the SPD will not fabricate, withhold, or destroy any evidence of any kind.

KK. **Soliciting Petitions for Promotion or Change of Duty** - No employees of the SPD will solicit a petition supporting the promotion or demotion or a change in duty status, of any SPD employee. This excludes letters of endorsement by individuals for employment

LL. **Distribution of Cards, Buttons, Etc.** - Employees of the SPD, individually or representing police organizations, are prohibited from issuing to persons other than employees, volunteers or chaplains of the SPD, any identification card, button or other device which assumes or implies to grant the person any special privilege or consideration in their business of the SPD.

MM. **Gifts and Favors** - No employees of the SPD will seek or accept, under any circumstances, directly or indirectly, any gift, reward, present, money, gratuity, or any form of compensation from any person, based on their employment as an SPD employee or for any service rendered.

    1. The Chief of Police is authorized to allow employees to accept and participate in publically presented acts of recognition.

NN. **Recognition of the United States Flag** – Uniformed sworn employees will render all honors to the flag in the form of a military salute.

    1. Massed flags, flags used for decorative purposes, etc., will not be saluted.

    2. During the playing of the national anthem officers will stand at attention and salute the flag.

    3. A hand salute will be rendered to a color guard when posting or presenting the colors (U.S. flag) in either a parade or assembly.

## V. DISCIPLINARY SYSTEM

I. SPD employees violating their oath and trust by committing an offense punishable under the laws or statutes of the United States, the State of Georgia, local ordinances, or who violates any provision of the Rules and Regulations of the Department, or who disobeys any lawful order, or who is incompetent to perform their duties is subject to appropriate disciplinary action.

KANG 000375

J.  Final Department disciplinary authority and responsibility rests with the Chief of Police.

    1.  For disciplinary purposes, the Chief of Police has the authority to reprimand, suspend up to 30 days, demote, or dismiss the employee from the Department, subject to review by the City Manager.

    2.  If the employee involved feels they may have been improperly treated, they may apply to the City Manager for a hearing after receipt of written notice of the penalty.

    3.  Any appeal of the decision of the City Manager must be made in accordance with existing civil service rules and regulations.  [CALEA 26.1.6]

K.  Supervisory personnel may take the following measures in the course of discipline:

    1.  Assign an officer to either new training or remedial training.

    2.  Verbal Counseling will be documented and place in the Officer's file

    3.  Written reprimand (subject to approval by the Chief of Police).

    4.  Written recommendations for other penalties.  [CALEA 26.1.5]

L.  Whenever disciplinary action  is to be taken or recommended, a written report must be submitted immediately, containing the following information:

    1.  The name, rank, payroll number, and present assignment of the person being disciplined.

    2.  The date(s) and time(s) of the misconduct and the location.

    3.  The section number(s) of the policy violated and wording.

    4.  A complete statement of the facts of the misconduct.

    5.  The punishment imposed or recommended.

    6.  The written signature, rank and payroll number of the preparing officer and their position in relation to the person being disciplined.  [CALEA 26.1.5]

M.  Any Supervisory or Command Officer has the authority to impose an emergency suspension against any employee regardless of the unit to which the employee is assigned until the next business day when an employee's continued presence at work would be a detriment to the efficiency of the Department or to public safety, A business day is defined as Monday through Friday from 0800 to 1700 hours.  [CALEA 26.1.5]

N.  An SPD employee receiving an emergency suspension will be required to report to the Division Commander on the next business day at 0800 hrs, unless otherwise directed by competent authority to appear at a different time or date. The command or supervisory officer imposing or recommending the suspension will also report to the Division Commander at the same time. The Chief of Police may sustain or rescind the suspension action.  [CALEA 26.1.5]

O.  When the command or supervisory officer of one unit orally reprimands an employee of another unit, they will notify the supervisor of the individual so disciplined as soon

---

KANG 000376

as possible. They will also submit a written report of this action and the reasons therefore to the commanding Officer of the employee.

This General Order serves as the Department's Rules and Regulations and supersedes all written directives issued prior to 04/23/2018 pursuant to **Oath of Office, Ethics, and Conduct**.

**BY ORDER OF:**
**Original Signature on File**

**Mark Revenew**
**Interim Chief of Police**

KANG 000377



**SavannahPD.org**

# SECTION 10

## Notifications

## 15. Administrative Leave letter for Officer Adrian Gates

**KANG 000378**



**SAVANNAH POLICE**

To Serve, Protect and Build Trust

*SavannahPD.org* 

**August 23, 2019**

**Adrian Gates**
Savannah Police Department
**SIU/Gang Unit**
Savannah, Georgia

**Adrian Gates**

Effective **August 23, 2019** you were placed on Administrative Leave with pay until further notice from the **Internal Affairs Unit**. During the time you are on Administrative Leave with pay, you are directed to remain at your residence during duty hours: 8:00 a.m. to 5:00 p.m., Monday through Friday. Any periods of absence from your residence during your duty hours must be preauthorized, by the Internal Affairs Office, Lt. David Barefield, or designee.

You are not allowed to discuss this case with anyone except members of the Internal Affairs Unit. You are not allowed to enter any SPD City/County facility. You are only authorized entry into these facilities under the escort of a member from the Internal Affairs Unit, or their designee.

You are to notify the Internal Affairs Unit if anyone attempts to discuss this case with you.

Employee

DATE: 8/23/19

Department Head or Bureau Chief
Savannah Police Department

DATE: 08-23-19

**KANG 000379**

EXHIBIT 38



<u>INTER-OFFICE CORRESPONDENCE</u>

**TO:**      Roy Minter, Police Chief

**THRU:**    Lenny Gunther, Assistant Police Chief
             Devonne Adams, Major, Criminal Investigations Division

**FROM:**    David W. Gay, Captain, Criminal Investigations Division

**SUBJECT:**  OPS #19-0384

**DATE:**    January 7th, 2019

---

In reference to the above referenced OPS investigation, I submit the following in regards to Officer Adrian Gates.

On Monday, January 6th at 1:30 PM a disciplinary review board convened at OPS to review this investigation and make recommendations.

The board consisted of the following members:

      Assistant Chief Lenny Gunther, Board chair
      Major Devonne Adams, CID Commander
      Captain David W. Gay, CID Captain & Scribe
      Lieutenant Torrance Garvin, CID Lieutenant
      Sergeant James Hutcherson, Gang & Gun Unit Supervisor

After receiving instructions from Lieutenant Barefield, the board met in private and discussed the investigation. The board sustained all of the allegations against Officer Gates. The discussion then shifted to discipline. After much discussion and deliberation, which included Officer Gates discipline history, the board reached the consensus that the appropriate and reasonable discipline is termination.

KANG 000380

**EXHIBIT 38**



### INTEROFFICE MEMORANDUM

**To:**      File Memorandum

**Thru:**

**From:**    Roy W. Minter, Jr.  Chief of Police

**Date:**    February 4, 2020

**Subject:** Notice of Final Discipline and Findings/ OPS #19-0384

---

On January 9, 2020, an Internal Affairs Unit file was forwarded to me concerning an investigation of alleged misconduct by Officer Adrian Gates.  I reviewed this investigation and have determined that the following allegation(s) are **SUSTAINED.**

1. Violation of G.O. #ADM-004 – Oath of Office, Ethics and Conduct

**DISCIPLINARY ACTION**

Based on my review of this investigation and recommendations from your supervisors, I have concluded that a **40-hour suspension** is appropriate for this matter.

.

P.O. Box 8032 • Savannah, Georgia  31412 • 912-651-6675 • Fax 912-651-6683

KANG 000381

EXHIBIT 38



SavannahPD.org

# Office of Professional Standards

**TO:**      **Officer Adrian Gates PR #63099**

**FROM:**    **Lt. David Barefield, Jr.**

**DATE:**     **February 18, 2020**

**SUBJ:**     **Return to Duty | OPS #19-0384**

**Officer Adrian Gates,**

      **Effective today, you are off of Administrative Leave and can return to full duty status. You need to contact Assistant Chief Gunther regarding when you are to report to your assigned shift.**

_____
Officer A Gates

2/18/20
Date

_____
Lieutenant David Barefield, Jr.

02-18-20
Date

KANG 000382

**EXHIBIT 38**



## INTEROFFICE MEMORANDUM

To:        File Memorandum

Thru:

From:      Roy W. Minter, Jr., Chief of Police

Date:      March 9, 2020

Subject:   Notice of Final Discipline and Findings / OPS #19-0384

---

On January 9, 2020, an Internal Affairs Unit file was forwarded to me concerning an investigation of alleged misconduct by Officer Adrian Gates. I reviewed this investigation and have determined that the following allegation(s) are **SUSTAINED**.

(1). Violation of SPD G.O. #ADM – 004: Oath of Office, Ethics, and Conduct
      I.      General Standards Of Conduct
           A.  (1) Conduct Unbecoming


(2). Violation of SPD G.O. #ADM – 004: Oath of Office, Ethics, and Conduct
      I.      General Standards Of Conduct
           A.  (3) Impartiality


**DISCIPLINARY ACTION**

Based on my review of this investigation and recommendations from your supervisors, I have concluded that a **40-hour suspension** is appropriate for this matter.

KANG 000383

**EXHIBIT 38**



# DISCIPLINARY ACTION RECORD

EMPLOYEE'S NAME:   **Officer Adrian Gates**                                    EMPLOYEE NO:   **63099**

DEPT. NAME:   **CID – Gang Unit**          SUPERVISOR'S NAME: **Sgt. Hutcherson**      DATE:   **02/10/2020**

---

Type of Action: (select one)
- ☐ Oral Reprimand
- ☐ Written Reprimand
- ☒ Suspended without pay for (40) forty hours beginning 02/11/2020 through 02/17/2020.
- ☐ Demotion (Attach Employee Action Record)

Type of Infraction (select one)
- ☐ Attendance    ☐ Performance    ☐ Safety    ☐ Violation of City Policy
- ☒ Violation of SPD Policy

**Supervisor's description of infraction. Include specific details (date, time, location, names of other employees involved, etc.). Attach additional sheet if needed.**

**OPS #19-0384**

**ADM-004 – Oath of Office, Ethics, and Conduct**

**History of Disciplinary Action previously administered to employee. List type of action, brief description, & date.**

**OPS #19-0371 (40 hour suspension) Violation of ADM-004 Oath of Office, Ethics, and Conduct**

**OPS #19-0311 (Written Reprimand) Violation of ADM-004 Oath of Office, Ethics, and Conduct**

---

**Performance Improvement - Plan for Improvement (PIP).  Include specific time frames, if applicable.**

The employee must complete the following activities in order to meet the acceptable standards of performance or behavior.  Failure to show satisfactory improvement will necessitate further disciplinary action which may result in eventual dismissal.

---

| Supervisor | Signature | Print Name | Date |
|---|---|---|---|
| Dept. Head | *Capt. A. Tom 16090* | *Capt. Alot Oral* | 2-10-2020 |
| | Signature | Print Name | Date |
| Employee | *[signature]* | GATES ADRIAN | 2/10/20 |
| | Signature | Print Name | Date |

Signature is an acknowledgement of the action.  It is not an admission of the infraction.  If you feel this action is unjust, you may complete an Appeal of Disciplinary Action form as outlined in the City's Appeal of Disciplinary Action policy and present it to your supervisor. **Distribution**:  Original to Employee, Copy to Human Resources & Department, Copy of suspensions only to Payroll.

Rev: 04/04/19

KANG 000384