EXHIBIT 10

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DANIEL KANG,                    )
                                )
            Plaintiff,          )
                                )
      vs.                       )
                                ) CIVIL ACTION FILE
THE MAYOR AND ALDERMEN OF       )
THE CITY OF SAVANNAH and        ) NO.: 4:21-CV-111
ROY W. MINTER, JR., Chief       )
of Police for the City of       )
Savannah, Georgia, In His       )
Individual and Official         )
Capacities,                     )
                                )
_____Defendants._____)

VIDEOCONFERENCE DEPOSITION OF
CHIEF LENNY GUNTHER

Friday, October 7, 2022
10:04 a.m.

218 West State Street
Savannah, Georgia

Abigail M. Pace, RPR, CCR-B-1484

**Gilbert & Jones**
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
*Brunswick*, GA 31520

*gilbertandjones1@gmail.com*
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
*Savannah*, GA 31406

EXHIBIT 10

2

```
 1                APPEARANCES OF COUNSEL

 2
     On behalf of the Plaintiff:
 3
         MICHAEL G. SCHIAVONE, Esq.
 4           (By videoconference)
         Jackson & Schiavone
 5       1111 Bull Street
         Savannah, Georgia 31401
 6       912-232-2646
         Js_law@bellsouth.net
 7
         JAMES H. WILSON, III, Esq.
 8           (By videoconference)
         Savage, Turner, Pinckney, Savage & Sprouse
 9       102 East Liberty Street
         8th Floor
10       Savannah, Georgia 31401
         912-231-1140
11       Jwilson@savagelawfirm.net

12
     On behalf of the Defendant the Mayor and Aldermen of
13   the City of Savannah:

14       PATRICK T. O'CONNOR, Esq.
         PATRICIA T. PAUL, Esq.
15       Oliver Maner, LLP
         218 West State Street
16       Savannah, Georgia 31401
         912-236-3311
17       Pto@olivermaner.com

18       JENNIFER N. HERMAN, Esq.
         City of Savannah
19       2 East Bay Street
         Savannah, Georgia 31401
20       912-525-3092
         Jherman@savannahga.gov
21

22

23

24

25
```

GILBERT & JONES

EXHIBIT 10

**Page 3**

1  On behalf of the Defendant Chief Roy W. Minter, Jr.:

2  SHAWN KACHMAR, Esq.
   HunterMaclean
3  200 East St. Julian Street
   Savannah, Georgia 31401
4  912-238-0261
   Skachmar@huntermaclean.com

6  Also Present:

7  Daniel Kang
   Mike Arango  (By videoconference)

9  - - -

GILBERT & JONES

**Page 4**

INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| Examination by Mr. Schiavone | 5 |
| Examination by Mr. Kachmar | 37 |
| Further examination by Mr. Schiavone | 39 |

- - -

GILBERT & JONES

**Page 5**

1  (Reporter disclosure made pursuant to
2  Article 10.B. of the Rules and Regulations of
3  the Board of Court Reporting of the Judicial
4  Council of Georgia.)
5       CHIEF LENNY GUNTHER,
6  having been first duly sworn, was examined and
7  testified as follows:
8       MR. SCHIAVONE:  All right.  So this is the
9  deposition of Chief Lenny Gunther pursuant to
10 notice in the Federal Civil Practice or Civil --
11 Rules of Civil Procedure.
12              EXAMINATION
13 BY MR. SCHIAVONE:
14    Q.   Chief, if you -- if there's a question you
15 don't understand or you need me to repeat it, just
16 ask me -- okay? -- and I'll be happy to do that.
17    A.   Yes.
18    Q.   Would you state your name, please, for the
19 record.
20    A.   Lenny Gunther.
21    Q.   And, Chief, how are you employed?
22    A.   Through the City of Savannah.
23    Q.   And what's your present position?
24    A.   Interim police chief for the Savannah
25 Police Department.

GILBERT & JONES

**Page 6**

1    Q.   All right.  And how long have you been a
2  police officer?
3    A.   About 21 years.
4    Q.   All right.  And was all of that here in
5  Savannah or did you have employment before you came
6  to Savannah?
7    A.   All in Savannah.
8    Q.   All in Savannah.  All right.  And you're
9  POST certified?
10   A.   Yes.
11   Q.   All right.  Tell me during the course of
12 your employment with the Savannah Police Department
13 have you worked in different areas of law
14 enforcement?  For instance, did you ever -- were you
15 ever required to serve arrest warrants as a police
16 officer at some point?
17   A.   Yes.
18   Q.   And tell me how the process works when
19 there's an investigation, an internal affairs
20 investigation, how does that -- what's the process?
21 How does that process work?
22   A.   I don't understand the question.
23   Q.   Is that requested by somebody to internal
24 affairs to do an investigation?  What's the
25 procedure, the protocol?

GILBERT & JONES

EXHIBIT 10

**Page 7**

1 A. For internal investigation that can come
2 from internal, an internal possible policy violation
3 and/or external complaint from the community.
4 Q. All right. And there's a certain part of
5 the police department that is designated to do the
6 internal affairs investigations; is that correct?
7 A. It depends on what type of complaint it
8 is. It can be a service complaint. It can be
9 investigated by the officer's supervisors. If it's
10 an administrative complaint, the office of
11 professional standards investigate, IA.
12 Q. All right. And the Savannah Police
13 Department it has certain policies that apply to
14 everyone employed with the Savannah Police
15 Department; is that correct?
16 A. Yes, sir.
17 Q. And can you tell me how these policies
18 work? Who creates a policy? Is there a procedure
19 for that or protocol?
20 A. I'm not familiar with the actual protocol
21 of who creates a policy.
22 Q. All right. Is there a -- is there a unit
23 at the police department that when a draft policy is
24 created it goes to them to be ratified and become
25 policy?

GILBERT & JONES

**Page 8**

1 A. Usually the Office of Professional
2 Standards in conjunction with accreditation.
3 Q. All right. And so a proposed policy then
4 would be submitted to them and they would review it,
5 what, to see if it complies with those areas that you
6 keep your certification, I guess? Things of that
7 nature? Is that a fair statement?
8     MR. KACHMAR: Object to the form.
9     MR. O'CONNNOR: You can answer subject to
10    his objection.
11 Q. (By Mr. Schiavone) Is that a fair
12 statement, Chief?
13 A. It goes through a process.
14 Q. Let me go it at this way. The Savannah
15 Police Department do they have to be evaluated by
16 some outside organizations and given some type of
17 certification?
18 A. It's not mandated that we have to.
19 Q. But does that happen and do they have
20 those kind of certifications?
21 A. Yes.
22 Q. Could you tell me what those -- to your
23 knowledge what those are that exist and would have
24 existed back when this case occurred? I mean you're
25 aware this deals with Dan Kang and Mike Arango, the

GILBERT & JONES

**Page 9**

1 incident concerning the execution of an arrest
2 warrant. You're familiar with that, aren't you?
3     MR. O'CONNNOR: Object to the form. That
4    was really three questions, Mike. So if you
5    want him to answer the last one is he familiar
6    with the situation.
7 Q. (By Mr. Schiavone) You're familiar with
8 the case, aren't you?
9 A. Yes.
10 Q. All right. Back when this was occurring
11 can you tell me what certifications, what
12 accreditations to your knowledge the Savannah Police
13 Department had during that period and if they still
14 have it?
15 A. I don't recall if our -- if we were going
16 through the process of accreditation or we actually
17 were accredited at that time.
18 Q. All right. And what would be the purpose
19 of that to get that accreditation?
20 A. Certain standards to exemplify certain
21 standards that a department may want.
22 Q. All right. So this unit that policies
23 would be submitted to, they do a review of it all and
24 then do they certify the policy and implement it?
25     MR. KACHMAR: Object to the form.

GILBERT & JONES

**Page 10**

1     MR. O'CONNNOR: You can answer it subject
2    to the objection.
3     THE WITNESS: They do review it.
4 Q. (By Mr. Schiavone) All right. So how
5 does it become policy to where it is considered
6 something that all officers are required to know that
7 it's a policy of the police department? How does
8 that happen?
9 A. After the review then the police chief
10 will sign off on the policy.
11 Q. All right. And then it becomes the policy
12 of the police department?
13 A. Yes, sir.
14 Q. All right. And policy of the Savannah
15 Police Department does that apply to everyone
16 employed, including superior officers all the way up
17 to the chief?
18 A. Yes, sir.
19 Q. And if a superior officer, for instance,
20 lieutenants, captains, assistant chief of police, and
21 the chief of police, if they violate policy, who
22 reviews that? Who holds them accountable?
23 A. OPS would review the case or a third
24 entity could be brought in to review the case when it
25 comes to certain ranks.

GILBERT & JONES

EXHIBIT 10

**Page 11**

Q. All right. And is the chief required to follow the policy that exists at the time?

A. Yes, sir.

Q. And are these policies kept somewhere where all officers and all employees of the Savannah Police Department they would have access, become familiar with the existing policy?

A. Yes.

Q. Is everyone required to become familiar with existing policy?

A. Yes.

Q. And are officers -- is it presumed that they can rely on what the policies are at the time there's an allegation that they may have violated policy?

MR. O'CONNNOR: Object to form.

Q. (By Mr. Schiavone) Can they rely that the ones that are listed are the policies of the police department at the time?

MR. O'CONNNOR: Same objection. You can answer.

THE WITNESS: I don't understand the question. If you could just . . .

Q. (By Mr. Schiavone) Well, I'll -- let me take it as a hypothetical. I'm a Savannah police

**Page 12**

officer and there's numerous policies that exist apparently that I am required to be familiar with. And there would be a location -- right? -- that I could go to to familiarize myself with that existing policy.

A. Yes.

Q. So an officer should be able to rely that the policies that should be followed would be listed there, wouldn't they?

A. Yes.

Q. All right. Now, in this case --

MR. SCHIAVONE: Do they have Exhibit 1 and 2.

THE COURT REPORTER: I don't have any exhibits.

MR. SCHIAVONE: We have a different court reporter?

MS. PAUL: Actually the court reporter left this here one and two.

MR. O'CONNNOR: We have what the court reporter had marked one and two. There are some -- that looks like your note, Patty.

All right. We've got one and two.

MR. SCHIAVONE: All right. Would you give those to the witness.

**Page 13**

MR. O'CONNNOR: He has them.

Q. (By Mr. Schiavone) All right. Chief, if you'll look at -- I'm not sure which is which. Would you tell me the Exhibit Number for the one that is OPS016 and it has the operation date of -- the last one of 8/29/2018. Do you see that one?

A. Yes, sir. Exhibit 1.

Q. That's Exhibit 1. And then Exhibit 2 would be the same -- presumably looks like the same policy but it has October 30th, 2019, marked out.

A. Yes, sir.

Q. All right. On Exhibit 2 or Exhibit 1 at the time of this case to your knowledge was that the existing policy?

A. I don't recall.

Q. All right.

A. I don't recall.

Q. Exhibit -- the 10/30/2019, what was that exhibit number?

A. Two.

Q. Two. Exhibit 2 that appears to be a draft policy. Are you familiar with that draft policy?

A. No.

Q. Have you made a decision since you became the interim chief that the department is not to

**Page 14**

follow Exhibit 2, that draft policy?

A. I didn't make a decision regarding exactly Exhibit 2. I would have to go through this whole policy to see exactly what this entails.

Q. Well, are you familiar that in this case Chief Minter followed this draft policy rather than the existing policy?

MR. KACHMAR: Object to the form.

Q. (By Mr. Schiavone) You were aware of that, weren't you?

MR. KACHMAR: Object to the form. You can answer, if you know.

THE WITNESS: What do you mean existing policy?

Q. (By Mr. Schiavone) Well, it wasn't a policy that applied to the officers because it had never been implemented and he was following a draft policy rather than the existing policy. You were aware of that, weren't you?

MR. KACHMAR: Object to the form.

THE WITNESS: No, I was not.

Q. (By Mr. Schiavone) Well, it appears that just about everything in this case went through you. You were copied with everything. Is that normal when you were the assistant chief at the time?

GILBERT & JONES

EXHIBIT 10

**Page 15**

1  A.   I would have to have the documents in
2  front of me to see exactly what exactly went through
3  me regarding this actual case from years ago.
4  Q.   Well, let me ask you: Would any chief or
5  anyone be allowed to follow a draft policy rather
6  than the existing policy?
7       MR. KACHMAR:  Object to the form.
8  Q.   (By Mr. Schiavone)  Generally would they
9  ever be allowed to do that?
10 A.   Generally the police chief would follow an
11 existing policy.
12 Q.   An existing policy.  All right.  Now, part
13 of the process -- and when did you become aware about
14 the internal investigation in this case?
15 A.   I'm sorry, I don't recall the exact date.
16 Q.   Well, I mean but you did become aware of
17 it?
18 A.   Yes.
19 Q.   All right.  And were you called in and
20 were you kept informed of everything that was
21 occurring in this case?
22      MR. O'CONNNOR:  Object to the form, Mike.
23      When you say occurring in the case, there's a
24      whole lot of aspects to the case.  Could you --
25 Q.   (By Mr. Schiavone)  Well, from the time an
                    GILBERT & JONES

**Page 16**

1  internal investigation began until the time that they
2  were terminated, were you kept informed each time
3  decisions were made and things that occurred in the
4  case?
5  A.   No.
6  Q.   All right.  Now, when internal affairs
7  does an investigation if at some point they think
8  that the officers may have committed a crime what's
9  the protocol?  Do you know?
10 A.   IA would not -- they would -- depends upon
11 the case.  That's when the GBI could possibly be
12 called in for a criminal violation.
13 Q.   All right.  And that would be and always
14 has been the standard protocol at the Savannah Police
15 Department -- hasn't it? -- to call an independent
16 agency in to investigate.
17 A.   I can't comment on always, sir.
18 Q.   Well, do you know of a case in which it
19 was not done and there was a criminal investigation
20 of the police officers?
21 A.   It would have to be -- if a case is
22 considered to be going to a criminal direction that
23 could also be referred to the district attorney's
24 office for review.
25 Q.   For review but the criminal investigation
                    GILBERT & JONES

**Page 17**

1  would be done by an outside agency, wouldn't it?
2  Make sure it's impartial?
3  A.   I believe in my career I've seen it done
4  both ways, GBI and referred to the DA's office for
5  review.
6  Q.   All right.  But that would be the only two
7  ways that based on your memory that the investigation
8  would occur, it would be done by the GBI or by the
9  district attorney's office?
10 A.   I can't recall.  There might be some
11 instances where as RCID might investigate but I can't
12 recall off the top of my head.
13 Q.   All right.  In this case are you aware
14 that the GBI was not called in to do an impartial
15 investigation or the district attorney's office?
16      MR. KACHMAR:  Object to the form.
17      THE WITNESS:  I don't know the particulars
18      in reference to the criminal aspect of the case.
19      If there was -- if anyone else was consulting a
20      third party.
21 Q.   (By Mr. Schiavone)  Well, you wouldn't --
22 the police department wouldn't do their -- require
23 all their SPD officers to do the criminal
24 investigation, would they?
25 A.   Can you explain all police officers?
                    GILBERT & JONES

**Page 18**

1  Q.   Well, you believe that a police officer
2  may have committed a crime and you contact criminal
3  investigations in your own department to do the
4  criminal investigation rather than an outside source,
5  an independent outside source.
6       MR. O'CONNNOR:  I'm sorry, what's the
7       question, Mike?
8  Q.   (By Mr. Schiavone)  The question is: The
9  Savannah Police Department has never done that, have
10 they?  Let the fox in with the chickens?
11 A.   I can't say, sir, if that's happened or
12 not.
13 Q.   All right.  Well, are you aware that
14 that's what happened in this case?
15      MR. KACHMAR:  Object to the form.
16      THE WITNESS:  I'm not aware.
17 Q.   (By Mr. Schiavone)  All right.  When did
18 you or did you become aware that the internal affairs
19 investigation -- well, what is the procedure if they
20 think that a criminal -- they start their
21 investigation.  If at some point during the course of
22 the investigation if they think that something
23 criminal may have occurred, what is the procedure at
24 that point?  Do you know?
25 A.   It can be referred to a third party.  That
                    GILBERT & JONES

EXHIBIT 10

**Page 19**

1 could be part of the procedure.
2    Q.   Well, aren't they required to stop their
3 investigation and do that, turn it over to a third
4 party to do a criminal investigation to protect the
5 officers? Isn't that the way the policies are
6 written?
7    A.   I would have to review the policy.
8 Typically IA does the administrative investigation.
9    Q.   Well, everyone is presumed to know policy,
10 aren't they, including you?
11    A.   You're presumed to know policy.
12    Q.   All right. Now, did you become aware that
13 Chief Minter took a personal interest in this case on
14 the criminal side?
15        MR. KACHMAR: Object to the form.
16    Q.   (By Mr. Schiavone) Did you have
17 conversations with him about that?
18    A.   No.
19    Q.   Are you aware that he walked this case
20 over to the district attorney's office?
21        MR. KACHMAR: Object to the form.
22        THE WITNESS: No.
23    Q.   (By Mr. Schiavone) Was there any ever any
24 discussions, did you have any discussions with Chief
25 Minter or did you hear any discussions in his
                GILBERT & JONES

**Page 20**

1 presence in which he discussed the criminal wanting
2 these two officers to be charged criminally?
3    A.   No.
4    Q.   All right. And what's the procedure once
5 a case becomes a criminal investigation? Do you all
6 hold press conferences to discuss the criminal
7 investigation once there is a criminal investigation?
8    A.   I can't comment on that because I didn't.
9    Q.   Well, you're the interim chief. If an
10 officer commits a criminal -- what you believe is a
11 criminal act, do you hold press conferences to
12 discuss the criminal case?
13    A.   I haven't had that experience yet.
14    Q.   All right. But is there a policy or a
15 protocol on that?
16    A.   I'm not familiar with a policy and I can't
17 comment on the protocol.
18    Q.   Well, are you aware that in this case --
19 all right. In this case were you part of the
20 disciplinary review?
21    A.   In this case I was the board chair.
22    Q.   All right. And isn't it true that after
23 the investigation you agreed with the recommendation
24 of suspension and not termination of these officers?
25    A.   In this case I had no -- as a board chair
                GILBERT & JONES

**Page 21**

1 you don't agree or disagree with the recommendation.
2    Q.   Well, you were aware that's the
3 recommendation, weren't you?
4    A.   Yes.
5    Q.   And did you have any objection to that?
6        MR. KACHMAR: Object to the form.
7        THE WITNESS: Objection to what, sir?
8    Q.   (By Mr. Schiavone) Of whether or not that
9 was the correct recommendation.
10    A.   In that role I didn't have an opinion.
11 That was not my role as board chairman.
12    Q.   Well, once that investigation was
13 completed and that -- that was the recommendation,
14 wasn't it?
15    A.   Yes.
16    Q.   And there was no recommendation nor did
17 anyone recommend or see that a crime had been
18 committed, isn't that true?
19        MR. KACHMAR: Object to the form.
20        THE WITNESS: As board chair I recall just
21    recommendations on the administrative platform
22    suspension.
23    Q.   (By Mr. Schiavone) Right. But nobody
24 found or recommended that the officers had committed
25 any crime, had they?
                GILBERT & JONES

**Page 22**

1    A.   No.
2    Q.   Yet Chief Minter didn't agree with the
3 recommendations and who pursued the criminal case
4 after that point?
5    A.   I don't recall.
6    Q.   Give me one second.
7        In a criminal investigation that's pending
8 and if there's video or any other evidence in the
9 case, what is the police department's policy about
10 making that public while a case is pending?
11    A.   I'm not familiar with a policy that
12 addresses making any information public or not public
13 regarding an active investigation.
14    Q.   Well, do you routinely release that kind
15 of evidence to the press when they request it in a
16 pending criminal investigation?
17    A.   No.
18    Q.   All right. Were you made aware that the
19 videos in the course of the execution of this arrest
20 warrant that those videos were made available to
21 Mayor Van Johnson to review?
22    A.   I was not made aware.
23    Q.   Were you aware of Chief Minter holding
24 press conferences in relation to the execution of
25 this arrest warrant and publishing those videos?
                GILBERT & JONES

EXHIBIT 10

**Page 23**

1 A. I recall the press conference vaguely. I
2 don't recall the publication of the videos publicly.
3 Q. Well, are you familiar with the Savannah
4 Citizens Accountability and Review of Emergency
5 Services, commonly called CARES?
6 A. Yes, sir.
7 Q. All right. And do you know why that was
8 created?
9 A. From what I remember it was a body of
10 citizens that were called in to review our policies,
11 yeah.
12 Q. And would the chief and the district
13 attorney have met with these people in reference to
14 this case?
15    MR. KACHMAR: Object to the form.
16    THE WITNESS: Do you mean should be or --
17 I don't --
18 Q. (By Mr. Schiavone) Well, I mean are you
19 aware that he had done that?
20 A. Not at that time.
21 Q. All right. But are you aware of it now
22 that he had done that?
23 A. Now.
24 Q. And that they had been shown and that
25 there was press conferences about this?

GILBERT & JONES

**Page 24**

1 A. I vaguely remember a press conference. I
2 wasn't in attendance.
3 Q. And that these people were shown evidence
4 in the case, including the video?
5 A. I don't recall that.
6 Q. All right. If that occurred and since
7 that occurred -- would have been in 2020, around
8 August of 2020. Since that date do you know of any
9 other case that has been presented to CARES since
10 then?
11 A. I'm not familiar.
12 Q. All right. Have there been other officers
13 since August or since the year of 2020 that have been
14 accused of criminal conduct?
15    MR. O'CONNNOR: Let me object to the
16    extent you're asking him to comment on currently
17    pending investigations or matters that are not
18    of public record. Subject to that.
19 Q. (By Mr. Schiavone) Well, just give me one
20 second and let me find some stuff here.
21    Are you familiar with the individual that
22 hung himself at the police department?
23 A. Yes.
24 Q. That occurred after this?
25 A. Yes.

GILBERT & JONES

**Page 25**

1 Q. And do you recall is there a criminal
2 investigation in that? You don't have to tell me the
3 facts, but is there a criminal investigation?
4 A. Yes.
5 Q. And does that involve, for instance, one
6 of the detectives Silver -- her last name I'll get it
7 wrong. What's her last name, Chief?
8 A. Leuschner.
9 Q. Leuschner. Are you aware of a criminal
10 investigation in that case with the GBI?
11 A. Yes.
12 Q. All right. And to your knowledge was that
13 case presented to CARE?
14 A. Not to my knowledge.
15 Q. And do you know if CARE even still exists?
16 Do they meet? Do you have any knowledge of that?
17 A. No knowledge of that.
18 Q. And have you ever been requested to appear
19 at a meeting with that group of citizens?
20 A. I have not.
21 Q. Since you became interim chief?
22 A. No, sir.
23 Q. All right. Now, when -- part of the
24 existing policy at the time of this incident, which
25 would be Exhibit 1, it's my understanding that was in

GILBERT & JONES

**Page 26**

1 force at the time. Are you familiar with the
2 requirements of the Douglas Factors?
3 A. Yes.
4 Q. And can you tell me your understanding of
5 what the Douglas Factors are?
6 A. My understanding of the Douglas Factors is
7 to articulate any aggravating or mitigating factors
8 relevant to the case or -- yeah, the policy of the
9 case.
10 Q. And wasn't that required in this case that
11 they had to have been considered and followed in the
12 evaluation part of the policy?
13    MR. KACHMAR: Object to the form.
14    THE WITNESS: It's part of the letter of
15    transmittal.
16 Q. (By Mr. Schiavone) Part of the letter of
17 transmittal?
18 A. Usually, yes.
19 Q. And if that was not followed, would that
20 be a violation of the policy?
21 A. If it wasn't followed?
22 Q. If the chief didn't follow the existing
23 policy and the Douglas Factors were not considered in
24 the evaluation of these two officers in making the
25 final decision.

GILBERT & JONES

1  MR. KACHMAR: Object to the form.
2  THE WITNESS: I don't recall if the
3  Douglas Factors were followed or not.
4  Q. (By Mr. Schiavone) All right. Is a
5  letter of transmittal required?
6  MR. KACHMAR: Object to the form.
7  THE WITNESS: When?
8  Q. (By Mr. Schiavone) During the course of
9  the investigation based upon the policies at the
10 time.
11 MR. KACHMAR: Object to the form.
12 THE WITNESS: Can you repeat your
13 question? I'm sorry about that.
14 Q. (By Mr. Schiavone) Isn't that part of the
15 procedure of the policy that letters of transmittal
16 have to be prepared and filed in the course of making
17 decisions to -- internally to either suspend -- I
18 mean whatever the outcome is of the investigation?
19 MR. KACHMAR: Object to the form.
20 THE WITNESS: In my experience, yes.
21 Q. (By Mr. Schiavone) All right. And are
22 you aware if there exists a letter of transmittal in
23 this case?
24 A. I'm not aware.
25 Q. All right. Now, are you familiar with

1  Chief Minter directing superior officers to
2  communicate to Arango and Kang not to criminally
3  charge Faitele in this case with obstruction and
4  simple battery?
5  MR. KACHMAR: Object to the form.
6  THE WITNESS: I'm not aware.
7  Q. (By Mr. Schiavone) You're not aware of
8  that.
9  Are you aware of any e-mails and
10 communications between Chief Minter and Meg Heap in
11 reference to this case?
12 A. No, sir.
13 Q. Now, are you aware of an officer by the
14 name of Adrian Gates?
15 A. Yes.
16 Q. And are you familiar with the alleged --
17 both policy violations and alleged criminal acts that
18 were alleged against Adrian Gates?
19 A. I do not remember.
20 Q. You don't remember. Well, would you have
21 been notified as to those investigations at the time
22 as the assistant chief?
23 A. Yes.
24 Q. All right. Are you familiar -- do you
25 have any memory at all of Adrian Gates?

EXHIBIT 10

1  A. I'm familiar with -- I remember Adrian
2  Gates.
3  Q. All right. And there were numerous
4  allegations on different occasions of him having
5  committed criminal acts?
6  A. I vaguely remember one. Well, I don't
7  remember the actual criminal aspect of that case.
8  Q. Well, do you recall back in August of 2020
9  where Officer Gates made an illegal arrest of Robert
10 Padgett?
11 A. I remember a case where as the arrest was
12 brought into question.
13 Q. All right. And based on that illegal
14 arrest that would be false imprisonment, wouldn't it?
15 MR. O'CONNNOR: Object to form.
16 Q. (By Mr. Schiavone) You're a police
17 officer. You've charged people with false
18 imprisonment, haven't you?
19 A. You asked two questions. What was your
20 first one?
21 Q. All right. The first one is: If a police
22 officer makes an illegal arrest, has no probable
23 cause, doesn't have a warrant, isn't that false
24 imprisonment?
25 A. If a police officer does that that's a

1  policy violation.
2  Q. It's also a crime, isn't it?
3  A. I don't know if it's -- it would have to
4  go through an investigative process to see what the
5  intentions were, so I can't speculate on that.
6  Q. Well, if a person is not free to leave and
7  they haven't committed a crime, isn't that false
8  imprisonment?
9  MR. O'CONNNOR: Object to form.
10 Q. (By Mr. Schiavone) In other words, if I
11 took ahold of you right now and you were not free to
12 leave, couldn't I be charged with false imprisonment?
13 A. Yes.
14 Q. All right. It's no different for a police
15 officer, is it?
16 A. No.
17 Q. No. And if you become aware of that
18 through your investigation, why wouldn't that have
19 been turned over to the district attorney and him
20 criminally charged?
21 MR. O'CONNNOR: Object to form. It's a
22 hypothetical without sufficient foundation. Go
23 ahead, if you can.
24 THE WITNESS: I don't recall the factors
25 of the details of that case.

EXHIBIT 10

**Page 31**

1     Q.    (By Mr. Schiavone) Well, if during the
2 course of the internal investigation he also gave
3 false statements, wouldn't that be a felony?
4     A.    During the internal investigation?
5     Q.    Right. Or at any time he's questioned by
6 law enforcement.
7     A.    That's considered a policy violation
8 untruthfulness.
9     Q.    Well, are you aware that after that
10 investigation no criminal action was taken against
11 him?
12     A.    I'm aware.
13     Q.    And that the GBI or no -- and no
14 independent organization was asked to investigate?
15     A.    I wasn't aware of that.
16     Q.    All right. And are you aware that the
17 first time that he violated policy and procedure
18 termination was recommended but the Chief only
19 suspended him for 40 hours? Are you aware of that?
20     A.    I am aware of a case where termination was
21 recommended and he was suspended.
22     Q.    All right. And then there was a second
23 incident with Gates after that that there was an
24 interdepartment memo dated September 9, 2020, that
25 was sent to you as well as other superior officers in

GILBERT & JONES

**Page 32**

1 which it was determined that Gates had given false
2 statements in reference to policy violations, had
3 lied?
4     A.    I'm sorry, I don't remember that. I don't
5 have that.
6     Q.    All right. If that were true, false
7 statements would be a felony, wouldn't it? That
8 would be a criminal act on the part of the officer?
9     A.    I don't recall that case. It would be a
10 policy violation.
11     Q.    Well, are you familiar with the case of
12 Corporal Darrell Repress?
13     A.    Which case, sir?
14     Q.    The case in which there were allegations
15 against him back in March -- an investigation was
16 done in March 11th of 2021. Do you recall that case?
17     A.    I don't recall. I do a lot of cases.
18     Q.    Well, do you recall allegations of false
19 imprisonment in that case?
20     A.    I don't recall.
21     Q.    All right. Do you recall if a criminal
22 investigation was done and if criminal charges were
23 brought against the officer?
24     A.    I'm not familiar with any criminal charges
25 brought against Officer Repress.

GILBERT & JONES

**Page 33**

1     Q.    All right. Give me one second.
2         Do you recall Chief Minter asking for
3 there to be further investigation of an incident with
4 an individual named Pernell Drayton that occurred in
5 August of 2019 before he left the SPD?
6     A.    I'm not familiar, sir.
7     Q.    You're not familiar with that at all?
8     A.    You said August 2019?
9     Q.    That's when the incident occurred.
10    A.    I don't remember. I'm sorry.
11    Q.    Do you recall the Chief asking that that
12 be reopened in 2021?
13    A.    No, I don't recall.
14    Q.    Do you recall any investigation in
15 reference to that incident?
16    A.    No, I do not.
17         MR. SCHIAVONE: All right. Just give me a
18 second and I'll be right back.
19         (Off the record.)
20         MR. SCHIAVONE: Okay. I've just got maybe
21 a couple of more questions depending on his
22 answer if everybody is ready?
23         MR. O'CONNNOR: Yeah.
24    Q.    (By Mr. Schiavone) Chief, were you made
25 aware of the HR complaint filed by a number of

GILBERT & JONES

**Page 34**

1 officers, about 70, including Arango and Kang
2 concerning the chief's conduct?
3    A.    Yes, sir.
4    Q.    And was that -- how did you become aware
5 of that?
6    A.    I don't recall. I recall the
7 multi-officer complaints against the chief. I don't
8 remember how I found out exactly about that
9 complaint.
10    Q.    All right. Was there discussions at the
11 police department in reference to it?
12         MR. KACHMAR: Object to the form.
13    Q.    (By Mr. Schiavone) Meetings with the
14 chief?
15         MR. KACHMAR: Object to the form.
16         THE WITNESS: I don't recall any meetings
17 with the chief about that complaint.
18    Q.    (By Mr. Schiavone) Well, did you ever
19 have any discussions with the chief about it, about
20 the allegations?
21    A.    I remember discussing the fact that a
22 complaint was brought against him by several
23 officers.
24    Q.    Right. And there was a discussion about
25 who the officers were?

GILBERT & JONES

EXHIBIT 10

**Page 35**

1  MR. KACHMAR: Object to the form.
2  THE WITNESS: We did not conversate about
3  specific officers.
4  Q. (By Mr. Schiavone) Well, did he have a
5  copy of the complaint when you all had that
6  discussion?
7  A. No, I've never seen a copy of that
8  complaint.
9  Q. All right. Do you know if the chief had
10  it when you all were meeting?
11  A. Not to my knowledge.
12  Q. All right. Was that a set meeting
13  scheduled to discuss it?
14  A. I don't recall if it was a formal meeting.
15  It was a discussion that he had a complaint lodged
16  against him by several members of the police
17  department.
18  Q. All right. Who was present when you had
19  that discussion?
20  A. I don't recall. It was a while ago.
21  Q. All right. Can you tell me what the
22  discussion was about? Tell me what was said?
23  A. My recollection is that there were -- it
24  was a complaint against him by several officers, but
25  I don't recall any specifics about who and actually

GILBERT & JONES

**Page 36**

1  what during that discussion.
2  Q. Well, what would you be talking about
3  then? If it wasn't who brought it and what the
4  allegations were, what was the discussion about?
5  A. I believe the discussion revolved around
6  several members of the police department being
7  dissatisfied with him. I'm trying to recall
8  specifics. Yeah, at that -- I didn't see the
9  complaint so that was the discussion. A lot of
10  specific information wasn't relayed to me.
11  Q. Was this right after the complaint was
12  filed?
13  A. I don't recall the timeline. I am sorry.
14  Q. Was it before the Kang and Arango
15  incident?
16  A. I believe it was after.
17  Q. It was after the Kang and Arango?
18  A. I believe so.
19  Q. All right. And did he discuss Kang and
20  Arango?
21  MR. KACHMAR: Object to the form.
22  THE WITNESS: He did not.
23  Q. (By Mr. Schiavone) To your memory do you
24  remember who was present for the meeting?
25  A. I don't recall.

GILBERT & JONES

**Page 37**

1  MR. SCHIAVONE: All right. Just give me a
2  second.
3  I think that's all the questions I have.
4  Thanks.
5  MR. O'CONNNOR: No questions from the
6  City.
7  EXAMINATION
8  BY MR. KACHMAR:
9  Q. Chief, good morning. I actually -- I
10  represent Chief Minter. I just have a few questions
11  for you.
12  In your role as interim chief do you have
13  the discretion to make discipline and termination
14  decisions related to officers you supervise?
15  A. I do.
16  Q. Okay. As far as you know did Chief Minter
17  have that same discretion when he was chief of
18  police?
19  A. He did.
20  Q. Were you present at the mitigation hearing
21  that was held in this case?
22  A. Relevant to Officer Kang?
23  Q. Officer Kang, yes, sir.
24  A. Yes.
25  Q. Do you recall what happened at that

GILBERT & JONES

**Page 38**

1  hearing?
2  A. I recall -- vaguely. I think Officer Kang
3  presented a PowerPoint.
4  Q. So Officer Kang was at the mitigation
5  hearing?
6  A. Uh-huh. Yes.
7  Q. Is that a yes?
8  A. Yes.
9  Q. Okay. I'm not trying to trick you. I'm
10  just tying to see if you remember what happened. I
11  understand it was a while ago.
12  A. Okay.
13  Q. And you said Officer Kang presented a
14  PowerPoint?
15  A. I believe so.
16  Q. Okay. Was it your understanding that at
17  that hearing Officer Kang was aware of the charges
18  that were made against him?
19  A. Policy violations?
20  Q. Yes, sir.
21  A. I don't recall if Kang knew or not.
22  Q. Okay. Well, the mitigation hearing in the
23  timeline of events did it come after the review panel
24  made its decision and recommendations?
25  A. Yes.

GILBERT & JONES

EXHIBIT 10

**Page 39**

Q. Okay. What's the purpose of the mitigation hearing?

A. The purpose of a mitigation hearing is for the officer to present to the chief any factors that they may think would have an impact on the chief's decision.

Q. Do you remember the contents or the substance of Mr. Kang's PowerPoint?

A. I might be getting things kind of twisted but I recall Kang -- the only thing I recall is Kang presenting maybe something on lack of proper equipment and/or maybe a specific policy.

Q. Do you recall whether Officer Kang admitted to acting inappropriately in relation to the Faitele incident?

A. I don't remember.

Q. Okay.

A. I don't remember.

MR. KACHMAR: That's all I have.

FURTHER EXAMINATION
BY MR. SCHIAVONE:

Q. Chief, would you look at Exhibit 1 and 2, and will you tell me where a mitigation hearing even exists in the policy of the Savannah Police Department. And if it does, tell me which exhibit

GILBERT & JONES

**Page 40**

it's in.

A. Yes, sir. Exhibit 2.

Q. And that is the policy that was not enforce at the time?

MR. KACHMAR: Object to the form.

MR. O'CONNNOR: Join the objection. You can answer.

THE WITNESS: Can you explain, sir, what do you mean enforced?

Q. (By Mr. Schiavone) Well, if you look at the top of it 10/30/2019 it was marked out.

A. Okay.

Q. Okay. This is a draft policy that the chief followed in this case rather than the actual policy.

MR. KACHMAR: Object to form.

Q. (By Mr. Schiavone) The other exhibit is the existing policy. As of 8/29/2018 that was the existing policy; isn't that true?

MR. KACHMAR: Object to the form.

THE WITNESS: Based upon what I have in front of me, yes.

Q. (By Mr. Schiavone) All right. So these officers would not have known anything about that draft policy because it wasn't an existing policy,

GILBERT & JONES

**Page 41**

correct.

MR. KACHMAR: Object to the form.

THE WITNESS: If indeed this is a draft, they would not have known.

Q. (By Mr. Schiavone) And isn't the chief like anybody else required to only follow the policy in existence at the time?

MR. KACHMAR: Object to the form.

THE WITNESS: As a police chief you follow the existing policy.

MR. SCHIAVONE: All right. No further questions. Wait a minute. Just one second.

Q. (By Mr. Schiavone) Were you aware that they -- that Wiggins -- do you know who Wiggins is?

A. Yes, sir, I do.

Q. All right. Were you aware that Wiggins had informed those officers that they were not to prepare for an alleged mitigation hearing?

A. No, sir.

MR. KACHMAR: Object to the form.

Q. (By Mr. Schiavone) Were you aware of that?

A. No, sir.

Q. Would there be any reason that Wiggins would have told these officers not to prepare for

GILBERT & JONES

**Page 42**

that?

MR. KACHMAR: Object to the form.

THE WITNESS: I can't comment on his reasons, if he did or not.

Q. (By Mr. Schiavone) All right. Are you aware that Chief Minter told Wiggins to tell them that?

A. No, sir, I'm not.

MR. KACHMAR: Object to the form.

Q. (By Mr. Schiavone) All right. And would the -- just one more -- one second.

MR. SCHIAVONE: All right that's all the questions I have. Thank you.

MR. O'CONNNOR: Thank you very much.

THE COURT REPORTER: What would you like to order?

MR. SCHIAVONE: I'm not sure. I'll have Brent's office contact you and let you know about that.

THE COURT REPORTER: Do you know what you want, Mr. Wilson?

MR. WILSON: I'm going to let Brent make that decision.

MR. KACHMAR: Digital minuscript.

MR. O'CONNNOR: Whatever Patty needs.

GILBERT & JONES

EXHIBIT 10

## Page 43

```
 1        MS. PAUL:  The same.
 2        THE COURT REPORTER:  Just electronic mini
 3   only?
 4        MR. O'CONNNOR:  The Chief reserving
 5   reading and signing and you can send that to me
 6   or Patty.
 7        THE COURT REPORTER:  Okay.  Do you need a
 8   copy?
 9        MS. HERMAN:  No.
10        (Deposition concluded at 11:06 a.m.)
11        (Pursuant to Rule 30(e) of the Federal
12   Rules of Civil Procedure and/or O.C.G.A.
13   9-11-30(e), signature of the witness has been
14   reserved.)
```

GILBERT & JONES

## Page 44

### CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA:
COUNTY OF CHATHAM:

I hereby certify that the foregoing transcript was reported as stated in the caption and the questions and answers thereto were reduced to writing by me; that the foregoing 43 pages represent a true, correct, and complete transcript of the evidence given on Friday, October 7, 2022, by the witness, CHIEF LENNY GUNTHER, who was first duly sworn by me.

I certify that I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c); I am a Georgia Certified Court Reporter here as an employee of Gilbert & Jones, Inc. who was contacted by Savage, Turner, Pinckney, Savage & Sprouse to provide court reporting services for the proceedings; I will not be taking these proceedings under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and by the attached disclosure form I confirm that neither I nor Gilbert & Jones, Inc. are a party to a contract prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board.

This, the 16th day of October, 2022.

_____
Abigail M. Pace, B-1484, RPR

GILBERT & JONES

## Page 45

### DISCLOSURE OF NO CONTRACT

I, Debbie Gilbert, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Gilbert & Jones, Inc. was contacted by Savage, Turner, Pinckney, Savage & Sprouse to provide court reporting services for these proceedings and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board for the taking of these proceedings.

There is no contract to provide reporting services between Gilbert & Jones, Inc. or any person with whom Gilbert & Jones, Inc. has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

This, the 16th day of October, 2022.

_____
Debbie Gilbert,
FIRM REPRESENTATIVE
Gilbert & Jones, Inc.

GILBERT & JONES

## Page 46

**DEPOSITION OF: CHIEF LENNY GUNTHER/AMP**

I do hereby certify that I have read all questions propounded to me and all answers given by me on October 7, 2022, taken before Abigail M. Pace, and that:

___ 1) There are no changes noted.
___ 2) The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. ___ Line No. ___ should read:_____
_____
The reason for the change is _____
_____

Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is _____
_____

Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is _____
_____

Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is _____
_____

Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is _____
_____

Page No. ___ Line No. ___ should read: _____
_____
The reason for the change is _____

GILBERT & JONES

DEPOSITION OF: CHIEF LENNY GUNTHER/A

Page No. ___ Line No. ___ should read: _____

The reason for the change is
_____

Page No. ___ Line No. ___ should read: _____

The reason for the change is
_____

Page No. ___ Line No. ___ should read: _____

The reason for the change is
_____

Page No. ___ Line No. ___ should read: _____

The reason for the change is
_____

Page No. ___ Line No. ___ should read: _____

The reason for the change is
_____

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

_____
**CHIEF LENNY GUNTHER**

Sworn to and subscribed before me,
This the ___ day of _____, 20__.

_____
Notary Public
My commission expires: _____

Please forward corrections to:

Gilbert & Jones, Inc.
P. O. Box 1894
Brunswick, GA 31521
(912) 264-1670
GILBERT & JONES