## <u>REPORT OF LOUIS M. DEKMAR, November 18, 2022</u>

Shawn A. Kachmar, Attorney-At-Law, retained me, Louis M. Dekmar, to review documents and other material related to this case, <u>Daniel Kang *v. City of Savannah et al*</u>, Civil Action No.: 4:21-cv-111-WTM-CLR, United States District Court for the Southern District of Georgia, Savannah Division. A list of these documents and material can be found as a part of this report. My opinions in this matter are informed by the materials and documents provided by Mr. Kachmar.

I have 45 years of civilian police experience and four years of military police practice as a law enforcement specialist (USAF). My experience includes serving as police chief or chief of public safety for 31 years. Presently, I am the Chief of Police for the City of LaGrange, Georgia. I am responsible for the supervision, personnel, and management of the LaGrange Police Department. In the police department, I instituted significant personnel, operational, and service-related initiatives, improving training and educational curriculum, developing, and expanding community and problem-solving policing programs, while reducing liability and crime rates and increasing citizen confidence and community partnerships.

The LaGrange Police Department is accredited by the Commission on Accreditation for Law Enforcement Agencies (CALEA), receiving its first award in 1999. The agency has maintained State Certified since 1998. The police department provides contract police services for the LaGrange Downtown Development Authority. From 2005 to 2018, I served as Chief of Public Safety for the City of LaGrange, responsible for the police department (121 FTE 97/24) and the fire department (63 personnel). The Fire Department is an ISO Class II, operates four stations, and it provides a variety of fire and EMS services. During that time, I instituted practices and protocols that increased training, personnel development, and effective accountability systems. The Commission on Fire Accreditation International (CFAI), accredited the LaGrange Fire Department in 2018.

During my career as police chief in two different jurisdictions, I implemented the Community Oriented Policing philosophy resulting in significant partnerships with non-profits, faith-based services, and other government agencies. Additionally, I created a caseworker position within the police department to address high-risk populations and make effective referrals to partner agencies. I developed and monitored accountability crime fighting models based on data analysis, both for traditional and gang-related crime.

As police chief, I have directed, guided, and supervised the investigations of employee conduct, misconduct and the promulgation of policies, procedures, rules, and orders to support the efficient and effective delivery of police services as a central duty of my responsibilities. During my career, I have investigated administrative and criminal allegations of misconduct of police officers and overseen investigations of officer-involved use-of-force incidents, to include deadly force, in more than 35 years of supervisory assignments. My training and experience are that of a police officer, investigator, supervisor, manager, leader, and decision-maker. I have over three decades involvement in policy promulgation on matters related to police operations, administration, and support services, as well as employee accountability systems, with an emphasis on critical task policies. Additionally, I served for over 30 years as the chief disciplinary officer for three separate departments and for 27 years as a member of the city disciplinary appeals board for city departments, not involving police personnel.

In my role as police chief, I review and approve all department use of force reports, after the incidents have been investigated by the shift supervisor, approved by the division commander, and examined by the Office of Professional Standards. In that capacity, I have reviewed over 2,000 use of force incidents.

Similarly, I have generated policies and procedures, training criteria, and data collection for Emergency Vehicle Operations (EVOC) and vehicular pursuits. Further, as a part of the policy compliance assessment, not unlike the use of force process, I have reviewed over four hundred police vehicle pursuits for compliance and any indicators that would call for a modification of policy or training.

I have provided expert opinions or commentary on use of force, school safety, racial trust building, vehicle pursuits, police transparency, presumptive drug tests, police response to mental illness, policy and procedure, body cameras, policing and criminal justice reform which has appeared in the *New York Times, Atlanta Journal-Constitution, USA Today, Los Angeles Times*, *The Washington Post*, and on NBC News, CBS News, CNN, NPR, Georgia Public TV, and other local, national, international media outlets.

## **Prior Experience**

Chief of Police, City of Morrow, Georgia: 1991 - 1995, the department of forty-four employees served a city located in the Atlanta-Metropolitan area, with a daytime/evening population of 70,000. I implemented and developed operational policies, guidelines, and personnel processes. As police chief, I was the final reviewing authority for all use of force reports. In addition, I created and managed a multi-jurisdictional 911 Communications Center providing communication services to Police, Fire, and Emergency Medical Services.

Acting City Manager, City of Morrow, Georgia: 1994, for five months was responsible for the day-to-day operations of the city, which included fire, emergency medical services, public works, code enforcement, and municipal court, as well as serving as police chief.

Police Captain, Perry, Georgia: 1988 - 1991, served as commander for the Criminal Investigations Division, which included the Internal Affairs function. Additionally, I handled the Communications and Records Section. During that assignment, I aided with the CALEA accreditation process and developed policies and protocols for that division.

Police Officer, Macon, Georgia: 1987 – 1988, performed all duties associated with the patrol function in a diverse city of more than 110,000. Conducted initial and follow-up investigations, enforced traffic laws, responded to various calls for service.

Investigator, Converse County and Prosecuting Attorney's Office, Douglas, Wyoming: 1979 – 1987, responsible for initial and follow-up investigation on serious misdemeanor and felony cases, which included domestic violence, child abuse, sexual assault, illegal drugs, homicides, unattended deaths, police, and public official misconduct.

Police Officer, Douglas, Wyoming: 1977 – 1978, performed all duties associated with the patrol division in a "boom-town." Conducted initial and follow-up investigations, enforced traffic laws, responded to various calls for service. I also served as a Field Training Officer (FTO).

Law Enforcement Specialist, United States Air Force: 1973 – 1977, enforced laws and regulations consistent with the Uniform Code of Military Justice; responsible for sentry security, patrol, and responding to various calls for service.

I served as a Civil Rights Monitor for the United States Department of Justice, Civil Rights Division (DOJ) for three years. In that role, I monitored a police agency to ensure compliance with tasks detailed in a

Memorandum of Understanding between the agency and DOJ. I assisted the agency in developing policies, protocols, and procedures to ensure administrative and managerial safeguards addressing officer misconduct issues, particularly those involving bias-based profiling, internal affairs, and accountability.

In addition, I conduct police management audits, assessments, served on promotional boards and assessment centers, and performed use of force reviews and inquiries for law enforcement agencies, recommending modifications in policy, processes, and training to increase efficiencies and reduce agency liability. I also aid municipalities in police chief searches, advising and taking part in the selection process.

I hold a Master of Public Administration, Georgia College and State University, and a Bachelor of Science, University of Wyoming. I am a graduate of the FBI National Academy (142nd) and a graduate of the FBI Law Enforcement Executive Development Seminar (LEEDS). During my career I have attended over 3,500 hours of law enforcement training in patrol, criminal investigations, supervision, internal affairs, administration, management, leadership, policy, and procedure.

I am the Past-President (2017-2018) of the International Association of Chiefs of Police (IACP), a world-wide organization representing more than 31,000 police executives and professionals in 152 nations. During my period of leadership I introduced a "Trust Building" and "Elder Abuse" initiative and the "One Mind Campaign," recognized as the best practice for law enforcement agencies to adopt in dealing with those affected by mental illness. In addition to the professional organizations already referenced, my memberships include the National Organization of Black Law Enforcement Executives (NOBLE) and the FBI National Academy Associates. In 2004, as the delegation leader for the Georgia International Law Enforcement Exchange (GILEE), I traveled to Israel for a two-week training exchange with the Israel National Police and am currently a Board Member for GILEE.

In 2004, I was appointed as a Commissioner to the Commission on Accreditation for Law Enforcement Agencies (CALEA) for a period of ten years, serving as Chair/President for five years. While on the Commission, I chaired the Standards Review and Interpretation Committee (SRIC) for three years, which is responsible for developing and modifying public safety standards. In that role, I collaborated with the Innocence Project to develop law enforcement standards for eyewitness identification (showups, line-ups, and photo line-ups). I was appointed and served on the 2003 Standards Review Task Force, which completed a top-to-bottom review of the Standards for Law Enforcement Agencies Manual, resulting in the publication of the 5th Edition Manual. I also served on the Campus Security Committee, which created an accreditation process for non-sworn campus officers and the 2nd Edition Training Academy Accreditation Standards Manual. In addition, I chaired the CALEA Assessment Report Committee that examined and modified the Assessment Report, which included the gathering of use of force data, FBI Uniform Crime Report information, arrest rates, EEOC data related to hiring, firing, and promotion, and pursuit data for all CALEA accredited agencies.

I am a member and Past-President of the Georgia Association of Chiefs of Police (GACP), which represents more than 550 police chiefs in a variety of forums. In 2004, as GACP president, I initiated the GACP "white paper" process and appointed the first committee to generate a white paper on "Electronic Control Weapons." In 2006, I chaired a "Vehicle Pursuit" committee for the GACP, which published a white paper that recommended a required data gathering instrument from of all law enforcement agencies in Georgia that receive Law Enforcement Certification. That recommendation was adopted, resulting in the recording and analysis of vehicle pursuit data for Georgia law enforcement agencies for over a decade. The pursuit research was also accepted by the U.S. Supreme Court in a Brief of Amicus Curiae (*Scott v Harris, 2007*).

In 2013, I chaired an "At Risk Adult Abuse, Neglect, and Exploitation" committee for the GACP, which also published a white paper.

I am a former member of the Peace Officer Standards and Training Council (POST), serving on the Probable Cause Committee (PCC), which reviews investigations and issues sanctions in cases of police misconduct. During my tenure on the seven-member Probable Cause Committee, PCC reviewed more than 1,500 misconduct cases and revoked the certification status of more than five hundred jailers, correction officers, and peace officers. I also served eight years as a governor-appointed member of the Georgia Board of Public Safety, which provides policy oversight for the Georgia State Patrol, Georgia Bureau of Investigation, and the Georgia Public Safety Training Center.

I am an international presenter for police leaders and elected officials on a range of topics involving leadership, ethics, law enforcement management, and liability issues. I have provided numerous training programs or lectures to police chiefs, municipal and county attorneys, elected officials, and other law enforcement personnel in Alabama, Arkansas, California, Colorado, Georgia, Florida, Illinois, Indiana, Louisiana, New Hampshire, New Jersey, Nevada, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, South Carolina, Virginia, Washington, Wisconsin, Singapore, Republic of Georgia, Mexico, Hungary, Taiwan, and the Arab Emirates; I am a Georgia POST certified instructor. I have also presented at the Federal Bureau of Investigation (FBI) National Academy.

For more than 35 years, I have held the position of adjunct professor. Currently, I serve in that role for Columbus State University and have since 1995, teaching in their graduate public administration program. In 1996 through 1998, I served as an adjunct faculty member at LaGrange College, teaching undergraduate courses in criminal justice. From 1992 until 1995 I was an adjunct professor for Georgia College and State University; and, in 1982 through 1986, I served as an adjunct member of the Eastern Wyoming College faculty, instructing undergraduate students. The courses I taught in the undergraduate programs included constitutional law, criminology, juvenile delinquency, criminal investigations, ethics, and corrections.

## Awards and Professional Recognitions

2022
- "Trailblazer" Award, Georgia Innocence Project (GIP), partnered with GIP in developing state-wide Eyewitness Standards and related training for law enforcement; partnered with GIP and directed a police investigation into a Wrongful Conviction that resulted in the release of a citizen who served 40 years for crimes he did not commit; and, developed state-wide standards for post-conviction investigations by law enforcement.

2020
- Dr. Curtis McClung Motorola Award for Excellence, Georgia Association of Chiefs of Police, for various community-police initiatives and partnerships

2019
- IACP Executive Board Service Award (2014-2019)
- St. Francis of Assisi Award, St. Thomas More Society, Red Mass, Atlanta, Georgia for innovation in addressing past harms and building effective community partnerships
- Doctorate of Humanities - Honoris Causa, LaGrange College, LaGrange, Georgia
- Friend of NAMI Award, National Alliance on Mental Illness – Georgia Chapter, for various mental health initiatives and support for Crisis Intervention Team (CIT) Training

- National Hope Givers Award for Mental Illness for various mental health initiatives, support for Crisis Intervention Team (CIT) Training, and initiating and chairing the "One Mind" Campaign
- National Council for Behavioral Health's Visionary Leadership Award for the IACP "One Mind" Campaign

2018
- Honorary Doctorate, Central Police University, Taipei, Taiwan
- Citizen of the Year, LaGrange Rotary Club, for decades of community initiatives and service
- "Service Above and Beyond" Award, National Constables and Marshals Association, for racial trust building and commitment to the police profession

2017
- Kay Family Award presented at the Kennedy Center for the Performing Arts, Anti-Defamation League's most prestigious national award, for the initiating an acknowledgment and apology for 1940 lynching of Austin Callaway involving the LaGrange Police Department
- National Elected Prosecutor's "Headlight" Award for Racial Trust Building
- Robert Lamb Humanitarian Award, National Organization of Black Law Enforcement Executives (NOBLE) for Racial Trust Building
- Leadership Award, Troup County National Association for the Advancement of Colored People (NAACP) for initiating an acknowledgment and apology for 1940 lynching of Austin Callaway involving the LaGrange Police Department

2014
- Egon Bitner Award, Commission on Accreditation for Law Enforcement Agencies, for leading and keeping an accredited police department for over 15 years

2009
- Georgia Governor's Award for Life-Time Achievement and Contribution to the Law Enforcement Profession

2004
- Servant Leadership Award, LaGrange College for various community-police initiatives affecting the citizens of LaGrange

1997
- Police Chief of the Year, Georgia Association of Chiefs of Police

1988
- Officer of the Year, Perry Police Department

1978
- Medal of Valor for Bravery displayed in the Line of Duty, Douglas (WY) Police Department

## Authored Articles and Papers

Louis M. Dekmar, "I'm a police chief. I know about use of force and recent data about police behavior tells a different story than many believe." Op-ed, Atlanta Journal-Constitution, (August 28, 2022): A-18.

Tashante McCoy and Louis Dekmar, "As police brutality cases continue to mount, six things officers should do to build trust," Op-ed, USA Today, (December 16, 2021).

Louis Dekmar, "Training is key to excellence in policing in Georgia," Op-ed, Atlanta Journal-Constitution, (September 12, 2021): A-21.

Louis Dekmar and Collette Flanagan, "How to stop a killing like that of George Floyd from ever happening again," Op-ed, CNN Opinion, (April 2, 2021).

Louis M. Dekmar, "Criminal probes must seek truth," Op-ed, Atlanta Journal-Constitution, (March 11, 2021): A-13.

Louis M. Dekmar, "Flawed culture, not poor training," Op-ed, Atlanta Journal-Constitution, (June2, 2020): A-13.

Louis M. Dekmar, "One Mind," Michigan Police Chiefs (Fall 2019): 34-35.

Louis M. Dekmar, "The Cornerstone of Policing: Public Trust," President's Message, Police Chief 85, no. 8 (August 2018): 6.

Louis M. Dekmar, "Professional Excellence: An Earned Honor," President's Message, Police Chief 85, no. 7 (July 2018): 6.

Louis M. Dekmar, "Equipping for the Reality We Face: Addressing Community and Media Backlash," President's Message, Police Chief 85, no. 6 (June 2018): 6.

Louis M. Dekmar, "Ensuring Officer Engagement in Physical Fitness and Wellness Programs: A Supervisor's Duty," President's Message, Police Chief 85, no. 5 (May 2018): 6.

Louis M. Dekmar, "Protecting the Most Vulnerable in Our Communities," President's Message, Police Chief 85, no. 4 (April 2018): 6.

Louis M. Dekmar, "Combating Complex Drug Issues Requires a Collaborative, Multifaceted Approach," Police Chief 85, no. 3 (March 2018): 6, 10.

Louis M. Dekmar, "Solving Crimes in the Lab: Understanding the Role of Forensic Science in Policing," President's Message, Police Chief 85, no. 2 (February 2018): 6.

Louis M. Dekmar, "Leading the Way to a Culture of Safety," President's Message, Police Chief 85, no. 1 (January 2018): 6.

Louis M. Dekmar, "Contributing to Healthy Communities through the One Mind Campaign," President's Message, Police Chief 84, no. 12 (December 2017): 6.

Louis M. Dekmar, "The Year Ahead," President's Message, Police Chief 84, no. 11 (November 2017): 6–7.

Louis M. Dekmar, (2013), "At Risk Adult Abuse, Neglect and Exploitation in Georgia" Review and Recommendations White Paper, Georgia Association of Chiefs of Police, May 15.

Louis M. Dekmar, (2012), "Rivera Audit Report" Canton (GA) Police Department, January 12.

Louis M. Dekmar, "Handling Citizen Complaints through Proactive Methodology," The Police Chief (April 2010): 50–52.

Louis M. Dekmar, (2006), "Law Enforcement Pursuits in Georgia," Review and Recommendations White Paper, Georgia Association of Chiefs of Police, June 22.

**Training Courses or Presentations on Law Enforcement related Topics and Issues**

- Columbus Regional Police Academy — Supervisor Ethics Training
- Mercer University Law School — Internal Affairs
- National Association of Attorney Generals — Hate Crimes
- Georgia Association of Chiefs of Police — Conviction Integrity Policy
- Georgia Police Accreditation Coalition — Post-Conviction Investigations
- Tennessee Municipal Attorneys Association — High Liability Police Tasks
- Alabama Association of Chiefs of Police — Leadership Liability Variables
- NY-Division of Criminal Justice Services Symposium — Acknowledging Past Harms
- International Municipal Lawyers Association (IMLA) — Critical Task Police Policies
- International Forum on Police Cooperation (Taiwan) — Transnational Crime
- Georgia College and State University — Leadership
- The National Council for Behavioral Health — Police Response Mental Illness
- Georgia Chiefs Association (GACP) - District — Internal Affairs Training
- Association of State Criminal Investigative Agencies — CALEA Standards
- American Society of Criminology Conference — Police Use of Force
- Georgia Association of Internal Affairs Investigators — Internal Affairs Policy/Practice
- FBI National Academy — Leadership Trust Building
- Georgia City-County Attorneys Institute — Police Misconduct/Liability
- Legal and Liability Risk Management Institute (LLRMI) — Leadership and Policy
- New England Police Accreditation Coalition (NEPAC) — Leadership: Trust Building
- Colorado Association of Chiefs of Police — Blue on Blue Fatal Shooting
- National Internal Affairs Association — Policy/Accountability System
- FBI National Academy Associates, Georgia Chapter — Policy/Audits/Reviews
- IACP Annual Conference — Police Use of Force
- Georgia Police Accreditation Coalition — Pattern Practice Civil Rights
- Georgia New Police Chiefs School — Leadership/Policy/Discipline
- Public Agency Training Center-USA — Critical Policies and Procedure
- 11th Circuit Court of Appeals, Mediation Service — Racial Trust Building
- Association of State Criminal Investigative Agencies — Response Police Inv. Shooting
- Georgia Bar Association — Racial Trust Building
- Tennessee Police Chiefs Association — Policy and Procedure
- Georgia Association of Chiefs of Police — Eye Witness Policy/Procedure
- University of Virginia — Community Trust/Police
- The International Association of Chiefs of Police — Policy: Elder Abuse
- Georgia Municipal Association — Critical Police Tasks
- National Innocence Project Conference — Eye Witness Policy
- Georgia Association of Chiefs of Police — Pursuits: Policy Implications
- FBI National Academy Associates, Georgia Chapter — Missing Child Policy/Protocol
- Georgia International Law Enforcement Exchange (GILLE) — Body Camera Policy
- Alabama Police Chiefs Association — Police and the Media
- 9th Circuit, Mediators Dispute Resolution Conference — Civil Rights/Trust Building
- National Alliance for Mental Illness — Response to Mental illness
- Criminal Justice Association of Georgia — Racial Trust Building

- National Institute of Ethics-USA — Integrity Leadership
- Georgia Public Safety Training Center-Columbus — Ethics
- National Institute of Ethics — Advanced FTO Training
- Emory Law School — Eye Witness Standards
- Georgia Public Safety Training Center — Internal Affairs Investigations
- Alabama Chiefs Association — Policy/Procedure, Use of Force
- United Nations Police-Oslo, Norway — Law Enforcement Standards
- Colorado Police Chiefs Association — Police Involved Shooting
- Gwinnett County Police Department — Ethics and Professionalism
- Columbus Regional Police Academy — Supervision   Ethics (Mandate)
- Georgia Law Enforcement Command College — Civil Rights/USC: 14141
- Georgia Police Accreditation Coalition — Racial Profiling

## International, National, and State Commissions, Summits, Committees, and Roundtables

- 2022 – Georgia Association of Chiefs of Police and the Georgia Municipal Association, Chair, Collaborative effort in developing the Police Leadership Institute for developing law enforcement command staff and chief executive officers.

- 2021 - Department of Justice, Bureau of Justice Assistance (BJA), Training and Technical Assistance engagement to BJA to increase awareness of current challenges and promising practices in addressing hate crimes through the facilitation of a national focus group.

- 2021 - Georgia Municipal Association (GMA), Excellence in Policing Award Committee, Co-Chair: Responsible for developing an affordable, achievable, scalable, and measurable set of best practices and guidelines for public safety agencies to use as part of GMA's Certified Cities of Equity and Inclusion (E&I) program.

- 2021 - National Law Enforcement School Recognition Initiative Advisory Board, in coordination with the Office of Community Oriented Policing Services (COPS Office), to set up a program to create criteria to find and highlight schools that are going beyond to prioritize the safety and security of their students and staff.

- 2020 - Council on Criminal Justice, CCJ Task Force on Policing: Conducted a review of the research evidence on the top policy proposals under consideration by states and localities to enhance police accountability and reduce misuse of police authority, racial bias in policing, unjustified force, and police involved citizen fatalities.

- 2020 - The Peace Officers' Association of Georgia Foundation, committee member: Charged with developing a position paper to serve as framework for state law and policy on police operations, including use of force.

- 2020 - Presidential Commission - United States Attorney General, Washington, D.C.: Presidential Commission on Law Enforcement and the Administration of Justice, Grants Working Group. This Group reviewed the efficacy of federal grant programs in aiding state, local, and tribal law enforcement entities and constructively evaluated and recommended best use of federal funding for local law enforcement.

- 2019 - Behavior Health Innovation Commission, Atlanta, GA: Appointed to the Commission by the Speaker of the Georgia House of Representatives to conduct a comprehensive review of the behavioral health system in Georgia, including the impact mental health issues have on the criminal justice system.

- 2019 - White House, Washington, D.C.: Participated in a Criminal Justice Reform Strategy Session on follow-up legislation and policy relating to prison re-entry.

- 2018 - London Metropolitan Police Service (Met), Ditchley, UK: Participated in a three-day conclave facilitated by the chief of the Met and its high-ranking members. During the session, I took part in various plenary sessions, focusing on major trends in violent crime and the application of emerging technology.

- 2018 - White House, Washington, DC: Represented police leaders tasked with working with the White House on a legislative initiative. I provided input and recommendations for "First-Step" legislation." IACP was the only law enforcement association to offer initial support for this proposed legislation, after conducting an extensive analysis. "First-Step" provides incentives for inmates taking part in education and training, as a method to reduce recidivism rates.

- 2018 - National Police Chiefs' Council (NPCC), London, UK: Annually, the NPCC brings together the police leaders in England, Wales, and Northern Ireland, I participated in this invitation-only discussion on contemporary police issues involving operational responses to national threats such as terrorism, organized crime, and national emergencies.

- 2016 - IACP: Chaired a roundtable and working group involving more than thirty different national disciplines or organizations represented. The year-long effort resulted in a publication, "Police Response to Mental Illness," and IACP's "One-Mind" campaign. Currently almost five hundred agencies, involving more than 90,000 officers have generated policy and training, based on community partnerships to reduce the use of force incidents with those affected by mental illness.

- 2016 - The Peace Officers' Association of Georgia Foundation, "Use of Force in Georgia." Served as a subject matter expert and IACP representative on issues and challenges surrounding police use of force in Georgia, published in 2017.

- 2015 - White House, Washington, DC: Participated and aided in facilitating an event called, "A Cycle of Incarceration: Prison, Debt and Bail Practices," to bring public attention to the connection between poverty and the criminal justice system and highlight state reform efforts.

- 2015 - Association of State Criminal Investigative Agencies (ASCIA), Atlanta, GA: Served as IACP representative to ASCIA Use of Force Committee, presenting on local agency response to police involved shootings.

- 2014 - United Nations Police, Oslo, Norway: Presented at a conference attended by representatives from more than seventy nations on police standards and their international application.

- 2012 - Peace Officer and Prosecutor Training Fund Committee, Atlanta, GA: Conducted an analysis for all Georgia stakeholders relating to the administration of training funds collected under the

"Peace Officer and Prosecutor Training Fund" constitutional amendment.

- 2012 - EMERGING USE OF FORCE ISSUES, Balancing Public and Officer Safety Report from the International Association of Chiefs of Police/COPS Office, Use of Force Symposium, I participated as a subject matter expert.

- 2010 - Georgia Bureau of Investigation, Crime Laboratory Research & Analysis Project, Atlanta, GA: Conducted an end-user survey and compiled the results of the survey to decide the "State of the Crime Lab" and to make recommendations addressing deficiencies identified through the survey.

- 2009 - United States Attorney General (AG), Washington, DC: I participated in a roundtable with the Civil Rights Division to review the last 15 years of § 14141 litigation and to discuss ideas and suggestions for future directions. The meeting brought together a representative group of individuals including police chiefs and other law enforcement executives, attorneys, case monitors, advocates, and other federal staff to consider lessons from past experiences and deliver suggestions related to the future of § 14141 litigation.

- 1998 - Georgia Bureau of Investigation (GBI) Crime Laboratory Commission, Atlanta, GA: Served as a member of the Commission that studied the state-wide crime laboratory service delivery system and published a report that guided legislature support for increased funding of more than $50 million for the GBI Crime Laboratory System.

## Audits, Independent Reviews, Assessments and Evaluations, or Selection Services

1. November 2022, Stone Mtn, GA — Police Chief Selection Process
2. March 2022, Warm Springs, GA — Police Chief Selection Process
3. July 2021, College Park, — Police Chief Selection Process
4. April 2021, Tifton, GA — Police Management Audit
5. March 2021, College Park, GA — Police Management Audit
6. July 2019, Douglas County, CO — Communications CALEA Assessment
7. October 2018, LaGrange, GA — Fire Chief Selection Services
8. April 2018, Woodbury, GA — Police Chief Selection Services
9. August 2017, Tustin, CA — Police Department CALEA Assessment
10. March 2017, Boca Raton, FL — Police Department CALEA Assessment
11. August 2016, Valparaiso, IN — Police Department CALEA Assessment
12. April 2016, Springfield, OH — Police Department CALEA Assessment
13. January 2016, Warms Springs, GA — Police Chief Selection Services
14. September 2015, Luthersville, GA — Police Chief Selection Services
15. July 2015, Deer Park, TX — Police Department CALEA Assessment
16. June 2015, Peachtree City, GA, — Police Chief Selection Services
17. May 2015, Fort Lauderdale, FL — Independent Audit: Police Misconduct
18. April 2015, City of Honolulu, HI — Police Department CALEA Assessment
19. October 2013, Stockbridge, GA — Police Chief Selection Services
20. April 2013, Rice University, TX — Public Safety Management Audit
21. January 2013, Lakewood, CO — Independent Review: Fatal Officer on Officer
22. October 2012, Peachtree City, GA — Assistant Police Chief Selection Services
23. June 2012, City of Pembroke, GA — Police Management Audit

24. February 2012, Morrow, GA     - Police Chief Selection Services
25. January 2012, Univ. of Idaho, ID     - Independent Audit: Homicide/Suicide
26. December 2011, Cincinnati, OH     - Police Management Audit
27. December 2011, Canton, GA     - Independent Audit: Child Homicide
28. January 2011, Spokane, WA     - Death Investigation Review and Findings
29. June 2010, U of Florida, FL     - Police Shooting Review: Mental Illness
30. May 2010, U of Scranton, PA     - Audit and Use of Force Liability Training
31. May 2010, Geo Washington U., D.C.     - Independent Death Investigation Review
32. October 2009, Babson College, MA     - Public Safety Management Audit
33. May 2009, BART, Oakland, CA     - Management Audit: Fatal Police Shooting
34. March 2009, Col of NJ, Trenton, NJ     - Independent Inquiry: Police Use of Force
35. October 2008, Tulsa C College, OK     - Police Management Study
36. September 2008, Villa Rica, GA     - Police Department Management Audit
37. July 2008, Bucknell College, PA     - Policy and Training: Use of Force
38. April 2008, Lutherville, GA     - Police Chief Selection Services
39. February 2008, Peachtree City, GA     - Police Chief Selection Services
40. April 2007, GA State University,     - State Certification Assessment
41. February 2007, Albany, GA     - Police Department Management Audit
42. September 2005, Villa Rica, GA     - Police Chief Selection Services
43. January 2005, Villa Rica Police, GA     - Civil Rights Monitor: Racial Profiling
44. January 2005, Hope, AR     - Police Department CALEA Re-Assessment
45. January 2004, Hope, AR     - Police Department CALEA Assessment
46. August 2003, St. Catherine, Canada     - Police Services - CALEA Re-Assessment
47. August 2003, Kettering, OH     - Police Department CALEA Assessment
48. May 2003, Jacksonville Beach, FL     - Police Department CALEA Assessment
49. Nov. 2002, Gwinnett Co. School, GA     - State Certification Assessment
50. November 2002, Cornelius, NC     - Police Department CALEA Assessment
51. August 2003, St. Catherine, Canada     - Police Services - CALEA Assessment
52. August 2001, Shelby, NC     - Police Department CALEA Assessment
53. August 2000, Memorial Villages, TX     - Police Department CALEA Assessment
54. March 2000, Manchester, GA     - Police Chief Selection Services
55. March 2000, Monticello, GA     - Police Management Audit
56. January 2000, Scarsdale, NY     - Police Department CALEA Assessment
57. September 1999, So. Plainfield, NJ     - Police Department CALEA Assessment
58. May 1998, Forest Park, GA     - State Certification Assessment
59. December 1996, Henrico Co., VA     - Police Department CALEA Assessment
60. May 1996, Willowbrook, IL     - Police Department CALEA Assessment
61. February 1996, Mansfield, OH     - Police Department CALEA Assessment
62. May 1994, Summerville, SC     - Police Chief Selection Services

## **Appeared, Deposed, or Contracted as an Expert Witness in the following Controversies.**

1. January 2022, *Terrance Haynes v. Frank Astrella, et al*, United States District Court, Central District of Illinois, Urbana Division, retained as expert witness by **Plaintiff** and supplied a **written opinion** and **testified in deposition** regarding improper investigation, policy, procedure, and accountability systems related to wrongful conviction.

2. August 2021, *Ronald Eric Louden Jr. v. Officer Kenneth Carter, et al,* United States District Court, Northern District of Illinois, Eastern Division, retained as expert witness by **Defendant** and provided a **written opinion** regarding police use of force.

3. *March 2021, Darnell Banks vs. City of Country Club Hills, and Cortez Maxwell,* United States District Court, Northern District of Illinois, retained as an expert by **Plaintiff** and provided a **written opinion** and **testified in deposition** regarding police use of force.

4. December 2020, *Grant Nelson v. Walmart, et al,* Circuit Court of Cook County, Illinois, retained as an expert by the **Plaintiff** to review a murder of an Uber Driver and provided a **written opinion** and **testified in deposition** regarding off-duty or extra duty officer responsibility, commercial business police reporting of crime, and police response to in-progress or emergency calls for service.

5. June 2020, *Woinakee Gebray Harris-Billups v. Milele Anderson,* United States District Court for the Northern District of Georgia, Atlanta Division, retained as an expert by the **Defendant** and provided a **written opinion** regarding a police officer's use of deadly force.

6. October 2019, *State v. Devin Eaton,* Superior Court, State of Connecticut, retained as an expert by the **State's Attorney Office**, to review documents and other material related to a use of force criminal prosecution of a police officer and provided a **written opinion**.

7. August 2019, *Nakiya Moran v. Calumet City, et al,* United States District Court, Northern District of Illinois, Eastern Division, retained as an expert by the **Plaintiff** and provided an opinion and **testified in deposition** regarding improper investigation, policy, procedure, and accountability systems related to wrongful conviction.

8. January 2019, *Justin Strolis v. Lucas Heise,* United States District Court, Southern District of Georgia, retained as an expert by the **Defendant** and provided a **written opinion** regarding a criminal investigation and false arrest claim.

9. December 2018, *Ronald Jackson v. City of Butler,* retained as an expert by the **Defendant** and provided a **written opinion** regarding employment practices during the police chief selection process and **testified in deposition.**

The fee I received for reviewing the material in this matter and generating a report of my opinions is $300 per hour and $3500 a day for testimony.

***I considered the following documents and information in forming the basis of my opinions:***

1. Plaintiff Kang's Second Amended Compliant
2. Defendant's Answers to Plaintiff's Second Amended Complaint
3. Answer of Defendant Roy Minter
4. Court's Order to Plaintiff's Motion to Dismiss
5. Complaint Form completed by Darryl Faitele, 04/22/2020, 4 p.
6. Complaint Form completed by Rebecca Faitele, dated 04/21/2020, 4 p.
7. Administrative Investigation, OPS 20-0022, CITY00141-164
8. SPD OPS First Page, CITY00165-166

9. Facts and Finding, CITY00139-140
10. Emails between Chief Minter and Lt. IZZO, CITY00271
11. Conflict Resolution Program Form, KANG 000953 – 961
12. Conflict Resolution Program Form, CITY00432-744
13. Jeff Grant's Summary of Officer Complaints, 08/2/2020, 9 p.
14. Jeff Grant emails, May 20, 2020, September 23, 2020, August 12, 2020, 3 p.
15. Roy Minter's Summary Response to Officer Complaints, 10/2/2020, 19 p.
16. SPD GO #OPS-016, Office of Professional Standards, KANG 001333-1345 (Strike Out 10/30/2019)
17. SPD GO #OPS-016, Office of Professional Standards, KANG 001321-1332(Revised: 08/29/2018)
18. SPD GO #OPS-016, Office of Professional Standards, Revised: 08/03/21, CITY00167-228
19. SPD GO #ADM-002, Organization and Direction 08/21/18, City K 01972-1981
20. SPD GO #ADM-007, Police Response -Aggression/Resistance/Force, 08/10/22, City K 01999-2016
21. SPD GO #ADM-004, Oath of Office, Ethics, and Conduct, Revised 04/23/2018, CITY00749-765
22. SPD GO #OPS-067, Body Worn Cameras, Revised: 02/09/18, City K 02017-2023
23. City of Savannah Disciplinary, HR-019, Revised 08/30, 2013, CITY00272-276
24. City of Savannah, HR-020A, Appeal of Disciplinary Action, Revised: 01/1/2005, CITY00281-283
25. City of Savannah, HR-020B, Pre-Termination Process & Appeal, Revised: 01/01/2005, 00288-289
26. Various City of Savannah and SPD Policies, CITY00272-323
27. Daniel KANG, HR Complaint, 04/10/2020, 00962-000983
28. OPS Closure Letter to Darryl Faitele, 08/07/2020
29. Octavio Arango, "Appeal of Suspension Prior To Dismissal" signed Roy Minter 07/23/2020, 1 p.
30. Daniel H Kang, "Appeal of Suspension Prior To Dismissal" signed Roy Minter 07/23/2020, 1 p.
31. Octavio Arango, City of Savannah Separation Notice, 08/04/2020, 2 p.
32. Daniel Kang, City of Savannah Separation Notice, 08/04/2020, 2 p.
33. Letter of Transmittal, Admin. Investigation, OPS #20-0099, (Garvin), 03/10/21, City K 02075-81
34. Notice of Mitigation Hearing, OPS #20-0099, (Garvin), 03/30/2021, City K 02031-32
35. Disciplinary Action Record, (Garvin), 05/04/21, City K 02074
36. Notice of Final Discipline and Findings/OPS #20-0099, (Garvin), 04/30/2021, City K 02033
37. Notice of Final Discipline and Findings/OPS #20-0022, (Reagin, Kang, Arango), 07/17/2020, 3 p.
38. Letter of Transmittal, Internal Complaint (CRN 190607056), 04/28/2021, City K 02025-30
39. Pending OPS notification, (CRN 190607056), (Kang and Arango), 06/22/2021, City K 02024
40. Kang 000965-967
41. Deposition and exhibits Roy Minter
42. Deposition and exhibits George Gundich
43. Deposition and exhibits Jeff Grant
44. Deposition and exhibits Patrick Monahan
45. Deposition and exhibits Roy Minter
46. Deposition and exhibits Lenny Gunther
47. Deposition and exhibits Richard Wiggins
48. Discipline Review Board Findings and Recommendations, David W. Gay, 07/17/2020, 2 p.
49. Emails (various) attorneys, inter-city, inter-departmental, HR, SPD, CITY00324-431
50. Photograph of blood on rifle (200), City K 01965
51. Photograph of Sgt. Arango's shirt with small drop of blood (201), City K 01966
52. Photograph of Sgt. Arango's pants with bloody phlegm (203), City K 01968
53. Photograph of Sgt. Arango (206), City K 01971
54. Photograph of Darryl Faitele with laceration (202), City K 01967
55. Photograph of Darryl Faitele with blood on shirt (205), City K 01970
56. Photograph of Darryl Faitele - face (204), City K 01969

57. SPD Police Report, #190607056, Battery DVA, City K 02047-73
58. SPD Police Report, #200414073, Simple Battery LEO, CITY00124-134
59. SPD OPS Form, 03/05/21, City K 02082-81
60. SPD Show of Force Report, Sgt. Octavio Arango, 200414073, 04/16/2020, City K 02090-95
61. SPD Show Of Force Report, Cpl. Daniel Kang, CRN 190607056, 08/03/2019, City K 02042-46
62. SPD Response to Resistance Report, Cpl. Daniel Kang, late entry, 08/03/2019, City K 02034-41
63. Lt. Toth's Memorandum, discussion with Sgt. Arango, 04/24/2020, City K 02142
64. Sgt. Smith's Memorandum, Rebecca Faitele's contact information, 04/16/2020, City K 20141
65. OPS #20-0022, Timeline, 07/26/20, City K 02139-40
66. Warrant, Kahlil Kelly, Battery (DVA), City K 02137-38
67. Warrant, Kahlil Kelly, Obstructing an Emergency Call, City K 02135-36
68. Warrant, Kahlil Kelly, Aggravated Assault, City K 02133-34
69. Ante Litem Notice/Accompanying Documents, Darryl Faitele, 08/14/20, City K 02096-2132
70. 26(a) Disclosures filed by Defendants
71. 26(a) Disclosures filed by Plaintiff
72. SPD Administrative Investigation Report, IAPRO Entry, (Arango, Kang) 04/27/20, City K 02084-89
73. DEFENDANT THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH'S RESPONSES TO PLAINTIFF'S SECOND INTERROGATORIES
74. DEFENDANT THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH'S FIRST SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS
75. DEFENDANT THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES
76. PLAINTIFF'S RESPONSE TO DEFENDANT THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH'S FIRST INTERROGATORIES
77. PLAINTIFF'S RULE 26(a)(1) INITIAL DISCLOSURES
78. DEFENDANT THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH'S INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1)(A)
79. ROY W. MINTER JR.'S RULE 26(a)(1) INITIAL DISCLOSURES
80. PLAINTIFF'S SECOND SUPPLEMENTAL RULE 26(a)(1) INITIAL DISCLOSURES
81. DEFENDANT ROY W. MINTER, JR.'s RESPONSES TO PLAINTIFF'S THIRD INTERROGATORIES
82. PLAINTIFF'S SUPPLEMENTAL RULE 26(a)(1) INITIAL DISCLOSURES
83. PLAINTIFF'S RULE 26(a)(2)(B) DISCLOSURE (Expert Reports)
84. PLAINTIFF'S RESPONSE TO DEFENDANT ROY W. MINTER'S SECOND INTERROGATORIES
85. PLAINTIFF'S RESPONSE TO DEFENDANT ROY MINTER'S FIRST INTERROGATORIES
86. PLAINTIFF'S RESPONSE TO DEFENDANT ROY MINTER'S FIRST REQUESTS FOR ADMISSIONS
87. DEFENDANT ROY W. MINTER, JR.'S RESPONSES TO PLAINTIFF'S SECOND INTERROGATORIES
88. Daniel Kang - Body Worn Camera
89. Brandon Lord – Body Worn Camera
90. DIVISION I - THE CHARTER AND RELATED LAWS, ARTICLE 3. - ORGANIZATION, ADMINISTRATION, PERSONNEL, Contents: CHAPTER 3. - CIVIL SERVICE, Section 3-318. - Dismissal of employees.
91. Kang PowerPoint 07302020
92. Calendar Invite from Jessica Grove dated June 17, 2020, to Chief Minter, et al. Subject: Mitigation Hearing – Cpl. Kang.
93. FW FORMAL COMPLAINT on Joseph Toth and chain of command
94. FW IA File or Documents about Officer Kang
95. Answers filed by the City of Savannah
96. Affidavit of Dan Kang dated August 17, 2021

## *Civil Claims Related to Opinions*

A civil complaint filed by Daniel Kang against the City of Savannah, et al, alleges, among other grievances, that Savannah Police Chief Roy Minter:

1) failed to provide Daniel Kang with due process prior to terminating his employment with the City of Savannah Police Department; and,
2) his decision to terminate Daniel Kang was disparate treatment and retaliatory.
3) Further, in response to the Defendants' Motion to Dismiss the court DENIED the motion as to whether Chief Minter's disciplinary actions were part of his discretionary job functions.

## *Truncated Statement of the Record*

1. A string of concerns from members of the Savannah Police Department (SPD) were filed with the City of Savannah Human Resources Department (HR) on April 10, 2020. Specifically, a consortium of 75 SPD employees, including Cpl. Daniel Kang, signed a complaint form which included various allegations of corruption, favoritism, and disrespect towards SPD officers by Chief Minter.[1]

2. On that same date, Cpl. Kang also presented his own detailed HR complaint against Chief Minter and Assistant Chief Stephanie Price. Cpl. Kang alleged in his complaint that he experienced a hostile work environment, which caused him "significant grief, anguish, and impacted his "moral, mental and physical health." He also complained of Chief Minter's failure to provide adequate resources, communication, or personnel to his work unit, Special Investigations Section (SIS).[2]

3. On April 14, 2020, at approximately 4:00 PM, less than a week after filing the grievances against SPD leadership, Cpl. Kang, accompanied by other members of SIS, attempted to serve an arrest warrant on Kahlil Kelly. Kelly had outstanding felony arrest warrants for aggravated assault, battery, and obstructing a 911 call. SIS were directed to a residence identified as Kelly's apartment.[3]

4. As officers neared Kelly's residence, they observed a Black Male, later determined to be Darryl Faitele, run into the apartment, and slammed the door behind him. SIS officers thought Mr. Faitele was Kelly because of their similar complexion, age, height, and weight.[4]

5. SIS officers forcibly breached the door and pulled Mr. Faitele out of the apartment as he walked towards them, instructing who they believed to be "Kahlil Kelly" to get on the ground. During this encounter, Mr. Faitele was pulled to the ground, after officers commanded him to get on the ground.[5]

---

[1] CITY00433, 440-443.
[2] Kang 000965-967.
[3] Warrant, Kahlil Kelly, Battery (DVA), City K 02137-38, Warrant, Kahlil Kelly, Obstructing an Emergency Call, City K 02135-36; Warrant, Kahlil Kelly, Aggravated Assault, City K 02133-34.
[4] SPD Police Report, #200414073, Simple Battery LEO, CITY00125.
[5] Ibid, CITY00125.

6. Cpl. Kang participated in taking Mr. Faitele to the ground, which resulted in an injury to his chin. Cpl. Kang searched Mr. Faitele's wallet, finding documents identifying him as Darryl Faitele, not Kahlil Kelly. Once the scene was secured, Cpl. Kang notified EMS.[6]

7. During this encounter, Darryl Faitele was handcuffed and cursing officers. Mr. Faitele spit blood at the officers, hitting Cpl. Kang with a spray of spittle on the side of his face. To prevent Darryl Faitele from spitting on other officers, Sgt. Arango put Mr. Faitele's shirt over his face, but it became untied and fell off. While waiting for EMS, Sgt. Arango and Cpl. Kang exchanged expletives with Mr. Faitele.[7]

8. Cpl. Kang left the immediate arrest scene and while in the yard, below the balcony, became vocal and irritated when he learned the jail would not take an arrestee he had previously taken into custody because the arrestee told jail staff, he was quarantined for COVID. Cpl. Kang advised Sgt. Arango of that information and Cpl. Kang and Mr. Faitele began a profanity-laced argument. Cpl. Kang charged up the stairs towards Mr. Faitele but was blocked by Officer Reagin before Cpl. Kang could physically contact Mr. Faitele. Cpl. Kang descended the stairs, calling Mr. Faitele profanity-laced names and challenging him, suggesting Mr. Faitele be taken out of handcuffs and Cpl. Kang would drop his police gear.[8]

9. EMS arrived and transported Darryl Faitele to Candler Hospital. Mr. Faitele was released from custody with SIS personnel intending to secure arrest warrants against him for simple battery and obstruction.[9] Arrest warrants were never obtained for Mr. Faitele.

10. On April 21, 2020, Rebecca Faitele signed an SPD Complaint Form against officers assigned to SIS detailing police misconduct. Darryl Faitele signed an SPD Complaint Form on April 22, 2020, with similar allegations, resulting in Internal Investigation (IA), 20-0022, which included a review of the conduct and performance of Cpl. Kang during the incident referenced above.[10]

11. On April 27, 2020, Cpl. Kang was placed on Administrative Leave.[11]

12. On May 1, 2020, Sgt. Wiggins conducted a recorded interview with Cpl. Kang at the Internal Affairs Office. Cpl. Kang was provided with the Garrity Warning and Notification form, which listed complainants' names, location of incident, date of incident, and the allegation, "Conduct." He acknowledged the documents with his signature.[12]

13. During the IA interview with Cpl. Kang, Sgt. Wiggins detailed the conduct violations providing notification of the charges and discussed the evidence against him during a review of the incident, which included Cpl. Kang's BWC. Cpl. Kang acknowledged the following, which is representative of the behavior engaged by Cpl. Kang and Sgt. Arango, but not all inclusive:
    - He admitted Faitele was shoved in the chair with force, after being handcuffed.[13]

---

[6] SPD Police Report, #200414073, Simple Battery LEO, CITY00129.
[7] Kang BWC.
[8] Kang BWC 24:57-25:15.
[9] SPD Police Report, #200414073, Simple Battery LEO, CITY00128.
[10] CITY00080-87.
[11] CITY00098.
[12] CITY00005-6.
[13] Kang Recorded IA Interview, 11:34.

- He admitted Faitele was identified as not being Kelly before Faitele was shoved in the chair, but Cpl. Kang failed to share that information with his team.[14]
- He admitted losing his temper with Faitele[15] and calling him a "mother fucker"[16]
- He admitted cursing at Faitele during the incident.[17]
- He admitted that Sgt. Arango did not act professionally[18]and made comments about Faitele's "baby dick."[19]
- He admitted seeking counseling after being placed on administrative leave.[20]
- He admitted observing Sgt. Arango involved in this behavior previously but only after denying past similar occurrences.[21]
- He admitted not believing that throwing Faitele in a chair face first handcuffed was excessive force.[22]
- He admitted telling Faitele to "shut the fuck up" and acknowledging it was not professional.[23]
- He admitted hearing Sgt. Arango tell Faitele "you're a cocksucker, you take it up the butt… you're going to the right place… boys butt fucks you all kinds of ways."[24]
- He admitted posturing like he was going to fight Faitele, telling Faitele he would take off his stuff and fight him.[25]
- He admitted sprinting up the stairs and was going to get in Faitele face but not hit him and referring to Faitele as a "fucking bullshit ass faggot."[26]
- He admitted not completing a use of force report[27]

14. The IA investigation consisted of documents, recorded interviews, and a review of Body Worn Camera (BWC) video.[28] The Internal Investigation determined that Cpl. Kang violated these General Orders:
    SPD GO# ADM-004 Conduct Unbecoming
    SPD GO# ADM-004 Treatment of Others
    SPD GO# ADM-007 Reporting a Police Response to Aggression/ Resistance /Force[29]

15. On June 10, 2020, a Disciplinary Review Board convened online to discuss and deliberate OPS Investigation 20-0022. The Board was composed of *Assistant Chief* Lenny Gunther, Board Chair, *Major* Devonn Adams, Field Operations Commander, *Captain* David W. Gay, CID, *Lieutenant* Joe Toth, Special Investigations Section. Prior to the Board meeting, each member received access to a copy of the case file, which detailed findings against several officers, including Cpl. Kang who was found to have violated the following policies:

---

[14] Kang Recorded IA Interview 14:33.
[15] Ibid. 16:05.
[16] Ibid. 31:40.
[17] Ibid. 16:49.
[18] Kang Recorded IA Interview, 20:40.
[19] Ibid. 33:25.
[20] Ibid. 22:00.
[21] Ibid. 29:25.
[22] Ibid. 35:35.
[23] Ibid. 30:30.
[24] Ibid. 39:31.
[25] Ibid. 41:20.
[26] Ibid. 42:42.
[27] Ibid. 47:41.
[28] CITY00141-164.
[29] CITY00165.

       "1. SPD GO# ADM-004 Conduct Unbecoming

        2. SPD GO# ADM-004 Treatment of Others

        3. SPD GO# ADM-007 Reporting a Police Response to Aggression/Resistance/Force."[30]

16. Major Adams, Lieutenant Toth, and Captain Gay sustained all the allegations against Cpl. Kang and recommended the following:

    A. Incident review and training assessment by the Training Unit followed by additional training for Cpl. Kang.

    B. Transfer out of SIS.

    C. Review of SWAT Team membership.

    D. A five-day suspension.[31]

17. On June 24, 2020, Chief Minter held a Mitigation Hearing for Cpl. Kang.[32]

18. File Memorandum by Roy W. Minter, dated July 17, 2020, notes on June 16, 2020, he received the IA file and on July 17, 2020, concluded that termination of Cpl. Kang's employment was appropriate.[33]

19. <u>Notice of Suspension Prior to Dismissal</u>, filed by Daniel Kang on July 17, 2020. The document cites the Violations of the following General Orders:

       "1. ADM-004-Conduct Unbecoming

        2. ADM-004-Treatment of Prisoners

        3. ADM-007-Reporting Police Response to Aggression or Resistance Force"[34]

20. <u>Appeal of Suspension Prior to Dismissal</u>, filed by Daniel Kang to Chief Minter on July 17, 2020, the basis of his appeal was the "punishment appears disproportionate and does not follow the principles of progressive discipline." Chief Roy Minter affirmed his termination decision on July 23, 2020.[35] On that date, Cpl. Kang appealed Chief Minter's decision to the city manager.

21. On July 30, 2020, City Manager Patrick Monahan studied the internal investigation[36]and conducted an appeal hearing for Cpl. Kang, who provided a 17-slide PowerPoint presentation as a part of his appeal.[37] Cpl. Kang's appeal was denied. City Manager Monahan noted in the denial, "Uphold Chief Minter's decision. Cpl. Kang's pattern of behavior-abusive language, open anger towards suspect, not following department policy about use of force, challenging suspect-does not reflect well upon professional standards and conduct unbecoming of a police officer."[38]

---

[30] CITY00137-138.

[31] CITY00138.

[32] Calendar Invite from Jessica Grove, dated June 17, 2020, to Chief Minter, et al. Subject: Mitigation Hearing – Cpl. Kang.

[33] No Bates Stamp.

[34] CITY00097.

[35] No Bates Stamp, "Final Report" file, 073020 Cpl. Kang SPD Appeal paperwork.

[36] Monahan, 44:2-24.

[37] KANG 001282-98.

[38] No Bates Stamp, "Final Report" file, 073020 Cpl. Kang SPD Appeal paperwork.

22. On August 4, 2020, Daniel Kang received a <u>Separation Record</u> from the City of Savannah, noting his termination for violation of city/department policies. The <u>Separation Record</u> also advised Cpl. Kang he had 10 days to appeal to the Civil Service Board. There is no record of such an appeal.

23. According to Captain George Gundich, Chief Minter did not ever state to him that anyone that signed the complaint petition would never get promoted. Capt. Gundich did not receive any feedback from the chief about the petition.[39]

24. Captain Gundich acknowledges that to a point; community relations is a component of the chief of police's job.[40]

25. Sgt. Wiggins related that information surrounding the complaints against Chief Minter was broadcasted on the news, but Sgt. Wiggins did not see Chief Minter become visibly upset. Nor did Sgt. Wiggins have any conversations with Chief Minter about that issue.[41] Similarly, Sgt. Wiggins witnessed no favoritism by the police chief in promotions.[42]

26. The following policies are a part of the Savannah Police Department Written Directive System:

- IV. DISCIPLINARY SYSTEM A. SPD employees violating their oath and trust by committing an offense punishable under the laws or statutes of the United States, the State of Georgia, local ordinances, or who violates any provision of the Rules and Regulations of the Department, or who disobeys any lawful order, or who is incompetent to perform their duties is subject to appropriate disciplinary action. B. Final Department disciplinary authority and responsibility rests with the Chief of Police. 1. For disciplinary purposes, the Chief of Police has the authority to reprimand, suspend up to 30 days, demote, or dismiss the employee from the Department, subject to review by the City Manager. 2. If the employee involved feels they may have been improperly treated, they may apply to the City Manager for a hearing after receipt of written notice of the penalty. 3. Any appeal of the decision of the City Manager must be made in accordance with existing civil service rules and regulations.[43]
- Savannah Police Department Oath of Office "...I do further swear or affirm that, as a police officer, I will faithfully follow the orders of the Chief of Police, and I will faithfully serve and protect all citizens conscientiously, and without malice or partiality, to the best of my ability."[44]
- Definition for "GENERAL ORDER: Written orders issued by the Chief of Police outlining policy or procedure on matters which affect the entire department. A General Order is the most authoritative current directive issued by the Department and may be used to amend, supersede, or cancel any other rule, regulation, or order. General Orders are permanent department policy and remain in full force and effect until amended, superseded, or cancelled by the Chief of Police."[45]

---

[39] Gundich, 16:16-25
[40] Ibid. 35:7-10.
[41] Wiggins, 24:8-17.
[42] Ibid. 25:4-6
[43] City K 04632-33.
[44] SPD GO # ADM-004 <u>Oath of Office</u>, Ethics, and Conduct, City K 04618-19.
[45] Ibid. DEFINITIONS: These definitions shall apply to the use of such terms herein as well as to the use of such terms in all other Departmental contexts unless a different definition is specifically set forth in another document. City K 04620.

- ORDER: An order is a command; a directive (either oral or written) given by one in authority and directed to a subordinate.[46]
- POLICY: Any governing principle, broad plan, or course of action, either oral or written, designed to accomplish the Department's goals.[47]
- 4. Conflicting Orders - Upon receipt of an order conflicting with any previous order or instruction, the employee should advise the individual giving the second of the conflicting instruction. If so directed, the latter command will be obeyed first. Orders will be countermanded, or conflicting orders will be issued only when reasonably necessary for the good of the Department.[48]

## *Opinions*

27. My experience particular to these opinions, though not all inclusive, includes my career as an investigator and captain responsible for investigating police misconduct allegations and as a sitting police chief or chief of public safety for over 31 years, involved in all aspects of discipline and internal affairs policy development. Specifically, I am responsible for written directives, training, and supervision related to administrative and criminal investigations involving police misconduct. Additionally, in my role as police chief or chief of public safety, I ensure the proper response to allegations of employee misconduct. During my career I have conducted, reviewed, directed, or coordinated the investigation of police misconduct incidents or made a disciplinary decision on cases where there is a finding of misconduct. In my three decades of service as a police chief or chief of public safety, I have reviewed or taken disciplinary action in over 800 public safety employee misconduct cases, which include Terminations, Resignations in Lieu of Terminations, Suspensions, Last Chance Agreements, Demotions, Reduction-in-Pay, and Written Reprimands. Also, since 1995, I have been a member of the City of Lagrange grievance committee and have heard disciplinary appeals from all city departments except those that are under my authority. In addition, I served on the Peace Officer and Standards and Training Council (POST) and was assigned to the Probable Cause Committee. During the time I served, we reviewed approximately 1500 police misconduct cases and revoked the certification of approximately 500 peace officers, corrections officers, and jailers.

28. Further, since 1994 I have conducted a four-hour block of leadership and management training at "New Chief's School" for over two thousand Georgia police chiefs or their Command Staff. The New Chief's training includes the disciplinary process and all aspects of procedural due process. Additionally, I am an adjunct professor for Columbus State University, teaching an HR graduate course since 1995, which includes the disciplinary process and procedural due process. In my role as a certified training instructor, I have taught a 40-hour Internal Affairs course at the Georgia Public Safety Training Center. I also instructed an eight-hour internal affairs course for police chiefs. I have presented in dozens of states for the Public Safety Training Council (PATC) and the National Institute of Ethics, which are two-day courses focusing on leadership, policy development, encompassing internal affairs and the disciplinary process. I have been a presenter for IACP for over a dozen leadership and management blocks of instruction focusing on leadership and policy consideration surrounding use of force, internal affairs, and disciplinary

---

[46] SPD GO # ADM-004 **Oath of Office**, Ethics, and Conduct, City K 04622.

[47] DEFINITIONS: These definitions shall apply to the use of such terms herein as well as to the use of such terms in all other Departmental contexts unless a different definition is specifically set forth in another document. City K 04622.

[48] Ibid. City K 04631.

process. Also, I have provided training for the Georgia Internal Affairs Association and the National Internal Affairs Investigators Association.

29. In over 30 cases, I have been contracted, or served as part of a team, to conduct on-site assessments of an agency's critical tasks, including use of force, internal affairs, and the disciplinary process; this includes conducting independent reviews of alleged police misconduct incidents for the following agencies:

- 2019, Hamden, Connecticut (States Attorney's Office)
  Use of force criminal prosecution of a police officer

- 2013 Lakewood, Colorado (Police Department)
  Fatal shooting of a police officer by another police officer

- 2010 Gainesville, Florida (University of Florida)
  Police shooting involving someone affected by mental illness

- 2009 Oakland, California (BART)
  Fatal police shooting of an unarmed subject

- 2009 Trenton, New Jersey (College of New Jersey)
  Police use of less lethal force

- 2005, Villa Rica Police, GA (Police Department)
  Civil Rights Monitor – Provided Agency Oversight for the United States Department of Justice, which included assisting the agency in developing their Internal Affairs process

30. My observations and opinions are to a reasonable degree of professional certainty, although, as it turns out, the questions are, in my view, so basic and so clear that they qualify for an even higher quantum of certitude. They are based on my education, training, and 45 years of experience as a law enforcement professional; study of the referenced materials related to this case; my understanding and crafting of national law enforcement standards and guidelines related to training, regulations, accepted and best practices; contemporary case law and police training, policies and procedures related to internal affairs, employee discipline, and law enforcement agency accountability systems.

### *Chief Minters authority to terminate the employment of Daniel Kang*

31. Chief Minter had the authority based on the practices of the City of Savannah and the policies of the Savannah Police Department to terminate the employment of Cpl. Kang. Any reasonable and well-trained police chief understands that Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules if those rules are not discriminatory in nature. In the case of Cpl. Kang, Chief Minter had cause to take disciplinary action and he had the authority, responsibility, and obligation to function as outlined by the policies of the Savannah Police Department, and the practices of the City of Savannah. Individuals that are appointed as police officer are required to subscribe to the *Savannah Police Department Oath of Office "…I do further swear or affirm that, as a police officer, I will faithfully follow the orders of the Chief of Police, and*

*I will faithfully serve and protect all citizens conscientiously, and without malice or partiality, to the best of my ability.*"[49] As such, Internal Investigations and Disciplinary Actions are govern by the police chief's written policies or oral orders and the Internal Affairs function and Disciplinary Review Board is obliged to adhere to those policies and orders. Under the Savannah Police Department police definition for *"GENERAL ORDER: General Orders are permanent department policy and remain in full force and effect until amended, superseded, or cancelled by the Chief of Police."*[50] *The SPD definition of an* ORDER is a command; a directive (either oral or written) given by one in authority and directed to a subordinate.[51] Whereas a POLICY is a governing principle, broad plan, or course of action, either oral or written, designed to accomplish the Department's goals.[52] Further, the city manager has conferred upon the chief of police the absolute authority to manage personnel matters.[53]

32. Chief Minter is authorized to change policy and issue orders designed to accomplish the department's goals.[54] Any reasonable and well-trained police chief understands that he can modify, eliminate, or change a policy if those directly affected are aware of the change so they can respond accordingly. Cpl. Kang was sufficiently advised of the change in process from a policy where the police chief makes the sole determination for a disciplinary action to one that provides input, advice, and recommendations to the police chief in the form of a Disciplinary Review Board. Chief Minter's inclusion of a Disciplinary Review Board is allowed according to SPD policy and practice, as the Final Department Disciplinary Authority and Responsibility rests with the Chief of Police for the disciplinary system.[55]

33. Chief Minter has the responsibility and authority to appoint police employees and terminate police employees. Civil Service Rules allow for the dismissal of employees by any appointing authority for cause,[56] and the City of Savannah Charter, provides for heads of departments to appoint or approve for appointment all positions within their department, subject to the approval of the City Manager.[57] The City of Savannah practice places the authority of

---

[49] SPD GO # ADM-004 Oath of Office, Ethics, and Conduct, City K 04618-19.

[50] DEFINITIONS: These definitions shall apply to the use of such terms herein as well as to the use of such terms in all other Departmental contexts unless a different definition is specifically set forth in another document. City K 04620.

[51] Ibid. City K 04622.

[52] DEFINITIONS: These definitions shall apply to the use of such terms herein as well as to the use of such terms in all other Departmental contexts unless a different definition is specifically set forth in another document. City K 04622.

[53] Monahan, 75:6-22.

[54] Minter, 147:4-11, 'Okay. As part of your job duties as chief 5 of police, were you responsible for drafting and implementing policies? A. Yes. Did you have the discretion to change policies if you thought it was in the best interests of the department? A. Yes."

[55] Ibid. IV. DISCIPLINARY SYSTEM A. SPD employees violating their oath and trust by committing an offense punishable under the laws or statutes of the United States, the State of Georgia, local ordinances, or who violates any provision of the Rules and Regulations of the Department, or who disobeys any lawful order, or who is incompetent to perform their duties is subject to appropriate disciplinary action. B. Final Department disciplinary authority and responsibility rests with the Chief of Police. 1. For disciplinary purposes, the Chief of Police has the authority to reprimand, suspend up to 30 days, demote, or dismiss the employee from the Department, subject to review by the City Manager. 2. If the employee involved feels they may have been improperly treated, they may apply to the City Manager for a hearing after receipt of written notice of the penalty. 3. Any appeal of the decision of the City Manager must be made in accordance with existing civil service rules and regulations. City K 04632-33.

[56] DIVISION I - THE CHARTER AND RELATED LAWS, ARTICLE 3. - ORGANIZATION, ADMINISTRATION, PERSONNEL, Contents: CHAPTER 3. - CIVIL SERVICE, Section 3-318. - Dismissal of employees. Any appointing authority may dismiss a subordinate in the classified service for cause, upon filing with the Board [a] copy of written notice furnished the employee to be removed, setting forth in detail the reasons for such action, before the effective date of such removal. The dismissed employee, if holding a permanent civil service status, shall have an opportunity to answer the charges in writing within ten days, and to file with the Board affidavits in support of such answer. All papers filed in the case shall be subject to inspection by the persons affected. Such action of the appointing authority shall be final, except the Board may reinstate an officer or employee so removed in case it appears, after proper hearing, that the removal was made for personal, political, or religious reasons and not justified. (1956 Ga. Laws, page 2068, § 9)

[57] CODE OF ORDINANCES SAVANNAH, GEORGIA, DIVISION I - THE CHARTER AND RELATED LAWS[1] ARTICLE 3. - ORGANIZATION, ADMINISTRATION, PERSONNEL, Contents: CHAPTER 1. - CITY MANAGER Section 3-109. - Authority relative to officers and employees. a. The

disciplining police employees, up to and including termination, in the office of the police chief. That practice is clear in the documents created by the City of Savannah as reflected in the "City of Savannah Appeal of Suspension Prior to Dismissal"[58] form which provides the following instructions to an employee who desires to appeal a department heads decision to terminate their employment:

- Employee has 24 hours from receipt of Notice of Suspension Prior to Dismissal to appeal
- Submit appeal form within 24 hours of receipt to superior of supervisor who initiated action
- Bureau chiefs will review department head actions
- City Manager will review bureau chief actions

In this case, Cpl. Kang understood Chief Minter had the authority to terminate his employment and he understood he could appeal to Chief Minter to re-consider that decision. Upon learning that Chief Minter would not change his disciplinary decision, Cpl. Kang understood, recognized, and completed the process to appeal employment termination by Chief Minter to the city manager. Savannah City Manager, Patrick Monahan, confirmed in deposition, "The department head assumes responsibility for any disciplinary action. But under the city's personnel, procedures and ordinances, those appeals, -- an employee can appeal any disciplinary action, and those go to the city manager."[59] The City of Savannah practice of investing the police chief with the authority and responsibility to terminate employees of the police department, with an employee having the opportunity to appeal to the city manager, is reasonable and consistent with accepted law enforcement practice. The critical and practical application and importance of that authority is exemplified in Chief Gunther's testimony, acknowledging in his role as Interim Police Chief for the City of Savannah, he has discretion to make discipline and termination decisions for police personnel, as did Chief Minter.[60]

### Chief Minter's and the City of Savannah's "Due Process" practice

34. Chief Minter's disciplinary process as applied in the administration action taken against Cpl. Kang is reasonable and consistent with accepted law enforcement practices. A reasonable and well-trained police chief understands the legal protections afforded to a member of a police department who has a property interest in their employment as a police officer, ensuring any discipline process incorporates all required elements.

35. Chief Minter, consistent with a reasonable and well-trained police chief, included in his disciplinary process the legal requirements of "due process" as defined by the United States

---

City Manager shall have jurisdiction over and power to appoint to serve during his pleasure, to remove when he deems it in the good of the City, and to fix the compensation for the following officers, heads of department, and functionaries of the City, all of whom shall be in the unclassified service of the City: 3. Heads of the departments or bureaus of the City; b. The City Manager shall have exclusive power to determine and prescribe their qualifications and their duties... c. The heads of departments shall appoint or approve for appointment to all positions within their department that are in the classified service and shall fix or approve the salaries for such appointments, subject to the approval of the City Manager and the provisions of Chapter 3 of this article entitled "Civil Service." (1953 Ga. Laws, Nov.-Dec. Sess., page 2019, § 8; 1955 Ga. Laws, page 2197, § 3; Ord. of 11-19-1984, § 1)

[58] CITY00092
[59] Monahan, 9:22-24.
[60] Gunther, 37:12-19.

Supreme Court. Which makes clear that any disciplinary process involving a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story…coupled with post-termination administrative procedures…"[61] Sgt. Wiggins met with Cpl. Kang at Internal Affairs, Cpl. Kang was informed of the violation(s) against him when he was noticed with the Garrity form which noted a "conduct" violation. He was also informed of the date, time, address, and names of the complaining parties.[62] Further, during the interview with internal affairs, Sgt. Wiggins reviewed with Cpl. Kang conduct violations that were specific to the allegations when he questioned Cpl. Kang about his conduct regarding the Treatment of a prisoner, Conduct Unbecoming, and a failure in Reporting Police Response to Aggression or Resistance Force [63]

36. Cpl. Kang received adequate notice of the charges and evidence against him, as previously noted. In addition, in the "Appeal of Suspension Prior to Dismissal, filed by Cpl. Kang on July 17, 2020,[64] he alleges the "punishment appears disproportionate and does not follow the principles of progressive discipline." Cpl. Kang does not allege he was confused regarding the nature of the charges against him or the evidence supporting those charges.

37. Cpl. Kang received sufficient notice to respond to the Disciplinary Review Board on June 10, 2020. On June 15, 2020, the DRB made their findings, sustaining the charges against Cpl. Kang and forwarding those findings to Chief Minter.[65]

38. On June 24, 2020, at 11:00AM - 12 PM,[66] Chief Minter's held a Mitigation Hearing for Cpl. Kang. Cpl. Kang made no inquiry to Chief Minter regarding the charges or sought clarification on the charges, but Chief Minter did recall Cpl. Kang did provide evidence in mitigation in the form of a PowerPoint.[67] During his deposition, Chief Gunther vaguely recalled Cpl. Kang presenting his PowerPoint presentation.[68]

39. On July 17, 2020, Chief Minter sustained the policy violation findings against Cpl. Kang and issued the disciplinary action, resulting in Cpl. Kang's termination of employment.[69] On that same day, Cpl. Kang filed an "Appeal Of Suspension Prior To Dismissal." Citing the reason as follows: "The punishment appears disproportionate and does not follow principles of progressive discipline.

40. On July 23, 2020, Chief Minter denies Cpl. Kang's appeal, "Termination of employment is still appropriate for this matter." On that same day, Cpl. Kang appeals the decision to the city manager.

---

[61] CLEVELAND BOARD OF EDUCATION, Petitioner, v. James LOUDERMILL et al. PARMA BOARD OF EDUCATION, Petitioner, v. Richard DONNELLY et al. James LOUDERMILL, Petitioner, v. CLEVELAND BOARD OF EDUCATION et al., 470 U.S. 532 (1985).

[62] CITY00005-6.

[63] Recorded Audio Interview, Cpl. Kang and Sgt. Wiggins, May 1, 2020.

[64] Notice of Suspension Prior to Dismissal, filed by Daniel Kang on July 17, 2020, CITY00092.

[65] A revised memo from David W. Gay, Captain, Criminal Investigations Division, To: Chief Roy Minter, dated July 17, 2020. The original memo dated June 15th had an incorrect OPS number. Corporal Daniel Kang stood accused of violating the following policies: 1. SPD GO# ADM-004 Conduct Unbecoming 2. SPD GO# ADM-004 Treatment of Others 3. SPD GO# ADM-007 Reporting a Police Response to Aggression/Resistance/Force

[66] Calendar Invite from Jessica Grove, dated June 17, 2020, to Chief Minter, et al. Subject: Mitigation Hearing – Cpl. Kang.

[67] Minter, 143:6-9; 144:3-9; 145:18-20.

[68] Gunther, 38:2-15; 39:7-12.

[69] File Memorandum by Chief Minter dated July 17, 2020, "Notice of Final Discipline and Findings/ OPS #20-0022.

41. On July 30, 2020, Cpl. Kang appealed his termination to the city manager. At that hearing Cpl. Kang did not allege he did not understand the charges, did not receive adequate notice to respond, or was not able to respond to the allegations. In fact, a part of Cpl. Kang's PowerPoint presentation details the specific policy violations.[70]

42. Cpl. Kang was provided sufficient notice and had an opportunity to respond to the allegations against him before an impartial Disciplinary Review Board, a Mitigation Hearing before Chief Minter, an Appeal for Re-consideration to Chief Minter, and the opportunity to appeal his disciplinary action to the city manager. In his appeal to the city manager, Cpl. Kang cited the specific policy violations.[71] Any reasonable and well-trained police chief ensures that appeal processes in a disciplinary action are available and afforded to any employee with property interest in their position. This ensures a cure in any procedural questions that may arise early in a disciplinary action, which is correctable with a procedural remedy.[72] Cpl. Kang appealed his dismissal to Chief Minter and when he failed to prevail, appealed his case to the city manager. Prior to his appeal to the city manager, Cpl. Kang received written notice of the policy violations, and he cited the violations in his appeal notice, along with information in mitigation, including a PowerPoint.[73] City Manager Monahan spent a couple of hours reviewing material related to Cpl. Kang's appeal.[74]

***The personnel action terminating Daniel Kang was not disparate treatment and retaliatory***

43. Based on the record, Chief Minter's termination of Cpl. Kang was not pretextual as there were undisputed facts to support the disciplinary action, which included:
   a. The SPD received two citizen complaints on the arrest of Darryl Faitele:
      1. A citizen complaint from Darryl Faitele
      2. A citizen complaint from Rebecca Faitele

   b. An Internal Investigation completed by SPD into those complaints and the report of that investigation detailing the conclusion of facts that there were policy violations.

   c. A Disciplinary Review Board inquiry and finding that Cpl. Kang had violated the following policies:
      1. SPD GO# ADM-004 Conduct Unbecoming
      2. SPD GO# ADM-004 Treatment of Others
      3. SPD GO# ADM-007 Reporting a Police Response to Aggression/Resistance/Force[75]

---

[70] Kang 001283.

[71] CITY00097.

[72] Sylvanus Ogura v. Jesse CLEVELAND, (11th Cir. 2010). Millard McKinney v. John Pate, 20 F.3d 1550 (11th Cir. 1994).

[73] Kang PowerPoint 07302020, 001282-1298.

[74] CITY00097.

[75] CITY00049 SPD GO # ADM-007 Police Response to Aggression/Resistance/Force/Page 12 C Each assisting member who used force, including PTO/PTR partners, shall submit a separate supplementary report detailing his/her actions. When practical, reports relating to the police response to aggression/resistance/force incidents shall be submitted to the supervisor to whom the initial incident was reported. D Each member reporting force shall describe in detail the actions of the suspect necessitating the police response to aggression / resistance / force and the specific force used in response to the suspect's actions or resistance. E All injuries or complaint of injuries, and any medical treatment or refusal of medical treatment, shall be documented in the supplemental reports and photographed.

d. A Disciplinary Review Board disciplinary recommendation for Cpl. Kang that included:  `

- an Incident Review and Training Assessment by the Training Unit
- additional training
- transfer out of SIS
- a review of SWAT Team membership
- a five-day suspension.[76]

The record clearly establishes a factual basis for the disciplinary action against Cpl. Kang and sufficient evidence to support the decision as discussed in earlier paragraphs.

44. There is no evidence that demonstrates there was:

(1) *"suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent may be drawn,*

(2) *systematically better treatment of similarly situated employees, and,*

(3) *that the employer's justification is pretextual."[77]*

45. There is no evidence of "suspicious timing" of the discipline or that Chief Minter choreographed the investigation or disciplinary process involving Cpl. Kang.

- April 14, 2020, Cpl. Kang engaged in misconduct during the arrest of Mr. Faitele.
- April 21, 2020, Rebecca Faitele filed a complaint against Cpl. Kang.
- April 22, 2020, Darryl Faitele filed a complaint against Cpl. Kang.
- April 27, 2020, Cpl. Kang placed on Administrative Leave
- June 10, 2020, Disciplinary Review Board convened.
- June 16, 2020, Chief Minter received Cpl. Kang's IA file
- July 17, 2020, Chief Minter decides to terminate Cpl. Kang's employment
- July 17, 2020, Cpl. Kang files appeal of suspension prior to dismissal
- July 23, 2020, Chief Minter affirms Cpl. Kang's termination
- July 23, 2020, Cpl. Kang appeals to city manager
- July 30, 2020, City Manager conducts Cpl. Kang's appeal

46. The record as detailed in the "Timeline Outline" by Lt. Toth on July 26, 2021, does not suggest "suspicious timing" or ambiguous statements:

*"04-14-20-Use of Force on Mr. Darryl Faitele -Sergeant Arango Notified LT Toth - Lt Toth responds to Memorial Hospital but due to protocol (Covid-19) does not interview Mr. Faitele at the hospital. Will speak to him on future date. Jail will not accept as possible charges are only misdemeanor so he is released from custody by SGT Arango to follow up with warrants at a later date.*

*-LT Toth contacts Captain Alex Tobar regarding the incident as he is the EDO via cellphone.*

---

[76] CITY00138.

[77] Lewis v. City of Union City, 934 F.3d 1169, 1185, the Eleventh Circuit held that a plaintiff could survive summary judgment if they present a "convincing mosaic" of circumstantial evidence from which a factfinder can infer discriminatory motivation. This can "be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements…, and other bits and pieces from which an inference of discriminatory intent may be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." Silverman v. Bd. of Educ. of City of Chi., 637 F.3d 729, 733–34. While the "convincing mosaic" method bears similarities to the McDonnell Douglas method, it operates as a totality-of-circumstances test rather than a rigid step-by-step analysis.

> *-Lt Toth prepares recap based on Sgt Arango's description of events and forwards email to Lt David Barefield, Alexander Tobar, and Captain David Gay at the request of Captain Tobar.*
>
> *04-16-20-Sergeant Eric Smith contacts LT Toth regarding a complaint from this event by Ms. Rebecca Faitele via email. (Email Attached)*
>
> *-LT Toth contacts Ms. Faitele via cellphone and discuss the complaint and she is asked to prepare a complaint form along with Mr. Faitele.*
>
> *-Lt Toth sends email to Ms. Faitele with complaint forms attached. (Email Attached)*
>
> *04-23-20-LT Toth reviews BWC (Included in Audit trail in Evidence .com)*
>
> *-Lt Toth contacts Captain Gay regarding the BWC requesting his review and concerns.*
>
> *-Captain Tobar is requested to review BWC for his opinion.*
>
> *04-24-20-Lt Toth requests SGT Arango to have a meeting regarding the incident and discuss. (Notes of that meeting are included)*
>
> *04-27-20-Ms. Faitele brings the Complaint forms to LT Toth and they are forwarded. (Included in Blue Team)*
>
> *-Meeting held to discuss this case with Command Staff at Headquarters.*
>
> *-SGT Arango and CpL Kang placed on Administrative Leave by Internal Affairs."*[78]

47. The record contains no evidence of Chief Minter's involvement in any act of discrimination or inference of discriminatory intent or conduct during Cpl. Kang's internal investigation or the findings by the Disciplinary Review Board. In fact, the record shows that SPD received two citizen complaints regarding the Faitele incident. The Savannah Police Department properly engaged in conducting an inquiry into those complaints. Indeed, it is not Chief Minter who directs any action involving the investigation of Cpl. Kang. Lt. Toth contacted Captain Gay with his concerns regarding the BWC video of Faitele's custodial encounter with Sgt. Arango and his team, requesting Captain Gay review the incident.[79] The record is absent any evidence that Chief Minter directed or participated in Faitele citizen complaint internal investigation, in fact evidence clearly demonstrates he did not.[80] Further, there is no evidence that Chief Minter influenced the Disciplinary Review Board findings and recommendations, the disciplinary action Chief Minter instituted differed from the Disciplinary Review Board.

48. The record fails to establish systematically better treatment of similarly situated employees. The record cites issues involving Officer Gates, who was eventually terminated. Chief Minter did not conduct the Gates investigation,[81]and none of the charges involving Gates are comparable to those involving Cpl. Kang, which include:

---

[78] OPS #20-0022, Timeline, 07/26/20, City K 02139-40
[79] Ibid.
[80] Minter, 152:8-11. "Did you direct at any time who should investigate the allegations related to Officer Kang in the Faitele incident? "A. No, sir." 154:11-16. "Okay. So during the IA investigation and the disciplinary review panel process, were you 13 involved in either one of those? A. In the IA investigation. Yes. A. No."
[81] Minter, 152:12-16. "Similarly, with the Gates incidents that you were asked about earlier or any other complaint about an officer, do you specifically direct who 15 should conduct the internal investigations?" "No, sir."

- not reporting a use of force
- charging a handcuffed suspect
- being physically restrained by another police officer to prevent a physical confrontation between Cpl. Kang and an arrestee
- inviting a suspect to be unhandcuffed and engage in mutual combat with a police officer
- shouting profanity and cursing in public at a suspect
- all occurring in an apartment complex, on a weekday, at approximately 4:00 PM
- all captured on Body-worn-cameras

49. Any suggestion that the termination of Cpl. Kang is pretextual ignores the facts discussed in this report and the undisputed evidence gathered by internal affairs which is reflected in the Body-Worn Camera recordings, interviews with witnesses, and admissions by Cpl. Kang.

50. During his IA interview with Sgt. Wiggins, Cpl. Kang admitted to improper actions, behavior, and policy violations. Cpl. Kang acknowledged the following, which is representative of the type of behavior engaged by Cpl. Kang and Sgt. Arango, but not all inclusive:
    - He admitted Faitele was shoved in the chair with force, after being handcuffed.[82]
    - He admitted Faitele was identified before he was shoved in the chair and Cpl. Kang knew he was not the wanted suspect, Kahlil Kelly, but failed to share that information with his team.[83]
    - He admitted losing his temper with Faitele[84] and calling him a "mother fucker"[85]
    - He admitted cursing at Faitele during the incident.[86]
    - He admitted that Sgt. Arango did not act professionally[87] and made comments regarding Faitele's "baby dick."[88]
    - He admitted seeking counseling after being placed on administrative leave.[89]
    - He admitted seeing Sgt. Arango involved in this behavior previously but only after denying past similar occurrences.[90]
    - He admitted not believing that throwing Faitele in a chair face first handcuffed was excessive force.[91]
    - He admitted telling Faitele to "shut the fuck up" and acknowledging it was not professional.[92]
    - He admitted hearing Sgt. Arango tell Faitele "you're a cocksucker, you take it up the butt… you're going to the right place… boys butt fucks you all kinds of ways."[93]
    - He admitted posturing like he was going to fight Faitele, telling Faitele he would take off his stuff and fight him.[94]

---

[82] Kang Recorded IA Interview, 11:34.
[83] Ibid. 14:33.
[84] Ibid. 16:05.
[85] Ibid. 31:40.
[86] Ibid. 16:49.
[87] Ibid. 20:40.
[88] Ibid. 33:25.
[89] Ibid. 22:00.
[90] Ibid. 29:25.
[91] Ibid. 35:35.
[92] Ibid. 30:30.
[93] Kang Recorded IA Interview, 39:31.
[94] Ibid. 41:20.

- He admitted sprinting up the stairs and was going to get in Faitele face but not hit him and referring to Faitele as a "fucking bullshit ass faggot."[95]
- He admitted not completing a use of force report.[96]

51. There is no evidence supporting the proposition that Chief Minter's reasons for terminating Cpl. Kang was retaliatory. Personnel grievances are a routine part of the business practices of a municipal government, and not an experience that is novel to police chiefs or any other municipal department head, in fact most municipal governments of any size have a process for grievances, as does the City of Savannah. In this instance, the record does not demonstrate that Chief Minter had access to the names of the employees who signed the complaint document, including Cpl. Kang's complaint form. Indeed Jeffery Grant testified that at no time prior to the decision to end Cpl. Kang's employment, did he deliver a copy of Cpl. Kang's signed complaint to Chief Minter. Mr. Grant also said he was not aware of anyone supplying a copy of the signed grievance complaints to Chief Minter. Chief Minter similarly testified he had no knowledge prior to Cpl. Kang's termination that Cpl. Kang had signed the "group complaint" or an "individual complaint" against him as police chief.[97] Further, at no point prior to Cpl. Kang's termination, did Mr. Grant ever ask Chief Minter about any of the allegations in either Cpl. Kang's individual complaint or the group complaint.[98]

52. The record contradicts the suggestion that Cpl. Kang's termination for a violation of workplace rules was pretextual and the motive for Cpl. Kang's termination was retaliatory because of the complaint he lodged against Chief Minter. Sgt. Wiggins indicated that information surrounding the complaints against Chief Minter hit the news, but Sgt. Wiggins did not observe Chief Minter being visibly upset. Nor did Sgt. Wiggins have any conversations with the chief regarding that issue.[99] Correspondingly, Sgt. Wiggins witnessed no favoritism by the chief in promotions.[100] Captain Gundich related that Chief Minter made no statement to him declaring anyone that signed the complaint petition would never be promoted. Captain Gundich did not have any discussion with Chief Minter about the complaint petition.[101]

53. The record refutes the notion that Chief Minter took retaliatory action against Cpl. Kang because he signed the grievance complaints against Chief Minter. A review of the published seventy-five names of the officers that signed the petition and filed complaints against Chief Minter reveals that two other officers, Cpl. Locket and Sgt. Manual, were subjects of the Disciplinary Review Board process and their cases appeared before Chief Minter after Cpl. Kang's disciplinary action. In the case of Sgt. Manual, Chief Minter reduced the recommendation from the Disciplinary Review Board from a suspension of 2–15-days to an eight-hour suspension and let stand the "not sustained" finding involving Cpl. Locket.[102]

---

[95] Kang Recorded IA Interview 42:42.
[96] Ibid. 47:41.
[97] Minter, 157:17-22.
[98] Grant, 23, 24:1-13.
[99] Wiggins, 24:8-17.
[100] Ibid. 25:4-6.
[101] Gundich, 16:16-25.
[102] DEFENDANT THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES, dated, 22nd day of October 2021. OLIVER MANER LLP. Pages 13-14. Assuming the process for tracking IA reports is chronological, Kangs IA Report, OPS 20-0022 was issued before Cpl. Shariff Locket and Sgt. Tiffany Manual IA Report, OPS 20-0024. CITY00433-34.

### *Conclusion*

54. The disciplinary action taken by Chief Minter against Cpl. Kang is reasonable and consistent with contemporary law enforcement standards. A reasonable and well-trained police chief understands that there are competing constituencies and interests involved in a disciplinary action against a police officer. Particularly if the disciplinary action is related to a citizen complaint that resulted in an internal affairs investigation, with a finding against a police officer for misconduct. These include:

   - The complaining **citizen's interest** by ensuring the complainant receives fair treatment, and their complaint receives a prompt and impartial investigation, with proper accountability if warranted.
   - The **officer's interest** ensures the applicable rights are afforded to protect their due process interests. The investigation of such complaints also ensures that false or unwarranted charges are investigated to protect the officer. The case law about the rights of law enforcement officers is well established.
   - The **agency's interest** in ensuring policy compliance and ethical and professional conduct by its employees.
   - The **interest of other law enforcement agency members** by ensuring that only those fit to serve the agency are police officers, and the disciplinary action benchmarks for all police officers the consequences for serious policy violations, which can serve as a deterrence to future police misconduct. Inappropriately retained law enforcement officers impact morale and agency efficiency and effectiveness.
   - The **interest of the community** by ensuring that the law enforcement agency preserves the confidence of the community by showing consistently that investigation of allegations of police misconduct occurs in an objective and prompt manner and there is no tolerance for improper and unprofessional conduct by a police officer.
   - The **interest and accountability to elected officials** by ensuring police misconduct complaints are investigated, and proper disciplinary action is taken when misconduct by a police officer is discovered.

55. A reasonable and well-trained police chief knows a social contract exists between the police and the citizens they serve. A part of the contract provides that, through their elected officials, citizens grant enormous powers to the police so that the police can serve and protect them. Another provision provides that when officers exercise police powers in a manner that makes a citizen believe that such powers have been abused, the police will conduct a fair, objective, and honest inquiry to decide whether the officers' actions were right and will take corrective action if they find they were not. Police Chief Minter's decision to end Cpl. Kang's employment fulfills his general obligation to be accountable to the citizens for improper police actions.

56. Any reasonable and well-trained police chief knows that police employees have employment rights when and if charges of misconduct are brought against a police employee. They do not, however, have the right to vent their frustrations with their agency or with county jail in-take procedures upon persons in their care, custody, and control. Police Chief Minter's decision to

terminate Cpl. Kang's employment fulfills his obligation to ensure that individuals taken into police custody are handled in a manner consistent with agency policy.[103]

57. Any reasonable and well-trained police chief knows when a police department receives a citizen complainant against a police officer, and the allegation entails police misconduct, the citizen reasonably expects the agency to immediately investigate the incident and act on the findings.[104] In this case, Mr. Faitele and his mother filed police misconduct complaints with the Savannah Police Department. SPD conducted a competent, detailed internal investigation, and found misconduct by Cpl. Kang. A review of that investigation resulted in the Disciplinary Review Board making a finding and disciplinary recommendation against Cpl. Kang. Chief Minter agreed with the Boards findings but changed the disciplinary action resulting in Cpl. Kang's termination. Chief Minter's decision to end Cpl. Kang employment is consistent with accepted law enforcement standards based on the facts and circumstances detailed in the record.

58. The facts surrounding the unprofessional and unethical behavior of Cpl. Kang during his encounter with Mr. Faitele was alarming to Hiram Rivera, a member of the Savannah Police Department, who sent an email, in part, describing his concerns with the conduct of Cpl. Kang. *"… To our shock and dismay, we observed actions by the Sergeant (**who is my brother in law**) as well as actions by Daniel Kang that were a violation of policy, procedure, and may have skirted criminal action. I expressed that what we observed was not what we teach in training and I was concerned that ANY commander who saw this video and needed the opinion of the training unit staff to determine what course of action to take is negligent in their supervision and acted in cowardice if they did not take immediate action on this incident. This action rose to the level of a critical incident notification that requires immediate notification to the Chief of police because this was an incident that is likely to bring discredit to the Savannah Police Department."*[105] Similarly, Lt. Toth upon viewing the BWC video was sufficiently concerned that he notified his captain, requesting him to review the matter. Any responsible and well-trained police chief understands the interest of other police officers in the agency and his duty as a police chief to ensure that only those fit to serve the agency are police officers, particularly when a report of police misconduct by a citizen is verified through an internal investigation. Police Chief Minter's decision to terminate Cpl. Kang employment is consistent with contemporary law enforcement

---

[103]SPD GO # ADM-004 Oath of Office, Ethics, and Conduct/ 1. Conduct Unbecoming – The conduct of a public employee, on or off duty, reflects upon the SPD. The SPD shall investigate complaints and/or a circumstance suggesting an SPD employee has engaged in conduct unbecoming and shall impose disciplinary action when appropriate. 5. Treatment of Others - Employees shall treat citizens, superiors, subordinates, and associates with respect. They shall be courteous and civil at all times in their relationships with one another and in the presence of the public; employees will be referred to by rank. a. Employees shall not engage in offensive or harassing conduct, verbal or physical, towards fellow employees, supervisors or the public during work hours or off-duty hours. b. No employee will speak disrespectfully of any nationality, race, sex, or religion. c. No employee will engage in grossly indecent or vulgar talk which would detract from the efficient operation of the SPD or create an uncomfortable work environment. CITY00027-28.

[104] "Commission on Accreditation for Law Enforcement Agencies, (1983) Chapter 52, INTERNAL AFFAIRS, The internal affairs function is important for the maintenance of professional conduct in a law enforcement agency. The integrity of the agency depends on the personal integrity and discipline of each employee. To a large degree, the public image of the agency is determined by the quality of the internal affairs function in responding to allegations of misconduct against the agency or its employees… Agencies having an internal affairs function consistent with these standards will have the capability of responding appropriately to allegations of misfeasance, malfeasance, and nonfeasance by employees, and to complaints impacting on the agency's response to community needs, thereby instilling public confidence in the agency."

[105] Rivera email, **From:** Hiram Rivera <HRivera@Savannahga.Gov> **Sent:** Monday, July 20, 2020 12:00 PM **To:** Stephanie Price <SPrice@Savannahga.Gov> **Cc:** James Dale <jdale@Savannahga.Gov> **Subject:** FORMAL COMPLAINT on Joseph Toth and chain of command

standards and practice and with the agency interest in ensuring policy compliance and ethical and professional conduct by its police officers.

59. A reasonable and well-trained police chief understands the seriousness of the charges involving Cpl. Kang and the importance of reviewing the evidence supporting those charges based on the "totality-of-circumstances test, rather than a rigid step-by-step analysis".[106] Chief Minter understood before issuing his disciplinary action that Cpl. Kang's unprofessional behavior resulted in two citizen complaints. Further, Cpl. Kang's unprofessional behavior raised internal concerns by Lt. Toth, Capt. Gay, and Hiram Rivera. Rivera was remarkably offended by Sgt. Arango and Cpl. Kang's actions; he suggested it bordered on criminal conduct. Cpl. Kang's past record was reviewed before any disciplinary action, Chief Minter studied his prior record and considered "all the facts and findings of the investigation... disciplinary history... awards, commendations... psychological exam... a fitness-for-duty exam... his training record... [and] contacted his supervisor at CNT[107] to see if there was any information that was in his file..."[108] Cpl. Kang demonstrated he had knowledge of the rules he violated, admitting to Conduct Unbecoming, Treatment of Others, and not Reporting a Police Response to Aggression/Resistance/Force. As a Corporal he held a rank of an increased position of responsibility requiring him to ensure policies and procedures are followed. Generally, the longer a police officer is employed by an agency the better he should know the rules, Cpl. Kangs decade length of service infers an expectation that he would understand the importance of policy compliance. Based on the "totality-of-circumstances" the decision to end Cpl. Kang's employment as a police officer is consistent with contemporary law enforcement standards and practise and reflect the actions of a reasonable and well-trained police chief.

Louis M. Dekmar

---

[106] Silverman v. Bd. of Educ. of City of Chi., 637 F.3d 729, 733–34. While the "convincing mosaic" method bears similarities to the McDonnell Douglas method, it operates as a totality-of-circumstances test rather than a rigid step-by-step analysis.
[107] Chatham-Savannah Counter Narcotics Team, Kang000003.
[108] Minter, 156:17-24; 157:1.

## <u>Addendum to REPORT OF LOUIS M. DEKMAR, November 18, 2022</u>

Pursuant to a request from Mr. Kachmar, I have reviewed additional material which include the following depositions and related exhibits, nothing in their testimony causes me to modify or change my opinions:

- Gary Vowell                (Plaintiff's Expert 12/21/22)
- Richard Register        (Plaintiff's Expert 11/21/22)
- Torrance Garvin        ( LT, SPD 08/31/22)
- Diane McLeod            (GBI/CARES 02/14/23)
- Joseph Toth                ( LT, SPD 08/31/22)
- Robert Gavin            (Assistant Chief, SPD 11/07/22)
- David Gay                    (Captain-Ret., SPD 08/31/22)
- Robert Gavin            (Assistant Chief, SPD 03/07/23)
- Van Johnson            (Mayor, City of Savannah, 03/14/23)
- Daniel Kang                (Plaintiff, 03/16/23)

Louis M. Dekmar          March 22, 2023