IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| DANIEL KANG,<br><br>      Plaintiff,<br><br>-vs-<br><br>THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH and ROY W. MINTER, JR., Chief of Police for the City of Savannah, Georgia, In His Individual and Official Capacities,<br><br>      Defendants. | Civil Action No. 4:21-cv-111-RSB-CLR<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S SUR REPLY IN FURTHER SUPPORT OF HIS OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT
FILED BY THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH**

      COMES NOW, Plaintiff Daniel Kang ("Plaintiff"), and files this his Sur-Reply in further Support of his Opposition to the Motion for Summary Judgment, submitted by Defendant the Mayor and Aldermen of the City of Savannah (hereinafter "the City"), showing as follows:

**A.    The Record Reflects a Question of Fact as to whether the Plaintiff's Participation in the "Group HR Complaint" was a Substantial Factor in the Decision to Terminate Plaintiff.**

      In its sur-reply, the City reiterates its argument that Kang's speech - his participation in the Group HR Complaint - did not play a substantial part in his discharge. The arguments advanced by the City in this regard include the arguments that neither Minter, the Chief of Police who terminated Kang, nor Monahan, the City Manager who affirmed Minter's termination decision, knew that Kang had participated in either the Groups HR Complaint or that he had filed his own individual Complaint. No party disputes that the content of these reports places

Minter, his leadership, or the City in a bad light.  Instead, they simply deny knowledge that Plaintiff was involved.

Minter, an agent of the City, states that he had no knowledge. Monahan, the City Manger, similarly denies knowledge of Kang's participation.

But, the record contains evidence which rebuts these denials, and creates a jury question as to whether or not these officials knew of Kang's complaints, including:

> On July 17, 2020, Minter issued his initial "termination" decision.  By this time, Minter admitted that he had access to the Internal Affairs Report prepared by Wiggins.  This report expressly references the HR Complaint they had filed against the Chief.  (Wiggins IA Report, Ex. 32).  Minter admits to having reviewed these reports, but somehow does not recall reference to the HR complaint.  (Minter Depo., Doc. 95-9, t.170:12-25).  He also claims to have reviewed "all the facts and findings of the investigation" in making his decision on discipline (Minter Dep., Doc. 95-9, t.156:17-20).

Monahan similarly admits to having reviewed the Wiggins Internal Affairs Report (Monahan Depo. I at t.44:20-22), but similarly denies any knowledge that Kang or Arango were involved in filing the Group HR Complaint.  (Monahan Depo. I, t.44:16-17; id. at t.66:10-11). The Group HR Complaint is referenced in the Internal Affairs Report.  (Ex. 32, Internal Affairs Report at p. 21).  The report reads as follows:

> Sgt. Arango stated this situation was an anomaly and he had never acted that way in the past. Sgt. Arango stated he had reached a boiling point on the things they were dealing with. Sgt. Arango stated the job was stressful enough, but he can deal with it. Sgt. Arango advised it was outside factors they were dealing with causing the stress. Sgt. Arango mentioned COVID going around and they were still expected to go out, find these guys, and put up numbers. **Sgt. Arango stated they had been asking since the inception of the unit for equipment and personnel.** Sgt. Arango **described the unit** as being grossly undermanned and he cannot supervise because he must operate as **one of the unit**. Sgt. Arango stated this was causing more stress on him because he cannot do what needs to be done and superiors were not listening. **Sgt. Arango stated they had an HR complaint against the Chief which was also causing stress**.

> **Sgt. Arango stated when it was all said and done, their unit had a talk about everything that had occurred that day.** Sgt. Arango stated he told them they needed a "mental health break" the next day. Sgt. Arango stated the next day, they went to the range and took the remainder of the day off.

Id. (emphasis added). It is clear from the entire context of this report and the above-quoted language that Arango was referring to the members of his unit when he stated that "they" (i.e., members of the SIS Warrant Squad) have an "HR Complaint against the Chief." See id. at p. 1 ("The SIS Warrant Squad consisted of one sergeant and three officers. These were Sgt. Octavio Arango, Cpl. Daniel Kang, Cpl. Brandon Lord, and APO Ronald Reagin.").

The Wiggins Internal Affairs investigatory report also references Corporal Kang's discussion of problems that the SIS Warrant Unit had been experiencing:

> Cpl. Kang stated his unit had been dealing with things over the past year and how they have been treated. Cpl. Kang stated nothing had been addressed with issues going on within the unit. I asked if the issues within his unit had built up tension to where it affected how they dealt with citizens, suspects, and arrestees. Cpl. Kang stated it had affected him and he had sought counseling through EAP. I asked if he was still going to counseling which he advised he was. Cpl. Kang stated things were harder for him to deal with than it was for others. Cpl. Kang stated he felt like his ability to cope was getting less and less. I asked when he sought counseling in which he replied after being placed on Administrative Leave for this incident.

(Doc. 118-32 at p. 15). Wiggins next reported that he

> asked what kind of stuff was going on within the unit which he previously alluded to causing stress. Cpl. Kang stated it was issues such as manpower, equipment, and the way their unit came to be after being moved from CNT. Cpl. Kang stated they were lied to about the reasons why they were moved and there was a lack of communication. Cpl. Kang stated the issues caused more stress for him and combined with other things such as the CCDC issue on this date, led to everything boiling over.

(118-32 at p. 17).

Both Minter and Monahan state that they reviewed the Wiggins Internal Affairs report. (Monahan Depo. I, Doc.97-21; t.33:24 to t.34:6 ("I reviewed the report from the Internal Affairs Office."); Minter Depo., Doc. 101-7, t.170:13-25 (Minter reviewed the Internal Affairs Report, but does not recall seeing any reference to the fact that Kang or Arango singed the HR Complaint).

In addition to this evidence, the record contains other evidence which places knowledge of Kang's participation in the Group Complaint with both Monahan and Minter. Monahan testified that he received the Group HR Complaint before considering Kang's appeal. (Monahan Depo. I, Doc. 95-16, t.11:20-23; see Ex. 66, email from Jeff Grant to complainants dated May 20, 2022, acknowledging receipt of HR Complaint). It was of such a "critical nature" that he "personally handled it." (Id. at t.12:13-15). His claims that he did not know that Kang signed the petition (Monahan Depo. I, t.66:10-11) - yet when he received the HR Complaint, numbered how many of a "particular rank filed or signed "it. (Monahan Depo. I., t.13:7-10). If he reviewed the Group Complaint in such detail, a jury could certainly conclude that he noticed the names of the individuals signing the Complaint.

These facts of record (as well as those referenced in Kang's initial response to the pending summary judgment motions) clearly present a question of credibility which the Court cannot resolve on summary judgment. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a court ruling on a motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. "[T]he mere fact that the witness is interested in the

result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact." Sartor v. Ark. Nat. Gas Corp., 321 U.S. 620, 628 (1944) (citing Sonnentheil v. Christian Moerlein Brewing Co., 172 U.S. 401, 408 (1899)).[1]

The City further argues that Kang cannot demonstrate that his exercise of free speech - i.e., participating in the Group HR Complaint and also filing his own individual complaint - is not sufficient to show that "Kang's speech played a substantial part in [his] dismissal from City employment."  (City's Reply Brief, Doc. 128, p. 5).  The City's argument apparently goes like this:  since there is no evidence that the City decision makers - Minter and Monahan - knew about Kang's participation in the HR Complaint and his individual complaint, this participation cannot be causally linked to Kang's termination.  But the Plaintiff has raised an inference that these two officials in fact knew of Kang's participation, leading to the inference that each they failed to acknowledge this "notice" to hide the true motive for termination.

Other evidence supports the Plaintiff's position that he was fired because of his criticism of the City and of Chief Minter, including:

- Individuals in Kang's "chain of command" who reviewed the incident, recommended a five day suspension, not termination, for the Faitele incident. (Doc. 118-34, Recommendation of the Disciplinary Review Board);

---

[1] In raising this argument, the Plaintiff does not propose that summary judgment must be denied solely because Monahan and Minter are "interested parties."  Instead, Plaintiff submits that the fact of their interest in the litigation, as well as evidence supporting the inference that they each know of Plaintiff's participation in the Group HR Complaint, creates a jury question.  See  Hibiscus Assocs. v. Bd. of Trs. of the Policemen & Firemen Ret. Sys., 50 F.3d 908, 921 (11th Cir. 1995) ("A court should not generally grant a directed verdict based solely on the favorable testimony of an interested witness, even if this testimony is uncontroverted. [] However, a directed verdict is appropriate where the uncontroverted testimony of an interested witness is inherently plausible and corroborated by other evidence."  American  Hardware Mut. Ins. Co. v. Vick, 268 F.2d 183, 184 (5th Cir.1959); Brown v. Ford Motor Co., 479 F.2d 521, 523 (5th Cir.1973)).

The evidence of the knowledge of Monahan and Minter is controverted.

- Assistant Chief of Police Gavin, acknowledge that the work of the SIS Warrant Squad and its duties in arresting individuals were "the type of interactions that put officers in danger." (Gavin 30(b)(6) Depo., Doc. 119-48, t.46:1-2). Assistant Chief Gavin agreed that at the point the arresting officers ordered Faitele to get on the ground, and he failed to comply three separate times, they had a right to require Faitele to get on the ground. (Id. at t.50:21-25). On Faitele's failure to comply, these officers "had a right to secure his [Faitele's] person." Id. at t.51:1-4).

- Gavin did not observe anything "that exceeded a reasonable amount of force" at that point. Id. at t.51:6-9). At that point, the officers, including Kang, had not done anything that could be considered a crime, or enough to be "fired over." Id. at t.54:21 to t.55:7.

- Chief Minter made the determination to refer Kang for criminal prosecution. (Gavin 30(b)(6) Depo., Doc. 119-48, t.55:15-20).

- According to the City, police officers have a right to prevent individuals from "continuing to spit on them." (Gavin 30(b)(6) Depo., Doc. 119-48, t.58:16-18).

- Chief Minter made the decision as to whether allegations of criminal conduct against a police officer should be referred to another agency, such as the GBI, or investigated internally. (Gavin 30(b)(6) Depo., t.66:1-16). The investigation of Kang and Arango was not referred out, but was conduced internally by Lt. Larry. (Id. at t.62:18-20).

- The "draft policy" used to discipline both Kang and Arango was never published to the officers. (Gavin 30(b)(6) Depo., t.67:15-17). The City admits that neither Kang or Arango were provided the "draft" policy before the disciplinary proceedings began, and that both of these officers had a right to be put on notice of what to expect. (Id. at t.67:23 - t.69:14).

- Dekmar, Chief Minter's proffered expert, agreed that Chief Minter could not fire officers if he, Minter, did not follow his own policies and procedures. (Dekmar Depo., Doc. 99-1, t.13:23 - t.14:2). He further agrees that written Douglas factors were required, but not provided. Id. at t.14:21 to t.15:6).

- Chief Minter was required to follow policy. (See Dekmar Depo., Doc. 99-1, t.29:12-18); see also Toth Depo., Doc. 97-17, t.36-367) (same). Yet, the City did not fire Minter for his admitted breach of policy, but fired Kang for his alleged violation of policy.

This is not an exhaustive list of the information which rebuts the City's assertion that Kang was terminated for his involvement in the Faitele incident, and not for speaking out against Minter and the City. Kang's allegations of racism, lack of training, lack of resources, and poor morale clearly put the City and Minter in a bad light in the public eye.

At the same time it denies knowledge of Kang's participation in the Human Resources Complaint, the City claims that it would have made the same decision even if it knew about his participation. This testimony is completely speculative - how can Monahan and the City Manager credibly make such a claim when the decision maker expressly denies knowledge of Kang's complaints. "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181, 18 Fla. L. Weekly Fed. C 778 (11th Cir. 2005) (quoting Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 931-32 (7th Cir. 1995)).[2]

Cases cited by the City to support this argument are to be distinguished. In Elver v. Hendry Cty. Sheriff's Office, 791 F. App'x 56, 59 (11th Cir. 2019), a First Amendment retaliation case, the employer admitted knowledge of the employee's "whistleblowing," and presented evidence that knowledge of this "whistleblowing" did not motivate or impact the

---

[2] To the extent that the City and Minter argue that a Pickering analysis is necessary to support the First Amendment Retaliation claim, such an analysis is not necessary because the City and Minter deny any knowledge that Kang filed any complaints against Minter and the City. The prima facie showing in such cases is as follows:

> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a 'substantial part' in the employer's decision to demote or discharge the employee.

Anderson v. Burke County, 239 F.3d 1216, 1219 (11th Cir. 2001). If the Defendants deny knowledge of the speech, then there is no need to determine if the employer's interest in prohibiting the speech outweigh the employee's asserted right to speak. That is speculation, asking a court to condone the employer's actions based on a factual scenario that did not exist.

termination decision. In Bryson v. Waycross, 888 F.2d 1562 (11th Cir. 1989), the employing government entity had actual knowledge of the fact that the employee had filed a lawsuit against it. Similarly, in McAlpin v. Town of Sneads, 61 F.4th 916 (11th Cir. 2023) the City employer acknowledged the conduct which it allegedly underlying the retaliatory discharge.

The City argues that there was a "substantial delay" between the submission of the Group Complaint and of Monahan's review of Minter's termination decision. (Doc. 128, p. 8). But what the City does not recognize is that if it is believed that Minter actually made his initial termination decision on July 17, 2020 (as opposed to June 16, 2020, when he received the Internal Affairs Investigation file),³ this is not so far temporally removed from the April event as to break any causal chain. The Discipline Review Board originally considered this matter in early June of 2020. (Doc. 118-34, emails between DRB members). The "mitigation hearing" took place on June 24. (Kang Depo., Doc. 95-3, t.75:18-21). As explained above, Monahan claims to have reviewed the Internal Affairs file which references Kang's involvement in the Group Complaint prior to considering Kang's employment appeal in or around July 30, 2020 (Doc.118-38 (Appeal Decision)), so Monahan would have been reminded of Kang's participation in the two weeks between Minter's professed July 17, 2020 decision and his consideration of Kang's appeal on July 30, 2020.

---

³ See Doc. 118-35, Inter Office Memorandum, dated July 17, 2020. In this memorandum, Minter states that he received an "Internal Affairs Unit File" regarding Plaintiff on June 16, 2020, a month before he announced the termination decision. Apparently, Chief Minter had received a memo regarding OPS # 20-0022 on June 15, 2020, but received a "revised memo" on July 17, 2020, because the "original memo had an incorrect OPS number." (Doc. 118-34, Interoffice Correspondence from Assistant Chief Gunther to Minter).

**B.     The Due Process Argument.**

Chief Minter's "Memorandum" of Final Discipline indicates that he reviewed the Internal Affairs investigation file on June 16, 2020, and based on this review, decided to terminate Plaintiff's employment.  (Doc. 118-35).  This memo makes no mention of the June 24, 2020 mitigation hearing, leading to the conclusion that Minter actually made the decision to terminate Kang **before** the hearing.  As the even the City acknowledges, Plaintiff was entitled to notice of the allegations against him <u>before</u> his termination, and he was entitled to a pre-termination hearing.  (<u>See</u> Doc. 128, p. 18).  He received neither.  Kang's termination was July 17, 2020 - the post-termination alleged "appeal" procedures afforded to him after the fact were insufficient to remedy the denial of due process.

This is a **violation** of the constitutional due process notice that was owed to him, which **cannot** be remedied by a post-termination hearing or state court lawsuit.  It is not merely a deprivation.  <u>Galbreath v. Hale Cnty., Ala. Comm.</u>, 754 F. App'x 820, 828 (11th Cir. 2018) ("Where a due process violation is already complete because no hearing was held and required by <u>Loudermill</u>, <u>Mckinney</u> has no application."). <u>See e.g.</u>, <u>Bailey v. Henry Cnty.</u>, No. 119CV03504LMMRDC, 2022 WL 4596653, at *6 (N.D. Ga. June 27, 2022), report and recommendation adopted, No. 119CV03504LMMRDC, 2022 WL 18777540 (N.D. Ga. Sept. 27, 2022).

C. **There is Evidence both of Pretext and of a Convincing Mosaic of Circumstantial Evidence to Support Plaintiff's Claims of Retaliatory Discharge and Disparate Treatment.**

The record contains evidence that the City's stated reasons for termination were pretextual. Plaintiff presents a convincing mosaic of circumstantial evidence to support his claims. Summary judgment is simply not proper.

To establish "pretext," Kang may demonstrate that the proffered reason for termination was "not the true reason." Brooks v. Cty. Comm'n, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005)). Kang can succeed in this by either "persuading the court that a discriminatory reason more motivated the employer" or "by showing that the employer's proffered explanation is unworthy of credence." Id.

In the context of summary judgment, Kang "need only raise a genuine issue of material fact that the reason was a pretext; [he does] not need to actually prove it." Maddow v. P & G, 107 F.3d 846, 851 (11th Cir. 1997). That low bar makes grants of summary judgment at the pretext stage of a McDonnell Douglas analysis particularly suspect:

> [t]he grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable . . . [where] plaintiff has established a prima facie case because of the 'elusive factual question' of intentional discrimination.

Id.; see also Mulhall v. Advance Security, Inc., 19 F.3d 586, 598 (11th Cir. 1994).

Sufficient evidence exists here of pretext to compel a jury decision. Kang has "cast[ ] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that [those] reasons were not what actually motivated its conduct." Lewis v. City of Union City, 934 F.3d 1169, 1186 (11th Cir. 2019) ("Lewis II").

Kang can demonstrate that his termination was the result of either unlawful discrimination or retaliation through presenting a "convincing mosaic of circumstantial evidence." See Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). Presentation of this mosaic of evidence allows a plaintiff to survive summary judgment if it "would allow a jury to infer" that his termination was motivated by "unlawful animus." Andre v. Secretary, 2018 U.S. Dist. LEXIS 239194, *54 (M.D. Fla. 2018) (citing Lewis v. City of Union City, 877 F.3d 1000, 1018 (11th Cir. 2017)).

"The McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case." Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019) ("Lewis II). "Not every employee subject to unlawful discrimination will be able to produce a similarly situated comparator. Among other things, a proper comparator may not exist in every work place." Id. "[E]ven without similarly situated comparators, 'the plaintiff will always survive summary judgment if he or she presents a convincing mosaic of circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" Id. (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (internal alterations omitted)). Such a "'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." Lewis II, 934 F.3d at 1185. Other tiles which may be utilized to build the mosaic include preferential treatment of employees

who do not meet the "strict comparator" test, Andre, 2018 U.S. Dist. LEXIS 239194 at *54, and the credibility of the decision maker. Holland v. Gee, 677 F.3d 1047, 1063 (11th Cir. 2012).[4]

"The 'mosaic' may consist only of the plaintiff's prima facie case and of the evidence rebutting the employer's proffered reasons." Holland v. Gee, 677 F.3d 1047, 1056 n.2 (11th Cir. 2012) (referencing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000)).

Important in the analysis is the fact that Minter requested the termination. Other members of the SPD who reviewed the matter recommended suspension, additional training, transfer out of the SIS Warrant Unit, review of his SWAT Team membership, and a five day suspension. (DRB Decision, Doc. 118-34). Even though Minter may not have been the "ultimate decision maker" based on the allegations that the City Manager had the final say, "disparate treatment analysis"

> requires that none of the participants in the decision-making process be influenced by discriminatory bias. . . . Thus, the motivations of both the [decision maker] and [the recommender] are pertinent. If the [decision maker was] not motivated by racial animus but [the recommender was], the [decision maker's] neutrality with respect to race would not cure [the recommender's] racial bias.

Tucker v. Hous. Auth., 507 F. Supp. 2d 1240, 1252 (N.D. Ala. 2006) (quoting Jones v. Gerwens, 874 F.2d 1534, 1541 n.13 (11th Cir. 1989)); see also Staub v. Proctor Hospital, 562 U.S. 411, 420-421 (2011).

---

[4] In Holland, a Title VII case raising claims of discrimination based on the pregnancy of plaintiff, the ultimate decision maker denied that he knew of the plaintiff's pregnancy. This "knowledge" was disputed by the evidence presented at trial. This contradiction "could have allowed the jury to make an "adverse credibility determination" as to the decision maker, which in turn would have allowed "a rational jury [to] infer" that the decision maker did not fire the plaintiff for proffered reason. Holland, 677 F.3d 1063.

Kang has marshaled ample circumstantial evidence that Minter and the City acted with discriminatory intent in terminating him for pretextual reasons. The mosaic of circumstantial evidence includes:

- By the spring of 2019, Minter's lack of effective "leadership" of the SPD became an issue of concern to the members of the force. This lack of leadership led seventy-seven individual members of the SPD to sign a Complaint, asserting allegations against Minter. These allegations included:

    - claims that Minter threatened members of the Department with threats of removal from ranks, command, and units;

    - failed to communicate and distanced himself from responsibility in matters of promotions, transfers, and policies;

    - failed to plan for the safety and security of the Department with adequate supplies and equipment, including safety gear for critical incidents;

    - failed to listen to the needs of specialized units whose mission relies upon training and equipment;

    - engaged in favoritism in the levels of promotion and specialized positions, including the creation of positions for loyalty instead of skill;

    - engaged in inconsistent punishment levels for like violations through an Office of Professional Standards ("OPS") system, which was designed to be unbiased, but now operated with the Chief's absolute control; and

    - made untrue statements to the public, politicians, media and employees concerning the effectiveness, strategies, morale, manpower, and readiness of the Department.

    (Group HR Complaint, Doc. 118-2; see also First Kang Aff., Doc. 118-65, para. 16).

- Kang's personal complaint was submitted on April 10, 2020. In this complaint, Kang described a hostile work environment, and that "[t]he situation caused significant grief, anguish, and is a significant contributing factor to [his] moral, mental and physical health." (See id).

- The fact that such a large number of officers signed such a damning complaint caused problems for Minter in the public eye. (See Doc. 118-8 through 14).

- In August of 2019, members of the SPD presented an anonymous letter to then-Mayor Eddie DeLoach, City Manager Patrick Monahan, and the City Aldermen. The letter describes a continuing decline in moral in the SPD, as well as dwindling numbers under Minter's leadership. (Doc. 118-17). This anonymous letter was reported by local news media. (Doc. 118-16).

- The Covid Pandemic was in full swing, but understanding of the disease, methods of transmission, and survivability was lacking. Nevertheless, Minter would not allow officers to wear face masks, even if they purchased them with their own funds. (Gundich Depo., Doc.97-32, t.30:17-25). This lack of PPE lead to a heightened since of urgency when Faitele was spitting during the encounter in April of 2020.

- During the Faitele encounter, the officers involved did not have access to "Mobile Com" (or the mobile computer system), which would assist in identifying the individual under arrest. This lack of equipment was another factor that reflected on Minter's leadership, or lack thereof.

- SPD had no policies or training in handling exposure to COVID, nor as to how to handle spitting suspects. (See generally, First Kang Affidavit, para. 21-26). This lack of training is a factor that reflected on Minter's leadership, or lack thereof.

- Internal affairs investigating the Faitele incident, determined that Kang should be "charged" with the following policy violations:

    - SPD GO # ADM-004, "Conduct Unbecoming."
    - SPD GO # ADM-004, "Treatment of Others," and
    - SPD GO # ADM-007, "Reporting a Police Response to Aggression/Resistance/Force."

(Doc. 118-32, CITY 00165-000166). Kang was not advised of the policies which he was alleged to have violated until July 17, 2020, after Minter made the decision to terminate him. This supports jury inference that Minter was actively trying to handicap Kang in his ability to launch a meaningful defense to the allegations, and bolster Minter's attempts to "scape-goat" Kang.

- At no point was Kang being investigated for an unauthorized use of force, but only for his alleged failure to report a police response to aggression.

- The entire SPD disciplinary process utilized in Kang's case was a draft policy, authored by Minter, and not a policy actually enacted or ever made available to members of the SPD, including Kang.  Under this Policy, the initial discipline decision was directed to the Chief of Police alone.  A jury could conclude that Minter used this "draft policy" for the first time to secure Kang's termination.

- Members of the "Discipline Review Board," and recommended discipline including a five day suspension.  (DRB Decision, Doc. 118- 34).

- Although Kang was given a ""mitigation hearing," he was not advised of the purpose of the meeting, or why his presence was necessary.  At this point, he still did not know what the allegations against him were, or what punishment he was allegedly mitigating. (Kang Depo., t.76:1-7).

- Internal Affairs Officer Wiggins also told Kang "not to prepare" for this hearing, and to "accept responsibility and fall on [his] sword."  (Kang Depo., t:76:9-10).

- Minter, who was not in Kang's chain of command, attended the Mitigation Hearing.

- Kang did not know what the charges against him were until Minter terminated him on July 17, 2020.

- On this date, Kang, for the first time, received the contents of the Internal Affairs file. Information necessary for him to defend the "unknown" charges against him was purposefully withheld.  (Second Kang Aff., Doc. 118-42).

- On July 23, 2020:  Kang "Appeals" to Minter, affirmed his own prior decision, (Doc. 118-38).

- On August 7, 2020, Minter himself procured referral from CARES Committee for criminal prosecution of Kang.  Minter did not inform the members of the Cares Committee that the SPD and the City had violated their own policies and procedures in terminating Kang (McLeod Depo., Ex. 43, t.22:12-18), that Kang had a perfect disciplinary record (id. at t.24:22-24).  The Committee did not know that the officers were not given PPE (id. at 71:11-13), that Minter himself prevented officers from wearing masks (id. at 71:14-20), or that Faitele was spitting on the officers.  (Id. at 71:21-25).

- Chief Minter was the sole source of the information presented at the meeting. (McLeod Depo., t.34:1-7; t.70:21-23).

- On that same date - August 7 - Minter contacted District Attorney Meg Heap and provided her with the BWC Video.  (August 7, 2020 Email, Doc. 118-. 67).

- On August 7, 2020, Minter (for the SPD), the Mayor, and District Attorney Heap held a press conference on the steps of the Chatham County Courthouse. Here, they discussed Kang and charges of "excessive use of force," even though Kang was never alleged to have violated the SPD policy on excessive force.

- Each of the following African American individuals received preferential treatment from Minter and the City:

† **Lieutenant Rodney Reynolds** was charged with Pandering (or soliciting prostitution) while on duty in 2018.  He was given the opportunity to resign, in lieu of termination, and was not turned over for criminal prosecution.  (Doc. 118-58);

† **Corporal Wayne Peterson** was charged with punching a homeless man in the face while in handcuffs in July of 2017.  He was not terminated, and was not turned over for criminal investigation.  (Doc. 118-59).

† **Detective Latrell Goodine** misused the NCIC/GCIC crime database for personal reasons in violation of O.C.G.A. § 31-7-260 (a felony) and 28 U.S.C. § 534, and for lying to the Grand Jury Foreman.  She received a ten day suspension.  (Doc. 118-60).

† **Officer Adrian Gates.**  In July of 2019, Gates consorted with felons, compromised investigations, provided false information to Internal Affairs investigators, intimidated witnesses.  Although termination was recommended, Minter overruled this discipline and reduced it to a forty hour suspension.  (Doc. 118-61).

† **Officer Adrian Gates.**  In July of 2020, Gates knowingly attempted to arrest a suspect on a non-extraditable warrant.  After this incident, Gates was finally terminated.  (Doc. 118-61).

† **Corporal Tony Farmer.**  In December of 2021, Corporal Farmer slapped an arrestee while in handcuffs after the arrestee spit on him.  He received a sixteen hour suspension, and was not referred to the District Attorney for criminal prosecution.  (Doc. 118-62). [5]

---

[5] The City argues that these are not valid "comparators" for various reasons, but evidence of preferential treatment of these individuals is relevant to the "mosaic" argument.  See Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)

Through this evidence that Minter improperly changed the termination policy and used it in disciplining Kang, violated even his own policy by not giving Kang access to the investigative materials used in making the disciplinary decisions, procuring criminal prosecution against Kang without providing the CARES committee accurate information, wanting to escape bad publicity regarding his lack of leadership by diverting press attention away from his own actions, and through his demonstrated preferential treatment of African American employees, Kang's claims survive summary judgment.

## CONCLUSION

For the reasons below, the City's Motion for Summary Judgment must be denied. Numerous issues of fact exist.  A jury must decide if the Defendants unjustly stripped Corporal Kang of his career.

THIS THE  11th  DAY OF  SEPTEMBER , 2023.

                                            SAVAGE & TURNER, P.C.

By:    */s/ Kathryn Hughes Pinckney*
        Brent J. Savage
        Georgia Bar No. 627450
        Kathryn Hughes Pinckney
        Georgia Bar No. 376110

102 East Liberty Street, 8th Floor
Post Office Box 10600
Savannah Georgia 31412
Phone:  (912) 231-1140
Fax: (912) 232-4212
bsavage@savagelawfirm.net; lhatcher@savagelawfirm.net
kpinckney@savagelawfirm.net
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

      This is to certify that I have on this day filed electronically with the Clerk of the Court the foregoing.  By filing in the CM/ECF system, I have thereby served by email all of the parties in this case through the following counsels of record:

*Attorneys for Defendant The Mayor and Alderman of the City of Savannah:*

R. Bates Lovett
Jennifer N. Herman
blovett@savannahga.gov
jherman@savannahga.gov

Patrick T. O'Connor
Patricia T. Paul
K. Elizabeth Holland
pto@olivermaner.com
ppaul@olivermaner.com
eholland@olivermaner.com

*Attorneys for Defendant Chief Minter:*

Shawn A. Kachmar
Taylor L. Dove
Anita Harris
skachmar@huntermaclean.com
tdove@huntermaclean.com
aharris@huntermaclean.com

      THIS THE  11th  DAY OF  SEPTEMBER , 2023.

      SAVAGE & TURNER, P.C.

By:    */s/ Kathryn Hughes Pinckney*
      Brent J. Savage
      Georgia Bar No. 627450
      Kathryn Hughes Pinckney
      Georgia Bar No. 376110

102 East Liberty Street, 8th Floor
Post Office Box 10600
Savannah Georgia 31412
Phone:  (912) 231-1140
Fax: (912) 232-4212
bsavage@savagelawfirm.net; lhatcher@savagelawfirm.net
kpinckney@savagelawfirm.net
*Counsel for Plaintiff*