EXHIBIT 9

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DANIEL KANG, )
)
Plaintiff, ) CIVIL ACTION NO.:
)
vs. ) 4:21-cv-111-WTM-CLR
)
THE MAJOR AND ALDERMEN OF )
THE CITY OF SAVANNAH and )
ROY W. MINTER, JR., Chief )
of Police for the City of )
Savannah, Georgia, In His )
Individual and Official )
Capacities, )
)
_____Defendants. )

DEPOSITION OF

ROY W. MINTER, JR.

8:14 a.m.

November 11, 2022

Hunter Maclean Exley & Dunn
200 East Saint Julian Street
Savannah, Georgia

Annette Pacheco, RPR, RMR, CCR-B-2153

## Gilbert & Jones

Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
*Brunswick*, GA 31520

*gilbertandjones1@gmail.com*
**912.264.1670**

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
*Savannah*, GA 31406

EXHIBIT 9

2

```
 1                 APPEARANCES OF COUNSEL

 2    On behalf of the Plaintiff:

 3         BRENT J. SAVAGE, Esq.
           JAMES H. WILSON, III, Esq. (By videoconference)
 4         FELIX BERNARD ALFRED KLOC, Esq.
           SAVAGE TURNER PINCKNEY SAVAGE & SPROUSE
 5         102 East Liberty  Street
           Savannah, Georgia  31401
 6         912-231-1140
           bsavage@savagelawfirm.net
 7         jwilson@savagelawfirm.net
           fkloc@savagelawfirm.net
 8

 9    On behalf of the Defendant The Mayor and Aldermen of
      the City of Savannah:
10
           PATRICK T. O'CONNOR, Esq.
11         PATRICIA T. PAUL, Esq.
           OLIVER & MANER, LLP
12         218 West State Street
           Savannah, Georgia  31401
13         912-236-3311
           ptoconnor@olivermaner.com
14         ppaul@olivermaner.com

15
      On behalf of the Defendant Roy W. Minter, Jr.:
16
           SHAWN A. KACHMAR, Esq.
17         HUNTER, MACLEAN, EXLEY & DUNN
           200 East Saint Julian Street
18         Savannah, Georgia  31401
           912-236-0261
19         skachmar@HunterMaclean.com

20

21                     - - -

22

23

24

25


                      GILBERT & JONES
```

EXHIBIT 9

**3**

## INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| Examination by Mr. Savage | 8 |
| Examination by Mr. Kloc | 138 |
| Examination by Mr. Kachmar | 140 |
| Examination by Mr. Kloc | 166 |
| Examination by Mr. Kachmar | 171 |

- - -

## INDEX TO EXHIBITS

Plaintiff's
Exhibit        Description        Page

Exhibit 1    An article titled "Savannah
officers sign letter of
workplace conflict against
Chief Minter        94

Exhibit 2    An article titled "77 Ga.
officers file complaint
against police chief"        97

Exhibit 3    An article titled "Savannah
police HR complaint:  Chief
Roy Minter showed 'favoritism,'
'outright disrespect' towards
staff        106

Exhibit 4    Awards and Decorations
Information        107

Exhibit 5    Certificate for Air Force
Commendation Medal        107

GILBERT & JONES

**4**

## INDEX TO EXHIBITS

Plaintiff's
Exhibit        Description        Page

Exhibit 6    Certificate for Air Force
Commendation Medal        107

Exhibit 7    Certificate for The Joint
Service Achievement Medal
(First Oak Leaf Cluster)        107

Exhibit 8    Citation to accompany the
award of the Joint Service
Commendation Medal        107

Exhibit 9    Citation to accompany the
award of the Joint Service
Commendation Medal        107

Exhibit 10    Certificate for Air Force
Achievement Medal        107

Exhibit 11    (No Exhibit 11 identified.)

Exhibit 12    (No Exhibit 12 identified.)

Exhibit 13    (No Exhibit 13 identified.)

Exhibit 14    (No Exhibit 14 identified.)

Exhibit 15    (No Exhibit 15 identified.)

Exhibit 16    Power Point slide titled
"Previous work history/
performance"        138

Exhibit 17    Power Point slide titled
"Medal of Valor"        138

Exhibit 18    Power Point slide titled
"Medal of Distinction"        138

Exhibit 19    Power Point slide titled
"Unit Teamwork Citation"        138

Exhibit 20    Power Point slide titled
"Unit Teamwork Citation"        138

GILBERT & JONES

**5**

## INDEX TO EXHIBITS

Plaintiff's
Exhibit        Description        Page

Exhibit 21    Power Point slide titled
"Unit Teamwork Citation"        138

Exhibit 22    Power Point slide titled
"Medal of Valor"        138

Exhibit 23    Two photographs labeled
"Savannah Police"        138

Exhibit 24    (No Exhibit 24 identified.)

Exhibit 25    (No Exhibit 25 identified.)

Exhibit 26    SPD General Order, GO #OPS016        26

Exhibit 27    SPD General Order, GO #OPS016        26

Exhibit 28    Investigator's Report by Lt.
Robert Larry, III        48

Exhibit 29    12 unnumbered pages of Savannah
Police documents and previously
marked Exhibit 7, 8/31/22 TD        53

Exhibit 30    Video on thumb drive        172

Exhibit 31    Video on thumb drive        172

Exhibit 32    News articles        172

Exhibit 33    Inter-department memo dated
September 9, 2020, to Roy
Minter, Jr. from Michelle
Halford        104

Exhibit 34    A sheet of paper with a zero
on it        122

Exhibit 35    Investigative File/Appeal
Preparation        126

Exhibit 36    Photocopy of an envelope
and a letter to Attorney
Brent Savage        128

- - -

GILBERT & JONES

**6**

## INDEX TO EXHIBITS

Defendant's
Exhibit        Description        Page

Exhibit 37    17 pages of Power Point slides        141

(Original Plaintiff's Exhibits 1 through 10, 16
through 23 and 26 through 36 and Defendant's Exhibit
37 have been attached to the original transcript.)

GILBERT & JONES

EXHIBIT 9

**7**

1  (Reporter disclosure made pursuant to
2  Article 10.B of the Rules and Regulations of the
3  Board of Court Reporting of the Judicial Council
4  of Georgia.)
5  MR. SAVAGE: This is the deposition of
6  Roy Minter being taken by the plaintiffs in the
7  captioned case for all purposes permissible
8  under the Federal Rules of Civil Procedure.
9  I'd ask if you've got an objection to the
10  form of any questions, you make the objection at
11  the time of being allegedly improperly formed
12  question or soon thereafter as possible so I can
13  try to re-form it if I agree with you.
14  And then the only other thing I'd like to
15  make objections in a timely manner would be the
16  responsiveness of Mr. Minter's answers so that
17  we can try to get it done. I don't want to take
18  his deposition twice. So . . .
19  MR. KACHMAR: Understood.
20  MR. SAVAGE: Okay? Otherwise, the Federal
21  Rules of Civil Procedure apply. Why don't we
22  swear Mr. Minter in.
23  ROY W. MINTER, JR.,
24  having been first duly sworn, was examined and
25  testified as follows:

GILBERT & JONES

**8**

1  EXAMINATION
2  BY MR. SAVAGE:
3  Q. Let me get your name, sir.
4  A. Roy W. Minter, Jr.
5  Q. Okay. And how long were you employed by
6  the City of Savannah as the police chief?
7  A. Almost four years.
8  Q. And why did you leave?
9  A. I left because I'm transitioning to a new
10  position.
11  Q. Have you been appointed to the U.S.
12  Marshal?
13  A. Not yet.
14  Q. Okay. Robert Gavin I deposed a couple
15  days ago. Was he a good officer?
16  A. Yes.
17  Q. Knowledgeable about procedures and things
18  of that nature?
19  A. I believe he is.
20  Q. Okay. Let me show you some of his
21  testimony and see if you agree or disagree with it.
22  This is a rough transcript. I asked him if you were
23  working off a draft policy, and he said yes.
24  I asked him was that proper in the
25  termination of what I consider to be a war hero,

GILBERT & JONES

**9**

1  Daniel Kang. And he said your actions were improper.
2  Would you agree with that or disagree?
3  MR. KACHMAR: I object to the form. You
4  haven't identified what policy. So to the
5  extent he can answer your question, I guess he
6  can answer.
7  Q. (By Mr. Savage) Well, he said all of his
8  termination was improper. Gavin. I just can't
9  imagine you being appointed U.S. Marshal with the
10  assistant chief saying you violated policies to -- in
11  the termination of Daniel Kang.
12  Would you agree with him that you deviated
13  from accepted policies in the termination of
14  Daniel Kang?
15  A. Can you explain to me what do you mean by
16  "deviated from accepted policies"?
17  Q. Well, you used a draft policy you weren't
18  supposed to use.
19  A. I would have to go back and look and see
20  when that policy was actually put in place, put in
21  the system to be circulated, which means it would not
22  have been a draft policy.
23  Q. Okay. I thought there would be some kind
24  of answer.
25  He's there. He says you violated policy.

GILBERT & JONES

**10**

1  And if you violated -- I know you say you didn't --
2  should he have been terminated? You're traveling
3  with a draft policy. Gavin says you broke policy by
4  using that draft policy to terminate Daniel Kang.
5  Should you have done that if you accept, and I know
6  you don't, that that was a draft policy not been
7  accepted by the City of Savannah?
8  MR. KACHMAR: Object to the form. You can
9  answer if you can.
10  A. I think any perceived or alleged policy
11  violation has the right to be investigated.
12  Q. (By Mr. Savage) Okay. I took the dep --
13  you put Officer Khaalis -- what's her first name?
14  MR. ARANGO: Nicole.
15  Q. (By Mr. Savage) Nicole Khaalis in charge
16  of the investigation into Daniel Kang when you
17  cooperated with Meg Heap to get Daniel Kang indicted.
18  That was Sergeant, I mean, Lieutenant Larry and
19  Officer Khaalis, she told me, were put in charge of
20  investigating Daniel Kang after he was terminated for
21  the purposes of having him indicted.
22  Do you recall putting her in charge of
23  that investigation with Sergeant Larry?
24  MR. KACHMAR: Object to the form. You can
25  answer if you understand the question.

GILBERT & JONES

EXHIBIT 9

**11**

1     A.    I recall assigning that task to
2 Lieutenant Larry. I'm not sure who assigned anyone
3 else to assist with that investigation.
4     Q.    (By Mr. Savage) Have you ever read the
5 report that Officer Khaalis and Sergeant Larry put
6 together on Daniel Kang?
7     A.    I have not.
8     Q.    Meg Heap, I mean, she is on camera --
9 now, I don't want to pull this stuff up. It takes
10 too long -- saying you chose to not bring the GBI in
11 in investigating criminally Daniel Kang. That was
12 your choice. Is that true or not true?
13     A.    I don't recall me making the decision not
14 to bring the GBI in.
15     Q.    Okay. Her direct statement is you'd have
16 to talk to Chief Minter as to why he didn't bring the
17 GBI in.
18     Why wasn't the GBI brought in to
19 investigate Daniel Kang?
20     A.    I think what happened in this particular
21 situation, Mr. Savage, was there was a discussion
22 with the DA and myself regarding whether or not she
23 felt a criminal investigation should be conducted for
24 this matter.
25     Q.    Yes, sir.

**12**

1     A.    I remember, to the best of my
2 recollection, during that conversation that I asked
3 if she wanted me to look at the GBI. And I think
4 there was a discussion about maybe an internal or
5 maybe an SPD, SPD could conduct the criminal
6 investigation.
7     Q.    I mean, I tried to get ready to try to
8 go -- not waste everybody's time this morning. So I
9 don't want to pull the stuff up, but she's on tape
10 saying you would have to ask Chief Minter as to why
11 he didn't bring the GBI in. I didn't have anything
12 to do with that. Is that true or untrue? Assuming
13 that she made that statement.
14     A.    I'm not sure what the context of her
15 statement was, but I think the final decision was
16 made that the Savannah Police Department would
17 conduct that criminal investigation.
18     Q.    Whose decision was it?
19     A.    If I recall correctly, I think it was a --
20 one of -- a couple of recommendations.
21     Q.    By whom?
22     A.    I believe it was a discussion between
23 myself and the DA.
24     Q.    And she agreed to let you internally
25 investigate this guy even though he had signed a

**13**

1 petition taking you to HR? That was her decision?
2     MR. KACHMAR: Object to the form.
3     Q.    (By Mr. Savage) I mean, she wants to be a
4 judge. I don't think anybody wants to be too close
5 to this case. So you're saying it's a joint decision
6 not to bring the GBI in?
7     A.    I was saying it was a joint discussion.
8     Q.    Well, whose decision was it? I mean, you
9 tried to put this man in a orange suit to indict him.
10 He has three tours of duty in Iraq, one in
11 Afghanistan. You couldn't even get him indicted.
12 And I'll show you that you gave false information --
13 and we'll go into that and give you a chance to
14 respond -- to the district attorney regarding Kang.
15     Bottom line, is Gavin right on this, that
16 you violated policy and in using a draft policy that
17 was not approved by the city?
18     MR. KACHMAR: Object to the form. You can
19 answer.
20     Q.    (By Mr. Savage) In getting rid of Kang?
21     A.    I do not believe I violated any policy.
22     Q.    Okay. It stuns me that Adrian Gates is
23 still on this -- that you countermanded the
24 recommendation to get rid of him and kept him on the
25 force, and you got rid of Daniel Kang. What did he

**14**

1 do that was worse than Adrian Gates when you
2 countermanded the decision not to get rid of him?
3     MR. KACHMAR: Object to the form. You can
4 answer, if you can.
5     A.    Well, the things I took into consideration
6 with the Kang investigation is I started at the
7 beginning when he first contacted Mr. Faitele and
8 Mr. Faitele advised him that he was not Khalil and
9 told him that his identification was in his pocket.
10     And you can see from the video that
11 probably about two, two and a half minutes into his
12 contact with Mr. Faitele, you see Kang remove the
13 wallet and open it up. And you can see what appears
14 to be either a driver's license or some form of
15 identification. He then closes that back up.
16     Q.    Who does?
17     A.    Kang does. And puts it somewhere. I'm
18 not sure where he puts it.
19     Q.    Hm-hmm. This is Black Lives Matter.
20     MR. KACHMAR: Mr. Savage, he's answering
21 your question.
22     MR. SAVAGE: Yeah.
23     MR. KACHMAR: Let him finish. Okay?
24 Thank you.
25     A.    And closes it up. He puts it somewhere.

EXHIBIT 9

**15**

1 Does not say anything to anyone for almost 20
2 minutes. Leaves Faitele in handcuffs for almost 30
3 minutes. I did not see where there was any attempt
4 to try and de-escalate the situation, especially
5 after Kang knew that it appeared that he had the
6 person that -- he was detaining the person who was
7 not wanted on the warrant.
8        There's a situation of aggressively going
9 up the stairs after Kang yelled, in a courtyard, an
10 apartment complex where it appeared there were also
11 people present, quote, "I'm not talking to you,
12 mother fucker." And aggressively ran up the stairs.
13    Q.  (By Mr. Savage) Aggressively?
14    A.  Well, ran upstairs and had to be stopped
15 by another officer who turned him around and he went
16 back downstairs while he was referring to Mr. Faitele
17 as a "fucking bullshit ass faggot" and a "fucking
18 pussy."
19    Q.  This is Kang?
20    A.  This is Kang.
21    Q.  Okay. Let me -- let me stop you --
22      MR. KACHMAR: Let him finish answering
23 your question.
24      MR. SAVAGE: He's just got a -- oh, God,
25 it's my deposition.

**16**

1      MR. KACHMAR: Well, you asked him a
2 question. Let him finish answering.
3      MR. SAVAGE: We'll get back to it.
4    Q.  (By Mr. Savage) Your own assistant chief
5 said you broke the rules in firing these people. Do
6 you agree with Gavin or not?
7    A.  Who broke the rules?
8    Q.  He said you didn't follow an approved
9 policy and got rid of Kang. That's what he said.
10    A.  I think I answered that, Mr. Savage. I
11 believe the policy that was drafted was moved forward
12 and put into the system.
13    Q.  What does that mean? It was approved?
14    A.  It was --
15    Q.  I mean, the city attorney's office doesn't
16 think that you followed policy. Have they ever
17 talked to you, any of the city attorneys, that we
18 don't think you followed policy in this case?
19      MR. KACHMAR: Object to the form.
20    Q.  (By Mr. Savage) Bates Lovett and them.
21 Did they ever tell you that?
22    A.  I don't recall having any conversation
23 with the city attorney's office about not following
24 policies.
25    Q.  Okay. Now, Khaalis testified that

**17**

1 Faitele -- I'm not going to call him Mr. Faitele. Do
2 you understand there's four felonies pending against
3 him at this point? Putting a gun in somebody's mouth
4 out at the steakhouse out there, Tony's Steakhouse?
5 Beating women? Do you know why he hadn't been
6 prosecuted? You take a war hero.
7      Did you ever serve in the military?
8    A.  No, sir.
9    Q.  Do you have any respect for people that go
10 to Afghanistan or Iraq and protect our rights?
11    A.  I absolutely --
12    Q.  Why did you get rid of a guy like this? I
13 mean, we got Gates who's a friend of yours; right?
14      MR. KACHMAR: Object to the form.
15    Q.  (By Mr. Savage) Adrian Gates?
16      MR. KACHMAR: You can answer that question
17    if you understand it.
18    Q.  (By Mr. Savage) And you're told that
19 Gates is tipping off a bunch of guys from Miami who
20 are running guns and drugs in this community, that
21 he's their eyes and ears inside the police
22 department. Kind of like Julius Hall was 20 years
23 ago, went to federal prison without any type of right
24 to get out.
25      And you countermand the decision of the

**18**

1 chain of command to get rid of him. You said, oh,
2 no, let's not get rid of Mr. Gates who has been
3 accused of tipping off gunrunners and drug dealers in
4 this community. Let's give him 40 hours of community
5 service. You take a war hero like this and you try
6 to get him put in jail. How's that work?
7      MR. KACHMAR: Object to the form. Is
8    there a question?
9      MR. SAVAGE: Yeah.
10      MR. KACHMAR: Where's the question?
11    Q.  (By Mr. Savage) Why did you do that?
12    A.  Do what? I don't understand what your
13 question is.
14    Q.  Countermand Gates.
15    A.  What do you mean by "countermand Gates?"
16    Q.  Well, there was a decision made that he
17 should be, by his chain of command, terminated. You
18 stepped in and gave him 40 hours of community
19 service; is that true?
20    A.  I didn't give him 40 hours of community
21 service.
22    Q.  What did you give him?
23    A.  40 hours suspension.
24    Q.  Oh, wow. I mean, we have -- crime is up
25 under you. I do not believe that you're merely

EXHIBIT 9

**19**

1 campaigning for a job. Whose decision was it to
2 terminate you or was this your decision?
3       MR. KACHMAR: Object to the form of the
4       question. What is the question?
5     Q. (By Mr. Savage) The question is: Why
6 aren't you the police chief anymore? I never heard
7 of anybody getting out of a job that campaigned to be
8 a U.S. Marshal. I never heard of that in 44 years.
9     Why aren't you the police chief?
10     A. Because I'm -- I removed -- I'm
11 transitioning to a new position.
12     Q. Who's giving you the assurance that you're
13 going to get it? You're transitioning. That means
14 it's a completed deal to me. Senator Warnock? You
15 certainly won't get it if Herschel Walker's elected.
16 You won't. I mean, they count people. And they take
17 their enemies seriously. And anybody affiliated with
18 Senator Warnock is an enemy of theirs.
19       MR. KACHMAR: Is there a question relevant
20       to this case here?
21       MR. SAVAGE: Yeah. I want him to tell the
22       truth on why he's not the police chief.
23     Q. (By Mr. Savage) Did anybody suggest you
24 needed to step down?
25     A. No, sir.

**20**

1     Q. Okay. How much did we spend on the firm
2 that recruited you? I'm a city taxpayer. Do you
3 know how -- we spent on a recruiting firm and you
4 only last four years?
5     A. I don't have any information on how much
6 they spent.
7     Q. So Gavin is a knowledgeable person, good
8 police officer. A lot of them gone bad on you
9 because we've taken lots of depositions in the
10 Faitele case.
11     Toth? Good officer?
12     A. I believe so.
13     Q. He says that Kang had a right to detain
14 him, Faitele. I think that the DA's Office is
15 slow-walking the prosecution of Faitele on four
16 felonies so that they don't really get messed up when
17 they attempt to try this case against Arango.
18     Have you ever been in any discussions with
19 the district attorney's office that this guy Faitele
20 is getting in more and more trouble? He's holding
21 guns to people's heads. I fired a war hero over
22 this, and we don't want him convicted.
23     Have you ever been in any discussions of
24 that nature?
25       MR. KACHMAR: Object to the form.

**21**

1       MR. SAVAGE: Sure.
2     A. No, sir.
3     Q. (By Mr. Savage) Now, Toth. Kang and
4 Arango had every right to detain that young man.
5 Agree or disagree?
6       MR. KACHMAR: Object to the form. A young
7       man?
8       MR. SAVAGE: Faitele.
9     Q. (By Mr. Savage) I want to -- that's a
10 Solomon Amusan's pronunciation. I say Faitele or
11 worse. I don't like people that -- this community's
12 on fire with guns. And I don't blame you all for
13 that. I mean, I think it's a family issue all. I
14 mean, I don't think that the police chief -- you
15 know, it's easy to blame the police chief is what I'm
16 saying.
17     But did he have the right to detain
18 Faitele?
19     A. I believe he did to the point where he was
20 able to positively identify him, Mr. Faitele.
21     Q. They were smoking dope in that apartment.
22 Do we not detain people that are, you know, smoking
23 dope and distributing dope anymore in this community?
24 Do you understand Faitele and them were smoking dope
25 in there?

**22**

1     A. I don't know anything about any smoking
2 dope.
3     Q. Did you investigate it?
4     A. I didn't investigate the case.
5     Q. Khaalis, who you put on this investigation
6 with Larry, she issued the report. Said he committed
7 two felonies in the presence of these officers. Do
8 you agree with that?
9     A. I don't know what's in the report.
10     Q. Well, you looked at the tape. She says
11 that when he threatened Mike Arango, his daughter,
12 that "I'm going to beat the hell out of your daughter
13 if I ever run into her," is that a felony to tell a
14 police officer that?
15     You condone threatening your police
16 officers. Well, he should have let Mr. Faitele go.
17 Mr. Faitele's already got four felonies against him.
18 He's a criminal. And he threatened his daughter.
19 That's a felony, is it not?
20     That's what your officer who you put in
21 charge of investigating Kang and Arango to get them
22 put in jail said in her deposition. Is that a felony
23 to say to Mike Arango, "I'm going to beat the hell
24 out of your daughter if I ever run into her"? Is
25 that a felony? That's what one of your officers told

EXHIBIT 9

**23**

1  me under oath.
2      A.    I don't know if that's a felony or not
3  based on what their investigation revealed.
4      Q.    Okay.  So if we headline this when we try
5  it that the police chief says he's not sure that it's
6  a felony to threaten a 16-year-old girl -- that's how
7  old his daughter was -- to beat the hell out of her,
8  he's just not sure.  And ladies and gentlemen, you
9  got the opportunity to speak to the City of Savannah
10  in this case.  So you're not sure on that.  She was.
11          MR. KACHMAR:  Object.  Is there a question
12      here?
13          MR. SAVAGE:  No.
14      Q.    (By Mr. Savage) She also says he
15  committed a second felony by spitting at them where
16  you got no PPE for your people out there, spitting at
17  him.  Have you ever looked at his gun that he had on
18  him, Arango, as to whether there's sputum on it?
19          Probably the easiest way to convey
20  COVID-19.  1.07 million of our fellow citizens have
21  died from it.  97 million people have gotten COVID.
22  Have you ever looked at the spit that's on his gun
23  where he's spitting in their face?  "He" being
24  Faitele.  Did you see that?
25      A.    Did I see?  I'm sorry.

GILBERT & JONES

**24**

1      Q.    Did you ever see any evidence of that that
2  he was spitting in their face?
3      A.    I didn't see any evidence of spit on his
4  gun.
5      Q.    Where is his gun?
6      A.    I'm sorry?
7      Q.    Did you look at his gun?
8      A.    No, sir.
9      Q.    Well, I guess you don't.  What I think's
10  important to learn out of this stuff is that we just
11  don't nuke people.  That if we've got a conflict of
12  interest, we shouldn't be involved in getting rid of
13  war heroes.  And anybody who served in Iraq and
14  Afghanistan is a war hero to me.  I didn't serve.
15  You didn't serve.
16          MR. KACHMAR:  Mr. Savage, do you have a
17      question?
18          MR. SAVAGE:  Yeah.  Coming at him.
19      Q.    (By Mr. Savage)  Now, Toth says if you did
20  not file required policies, you broke your rules.
21  Agree with that?
22      A.    Did not follow policy, it should be looked
23  into and investigated like any other allegation of
24  not following policy.
25      Q.    Well, I've heard from the city attorney's

GILBERT & JONES

**25**

1  office that you didn't follow policy.  Did they ever
2  try to investigate you?
3      A.    That would be a question for the city
4  attorney's office.  I don't know what investigations
5  they have or have not done.
6      Q.    Hm-hmm.  What does it take to get -- I've
7  heard from the city's attorney that you never got the
8  policy, the draft policy approved.  It was sitting on
9  your desk and you never took it off the corner of
10  your desk.
11          Is that the approved policy you followed
12  in order to get rid of Kang?
13      A.    I don't know where the information came
14  from.
15      Q.    Which did you follow?  What policy did you
16  follow?  The draft policy or the original policy?
17      A.    I followed the policy that I reviewed and
18  approved and it was in place.
19      Q.    That's the draft -- what they would call
20  the draft policy.  I mean, you're an intelligent
21  person; right?  That's what we would call the draft
22  policy; correct?
23      A.    I'm not sure which policy you're referring
24  to as the draft policy, Mr. Savage.
25      Q.    Hm-hmm.  Okay.  Now, let me get the

GILBERT & JONES

**26**

1  policy.  Your officers are going bad on you.  You
2  could have controlled them more in this case, which I
3  don't think is a good thing, but . . .
4          MR. KACHMAR:  Do you have a question,
5      Mr. Savage?
6          MR. SAVAGE:  Yeah.
7      Q.    (By Mr. Savage)  Show me -- marked as
8  Exhibit -- what is the next number?
9          THE COURT REPORTER:  I think the last one
10      was 25.
11          MR. SAVAGE:  25?  All right.  26 and 27.
12          (Plaintiff's Exhibits 26 and 27 were
13      marked for identification.)
14      Q.    (By Mr. Savage)  We got it where Gay
15  refused to answer questions in this case.  That's as
16  close as you can get for an ally.  I'm marking 26.
17  I'm handing you what's been marked as
18  Exhibit 26.  Is that the policy you followed or not?
19          MR. KACHMAR:  Just for the record, it's
20      labeled Kang 1333 to 1345.
21          MS. PAUL:  What is the policy?
22      Q.    (By Mr. Savage)  While you guys are
23  looking at it, is the city paying you still?  They
24  usually do.  Are they still paying you?
25      A.    No, I'm not being paid by the city.

GILBERT & JONES

EXHIBIT 9

**27**

```
1    Q.    Okay.  Is anybody paying you?
2    A.    No.
3    Q.    You had no termination money?  Did you get
4  any pension considerations, anything of that nature?
5    A.    No.
6          THE WITNESS:  I'm sorry.  Are you pointing
7    to something?
8          MR. KACHMAR:  No.
9    Q.    (By Mr. Savage)  Is that the policy, No.
10  26, that you followed?
11   A.    Give me a second.
12   Q.    No, sure.  That's the pending question.
13  Absolutely.
14         MR. O'CONNOR:  Just FYI, that same exhibit
15   was already Exhibit 2.
16         MR. SAVAGE:  Okay.
17         MR. KACHMAR:  Can I see your exhibit.
18   Q.    (By Mr. Savage)  Is that the policy that's
19  filed, which is the pending question, No. 26?  Let's
20  put on the record he's taking time to look at the
21  policy.
22   A.    This appears to be the policy that was
23  drafted for approval.
24   Q.    Was it ever approved?
25   A.    I believe it was.
              GILBERT & JONES
```

**28**

```
1    Q.    By whom?
2    A.    Me.
3    Q.    That's it?  When did you approve it?
4    A.    I don't recall the date.
5    Q.    What writing is there that you approved it
6  and it was official police policy?  I've never seen
7  that piece of paper.
8    A.    It should be in the system.  When these
9  policies are drafted, I review them.  They are then
10  sent to the accreditation manager.
11   Q.    Who's that?
12   A.    That would have been Robert Edenfield.
13  They are then sent to the accreditation manager.
14   Q.    Who's that?  Is that Edenfield?
15   A.    Yes.  It's Robert Edenfield.  It's sent to
16  the accreditation manager, Robert Edenfield, for
17  final review and to be posted on the network.
18   Q.    How come Gavin is getting in here, who, in
19  this jury pool, will make a very good witness -- I
20  mean, we've got Effingham County, Bryan County --
21  says you didn't follow policy.  That's what he's
22  saying.
23         How come he doesn't know?  It's important
24  with policies that everybody know what policy you're
25  operating under; fair?
              GILBERT & JONES
```

**29**

```
1    A.    Fair.
2    Q.    How do they know what policy you're
3  operating under?  You wanted to put them both in
4  jail.  You still want to put Arango in jail.
5          MR. KACHMAR:  Object to the form.  What's
6    the question?
7    Q.    (By Mr. Savage)  How do they know that
8  Exhibit 26 is the policies that they're supposed to
9  follow?
10   A.    I don't know if they checked the system to
11  review the policy.
12   Q.    The city attorney, I believe, will admit
13  that you didn't have the Exhibit 26 properly passed.
14  What they say is Monahan got rid of them.  Don't
15  worry about Minter.
16         MR. O'CONNOR:  Object to the form.
17   Q.    (By Mr. Savage)  Have you ever talked to
18  the city attorney's office as to whether or not they
19  believe that you violated policy by using unapproved
20  policies, 26, to get -- to try to put handcuffs on
21  Kang and put him in jail?
22         MR. KACHMAR:  Object to the form.
23   A.    I'm sorry.  Can you restate the actual
24  question.
25   Q.    (By Mr. Savage)  Have you ever talked to
              GILBERT & JONES
```

**30**

```
1  the city attorney's office?
2    A.    About?
3    Q.    Whether you properly followed policy in
4  trying to put Kang in jail.
5    A.    I have not talked to the city attorney's
6  office about that.
7    Q.    Have you told -- and I'll prove this at
8  trial -- ranking officers in the City of Savannah
9  Police Department that anybody who signed that
10  petition, the initial petition of the 75 police
11  officers that Kang and Arango signed, would never be
12  promoted?  Did you ever tell a police officer that?
13   A.    No.  I never made that statement, to my
14  knowledge.
15   Q.    That would be terrible, wouldn't it?  That
16  would be retaliatory, fair, if it happened?  You're
17  saying it never happened?
18         MR. KACHMAR:  Object to the form.
19   Q.    (By Mr. Savage)  Sir?
20   A.    I don't recall ever making a statement
21  like that.
22   Q.    That's bad if you did, isn't it?
23   A.    I don't recall ever making a statement
24  like that.
25   Q.    I'm asking you if it's bad if you did.
              GILBERT & JONES
```

EXHIBIT 9

1    A.    I don't recall ever making that statement.

2    Q.    That's nonresponsive. I'll figure it out

3 later.

4          Were there any discussions with the city

5 attorney's office to this effect? You really need to

6 think what you're doing, Chief Minter, in getting out

7 of here because once you're gone, you have a very

8 real problem in the lawsuit that's pending against

9 you individually that you're not going to be able to

10 control the witnesses? Have you ever been in any

11 discussions of that nature?

12    A.    No, sir.

13    Q.    I mean, they have gone bad on you in

14 droves, from your perspective. Does it surprise you

15 Gavin says you didn't follow policy?

16    A.    He's entitled to his opinion.

17    Q.    Well, he's a knowledgeable person; right?

18 Does it surprise you that Khaalis, who you put with

19 Larry, who's got all these AWOL problems -- you have

20 two black officers were put in charge here, right, to

21 go investigate Kang and Arango after you fired them;

22 correct?

23    A.    I had two members of the Savannah Police

24 Department who were put in charge of the

25 investigation.

1    Q.    Right. They're African-American; right?

2    A.    I don't know what their race is.

3    Q.    Wow. You seem like a people person. I

4 thought you would know your people. So you're not

5 sure what Larry's race is. Okay.

6          Now, do we have paper clips? I'm sorry.

7 I'm going to show you what's marked as Exhibit 27,

8 ask you that.

9          MR. KACHMAR: For the record, it's Bates

10        Kang 1321 through 1332.

11    Q.    (By Mr. Savage) How about Wiggins? Is he

12 a good officer?

13    A.    I believe so.

14    Q.    Okay. He's gone bad on you, but we'll go

15 on to the next. Just identify, if you could, what 27

16 is. I'll represent to you that that is what the city

17 attorney's office has said was the policy that you

18 should have been going by.

19          MR. KACHMAR: Just for purposes of the

20        record, this Exhibit 27, I think, was previously

21        Exhibit 1 in previous depositions in this case.

22        MR. SAVAGE: Fair enough. Tanks.

23    Q.    (By Mr. Savage) It's like the professor

24 in wrestling, both me and Schiavone. We tag the

25 other guy and he comes in the ring. Schiavone says

1 he's with his grandson up in north Georgia, but I

2 suspect he's playing golf.

3          MR. KACHMAR: Just tell him to jump across

4        the table and suplex me. Okay?

5        MR. SAVAGE: He did that.

6        MR. KACHMAR: No. Or you might. I'm

7        asking that you not. That's all.

8        MR. SAVAGE: Oh, no. I only represent my

9        client. I can't imagine what it was like to

10        have Chief Minter try to put him in handcuffs.

11        MR. KACHMAR: Do you have a question?

12        MR. SAVAGE: No.

13    Q.    (By Mr. Savage) My question is is Exhibit

14 27 the policy that we would call the existing policy

15 for running the police department or was that

16 superseded by Exhibit 26?

17    A.    I believe Exhibit 26 was the policy that

18 was drafted to be moved forward through the system

19 by --

20    Q.    What does that mean? I mean, I don't want

21 double-talk. Was that the policy 26 that you tried

22 to put cuffs on Arango with?

23          MR. KACHMAR: Object to the form.

24    Q.    (By Mr. Savage) I mean, the DA is saying

25 he made the decision to not bring the GBI in. I

1 would always bring the GBI in, but Roy Minter made

2 the decision. You're saying that's not true.

3 Ms. Heap is not telling the truth there. It was a

4 joint decision.

5          MR. KACHMAR: Object to the form. What's

6        your question?

7    Q.    (By Mr. Savage) What is 27? The old

8 policy that you superseded?

9    A.    27 is a policy of the Savannah Police

10 Department.

11    Q.    Was it in place when you tried to have

12 Arango put in cuffs and indicted?

13          MR. KACHMAR: Object to the form.

14    Q.    (By Mr. Savage) 26 or 27? What was in

15 place?

16    A.    I believe 26 was in place.

17    Q.    When was it put in place? What's the

18 effective date?

19    A.    I don't recall what the effective date

20 was.

21    Q.    I've got the former head of the Georgia

22 State Patrol, I mean, as a witness in this case, who

23 I think is a very good guy. I mean, he doesn't

24 understand what you're doing here on this stuff. Do

25 you know Gary Vowell?

EXHIBIT 9

## 35

1    A.    I do not.

2    Q.    All right.  On Toth, do you agree that

3  they had the right to detain him, Faitele?

4  Mr. Faitele to you.

5    A.    I believe they had the right to detain him

6  up to the point where they realized that they had --

7    Q.    He was the wrong guy?

8    A.    Correct.

9    Q.    So if he's smoking dope, you don't detain

10  him; right?

11        MR. KACHMAR:  Object to the form.

12    Q.    (By Mr. Savage)  Sir?  If that room where

13  they are wreaks of it, you just don't detain him.  If

14  you don't detain him, if he threatens to beat the

15  hell out of Arango's child -- you saw that in the

16  tape, didn't you?  Or you just have a selective

17  interpretation of the tape?

18        Did you see in the tape that Faitele said,

19  "If I get your daughter, I'm going to beat the hell

20  out of her."  Did you see him say that?

21    A.    I don't recall that statement.

22    Q.    So we let guys like Faitele who threaten

23  16 year olds to beat them, just let him go?  That's

24  what you're telling me.  Is that true?

25    A.    That's not what I said, Mr. Savage.

GILBERT & JONES

## 36

1    Q.    Well, if he said I'm going to beat the

2  hell out of you, should they continue to detain him?

3  Beat the hell out of your daughter?  I mean, she's a

4  beautiful girl.  She's going to be one of my

5  witnesses in this case.

6        MR. KACHMAR:  What's your question?

7    Q.    (By Mr. Savage)  Did you ever try to

8  champion her and say, I looked at this tape, young

9  lady.  We're not going to tolerate criminals like

10  Faitele who beat women.  We're going to do something

11  to Faitele about it.

12        Did you ever talk to his daughter and say

13  I'm so sorry this happened?  I'm your chief.  I'm

14  with you, young lady?  Did you?

15    A.    I've never had a conversation with --

16    Q.    Did you ever seek her out?

17        MR. KACHMAR:  Let hem finish his answer,

18  please.

19        MR. SAVAGE:  Thank you.  I'm sorry.

20    Q.    (By Mr. Savage)  Let me ask you this:  Is

21  it on the tape or not that he threatened Arango's

22  daughter?

23    A.    I don't recall the exact statement that

24  was made.

25    Q.    What did he say about his daughter?

GILBERT & JONES

## 37

1    A.    I don't recall the exact statement.

2    Q.    Do you recall any statement threatening

3  this 16-year-old girl?  Would you put more credence

4  in a threat where Faitele has a history of beating

5  women and he threatens this 16-year-old daughter?

6  Would you put more credence that this guy might carry

7  it out and maybe you shouldn't just let him go?

8        Should they have apologized to Faitele who

9  has dope -- smoking dope in that room and also

10  threatens to beat the hell out of his daughter?

11  Should they have apologized?

12        MR. KACHMAR:  Object to the form.

13    Q.    (By Mr. Savage)  I don't know what remedy

14  you want us to do.  I'm trying to see what under your

15  procedures is the right thing.

16        MR. KACHMAR:  Object to the form.  There

17    are multiple questions.  Assumes multiple facts

18    not in evidence per -- consistent with previous

19    objections as well.  So what's your question?

20    Q.    (By Mr. Savage)  Should he still have let

21  him go if you assumed that he threatened to beat the

22  hell out of his daughter?  Just let him go, man?

23    A.    What's your question?

24    Q.    My question is:  Should they have just let

25  him go?  You said they should have let him go.  I'm

GILBERT & JONES

## 38

1  throwing more facts that are real facts that are in

2  the tape where he threatened to beat the hell out of

3  Mike Arango's daughter.

4        I'm just trying to say should they still

5  have let him go?

6        MR. KACHMAR:  Object to the form.

7    Q.    (By Mr. Savage)  Assume for me for the

8  purposes of this question that he threatened to beat

9  the hell out of Arango's daughter.  Should he still

10  have let him go?

11    A.    I never said he should have let him go.

12  You asked me should -- did they have the right to

13  detain him?

14    Q.    Did he have the right to detain him after

15  he threatened to beat the hell out Arango's daughter?

16    A.    If he felt he had probable cause for a

17  crime, I believe he should have acted upon that.

18    Q.    Well, is that not a crime in your mind?

19  Maybe that's part of the problem with the crime wave.

20  If he threatens his daughter, you don't think that's

21  a felony as Khaalis said?

22    A.    If he felt he threatened his daughter and

23  he felt he had probable cause for a crime, then he

24  should have acted upon it.

25    Q.    Well, you've seen the tape innumerable

GILBERT & JONES

times. He said it in there. Or do you just not remember?

A. I reviewed the tape.

Q. Did he say it in there that I'm going to get your daughter?

A. I don't recall him saying I'm going to get your daughter.

Q. What did he say about his daughter?

A. I don't remember.

Q. Let's call Mr. Faitele this guy, let's be on his side, but the hell with a 16-year-old girl.

Now, was there any discussion with Meg Heap about Faitele and his background? He's your lead guy. He's the guy you're trying to protect.

MR. KACHMAR: Object to the form.

Q. (By Mr. Savage) You know, let's throw war heroes in jail and let's protect the Darryl Faiteles of the world, who have a history of beating women, have four felonies pending against them. Let's throw our own police officers in jail.

MR. KACHMAR: Is there a question, Mr. Savage?

MR. SAVAGE: That's probably a good objection.

Q. (By Mr. Savage) Did Faitele refuse to get

on the ground?

A. I don't recall if he refused to get on the ground.

Q. When's the last time you looked at this tape?

A. It's probably been a couple weeks.

Q. Refused to put his hands behind his back? Did he do that?

A. I believe he did put his hands behind his back.

Q. Is that something that somebody can be detained for, not following a police order?

A. Could be.

Q. Should he have been detained here? I want you to know who you're championing here, Faitele.

MR. KACHMAR: Object to the form. Is there a question?

Q. (By Mr. Savage) Did he say "fuck you" to these guys and spit at them with bloody sputum? Faitele?

A. I don't recall if he used the term "fuck you."

Q. Hm-hmm. So you just want to put -- did you ever discuss with Meg Heap that we need to do something about Faitele, too? He's threatened

Arango's daughter. Was that ever part of your conversation with her?

A. No. I don't recall having a conversation about that.

Q. You've gone out to various groups, Inner City Ministerial Alliance, and shared with them and bragged about getting rid of Arango and Kang, have you not?

MR. KACHMAR: Object to the form.

A. I don't know what groups you're talking about.

Q. (By Mr. Savage) Inner City Ministerial Alliance, the Rotary Club? I got that on tape.

A. I don't know what the Inner City Ministerial Alliance is.

Q. Okay. Now, I want to talk to you about Gates. Are you proud of what you did in the disciplining of Gates?

A. I believe the disciplinary decision on that matter was appropriate.

Q. Yeah. Is he African-American?

A. I don't know what is his race.

Q. Well, you know him. You went to the gym with him a bunch.

A. I don't recall ever going to the gym.

Q. Do you know him?

A. No.

Q. You've never met him?

A. I mean, I've met him through the department.

Q. You vouched for him in the sense that you countermanded the chain-of-command recommendation that he be fired.

Let's go at it this way. July 5th, 2019, SWAT team, 1800 Fitzgerald Street, Liberty City. Are you aware that a person in that neighborhood said that Adrian Gates was protecting a gang that was stealing drugs and weapons in that neighborhood. Told police officers that.

A. I don't recall.

Q. Should he have been fired if he's protecting gangs?

A. Certainly --

Q. Buddies of his from Miami?

MR. KACHMAR: Mr. Savage, let him finish answering your question, please.

MR. SAVAGE: Well, I disagree.

Q. (By Mr. Savage) Should he have been fired for protecting gangs?

A. It would be investigated like any other

EXHIBIT 9

**43**

1  matter.

2      Q.   Okay.  Was it investigated?

3      A.   Was what investigated?

4      Q.   The complaint on the night of July 5th,

5  2019, about Adrian Gates where it says the lady who

6  lives in the neighborhood, who will be a witness in

7  this case, "I told the police department that he,

8  Gates, was fostering their existence and he knew that

9  they were drug dealers.  He knew that they were

10  running guns, and that he was protecting them in my

11  neighborhood."

12          Should he -- should that have been

13  investigated?  That complaint?

14      A.   If that complaint was made, it should have

15  been investigated.

16      Q.   Was it?

17      A.   I don't recall.

18      Q.   Well, you -- what do you do?  You

19  countermand the chain of command.  They wanted him

20  fired, did they not, for this stuff over on

21  Fitzgerald Street?

22          MR. KACHMAR:  Object to the form of the

23      question.  You can answer, if you can.

24      Q.   (By Mr. Savage)  Sir?

25      A.   Okay.  I'm not sure which investigation

GILBERT & JONES

**44**

1  you're referring to, Mr. Savage.

2      Q.   Well, there's six of them.  That's true,

3  IA investigations.  Is he a friend of yours?  Gates?

4      A.   No, sir.

5      Q.   Now, did you ever talk to Sergeant Collard

6  about what happened on that street?  Do you know him?

7      A.   Inside which street?

8      Q.   Fitzgerald where the woman in the

9  neighborhood says basically, thank God, the police

10  are here.  Your own police officer is fostering these

11  hoods in my neighborhood who are running drugs, who

12  are running guns.  And, thank God, you're here.  He,

13  meaning Gates, has been up at that house colluding

14  with these people so that they know ahead of time

15  when the cops are going to come.

16          Should that have been investigated?

17      A.   If that complaint was made, it should have

18  been investigated.

19      Q.   Was it investigated?

20      A.   I don't recall.

21      Q.   Who's in charge?  I mean, you're from far

22  west.  Harry Truman was one of my favorites.  He

23  said, the buck stops with me, Mr. Savage, he would

24  say if he was still alive from Independence,

25  Missouri.  Does the buck stop with you in running

GILBERT & JONES

**45**

1  this department?

2      A.   Well, when I was a chief, yes, I was the

3  chief and the head of the department.

4      Q.   Okay.  So, we have the city attorney's

5  office.  We have the deputy chief of police now

6  saying that you didn't follow appropriate policies.

7  We have Adrian Gates who you countermand the chain of

8  command recommendation that he be fired and give

9  him -- I'm sorry.  What is it? -- 40 hours what?  40

10  hours off?

11      A.   Suspension.

12      Q.   Oh, boy.  These are serious things that we

13  have dirty police officers.  Julius Hall went to jail

14  for the rest of his life for doing the exact same

15  thing that Adrian Gates is accused of.  Dirty

16  officer.  Tipping off drug dealers and gunrunners.

17          MR. KACHMAR:  Mr. Savage, do you have a

18      question?

19      Q.   (By Mr. Savage)  Do you know about the

20  Julius Hall case?

21      A.   No, sir, I don't.

22      Q.   All right.  As we sit here today, tell me

23  all that was done to investigate the incidents on the

24  evening of July 5th, 2019, on Fitzgerald Street where

25  a citizen, a tax-paying citizen says you've got a

GILBERT & JONES

**46**

1  dirty cop.  He's tipping off these gunrunners and

2  drug dealers.  Thank God you're here.  What was done

3  to investigate whether that was true or not true?

4      A.   I'd have to look back in the files and see

5  specifically what happened with that investigation.

6      Q.   Alex Tobar gave you a detailed memo that

7  said basically what I'm saying.  Do you recall that

8  memo?

9      A.   I'd have to review the memo.

10      Q.   Do you know who Alex Tobar is?

11      A.   Yes, I do.

12      Q.   Who is he?

13      A.   He's a captain with the Savannah Police

14  Department.

15      Q.   Good, honest guy?  Just like you said

16  Gavin is?  Just like you said Toth is?

17          MR. KACHMAR:  Object to the form.

18      Q.   (By Mr. Savage)  Good, honest guy?

19      A.   I believe he's a good officer.

20      Q.   Okay.  Do you remember his memo reporting

21  exactly what I'm telling you?  You got a dirty cop,

22  Gates, tipping off drug dealers and gunrunners.  Do

23  you remember him sending that memo to you?  Do we

24  have the memo?  Yeah.  We'll show it to you.

25          Have you advised Senator Warnock that

GILBERT & JONES

EXHIBIT 9

**47**

1  members of your own department are saying in your
2  attempt to take a war hero and have him put in
3  prison, that your own officers have said you didn't
4  follow policies?  Do you think you owe that to
5  Senator Warnock?
6      MR. KACHMAR:  Object to the form.
7      MR. SAVAGE:  Is this all one, Dan?
8      MR. KANG:  Yes, sir.
9      MR. SAVAGE:  This is one?
10     MR. KANG:  Yes, sir.
11     Q.  (By Mr. Savage)  Do you know anything
12  about your officers calling -- my son-in-law is
13  Korean.  It's an honor to represent Daniel Kang who
14  served in Afghanistan and Iraq.  You and I weren't
15  there.  Nobody in this room was there.  He was there.
16  And, yet, you try to put handcuffs on him.
17     Let me show you what is Kang Exhibit -- or
18  numbered document 212 and see if you've ever read
19  this.  You owe him an apology.
20     MR. KACHMAR:  Just for the record, he's
21     been handed a two-sided piece of paper, Kang 211
22     and Kang 212.  Are you making that an exhibit?
23     MR. SAVAGE:  I don't know.  I'm not very
24     good with paper.  You know that from the case
25     you beat me up on.

**48**

1      MR. KACHMAR:  Just trying to clean the
2  record up.
3      MR. SAVAGE:  I guess I have a military
4  thing.  My father said you need to go in the
5  military, Brent, or you'll regret it.  And she's
6  right.  I know all her family served.  But
7  having represented Gulfstream for 30 years, I
8  went crazy for a Blue Angel and Mr. Kachmar
9  schooled me on I shouldn't have gone crazy.  But
10  he was head of the air war in eastern
11  Afghanistan.  I didn't think he was treated
12  right.
13     Apparently, the Savannah Police Department
14  doesn't mean anything if you got a war record.
15     Q.  (By Mr. Savage)  Did you ever talk to --
16  thank you, sir.
17     A.  Uh-huh.
18     Q.  This is -- I'll make this Exhibit 28.
19     (Plaintiff's Exhibit 28 was marked for
20     identification.)
21     Q.  (By Mr. Savage)  Alex Tobar about his
22  findings?
23     A.  I don't believe those are Alex Tobar's
24  findings.
25     Q.  These are Robert Larry?

**49**

1      A.  Yeah.  I believe Robert Larry did that
2  investigation.
3      Q.  Okay.  So I don't know how you do this.
4  Do you know Khaalis's background where you
5  transferred her where she was -- had a felon, her
6  nephew, in her house.  Are you supposed to consort
7  with felons in your house as a police officer or is
8  that against policy?
9      A.  It's against policy, and I believe it
10  depends what circumstances.
11     Q.  Okay.  Sometimes it's okay to have felons
12  in there.  Sometimes it's not.
13     Are you familiar with her situation in
14  2019, a year before you put her in charge with
15  Larry -- and we'll talk about his AWOL charges -- of
16  investigating Kang after you had him fired?
17     MR. KACHMAR:  Object to the form.
18     Q.  (By Mr. Savage)  Do you recall -- do we
19  have that WTOC article?  Do we have the exhibits from
20  last time?  WTOC article?
21     Okay.  Are you familiar with a WTOC
22  article about her having her nephew in her house and
23  that he was running guns and drugs out of a police
24  officer's house, and that he was a felon?  Are you
25  familiar with that article, 2019?

**50**

1      A.  I don't recall that specific article.
2      Q.  So, I mean, plus you got Khaalis who
3  doesn't think you did the right thing by her husband.
4  But let's -- she testified to that.
5      You put her in charge of Kang's
6  investigation with Larry.  Somebody that is all over
7  the news besmirching your department that she has
8  fostered a felon in her house that's running dope and
9  guns.  And her reward is to put her in charge with
10  Larry to investigate him.
11     MR. KACHMAR:  Object to the form.  What's
12     the question?
13     Q.  (By Mr. Savage)  Were you aware that she
14  had a problem in 2019 related to her harboring a
15  felon who was dealing drugs and guns out of her home?
16     A.  I believe there was an investigation in
17  2019.  I don't recall what the circumstances of that
18  investigation were.
19     Q.  Is it important that you get good people,
20  fair people to Kang and Arango?  I mean, there is
21  systemic racism in this country, but it goes both
22  ways.  The ports just paid me $900,000 for a case
23  where it was reverse discrimination.
24     Did you have any concerns that I'm going
25  after people that are Caucasian or Asian, and I'm

EXHIBIT 9

**51**

1  putting an officer that was accused of allowing a
2  felon to run drugs out of her house, and
3  Officer Larry, both of whom are African-Americans --
4  and that doesn't look good -- did that concern you at
5  all?
6      MR. KACHMAR: Object to the form.
7      MR. SAVAGE: Sure.
8  A.     Members of the Savannah Police Department
9  were assigned to conduct the investigation.
10  Q.    (By Mr. Savage) Okay. Now, I don't -- I
11  sometimes stop myself. So I want to ask you this
12  question: Do you consider it a felony for Faitele to
13  spat at these guys at the beginning of COVID where
14  they don't have PPE from you guys? Which it blows my
15  mind.
16      And he's spitting bloody sputum on him.
17  That's probably the No. 1 way to convey or transmit
18  COVID-19. Is that a felony, assuming those facts are
19  true? Or you're not sure?
20  A.    I think you'd have to look at the facts
21  and determine --
22  Q.    No.
23  A.    -- whether or not --
24  Q.    That's you.
25  A.    -- there was probable cause.

GILBERT & JONES

**52**

1      MR. KACHMAR: Mr. Savage, let him answer
2  your question, please.
3  Q.    (By Mr. Savage) Fair enough. Have you
4  looked at the facts?
5  A.    No, I did not.
6  Q.    Have you ever been on a SWAT team?
7  A.    Yes.
8      MR. SAVAGE: All right. Now, let me get
9  that exhibit that was handed that -- what's his
10  name? Wright said Officer -- or Chief that
11  handed it -- that gave it to Officer Minter --
12  Mr. Minter. 404(b) stuff. Do you have it?
13      MR. KANG: No, you already have it.
14      MR. SAVAGE: I do have it? Well, hand it
15  to me. Got it.
16  Q.    (By Mr. Savage) Were you involved in
17  trying to dig up stuff for similar acts 404(b) stuff
18  at the behest of one of Governor Kemp's favorites, I
19  think, is Ms. Heap? She's on the parole committee,
20  perdition and parole. I mean, she wants to be a
21  judge.
22      MR. KACHMAR: Do you have a question?
23  Q.    (By Mr. Savage) Yes. Now, let me show
24  you what's marked as Exhibit 7. Show me where --
25  show me the page that we're dealing with.

GILBERT & JONES

**53**

1      When did you know that Kang and Arango had
2  signed the petition against you?
3  A.     I didn't know anything about Kang and
4  Arango signing a petition.
5  Q.    I don't believe that, but, okay. I mean,
6  this is a serious lawsuit. And you don't know
7  anything, even in preparing for this lawsuit. I
8  guess I don't have much effect on people. Them
9  signing a petition against you. All right.
10      MR. SAVAGE: Now, let's mark this as
11  Exhibit 29.
12      MR. KACHMAR: Is that other one marked 28
13  Kang 211 and 212?
14      MR. SAVAGE: Yeah. We'll mark this as the
15  next one.
16      MR. KACHMAR: So what you said was Exhibit
17  7 is actually 29?
18      MR. SAVAGE: Yeah.
19      (Plaintiff's Exhibit 29 was marked for
20  identification.)
21      MR. SAVAGE: As Nathaniel Wright will
22  testify in this case, the present DA's chief to
23  Meg Heap, as 404(b) information.
24      MR. KACHMAR: For purposes of the record,
25  he's been handed Plaintiff's Exhibit 29. The

GILBERT & JONES

**54**

1  first 11 pages are unnumbered and unmarked. And
2  then the last three are labeled Exhibit 7,
3  8/31/22 TD.
4      MR. SAVAGE: I only care about the --
5      MR. KACHMAR: This is not part of the
6  exhibit?
7      MR. SAVAGE: I don't know.
8      MR. ARANGO: Can I have all this paper,
9  please?
10      MR. SAVAGE: Yeah. Yeah. Yeah. You want
11  to put it order?
12      MS. PAUL: Off the record.
13      (Discussion off the record.)
14      MR. KACHMAR: Was this produced in
15  discovery? Do you know?
16      MR. SAVAGE: How would I know?
17      MR. KACHMAR: You're a lawyer.
18      MR. SAVAGE: Don't ask me.
19      MR. KACHMAR: The buck stops with you,
20  Brent. You don't know?
21      MR. SAVAGE: That's true. It's my fault
22  if it wasn't. I'll take that responsibility.
23  How about that?
24      MR. KACHMAR: I'm just asking if it was.
25  That's all.

GILBERT & JONES

EXHIBIT 9

1         MR. SAVAGE: I know you are. I was only
2 kidding back with Officer Minter. He said you
3 might have to fire -- you got and the city's got
4 as good a lawyer as you can get. I've been 44
5 years of doing this. I know who's good. I'm
6 not saying I'm good. I'm saying you got a good
7 lawyer.
8         MR. KACHMAR: All right. So just for
9 clarity, do you want this to be Exhibit 29 or
10 just go with the Exhibit 7?
11         MR. SAVAGE: Exhibit 7. Okay. Let him
12 take a minute and look at it.
13         MR. KACHMAR: We have a different Exhibit
14 7 in the ongoing Kang matter, don't we?
15         MR. SAVAGE: Make it 29. Just make it 29.
16 I've learned that from Tom.
17         MR. KACHMAR: Make it 29. We've already
18 got an Exhibit 7. So make this Exhibit 29.
19         MR. SAVAGE: All right. Got it.
20         MR. KACHMAR: So just so we're all clear,
21 what you're going to hand him is Exhibit 29.
22 It's unpaged, it doesn't have page numbers.
23         MR. SAVAGE: It doesn't. I don't know
24 what the deal is.
25         MR. KACHMAR: There's no Bates numbers on

1 there.
2         MR. SAVAGE: That's not good.
3         MR. KACHMAR: So can you just --
4         MR. SAVAGE: Do you got a Bates stamper?
5 I'm only kidding.
6         MR. KACHMAR: You guys can produce it
7 later. But maybe --
8         MR. SAVAGE: I'm shocked that we haven't
9 and I apologize if we haven't. I'll give you
10 anything I got. You can come over to my office
11 and look at my file.
12         MR. KACHMAR: You may have produced it
13 elsewhere. This particular document doesn't
14 have any markings on it. That's all. I'm just
15 trying to make sure the record is clear.
16     Q.   (By Mr. Savage) All right. Let me ask
17 you this before we get started: Is it important --
18 is it a bad thing to deliver false information to the
19 district attorney for the purpose of indicting
20 Dan Kang?
21         MR. KACHMAR: Object to the form.
22     Q.   (By Mr. Savage) Is that a bad thing?
23     A.   What do you mean by "bad thing"?
24     Q.   Okay. I get it. I'm going to ask the
25 jury and say he doesn't know whether it's a bad

1 thing. So you don't know if it's a bad thing. I got
2 it. I'm good with that. You don't know what a bad
3 thing is. All right.
4         What I'm looking at is did you deliver
5 Exhibit 29 to the office of the district attorney for
6 the purpose of establishing 404(b) testimony, similar
7 acts, against Daniel Kang and Mike Arango?
8         MR. KACHMAR: Object to the form.
9     A.   Mr. Savage, make sure I understand your
10 question. Are you saying did I deliver this
11 document?
12     Q.   (By Mr. Savage) Yeah.
13     A.   No, sir.
14     Q.   Okay. I don't know if they can prosecute
15 you if they're going to be witnesses in this case,
16 but we'll figure that out later.
17         Now, let's go to the top where it's got
18 asterisk next to page 1 of Exhibit 29. Could you
19 read that into the record, sir. Yeah, go ahead.
20 Read it into the record, please.
21     A.   "During this encounter, Sergeant Arango
22 advised Corporal Kang to disconnect his BWC which he
23 did do. BWC footage was available on Corporal Lord's
24 and APO Reagin's BWC."
25     Q.   Did you make any effort before having that

1 delivered to the district attorney's office -- I'll
2 take your side that I didn't walk it over there as
3 Deputy Wright says. He did. Do you know him,
4 Nathaniel Wright?
5     A.   I met him before.
6     Q.   Good guy. Yeah. Good guy. Did you make
7 any effort to make sure that what you were delivering
8 was true?
9         MR. KACHMAR: Object to the form.
10     Q.   (By Mr. Savage) Or is that too much of an
11 effort? I'm going to try to get these guys. That
12 was your goal to have them in jail. Still your goal
13 with Arango. You just couldn't get an indictment.
14         MR. KACHMAR: Object to the form. Is
15 there a question?
16         MR. SAVAGE: Yeah.
17     Q.   (By Mr. Savage) Is it important that you
18 made sure that what you delivered to the district
19 attorney's office was true?
20     A.   I don't recall delivering anything to the
21 district attorney's office.
22     Q.   Okay. Well, assume you did for the
23 purposes of the question. I understand you say I
24 don't recall. Assume you delivered it. Is it
25 important to make sure what you delivered to them was

1 true?

2       MR. SAVAGE:  Object to the form.  You can

3   answer, if you can.

4       Q.    (By Mr. Savage) Go ahead.  Is it

5   important that it's true?  Or you don't know?  Like

6   you don't know what the word "bad" means.

7       A.    I don't think it would be fair to give you

8   an opinion of what I assume.

9       Q.    Why?  I mean, I would think that would be

10  an easy one.  We should never deliver things to the

11  district attorney's office to put officers in jail

12  unless we've checked it out before we delivered it to

13  the district attorney's office.

14        Is that too much to ask of the police

15  department?  Does that make sense?

16      MR. KACHMAR:  What's your question?

17      Q.    (By Mr. Savage) That is a question.  Does

18  it make sense before your office -- I'll make it your

19  office delivered it.  I don't think that's true.  I

20  think you delivered it, and I'll establish that.  But

21  you don't remember.  Before the police department

22  delivers information to get Arango and Kang locked

23  up, put in jail, prosecuted on similar acts, that we

24  make sure what we're delivering to the district

25  attorney's office is true?  Should we do that?

1       A.    I would say it would be important to make

2   sure, to the best of your ability, information that

3   you deliver is factual.

4       Q.    What I have put an asterisk next to is a

5   lie.  Kang never turned off his camera.  Have you

6   ever looked at the tape?  The tape says that Kang and

7   Arango had their tape off when they went in and tried

8   to get Pernell Drayton off the toilet.  He's another

9   that beats women.  But that's not a big deal to you.

10        If it's his daughter -- you know, my job

11  is to get my cops indicted.  Let's not talk about

12  what Mr. Faitele did.  Did you ever meet with

13  Darryl Faitele?

14      A.    No, sir.

15      Q.    His mom?

16      A.    No, sir.

17      Q.    Do you know how many felony records were

18  in that apartment smoking dope that you're saying,

19  well, he should have let him go?

20      MR. KACHMAR:  Object to the form.

21      Q.    (By Mr. Savage) Do you know the people

22  that were in that apartment?

23      A.    No, sir.

24      Q.    Your own officers have said that he, being

25  Faitele, committed felonies.  Have you ever had that

1   experience where you don't prosecute Faitele, who

2   threatens his daughter, but you prosecute the police

3   officer?  Have you ever seen -- have you ever done

4   that before?

5       MR. KACHMAR:  Object to the form.

6       Q.    (By Mr. Savage)  Sir?

7       A.    Mr. Savage, I don't prosecute anyone.

8       Q.    Hmm.  You wanted them prosecuted, didn't

9   you?

10      MR. KACHMAR:  Object to the form.

11      Q.    (By Mr. Savage)  Own it.

12      A.    It's not my decision whether or not

13  someone gets prosecuted.

14      Q.    Whose was it?  Whose decision was it?

15      A.    We investigate matters.  It's up to the --

16      Q.    Well --

17      A.    -- the district attorney's office to

18  decide the next step in the court system.

19      Q.    Let's not go too far.  We don't

20  investigate when Faitele, with four felonies pending,

21  the initial one in 2017, threatens to beat the hell

22  out of his daughter.  Tell me what investigation you

23  did.  We investigate matters.  Let's just tell the

24  truth.  We selectively investigate matters.

25        Is there any investigation into the threat

1   against his daughter?

2       MR. KACHMAR:  Object to the form.  You can

3   answer.

4       Q.    (By Mr. Savage) Do you know one?

5       A.    Not that I'm aware of.

6       Q.    Yeah.  So we selectively do it.

7         We champion felons and 16-year-old girls,

8   we don't investigate those threats against her.

9   Faitele is a rough character.  Do you know that?  Do

10  you know much about Darryl Faitele, who you're

11  championing in this case?

12      MR. KACHMAR:  Object to the form.

13      A.    I'm sorry.  What's your question,

14  Mr. Savage?

15      Q.    (By Mr. Savage) He's a rough character.

16      A.    That sounds like a statement.

17      Q.    Do you agree with that statement?

18      A.    I don't know what you categorize as "a

19  rough character."

20      Q.    Okay.  Well, maybe that's part of our

21  crime wave problem.

22        All right.  Now, have you ever bothered to

23  look at the tape from the SWAT team that night with

24  Pernell Drayton as to whether or not what you handed

25  over to the district attorney office's is absolutely

EXHIBIT 9

63

1  false?
2          Well, of course, you're stretching.  You
3  want to get Kang.  And you need 404(b) information.
4  So you go back five years to get it.  That's what
5  happened, isn't it?
6          MR. KACHMAR:  Object to the form.
7      Q.  (By Mr. Savage)  Didn't you tell people in
8  your department we need to make a case against -- I'm
9  going to call him a war hero.  Do you object to that
10  term?
11          MR. KACHMAR:  Object to the form of the
12      question.
13      Q.  (By Mr. Savage)  Dan Kang?
14      A.  What's your question?
15      Q.  Didn't you go back and direct people in
16  your department to go through everything they could
17  to try to strain and get 404(b) similar acts
18  information against Kang and Arango, and then deliver
19  false information because Kang never turned off his
20  camera?  Page 1 of Exhibit 29 says that Kang and
21  Arango cameras were turned off, doesn't it?  Look at
22  it, please.
23          MR. KACHMAR:  Object to the form.
24      Q.  (By Mr. Savage)  That's the question.
25      A.  Okay.  I'm kind of confused because you

GILBERT & JONES

64

1  kind of like asked me three questions.
2      Q.  Fair enough.  I think that's very fair.  I
3  think a lot of these objections are at least
4  colorably okay.
5          What stuff that's delivered from your
6  department says is that Kang and Arango turned off
7  their camera when they went in to Drayton's
8  apartment.  That's what it says; right?  Where the
9  asterisk is?  There's only two cameras that were kept
10  live?  Sir?
11      A.  I believe that's what it says.
12      Q.  That's a lie.
13          MR. KACHMAR:  Is there a question?
14      Q.  (By Mr. Savage)  I am asking you as a
15  citizen of this community to go back to the district
16  attorney's office, copy us with it, and say part of
17  the information that I gave you, or my department
18  gave you, page 1 of Exhibit 29, was false, and I want
19  you to know that.  Will you do that for me, please,
20  if you watch the tape?  No?  Okay.
21      A.  For the record, I did not say no.
22      Q.  Oh, I'm sorry.
23      A.  I was trying to answer your question.
24      Q.  My apologies.
25      A.  I don't know if that's true or not.

GILBERT & JONES

65

1      Q.  Okay.  Let's play the tape.
2          Does anywhere in there say that Kang
3  told -- I mean, that Arango told Kang to keep his
4  camera on?
5      A.  I don't know.
6      Q.  Often outside of apartments, if you're
7  going in on a --
8          MR. KACHMAR:  Keep going.
9          MR. SAVAGE:  No, no, no.
10          MR. KACHMAR:  No, I'm just seeing if
11      the -- keep going.  I'm not leaving.
12          MR. SAVAGE:  I wouldn't do that.
13          MR. KACHMAR:  I was going to see if the IT
14      stuff was here.  Sorry.
15          MR. SAVAGE:  Well, let's get some coffee.
16          MR. KACHMAR:  Okay.
17          (Recess from 9:24 a.m. to 9:39 a.m.)
18          MR. SAVAGE:  We're playing a tape of
19  Pernell Drayton, and I think we have the volume,
20  and I'm going to make the thumb drive for this
21  tape Exhibit 30.  And my question is going to
22  be:  Do you see any time in there where Mike
23  Arango told Dan Kang to turn his camera off?
24          MR. KACHMAR:  Just before we start, has
25  this been produced in discovery?  Do you know?

GILBERT & JONES

66

1          MR. SAVAGE:  You know, I wish I knew,
2  Shawn.  I'm sorry.  I don't know.
3          MR. KACHMAR:  Okay.
4          MR. SAVAGE:  I think there's some
5  controversy over whether the city said they had
6  it.
7          MS. PAUL:  No.  No.  I can speak.  I
8  believe I produced it either in this one or the
9  Faitele case.  I cannot remember which one or
10  both.
11          MR. SAVAGE:  Okay.  All right.
12          MR. ARANGO:  I believe you produced -- I
13  believe it was the Faitele case.
14          MR. SAVAGE:  Why don't we set up a time
15  for you to come over and just say here's our
16  file.  We'll make you copies of anything.  But
17  we should do that.
18          MR. KACHMAR:  I just --
19          MR. SAVAGE:  Okay.  Let's get going.  I'd
20  like to be done by 11.  Has this got volume?
21          MR. ARANGO:  Yes, sir.  I'm just getting
22  to the parts because it's an hour long.
23          MR. KACHMAR:  I guess I shouldn't insist
24  we watch the whole thing for context?
25          MR. ARANGO:  You could.

GILBERT & JONES

EXHIBIT 9

1 MR. KACHMAR: I just wanted to see Brent's
2 reaction.
3 MR. SAVAGE: Okay. Why don't we annotate.
4 But the tape is roughly an hour long. We're
5 going to the end of the tape. And where are we
6 as far as time on the tape on Exhibit 30?
7 MR. ARANGO: I'm sorry. I was on the
8 wrong video.
9 MR. SAVAGE: Okay. We're starting it now,
10 Mike?
11 MR. ARANGO: Yes. This is Kang's video
12 running continuously.
13 MR. SAVAGE: So all this is off his Body
14 Cam?
15 MR. ARANGO: Yes, sir. This is when we
16 make entry into the house.
17 MR. SAVAGE: Okay. Why don't we stop it
18 right there.
19 Q. (By Mr. Savage) Do you know one way or
20 the other whether what we've marked as Exhibit 30,
21 which is the thumb drive, about the confrontation and
22 arrest of, finally, Pernell Drayton, whether or not
23 all the video that I'm showing you is off of
24 Officer Kang's video, is by Body Cam? Do you know
25 one way or the other?

1 A. I don't.
2 Q. Okay. So we're cuing in on -- but we've
3 agreed already that the memo delivered to the city
4 for 404(b) -- I mean, the DA's office for 404(b)
5 information infers that Kang had turned off his
6 camera; fair? That's what we said already.
7 A. I believe that's what's in the document.
8 Q. Okay. I'm just showing you.
9 MR. ARANGO: This thing is jumping all
10 over the place. I apologize.
11 MR. SAVAGE: Okay. Just play it.
12 MR. ARANGO: Let me make sure it's in the
13 right place.
14 MR. SAVAGE: We'll eventually get to the
15 right place.
16 MR. ARANGO: Eventually, yeah. Let's see
17 if this thing goes.
18 MR. KACHMAR: It might be easier if you
19 download it to the hard drive and play it from
20 that.
21 MR. ARANGO: It may be. Possibly. It's a
22 pretty big file. Give me a few seconds.
23 (The videotape was played.)
24 MR. SAVAGE: So we're playing it. And
25 where on the tape?

1 MR. ARANGO: This is where --
2 MR. SAVAGE: 45 minutes and 15 seconds
3 into it roughly?
4 MR. ARANGO: Yes, sir.
5 MR. SAVAGE: Okay.
6 Q. (By Mr. Savage) I made my point, which is
7 delivered to the district attorney's office is false
8 information that says that Kang turned off his Body
9 Cam.
10 Let me ask you this: Do you know anything
11 about the discussions with people in the area about
12 Drayton beating kids? Beating kids? Am I saying it
13 right?
14 MR. ARANGO: He beat his girlfriend.
15 Q. (By Mr. Savage) Beating his girlfriend
16 and that he was a dangerous person before they went?
17 Do you know anything about that? Probably not.
18 A. No.
19 Q. I'm not saying you should.
20 A. No. No.
21 Q. I do think you should have checked it out,
22 that there was a tape, before you turned in the
23 404(b) stuff in. Go ahead.
24 (The videotape was played.)
25 Q. (By Mr. Savage) Did you hear Mike Arango

1 say, "Turn your cameras on"? Sir?
2 A. No, I didn't.
3 Q. All right.
4 A. I'm sorry. I didn't know you were talking
5 to me, Mr. Savage.
6 Q. Yes, sir. That's okay.
7 MR. KACHMAR: Madam Court Reporter, have
8 you noted where Mr. Savage was asking questions
9 of his staff versus the deponent on the record?
10 THE COURT REPORTER: When he asked a
11 question and Mr. Arango answered, yes, sir.
12 MR. KACHMAR: Okay. Thank you.
13 MS. PAUL: Can I make a statement? I
14 don't recall whether I produced the Kang video.
15 I remember producing a video from another
16 officer. I may have. I'm going to go back and
17 double-check.
18 MR. SAVAGE: We'll figure it out. What --
19 yeah. Yeah. It's not working. All I'm showing
20 you is that information delivered to put Kang in
21 jail is false. And I asked you to correct it
22 with the district attorney's office and you
23 responded. Let's not do this.
24 MR. ARANGO: Okay.
25 Q. (By Mr. Savage) You told people that in

EXHIBIT 9

1   the discipline hearings about Mike Arango, that he
2   had banged Faitele's head against a grate. Do you
3   remember saying that?
4       A.   I'm sorry. Can you repeat. I didn't hear
5   the last part.
6       Q.   That Arango had banged Faitele's head
7   against a grate.
8       A.   A grate, like g-r-a-t-e.
9       Q.   Yeah, like a fence, you know, up on the
10   second story outside of the dope-filled room out of
11   which Faitele came.
12       A.   I told him that?
13       Q.   Uh-huh.
14       A.   I don't recall making that statement.
15       Q.   Okay. Now, look at what you think is the
16   policies in the case, which I think is 26. Does that
17   require that there be a letter of transmittal which
18   sets out the allegations against the police officer
19   in it?
20       A.   It does.
21       Q.   Was that ever done?
22       A.   I don't recall.
23       Q.   I mean, that's pretty fundamental stuff.
24   I mean, we've got -- these guys had rights. Did they
25   have a right to expect you to follow your own

1   policies? I think they're your own policies. I
2   don't think they're the city's. But Exhibit 26, did
3   they have a right to believe you would do that?
4       A.   Yes, they do.
5       Q.   Did they have a right to know what they
6   were being charged with, which is what the
7   transmittal letter does, as I understand it? Did
8   they have a right to know this?
9       A.   They had a right to a transmittal letter;
10   correct.
11       Q.   Do you know of one that exists?
12       A.   I don't recall.
13       Q.   I mean, do you -- I mean, certainly -- and
14   I mean this about Shawn. He's a very good lawyer.
15   You're going to move for summary judgment.
16       Do you think you ought to get out of the
17   case where you don't follow your own policies?
18       MR. KACHMAR: Object to the form.
19       MR. SAVAGE: I think that's a legal
20   conclusion.
21       Q.   (By Mr. Savage) How about Douglas
22   Factors? Is there a written statement on Douglas
23   Factors with regard to the firing of Kang and Arango?
24       A.   For which one?
25       Q.   Kang.

1       A.   I don't recall.
2       Q.   Are those required by your policies?
3       A.   Yes.
4       Q.   I mean, how do we do this? I mean --
5   let's go off the record for a second.
6       (Discussion off the record.)
7       Q.   (By Mr. Savage) Now, Lieutenant Larry was
8   the head of the investigation with Officer Khaalis
9   after they were fired?
10       MR. KACHMAR: Object to the form.
11       Q.   (By Mr. Savage) Is that correct?
12       A.   I believe Lieutenant Larry was involved in
13   that investigation.
14       Q.   What are you investigating them for?
15   They're already gone. Is it a fair assumption to say
16   you're investigating them to have them locked up as
17   part of a criminal investigation? I mean, they're
18   already gone. They're fired.
19       A.   Yeah.
20       Q.   Is that what it was for?
21       A.   I'm sorry. Can you restate your question.
22       Q.   Is that what Larry and Khaalis were
23   charged with doing was investigating the tape for the
24   purpose of prosecuting Kang and Arango because
25   they're already fired?

1       A.   I believe they were investigating the
2   matter to determine whether or not there was anything
3   of a criminal nature and submitting a report to the
4   district attorney's office.
5       Q.   And did they make a conclusion there was
6   anything of a criminal nature?
7       A.   I don't know.
8       Q.   Wiggins you said is a good officer. "Did
9   you think that the officer had done anything wrong at
10   this point?"
11       "I did not." We played him the tape.
12       "How about inconsistent punishment levels
13   and violations?"
14       "There was inconsistent punishment."
15       Do you agree with that?
16       A.   I don't know what he's talking about.
17       Q.   It's supposed to be a graduated punishment
18   thing with the City of Savannah; right?
19       A.   What do you mean by "graduated
20   punishment"?
21       Q.   I mean that you get -- first you're
22   suspended like you did with, in my opinion, the dirty
23   cop Gates. Gave him 40 hours off.
24       Did Kang have a bad record prior to April
25   of 2019?

EXHIBIT 9

**75**

1    MR. ARANGO:  '20.
2    Q.    (By Mr. Savage)  '20?
3    MR. KACHMAR:  Object to the form.  Is the
4    last question your question?
5    Q.    (By Mr. Savage)  Yes.  Did Kang have a bad
6    record?
7    A.    I'm not sure what you when mean by "bad
8    record."
9    Q.    Well, here's where I -- did he have
10   anything in his police file that showed he had been
11   sanctioned or found lacking in any way as a police
12   officer prior to Faitele?
13   A.    I believe it's my understanding that there
14   were two documented incidents from when he was
15   assigned to CNT.  One had to do with a, I believe, a
16   preventable accident.  And the other --
17   Q.    Tell me about that.
18   A.    I don't know.
19   Q.    Preventable accident like a car crash?
20   A.    Yes.
21   Q.    Okay.
22   A.    And then the other one had to do with a
23   negligent discharge of a weapon at the range.
24   Q.    Are those big deals when you compare it to
25   what Gates is being accused of?  Gates is a dirty

GILBERT & JONES

**76**

1    cop.  You came to that conclusion, didn't you?
2    That's why he was fired.
3    MR. KACHMAR:  Object to the form of
4    multiple questions.
5    Q.    (By Mr. Savage)  Did you come to the
6    conclusion that Gates was a dirty cop?  Adrian Gates.
7    A.    I came to the conclusion that
8    Officer Gates was terminated from the police
9    department for policy violations.
10   Q.    If you're black, you can harbor felons who
11   are dealing drugs and dealing guns and you get
12   transferred.  That's Khaalis's history; fair?
13   MR. KACHMAR:  Object to the form.
14   Q.    (By Mr. Savage)  She wasn't even suspended
15   for any length of time.
16   A.    I don't remember what the conclusion of
17   that investigation was.
18   Q.    And if you are Arango and you -- I mean,
19   Kang and you fight for this country, you get no
20   graduated punishments like Gates got.  You get -- can
21   you imagine what it was like to sit out and wonder if
22   you're going to get indicted?  Can you imagine what
23   it was like?
24   A.    Is that a question?
25   Q.    Yes.

GILBERT & JONES

**77**

1    A.    I can't imagine that.
2    Q.    It was horrible.  And part of that that
3    they went over was false evidence that your
4    department gave about them turning cameras off.
5    Because turning cameras off is what bad cops do so
6    they're not recorded.  And that's what Arango's being
7    accused of, and that's what they accused him of in
8    the grand jury based on what you gave him.
9    MR. KACHMAR:  Object to the form.
10   Q.    (By Mr. Savage)  Page 1 of Exhibit --
11   what's that?  29, sir?
12   A.    Yes, sir.
13   Q.    And I asked you to go correct it and you
14   won't.  Now --
15   MR. KACHMAR:  Object to the statement.
16   Q.    (By Mr. Savage)  Hm-hmm.  Now, here's
17   Wiggins.  "There was inconsistent punishment.  All
18   Savannah police officers, no matter what their rank,
19   including the chief, are required to follow existing
20   policy; isn't that fair?"
21   "Yes, sir."
22   "Kang and Arango were never given letters
23   of transmittal of the 12 Douglas Factors, were they?"
24   "No."  Because they don't exist.  You show
25   me in your policy, which I don't think the city says

GILBERT & JONES

**78**

1    is an appropriate past policy, that you didn't even
2    take time on your crusade to get them thrown in jail
3    to follow your own policy.  There's no Douglas
4    Factors here, are there?
5    MR. KACHMAR:  Object to the form.
6    Q.    (By Mr. Savage)  Yet, Exhibit 26 says
7    there should be Douglas Factors.  Mitigating
8    circumstances.  So we have some humanity left.  That
9    wasn't followed, was it?
10   MR. KACHMAR:  Object to the form.
11   Q.    (By Mr. Savage)  I mean, Wiggins is right
12   here.  They were never given the Douglas Factors.
13   And Douglas Factors are meant to have humanity.
14   Let's look at the big picture.
15   MR. KACHMAR:  What is your question?
16   Q.    (By Mr. Savage)  You broke your own
17   policies.  Can you man up and say that?  We broke my
18   own policies, Exhibit 26, in no less than two
19   fashions, which would be the failure to do Douglas
20   Factors and the failure to do a transmittal letter
21   when we fired Kang.  Can you do that?  Man up on
22   that?
23   A.    I do not recall whether there was an LOT
24   or a Douglas Factors included in the investigation.
25   I'd have to go back and look at the file.

GILBERT & JONES

EXHIBIT 9

**79**

1  Q. There has to be, though?

2  A. There should be.

3  Q. Right. And if I didn't, I broke -- we

4  broke the rules. We didn't have Douglas Factors

5  outlined and we didn't have a letter of transmittal.

6  We broke our own rules; right?

7  A. If they weren't there, they should have

8  been there.

9  Q. And we broke our own rules.

10  A. I'm sorry. Is there a question there?

11  Q. Yeah. The question is: We broke our own

12  rules if we didn't have Douglas Factors outlined. I

13  mean, you know, we get into this the police speak.

14  Douglas Factors are meant that we still are human

15  beings. We look at the whole picture with a guy like

16  Kang. I mean, how many aerospace engineers do you

17  have that are colonels in the United States Air Force

18  that have fought for this country in four separate

19  tours of duty in the Middle East that you've ever

20  fired, tried to put in jail?

21  MR. KACHMAR: Object to the form.

22  Q. (By Mr. Savage) I'm amazed that the Air

23  Force is still doing him. He's affiliated with sent

24  come. You know where that is? Tampa. He's a

25  Colonel. I mean, can you imagine what a jury's going

**80**

1  to think about this of mainly people from Bryan

2  County, Effingham County?

3  MR. KACHMAR: Object to the form.

4  Q. (By Mr. Savage) I don't always win but

5  I've got the 19th biggest verdict in America last

6  year, 66 and a half million bucks in a road wreck

7  case. This is a dangerous case.

8  You don't have any idea why Gavin,

9  Wiggins, Toth have an agenda against you, do you?

10  Because they've eviscerated you in their testimony in

11  the Faitele case. Do they have an agenda? You need

12  to know if they've got an angle against you?

13  A. Not that I'm aware of.

14  Q. Now, one of the biggest legal fictions

15  that we have in this case is that you didn't know who

16  signed -- you still don't know who signed the

17  petition, is what you're telling me, the 75 people.

18  MR. KACHMAR: Is there a question?

19  Q. (By Mr. Savage) That's a question. You

20  say I still don't know Kang and Arango did it

21  because -- when I explain this case to people, they

22  say, "What do you mean?"

23  The guy the petition was filed against

24  refused to get the GBI involved in the criminal

25  prosecution and he decided that they get canned. You

**81**

1  decided that they get canned; fair? I mean,

2  Monahan's only the appeals part. Sir?

3  A. Okay. I'm sorry. What's the question?

4  Q. You decided that Kang and Arango get

5  canned?

6  A. I made the determination for termination.

7  Q. Yeah. Did you have anybody in your

8  organization misinform Kang and Arango, as Wiggins

9  has said he did, you don't really have to be ready

10  for the mitigation hearing because all you have to do

11  is fall on your sword, I'll call it, and you'll be

12  fine. So don't really get prepared for the

13  mitigation hearing. Are you aware that Wiggins did

14  that?

15  MR. KACHMAR: Object to the form.

16  Q. (By Mr. Savage) Sir?

17  A. No, sir.

18  Q. That's not fair, is it? I mean, these

19  guys are fighting for their lives. He's got two

20  kids. I mean, he's accomplished a lot. His father's

21  a Cuban immigrant. I mean, these guys have pride.

22  His wife is essentially one of the top three people

23  at one of our biggest companies.

24  MR. SAVAGE: What's the name of that

25  engineering company?

**82**

1  MR. ARANGO: Thomas & Hutton.

2  Q. (By Mr. Savage) Thomas & Hutton. Can you

3  imagine what it was like to go to school when you

4  guys put all this stuff, hold a press conference,

5  what it was like for his daughter? Savannah Arts?

6  MR. ARANGO: Yes, sir.

7  Q. (By Mr. Savage) Did you think about that

8  at all when you held that press conference?

9  MR. KACHMAR: Object to the form.

10  A. I'm sorry. What's the question,

11  Mr. Savage?

12  Q. (By Mr. Savage) Did you think about that?

13  Q. Think about what?

14  Q. When you held a press conference about

15  Arango and Kang, what effect this would have on their

16  families?

17  MR. KACHMAR: Object to the form. What

18  press conference are you talking about?

19  MR. SAVAGE: The DA had it. We got it.

20  Let's do this. Let's a take a minute

21  because I'm going to be done by 11. Pull up

22  Heap being interviewed where she says it's

23  Mr. Minter's call on not getting the GBI in.

24  MR. ARANGO: Okay.

25  (The video was played.)

EXHIBIT 9

**83**

1    Q.  (By Mr. Savage) Have you ever seen that

2 before? She's throwing you under the bus.

3    A.  I don't think I remember seeing that

4 before.

5        MR. KACHMAR: So just for the purposes of

6 the record, did you get everything that was said

7 from the video?

8        MR. SAVAGE: Thank you. Let's do this.

9 We're going to make that snippet of Meg Heap

10 saying that it was -- and I think in any

11 reasonable person's mind -- Chief Minter's

12 decision not to bring the GBI involved into the

13 case. That's Exhibit 31 thumb drive.

14        MR. KACHMAR: Is there a date on there

15 just so we can put it on the record the date of

16 the clip? The station? TOC or SAV.

17       (The video was played.)

18        MR. ARANGO: There is a -- I'm sorry.

19 There's a hard copy, if you would like, that has

20 the date on it. There's no date on this video.

21        MR. SAVAGE: Okay. We'll make that

22 Exhibit 32, the hard copy, and the thumb drive

23 31.

24        MR. KACHMAR: You said it's 31.

25        MR. SAVAGE: Yeah. But the hard copy. He

GILBERT & JONES

**84**

1 says there's a hard copy, a transcript of the

2 hearing. So we'll make that 32.

3        MR. KACHMAR: Oh, you have the transcript.

4        MR. ARANGO: No, no, no, no. There's a

5 hard copy of the article.

6        MR. KACHMAR: Oh, there's a printed

7 article?

8        MR. ARANGO: There's a printed version.

9        MR. SAVAGE: Well, we'll make that 32. We

10 got it?

11        MR. ARANGO: No, sir.

12        MR. KACHMAR: So 31 is the video and 32 is

13 the printed article?

14        MR. SAVAGE: And we'll get it for the

15 court reporter and send it out to everybody.

16        MR. KACHMAR: Is that clear for you? 31

17 video, 32 printed article.

18    Q.  (By Mr. Savage) Lieutenant Larry, how

19 many times was he found to be AWOL? That's a serious

20 offense, is not, being AWOL? We need to know where

21 our police officers are. They're supposed to be

22 where they're supposed to be. Are you aware that he

23 had multiple AWOL citations in his record, the chief

24 prosecutor of Dan Kang and Mike Arango from inside

25 the department?

GILBERT & JONES

**85**

1    A.  No.

2    Q.  Was Larry a personal friend of yours?

3    A.  No, sir.

4    Q.  Okay. Here's a note. I hate notes. You

5 can have it.

6        MR. KACHMAR: I don't need it.

7    Q.  (By Mr. Savage) How many AI (sic)

8 investigations were there into Darryl Gates before he

9 was dismissed?

10    A.  I don't recall.

11    Q.  Six?

12    A.  I don't recall.

13    Q.  Okay.

14        MR. KACHMAR: Speak up, if you can.

15        THE WITNESS: I'm sorry.

16        MR. KACHMAR: A little louder.

17    Q.  (By Mr. Savage) There are transcripts.

18 So the progression, as I understand it, there's an IA

19 investigation into these officers in regard to the

20 Moss Point incident. Did you tell Meg Heap that, you

21 know -- I guess your heart grieves when you try to

22 prosecute people, I would hope -- that I studied this

23 thing hard and I want to tell you that he threatened

24 Arango -- "he" being Faitele -- his daughter?

25 Threatened to beat her.

GILBERT & JONES

**86**

1        Did you ever tell -- let's look at the big

2 picture. Let's look -- would that be a Douglas

3 Factor? That we got to look at the big picture when

4 we're trying to put them in jail, that Faitele, who

5 has a history of beating women -- that's a big deal

6 to beat women.

7        MR. KACHMAR: What's your question?

8    Q.  (By Mr. Savage) Did you tell the district

9 attorney that it's in the tape? I want you to be --

10 I want to tell the whole truth that Arango's daughter

11 was threatened in this tape? I want you to know that

12 when you prosecute them?

13    A.  Did I have that conversation with the DA?

14 No.

15    Q.  Anybody?

16    A.  No. The DA also had a copy of the tape.

17    Q.  Okay. Now, so the next step above AI

18 (sic) is the disciplinary review committee in the

19 progression of trying to get Kang put in jail?

20        MR. KACHMAR: Object to the form.

21    Q.  (By Mr. Savage) What's the next step?

22    A.  Are you asking the next step --

23    Q.  Yes, sir.

24    A.  -- in the internal investigation process?

25    Q.  Yes, sir.

GILBERT & JONES

EXHIBIT 9

1      A.     That would be the next step in certain
2  investigative processes.
3      Q.     Was it in Kang's?
4      A.     I believe so.
5      Q.     Okay.  What was their recommendation with
6  Sergeant Kang?
7      A.     I'd have to look it up.  I don't have the
8  specific information in front of me.
9      Q.     Five days?  So Gates they say get rid of
10 him.  He's a dirty cop.  He's fostering guns and
11 drugs on Fitzgerald Street.  He shows up, oddly
12 enough, where drug deals are going down.  And he
13 knows the drug dealers.  Do you know that, that he's
14 done that?
15             MR. KACHMAR:  Object to the form.
16     Q.     (By Mr. Savage)  That he did that?
17             MR. KACHMAR:  Object to the form.  What
18 question are you asking?
19     Q.     (By Mr. Savage)  Do you know if Gates
20 showed up where drug busts were going down and he
21 knew the drug dealers?
22     A.     I don't know.  I'm sorry.  I apologize.
23 My voice is kind of going out.
24     Q.     Do you know Robert Padgett?
25     A.     Robert who?  I didn't hear the last name.

1      Q.     Padgett.  Padgett.  P-a-d-g-e-t-t.
2      A.     That's not ringing a bell with me.
3      Q.     Let's talk about this COVID-19 stuff
4  because that really bothers me.  Here's the setup,
5  the question of what I understand.  Mayor Johnson is
6  on a Zoom meeting with the Metro Kiwanis Club.
7              MR. ARANGO:  Rotary.
8      Q.     (By Mr. Savage)  Metro Rotary Club.  And
9  his wife is on there.  And Mayor Johnson, who I think
10 well of, says they all got PPE.  And she says, "My
11 husband doesn't.  He just left here."
12             Did you at points in March of 2020 tell
13 your officers not to wear PPE because it made them
14 look like guys are masked up, and that was bad?
15     A.     I don't recall saying that.
16     Q.     At the same time the CDC is saying you
17 should wear -- when was Arango -- did Arango and Kang
18 have any PPE when your department sent them out to
19 deal with Khalil Kelly?
20     A.     I don't know.
21     Q.     Do you understand and did you -- well, did
22 you ever tell Meg Heap that these folks, Kang and
23 Arango, were told that Khalil Kelly was in that
24 apartment by one of the managers of the apartment?
25 He was in -- what is it?  530?

1              MR. ARANGO:  Yes, sir.
2      Q.     (By Mr. Savage)  That they were told that
3  Khalil Kelly was in there by one of the managers of
4  the apartment complex before they went up there and
5  said -- so that's why they were certain because they
6  were told by somebody that's where Kelly is.  Did you
7  ever tell Meg Heap that?
8      A.     I don't recall having that conversation
9  with Meg Heap.
10     Q.     All right, sir.  Were there discussions in
11 your -- and I don't know what the answer is here.  I
12 think everybody's life matters.  If you get certain
13 extreme groups, they believe that Black Lives Matter,
14 and I don't subscribe to this is a Marxist
15 organization.
16             Was there any discussion with Meg Heap
17 that Black Lives Matter, and it was despicable what
18 was done to George Floyd, that we've got to keep this
19 city calm and we're going to sacrifice these cops
20 because we're going to keep the temperature down?
21 Was there any discussions about George Floyd related
22 to what Kang and Arango did that day?
23     A.     No, I don't recall having any
24 discussion --
25     Q.     Any --

1      A.     -- like that.
2      Q.     None --
3              MR. KACHMAR:  Let him finish.
4              MR. SAVAGE:  Yes, sir.
5      Q.     (By Mr. Savage)  Did you ask anybody to
6  call Dan Kang's mother, a Korean immigrant, hard
7  worker, and misrepresent them that they were an
8  attorney for the city and they had some questions for
9  her about her son, to call her at her house in
10 Chicago?
11     A.     Did I do that?
12     Q.     Did you know of anything done there to
13 misrepresent -- police officer misrepresenting who
14 they, in fact, were in order to gain some information
15 from his mother?
16     A.     No, I'm not aware of anything like that.
17     Q.     I take the answer is no, that nobody's
18 ever tried to put you in handcuffs and put you in
19 jail; correct?
20     A.     That would be correct.
21     Q.     Do you think that having been part of the
22 process, will you agree that you're part of the
23 process to have them criminally prosecuted, Kang and
24 Arango?
25     A.     Was I part of the process?

EXHIBIT 9

**91**

1    Q.   Yes.

2    A.   I was not part of the process of him being

3 criminally prosecuted.

4    Q.   Well, whose decision was it?

5    A.   That would be the DA's office.

6    Q.   You're well read.  I can tell that.

7 There's a saying, "Success has a thousand followers,

8 and failure is an orphan."  This case is fast against

9 Kang turning into an orphan.

10       Who -- tell me the person who's going to

11 say this is Meg Heap's job.

12    A.   I'm sorry.  Who's --

13    Q.   Do you think Meg Heap was the person who

14 decided to prosecute these people?

15    A.   I would assume the DA's office would make

16 decisions on the status of cases.

17    Q.   Was she in a hotly contested race that she

18 eventually lost?  Did she ever tell you that I'm very

19 concerned about getting African-American support for

20 my race for DA?

21    A.   I've never had that type of discussion

22 with Ms. Heap.

23    Q.   Now, so you still don't know if Kang and

24 Arango signed this 70-plus officer petition; right?

25    A.   No, I don't know nothing other than the

GILBERT & JONES

**92**

1 information that's been forwarded as part of this

2 case.

3    Q.   Okay.  So we've got Garvin.  He's one of

4 your allies, kind of.  They're getting smaller and

5 smaller, but Garvin is.  We took his deposition.

6 Trust me.

7       "You were aware about the group complaints

8 to human resources filed by 70 some officers,

9 including Arango and Kang.  Were you not aware?"

10      "Like everybody else in the city, I was

11 aware."  Do you agree with that statement or not?

12    MR. KACHMAR:  Object to the form.

13    A.   I can't testify to what people are aware

14 of.

15    Q.   (By Mr. Savage)  "And you knew and the

16 chief had made it clear he was aware of it, didn't

17 he?"

18       "He made mention of it to the department."

19 Is that false?

20    A.   Mention of what?  I'm not sure.

21    Q.   That Kang and Arango, that he had a

22 petition that they signed against him?

23    MR. KACHMAR:  Object to the form.  I think

24 you're misrepresenting what's on the board.

25    Q.   (By Mr. Savage)  Don't you care about our

GILBERT & JONES

**93**

1 city?  Have you ever been in a situation where 75

2 police officers, six captains, and I can count the

3 lieutenants, signed a human resources petition

4 against you?  Didn't you read the thing so you could

5 say, well, maybe I can improve some.

6       Have you ever had that many police

7 officers come at you and say the litany of things

8 they're complaining about?

9    MR. KACHMAR:  Object to the form.  There

10 were multiple questions in there.

11    Q.   (By Mr. Savage)  Have you ever had that

12 happen before?

13    A.   I need to know which question you're

14 asking me.

15    Q.   Fair enough.  The one is have you ever had

16 that happen before?

17    A.   Had what?

18    Q.   75 police officers sign a petition to HR

19 saying there are multiple problems with this man?

20    A.   No, sir.

21    Q.   Did you read it so that you can come up to

22 speed and say I want to learn what they're saying so

23 maybe I can improve?  Maybe I can clarify stuff?  Did

24 you ever read the petition?

25    A.   No, sir.

GILBERT & JONES

**94**

1    Q.   Does city policy require that you, being

2 the subject of that, read it and respond to it?

3    A.   I don't know.  I'd have to look and see

4 what city policy says.

5    MR. SAVAGE:  I want to make this the next

6   one.

7    THE COURT REPORTER:  I already marked

8   that.

9    MR. SAVAGE:  As 1?

10    THE COURT REPORTER:  Yes.

11    (Plaintiff's Exhibit 1 was marked for

12   identification.)

13    Q.   (By Mr. Savage)  Tell me about this

14 article which -- I'm sorry.  I'll hand it back to

15 you.  Savannah officers sign letter of workplace

16 conflict of interest.  This is the worst conflict of

17 interest you explain it to a guy on a bus that

18 they've ever seen.

19       You've denied, according to Heap -- you

20 think she's a truthful person, don't you?

21    A.   I think she's a good person.

22    Q.   She says that you're the person who keeps

23 the GBI out of the prosecution.  You saw it; right?

24 That's what she said; fair?

25    A.   I saw her statement.

GILBERT & JONES

EXHIBIT 9

## 95

1    Q.    And that's what she said. You're the
2  person that keeps the GBI out because I got them
3  pretty far down the road. The GBI gets involved and
4  says they shouldn't be prosecuted or suspended.
5  That's bad.
6        MR. KACHMAR: Object to the form.
7    Q.    (By Mr. Savage) So I'm going to control
8  the investigation. Wasn't that what you wanted to
9  do?
10    A.    I'm sorry. What's your question?
11    Q.    Wasn't that what you wanted to do, control
12  the investigation?
13    A.    Control which investigation?
14    Q.    That you were going to be the guy to get
15  rid of them. You were going to be the guy to send
16  stuff over that said Kang turned off his Web cam
17  dealing with Pernell Drayton. You wanted to control
18  the message rather than have an independent force
19  come in, GBI?
20    A.    No. I wasn't looking at controlling
21  anything.
22    Q.    Okay.
23        MR. KACHMAR: Just for purposes of the
24    record, Plaintiff's Exhibit 1, first page is
25    Kang 1470. Second page is Kang 1471. The third

GILBERT & JONES

## 96

1    page is unmarked.
2    Q.    (By Mr. Savage) Let's go at it this way.
3  Would you agree with me that it's important to have
4  people not in chain of discipline where allegations
5  have been made by the people you're trying to
6  discipline against them. In other words, this is a
7  massive conflict of interest for you to discipline
8  these guys because they've signed the petition
9  against you. You shouldn't do it. That's what you
10  should not do.
11        MR. KACHMAR: Object to the form.
12    Q.    (By Mr. Savage) Would you agree that you
13  had a conflict of interest in disciplining these
14  guys?
15    A.    The question is do I agree that I had a
16  conflict of interest? No, I don't believe so.
17    Q.    What would you define a conflict of
18  interest to be?
19    A.    Something that appears to be kind of a
20  conflict between a matter that you're involved in
21  that maybe someone should not be involved in because
22  of certain interests or things that they may have
23  that are involved in that particular situation.
24    Q.    Did you ever -- do you take the *Savannah*
25  *Morning News*?

GILBERT & JONES

## 97

1    A.    No.
2        (Plaintiff's Exhibit 2 was marked for
3    identification.)
4    Q.    (By Mr. Savage) How about Exhibit 2? Did
5  you ever see that? Will Peebles? What's the
6  headline?
7        MR. KACHMAR: For the record, it's Kang
8    1346 through 1349.
9    Q.    (By Mr. Savage) What's the title, sir?
10    A.    You want me to read it?
11    Q.    No, just the headline. Just read the
12  headline, please. That's it.
13    A.    77 Ga. officers file complaint against
14  chief.
15    Q.    Did you ever know that at the time? You
16  said you didn't know Kang and Arango did it. Did you
17  know 77 officers did that?
18    A.    Yes.
19    Q.    So you knew it close to the time it was
20  filed. You just didn't know the names of the people;
21  correct?
22    A.    Fair.
23    Q.    All right. Have you read Monahan's
24  testimony?
25    A.    Which testimony?

GILBERT & JONES

## 98

1    Q.    He's given testimony in this case. It
2  might have been Faitele. I don't know what case it
3  is. I mean, you want to talk about warped things in
4  America. You threaten to beat up a 16-year-old girl
5  and you file a lawsuit in federal court against the
6  people?
7        MR. KACHMAR: Do you have a question?
8    Q.    (By Mr. Savage) Do you think Faitele has
9  a legitimate cause of action?
10        MR. KACHMAR: Object to the form.
11    Q.    (By Mr. Savage) Are you a defendant in
12  that case? I forget.
13        MR. KACHMAR: Huh-uh.
14        MR. SAVAGE: No. Probable not. Does that
15    tell you something?
16    Q.    (By Mr. Savage) Now, so you knew 77
17  officers did it. When did you talk to Moynahan (sic)
18  about this? Because he said he talked to you about
19  it very soon after, very early on.
20    A.    I think after the complaint or after the
21  document was received by HR, I think they advised the
22  city manager. And I think he called to advise me
23  that the matter was being reviewed.
24    Q.    Did you ever tell Moynahan (sic) that you
25  delivered to -- what's the young man's name? Is it

GILBERT & JONES

EXHIBIT 9

**99**

1    Wright?  What's his first name, the DA?
2          MR. ARANGO:  Nathaniel Wright.
3          Q.    (By Mr. Savage)  Nathaniel Wright.  Did
4    you personally deliver to Nathaniel Wright false
5    information that Kang meant to garner up a 404(b)
6    claim?  Did you ever tell Moynahan that?
7          A.    I don't recalling delivering any false
8    information to anyone.
9          Q.    Whoever delivered -- what's the number on
10   that?
11         A.    29.
12         Q.    The thing with the asterisk.  Whoever
13   delivered it delivered false information now that
14   we've had a chance to look at the tape; fair?
15         A.    I haven't seen the tape yet.
16         Q.    You just saw it.  It was Kang's Body Cam.
17         A.    I haven't seen the whole tape.  You saw we
18   did not see the whole tape.
19         Q.    Okay.  All right.
20         MR. KACHMAR:  Mr. Savage, just to -- you
21   say Moynahan.  Are you referring to
22   Pat Monahan --
23         MR. SAVAGE:  Monahan.
24         MR. KACHMAR:  -- the city manager?
25   M-o-n-a-h-a-n; correct?

**100**

1          MR. SAVAGE:  Yes.
2          MR. KACHMAR:  I'm just trying to clear
3    much the record.  Thank you.
4          Q.    (By Mr. Savage)  Was it important for the
5    appeal process that Monahan understood the whole
6    truth about Kang?
7          A.    It is important that Mr. Monahan had all
8    the facts of the case.
9          Q.    Did you tell him about what you had done
10   with Gates to -- where the chain of command said get
11   rid of this bad cop and you had countermanded for 40
12   hours?  Did you tell them about what happened with
13   Gates, an Africa-American officer?
14         A.    I don't know if Mr. Monahan was aware of
15   that in the investigation that Mr. Monahan did.
16         Q.    Did you tell him about the 404(b)
17   information that said Kang's camera was off, that it
18   had been delivered to the district attorney's office?
19         A.    I don't recall having that conversation
20   with Mr. Monahan.
21         Q.    Did you make sure that he understood that
22   you had never served Douglas Factors on Kang?
23         A.    I don't recall having that conversation
24   with Mr. Monahan.
25         Q.    So how does he know the whole truth?  He

**101**

1    wants to talk to me about his brother who's a cop.  I
2    don't know where he's a cop.  Do you know where his
3    brother's a police officer?  I imagine somewhere in
4    Florida because I want to talk to that department.
5          A.    I don't.
6          Q.    And did you ever tell Moynahan (sic) that
7    we didn't follow my policy, Exhibit 26, in having a
8    letter of transmittal so that we can apprise people.
9    It's important to be fair in this country.  If
10   anybody should understand that, it's African-American
11   people who have not been treated fair in this
12   country.
13         I think there's systemic racism all over
14   the place.  And there's some counter-racism.  But it
15   was important to be fair.  And that's what Douglas
16   Factors are about.  Be fair to the accused; fair?
17         A.    That's what Douglas Factors are about.
18         Q.    We should weigh what we should do.  We
19   have humanity.  That's what Douglas Factors are
20   about; fair?
21         A.    Yes.  That's part of what Douglas Factors
22   cover.
23         Q.    Right.  So you don't even do that with
24   Kang.  I mean, how -- he's going to file a summary
25   judgment.  You've got federal judges over there, you

**102**

1    know.
2          MR. SAVAGE:  Mr. Baker have this?
3    Judge Baker?
4          MR. KACHMAR:  Now he does, yeah.
5          MR. SAVAGE:  Yeah.  He's appointed by
6    Donald J. Trump.
7          Q.    (By Mr. Savage)  And are you proud of what
8    you did in not telling about the Douglas Factors, not
9    following the Douglas Factors, not having a letter of
10   transmittal which would have outlined the charges
11   against him?
12         Charles Manson was treated better than
13   them, the mass murderer out of California, because at
14   least he knew in his indictments what the charges
15   were.  That was the purpose of the letter of
16   transmittal; fair?
17         MR. KACHMAR:  Object to the form.
18         A.    I'm sorry.  What's the question,
19   Mr. Savage?
20         Q.    (By Mr. Savage)  The purpose of the letter
21   of transmittal was to outline the charges against
22   these folks?
23         A.    That's part of what's included in the
24   Douglas Factors; right.
25         Q.    Would you agree with me that

EXHIBIT 9

1  Charles Manson, one of the most heinous criminals --
2  I mean, the Nazi war criminals in Nuremberg, Goering,
3  had the charges outlined to him.  They're responsible
4  for the death of 60 million people.
5      MR. KACHMAR:  Is there a question?
6      Q.    (By Mr. Savage)  Show me where you
7  outlined the charges to Kang.  You had no letter of
8  transmittal.  You had no Douglas Factors.  Basic due
9  process in this country.  Did you ever do either of
10 those?
11     A.    I don't recall whether there was an LOT or
12 Douglas Factors in the filing.  I'd have to go back
13 and look and see if they were in the file.
14     Q.    Well, I hope it doesn't get produced now
15 because we've been through it.  It would be a very
16 suspicious documents if they show because there
17 aren't any.
18           I mean, there were certain points -- you
19 left the city when, sir?
20     A.    July 29th, I believe.
21     Q.    Did you take this stuff seriously?  I
22 mean, we're making very serious allegations.  Did you
23 go back and check whether you had any, in your
24 records, Douglas Factors or letters of transmittal?
25 Basic fairness in this country.  We agree that that

1  is basic fairness to a police officer; fair?  Douglas
2  Factors outlined and letters of transmittal with your
3  charges?
4      A.    What do you mean by "basic fairness"?
5      Q.    Okay.  I can't get these people basic
6  fairness.  I'll ask a jury to do it.  I'll say that
7  this officer who is highly educated doesn't know what
8  the word "bad" means.  He doesn't know what "basic
9  fairness" is.  So you've got to tell him.
10     MR. SAVAGE:  Now, let's mark this as
11     Exhibit 33.
12          (Plaintiff's Exhibit 33 was marked for
13          identification.)
14     Q.    (By Mr. Savage)  See, that's what happened
15 in the Billy Jenkins case where the ports paid
16 $900,000.  Is that Carl Nell, who's an
17 African-American, who's head of the crane department
18 out there.  Part of the state of Georgia, government
19 like you.  And he had guys, Randy Jones, an
20 African-American operator said, "I'll put a boot up
21 your ass if you keep acting this way."  And he fired
22 Billy Jenkins who had six years in Afghanistan and
23 Iraq.  It didn't look too good.
24          And then Judge Moore threw me out, and the
25 Eleventh Circuit said that's not fair.

1      MR. KACHMAR:  Is that a question?
2      MR. SAVAGE:  No.
3      MR. KACHMAR:  For purposes of the record,
4      Exhibits 33 is marked Kang 410 to 413.
5      Q.    (By Mr. Savage)  This is an LOT for
6  Adrian Gates, is it not, sir?
7      A.    Correct.  It is.
8      Q.    So if you tip off drug dealers telling
9  them lay low, man, don't be moving that dope out of
10 this house in an area that's within your
11 jurisdiction.  Gates, don't be dealing guns.  You get
12 an LOT and you get the chief to step in for you.
13 He's one of you.  He's going to hang with you.
14          But Kang never gets an LOT like Gates
15 gets.  Is that fair to you, sir?
16     A.    If an LOT was not done for the Kang
17 investigation, it should have been done.
18     Q.    It was not fair if it wasn't done?
19     A.    If it wasn't done, it should have been
20 done.
21     Q.    Well, it's unfair.  Can you abide by that?
22 I mean, c'mon.  This guy has rights.  He's an
23 American citizen.
24     A.    LOTs and Douglas Factors should be done
25 for all internal -- well, it should be done for those

1  types of internal investigations.
2      Q.    Now, I want -- this COVID-19 thing bothers
3  me.  But let me mark some more stuff.
4          (Plaintiff's Exhibit 3 was marked for
5          identification.)
6      Q.    (By Mr. Savage)  Exhibit 3, have you ever
7  seen this savannahnow.com headlines of which is
8  "Savannah police HR complaint:  Chief Roy Minter
9  shows 'favoritism,' 'outright disrespect' towards
10 staff."  Did you ever see this article?
11     MR. KACHMAR:  For the record, Exhibit 3
12     doesn't have Bates stamps on it.  It appears to
13     be a savannahnow article from April 22nd, 2020.
14     Oh, wait.  I'm sorry.  It's on the side.  It's
15     Kang 1476 through 1480.
16     Q.    (By Mr. Savage)  Are you aware of that
17 article?
18     A.    No, sir.
19     Q.    Do you have a TV?
20     A.    I do.
21     Q.    I mean, they showed on the TV the
22 petition.  Do you have a TV?
23     A.    I do.
24     Q.    Do you watch WSAV or WTOC?
25     A.    Occasionally.

EXHIBIT 9

## 107

1    Q.    Did you ever see them hold the petition
2  up?
3    A.    I'm sorry.  What?
4    Q.    Did you ever see them hold the petition up
5  and shares the names?  They're on the first page.
6    A.    No, sir.
7    Q.    All right.  It just didn't happen.  All
8  right.  Now, I want you to understand who you did
9  this to.
10         (Plaintiff's Exhibits 4 through 10 were
11         marked for identification.)
12    Q.    (By Mr. Savage) So Exhibits 4 -- I asked
13  Dan last night -- but they're not Bates stamped --
14  through 10.  I mean, he doesn't have a job.  You
15  understand that?  I employ him some.  I employ Arango
16  some because I feel bad for them.
17         Did you ever make an effort saying, you
18  know, we couldn't put you in jail, Kang, let me help
19  you get a job?  Let me at least do what Savage is
20  doing for you?
21    MR. KACHMAR:  Object to the form.
22    Q.    (By Mr. Savage) Did you ever try to help
23  them?
24    A.    I'm sorry.  What's the --
25    Q.    Did you ever help Kang?

## 108

1    A.    What do you mean by "help" him?
2    Q.    Get a job.
3    A.    No, I did not.
4    Q.    There's the man you did it to on paper,
5  Exhibits 4 through 10.
6    MR. KACHMAR:  Take 30 seconds.
7         (Recess from 10:31 a.m. to 10:32 a.m.)
8    Q.    (By Mr. Savage)  Why did you countermand
9  the chain of command recommendation that Kang get
10  five days off?
11    A.    I took you all of the facts and the
12  circumstances into consideration.
13    Q.    Which facts?
14    A.    The factors of the incident that occurred.
15    Q.    Just list for them for me, please.
16    A.    Okay.  Sure.  It started with the initial
17  contact with Mr. Faitele.  And about two, two and a
18  half minutes into the contact, Mr. Faitele advised
19  Kang that he was not Khalil, and that he had his
20  wallet in his back pocket.
21         You could see then Kang removed the wallet
22  from the back pocket, opened it up.  There appeared
23  to be some type of identification inside.  It looked
24  like a driver's license or an ID.  It looked like
25  Kang closed it back up.

## 109

1    Q.    I mean, it's just -- do criminals often
2  carry false IDs?
3    A.    They could.
4    Q.    Okay.  Go ahead, please.
5    A.    Okay.  Closed it back up and put it
6  somewhere.  I don't know if it was in a pocket or
7  whatever.  Did not advise anyone or say anything to
8  anyone that he had identification that was contrary
9  to the person he was looking for.
10    Q.    At any point he never advised them?
11    A.    Not for about 20 minutes.
12    Q.    Okay.
13    A.    And still left Faitele in handcuffs for
14  about 30 minutes.
15    Q.    Poor Mr. Faitele.  At least --
16    MR. KACHMAR:  Mr. Savage, you asked him a
17  question.  Let him finish -- let him finish his
18  answer.
19    Q.    (By Mr. Savage)  At least he couldn't be
20  beating women since he was in handcuffs or go beat
21  Arango's daughter, which doesn't seem to upset you at
22  all that he threatened his daughter.  Go ahead.  Keep
23  going, please.
24    A.    Then there was the incident running up the
25  stairs and --

## 110

1    Q.    He ran in an aggressive manner?
2    A.    He ran up the stairs.
3    Q.    Yeah.
4    A.    And had to be stopped by another officer.
5    Q.    Which one?
6    A.    I believe that was Reagin.  And --
7    Q.    Stopped from doing what?
8    MR. KACHMAR:  Mr. Savage, he's trying to
9  answer your question.
10    MR. SAVAGE:  I'm trying to understand his
11  answer.
12    MR. KACHMAR:  Well, let him finish his
13  answer.
14    MR. SAVAGE:  I can't remember stuff like
15  you.
16    MR. KACHMAR:  Let him finish his answer.
17  You asked him what factors he --
18    MR. SAVAGE:  I will absolutely let him
19  finish his answer.
20    MR. KACHMAR:  You keep interrupting him.
21    MR. SAVAGE:  I just want to know when he
22  brings up points that I need clarification on.
23  I won't remember.  So I'm trying to do this at
24  the time.
25    A.    Did you have a question?

EXHIBIT 9

1    Q.    (By Mr. Savage)  I did, but I forget what
2    it was.  Mr. Kachmar's scared to death.
3    A.    Okay.  Went back downstairs.  Prior to
4    going upstairs in the apartment courtyard where there
5    were other people present, he made the loud statement of
6    "I'm not talking to you, mother fucker."  Went
7    upstairs and turned around.
8    Q.    Are they never supposed to curse?
9    A.    Who's "they"?
10   Q.    The police officers.
11   A.    They should always conduct themselves in a
12   professional manner.
13   Q.    Have you ever watched the tape of
14   Kirby Smart -- I'm going to have that as an
15   exhibit -- at practice before the Tennessee game --
16   he's the highest paid state employee, you know,
17   public employee -- about the words he uses when he
18   gets excited?
19   A.    I've never seen that.
20   Q.    Okay.  I just want the jury to hold, which
21   I think they will.  I mean, Georgia's -- people love
22   University of Georgia football.  Hold my men to the
23   same standard as Kirby smart.  I'm happy to live with
24   that.  It's the highest paid official employee in the
25   state.

1    MR. KACHMAR:  Can you finish?
2    Q.    (By Mr. Savage)  All right.  He said
3    "mother fucker."  Go ahead.
4    A.    And going back downstairs, again, he
5    yelled, I believe the words were "bullshit," "fucking
6    faggot" and "fucking pussy."
7    Q.    Uh-huh.
8    A.    When he went back downstairs --
9    Q.    Would you consider people who beat women
10   to be, quote/unquote, fucking pussies?
11   MR. KACHMAR:  Mr. Savage, let him finish
12   his answer.
13   MR. SAVAGE:  I'm asking him a question.
14   MR. KACHMAR:  You're going off on tangents
15   on other questions.
16   MR. SAVAGE:  No, I'm not.
17   Q.    (By Mr. Savage)  Would you consider that
18   to be abominable?  Horrible?  Beating women?
19   MR. KACHMAR:  Object to the form.
20   Q.    (By Mr. Savage)  Okay.  He's not going to
21   answer.  Okay.  Go ahead.
22   A.    Okay.  When he was asked during the
23   mitigation hearing what he was planning on doing when
24   he ran upstairs, he stated he was only going up there
25   to scare Faitele.

1    Q.    And there's a transcript of that?
2    A.    I believe it's in the internal affairs
3    report.
4    Q.    And I'm the first guy to tell you Wiggins
5    set him up.  He told him not to get ready for the
6    hearing.
7    MR. KACHMAR:  Is that a question?
8    MR. SAVAGE:  Yeah.
9    Q.    (By Mr. Savage)  Wiggins has testified to
10   that under oath.  You weren't aware before I posed
11   that question to you that the mitigation hearing,
12   which you put stock in, they were told just to come
13   in and don't get ready.  That's not right, is it?
14   MR. KACHMAR:  Object to the form.  You're
15   still interrupting his answer to your question.
16   MR. SAVAGE:  I'll tell you what.  I'll
17   write my questions down.
18   MR. KACHMAR:  Okay.
19   A.    Let me know when you're ready and I'll
20   continue.
21   Q.    (By Mr. Savage)  I'm ready, sir.
22   A.    Okay.  When he's asked in his mitigation
23   hearing, and even in the internal affairs
24   investigation, what he was planning on doing when he
25   went upstairs, he said he was only going up there to

1    scare Faitele.
2    Q.    Okay.
3    A.    But when he went downstairs, he made the
4    statement of, "Well, take off those fucking cuffs and
5    I'll drop this shit," which indicates that he wanted
6    to have some type of physical confrontation.
7    Q.    Did he have any physical contact with four
8    time, soon-to-be-four-time felon whenever the DA's
9    Office decides to prosecute him, did he rough up
10   Faitele in any way, shape or form?
11   A.    I don't know what you mean by "rough up,"
12   but I believe there was some physical contact between
13   the two of them.
14   Q.    Well, I mean, if you held out your hand
15   and we shook hands, would there be physical contact?
16   Did he rough him up?
17   A.    I don't know what your definition of
18   "rough him up" is.
19   Q.    All right.  Anything else that caused him
20   to be fired when your friend, Adrian Gates, is not
21   fired?
22   MR. KACHMAR:  Object to the form.
23   Q.    (By Mr. Savage)  I'll prove he is your
24   friend.
25   MR. KACHMAR:  So your original question

**Page 115**

1  was why did you deviate from the recommendation.
2      MR. SAVAGE: Yeah.
3      MR. KACHMAR: That's what he's trying to
4  answer.
5      MR. SAVAGE: Yeah.
6      MR. KACHMAR: So let him finish that
7  answer.
8      Q. (By Mr. Savage) I don't really -- I don't
9  really care about people who don't follow the
10  policies and try to put -- I mean, you've admitted
11  you broke your own policies. So go ahead. Answer my
12  question.
13      A. In addition to those factors, there was
14  also the situation where Kang stated that he was
15  going to charge Faitele with hindering or obstruction
16  but could not recall whether anyone had given Faitele
17  an order to stop or not go into the apartment. When
18  asked during his internal affairs interview if he
19  thought that charge would hold up in court, his
20  response was "no," which kind of indicated that he
21  was going to charge someone with a crime but he
22  didn't think it was going to be --
23      Q. Well, we already solved that with
24  Khalil -- your person that you put on with Larry --
25  saying there were two violent felonies committed in

**Page 116**

1  the presence of these officers and he should have
2  been arrested. So that's coming from your
3  department. Go ahead.
4      MR. KACHMAR: Object to the form.
5      A. I don't know what you're talking about as
6  far as Khalil.
7      MR. SAVAGE: What's her name?
8      MR. ARANGO: Khaalis.
9      MR. SAVAGE: Khaalis. Khaalis.
10      MR. KACHMAR: What's your question?
11      Q. (By Mr. Savage) Go ahead. I want him to
12  say why he did this. Why Adrian Gates, who fosters
13  drug dealing/gunrunning criminals in our
14  neighborhood, and it's told to the police department.
15  They don't investigate why he's put on the street.
16  Go ahead. Keep going.
17      A. And then the other thing was when Kang was
18  asked if he had used that type of language before, he
19  stated that he has told people to, quote, shut the
20  fuck up. And has used the term "faggot" before.
21      Q. So let's fire him. Let's get the guys who
22  are dirty cops -- did you come to the conclusion that
23  Adrian Gates was a dirty cop and he should have been
24  dismissed, and you shouldn't have countermanded what
25  the chain of command recommended on Adrian Gates?

**Page 117**

1      A. I believe the disciplinary decision for
2  that matter was appropriate.
3      Q. Was what?
4      A. Appropriate.
5      Q. Appropriate. Where's Adrian Gates now?
6      A. I don't know, sir.
7      Q. Did you know that he was hanging out with
8  felons from Miami where he's from?
9      A. I don't know anything about him hanging
10  out with felons from Miami.
11      Q. Is that okay for your officers?
12      A. To?
13      Q. Hang out with drug-dealing/gun-purveying
14  felons in our neighborhoods. Is that okay?
15      A. If that were true, that would be a matter
16  that would need to be investigated.
17      Q. Did this city have the right to believe
18  you would follow your own rules? Is that too much to
19  expect out of a police officer? What are we paying
20  you? 160 a year? What are we paying?
21      A. For? Paying who?
22      Q. You. As a police chief, what were we
23  paying?
24      A. I don't recall what my closing salary was.
25      Q. Over 200?

**Page 118**

1      A. No.
2      Q. All right. Well, let's make a number up.
3  180. You got a car?
4      A. Yes.
5      Q. What else did you get for benefits?
6  Health insurance?
7      A. Correct.
8      Q. What else? For you and your wife or just
9  you?
10      A. Family.
11      Q. Okay. We pay for that. Is that too much
12  to expect that one of the highest paid officials in
13  this city should follow their own rules when you're
14  dealing with a guy's career? Is that too much for us
15  to expect as a citizen?
16      Because you've admitted you broke them.
17  Unless you can somehow find, that nobody else has
18  been able to find, a letter of transmittal or Douglas
19  Factors. You admit you broke your own rules. Was
20  that too much for us to expect out of you?
21      MR. KACHMAR: Object to the form.
22      Q. (By Mr. Savage) Sir?
23      A. I'm sorry. What was too much?
24      Q. You break your own rules and get rid of
25  people. Were you ever sanctioned for that?

EXHIBIT 9

## 119

1    MR. KACHMAR:  Object to the form.
2    A.    Sanctioned for?  I'm sorry.
3    Q.    (By Mr. Savage)  Breaking your own rules.
4    A.    In terms of?
5    A.    Oh, God.  I can't help you.  You've
6  admitted that you didn't have -- if there's no letter
7  of transmittal and there's no letter of -- there's no
8  Douglas Factors, those rules -- those rules were
9  broken; right?
10   A.    I admitted that I don't recall seeing an
11 LOT or Douglas Factors.
12   Q.    Yeah.  Well, they better not appear now
13 because we've gone through this file.  We repeatedly
14 asked for them.  We've been told by the city
15 attorney's office that they don't exist.  They better
16 not show up now because they're going to be highly
17 suspect.
18         How do you throw a guy, try to throw them
19 in jail when you don't follow your own rules?
20 Because this is going to be like a bible.  My head
21 witness, Gary Vowell, who's former head of the State
22 Patrol -- he was appointed by Governor Kemp.
23         MR. KACHMAR:  Do you have a question?
24   Q.    (By Mr. Savage)  Do you think Meg Heap is
25 going to hang with you?  Who wants to be put on the
                    GILBERT & JONES

## 120

1  bench?  Are you that naive?  She's already thrown you
2  under the bus, according to you, saying you're the
3  person who kept the GBI out of the investigation.
4          MR. KACHMAR:  What's your question?
5          MR. SAVAGE:  I forgot.
6    Q.    (By Mr. Savage)  Tell me about this
7  citizens account -- review and -- of the CARES
8  committee.  Did they review the prosecution of Kang?
9    A.    What do you mean by "the prosecution"?
10   Q.    What do you think it was when he had to go
11 over there?  He was indicted.  Are you -- you don't
12 know he was indicted?
13   A.    Yeah, I do know.  I am aware he was
14 indicted.
15   Q.    Is CARES -- look at Exhibit 26.  Is that
16 in your policy that there's going to be a citizens
17 review committee?
18   A.    No.
19   Q.    Should you do things that aren't in your
20 policy or you just do whatever the hell you want
21 because I'm the chief?
22         What did CARES do in regard to Kang?
23   A.    I'm not sure if CARES did anything
24 regarding Kang.
25   Q.    You should have known more about who you
                    GILBERT & JONES

## 121

1  were doing it to and at least when we sued you, you
2  should have found out.  You knew we were coming in
3  here saying you didn't have Douglas Factors.  Tell me
4  everything -- write down everything on Exhibit --
5  what's the next number?
6          THE COURT REPORTER:  34.
7    Q.    (By Mr. Savage)  That you did on that
8  piece of paper -- I'll lend you -- no, you got a
9  pen -- that you did to check on whether or not very
10 serious allegations that were made against you that
11 you didn't have a sense of fairness and do Douglas
12 Factors, and that you also did not have a letter of
13 transmittal so that these men could understand.
14 Write down what you did after we filed the lawsuit to
15 find out whether that was true or not.
16         MR. KACHMAR:  Object to the form.
17   Q.    (By Mr. Savage)  You're still the chief
18 until July of 2022.
19         MR. KACHMAR:  Object to the form.  You
20         don't need to write down anything.  If he asks
21         you a question, you can answer his question.
22   Q.    (By Mr. Savage)  Let me borrow that piece
23 of paper.  You can keep the pad.  Just give me the
24 piece of paper.
25         MR. SAVAGE:  What's this exhibit?
                    GILBERT & JONES

## 122

1          THE COURT REPORTER:  34.
2          (Plaintiff's Exhibit 34 was marked for
3          identification.)
4    Q.    (By Mr. Savage)  I'll write it down.  I'm
5  not above writing it down.  What did you do to find
6  out the very serious allegation that you as the head
7  man in that police department failed to follow your
8  own rules, specifically in the fairness aspects of
9  Douglas where you look at the big picture, and in the
10 letter of transmittal where you tell a person, like
11 Charles Manson was told when he was indicted, what
12 you're the charges were against you by the police
13 department.
14         Tell me what you did after we laid those
15 out in the complaint to see whether we were right or
16 not, whether an LOT, letter of transmittal, or
17 Douglas Factors existed.
18         MR. KACHMAR:  Object to the form.
19         Multiple questions in there.
20   Q.    (By Mr. Savage)  That's it.  That's the
21 last question.  What did you do after we filed suit
22 to find out whether we were wrong or right.
23   A.    I don't recall when I was notified about
24 LOT and Douglas Factors.  But I also don't recall
25 during any point during the investigation or the
                    GILBERT & JONES

EXHIBIT 9

1  appeal process anyone bringing up that there were
2  Douglas Factors or LOTs missing from the file.
3       Q.    Well, do you think you created a fear
4  factor, which is one of the allegations against you?
5  And I'll be honest with you. I create that in my
6  office too much, and I'm trying to do better. I'm
7  trying to -- you know, confession is good for the
8  soul. And that's a bad thing.
9            Do you think that when you're going to put
10 two of your officers in jail, people are going to
11 come to you and say, listen, man, you're blowing your
12 own rules? Now, they've done it repeatedly in this
13 lawsuit.
14           The second ranking officer in this case, I
15 mean, in that department over there, Gavin has said
16 you broke the rules. You used the wrong things.
17 But, you know, I talked to Arango and Kang because
18 I'm proud of employing them. Proud of it.
19           And if I could find that officer who
20 misrepresented to his mother, who knew nothing about
21 this, and called his mother up and said I need to
22 talk to you about your son, he's having criminal
23 problems in Savannah, where he tried to shelter that
24 from his mother, I'd sue him.
25       MR. KACHMAR: Do you have a question?

GILBERT & JONES

1       Q.    (By Mr. Savage) What did you do to find
2  these Douglas Factors and the LOT? Okay. What did
3  you do?
4            I mean, I understand you're busy, and I'm
5  not faulting you for that. You were made the head of
6  the police department. It lasted four years or over.
7  Did you tell somebody else to go see whether there's
8  an LOT or Douglas Factors? Because they're coming
9  after me for it. I want to know who's right and
10 who's wrong.
11      A.    I don't recall when I was advised that
12 there were no LOT -- that there was not an LOT or
13 Douglas Factors completed.
14      Q.    Did you ever look for them while you were
15 still the police chief or say I don't recall anybody
16 ever bringing that to our attention, so I want to
17 make sure that these plaintiffs -- I mean, one of
18 them's under indictment. Hell, how could you -- I
19 trust Adrian Gates, but I don't trust the sons of
20 Cuban immigrants like Arango?
21      MR. KACHMAR: Object to the form. What's
22 your question?
23      Q.    (By Mr. Savage) Did you ever ask anybody
24 to check while you were still the police chief?
25      A.    I don't recall asking anybody to check.

GILBERT & JONES

1       Q.    So you did nothing. I'll draw a big zero
2  on 34.
3       MR. KACHMAR: Just let the record be clear
4  that whatever's on Exhibit 34 was done by
5  Mr. Savage.
6       MR. SAVAGE: Yeah.
7       Q.    Well, now, let me show you what I'm going
8  to mark as part of Arango's presentation to you. Did
9  you listen to what he was saying or was your mind
10 made up?
11      A.    Listen to who?
12      Q.    Arango when he had the -- what's this, the
13 mitigation hearing?
14      MR. ARANGO: It's the appeals.
15      MR. SAVAGE: Appeal.
16      MR. ARANGO: My Power Point.
17      Q.    (By Mr. Savage) You were at that thing
18 with Monahan; right?
19      A.    Correct.
20      Q.    Is there anything in policy No. 26 that
21 says the police chief, the accuser, should be at the
22 appeal process with the city manager? Because you
23 got in that. And we have transcripts of it. And
24 some of what you said was false in that. But we'll
25 get into that later.

GILBERT & JONES

1            Let me mark this as exhibit next number.
2  This is a presentation that you said nobody raised
3  the LOT with us. That's Arango's presentation that
4  was on slide. So it's presented to you.
5       MR. KACHMAR: Object to the form. Your
6  earlier questions were of Mr. Kang's
7  proceedings. What you appear to be presenting
8  now is related to Mr. Arango. And I would just
9  ask is this -- which appeal is this? Could you
10 clarify that? Was it the appeal to the city
11 manager or appeal to the chief of police?
12      MR. ARANGO: Appeal to the chief of
13 police.
14      MR. SAVAGE: Chief of police.
15      (Plaintiff's Exhibit 35 was marked for
16 identification.)
17      Q.    (By Mr. Savage) And it's the same one
18 that went to Monahan, this appeal termination. Does
19 it say in the middle of Exhibit -- what's the number?
20      THE COURT REPORTER: 35.
21      Q.    (By Mr. Savage) 35 that we weren't given
22 a letter of transmittal?
23      A.    It does.
24      Q.    And he played that. Arango.
25      A.    He what?

GILBERT & JONES

1    Q.    He played that.
2    A.    What do you mean by "played that"?
3    Q.    Didn't you play it?
4          MR. ARANGO:  I did.
5    Q.    (By Mr. Savage)  Do you remember him
6  playing a presentation, a Power Point?
7    A.    Oh, this Power Point.  You displayed the
8  Power Point.
9    Q.    Uh-huh.
10   A.    Okay.
11   Q.    Does it say on there while you were
12 sitting there that no LOT had ever been given to
13 Sergeant Arango?
14   A.    It does state that in this file.
15   Q.    You know, one of the ideas in this case
16 was to give them back their POST certification.  Who
17 the hell would want to be in police work where a
18 colonel in the United States Air Force that has
19 fought for his country was stabbed in the back by you
20 and your cohorts?  Who the hell would want to be a
21 police officer?
22         We're losing officers left and right.
23 Isn't that a problem in the City of Savannah?  Sir?
24 Isn't that a problem?
25   A.    It's a problem nationwide, sir.

GILBERT & JONES

128

1    Q.    Okay.  I mean, how many understaffed are
2  we?
3    A.    I don't know, sir.
4          MS. PAUL:  Can we take a brief break?
5          MR. SAVAGE:  Yes, sir.  Ma'am.
6          (Recess from 11:00 a.m. to 11:02 a.m.)
7    Q.    (By Mr. Savage)  Any other reasons for
8  getting rid of Kang and prosecuting him?
9          MR. KACHMAR:  Object to the form.
10   A.    I think those are the major factors as
11 part of the investigation.
12   Q.    (By Mr. Savage)  Okay.  If you come up
13 with any other ideas, would you tell Mr. Kachmar
14 because I don't want to just keep going and beating
15 you up and you beating me up.
16   A.    I'm not beating you up, Mr. Savage.
17   Q.    No, you are.  And I want you to talk to
18 him after we get done.
19         Let me just show you what's marked as
20 Exhibit 37, which I don't know who the hell sent it
21 to me, but it came from the police department as a
22 secret letter.
23         THE COURT REPORTER:  This will be 36.
24         (Plaintiff's Exhibit 36 was marked for
25 identification.)

GILBERT & JONES

129

1          MR. KACHMAR:  Again, we don't know, since
2  Exhibit 36 doesn't have Bates marks on it, we
3  don't know if this has been produced or it has
4  not been produced?
5          MR. SAVAGE:  I'm sorry.
6          MR. KACHMAR:  We don't know?
7          MR. SAVAGE:  Don't ask me.
8          MR. KACHMAR:  Well, the buck stops with
9  you, Mr. Savage.
10         MR. SAVAGE:  It does.  And if it hasn't,
11 it's my fault.  I'll own up to that.
12   Q.    (By Mr. Savage)  I don't like secret
13 letters, but this is one I got.  Come from the police
14 department for the outside address.  And basically
15 it's saying that there was a quid pro quo with
16 David Gay.  That he was going to become a major for
17 his help in this investigation of Kang and Arango.
18 That's what it says in street terms.  That you told
19 Gay, I owe you.  And I don't care who supposed to be
20 the next major, you're going to be it.  And that's
21 what I got.
22         MR. KACHMAR:  Is there a question there?
23   Q.    (By Mr. Savage)  Did he tell Gay for his
24 activities in getting Kang and Arango, both
25 internally and the police department and also in the

GILBERT & JONES

130

1  criminal prosecutions, that he owed Gay for that
2  behavior, and that he would become the next major
3  regardless of seniority?
4          MR. KACHMAR:  Object to the form.  And
5  also object to the extent you're
6  mischaracterizing what the exhibit says.
7          MR. SAVAGE:  Okay.
8          MR. KACHMAR:  Subject to those objections,
9  you can answer the question.
10         MR. SAVAGE:  That's my take on it.
11   A.    Answer is no, I never had that type of
12 conversation with David Gay.
13   Q.    (By Mr. Savage)  I just wanted to give you
14 a chance to respond to it because he wouldn't talk
15 about anything in his deposition.
16         MS. PAUL:  I object to --
17         MR. SAVAGE:  Not much.
18         MS. PAUL:  -- that, the form of that
19 question.
20   Q.    (By Mr. Savage)  Tanisha Thompson, does
21 that look like her handwriting?
22   A.    This?
23   Q.    Yes, sir.
24   A.    I don't know if I've ever seen her
25 handwriting.

GILBERT & JONES

1    Q.    Who is she?

2    A.    I think she worked in the intelligence

3 unit.

4    Q.    Monahan says he talked to you about the

5 complaint of the 75 officers, six captains.  How many

6 lieutenants?

7        MR. ARANGO:  I think we have on one of

8 the -- I don't know the exact number.

9        MR. SAVAGE:  Okay.

10       MR. ARANGO:  I think it's on one of the

11 papers.  SORRY.

12       MR. SAVAGE:  All right.

13    Q.   (By Mr. Savage)  And that he talked to you

14 about it.  Did he do anything other than that in

15 regard to the complaint by 75 police officers in our

16 community, six captains?  I mean, how many captains

17 were there at that point approximately?

18       MR. KACHMAR:  Object to the form.  What's

19 your question?

20       MR. SAVAGE:  No.  He's answering my

21 question.  I'll tell you when you need to talk.

22       MR. KACHMAR:  Okay.  You were asking about

23 who signed the complaint and how many captains

24 signed it.  So are you asking him that?

25       MR. SAVAGE:  No.  I'm asking him how many

---

1 captains there were.  Do I have 6 out of 20?

2       MR. KACHMAR:  At what time?

3       MR. SAVAGE:  7 out of 10?  Round number.

4 A range.

5       MR. KACHMAR:  What period of time?

6       MR. SAVAGE:  At the time that this 75

7 police officers thing was signed.

8    A.    I don't recall exactly how many positions

9 there were there.  I think the department is allotted

10 10 captain positions.

11    Q.   (By Mr. Savage)  Okay.  So would it be

12 fair to say that over half the captains in your

13 department signed a very serious HR complaint against

14 you?

15    A.    If they signed it.

16    Q.    Okay.  I mean, what's Moynahan (sic)

17 doing?  I mean, you had a right to respond to this

18 stuff.  Did he go through the allegations against

19 you?  Moynahan (sic)?

20    A.    We met and discussed the document.

21    Q.    How long?

22    A.    How long what?

23    Q.    Was the discussion?

24    A.    I don't remember.

25    Q.    Did he give you a copy of it?

---

1    A.    The actual initial document?

2    Q.    Yeah.

3    A.    No.

4    Q.    Now, do you stay in touch with Ms. Price?

5    A.    I do not.

6    Q.    Okay.  Do you understand why she was

7 terminated by the city of Bluffton?

8    A.    I do not.

9    Q.    Do you know if it had anything to do with

10 her lying to city council about certain residences?

11    A.    I do not.

12    Q.    Was she second in command when you got

13 Kang and Arango?

14    A.    What do you mean by "got Kang and Arango"?

15    Q.    Well, what do you think you did?

16    A.    You mean during their investigation?

17    Q.    Well, you fired them without giving them

18 an LOI -- LOT and Douglas Factors.  And you sent, or

19 your department sent, I think, that Wright -- who

20 knows what he'll say? -- he'll say you hand-delivered

21 what is, we concede, you and I, false information

22 about a 404(b).

23       MR. KACHMAR:  Object to the form.

24    Q.   (By Mr. Savage)  That saying that Kang,

25 who you want to indict, turned his camera off.  I

---

1 mean, that, you know, we get it.  If some cop turns

2 his camera off, he's going to do bad things.  He

3 doesn't want it recorded.

4       And that's what your department told about

5 Kang in regard to the Pernell Drayton thing, and it's

6 false.  We can agree on that much that it's false, is

7 it not?

8       MR. KACHMAR:  Object to the form.

9    Q.   (By Mr. Savage)  Sir?

10    A.    I don't know.  I haven't seen the whole

11 video yet, sir.

12    Q.    Okay.  Well, if you see any part that shows

13 that Kang turned off his camera as is alleged by

14 omission, because you there, in what's passed to the

15 district attorney, only list two other officers  as

16 having had their cameras on.

17       COVID-19, when did you issue protection to

18 these guys?

19    A.    I don't recall it:  That's over two years

20 ago.  I don't remember when.

21    Q.    Who would know that?  Who's the best

22 person?  Toth went out there after -- I mean, he was

23 hot.  Made them sign for their N-95, one N-95 mask

24 for these guys.  I mean, you had protection, PPE

25 protection, did you not?

EXHIBIT 9

1    A.    As much as the department had.

2    Q.    Okay.  And he said here, "I've been

3 directed to get you to sign for this stuff."  How

4 long does an N-95 mask last?

5    A.    I don't know if I'm qualified to answer

6 that.

7    Q.    Eight hours.  I'll give it to you.  So you

8 want him to go out and deal with Khalil Kelly.  Do

9 you know who Khalil Kelly's record, what they were

10 out there to serve a warrant for?

11    A.    It's my understanding it was domestic

12 related.

13    Q.    You don't seem to have much detail on any

14 women-beating charges.  When he's -- he -- his

15 daughter's going to be beaten, a 16-year-old girl.

16 You're kind of foggy on that is my impression.

17         Do you think that that was right to have

18 no mask?  They had no masks when they went out there

19 to deal with Kelly and/or Faitele, did they?

20    A.    I'm not sure what PPE equipment they had

21 at that time.

22    Q.    Well, they didn't have it.  That's what

23 we'll prove.  And they got spit on.  How many times

24 did Faitele call them "mother fuckers"?

25    A.    I don't know if that term was used by him.

1    Q.    Hmm.  I mean, it seems like you have a

2 selective memory.  I mean, you can count them when

3 Kang says it, but Mr. Faitele -- which I resent him

4 being called that.  That's a status term.  I don't

5 care black, white.  I don't accuse -- I don't think

6 criminals that beat him are Mr. anything.

7         MR. KACHMAR:  Do you have a question?

8         MR. SAVAGE:  Yeah.

9    Q.    (By Mr. Savage)  Do you know anything more

10 about why Kang was prosecuted or why he was dismissed

11 other than what you've been good enough to tell me?

12    A.    I provided you with all the facts that I

13 have at this time.

14    Q.    Well, if you get new facts, tell

15 Mr. Kachmar because I need to know.  I wish you well.

16 I'm not a hater, but I feel very bad about what

17 happened to these people and it shouldn't have

18 happened.  And you were in charge.  Take care of

19 yourself.

20         THE WITNESS:  Thank you, Mr. Savage.

21         MR. SAVAGE:  Okay.

22         MR. KACHMAR:  Done?

23         MR. SAVAGE:  Yeah, I'm done.

24         MR. KACHMAR:  Do we need a break?

25         MR. SAVAGE:  How many questions you got?

1         MR. KACHMAR:  We'll see.  Hopefully not a

2 lot.

3         MR. SAVAGE:  Here's the rule.  If he's

4 asking questions, I did okay.  I mean, I'm just

5 telling you the way it is.  You can tell me

6 about police work.  If he's asking questions,

7 he's clarifying stuff that he doesn't like you

8 said.  Go ahead.

9         MR. KACHMAR:  Anybody need a break?

10         MR. SAVAGE:  No.

11         MR. KACHMAR:  All right.

12         MR. SAVAGE:  Is it raining?

13         MR. KACHMAR:  It doesn't look like it.  I

14 can lend you an umbrella.

15         MR. SAVAGE:  Felix is going to be here.  I

16 got to go take a guy's deposition, who Adams &

17 Ellis said my guy was a great kid, was

18 contributorily negligent when he was hit at 124

19 miles an hour by a guy going 124 miles an hour

20 .31 drunk.  So we were contributorily negligent.

21 That's what gets you 66 and a half million

22 dollar verdicts.

23         But that was their wisdom.  They shouldn't

24 have fired me and I would have been there to

25 tell the people that came after me you don't do

1 that kind of stuff.  But, you know, they didn't

2 want me.  So I'm good with it.  Take care of

3 yourself.

4         THE WITNESS:  Thank you, Mr. Savage.

5         MR. SAVAGE:  Talk to him when you're done.

6         THE WITNESS:  Will do.

7         MR. KACHMAR:  Let's take a minute.

8         (Recess from 11:14 a.m. to 11:29 a.m.)

9         MR. KACHMAR:  Still under the examination

10 of the plaintiff, but now new counsel.

11         (Plaintiff's Exhibits 16 through 23 was

12 marked for identification.)

13              EXAMINATION

14 BY MR. KLOC:

15    Q.    All right.  I'm going to hand you what is

16 marked as Plaintiff's Exhibit 16 through Plaintiff's

17 Exhibit 23.  And I'd like you to look over these and

18 just let me know if you're familiar with them and

19 describe for me generally what each exhibit is.

20    A.    I believe these are all copies of slides

21 from Kang's Power Point presentation that he

22 presented during his mitigation hearing.

23    Q.    And did you see those slides when they

24 were presented at that hearing?

25    A.    I do recall seeing these slides.

1    Q.    Okay.  And what is contained on those
2  slides?
3    A.    Slide 17 talks about previous work
4  history/performance.  I'm sorry.  That was slide 16.
5    Q.    A.    Slide 17, it's like a medal of valor
6    A.    Slide 17, it's like a medal of valor
7  certificate.
8        Slide 18, a medal of distinction
9  certificate.
10        Slide 19, a unit teamwork citation
11  certificate.
12        Slide 20, a unit teamwork citation
13  certificate.
14        And slide 21, a unit teamwork citation
15  certificate.
16    Q.    Okay.  And those were certificates
17  issued by --
18    A.    Wait a minute.  I got a couple more.
19    Q.    Oh, sorry.
20    A.    Slide 22, medal of valor certificate.
21        Slide 23, it looks like photo from a
22  community event.  And then another photo, it looks
23  like Centrus or Certus, C-e-r-t-u-s, Bank lobby.
24    Q.    Okay.  And in regards to the certificates
25  that you ran through, what was the issuing body for

1  those certificates?  In other words, what department
2  issued those to Mr. Kang?
3    A.    Slide 17, Savannah Police Department.
4        Slide 18, Savannah-Chatham Metropolitan
5  Police Department.
6        Slide 19, Savannah-Chatham Metropolitan
7  department.
8        Slide 20, Savannah-Chatham Metropolitan
9  Police Department.
10        Slide 21, Savannah-Chatham Metropolitan
11  Police Department.
12        Slide 22, Savannah-Chatham Metropolitan
13  Police Department.
14        And slide 23 is captioned Savannah Police
15  Department.
16    MR. KLOC:  Thank you.  I think those are
17  all the questions I have for you.  Thank you.
18    THE WITNESS:  You're welcome.
19        EXAMINATION
20  BY MR. KACHMAR:
21    Q.    Mr. Minter, I have a few questions for
22  you.  First, I'm going to hand you -- what's the next
23  exhibit number?
24    THE COURT REPORTER:  Are you going in
25  order?

1    MR. KACHMAR:  Yes.
2    THE COURT REPORTER:  It will be No. 37.
3    (Defendant's Exhibit 37 was marked for
4  identification.)
5    Q.    (By Mr. Kachmar)  I'm going to hand you
6  what's been marked for identification as Exhibit 37.
7  For the record, it's labeled Kang 1282 through 1298.
8  I'm going to hand it to opposing counsel to look at
9  first.
10        Have you looked at the exhibit, sir?
11    A.    Yes, I have.
12    Q.    Okay.  On the first page, what's it dated?
13    A.    It looks like July 30th, 2020.
14    Q.    Okay.  And do you recall what occurred
15  that day in relation to Mr. Kang's appeal of his
16  termination?
17    A.    I believe, if memory serves me correct,
18  this was the date of his termination appeal with the
19  city manager.
20    Q.    Okay.  And what is Exhibit 37?
21    A.    It looks like copies of Power Point
22  slides.
23    Q.    Okay.  So the previous exhibit that
24  counsel asked you about, Plaintiff's Exhibit 16,
25  those were Power Point slides from Officer Kang's

1  appeal hearing with you, to the best of your
2  recollection; is that correct?
3    A.    I believe to the best of my recollection.
4    Q.    And is Plaintiff's Exhibit 16 through 23,
5  do you recall whether those were the entirety of the
6  Power Point slides presented to you or were they part
7  of a larger presentation?
8    A.    I don't recall.
9    Q.    Okay.  If you could look at -- so just for
10  clarity, Officer Kang presented a Power Point during
11  the mitigation hearing with you and then during the
12  appeal to the city manager where you were present?
13    A.    Correct.
14    Q.    Okay.  Could you look at Exhibit 37, the
15  document labeled Kang 1283, the bottom right.
16    A.    Uh-huh.
17    Q.    And what is listed on slide 1283?
18    A.    It's titled Responsibility, and there are
19  three points.  The first one is ADM-004 - Conduct
20  Unbecoming; ADM-004 - Treatment of Others; and
21  ADMN-007, Reporting A Police Response to
22  Aggression/Resistance/Force.
23    Q.    Okay.  Then could you turn to the document
24  labeled Kang 1286.  And what is listed on that slide?
25    A.    It's titled Disciplinary Review Board

**143**

1 Finding. It says June 10. "Corporal Daniel Kang
2 stood accused of the following policies: SPD GO#
3 ADM-004, Conduct Unbecoming; SPD GO# ADM-004,
4 Treatment of Others; SPD GO# ADM-007, Reporting A
5 Police Response to Aggregation/Resistance/Force."
6     Q.    Okay. So this was a Power Point prepared
7 and presented by Officer Kang; is that accurate?
8     A.    I believe so.
9     Q.    Okay.
10         MR. KLOC: I'm sorry. Could we just get
11     some clarification. What hearing was this
12     presented at? Was it a mitigation hearing or
13     was it an appeal? Are those two different
14     things? The mitigation --
15         MR. KACHMAR: He's already testified that
16     Exhibit 37, his recollection, is Officer Kang
17     presented it at the appeal to the city manager.
18         MR. KLOC: Okay. Thank you.
19     Q.    (By Mr. Kachmar) Okay. So the document
20 that or the Power Point that Officer Kang drafted and
21 where he listed specific SPD policies that he was
22 accused of violating, it's clear, isn't it, that he
23 was aware of what he was accused of doing that led to
24 his termination?
25         MR. KLOC: Objection to the form.
           GILBERT & JONES

**144**

1     Q.    (By Mr. Kachmar) You can answer.
2     A.    Correct.
3     Q.    Okay. At any time during your
4 interactions with Officer Kang, either in mitigation
5 hearing or in his appeal to you, did he ever say to
6 you I don't know what I'm being accused of doing?
7     A.    No.
8     Q.    Or words to similar effect?
9     A.    No.
10     Q.    Okay. You were asked some questions
11 earlier about Douglas Factors. And could you
12 describe what Douglas Factors are and how they're
13 utilized?
14     A.    Usually they are listings of some
15 mitigating factors that are to be considered as part
16 of the investigation.
17     Q.    Were mitigating factors considered as part
18 of your decisionmaking process related to
19 Officer Kang?
20     A.    Yes.
21     Q.    Okay. Tell me how those factors were
22 considered, how you considered those factors.
23     A.    I looked at the mitigating factors in
24 terms of disciplinary history, awards, commendations,
25 and any other factors that would present information
           GILBERT & JONES

**145**

1 that the person wanted me to make sure that I was
2 aware of as far as work performance, job history,
3 accomplishments that they also wanted to be
4 considered as part of the investigative review
5 process.
6     Q.    And did Officer Kang, in fact, present
7 whatever factors he wanted you to consider during the
8 mitigation hearing with you?
9         MR. KLOC: Objection to the form.
10         MR. KACHMAR: What's the objection? I'm
11     asking if Officer Kang --
12         MR. KLOC: I'm sorry. I misunderstood
13     your question. Yeah.
14     Q.    (By Mr. Kachmar) Did Officer Kang, in
15 fact, present factors to you that he thought should
16 be considered as part of your decisionmaking process?
17     A.    Yes.
18     Q.    Including the Power Point that was
19 presented to you; correct?
20     A.    Correct.
21     Q.    Okay. And at least in Exhibit 37, are
22 there -- does Officer Kang list mitigating factors in
23 Exhibit 37?
24     A.    Yes.
25     Q.    Let me step back for a minute. As chief
           GILBERT & JONES

**146**

1 of police, were you the highest authority over the
2 Savannah Police Department?
3     A.    Yes.
4     Q.    And who did you report to?
5     A.    The city manager.
6     Q.    Did you have the discretion to make
7 personnel decisions related to individuals within the
8 police department?
9     A.    Yes, I did.
10     Q.    Okay. To your knowledge, was there an
11 appellate process for decisions you made?
12     A.    Yes.
13     Q.    And what's your understanding of that
14 process?
15     A.    That those decisions could be appealed
16 directly to the city manager.
17     Q.    I'm going to refer you to Exhibits 26 and
18 27. This is the OPS 016 that you were asked about
19 previously. Exhibit 27 has an effective date of
20 9/24/04 and then a revised date of 8/29/18; is that
21 correct?
22     A.    Correct.
23     Q.    Exhibit 26 lists the same effective date.
24 Also lists the revised date of 8/29/18; correct?
25     A.    Correct.
           GILBERT & JONES

1    Q.    And then under it, there's another date in
2    red.  What date is that?
3    A.    October 30th, 2019.
4    Q.    Okay.  As part of your job duties as chief
5    of police, were you responsible for drafting and
6    implementing policies?
7    A.    Yes.
8    Q.    Did you have the discretion to change
9    policies if you thought it was in the best interests
10   of the department?
11   A.    Yes.
12   Q.    Okay.  In looking at Exhibit 26, there are
13   certain sections of the policy that are in red and
14   struck through.  Do you see that?
15   A.    Yes.
16   Q.    Okay.  What role, if any, did you have in
17   making the edits that we see in Exhibit 26?
18   A.    This was done during the review to look at
19   things that may have been typos, mistakes, or things
20   that needed to be revised in the policy.
21   Q.    Okay.  So some of the revisions were
22   nonsubstantive, just to clarify a spelling error or
23   something like that?
24   A.    Correct.
25   Q.    Were there also substantive changes in

1    Exhibit 26?
2    A.    Yes.
3    Q.    Okay.  And whose idea was it to put the
4    substantive changes into the policy?
5    A.    It was mine.
6    Q.    Okay.  Can you describe what your thought
7    process was for reviewing the policy and then making
8    these proposed -- making these changes?
9    A.    Yeah.  Reviewing the policy, one of the
10   things that I wanted to do was make sure that
11   officers had as much due process as possible during
12   disciplinary process.
13         So one of the things we looked at was
14   there were things that were talked about over the
15   years but were never really codified in policy.
16   Officers had talked about the fact that there was
17   really no mechanism for them to actually talk about
18   mitigating factors that were involved in
19   investigations.  Actually have an actual review
20   process or meet with the actual board, the
21   disciplinary review board, as part of the process.
22         So those are some of the things that I
23   wanted to look at codifying and actually putting in
24   writing so that there was more clarity for the
25   officers in terms of what the disciplinary process or

1    what the investigative process involved.
2    Q.    And did you work with anyone on the edits
3    to this policy or did you do them yourself?
4    A.    I worked with the manager who was in
5    charge of the accreditation unit, Robert Edenfield.
6    E-d-e-n-f-i-e-l-d, I believe.
7    Q.    And is that normal course for any policy
8    review and revision that you would work with the
9    person in charge of that unit?
10   A.    It is because Savannah Police Department
11   was working under CLIA, which is the Commission For
12   Law Enforcement Accreditation, working under CLIA
13   policies.  So Edenfield's, part of his
14   responsibilities were to make sure that any policy
15   revisions fit in with CLIA standards.
16   Q.    Okay.  So at some point you get the
17   revised policy to a final form which you're happy
18   with; correct?
19   A.    Correct.
20   Q.    What did you do next?
21   A.    Sent it to Edenfield for review and for
22   publication to be entered into the system.
23   Q.    Okay.  And is that normal course for any
24   policy revision?
25   A.    Yes.

1    Q.    What does "enter into the system" mean?
2    A.    There is a system that I believe is still
3    used.  It's called Power DMS.  And it goes into Power
4    DMS for distribution to members of the department.
5    Q.    And how does that distribution occur?
6    A.    Officers, I believe, are supposed to sign
7    into the system and review and see if there is any
8    information in there that needs to be reviewed.
9    Q.    After you sent it to Mr. Edenfield, did
10   you follow up with him at any point or with anyone
11   else in that department to see if the policy had been
12   entered and, if so, when?
13   A.    No.  I assumed he would have taken care of
14   everything that needed to be taken care of and
15   addressed.  So I assumed he would make sure that that
16   was taken care of.
17   Q.    Do you recall the time frame when you
18   finalized the revisions to this policy and sent them
19   to the department to be entered into the system?
20   A.    I don't recall.
21   Q.    Was it prior to or after Mr. Kang's
22   termination?
23   A.    It was prior to.
24   Q.    Prior to.  You were asked several
25   questions about the investigation into the

EXHIBIT 9

151

1  circumstances that ultimately led to Officer Kang's
2  termination.  Particularly you were asked about the
3  internal affairs, the AI (sic) investigation.  My
4  question is when a complaint comes into the
5  department about an officer, which organization
6  within the Savannah Police Department would handle
7  that complaint?
8      A.     It depends.  Complaints are somewhat
9  divided into two categories:  Service complaint and
10 administrative investigations.  A service complaint
11 could be something like, you know, somebody missing
12 court.  An administrative complaint would be
13 something more of something that somebody would be
14 requesting internal affairs to look at, look into.
15     Q.     When the complaints came in about the
16 Faitele incident and Officer Kang, in particular, did
17 you personally direct what part of the Savannah
18 Police Department should investigate those
19 complaints?
20     A.     For this particular situation, that one
21 was sent to internal affairs.
22     Q.     Okay.  And who would make the decision
23 about who to assign the investigation?
24     A.     That would be the supervisor for the
25 internal affairs unit.

GILBERT & JONES

152

1      Q.     Okay.  And who was that at the time?
2      A.     I believe that was Captain -- well, I
3  believe that may have been Lieutenant Barefield at
4  the time.  B-a-r-e-f-i-e-l-d.
5      Q.     But as we sit here today, you're not a
6  hundred percent sure?
7      A.     I'm not a hundred percent sure.
8      Q.     Did you direct at any time who should
9  investigate the allegations related to Officer Kang
10 in the Faitele incident?
11     A.     No, sir.
12     Q.     Similarly, with the Gates incidents that
13 you were asked about earlier or any other complaint
14 about an officer, do you specifically direct who
15 should conduct the internal investigations?
16     A.     No, sir.
17     Q.     Those assignments are done by the head of
18 that department; correct?
19     A.     Correct.
20     Q.     And just for clarity, Exhibits 26 and 27,
21 can you tell me generally what they are?
22            26 and 27 are Office of Professional
23 Standards policies that basically talk about the
24 investigative complaint process and the disciplinary
25 process.

GILBERT & JONES

153

1      Q.     Okay.  And who do they primarily apply to?
2      A.     Members of the Savannah Police Department.
3      Q.     Okay.  But these are guidelines for
4  internal affairs to follow, and then for HR to follow
5  in terms of discipline in handling the complaints
6  against an officer; is that accurate?
7      A.     That would be accurate.
8      Q.     Is there anything in here that defines
9  what Officer Kang personally should or should not do?
10     A.     In terms of?
11     Q.     Anything.  Mr. Savage asked you questions
12 before about the policy and how is Officer Kang
13 supposed to know what to do.  Is there anything in
14 these policies that require Officer Kang to do or not
15 do anything?  Do these apply to his conduct?
16     A.     No.
17     Q.     Or does it apply to the departmental
18 process for investigating his conduct, I guess is
19 what I'm asking?
20     A.     It applies to the departmental process of
21 investigating conduct.
22     Q.     Okay.  From a review of the depositions of
23 other witnesses and of the record, it appears that
24 the process with Officer Kang was there was a
25 complaint.  There was an internal affairs

GILBERT & JONES

154

1  investigation.  There was a disciplinary review panel
2  assessment and a recommendation to you as the chief.
3            There was then a mitigation hearing.
4  There was a decision by you.  There was an appeal to
5  you.  And then there was an appeal to the city
6  manager.
7            Is that your -- is that an accurate
8  recitation of the chain of events?
9      A.     That's the way I remember it for this
10 investigation.
11     Q.     Okay.  So during the IA investigation and
12 the disciplinary review panel process, were you
13 involved in either one of those?
14     A.     In the IA investigation?
15     Q.     Yes.
16     A.     No.
17     Q.     And what about the disciplinary review
18 panel review of the IA investigation in consideration
19 of the charges?
20     A.     No, I did not participate in the
21 disciplinary review panel process.
22     Q.     Okay.  So the first time you were involved
23 with the discipline decisions related to Officer Kang
24 was when the mitigation hearing happened?
25     A.     Correct.

GILBERT & JONES

**155**

1    Q.    And how did you get information sent to
2  you related so that you could conduct the mitigation
3  hearing?
4    A.    What do you mean by "information"?
5    Q.    Well, did someone send to you the
6  disciplinary review panel recommendation?  Did
7  anybody schedule it?  Or did you handle all of it
8  yourself?  Who did the administrative work to set up
9  the hearing, get the relevant documents, identify
10  witnesses, etcetera?
11    A.    Yeah.  After the disciplinary review panel
12  hearing is conducted, I received a memorandum from
13  the assistant chief with the findings of the panel.
14          And then there is information that's
15  communicated regarding the next step to the person,
16  and they are offered the opportunity to have a
17  mitigation hearing.
18    Q.    And Officer Kang selected or chose to have
19  a mitigation hearing?
20    A.    That's my understanding.
21    Q.    Okay.  Do you recall who was at the
22  mitigation hearing?
23    A.    It was myself.  It was Assistant Chief
24  Lenny Gunther.  I don't recall whether there was a
25  major there or not.  I believe Captain Gay was also

**156**

1  there.  And I believe Lieutenant Barefield was there.
2    Q.    And Officer Kang?
3    A.    And Officer Kang.
4    Q.    Okay.  And during this mitigation hearing,
5  Officer Kang presented a Power Point?
6    A.    Correct.
7    Q.    Was there -- did you ask questions of
8  Officer Kang?
9    A.    Yes, I did.
10    Q.    Okay.  Was Officer Kang given the
11  opportunity to basically say whatever he wanted to
12  the group?
13    A.    Yes, he was.
14    Q.    So then after the mitigation hearing, you
15  then made a decision about discipline; correct?
16    A.    Correct.
17    Q.    Okay.  In making the decision, what did
18  you consider before making your consideration?
19    A.    I consider all the facts and findings of
20  the investigation.  I looked at disciplinary history.
21  I considered awards, commendations.  There was a
22  psychological exam, I think, that was done, a
23  fitness-for-duty exam.  And I also looked at his
24  training record.  And then I also contacted his
25  supervisor at CNT to see if there was any information

**157**

1  that was in his file also.
2    Q.    Did you review any of the body camera
3  footage?
4    A.    I did.
5    Q.    And then you made a decision to terminate.
6  The next step was an appeal to you; correct?
7    A.    Correct.
8    Q.    And then did you participate or were you
9  present at the appeal to the city manager?
10    A.    I was.
11    Q.    Do you recall if you were asked questions
12  or if you said anything during the appeal to the city
13  manager?
14    A.    I don't remember being asked any
15  questions.  I may have made a statement, opening
16  statement.
17    Q.    At any time prior to your making the
18  decision to terminate Officer Kang's employment, were
19  you aware that he had signed the group complaint
20  submitted to HR or that he had submitted an
21  individual complaint?
22    A.    I was not.
23    Q.    Okay.  Let's talk about the group
24  complaint.  There was some testimony about it before.
25  I think you said earlier that you spoke with the city

**158**

1  manager about the group complaint; correct?
2    A.    Correct.
3    Q.    Do you recall speaking with anyone else in
4  the city about the group complaint or its substance?
5    A.    No one other than the HR director.
6    Q.    Who was that?
7    A.    Jeff Grant.
8    Q.    Okay.  Were you interviewed by anybody in
9  relation to the group complaint?
10    A.    I remember having a conversation with
11  Susan Cox.
12    Q.    Who was she?
13    A.    She was the attorney that was hired by the
14  city to actually look or actually review the
15  document.
16    Q.    Okay.  When you spoke with the city
17  manager, Jeff Grant, the HR director, or the outside
18  attorney, Susan Cox, did any of them ever give you a
19  copy of the group complaint?
20    A.    No.
21    Q.    Did any of them ever give you a copy of
22  the individual complaint Officer Kang submitted?
23    A.    No.
24    Q.    Did anyone ever -- did any of the three of
25  them ever tell you the names of any of the people who

EXHIBIT 9

1  had signed the group complaint?
2      A.    No.
3      Q.    In the record, there's a memorandum from
4  Susan Cox to the city related to her investigation of
5  the complaint.  Do you recall whether you were ever
6  given a copy of that memorandum?
7      A.    From Susan Cox?
8      Q.    Or anyone else.
9      A.    I did -- I do remember receiving a
10  document from Susan Cox.
11      Q.    Okay.  And at some point in the record,
12  you drafted a document related to some of the
13  allegations in the complaint and Susan Cox's document
14  and sent it back to the city; is that correct?
15      A.    Correct.
16      Q.    Can you describe kind of that process.
17  Was there anything more to it or is it just as I
18  described it?
19      A.    Just as you described it.
20      Q.    Okay.  And your response was sent to the
21  city manager and the HR manager?
22      A.    Yes.
23      Q.    What happened next?
24      A.    At some point I had a meeting with the
25  city manager and the HR manager.

1      Q.    And that's where you discussed some of the
2  allegations of the group complaint?
3      A.    Correct.
4      Q.    Was there a discussion about whether and
5  how some of those would be addressed with the
6  department moving forward?
7      A.    Yes.
8      Q.    And after that meeting, are you aware of
9  what, if anything, the city manager did in response
10  to the group complaint?
11      A.    I believe he drafted an email that was
12  sent out in response to the group complaint.
13      Q.    And, did you, in fact, implement some of
14  the agreed-upon initiatives that you and the city
15  manager and the HR manager agreed to?
16      A.    I did.
17      Q.    I'm going to refer you to Plaintiff's
18  Exhibit 29.  Take a look and just refresh your memory
19  of what that exhibit is.
20      A.    This is an OPS memo from Captain Gay.
21  Office of Professional Standards memo from
22  Captain Gay.
23      Q.    And what's the date of that memo?
24      A.    June 22nd, 2021.
25      Q.    Okay.  As far as you know, did this

1  document exist at the time you made the decision to
2  terminate Officer Kang's employment?
3      A.    No, sir.
4      Q.    Okay.  Mr. Savage asked you questions
5  about whether you put together documents or evidence
6  and walked them over or delivered them yourself to
7  the district attorney's office.  Do you remember
8  those questions?
9      A.    I do.
10      Q.    At any time related to Officer Kang, did
11  you put together copies or documents or evidence and
12  personally deliver them to the district attorney's
13  office?
14      A.    No, I don't recall doing that.
15      Q.    Okay.  You were asked some questions about
16  PPE during COVID.  Could you describe what, if any,
17  PPE was available to the department, and then what
18  efforts you made to get PPE in the first half of 2020
19  when COVID was starting to hit?
20      A.    Well, of course, I think you know that it
21  was a nationwide concern.  There was a shortage of
22  PPE not only nationwide but internationally.  It was
23  very hard to come by.  And a lot of the PPE that was
24  available was going to medical facilities first.
25          As we were able to obtain any PPE that was

1  available, that was collected and distributed out to
2  department members.
3      Q.    There was an allegation made in other
4  depositions in this case that a local donor donated
5  PPE to a precinct, and that you specifically directed
6  them that they couldn't use the PPE.  Do you remember
7  anything like that?
8      A.    I don't remember directing anybody that
9  they could not use the PPE.  I believe that was
10  something that was brought to my attention by
11  Assistant Chief Price.  And I believe my response to
12  her in a discussion we had was that if PPE was being
13  donated, it should be donated to the department so
14  that we can assess and prioritize the needs of the
15  department.
16      Q.    You were asked a lot of questions about
17  Officer Gates, and I'm a little confused about the
18  testimony.  I think there was testimony that there
19  were multiple investigations.  So I want to ask you
20  some clarifying questions.
21          At some point there were charges against
22  Officer Gates where ultimately you made the decision
23  to terminate his employment; correct?
24      A.    Correct.
25      Q.    Were there charges against Officer Gates

prior to that charge, prior to the charge that led to
his termination?

A.    Yes.

Q.    Okay.  And I think Mr. Savage asked you
some questions about why -- I think you said he got
40 hours suspension and maybe some other discipline.
Do you recall those questions?

A.    I do.

Q.    So the question, which I don't think you
ever got to answer, was in that particular charge,
why did you decide for discipline short of
termination?

A.    Well, after the mitigation hearing with
Gates, there were several things that were brought up
that were further discussed by myself, a couple
members of the disciplinary review board.  I don't
remember all the things that were brought up.  I do
remember conversations about notification to the
supervisors regarding his activity and individuals
that he did and did not have contact with.

After following up and meeting with the
lieutenant in charge of the gang unit, following up
with the investigator who completed the report, I
then had a meeting with the assistant chief.  We
discussed the investigation, the disciplinary review

---

panel meeting, Gates's mitigation hearing.

And after our discussion, we decided,
which was ultimately my decision, that a 40-hour
suspension, removal from the gang unit and a transfer
to patrol was the appropriate decision for that
matter.

Q.    And it was based on information raised
during the mitigation hearing which caused you to
question the completeness of the investigation, or
explain that further.  I'm not clear on that.

A.    Well, there were some things that needed
some clarity.

Q.    Okay.

A.    And after looking into it, and balancing
out the information, it was decided that -- because I
realized that termination is, of course, difficult
for any member of the department.

So the assistant chief and I sat down and
had a discussion about whether or not we felt
termination was appropriate for that matter, and we
made the decision to move forward with the
suspension.

Q.    Do you recall how the complaints about
Officer Kang's conduct during the Faitele incident
first came to your attention?

---

A.    I believe it came to my attention after
there was a discussion with, I think, a couple
members of the training unit.  I think someone may
have contacted the assistant chief about the matter,
and the assistant chief contacted me.  And I
scheduled time to review the video with the assistant
chief and the internal affairs lieutenant.

Q.    But the complaints came from within
officers in the department or from outside?

A.    Well, there was a complaint came -- there
was a formal complaint that was filed from outside
the department by, I believe, Faitele's mother, I
believe it may have been.

Q.    There's some email traffic in the record
where officers within the department raised concerns
about the footage.  Do you recall ever seeing that?

A.    I do.  I recall a concern being raised by
the lieutenant within the training unit.

Q.    So that's what you were referring, to the
training unit?

A.    Yes.

Q.    And so ultimately, the complaints come in
from two places.  They go to IA for investigation;
correct?

A.    Correct.

---

MR. KACHMAR:  Okay.  Chief Minter, I don't
have any further questions for you at this
point.  Counsel for the city may have.

MS. PAUL:  I don't.

MR. KACHMAR:  Counsel for the city does
not.  Counsel for Officer Kang may have some
additional questions.

MR. KLOC:  Just a few.  Hopefully it won't
take too long.

                    EXAMINATION

BY MR. KLOC:

Q.    I'm going to be referring to Exhibits 26
and 27 kind of that you reviewed recently.  Those
two.

A.    Okay.

Q.    In those two, you mentioned that you are
the one who was partly responsible for drafting the
substantive changes that appear in Exhibit 26?

A.    Correct.

Q.    And you said you wanted to ensure that
officers get a certain level of due process; correct?

A.    Correct.

Q.    And would that due process include LOTs
and enumeration of the Douglas Factors and those
factors being considered?

---

**167**

1    A.    Correct.

2    Q.    Were those done for Daniel Kang when he

3    was terminated?

4    A.    I don't recall whether there were Douglas

5    Factors or LOTs.

6    Q.    But it's fair to say that it would be

7    proper due process for those to have been done in

8    regards to Mr. Kang being terminated?

9          MR. KACHMAR:  Object to the form.

10   A.    Correct.

11   Q.    (By Mr. Kloc)  You mentioned about Exhibit

12   26 that draft policy being published or entered into

13   the system.  Are you aware if members of the police

14   department had access to it when it was entered into

15   the system?

16   A.    I'm not aware that they did not have

17   access.

18   Q.    Would members of the department receive

19   any notification that there were any updates made to

20   any document in the kind of database that you were

21   maintaining?

22   A.    I'm not sure what the actual notification

23   process is for that.

24   Q.    Okay.  So you're not sure one way or the

25   other if members would be notified if there was any

**168**

1    changes made?

2    A.    I'm not sure what that process involves.

3    Q.    Okay.  Before these mitigation hearings,

4    do you know if the officers who were participating in

5    them were apprised of the misconduct they were being

6    accused of?

7    A.    Before which mitigation?

8    Q.    Before mitigation hearings in general, is

9    it common practice to apprise the person who's

10   attending those hearings of the misconduct that's

11   been alleged to have been perpetrated?

12   A.    Again, I'm sorry, can you repeat the

13   question.

14   Q.    These mitigation hearings, before they

15   occurred, would the person attending those hearings

16   who's been accused of the misconduct, would they be

17   apprised of what they had been accused of before

18   going to those hearings?

19   A.    I believe they are.

20   Q.    And do you know if Daniel Kang was

21   apprised of what he was being accused of before he

22   went to his mitigation hearing?

23   A.    I'm not sure.

24   Q.    You're not sure.  And would you know for

25   Mr. Arango?

**169**

1    A.    I'm not sure.

2    Q.    You're not sure.  All right.  As far as

3    the mitigation hearing for Mr. Kang, did Mr. Kang

4    present any sort of Power Point at that hearing?

5    A.    I recall that he did.

6    Q.    And if there was evidence or testimony

7    submitted otherwise, you believe that that would be

8    incorrect?

9          MR. KACHMAR:  Objection to the form.  You

10   can answer if you know and if you understand the

11   question.

12   A.    Repeat the question one more time.  Make

13   sure I understand the question.

14   Q.    (By Mr. Kloc)  In Mr. Kang's mitigation

15   hearing, did Mr. Kang present a Power Point slide?

16   A.    I believe he did.

17   Q.    You believe he did?  So you're not sure

18   one way or the other?

19   A.    I'm not sure.  I believe he did.

20   Q.    Okay.  You mentioned that you did not

21   direct who would be handling the investigations of

22   Mr. Kang.  Did you have any input at all as to who

23   would be involved in those investigations?

24   A.    No.

25   Q.    No?  Do you believe that members of the

**170**

1    police department should know how investigations are

2    going to be conducted?

3    A.    I believe that's part of the policy.

4    Q.    You believe that's part of the policy?

5          Okay.  It was Officer Wiggins who was

6    handling the internal affairs report on both Mr. Kang

7    and Mr. Arango; correct?

8    A.    Correct.

9    Q.    And that's --

10   A.    Just for the record, it's Sergeant

11   Wiggins.

12   Q.    Sergeant Wiggins?  I apologize.

13   Sergeant Wiggins.  Thank you.  And it was

14   Sergeant Wiggins who wrote up the report on both of

15   those investigations?

16   A.    I believe so.

17   Q.    And you saw those reports?

18   A.    Correct.

19   Q.    Do you recall anything in those reports

20   mentioning that Mr. Kang or Mr. Arango had signed

21   that 77-officer complaint that we've been referring

22   to throughout this deposition?

23   A.    In the internal affairs report?

24   Q.    In the report, yes, by Sergeant Wiggins.

25   A.    I don't recall seeing that.

| | |
|---|---|
| 1 | Q. You don't recall seeing that. |
| 2 | Okay. You mentioned that termination is a |
| 3 | big step for the department. With Mr. Gates, was |
| 4 | that an appropriate step given the July 5th, 2019, |
| 5 | incident that's been discussed? |
| 6 | A. I believe the disciplinary decision for |
| 7 | that matter was appropriate. |
| 8 | Q. Okay. And that didn't result in |
| 9 | termination, did it? |
| 10 | A. No, it did not. |
| 11 | Q. But the incident involving Mr. Kang |
| 12 | resulted in his termination; correct? |
| 13 | A. Correct. |
| 14 | MR. KLOC: All right. I think that's all |
| 15 | I have. |
| 16 | MR. KACHMAR: Just one followup question. |
| 17 | EXAMINATION |
| 18 | BY MR. KACHMAR: |
| 19 | Q. In terms of the investigative process, was |
| 20 | it your job as the chief of police to draft letters |
| 21 | of transmittal or Douglas Factors? |
| 22 | A. No. |
| 23 | Q. In Officer Kang's case, did you direct |
| 24 | anyone to not draft either one of those documents? |
| 25 | A. No. |

GILBERT & JONES

---

## CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA:
COUNTY OF CHATHAM:

I hereby certify that the foregoing transcript was reported as stated in the caption and the questions and answers thereto were reduced to writing by me; that the foregoing 172 pages represent a true, correct, and complete transcript of the evidence given on Friday, November 11, 2022, by the witness, ROY W. MINTER, JR., who was first duly sworn by me.

I certify that I am not disqualified for a relationship of interest under O.C.G.A. 9-11-28(c); I am a Georgia Certified Court Reporter here as an employee of Gilbert & Jones, Inc. who was contacted by Brent J. Savage, Esquire, to provide court reporting services for the proceedings; I will not be taking these proceedings under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and by the attached disclosure form I confirm that neither I nor Gilbert & Jones, Inc. are a party to a contract prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board.

This 13th day of November, 2022.

_____
Annette Pacheco, CCR-B-2153

GILBERT & JONES

---

| | |
|---|---|
| 1 | MR. KACHMAR: That's all. |
| 2 | MR. KLOC: Nothing further. |
| 3 | (Deposition concluded at 12:15 p.m.) |
| 4 | (Pursuant to Rule 30(e) of the Federal |
| 5 | Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), |
| 6 | signature of the witness has been reserved.) |
| 7 | (Plaintiff's Exhibits 30 through 32 were |
| 8 | marked for identification.) |

GILBERT & JONES

---

## DISCLOSURE OF NO CONTRACT

I, Debbie Gilbert, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Gilbert & Jones, Inc. was contacted by Brent J. Savage, Esquire, to provide court reporting services for these proceedings and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board for the taking of these proceedings.

There is no contract to provide reporting services between Gilbert & Jones, Inc. or any person with whom Gilbert & Jones, Inc. has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

This 13th day of November, 2022.

_____
Debbie Gilbert, FIRM
REPRESENTATIVE
Gilbert & Jones, Inc.

GILBERT & JONES

1 DEPOSITION OF: ROY W. MINTER, JR./AP

2     I do hereby certify that I have read all
3 questions propounded to me and all answers given by
   me on November 11, 2022, taken before
   Annette Pacheco, and that:

4
   ___ 1) There are no changes noted.
5 ___ 2) The following changes are noted:

6

7     Pursuant to Rule 30(e) of the Federal Rules of
   Civil Procedure and/or the Official Code of Georgia
   Annotated 9-11-30(e), both of which read in part:
8 Any changes in form or substance which you desire to
   make shall be entered upon the deposition...with a
9 statement of the reasons given...for making them.
   Accordingly, to assist you in effecting corrections,
10 please use the form below:

11 Page No. ___ Line No. ___ should read:_____

12 Reason for Change_____

13 Page No. ___ Line No. ___ should read:_____

14 Reason for Change_____

15 Page No. ___ Line No. ___ should read:_____

16 Reason for Change_____

17 Page No. ___ Line No. ___ should read:_____

18 Reason for Change_____

19 Page No. ___ Line No. ___ should read:_____

20 Reason for Change_____

21 Page No. ___ Line No. ___ should read:_____

22 Reason for Change_____

23 Page No. ___ Line No. ___ should read:_____

24 Reason for Change_____

25

GILBERT & JONES

1 DEPOSITION OF: ROY W. MINTER, JR./AP

2 Page No. ___ Line No. ___ should read:_____

3 Reason for Change_____

4 Page No. ___ Line No. ___ should read:_____

5 Reason for Change_____

6 Page No. ___ Line No. ___ should read:_____

7 Reason for Change_____

8 Page No. ___ Line No. ___ should read:_____

9 Reason for Change_____

10 Page No. ___ Line No. ___ should read:_____

11 Reason for Change_____

12 Page No. ___ Line No. ___ should read:_____

13 Reason for Change_____

14
15 If supplemental or additional pages are necessary,
   please furnish same in typewriting annexed to this
16 deposition.

17 _____
    ROY W. MINTER, JR.
18
Sworn to and subscribed before me,
19 This the ___ day of _____, 20__.

20 _____
Notary Public
21 My commission expires: _____

22
Please forward corrections to:
23
    Gilbert & Jones, Inc.
24     P. O. Box 14515
    Savannah, GA 31416
25     (912) 355-0320
GILBERT & JONES

EXHIBIT 9

1  DEPOSITION OF:  ROY W. MINTER, JR./AP

2  Page No. _____ Line No. _____ should read:_____

3  Reason for Change_____

4  Page No. _____ Line No. _____ should read:_____

5  Reason for Change_____

6  Page No. _____ Line No. _____ should read:_____

7  Reason for Change_____

8  Page No. _____ Line No. _____ should read:_____

9  Reason for Change_____

10  Page No. _____ Line No. _____ should read:_____

11  Reason for Change_____

12  Page No. _____ Line No. _____ should read:_____

13  Reason for Change_____

14

15  If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

16

17  _____

ROY W. MINTER, JR.

18  Sworn to and subscribed before me,

19  This the _____ day of _____, 20___.

20  _____

Notary Public

21  My commission expires: _____

22

23  Please forward corrections to:

Gilbert & Jones, Inc.

24  P. O. Box 14515

Savannah, GA 31416

25  (912) 355-0320

EXHIBIT 9

☰ Live News Tracking the Vaccine Weather Investigates ⌕

ADVERTISEMENT



PENGAD 800-631-6989

PLAINTIFF'S EXHIBIT
1
@p 11-11-22

# Savannah officers sign letter of workplace conflict against Chief Minter



Roy Minter (Source: WTOC)  (WTOC)

By Sean Evans

*Updated: Apr. 22, 2020 at 4:45 PM EDT*





KANG 001470

EXHIBIT 9

≡  Live   News   Tracking the Vaccine   Weather   Investigates

ACCIDENT INJURIES?
ARROWHEAD
CLINIC

STOCKS    Dominion Energy Inc    78.74   ▲  2.13    74° | 5:33

SAVANNAH, Ga. (WTOC) - Dozens of Savannah Police Department officers, some ranking as high as captains in the department, have signed a letter complaining of workplace conflicts with Chief Roy Minter at the middle of the issues.

Last Friday, Savannah Interim City Manager Pat Monahan sent an email to council letting them know an issue within the police department could become public.

According to Monahan, the Statement of Workplace Conflict was submitted and signed by 75 officers within SPD, including five captains, seven lieutenants, 17 sergeants, 16 corporals, nine APO's, 11 officers, nine detectives and one non-sworn department employee.

ADVERTISEMENT

According to Monahan's email, the Statement of Workplace Conflict alleges Chief Minter has failed "...to abide by the City's Employee Standards and Leadership Principles," citing 22 categories of conduct contrary to city policy.

Monahan told council he's met with Chief Minter and the city's human resources director to outline a path forward. Monahan says because of the number of employees involved, he will be asking the Human Resources Department to seek outside professional assistance for interviews/surveys to give personal accounts and examples of violations (as the process requires). Outside assistance will also help keep the inquiry objective and allow for a quicker resolution, Monahan says.

Monahan told council he's committed to fairness for all involved in this process and added he will continue to have confidence in Chief Minter unless overwhelming evidence later suggests otherwise.

Neither the police department nor the city is providing additional statements currently.

Copyright 2020 WTOC. All rights reserved.



GSP looking for vehicle involved in hit-and-run that
killed 1, seriously injured another in downtown Savan...

Around The Web

KANG 001471

EXHIBIT 9

**RELATED CONTENT**

**WSAV INVESTIGATES: Anonymous letter details officer unrest at SPD**

"If there are issues or concerns that are going on in the SPD and officers feel that they are important enough to be addressed come talk to us I'm always available," said Chief Minter in an August 2019 interview with News 3.

Minter sat down with us after an anonymous letter detailed major issues in the department.

6   of 9   🔍        —  +  ⟳  ⊡  ⊏⊐  Aᴬ  ⊤  ⩛  ⌄  ⩛  ⌄  ⬦  🖶  🖫        📌

Employees Signature: <u>See below and attached forms</u>                    Date: 4-10-20  thru 4-10-20

Please complete and return to the Human Resources Employee Assistance Coordinator.

Rev. 10/28/10

1. Employee Printed Name and Signature: _VOID_
2. Employee Printed Name and Signature: _VOID_
3. Employee Printed Name and Signature: Cpt George Gurdich  CPT _____
4. Employee Printed Name and Signature: _____ Cary Hill _____
5. Employee Printed Name and Signature: _____
6. Employee Printed Name and Signature: Capt JJ Hagmel
7. Employee Printed Name and Signature: _____  Lt ___ Bulldog
8. Employee Printed Name and Signature: _____  Lt Raymond Retzer
9. Employee Printed Name and Signature: _____  1853, G. _____
10. Employee Printed Name and Signature: Sgt Octavia Arango  00173
11. Employee Printed Name and Signature: APO Ronald S. Pegg  #1207
12. Employee Printed Name and Signature: CPL Brandon Lord  00353
13. Employee Printed Name and Signature: CPL Daniel H Kay  12043

EXHIBIT 9





PLAINTIFF'S
EXHIBIT
2
ap 11-11-22
PENGAD 800-631-6989

Topics > Officer Misconduct / Internal Affairs

# 77 Ga. officers file complaint against police chief

## The letter includes claims of favoritism, public embarrassment and 'outright disrespect'

Apr 24, 2020

Will Peebles
Savannah Morning News

SAVANNAH, Ga. — A group of 77 members of the Savannah Police Department, including the captains of all four precincts, have signed a statement of workplace conflict with 22 complaints against Savannah Police Chief Roy Minter.

The undated letter, sent to the city of Savannah's Human Resources Department, includes claims of favoritism, public embarrassment and "outright disrespect" shown by Minter between August 2018 -- when Minter first took the reins of the department -- and the present.

The names of Northwest Precinct Capt. Cary Hill, Southside Precinct Capt. Michelle Halford, Eastside Precinct Capt. George Gundich and Central Precinct Capt. Tonya Reid appear among the 77 staffers who signed the complaint. Lieutenants, sergeants, corporals, patrol officers and detectives are among the names on the list.

The complaints claim Minter issued "a series of threats aimed at members of command staff and supervisors of units in group settings."

These alleged threats included removal from rank, command, units and were "placed as a warning to all to not disappoint him and implant fear in the rank and file," the complaints said.

Also included were complaints that Minter used "intimidation and admonishing to instill embarrassment as a toll and instill his power in numerous meetings where officers, supervisors and commanders were publicly belittled in front of peers and subordinates."

KANG 001346

EXHIBIT 9

The complaints include "outright disrespect shown to members of staff, which leads to dissenting and an overwhelming distancing by members of the department to remain out of the target zone."

The complaints said Minter showed favoritism to some staff members, inducing "favoritism in the levels of promotion and specialized positions," creating positions "for loyalty instead of skill" and that "those of skill [were] removed from positions to make way for those of favor."

The complaints accused Minter of having a "selective open door policy," which limited some officers from communicating issues with the chief, whereas others had unlimited access.

Included in the document were accusations of inconsistent punishment levels for similar violations through the department's Office of Professional Standards. The office handles internal investigations and recruiting for the department, and the letter accuses Minter of the office now operating "with the Chiefs absolute control," saying he relieved the office "of all counter balances of leadership."

anced himself from responsibility in decisions regarding promotions, transfers and policies. "A refusal to put his name to decisions that affect the department as a whole to avoid liability or blame," it said.

The claims cite Minter's "failure to act in chaotic situations," and said he doesn't assume control over issues and "attacks decisions at a later time."

Also included were claims that Minter gave untrue statement to the public, politicians, media and employees in regards to the "effectiveness, strategies, morale, manpower and readiness of the department," though the letter does not include the specific statements to which the signees refer.

Interim City Manager Pat Monahan said Wednesday, April 22, that any HR claim filed in the city begins with an attempt to get the parties together and have them work out an agreement between themselves, without going through any of the formal processes, including mediation.

Monahan did not address the complaint filed against Minter directly, but outlined the city's dispute resolution process.

Monahan said if there are multiple employees and supervisors involved with an HR complaint, the city would seek outside assistance "to ensure the process remains fair and impartial."

"Employees need to be interviewed," Monahan said. "They need to be given the opportunity to be heard. And if the complaint involves a large number of employees, then that involves a rather exhaustive amount of time to interview employees to find out the particulars, the facts, maybe even date the situations in which the complaint occurred."

Monahan said the HR department initially does fact-finding on their own, as outside assistance costs the city money.

"At some point, depending on the number of complaints, the outside assistance will be brought in to continue the fact-finding and then perhaps even make a recommendation," Monahan said.

EXHIBIT 9

Time is of the essence in HR situations, as lingering issues can undermine trust and confidence between employees.

"It is our desire to try to get these matters resolved as quickly as possible, and I'm not talking about any specific case, I'm just speaking in general," Monahan said.

Ultimately, the final decision in any HR complaint falls on Monahan, who, as city manager, can fire any at-will city employee from their position for any reason. In Savannah, department heads are considered at-will employees.

"I've always followed the process," Monahan said. "I do believe in measured discipline and going through the steps of discipline that usually starts with a verbal warning, and then written warnings and then corrective behavior plans, of course, depending on the circumstances."

McClatchy-Tribune News Service

Tags  >  Command Staff - Chiefs / Sheriffs  ·  Officer Misconduct / Internal Affairs

## RECOMMENDED FOR YOU

‹ Audit: Ore. state public safety is too complaisant with local police agencies' internal investigations

Denver officer fired for not giving first aid to gunshot victim who died

Guardian Alliance Techn access to free National Decertification Index ›

## POLICE1 TOP 5

1 Police: School resource officer disarmed gunman at Mich. high school

2 Ariz. officer fired after fatal shooting of knife-wielding shoplifting suspect in a wheelchair

3 San Francisco restaurant turns away 3 cops over their service weapons

4 Denver officer fired for not giving first aid to gunshot victim who died

5 Off-duty cop fools accused robber into driving himself to his arrest

MORE POLICE1 ARTICLES ›

KANG 001348

EXHIBIT 9

Copyright © 2021 Police1. All rights reserved.

KANG 001349

EXHIBIT 9

KANG 001476



# Savannah police HR complaint: Chief Roy Minter showed 'favoritism,' 'outright disrespect' towards staff

**By Will Peebles**

Posted Apr 22, 2020 at 6:38 PM

A group of 77 members of the Savannah Police Department, including the captains of all four precincts, have signed a statement of workplace conflict with 22 complaints against Savannah Police Chief Roy Minter.

The undated letter, sent to the city of Savannah's Human Resources Department, includes claims of favoritism, public embarrassment and "outright disrespect" shown by Minter between August 2018 — when Minter first took the reins of the department — and the present.

The names of Northwest Precinct Capt. Cary Hill, Southside Precinct Capt. Michelle Halford, Eastside Precinct Capt. George Gundich and Central Precinct Capt. Tonya Reid appear among the 77 staffers who signed the complaint. Lieutenants, sergeants, corporals, patrol officers and detectives are among the names on the list.

City of Savannah Human Reso... by savannahnow.com on Scribd



PLAINTIFF'S
EXHIBIT
3
QP 11-11-22
PENGAD 800-631-6989

EXHIBIT 9

KANG 001477

9 of 9

**'Intimidation,' 'admonishing,' embarrassment**

The complaints claim Minter issued "a series of threats aimed at members of command staff and supervisors of units in group settings."

These alleged threats included removal from rank, command, units and were "placed as a warning to all to not disappoint him and implant fear in the rank and file," the complaints said.

Also included were complaints that Minter used "intimidation and admonishing to instill embarrassment as a toll and instill his power in numerous meetings where officers, supervisors and commanders were publicly belittled in front of peers and subordinates."

# EXHIBIT 9

KANG 001478

The complaints include "outright disrespect shown to members of staff, which leads to dissenting and an overwhelming distancing by members of the department to remain out of the target zone."

## 'Favoritism'

The complaints said Minter showed favoritism to some staff members, inducing "favoritism in the levels of promotion and specialized positions," creating positions "for loyalty instead of skill" and that "those of skill [were] removed from positions to make way for those of favor."

The complaints accused Minter of having a "selective open door policy," which limited some officers from communicating issues with the chief, whereas others had unlimited access.

Included in the document were accusations of inconsistent punishment levels for similar violations through the department's Office of Professional Standards. The office handles internal investigations and recruiting for the department, and the letter accuses Minter of the office now operating "with the Chiefs absolute control," saying he relieved the office "of all counter balances of leadership."

## Lack of communication

The complaint said there was a "complete breakdown of communication between levels of command staff to mid-level supervision and employees."

Those who signed the letter claim Minter distanced himself from responsibility in decisions regarding promotions, transfers and policies. "A refusal to put his name to decisions that affect the department as a whole to avoid liability or blame," it said.

The claims cite Minter's "failure to act in chaotic situations," and said he doesn't assume control over issues and "attacks decisions at a later time."

Also included were claims that Minter gave untrue statement to the public, politicians, media and employees in regards to the "effectiveness, strategies, morale, manpower and readiness of the department," though the letter does not include the specific statements to which the signees refer.

# EXHIBIT 9

KANG 001479

**Conflict resolution**

Interim City Manager Pat Monahan said Wednesday, April 22, that any HR claim filed in the city begins with an attempt to get the parties together and have them work out an agreement between themselves, without going through any of the formal processes, including mediation.

Monahan did not address the complaint filed against Minter directly, but outlined the city's dispute resolution process.

Monahan said if there are multiple employees and supervisors involved with an HR complaint, the city would seek outside assistance "to ensure the process remains fair and impartial."

"Employees need to be interviewed," Monahan said. "They need to be given the opportunity to be heard. And if the complaint involves a large number of employees, then that involves a rather exhaustive amount of time to interview employees to find out the particulars, the facts, maybe even date the situations in which the complaint occurred."

Monahan said the HR department initially does fact-finding on their own, as outside assistance costs the city money.

"At some point, depending on the number of complaints, the outside assistance will be brought in to continue the fact-finding and then perhaps even make a recommendation," Monahan said.

Time is of the essence in HR situations, as lingering issues can undermine trust and confidence between employees.

"It is our desire to try to get these matters resolved as quickly as possible, and I'm not talking about any specific case, I'm just speaking in general," Monahan said.

Ultimately, the final decision in any HR complaint falls on Monahan, who, as city manager, can fire any at-will city employee from their position for any reason. In Savannah, department heads are considered at-will employees.

"I've always followed the process," Monahan said. "I do believe in measured discipline and going through the steps of discipline that usually starts with a verbal warning, and then written warnings and then corrective behavior plans,

# EXHIBIT 9

of course, depending on the circumstances."

KANG 001480

11 NOV 2022

## Personal Information

### Awards and Decorations Information

The information provided from MilPDS reflects that you are authorized to wear the following awards and decorations. They are listed in order of precedence and displayed as you would wear them on the uniform in accordance with current standards for dress and appearance. There may be unique circumstances (such as prior service in a different branch of the armed services) which may authorize you additional ribbons and/or devices. For additional information, refer to *AFMAN 36-2806, Awards and Memorialization Program, AFI 36-2903, Dress and Personal Appearance of Air Force Personnel,* or visit your servicing military personnel section. Reservists may contact their unit or the Total Force Service Center[1] to update their Awards and Decorations.

**Name:** DANIEL H KANG     **Rank:** LTC

### Federal Awards



| Awards And Decorations | Devices |
|---|---|
| 1. Joint Service Commendation Medal | |
| 2. Air and Space Commendation Medal | 1 Oak Leaf Cluster |
| 3. Joint Service Achievement Medal | 1 Oak Leaf Cluster |
| 4. Air and Space Achievement Medal | |
| 5. Joint Meritorious Unit Award | 1 Oak Leaf Cluster |
| 6. Meritorious Unit Award | |
| 7. Air and Space Organizational Excellence Award | 1 Oak Leaf Cluster |
| 8. National Defense Service Medal | |
| 9. Afghanistan Campaign Medal | 1 Service Star |
| 10. Iraq Campaign Medal | 1 Service Star |
| 11. Global War On Terrorism Expeditionary Medal | |
| 12. Global War on Terrorism Service Medal | |
| 13. Air and Space Expeditionary Service Ribbon with Gold Border | 2 Oak Leaf Clusters |
| 14. Air and Space Longevity Service Award | 3 Oak Leaf Clusters |
| 15. Small Arms Expert Marksmanship Ribbon (Rifle) | |
| 16. Air and Space Training Ribbon | |



PLAINTIFF'S
EXHIBIT
4
ap 11-11-22

PENGAD 800-631-6989

If there is an error, view known problems[2] or information on corrective actions[3].

**EXHIBIT 9**

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

CCF



# DEPARTMENT OF THE AIR FORCE

## THIS IS TO CERTIFY THAT

# THE AIR FORCE COMMENDATION MEDAL

(FIRST OAK LEAF CLUSTER)

## HAS BEEN AWARDED TO

CAPTAIN DANIEL H. KANG

### FOR

PLAINTIFF'S
EXHIBIT
5
GP 11-11-22
PENGAD 800-631-6989



MERITORIOUS SERVICE
1 JULY 2008 TO 1 SEPTEMBER 2011

### ACCOMPLISHMENTS

Captain Daniel H. Kang distinguished himself by meritorious service, as the Chief of Intelligence for the 15th Special Operations Squadron, Chief Intelligence Readiness and Squadron Executive Officer, 1st Special Operations Support Squadron, 1st Special Operations Wing, Hurlburt Field, Florida. Captain Kang provided intelligence support to over 1,000 MC-130 Talon II training missions, preparing aircrews for global combat taskings. He oversaw intelligence training for over 200 aircrew members and provided the command staff with more than 100 current intelligence briefings, ensuring commanders were armed with the most up-to-date threat and geo-political information. His leadership was vital in driving MC-130H operations during RED FLAG 09-5 where he prepared crews to defeat sophisticated air defenses. As Deputy Chief of Intelligence Readiness, Captain Kang was responsible for ensuring 69 intelligence professionals assigned to the 1st Special Operations Wing could deploy to support national taskings. He played a key role in managing 88 intelligence deployments across Air Force Special Operations Command which ensured the success of global special operations. Capt Kang ensured that more than 500 Airmen deploying worldwide received the most current intelligence information, resulting in threat mitigation and mission success overseas and at home. As squadron Executive Officer, Captain Kang's efforts were directly responsible for the squadron being named the 2010 1st Special Operations Wing's Squadron of the Year and ensuring four Airmen were recognized at the Air Force-level in their respective annual awards programs. The distinctive accomplishments of Captain Kang while serving his country reflect credit upon himself and the United States Air Force.

### GIVEN UNDER MY HAND

### 23 OCTOBER 2012

RANDOLPH S. LAWSON
Colonel, USAF
Deputy Commander, 1st Special Operations Group

AF FORM 2224, JUL 99    SPECIAL ORDER: G-70    CONDITION: 2    PAS: EE0VFC9X    RDP: 19 JUL 11



# DEPARTMENT OF THE AIR FORCE



PLAINTIFF'S EXHIBIT
6
ap 11-11-22
PENGAD 800-631-6989

THIS IS TO CERTIFY THAT

## THE AIR FORCE COMMENDATION MEDAL

### HAS BEEN AWARDED TO

#### CAPTAIN DANIEL H. KANG

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

#### FOR

#### OUTSTANDING ACHIEVEMENT
#### 26 SEPTEMBER 2009 TO 1 FEBRUARY 2010

### ACCOMPLISHMENTS

Captain Daniel H. Kang distinguished himself by outstanding achievement as Chief Intelligence Analyst, 15th Expeditionary Special Operations Squadron, 1st Expeditionary Special Operations Group A, Combined Joint Special Operations Air Component, Special Operations Command Central. During this period, Captain Kang provided 166 combat mission briefings, debriefings, and mission reports encompassing 795 MC-130II combat sorties that amassed 646 combat hours. His intelligence data directly enabled the first ever Joint Precision Aerial Delivery System airdrop to an austere airfield by Special Operations Forces in Iraq, adding a lethal aerial delivery system to the Special Operations Forces arsenal. Additionally, Captain Kang provided critical intelligence data to the crew during the first ever tilt rotor refueling of the CV-22 Osprey. Based on his intelligence, the crew changed the refueling track to a low threat environment that ensured mission success. Captain Kang displayed superb leadership while working diligently with the theater survival evasion rescue and escape specialist to equip and maintain 25 aircrew survival kits and enhance the unit's evasion plan of action to meet the challenges of an ever changing enemy threat in the United States Central Command's area of operations. Overall, his leadership directly led to the Combined Joint Special Operations Air Component to the generation of 427 combat sorties totaling 1,482 flight hours providing transportation for 3,205 passengers and the delivery of 1,037 tons of cargo resulting in the capture of 248 insurgents and three enemy killed in action. The distinctive accomplishments of Captain Kang reflect credit upon himself and the United States Air Force.

GIVEN UNDER MY HAND

**29 MARCH 2010**

**GILMARY M. HOSTAGE III**
Lieutenant General, USAF
Commander, USAFCENT

Special Order: G-17958

AF FORM 2224, JUL 99

Condition: 4      PAS: YYYYYYYY   RDP: 28 JAN 2010

EXHIBIT 9

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

CJS

CITATION TO ACCOMPANY THE AWARD OF

THE JOINT SERVICE ACHIEVEMENT MEDAL
(FIRST OAK LEAF CLUSTER)



PLAINTIFF'S
EXHIBIT
7
QP 11-11-22

PENGAD 800-631-6989

TO

DANIEL H. KANG

Captain Daniel H. Kang, United States Air Force, distinguished himself by meritorious achievement as Senior Intelligence Duty Officer, Combined Joint Special Operations Air Component, Combined Forces Special Operations Component Command in support of Operations ENDURING FREEDOM and IRAQI FREEDOM, from 24 February 2008 to 2 June 2008. During this period, Captain Kang provided superior intelligence analysis, tracking, and reporting to the staff while supporting aircrew members of United States Army, Navy, and Air Force Special Operations fixed and rotary wing aircraft. He monitored real-time threats to operations, relayed critical data to air and ground teams, and refined intelligence processes in two separate theaters of operations. His efforts contributed to the success of over 1,800 combat sorties resulting in over 400 enemy killed in action, and more than one thousand enemy captured or detained which significantly degraded multiple enemy networks. Additionally, he provided 13 detailed intelligence briefings, giving the commander and his staff operational summaries of the air component's strategic impact on terrorist networks, and integrated Air Force Special Tactics mission results into daily tracking products. The distinctive accomplishments of Captain Kang reflect credit upon himself, the United States Air Force, Special Operations Command Central, and the Department of Defense.



EXHIBIT 9

C JS


PLAINTIFF'S
EXHIBIT
8
ap 11-11-22

CITATION TO ACCOMPANY THE AWARD OF

THE JOINT SERVICE COMMENDATION MEDAL

TO

329 80 8729

DANIEL H. KANG

First Lieutenant Daniel H. Kang, United States Air Force, distinguished himself by exceptionally meritorious service as Lead Global Positioning Systems Modernized Signals Engineer, Global Positioning Systems Engineering Office, Global Positioning Systems Wing, Space and Missile Systems Center, Air Force Space Command, Los Angeles Air Force Base, California, from 29 May 2003 to 10 April 2007. During this period, the outstanding professional skill, leadership, and tireless efforts of Lieutenant Kang resulted in significant contributions to the effectiveness and success of the Navstar Global Positioning System. As program manager for the 18 million dollar advanced atomic clocks research and development programs, he delivered four cutting-edge contracts that assured the heart of the Global Position System for the next 20 years. He championed navigation warfare with the addition of a more powerful spot beam capability for the latest block of satellites, delivering to warfighters a 100 times increase in resistance to jamming. As deputy program manager, Lieutenant Kang shaped the next generation space-borne receiver development. He led the program through source selection and delivered the 103 million dollar contract on schedule and improved Global Positioning System-aided precision guided munitions accuracy by 25 percent. The distinctive accomplishments of Lieutenant Kang reflect great credit upon himself, the United States Air Force, and the Department of Defense.

PBR PROCESSED

**EXHIBIT 9**

CITATION TO ACCOMPANY THE AWARD OF

THE JOINT SERVICE ACHIEVEMENT MEDAL

TO

FIRST LIEUTENANT DANIEL H. KANG

FIRST LIEUTENANT DANIEL H. KANG, UNITED STATES AIR FORCE, DISTINGUISHED HIMSELF BY MERITORIOUS SERVICE AS BATTLE CAPTAIN, PERSONAL SECURITY COORDINATION CENTER, STRATEGIC OPERATIONS DIRECTORATE, MULTI-NATIONAL FORCE-IRAQ, BAGHDAD, IRAQ, FROM 7 SEPTEMBER 2006 TO 9 JANUARY 2007 DURING OPERATION IRAQI FREEDOM. LIEUTENANT KANG CONTRIBUTED TO THE OVERALL 100 PERCENT MISSION SUCCESS OF THE ONLY AIR FORCE-LED JOINT OPERATIONS CENTER RESPONSIBLE FOR THE PROTECTIVE ACTIVITIES OF SEVEN TOP IRAQI GOVERNMENT LEADERS. BY MONITORING PRINCIPAL MOVEMENTS, SECURITY THREATS, AND INSURGENCY ATTACK LOCATIONS, LIEUTENANT KANG ENSURED THE SAFETY OF THE TOP IRAQI LEADERSHIP THROUGH COORDINATION WITH 13 AIR FORCE AND ARMY LIAISON OFFICERS ON OVER 1,000 SUCCESSFUL AIR AND LAND MOVEMENTS THROUGHOUT IRAQ. THROUGH HIS ACCOMPLISHMENTS, FIRST LIEUTENANT KANG REFLECTED CREDIT UPON HIMSELF, THE MULTI-NATIONAL FORCE-IRAQ, THE UNITED STATES AIR FORCE, AND THE DEPARTMENT OF DEFENSE.



PLAINTIFF'S
EXHIBIT
9
ap 11-11-22
PENGAD 800-631-6989

**EXHIBIT 9**



*CAC*

# DEPARTMENT OF THE AIR FORCE

## THIS IS TO CERTIFY THAT

## THE AIR FORCE ACHIEVEMENT MEDAL

### HAS BEEN AWARDED TO

**FIRST LIEUTENANT DANIEL H. KANG**

### FOR

*329 808 729*

OUTSTANDING ACHIEVEMENT
22 JUNE 2004 TO 26 JULY 2005

## ACCOMPLISHMENTS

First Lieutenant Daniel H. Kang distinguished himself by outstanding achievement as a member of the Los Angeles Air Force Base Honor Guard, 61st Air Base Group, Space and Missile Systems Center, Air Force Space Command, Los Angeles Air Force Base, California. He displayed superb initiative and dedication to duty, which aided immeasurably in 102 hours of laudatory Honor Guard performances for military honors and ceremonies, military funerals and memorial services, and civilian programs and parades in Southern California. Lieutenant Kang was key to the success of the 61st Communications Squadron Change of Command Ceremony, retirement and promotion ceremonies for Los Angeles Air Force Base personnel, awards ceremonies, and several Drill and Ceremony competitions. In addition, Lieutenant Kang also led the Blue Eagles Honor Guard during military funeral and memorial honors, earning praise from the families of deceased Air Force veterans and retirees. The distinctive accomplishments of Lieutenant Kang reflect credit upon himself and the United States Air Force.

GIVEN UNDER MY HAND

27 DECEMBER 2005

JOSEPH M. CODISPOTI, Colonel, USAF
Commander, 61st Air Base Group

PLAINTIFF'S
EXHIBIT
10
DP 11-11-22
PENGAD 800-631-6989

AF FORM 2274 20000101

EXHIBIT 9

# Previous work history/performance

- Decorated
  - CNT Agent of the Quarter – 1Q2019
  - Medal of Valor – August 2018
  - Medal of Distinction – March 2017
  - Team Award/Central Precinct CSU – April 2016
  - Team Award/SWAT – April 2016 (2 incidents)
  - Medal of Valor – March 2016
  - Certus Bank Community Spotlight Hero – December 2014



PLAINTIFF'S
EXHIBIT
16
ap 1-11-22
PENGAD 800-631-6989

EXHIBIT 9



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT

17

QP  –11-11-22



# THE SAVANNAH POLICE DEPARTMENT

*proudly presents the*

# MEDAL OF VALOR

*to*

## Cpl. Daniel Kang

in honor and recognition for demonstrating exceptional bravery, exemplary courage and unselfishly risking your own life while responding to a barricaded gunman on Chapel Lake South on February 18, 2017, resulting in the successful apprehension of the suspect and rescue of a woman and two children. You are hereby  authorized to wear the official Medal of Valor and service bar, issued by the Savannah Police Department

### on this 3rd day of August 2018

_____

Mark Revenew, Chief of Police

**EXHIBIT 9**

**PLAINTIFF'S EXHIBIT**
18
QP 11-11-22
PENGAD 800-631-6989



# THE SAVANNAH-CHATHAM METROPOLITAN POLICE DEPARTMENT

*proudly presents the*

# MEDAL OF DISTINCTION

*to*

## APO Daniel Kang

*in honor and recognition for demonstrating exceptional bravery and exemplary courage, along with your SWAT team members, when responding to a domestic shooting on December 23, 2016 and quickly rescuing the injured woman who had been shot. You are hereby authorized to wear the official Medal of Distinction and service bar, issued by the Savannah-Chatham Metropolitan Police Department*

*on this 3rd day of March 2017*

Joseph H. Lumpkin, Sr., Chief of Police



EXHIBIT 9



PLAINTIFF'S
EXHIBIT
19
QP 11-11-22
PENGAD 800-631-6989



# THE SAVANNAH-CHATHAM METROPOLITAN POLICE DEPARTMENT

*proudly presents this*

# UNIT-TEAMWORK CITATION

*to*

## APO Daniel Kang, SWAT Team

*in honor and recognition for your outstanding performance in the coordinated and cumulative effort when responding to an "officer down" call in Pooler on February 10th, 2016 in which a deputy had been shot by a barricaded gunman and others were pinned down behind their vehicles. The teamwork displayed to rescue fellow law enforcement officers and end the standoff peacefully illustrates your commitment to the SCMPD and the community.*

*on this 20th day of April, 2016*

Joseph H. Lumpkin, Sr., Chief of Police



EXHIBIT 9

**PLAINTIFF'S EXHIBIT**
2D
QP 11-11-22

PENGAD 800-631-6989



## THE SAVANNAH-CHATHAM METROPOLITAN POLICE DEPARTMENT

*proudly presents this*

# UNIT-TEAMWORK CITATION

*to*

### APO Daniel Kang, SWAT Team

*in honor and recognition for the outstanding performance in the coordinated and cumulative effort on February 4th, 2016 when you responded to a barricaded gunman at a Georgetown apartment complex; the gunman was firing at officers, their vehicles, and equipment. The teamwork displayed to spend 10 hours in cold, wet conditions to convince the gunman to surrender without causing any harm to officers, bystanders, or the gunman illustrates your commitment to the SCMPD and the community.*

*on this 20th day of April, 2016*



Joseph H. Lumpkin, Sr., Chief of Police

EXHIBIT 9

PENGAD 800-631-6989

**PLAINTIFF'S EXHIBIT**

21

QP 11-11-22



# THE SAVANNAH-CHATHAM METROPOLITAN POLICE DEPARTMENT

*proudly presents this*

# UNIT-TEAMWORK CITATION

*to*

## APO Daniel Kang, Central Precinct CSU

*in honor and recognition for your outstanding performance in the coordinated and cumulative effort to improve public safety in the Central Precinct neighborhoods by saturating high crime areas, tracking down the violent criminals, and building rapport with the citizens to improve community policing efforts. The teamwork displayed by you led to the arrests of several homicide and shooting suspects in 2015 and illustrates your commitment to the SCMPD and the community.*

*on this 20th day of April, 2016*

Joseph H. Lumpkin, Sr., Chief of Police

EXHIBIT 9

PLAINTIFF'S
EXHIBIT
22
ap 11-11-22
PENGAD 800-631-6989



# THE SAVANNAH-CHATHAM METROPOLITAN POLICE DEPARTMENT

*proudly presents the*

# MEDAL OF VALOR

*to*

## Officer Daniel Kang

*in honor and recognition for demonstrating exceptional bravery, exemplary courage and unselfishly risking your own safety to alleviate danger during a shootout with a suspect and rendering aide to a fellow officers on October 28, 2015. You are hereby authorized to wear the official Medal of Valor and service bar, issued by the Savannah-Chatham Metropolitan Police Department*

*on this 25th day of March 2016*

Joseph H. Lumpkin, Sr.

Joseph H. Lumpkin, Sr., Chief of Police

EXHIBIT 9



PLAINTIFF'S
EXHIBIT
23
GP 11-11-22
PENGAD 800-631-6989

# SAVANNAH POLICE
EST. 1864

**HOME     ABOUT     OUTREAC**



SAVANNAH, GA (December 16, 2014) — Certus Bank's, AVP and Manager of the Hodgson Memorial Branch, Tina Browning presented Central Precinct officer Daniel Kang with the Certus Bank Community Spotlight Hero award for his continued excellence in protecting and serving the citizens of the Central Precinct Neighborhood and the City of Savannah as a whole. Officer Kang is committed to his department, precinct and keeps the integrity of his beat intact. Officer Kang is a three-time deployment Iraq war veteran.



A triptych with Officer Daniel Kang's accomplishments will stand in the Certus Bank lobby located on Hodgson Memorial drive.

**EXHIBIT 9**



PLAINTIFF'S
EXHIBIT
26
Rap 11-11-22
FERRAO 800-631-6989

**SPD GENERAL ORDER**                                              **OPERATIONS**

| | | |
|---|---|---|
| **GO # OPS-016:** | **EFFECTIVE:** | **09/25/2004** |
| **OFFICE OF PROFESSIONAL STANDARDS** | **REVISED:** 10/21/2009 | **11/30/2011** |
| | 10/19/2010 | **02/02/2012** |
| | 03/21/2011 | **03/05/2014** |
| | 07/16/2014 | **04/18/2016** |
| | 12/13/2016 | **08/29/2018** |
| | | ~~10/30/2019~~ |

## PURPOSE

The purpose of this directive is to establish guidelines for the investigation of complaints against employees of the Savannah Police Department (SPD). All complaints will be thoroughly investigated to determine the appropriate finding.

## POLICY

A system to investigate and review complaints is essential to establish and maintain the public's confidence and trust, and to protect our citizens from police misconduct. This same system will also protect the integrity and the rights of all SPD employees. Citizens are encouraged to bring forward legitimate complaints regarding policy violations and misconduct by all SPD personnel. SPD personnel will act in a courteous and professional manner when receiving complaints from citizens. SPD personnel will assist and cooperate in the processing of Service complaints. It shall be the policy of the SPD to investigate all complaints against its employees and to maintain an Office of Professional Standards Unit which will thoroughly, expeditiously, and impartially investigate all complaints involving the Department's integrity.

When an employee's continued presence at work would be a detriment to the efficiency of the Department or to public safety, the Chief of Police or his designee may place an employee on administrative leave with pay during the investigation process. When such action is taken, the supervisor or commander responsible for making the notification shall notify the employee in writing and shall submit that notification to the appropriate Division Commander.

## PROCEDURE

### I.    OFFICE OF PROFESSIONAL STANDARDS

A.  The Office of Professional Standards (OPS) is organized under the Office of the Chief of Police. The OPS Commander reports directly to the Chief of Police.

B.  The OPS coordinates and exercises staff supervision over complaint investigations and/or allegations of policy violations and misconduct against Department employees from all sources.

C.  The OPS serves as the SPD's control agent in all Service complaints; recording complaints when received, reviewing completed investigations for thoroughness, objectivity, and accuracy, and establishing and maintaining a complete case file on each complainant.

D.  The OPS shall be responsible for recording, registering, and controlling all alleged or suspected policy violations and misconduct complaints against the employees of the SPD. The confidentially of a d m i n i s t r a t i v e investigation files shall be

**KANG 001333**

# EXHIBIT 9

maintained in accordance with public records law.

E. The OPS Commander shall be directly responsible for the Office of Professional Standards function and shall report all complaints involving violations of the law, use of force incidents involving serious injury or death, and conduct involving moral turpitude directly to the Chief of Police, or designee, without delay.

F. The OPS shall have the authority to interview any employee, use facilities and equipment, and review any record or report of the SPD in order to facilitate the just resolution of all complaint investigations.

G. Recognizing that complaint investigations are conducted under the immediate authority of the Chief of Police, SPD personnel shall cooperate with and assist the OPS during investigations.

H. The OPS Investigators will be knowledgeable of all processes involved in the investigation of complaints, administering of discipline, and all applicable rules, orders, directives, and procedures.

I. The OPS will develop and maintain a database of all SPD complaints. Disciplinary Actions taken as a result of an Administrative Investigation or a Service Complaint will be entered into the OPS database/computer file. A copy of the Disciplinary Action Record, notification letters, and all other associated documentation will be filed with the completed case file. All discipline records will be maintained in accordance with the State of Georgia records retention laws.

J. The OPS will forward all Disciplinary Action Records (DAR) to the City's Human Resource Department for record-keeping purposes.

K. The OPS will apprise the Chief of Police of the status or progress of disciplinary actions that are under appeal or that may develop into an appeal.

L. The OPS will make observations or recommendations to the Chief of Police concerning any modification or improvement in disciplinary procedures, legislative updates or practices, as well as needed training based upon trends and tendencies that have been identified.

M. The OPS will monitor sensitive cases that may affect future policies or actions and will make appropriate recommendations for change.

N. The OPS will serve as the liaison with other entities involved in the disciplinary process including, but not limited to, the Chief of Police, the District Attorney's Office, The City Attorney's Office, the County Attorney's Office, and the City of Savannah Human Resources Department.

O. The OPS investigates complaints against the SPD employees. OPS investigators are responsible for the investigation. They are strictly fact finders. They DO NOT make recommendations regarding findings or penalty. The employee's Commander is the first to make a recommendation regarding the finding of the case, and the recommended penalty.

P. To expedite the closure of administrative complaints, the OPS may assign a day for the Command Staff to discuss and review completed cases.

Q. The OPS Investigators will be assigned to a Precinct/Division to attend Community meetings (Outreach) and to be a liaison between SPD personnel regarding the complaint process through final disposition.

KANG 001334

**EXHIBIT 9**

## II. COMPLAINT INVESTIGATIONS

A. All complaints and discipline files can be classified under one of the following three areas:

1. **Supervisory Discipline:** This type of discipline is usually generated through the first line supervisor, and depending on the violation or misconduct, may require a formal investigation.

2. **Service Complaints:** Depending upon the severity of the allegation, such complaints may require a formal investigation. Should a service complaint be so severe as to merit a formal investigation, it will then be labeled as an Internal Investigation.

3. **Administrative Investigations:** The more serious allegations usually require a formal investigation and may include the advisement of rights pertaining to an administrative investigation which is known as the Garrity Warning.

B. Supervisory personnel are authorized to investigate ~~violations involving~~ allegations of:

1. Minor violations of policy and procedure;

2. Allegations of rudeness to citizens;

3. Insubordination;

4. Tardiness or abuse of leave.

C. A comprehensive investigative report shall be prepared on all investigations. This report will include:

1. A summary of the complaint or alleged act of misconduct.

2. A description of the incident, physical evidence, and other pertinent information.

3. Non-edited investigative statements.

4. Evaluation of the complaint with a statement indicating what can or cannot be substantiated.

D. Investigations by supervisory personnel shall be forwarded through their Chain-of-Command for review to ensure service complaints are resolved satisfactorily. A comprehensive investigative report, LOT to include, applicable Douglas Factors will be completed and submitted to the OPS Commander as soon as possible. In those cases where delays are anticipated, the OPS Commander will be notified.

E. The OPS shall conduct investigations into:

1. Civil liability suits against members of the Department.

2. Administrative investigations for other agencies within the concurrent jurisdiction of the SPD, at the direction of the Chief of Police.

3. Allegations of corruption.

4. Gross misconduct.

5. Allegations of the use of excessive force or brutality.

KANG 001335

EXHIBIT 9

6. Use of deadly force and firearms.

7. Violations of civil rights.

8. Allegations of criminal misconduct.

9. Incidents requiring investigation that are extremely lengthy, time consuming, involve multiple units or divisions, or when other investigative resources are unavailable.

10. All other Administrative Investigations assigned by the Chief of Police.

F. All administrative investigations should be completed within ninety days of the dated assigned. Any delays should be cleared through the OPS Commander. If the case is not resolved within ninety days the complainant will be notified in writing of the case status.

## III. RELIEF FROM DUTY

A. When an employee's continued presence at work may be a detriment to the efficiency of the Department or to public safety, the Chief of Police or his designee may place an employee on administrative leave with pay during the investigation process.

B. When such action is taken, the supervisor or commander responsible for making the notification shall notify the employee in writing and shall submit that notification to the appropriate Division Commander.

C. When an employee is placed on Administrative Leave pending an administrative investigation either the Internal Affairs Office or the employee's commanding officer will retrieve and secure the person's firearms and badges. Upon completion of the investigation the Chief of Police or designee will determine the reinstatement of the items.

## IV. COMPLAINT PROCESS

A. Allegations of police misconduct are received as complaints from both citizens and SPD personnel. All complaints against the SPD and its personnel will be documented and investigated, including anonymous complaints.

B. Citizens wishing to register a complaint will be referred to the employee's immediate supervisor. If the immediate supervisor is unavailable, a supervisor within the employee's division shall be notified.

C. The supervisor processing the complaint will record pertinent information regarding the complaint on the Complaint Form (SPD Form 1044w).

D. All complaints will be investigated, including complaints where the complainant is unwilling to complete or sign the complaint form.

E. The complaint shall be documented and, as soon as practical, the supervisor must telephone or e-mail the OPS for a control/tracking number.

F. Upon receipt of a complaint the OPS Office will provide the complainant with documentation the complaint has been received and provide a description of the process.

G. Once a tracking number has been assigned and a brief synopsis given to the OPS Investigator, it will be determined by the OPS Commander if the investigation will be conducted by a supervisor of this Department or by an OPS Investigator.

KANG 001336

EXHIBIT 9

H.  The person recording the complaint shall provide the complainant with a copy of the Complaint Form.

I.  When an employee is notified that they have become the subject of an OPS investigation, the employee shall be issued a written or electronic notice of the allegation and the employee's rights and responsibilities relative to the investigation.

## V.  INVESTIGATIVE PROCEDURES

A.  The complainant shall be interviewed as soon as practical regarding the complaint. The recorded complaint interview will be retained in the same manner as established for the internal file from which it was taken.

B.  The Complainant shall be asked to read and sign the Complaint Form.

C.  The Complainant shall write the complaint on pages two (2) through four (4) of the Complaint Form and additional pages may be added if necessary.

D.  The supervisor shall conduct a preliminary investigation, including interviewing the complainant and any witnesses readily available in person. The supervisor shall also advise the subject employee of the complaint, when appropriate.

E.  An effort will be made to locate and interview each person who may be a witness or have information relevant to the incident.

F.  When an employee is under investigation and subject to a formal interview, the interview shall be conducted under the following conditions:

1.  ~~When practical, appropriate Commanders should be notified when one of their subordinates is to be interviewed by an OPS Investigator.~~

2.  Interviews of SPD employees should be scheduled during the employee's normal duty hours, when practical.

3.  Employees will be compensated for interviews conducted at times other than normal duty hours.

4.  Employees being interviewed or writing a statement concerning an administrative investigation may not have an attorney, supervisor, or Commander present.

5.  The interview should take place in the Office of Professional Standards or any place necessary in order to complete the mission.

6.  The employee will be informed of the name and rank of the interviewer and all other persons present during the interview.

7.  The employee will be informed of the nature of the investigation before the interview begins.

8.  The employee will be informed of all the complainant(s), unless there is a compelling reason not to do so.

9.  The interview should be audio/digital recorded by the interviewer.

10.  Questions asked during the interview should be relevant to the investigation and should be within the area of knowledge the employee is thought to possess.

11.  If an interview extends into a normal mealtime, the interview should be suspended while the employee has a meal period.

KANG 001337

EXHIBIT 9

12. If the interview continues beyond the normal tour of duty, the employee should be allowed to make phone calls to notify such persons as necessary.

13. Employees will be allowed to use toilet facilities as necessary.

G. In addition, an employee may be required to:

1. Be photographed, to participate in a lineup, and/or to submit a financial disclosure statement when the actions are material to a particular OPS investigation being conducted by the SPD.

2. Submit to a medical or laboratory examination, at the SPD's expense, when the examination is specifically directed and narrowly related to a particular OPS investigation being conducted by the SPD.

3. Submit to a polygraph examination in the course of an OPS investigation. The use of the polygraph will be restricted to those issues narrowly related to a particular administrative investigation. Generally, the citizen or witness must submit to and pass the polygraph examination before such examination will be considered for the employee.

4. An employee shall be ordered not to divulge any information about the interview until the disposition of the investigation, if the progress of the investigation would be otherwise hampered.

5. Employees may not refuse to provide a statement to the OPS. Refusal shall result in immediate suspension, and the OPS Commander shall immediately notify the Chief of Police.

H. All complaint investigations will be completed, regardless if the employee retires or resigns prior to the conclusion of the investigation.

1. When an employee retires or resigns prior to the conclusion of the investigative findings, the employee's separation status will reflect either:

a. Retired – Pending IA Investigation

b. Resigned – Pending IA Investigation

## VI. DISCIPLINE REVIEW PANEL

A. Upon completion of an Administrative Investigation (AI), the Office of Professional Standards (OPS) will forward the completed investigation to the involved employee's chain of command.

B. When an investigation is distributed for review, OPS will schedule a Discipline Review Panel (DRP) meeting within 14 calendar days of sending the AI to the chain of command.

C. Reviewers shall forward questions concerning the investigation to OPS two (2) business days prior to the DRP, allowing OPS the opportunity to find answers prior to the DRP meeting.

D. The chain will send their independent findings to OPS at least one (1) business day prior to the DRP meeting.

1. If all are in agreement that the allegation is exonerated, not sustained, or unfounded, the meeting will be cancelled.

KANG 001338

EXHIBIT 9

    2. If the allegation is sustained or there is any disagreement among the chain, the DRP will meet to discuss the findings.

E. The DRP consists of the Assistant Chief, Major, employee's commander, lieutenant, and sergeant.

F. The DRP meeting will be chaired by the Assistant Chief.

G. The DRP will first come to a consensus as to the finding for each allegation. After a consensus is reached, the DRP will discuss recommendations concerning the range for the sustained violation(s). The recommendations are limited to:

    1. Option 1: Verbal counseling to written reprimand.

    2. Option 2: Suspension to termination.

H. If the DRP is unable to reach a consensus as to the findings for the allegation(s) the reason (s) for the dissention(s) will be documented and forwarded to the Chief of Police or his/her designee for review and resolution.

I. The employee's commander shall complete a Letter of Transmittal summarizing the findings, complete Douglas Factors, and recommended discipline within two (2) business days of the DRP.

    1. If the recommendation is for Option 1, the discipline recommendation and Letter of transmittal will be forwarded to the Major for concurrence and final determination of discipline.

    2. If the recommendation is for Option 2, OPS shall schedule a mitigation hearing within twenty-one (21) calendar days of the DRP and the Letter of Transmittal will be provided to the Chief of Police.

**J. Mitigation Hearing**

    1. Present during this hearing are the Chief of Police, Assistant Chief, Major OPS Commander, OPS Investigator, involved employee's Commander, and involved employee.

    2. This hearing will be conducted by the Chief and is the employee's opportunity to present mitigating information they would like to be considered prior to a final discipline decision being made.

    3. This hearing shall be recorded by OPS and forwarded to the members of the DRP within one (1) calendar day of the hearing for their review and consideration prior to making a final recommendation concerning discipline.

**K. Final Discipline**

    1. Final discipline review meeting will be set within seven (7) calendar days of the mitigation hearing.

    2. Present during this meeting are:

        i. Chief of Police

        ii. Assistant Chief

        iii. Employee's Chain of Command

        iv. OPS Commander

KANG 001339

EXHIBIT 9

     v.   OPS Investigator

3. This is the opportunity for the employee's chain of command to make final recommendations concerning discipline and discuss issues raised during the mitigation hearing.

4. The final decision rests with the Chief of Police and is based upon all available information provided during the discipline review process.

**L. Investigative Findings**

1. The LOT and Douglas Factors, with the disciplinary action, shall be forwarded to OPS for record-keeping purposes.

2. OPS shall be responsible for informing the employee of the discipline imposed and ensuring the employee understands the required actions. The subject officer shall receive a complete copy of the investigative file.

3. If the complaint is sustained and the penalty is a written reprimand or greater, the subject officer can respond, either verbally or in writing, within 3 days, to the allegations (Cleveland Board of Education v Loudermill).

4. When discipline is issued, the employee will be notified of their right to appeal under the City of Savannah Policy (HR-020A).

5. If the employee fails to appeal to the City Manager, this non-response will constitute a waiver of the right to appeal and the discipline will be imposed.

6. Final disciplinary action reports (DAR) shall be forwarded to OPS for record-keeping purposes.

**VII. DISPOSTION**

A. Investigations into allegations of policy violations or employee misconduct will conclude with one of the following findings:

2. **EXONERATED** - The investigation supported the conclusion that the incident did occur, but the employee's actions were legal, proper, and reasonable.

3. **UNFOUNDED** -- The investigation supported the conclusion that the employee did not engage in the alleged conduct and did not violate a rule by doing so.

4. **POLICY FAILURE** - Policy or procedure does not properly address the allegation or procedure which led to the alleged conduct and the investigation reveals recommended policy or procedural changes.

5. **NOT SUSTAINED** - The investigation didn't prove or disprove the alleged conduct.

6. **SUSTAINED** - The investigation supported the conclusion that the employee engaged in the alleged conduct and violated a rule by doing so.

B. Appropriate disciplinary action will be taken, when warranted, and a complete file maintained by the SPD Office of Professional Standards.

C. Investigative findings for those employees that have since retired or resigned will be forwarded to the Chief of Police or designee. Depending upon the final disposition of the investigation the Chief of Police or designee will change the former employee's separation status accordingly.

KANG 001340

**EXHIBIT 9**

D. Upon conclusion of the investigation, the involved employee(s) will receive, in writing, notification of the results of the investigation.

    1. This will also include those employees that have retired or are no longer employed with the Savannah Police Department.

        a. This notification will be done by certified mail and with a return/receipt.

## VIII. OFFICE OF PROFESSIONAL STANDARDS ROLE IN CRIMINAL INVESTIGATIONS

A. If during the course of an Administrative Investigation there appears that there is, or that there may have been, a violation of criminal law, the investigation by the OPS may be suspended and the Chief of Police promptly notified.

B. No further administrative investigative effort will normally be made until after the Chief of Police has determined whether to assign the matter for criminal investigation.

C. Employees under investigation for alleged criminal law violations will be afforded those rights guaranteed by the Constitution of the United States and the policies and procedures of the SPD.

D. Generally, criminal investigations will be conducted by the appropriate investigative unit or agency unless the OPS is directed by the Chief of Police to conduct the criminal investigation.

E. Deadly force cases will be investigated in accordance with the SPD's Use of Force policy (General Order #ADM-007).

## IX. MISSED COURT, TRAINING, ~~VEHICLE MAINTENANCE~~

I. The OPS shall receive notices for unexcused absences from supervisors who coordinate court, training, or vehicle maintenance for their respective units. Once received, the OPS will record the alleged unexcused absence and notify the employee's Commander.

J. The Commander or designee of the subject employee has 30 days to investigate the allegation and return the appropriate finding and/or penalty to the OPS.

K. If the finding is Sustained, the Commander or designee must recommend the appropriate pre-determined penalty for the employee and forward that recommendation to the Assistant Chief for approval, rejection or modification. These penalties have been set by the Command Staff, and are listed below:

SPD Personnel who are **unexcused** from training, court, or appointments with vehicle maintenance will receive the following:

| First offense: | Verbal Counseling |
|---|---|
| Second Offense: | Written Reprimand |
| Third Offense: | 1 Day Suspension |
| Fourth Offense: | 3 Day Suspension |
| Fifth Offense: | Chief's Office |

KANG 001341

**EXHIBIT 9**

Each category will stand alone, not consolidated.

**Example:**

| Unexcused absence from court | Written Reprimand |
|---|---|
| Unexcused absence from training | Written Reprimand |
| Unexcused absence from court (second violation) | 1 Day suspension |

*Time Frame*: After two (2) years the penalty enhancement drops off, however, the disciplinary file remains. [In other words, if you have a failure to appear (Court) in January 2007 and then a failure to appear in January 2008; in January 2009 the first one drops off. If you have a third failure to appear in February 2009, then you have two penalties.]

**Example:**   Written Reprimand for court:  Jan. 2007
1 Day Suspension for court:  Jan. 2008
Jan. 2007 penalty drops off:  Jan. 2009.
Failure to appear in Feb. 2009:  1 Day Suspension.

## X. RUDENESS COMPLAINTS

A. Rudeness complaints will generally be classified as a Service Complaint. Depending upon the severity of the allegation, such complaints may require a formal investigation. Should a Service complaint be so severe as to merit a formal investigation, it will then be labeled as an Administrative Investigation.

B. When appropriate, the Precinct/Unit supervisor shall conduct the investigation, including interviewing the complainant as soon as practical regarding the complaint and any witnesses readily available in person. The supervisor shall also advise the subject employee of the complaint.

C. If the finding is Sustained (all other findings do not apply), the Commander or designee must give the appropriate pre-determined penalty to the employee. These penalties have been set by the Command Staff, and are listed below:

SPD Personnel who have sustained rudeness complaints will receive the following:

| First offense: | Written Reprimand |
|---|---|
| Second Offense: | 1 Day Suspension |
| Third Offense: | 3-Day Suspension |
| Fourth Offense: | Chief's Office |

*Time Frame*: After two (2) years the penalty enhancement drops off, however, the disciplinary file remains. [In other words, if you have a sustained rudeness complaint on January 1, 2011 and another in January 2, 2013; the January 1, 2011 will drop off and does not apply to the progressive discipline above. If you have another in February 2013, then you have two applicable offenses and a 1-day suspension would apply.]

## XI. ADMINISTRATIVE INVESTIGATION FILES [CALEA 52.1.2]

A. The OPS shall be responsible for maintaining all records regarding administrative investigations within the Office of Professional Standards.

KANG 001342

**EXHIBIT 9**

B. The OPS shall take all proper precautions to ensure the security of these records. These records shall be stored separate and apart from personnel records.

C. All complaints received by any member of the Department, against the Department or an employee, shall be assigned a complaint control number. OPS will assign control numbers and will enter them into a computer database.

D. OPS shall prepare a file for every complaint assigned. The file shall contain the original report, audio tapes of OPS interviews, incident reports, photographs, and other pertinent documentation.

E. Folders shall be filed numerically by control number and kept secure while in the custody and control of OPS.

F. No one may access the files without the permission from the Chief of Police or the OPS Commander.

G. No portion of the file shall be copied or reproduced by anyone other than the OPS personnel.

H. For record keeping efficiency, information contained in the log book and card files may be computerized.

## XII. OFFICE OF PROFESSIONAL STANDARDS MONTHLY AND ANNUAL REPORTS

A. The OPS Commander, or designee, will prepare a monthly report that will be due at the end of each month. The report will be provided to the Chief of Police and will detail the:

1. Number of complaints against sworn and non-sworn employees of the SPD.

2. Nature of the complaints identified by the type of Department violations.

3. Disposition of the complaints.

4. Number of Use of Force Reports received from Division Commanders during the month, including the number of incidents in which the use of force resulted in an individual being treated at a hospital.

B. The OPS Commander, or designee, will prepare an annual report at the end of each year based upon information in the previous year's monthly reports. The annual report is for dissemination to the public and to SPD employees upon request.

## XIII. EARLY INTERVENTION SYSTEM

A. The SPD has the responsibility to its employees and to the community to identify and assist employees that show symptoms of job-related stress and/or performance deficiencies. An Early Intervention System has been developed to provide a systematic review of complaints received by the SPD, and use of force incidents. It is designed to highlight tendencies in regard to complaints and use of force incidents that may otherwise be overlooked by the Department.

B. The first and second line supervisors are crucial to a successful Personnel Early Warning System program. They should always be cognizant of their employees and watch for signs of performance issues.

C. If a supervisor becomes aware of a problem with an employee that warrants

KANG 001343

# EXHIBIT 9

immediate attention, he or she should not wait for the employee to be identified by the Personnel Early Warning System before taking action to rectify the situation.

D. These may include but are not limited to:

    1. Excessive sick leave usage

    2. Excessive injuries

    3. Displays of emotional hostility

    4. Excessive accidents

    5. Excessive tardiness

    6. Alerts triggered by the Early Warning System

E. An annual report will be prepared by the OPS, outlining personnel complaints, use of force incidents, and will contain the names of employees who have received three or more OPS investigations within a rotating 365-day period or receive any ALERTS for Use of Force.

F. The OPS Case Management System will give an ALERT for 3 or more OPS investigations within a rotating 365-day period and 3 or more Use of Force Reports within a 90-day period.

    1. The annual report will provide a brief profile of the complaints and use of force incidents.

    2. Profile for the complaints will include the employee's name, payroll number, name of complainant, nature of the complaint, and disposition (if known).

    3. Profile for use of force incidents will include the employee's name, payroll number, subject's name, date of incident, nature of incident, and extent of injury, if any.

G. Report data will be disseminated monthly to the appropriate supervisors for review. A summary of supervisory review findings will be submitted to the Office of Professional Standards. The concerned Commander or designee and the employee's supervisor will jointly make a final determination based on an assessment of the report data and other relevant criteria.

H. Determinations will result in the following alternative measures:

    1. Referral to Employee Assistance Program (EAP), the City Psychologist, or other approved practitioner for counseling or referral assistance.

    2. Participation in stress reduction programs.

    3. Corrective action.

    4. Training/Remedial Training.

    5. Reassignment

    6. Suspension of outside employment authorizations

I. The Employee Profile System establishes a data collection source profiling SPD employees to identify patterns of stress-induced or performance problems.

J. Profiles will document specified criteria for assessment:

KANG 001344

EXHIBIT 9

    1. Compliance.

    2. Use of Force incidents.

    3. Commendations.

    4. Corrective actions.

    5. Promotional status change.

K. Immediate supervisors, as deemed necessary, will review profile reports. The concerned Commander or designee will review profile reports annually, in conjunction with other criteria, to identify problems.

L. Based on profile reports and relevant data, the following actions may be taken.

M. Referral to the EAP or City Psychologist for counseling or additional referral.

    1. Participation in stress reduction training either voluntarily of mandatory.

    2. Corrective action.

    3. Assessment that no problem exists, terminating further action.

N. All ALERTS will be maintained within the OPS Case Management System.

L. All levels of supervision will be responsible for ensuring that the OPS is aware of all complaints against, commendations awarded, and each incident of use of force involved by each employee under their command. This is to ensure accuracy in compiling profiles.

M. All levels of supervision can make recommendations of remedial training in instances where remedial or additional training can correct the behavior. In these situations, the OPS will still be notified of the recommendation.

N. The OPS Commander will prepare a yearly report evaluating the effectiveness of the early warning system and make recommendations for any changes to the Chief of Police.

This General Order supersedes all written directives issued prior to ~~10/30/2019~~, pursuant to Office of Professional Standards.

<div style="border: 1px solid black; padding: 10px;">

**BY ORDER OF:**
**Original Signature on File**

_____

**Roy Minter, Jr.**
**Chief of Police**

</div>

KANG 001345

EXHIBIT 9



PLAINTIFF'S
EXHIBIT
27
ap 11-11-22

**SPD GENERAL ORDER**                                                                    **OPERATIONS**

| | |
|---|---|
| **GO # OPS-016:** | **EFFECTIVE:** 09/25/2004 |
| **OFFICE OF PROFESSIONAL STANDARDS** | **REVISED:** 10/21/2009    11/30/2011 |
| | 10/19/2010    02/02/2012 |
| | 03/21/2011    03/05/2014 |
| | 07/16/2014    04/18/2016 |
| | 12/13/2016    08/29/2018 |

## PURPOSE

The purpose of this directive is to establish guidelines for the investigation of complaints against employees of the Savannah Police Department (SPD). All complaints will be thoroughly investigated to determine the appropriate finding.

## POLICY

A system to investigate and review complaints is essential to establish and maintain the public's confidence and trust, and to protect our citizens from police misconduct. This same system will also protect the integrity and the rights of all SPD employees. Citizens are encouraged to bring forward legitimate complaints regarding policy violations and misconduct by all SPD personnel. SPD personnel will act in a courteous and professional manner when receiving complaints from citizens. SPD personnel will assist and cooperate in the processing of citizen complaints. It shall be the policy of the SPD to investigate all complaints against its employees and to maintain an Office of Professional Standards Unit which will thoroughly, expeditiously, and impartially investigate all complaints involving the Department's integrity.

When an employee's continued presence at work would be a detriment to the efficiency of the Department or to public safety, the Chief of Police or his designee may place an employee on administrative leave with pay during the investigation process. When such action is taken, the supervisor or commander responsible for making the notification shall notify the employee in writing and shall submit that notification to the appropriate Division Commander.

## PROCEDURE

### I.     OFFICE OF PROFESSIONAL STANDARDS

    A.    The Office of Professional Standards (OPS) is organized under the Office of the Chief of Police. The OPS Commander reports directly to the Chief of Police. [CALEA 52.1.3]

    B.    The OPS coordinates and exercises staff supervision over complaint investigations and/or allegations of policy violations and misconduct against Department employees from all sources.

    C.    The OPS serves as the SPD's control agent in all citizen complaints; recording complaints when received, reviewing completed investigations for thoroughness, objectivity, and accuracy, and establishing and maintaining a complete case file on each complainant.

EXHIBIT 9

D.   The OPS shall be responsible for recording, registering, and controlling all alleged or suspected policy violations and misconduct complaints against the employees of the SPD. The confidentially of internal investigation files shall be maintained in accordance with public records law.

E.   The OPS Commander shall be directly responsible for the Office of Professional Standards function and shall report all complaints involving violations of the law, use of force incidents involving serious injury or death, and conduct involving moral turpitude directly to the Chief of Police, or designee, without delay. [CALEA 52.2.2]

F.   The OPS shall have the authority to interview any employee, use facilities and equipment, and review any record or report of the SPD in order to facilitate the just resolution of all complaint investigations.

G.   Recognizing that complaint investigations are conducted under the immediate authority of the Chief of Police, SPD personnel shall cooperate with and assist the OPS during investigations.

H.   The OPS Investigators will be knowledgeable of all processes involved in the investigation of complaints, administering of discipline, and all applicable rules, orders, directives, and procedures.

I.   The OPS will develop and maintain a database of all SPD complaints. Disciplinary Actions taken as a result of an Administrative Investigation or a Citizen Complaint will be entered into the OPS database/computer file. A copy of the Disciplinary Action Record, notification letters, and all other associated documentation will be filed with the completed case file. All discipline records will be maintained in accordance with the State of Georgia records retention laws.

J.   The OPS will forward all Disciplinary Action Records (DAR) to the City's Human Resource Department for record-keeping purposes.

K.   The OPS will apprise the Chief of Police of the status or progress of disciplinary actions that are under appeal or that may develop into an appeal.

L.   The OPS will make observations or recommendations to the Chief of Police concerning any modification or improvement in disciplinary procedures, legislative updates or practices, as well as needed training based upon trends and tendencies that have been identified.

M.   The OPS will monitor sensitive cases that may affect future policies or actions and will make appropriate recommendations for change.

N.   The OPS will serve as the liaison with other entities involved in the disciplinary process including, but not limited to, the Chief of Police, the District Attorney's Office, The City Attorney's Office, the County Attorney's Office, and the City of Savannah Human Resources Department.

O.   The OPS investigates complaints against the SPD employees. OPS investigators are responsible for the investigation. They are strictly fact finders. They DO NOT make recommendations regarding findings or penalty. The employee's Commander is the first to make a recommendation regarding the finding of the case, and the recommended penalty.

P.   To expedite the closure of internal complaints, the OPS may assign a day for

KANG 001322

**EXHIBIT 9**

the Command Staff to discuss and review completed cases.

Q. The OPS Investigators will be assigned to a Precinct/Division to attend Community meetings (Outreach) and to be a liaison between SPD personnel regarding the complaint process through final disposition.

## II. COMPLAINT INVESTIGATIONS

A. All complaints and discipline files can be classified under one of the following three areas:

1. **Supervisory Discipline:** This type of discipline is usually generated through the first line supervisor, and depending on the violation or misconduct, may require a formal investigation.

2. **Citizen Complaints:** Depending upon the severity of the allegation, such complaints may require a formal investigation. Should a citizen's complaint be so severe as to merit a formal investigation, it will then be labeled as an Internal Investigation.

3. **Internal Investigations:** The more serious allegations usually require a formal investigation and may include the advisement of rights pertaining to an administrative investigation which is known as the Garrity Warning.

B. Supervisory personnel are authorized to investigate violations involving: [CALEA 52.2.1 a]

1. Minor violations of policy and procedure;

2. Allegations of rudeness to citizens;

3. Insubordination;

4. Tardiness or abuse of leave.

C. A comprehensive investigative report shall be prepared on all investigations. This report will include:

1. A summary of the complaint or alleged act of misconduct.

2. A description of the incident, physical evidence, and other pertinent information.

3. Non-edited investigative statements.

4. Evaluation of the complaint with a statement indicating what can or cannot be substantiated.

D. Investigations by supervisory personnel shall be forwarded through their Chain-of- Command for review to ensure citizen complaints are resolved satisfactorily. A comprehensive investigative report, LOT to include, applicable Douglas Factors will be completed and submitted to the OPS Commander as soon as possible. In those cases where delays are anticipated, the OPS Commander will be notified.

E. The OPS shall conduct investigations into: [CALEA 52.2.1b]

1. Civil liability suits against members of the Department.

EXHIBIT 9

2. Internal investigations for other agencies within the concurrent jurisdiction of the SPD, at the direction of the Chief of Police.

3. Allegations of corruption.

4. Gross misconduct.

5. Allegations of the use of excessive force or brutality.

6. Use of deadly force and firearms.

7. Violations of civil rights.

8. Allegations of criminal misconduct.

9. Incidents requiring investigation that are extremely lengthy, time consuming, involve multiple units or divisions, or when other investigative resources are unavailable.

10. All other Administrative Investigations assigned by the Chief of Police.

F. All complaint investigations should be completed within ninety days of the dated assigned. [CALEA52.2.3] Any delays should be cleared through the OPS Commander. If the case is not resolved within ninety days the complainant will be notified in writing of the case status. [CALEA 52.2.4b]

## III. RELIEF FROM DUTY [CALEA 52.2.7]

A. When an employee's continued presence at work may be a detriment to the efficiency of the Department or to public safety, the Chief of Police or his designee may place an employee on administrative leave with pay during the investigation process.

B. When such action is taken, the supervisor or commander responsible for making the notification shall notify the employee in writing and shall submit that notification to the appropriate Division Commander.

C. When an employee is placed on Administrative Leave pending an internal investigation either the Internal Affairs Office or the employee's commanding officer will retrieve and secure the person's firearms and badges. Upon completion of the investigation the Chief of Police or designee will determine the reinstatement of the items.

## IV. COMPLAINT PROCESS

A. Allegations of police misconduct are received as complaints from both citizens and SPD personnel. All complaints against the SPD and its personnel will be documented and investigated, including anonymous complaints. [CALEA 52.1.1]

B. Citizens wishing to register a complaint will be referred to the employee's immediate supervisor. If the immediate supervisor is unavailable, a supervisor within the employee's division shall be notified.

C. The supervisor processing the complaint will record pertinent information regarding the complaint on the Complaint Form (SPD Form 1044w).

D. All complaints will be investigated, including complaints where the complainant is unwilling to complete or sign the complaint form.

E. The complaint shall be documented and, as soon as practical, the supervisor must

EXHIBIT 9

telephone or e-mail the OPS for a control/tracking number.

F. Upon receipt of a complaint the OPS Office will provide the complainant with documentation the complaint has been received and provide a description of the process. [CALEA 52.2.4a]

G. Once a tracking number has been assigned and a brief synopsis given to the OPS Investigator, it will be determined by the OPS Commander if the investigation will be conducted by a supervisor of this Department or by an OPS Investigator.

H. The person recording the complaint shall provide the complainant with a copy of the Complaint Form.

I. When an employee is notified that they have become the subject of an OPS investigation, the employee shall be issued a written or electronic notice of the allegation and the employee's rights and responsibilities relative to the investigation. [CALEA 52.2.5]

## V. INVESTIGATIVE PROCEDURES

A. The complainant shall be interviewed as soon as practical regarding the complaint. The recorded complaint interview will be retained in the same manner as established for the internal file from which it was taken.

B. The Complainant shall be asked to read and sign the Complaint Form.

C. The Complainant shall write the complaint on pages two (2) through four (4) of the Complaint Form and additional pages may be added if necessary.

D. The supervisor shall conduct a preliminary investigation, including interviewing the complainant and any witnesses readily available in person. The supervisor shall also advise the subject employee of the complaint, when appropriate.

E. An effort will be made to locate and interview each person who may be a witness or have information relevant to the incident.

F. When an employee is under investigation and subject to a formal interview, the interview shall be conducted under the following conditions:

1. When practical, appropriate Commanders should be notified when one of their subordinates is to be interviewed by an OPS Investigator.

2. Interviews of SPD employees should be scheduled during the employee's normal duty hours, when practical.

3. Employees will be compensated for interviews conducted at times other than normal duty hours.

4. Employees being interviewed or writing a statement concerning an internal investigation may not have an attorney, supervisor, or Commander present.

5. The interview should take place in the Office of Professional Standards or any place necessary in order to complete the mission.

6. The employee will be informed of the name and rank of the interviewer and all other persons present during the interview.

7. The employee will be informed of the nature of the investigation before the interview begins.

EXHIBIT 9

C. The LOT and Douglas Factors, with the recommended disciplinary action, shall be forwarded to the OPS for record-keeping purposes. OPS will forward the investigative file with the LOT to the next Command Officer in the Chain-of-Command. Once received, the Commander has 10 days to complete the LOT. This process will continue until it reaches the Chief of Police, or designee, for final review and approval.

D. Once a finding is reached, the subject officer will be notified by the investigating Division Commander, or designee. The subject officer shall receive a complete copy of the investigative file.

E. If the complaint is sustained and the penalty is above a written reprimand, the subject officer can respond, either verbally or in writing, within 3 days, to the allegations (Cleveland Board of Education v Loudermill).

F. When discipline is issued the employee will be notified of their right to appeal under the City of Savannah Policy (HR-020A).

G. If the employee fails to appeal to the City Manager, this non-response will constitute a waiver of the right to appeal and the discipline will be imposed.

H. Final disciplinary action reports (DAR) shall be forwarded to the OPS for recordkeeping purposes.

## VII. DISPOSTION

A. Investigations into allegations of policy violations or employee misconduct will conclude with one of the following findings:

1. **EXONERATED** - The investigation supported the conclusion that the incident did occur, but the employee's actions were legal, proper, and reasonable.

2. **UNFOUNDED** – The investigation supported the conclusion that the employee did not engage in the alleged conduct and did not violate a rule by doing so.

3. **POLICY FAILURE** - Policy or procedure does not properly address the allegation or procedure which led to the alleged conduct and the investigation reveals recommended policy or procedural changes.

4. **NOT SUSTAINED** - The investigation didn't prove or disprove the alleged conduct.

5. **SUSTAINED** - The investigation supported the conclusion that the employee engaged in the alleged conduct and violated a rule by doing so.

B. Appropriate disciplinary action will be taken, when warranted, and a complete file maintained by the SPD Office of Professional Standards.

C. Investigative findings for those employees that have since retired or resigned will be forwarded to the Chief of Police or designee. Depending upon the final disposition of the investigation the Chief of Police or designee will change the former employee's separation status accordingly.

D. Upon conclusion of the investigation, the involved employee(s) will receive, in writing, notification of the results of the investigation.

EXHIBIT 9

      1.   This will also include those employees that have retired or are no longer employed with the Savannah Police Department.

          a.   This notification will be done by certified mail and with a return/receipt.

## VIII. OFFICE OF PROFESSIONAL STANDARDS ROLE IN CRIMINAL INVESTIGATIONS

A. If during the course of an Internal Administrative Investigation there appears that there is, or that there may have been, a violation of criminal law, the investigation by the OPS may be suspended and the Chief of Police promptly notified.

B. No further administrative investigative effort will normally be made until after the Chief of Police has determined whether to assign the matter for criminal investigation.

C. Employees under investigation for alleged criminal law violations will be afforded those rights guaranteed by the Constitution of the United States and the policies and procedures of the SPD.

D. Generally, criminal investigations will be conducted by the appropriate investigative unit or agency unless the OPS is directed by the Chief of Police to conduct the criminal investigation.

E. Deadly force cases will be investigated in accordance with the SPD's Use of Force policy (General Order #ADM-007).

## IX. MISSED COURT, TRAINING, VEHICLE MAINTENANCE

A. The OPS shall receive notices for unexcused absences from supervisors who coordinate court, training, or vehicle maintenance for their respective units. Once received, the OPS will record the alleged unexcused absence and notify the employee's Commander.

B. The Commander or designee of the subject employee has 15 days to investigate the allegation and return the appropriate finding and/or penalty to the OPS.

C. If the finding is Sustained, the Commander or designee must recommend the appropriate pre-determined penalty for the employee and forward that recommendation to the Assistant Chief for approval, rejection or modification. These penalties have been set by the Command Staff, and are listed below:

SPD Personnel who are _unexcused_ from training, court, or appointments with vehicle maintenance will receive the following:

| | |
|---|---|
| First offense: | Written Reprimand |
| Second Offense: | 1 Day Suspension |
| Third Offense: | 3-Day Suspension |
| Fourth Offense: | Chief's Office |

KANG 001328

**EXHIBIT 9**

Each category will stand alone, not consolidated.

**Example:**

| | |
|---|---|
| Unexcused absence from court | Written Reprimand |
| Unexcused absence from training | Written Reprimand |
| Unexcused absence from court (second violation) | 1 Day suspension |

*Time Frame*: After two (2) years the penalty enhancement drops off, however, the disciplinary file remains. [In other words, if you have a failure to appear (Court) in January 2007 and then a failure to appear in January 2008; in January 2009 the first one drops off. If you have a third failure to appear in February 2009, then you have two penalties.]

**Example:** Written Reprimand for court: Jan. 2007
1-Day Suspension for court: Jan. 2008
Jan. 2007 penalty drops off: Jan. 2009.
Failure to appear in Feb. 2009: 1-Day Suspension.

## X. RUDENESS COMPLAINTS

A. Rudeness complaints will generally be classified as a Citizen Complaint. Depending upon the severity of the allegation, such complaints may require a formal investigation. Should a citizen's complaint be so severe as to merit a formal investigation, it will then be labeled as an Internal Investigation.

B. When appropriate, the Precinct/Unit supervisor shall conduct the investigation, including interviewing the complainant as soon as practical regarding the complaint and any witnesses readily available in person. The supervisor shall also advise the subject employee of the complaint.

C. If the finding is <u>Sustained</u> (all other findings do not apply), the Commander or designee must give the appropriate pre- determined penalty to the employee. These penalties have been set by the Command Staff, and are listed below:

SPD Personnel who have <u>sustained</u> rudeness complaints will receive the following:

| | |
|---|---|
| First offense: | Written Reprimand |
| Second Offense: | 1 Day Suspension |
| Third Offense: | 3-Day Suspension |
| Fourth Offense: | Chief's Office |

*Time Frame*: After two (2) years the penalty enhancement drops off, however, the disciplinary file remains. [In other words, if you have a <u>sustained</u> rudeness complaint on January 1, 2011 and another in January 2, 2013; the January 1, 2011 will drop off and does not apply to the progressive discipline above. If you have another in February 2013, then you have two applicable offenses and a 1 day suspension would apply.]

## XI. ADMINISTRATIVE INVESTIGATION FILES [CALEA 52.1.2]

A. The OPS shall be responsible for maintaining all records regarding internal investigations within the Office of Professional Standards.

EXHIBIT 9

B. The OPS shall take all proper precautions to ensure the security of these records. These records shall be stored separate and apart from personnel records.

C. All complaints received by any member of the Department, against the Department or an employee, shall be assigned a complaint control number. OPS will assign control numbers and will enter them into a computer database.

D. OPS shall prepare a file for every complaint assigned. The file shall contain the original report, audio tapes of OPS interviews, incident reports, photographs, and other pertinent documentation.

E. Folders shall be filed numerically by control number and kept secure while in the custody and control of OPS.

F. No one may access the files without the permission from the Chief of Police or the OPS Commander.

G. No portion of the file shall be copied or reproduced by anyone other than the OPS personnel.

H. For record keeping efficiency, information contained in the log book and card files may be computerized.

## XII. OFFICE OF PROFESSIONAL STANDARDS MONTHLY AND ANNUAL REPORTS

A. The OPS Commander, or designee, will prepare a monthly report that will be due at the end of each month. The report will be provided to the Chief of Police and will detail the:

1. Number of complaints against sworn and non-sworn employees of the SPD.

2. Nature of the complaints identified by the type of Department violations.

3. Disposition of the complaints.

4. Number of Use of Force Reports received from Division Commanders during the month, including the number of incidents in which the use of force resulted in an individual being treated at a hospital.

B. The OPS Commander, or designee, will prepare an annual report at the end of each year based upon information in the previous year's monthly reports. The annual report is for dissemination to the public and to SPD employees upon request. [CALEA 52.1.5]

## XIII. EARLY INTERVENTION SYSTEM

A. The SPD has the responsibility to its employees and to the community to identify and assist employees that show symptoms of job-related stress and/or performance deficiencies. An Early Intervention System has been developed to provide a systematic review of complaints received by the SPD, and use of force incidents. It is designed to highlight tendencies in regard to complaints and use of force incidents that may otherwise be overlooked by the Department. [CALEA 35.1.9a]

**EXHIBIT 9**

B. The first and second line supervisors are crucial to a successful Personnel Early Warning System program. They should always be cognizant of their employees and watch for signs of performance issues. [CALEA 35.1.9d]

C. If a supervisor becomes aware of a problem with an employee that warrants immediate attention, he or she should not wait for the employee to be identified by the Personnel Early Warning System before taking action to rectify the situation.[CALEA 35.1.9 b.d]

D. These may include but are not limited to:[CALEA 35.1.9d]

   1. Excessive sick leave usage

   2. Excessive injuries

   3. Displays of emotional hostility

   4. Excessive accidents

   5. Excessive tardiness

   6. Alerts triggered by the Early Warning System

E. An annual report will be prepared by the OPS, outlining personnel complaints, use of force incidents, and will contain the names of employees who have received three or more OPS investigations within a rotating 365-day period or receive any ALERTS for Use of Force.

F. The OPS Case Management System will give an ALERT for 3 or more OPS investigations within a rotating 365-day period and 3 or more Use of Force Reports within a 90-day period.

   1. The annual report will provide a brief profile of the complaints and use of force incidents.

   2. Profile for the complaints will include the employee's name, payroll number, name of complainant, nature of the complaint, and disposition (if known).

   3. Profile for use of force incidents will include the employee's name, payroll number, subject's name, date of incident, nature of incident, and extent of injury, if any.

G. Report data will be disseminated monthly to the appropriate supervisors for review. A summary of supervisory review findings will be submitted to the Office of Professional Standards. The concerned Commander or designee and the employee's supervisor will jointly make a final determination based on an assessment of the report data and other relevant criteria.

H. Determinations will result in the following alternative measures:

   1. Referral to Employee Assistance Program (EAP), the City Psychologist, or other approved practitioner for counseling or referral assistance.

   2. Participation in stress reduction programs.

   3. Corrective action.

   4. Training/Remedial Training. [CALEA 35.1.9e]

   5. Reassignment

EXHIBIT 9

    6.    Suspension of outside employment authorizations

I.    The Employee Profile System establishes a data collection source profiling SPD employees to identify patterns of stress-induced or performance problems.

J.    Profiles will document specified criteria for assessment:

    1.    Compliance.

    2.    Use of Force incidents.

    3.    Commendations.

    4.    Corrective actions.

    5.    Promotional status change.

K.    Immediate supervisors, as deemed necessary, will review profile reports. The concerned Commander or designee will review profile reports annually, in conjunction with other criteria, to identify problems.

L.    Based on profile reports and relevant data, the following actions may be taken.

M.    Referral to the EAP or City Psychologist for counseling or additional referral.

    1.    Participation in stress reduction training either voluntarily of mandatory.

    2.    Corrective action.

    3.    Assessment that no problem exists, terminating further action.

N.    All ALERTS will be maintained within the OPS Case Management System.

O.    All levels of supervision will be responsible for ensuring that the OPS is aware of all complaints against, commendations awarded, and each incident of use of force involved by each employee under their command. This is to ensure accuracy in compiling profiles. [CALEA 31.5.9b]

P.    All levels of supervision can make recommendations of remedial training in instances where remedial or additional training can correct the behavior. In these situations, the OPS will still be notified of the recommendation.

Q.    The OPS Commander will prepare a yearly report evaluating the effectiveness of the early warning system and make recommendations for any changes to the Chief of Police.

This General Order supersedes all written directives issued prior to 08/29/2018, pursuant to Office of Professional Standards.

**BY ORDER OF:**
**Original Signature on File**

**Mark Revenew**
**Interim**
**Chief of Police**

EXHIBIT 9



SavannahPD.org

# **SECTION 1**

## Investigator's Report

## By:

## Lt. Robert Larry III



PLAINTIFF'S
EXHIBIT
28
11-11-22
PENGAD 800-631-6989

EXHIBIT 9



SavannahPD.org

### ADMINISTRATIVE INVESTIGATION
#### Incident Report

| OPS NUMBER: | 19-0384 |
|---|---|
| EMPLOYEE: | Officer Adrian Gates |
| DATE: | 11-8-19 |
| INVESTIGATOR: | Sgt. Robert Larry III |

I was assigned this investigation by OPS Commander Captain Alexander Tobar and Lt. David Barefield involving an SPD Officer Adrian Gates and his possible association with a subject named Traivon Feldman-Harris and family. Traivon Feldman-Harris was arrested for Armed Robbery on July 5th 2019 and a subsequent search warrant was executed by SIU investigators at 1807 Fitzgerald Street. While on scene Tamika Gaines who resides at 1807 Fitzgerald was very vocal about one of the SIU investigators later identified as Adrian Gates. Her concerns were shared with SIU Sgt. Arango and were related to Officer Gates and his association with the Harris family (Traivon Harris, Javon Harris and Vinnecia Harris).

**(There are numerous emails related to this case and those emails were added to this casefile and can be located in Section 6 under the Official Documents portion of this casefile.)**

SIU supervisor Sean Sueaquan also had concerns about Officer Gates and his failure to be where he was instructed to be and in light of these allegations he (Cpl. Sueaquan) was instructed to retrieve any jail recordings from Feldman-Harris during his stay at the CCDC. The recordings were sent to Captain Alex Tobar along with details of where to hear key/important parts of the conversations. The conversations appeared to be between Feldman-Harris and *his family and Officer Gates' name was mentioned during these calls*

In recording **P9_5033_87_20190707175520 Recording #1** at the 14:45 minute mark Feldman-Harris can be heard saying, "keep hollering at Gates bro see what that N (N-word) has to do. His mother can be heard telling him to be careful about what he says on the phone because the calls are recorded.

In recording **P9_5033_132_20190707183923 Recording #2** at the 15:15 minute mark Feldman-Harris can be heard saying, "I tried to talk to Gates before them crackers even grabbed me bro and them mutherfuckin' crackers beat my ass,

1

KANG 000212

**EXHIBIT 9**



# SAVANNAH POLICE
To Serve, Protect and Build Trust

*SavannahPD.org*

During this encounter, Sgt. Arango advised Cpl. Kang to disconnect his BWC which he did do. BWC footage was available on Cpl. Lord's and Apo. Reagin's BWC.

## CORRECTIVE MEASURES:

Since both officer no longer works for this agency no further action is needed in this incident.

## ADMINISTRATIVE INSIGHT:

Training Issues- N/A

Workplace Issues- N/A

Work / Complaint History- N/A

Demotion / Downgrade Considerations-

Relief from Duty Considerations- N/A



PENGAD 800-631-6989 • PLAINTIFF'S EXHIBIT 29 CUP 11-11-22

## Douglas Factors

1) _____ The nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; The action

2) _____ The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position.

3) _____ The employees past disciplinary record.

4) _____ The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability.

5) _____ The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties.

**EXHIBIT 9**

# SAVANNAH POLICE
To Serve, Protect and Build Trust

*SavannahPD.org*

6) _____ Consistency of the penalty with those imposed upon other employees for the same or similar offenses.

7) _____ Consistency of the penalty with any applicable agency table of penalties; N/A

8) _____ The notoriety of the offense or its impact upon the reputation of the agency.

9) _____ The clarity with which the employee was on notice of any rules that were violated in committing the offense or had been warned about the conduct in question.

10) _____ Potential for the employee's rehabilitation.

11) _____ Mitigating circumstances surrounding the offense such as unusual job tension, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter.

12) _____ The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

I hereby certify that I have considered the twelve (12) Douglas Factors as indicated above (with my initial next to each factor) for possible mitigation of the penalty.

NAME_____ DATE_____

**CAPTAIN'S COMMENTS**

SIGNATURE_____

DATE          _____

**MAJOR'S COMMENTS:**

SIGNATURE_____

**EXHIBIT 9**



*SavannahPD.org*

**DATE** _____

**ASSISTANT CHIEF'S COMMENTS**

| |
|---|
| |

**SIGNATURE**_____

**DATE** _____

**CHIEF'S COMMENTS:**

| |
|---|
| |

**SIGNATURE**_____

**DATE** _____

**EXHIBIT 9**



<u>INTER-OFFICE CORRESPONDENCE</u>

**TO:**       Roy Minter, Chief of Police

**Thru:**     Lenny Gunther, Assistant Chief of Police
            Robert Gavin, Major Field Operations

**FROM:**     David W. Gay, Captain, Criminal Investigations Division

**SUBJECT:**  OPS# Pending (CRN 190607056)

**DATE:**     June 22nd , 2021

After reviewing the file, I submit the following:

I do not sustain either of the two allegations against Corporal Kang.

I sustain the two allegations against Sergeant Arango. Additionally, I also sustain a third allegation against Sergeant Arango under GO# ADM-007.

Allegation #3

**GO# ADM-007 Police Response to Aggression/ Resistance/ Force**

II Non-Deadly Force

  A Parameters for the use of non-deadly force

      1.  All officers who encounter a situation where the possibility of non-compliance to a lawful arrest exists, if possible, attempt to defuse the situation through verbal warning and persuasion.

This verbiage was taken from the policy in effect at the time of the incident and is included as part of the BlueTeam file.

Since both officers are no longer employed by SPD, I will not recommend discipline.

EXHIBIT 9

Print

# Savannah Police Department
## Response To Resistance Report

## Incident Details

| Date Received | Date of Occurrence | Time of Occurrence |
|---|---|---|
| 08/03/2019 | 08/03/2019 | 12:40 |

| Record ID Number | CRN | OPS # |
|---|---|---|
| 3812 | 190607056 | RR21-0105 |

| Date/Time Entered | Entered By | |
|---|---|---|
| 03/16/2021 14:25 | [IAPro entry - Corporal Sean Sueaquan] | |

| SPD BlueTeam LIVE Assigned Investigator | IAPro Assigned Investigator | |
|---|---|---|
| Major Devonn Adams - 1440 | Un-assigned | |

## Incident Summary

Deployed 2 less lethal/supersock rounds
Used body pressure to immobilize suspect during handcuffing

### Incident Location

**Addresses**
920 Mohawk Street, Savannah, GA, 31419

- Location of Occurrence: Chatham

## Use of Force Details

| Reason For Using Force | Service Being Rendered | More Than 1 Citizen Involved |
|---|---|---|
| Effecting Arrest | Serving A Warrant | Yes |

| Weather Condition | Light Condition | Distance to Citizen |
|---|---|---|
| Cloudy | Interior Lighting | 7 feet to 10 feet |

| Citizen Injured | Citizen Hospitalized | Citizen Arrested |
|---|---|---|
| Yes | No | Yes |

| Citizen Build | Citizen Height | Citizen Influence Assessment |
|---|---|---|
| Larger than officer | 5'7" to 5'9" | Agitated |

| Employee(s) Injured | Employee(s) Taken to Hospital | |
|---|---|---|
| No | Yes | |

## Crisis Details


## Reporting/Involved Citizen
### Pernell Drayton
Date of Birth: 10/18/1990   Race: Black   Ethnicity: Non-Hispanic   Gender: Male

**Addresses**
920 Mohawk Street, Savannah, GA, 31419

Phone Numbers [None Entered]

# EXHIBIT 9

**Role:** Arrestee

**Additional Snapshot Data**

| Homeless at time of involvement | Perceived Limited English | Primary Language |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

| Sexual Orientation | Gender Expression | Experiencing Mental Crisis (Officer Assessment) |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

| Experiencing Mental Crisis (Self Reported) | Armed at Time of Incident | |
|---|---|---|
| [None Entered] | [None Entered] | |

**Type of Resistance Citizen Used Against Employee**
· Passive Resistance

**Injuries Sustained By Citizen**

| Injury | Region | Injury Location |
|---|---|---|

Minor Injury



**Charges Against Citizen**
· Felony - Warrants
· Resist / Obstruct

## Pernell Drayton

**Date of Birth:** Unknown   **Race:** Black   **Ethnicity:** Unknown   **Gender:** Male

**Addresses** [None Entered]
**Phone Numbers** [None Entered]
**Role:** [None Entered]

**Additional Snapshot Data**

| Homeless at time of involvement | Perceived Limited English | Primary Language |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

| Sexual Orientation | Gender Expression | Experiencing Mental Crisis (Officer Assessment) |
|---|---|---|
| [None Entered] | [None Entered] | [None Entered] |

# EXHIBIT 9

**Experiencing Mental Crisis (Self Reported)**

[None Entered]

**Armed at Time of Incident**

[None Entered]

**Type of Resistance Citizen Used Against Employee**
· Passive Resistance

**Injuries Sustained By Citizen**

| Injury | Region | Injury Location |
|---|---|---|
| Minor Injury | 10, 12 | 1, 2 |



## Incident Employees

### Corporal Daniel Kang - 12043

Assignment at time of incident: Corporal Field Operations/Intelligence & Strategic Investigations/Strategic Investigative Unit Video Footage:
Issued - Activated - Effective
**Role:** Primary Officer
**Policy Outcome:** Not yet entered

**Force used by this Employee against Citizen**
· Firearm - Force Effective: Yes

**Less lethal force used by this Employee against Citizen**

| Force Used | Force Effective | Region | Point of Contact |
|---|---|---|---|
| Firearm | Yes | 10, 12 | 1, 2 |

# EXHIBIT 9



**Injuries Sustained By Employee**

| Injury | Region | Injury Location |
|--------|--------|-----------------|

No injuries noted or visible

## Tasks

No tasks to show

## Running Sheet Entries

No running sheet entries to show

## Attachments

| Date Attached | Attachment Description | Attachment Types |
|---------------|------------------------|------------------|
| 06/22/2021 | Body-worn video | |
| 06/22/2021 | LOT- 190607056 Arrango | docx |
| 06/15/2021 | ADM-007 Police Response to Aggression, Resistance, and Force | pdf |
| 06/22/2021 | Daniel Kang body-worn camera video | |
| 06/22/2021 | KangArangoUoC memo | pdf |
| 04/13/2021 | CPL Kang's BWC from 6/7/2019 | |

## Assignment History

| Date/Time Sent | From | To | Activity |
|----------------|------|-----|----------|
| 04/13/2021 09:16 | Cor S Sueaquan | | Field status changed in IAPro from to Field assigned |
| 04/13/2021 09:16 | Cor S Sueaquan | Corporal Sean Sueaquan | IAPro assigned |

# EXHIBIT 9

| 04/13/2021 10:33 | Corporal Sean Sueaquan | Lieutenant Torrance Garvin | Incident re-assigned by Corporal Sean Sueaquan to Lieutenant Torrance Garvin for further work-up. |
| 06/22/2021 13:48 | Lie D Barefield | | Field status changed in IAPro from Completed - review pending to Released |
| 06/22/2021 13:49 | Lie D Barefield | | Field status changed in IAPro from Released to Field assigned |
| 06/22/2021 13:49 | Lie D Barefield | Captain David Gay | IAPro assigned |
| 06/22/2021 13:51 | Captain David Gay | Major Robert Gavin | Incident re-assigned by Captain David Gay to Major Robert Gavin for further work-up. |
| 06/22/2021 15:12 | Cor S Sueaquan | Major Devonn Adams | IAPro assigned as part of IAPro re-route |
| 07/06/2021 15:07 | Cor S Sueaquan | | Field status changed in IAPro from Completed - in holding bin to Released |

## Chain of Command History

### Routing Number: 1

| From | Corporal Sean Sueaquan |
| To | Corporal Sean Sueaquan |
| Cc: | |
| Date/Time Sent | 04/13/2021 09:16 |

**Instructions From [ Corporal Sean Sueaquan ] To [ Corporal Sean Sueaquan ]**

Use Kang's original SoF21-0003, to complete this Response to Resistance

**Comments/Response From [ Corporal Sean Sueaquan ]**

[Corporal Sean Sueaquan has re-assigned the incident to Corporal Sean Sueaquan]

### Routing Number: 2

| From | Corporal Sean Sueaquan |
| To | Lieutenant Torrance Garvin |
| Cc: | |
| Date/Time Sent | 04/13/2021 10:33 |

**Instructions From [ Corporal Sean Sueaquan ] To [ Lieutenant Torrance Garvin ]**

This June 7, 2019, incident was originally submitted by CP_ Kang on August 3, 2019, as a Show of Force - SoF21-0003. Before it could be corrected/changed to a Response to Resistance, CPL Kang was terminated and a new entry was resubmitted/duplicated to properly document this incident. When this Response to Resistance entry was duplicated (from SoF21-0003), the Show of Force/ Use of Force and Crisis Details did not populate and had to be done manually. Moreover, in CPL Kang's initial SoF, he selected "Expandable Baton" as the type of force used, which was changed to "Firearm", based in part on his narrative that he "Deployed 2 less lethal/supersock rounds". In addition, we added the evidence.com link/URL, of CPL Kang's BWC for this incident, since it was not included in with the initial SoF that was submitted. Please review and forward with you findings

**Comments/Response From [ Lieutenant Torrance Garvin ]**

# EXHIBIT 9

This is LOT for Sgt Arango & Cpl. D. Kang

Routing Number: 3

| | |
|---|---|
| **From** | Lieutenant Torrance Garvin |
| **To** | Captain David Gay |
| **Cc:** | |
| **Date/Time Sent** | 05/03/2021 02:19 |

**Instructions From [ Lieutenant Torrance Garvin ] To [ Captain David Gay ]**

Capt. Gay, Here is the LOT for Sgt Arango & Cpl Kang

**Comments/Response From [ Captain David Gay ]**

[Forwarded by Captain David Gay]

Routing Number: 4

| | |
|---|---|
| **From** | Captain David Gay |
| **To** | Lieutenant Torrance Garvin |
| **Cc:** | |
| **Date/Time Sent** | 06/04/2021 11:12 |

**Instructions From [ Captain David Gay ] To [ Lieutenant Torrance Garvin ]**

Please check your e-mail  Thnaks

**Comments/Response From [ Lieutenant Torrance Garvin ]**

Changes were made to reflect that either officer is still present with our agency

Routing Number: 5

| | |
|---|---|
| **From** | Lieutenant Torrance Garvin |
| **To** | Captain David Gay |
| **Cc:** | |
| **Date/Time Sent** | 06/13/2021 00:21 |

**Instructions From [ Lieutenant Torrance Garvin ] To [ Captain David Gay ]**

Capt. Gay, The changes were made to reflect that neither officer is employed with SPD agency and no further action is needed for this incident.

**Comments/Response From [ Captain David Gay ]**

[Forwarded by Captain David Gay]

Routing Number: 6

| | |
|---|---|
| **From** | Captain David Gay |
| **To** | Lieutenant Torrance Garvin |
| **Cc:** | |
| **Date/Time Sent** | 06/16/2021 15:33 |

**Instructions From [ Captain David Gay ] To [ Lieutenant Torrance Garvin ]**

## EXHIBIT 9

Torrance, Address the issues in my e-mail and resubmit. Thanks

**Comments/Response From [ Lieutenant Torrance Garvin ]**

Capt. Gay All necessary corrections have been made to LOT & Memo

**Routing Number: 7**

| | |
|---|---|
| **From** | Lieutenant Torrance Garvin |
| **To** | Captain David Gay |
| **Cc:** | |
| **Date/Time Sent** | 06/16/2021 23:00 |

**Instructions From [ Lieutenant Torrance Garvin ] To [ Captain David Gay ]**

Capt. Gay, Corrections made to LOT & Memo

**Comments/Response From [ Captain David Gay ]**

[Forwarded by Captain David Gay]

**Routing Number: 8**

| | |
|---|---|
| **From** | Captain David Gay |
| **To** | Captain David Gay |
| **Cc:** | |
| **Date/Time Sent** | 06/22/2021 13:38 |

**Instructions From [ Captain David Gay ] To [ Captain David Gay ]**

I need to upload an amended LOT

**Comments/Response From [ Captain David Gay ]**

Routing was NOT completed in BlueTeam. The incident was moved into IAPro by IAPro user Lieutenant David Barefield

**Routing Number: 9**

| | |
|---|---|
| **From** | Lieutenant David Barefield |
| **To** | Captain David Gay |
| **Cc:** | |
| **Date/Time Sent** | 06/22/2021 13:49 |

**Instructions From [ Lieutenant David Barefield ] To [ Captain David Gay ]**

Sending back so that you can upload attachments

**Comments/Response From [ Captain David Gay ]**

[Captain David Gay has re-assigned the incident to Captain David Gay]

**Routing Number: 10**

| | |
|---|---|
| **From** | Captain David Gay |
| **To** | Major Robert Gavin |
| **Cc:** | |

# EXHIBIT 9

**Date/Time Sent**

06/22/2021
13:51

**Instructions From [ Captain David Gay ] To [ Major Robert Gavin ]**

Assignment is complete. See the attached LOT and memo for details.

**Comments/Response From [ Major Robert Gavin ]**

Incident assignment and routing were closed out by IAPro user Corporal Sean Sueaquan and the incident was re-assigned and re-routed to Major Devonn C Adams [1440]

**Routing Number: 11**

| | |
|---|---|
| **From** | Major Robert Gavin |
| **To** | Major Devonn Adams |
| **Cc:** | |

**Date/Time Sent**

06/22/2021 15:12

**Instructions From [ Major Robert Gavin ] To [ Major Devonn Adams ]**

This should have been sent to you for review

**Comments/Response From [ Major Devonn Adams ]**

Completion notes: I CONCUR WITH CAPTAIN GAY AND FINDINGS

**EXHIBIT 9**





*SavannahPD.org*

## Letter of Transmittal

| | |
|---|---|
| **TO:** | Roy Minter, Police Chief |
| **THRU:** | Lenny Gunther, Assistant Chief |
| | DeVonn Adams, Major |
| | David Gay, Captain |
| **FROM:** | Torrance Garvin, Lieutenant |
| **DATE:** | April 28, 2021 |
| **SUBJECT:** | CRN#190607056 |

### COMPLAINT:

This investigation was an internal complaint against The Warrant Squad that was assigned under The Special Investigations Section. The following officers are assigned to the Warrant Squad: Sgt. Octavio Arango, Cpl. Brandon Lord, Cpl. Daniel Kang and Apo. Ronald Reagin. The Warrant Squad was tasked with apprehending offenders with outstanding warrants from Savannah Police Department.

On July 1 and July 3, 2019, the Warrant Squad was attempting to locate Pernell Drayton who had outstanding warrants for aggravated assault, aggravated battery and cruelty to children. The Warrant Squad responded to various previous residences attempting to locate Drayton to no avail.

### ALLEGATIONS:

**Sgt. Octavio Arango, Payroll# 00173**

**SPD GO #ADM-002 Organization and Direction, IV, A**

#### IV SUPERVISORY RESPONSIBILITY

A.     The responsibility of a supervisor is to account for employees under their supervision and to ensure that tasks are performed correctly and efficiently. A supervisor will be held responsible for issuing proper orders. To accomplish this responsibility, these orders must not be unlawful or in violation of Department rules and regulations or policies and procedures.



EXHIBIT 9

# SAVANNAH POLICE
To Serve, Protect and Build Trust

SavannahPD.org 

**SPD GO# ADM-004 Oath of Office, Ethics and Conduct**

**AA.** Orders - Orders from a superior to a subordinate will be in clear and understandable language, civil in tone, and issued in pursuit of SPD business.

**1.** Inappropriate Orders - No command or supervisory Officer will knowingly issue an order which is in violation of any law, ordinance, or Department rule. Employees who are given orders they feel to be unjust or contrary to rules and regulations must first obey the order to the best of their ability and then may proceed to appeal as provided below

**Cpl. Daniel Kang, Payroll#12043**

**SPD GO# ADM-004 Oath of Office, Ethics and Conduct**

**AA.** Orders - Orders from a superior to a subordinate will be in clear and understandable language, civil in tone, and issued in pursuit of SPD business.

**3.** Action upon receiving unlawful Orders - SPD employees receiving an unlawful, unjust, or improper order will, at the first opportunity, report in writing to the Chief of Police through official channels. This report will contain the facts of the incident and the action taken. Appeals for relief from such orders may be made at the same time. Extra-departmental action regarding such an appeal will be conducted through the office of the Chief of Police.

**SPD GO #OPS-067 Body Worn Camera**

**B. Officer Responsibilities**
**C. Activation and Deactivation of Body Worn Camera**

1. The BWC will be activated for all incidents involving citizen contacts. This would include, but is not limited to calls for service, traffic stops, activation of emergency equipment, suspicious person(s), vehicle contacts, use of force situations, warrant service, pursuits, arrest, if a pending citizen complaint is likely or any other significant event that would require supervisory notification. (CALEA 41.3.8 b, c)

**RECOMMENDATIONS:**

I recommend that the allegations against **Sgt. Octavio Arango**

**SPD GO #ADM-002 Organization and Direction, IV, A**        **SUSTAINED**

**EXHIBIT 9**

# SAVANNAH POLICE

To Serve, Protect and Build Trust

SavannahPD.org

**SPD GO#ADM-004 Oath of Office, Ethics and Conduct, AA; 1**     <u>**SUSTAINED**</u>

I recommend that the allegations against **Cpl. Daniel Kang**

**SPD GO# ADM-004 Oath of Office, Ethics and Conduct, AA; 3**     <u>**SUSTAINED**</u>

**SPD GO #OPS-067 Body Worn Camera, B, C**     <u>**SUSTAINED**</u>

## RATIONALE:

On 08/03/2019, The Warrant Squad executed arrest warrants at 920 Mohawk St, Apt 8F. It was determined that Pernell Drayton had active arrests warrants for Aggravated Battery, Cruelty to Children, and Aggravated Assault. It was also discovered that Drayton's live-in girlfriend, Carol Quinones, had an active Probation Violation warrant.

As the unit approached the apartment, there was a sign stating, "Trespassers will be shot" on the front window. Cpl. Lord knocked on the front door and Quinones answered the door with two small children. Quinones stated that Mr. Drayton was not present. Quinones was informed that she had an active misdemeanor Probation Violation Warrant. Her sister was to take custody of her two children.

Quinones stated that she did not want anyone going into her apartment and wanted the door to be left unlocked for her sister. The decision to enter the apartment to look for Drayton was made by Sgt. Arango due to Quinones suspicious behavior. The Warrant Squad proceeded to enter and look for Mr. Drayton. Announcements were made stating "POLICE" and that anyone in the apartment needed to advise. Apo. Reagin advised he observed movement in through the bathroom door. After repeated commands, the door opened, and Drayton was seated on the toilet. Drayton refused to show his hands after various commands, so Cpl. Kang shot Drayton with a less lethal/super sock munition.

The first round made Drayton stand up from the toilet, but he still did not comply. Cpl. Kang shot a second less lethal/super sock munition to Drayton. Apo. Reagin placed Drayton in handcuffs after a short struggle. Drayton was extremely disorderly, but after arrest and double locking he calmed down.

Drayton was secured inside the transport wagon and Quinones was moved from a marked unit to the transport wagon by Cpl. Lord. She was escorted to the wagon and pulled away from Cpl. Lord during escort. Quinones was pinned to the Cruiser door and advised to calm down. Both Drayton and Quinones were transported to Memorial Hospital for evaluation and clearance.

EXHIBIT 9

# 2 SPD officers fired, could face criminal charges following use of force investigation



wsav.com/crime-safety/watch-live-da-provides-update-on-firing-of-2-spd-officers/

WSAV Staff                                                                 August 13, 2020



by: WSAV Staff

Posted: Aug 13, 2020 / 07:02 AM EDT

Updated: Aug 13, 2020 / 07:02 AM EDT

SAVANNAH, Ga. (WSAV) – Two officers have been fired from the Savannah Police Department (SPD) following an excessive use of force investigation.

After watching the body camera video of the incident, Chatham County District Attorney Meg Heap is convening a special grand jury to discuss criminal charges against the pair.

Sgt. Octavio "Mike" Arango and Cpl. Daniel Kang — who had 15 and 8 years experience respectively — were placed on leave shortly after an incident in April.

"Two members of the (warrant) squad violated several policies including our use of force policy," said Savannah Police Chief Roy Minter.

The men were caught on a police body camera during a warrant sweep using what is being called excessive force against an individual.

EXHIBIT 9

That person turned out not to be the suspect the officers were looking for in the first place.

Though an internal affairs investigation called for their suspension, SPD Chief Roy Minter made the decision to fire Arango and Kang. They were officially separated from the department on July 30.

"The conduct of two members of the Savannah Police Department during this particular incident was totally unacceptable and egregious behavior on their part," Minter said. "I do not believe that their behavior during this incident is in line with the core values of our department which is to protect serve and to build trust in this community. I do not believe that their behavior is in line with what we expect for Savannah Police Department members of city employees or people that are charged with serving and protecting this community."

The recommendation for the officers' firing and request to involve the district attorney was made by the Savannah CARES (Citizens Accountability and Review of Emergency Services) task force, which was assembled just a few months ago to investigate incidents involving use of force and internal affairs data.

The task force reviewed body camera footage of the April incident and forwarded their recommendations to the chief and district attorney.

"I was horrified," said Savannah Mayor Van Johnson. "As someone who served as a law enforcement officer and a member of this community, I felt personally that it was absolutely inappropriate. I felt as a human resources professional that the chief's actions were absolutely appropriate."

During a protest for George Floyd's death, the mayor announced the creation of the task force to examine the police department.

"I meant what I said on that hot day at the end of May," Johnson said, "that it would be a new day in Savannah, that Black lives matter, that everyone's lives matter, that we are going to make sure that people are treated with dignity and respect."

Johnson said each member of Savannah CARES signed a confidentiality agreement "that is fully enforceable" before reviewing Arango and Kang's case because they would view things the general public would not.

"One (officer's dismissal) was sustained on three department policy violations the other on seven department violations," said Minter. "We did not have to search to find policies that governor their activities. The policies were in place the department policies were very clear. It was very clear to these officers that they violated those department policies."

Meanwhile, Heap has called for a special grand jury to look at the case the week of Sept. 14. At this time, the officers have not been arrested or formally charged.

EXHIBIT 9

Although Heap could not comment on what the footage shows, she called it "concerning."

"The best way I can ensure justice is to put this case in front of a grand jury as soon as possible," said Heap.

"We will support our police department but yet we are going to be committed that the people who do bad things who don't want to serve and protect will no longer be members of our police department," said Johnson.

Minter said that while the Georgia Bureau of Investigation was consulted, it probably would've taken longer to move forward with the case with the agency leading the investigation.

# EXHIBIT 9



Sgt. Octavio "Mike" Arango

# EXHIBIT 9



Cpl. Daniel Kang

EXHIBIT 9

# ONLY ON 3: Fired SPD officer's attorney calls special grand jury and possible criminal charges 'political'

3⁝ wsav.com/crime-safety/only-on-3-defense-chatham-county-da-talk-about-upcoming-special-grand-jury/

Andrew Davis                                                                                     September 16, 2020



Chatham County District Attorney says she has no political agenda, is following the law

by: Andrew Davis

Posted: Sep 16, 2020 / 06:00 AM EDT

Updated: Sep 16, 2020 / 06:00 AM EDT

SAVANNAH, Ga. (WSAV) — Two former officers of the Savannah Police Department could soon end up behind bars for what they did on the job.

A special Chatham County Grand Jury will meet this week to discuss if criminal charges should be pressed in the case against Sgt. Mike Arango and Cpl. Daniel Kang. Both men were fired from their jobs as Savannah officers earlier this year.

Arango says he was following the law, not breaking it that day in April, which led to his firing from SPD. Now a special grand jury could indict him and Kang.

Arango's lawyer calls the entire investigation all "political" and "unjust".

EXHIBIT 9

"They weren't treated fairly internally within the police department, and they are certainly not going to be treated fairly now by the State," said Michael Schiavone.

"Do you believe what they did was in policy?" News 3 asked.

"Absolutely," said Schiavone. "There is nothing in the video or anything they did that could rise to the level of being criminal."

On April 14, Arango, Kang, and two others from the SIS Warrant Squad went to the Moss Pointe Apartments in search of a suspect, Khalil Kelly.

In the police report obtained by News 3, Arango says the squad was told Kelly was living inside one of those apartments. When the officers approached, Arango writes that he ran inside.

"His conduct seeing those officers and then running back into the apartment clearly sends a signal to the officers that this is the individual," explains Schiavone, "that he is on notice they are looking for him and now they have to worry he has run in there and is armed and dangerous and have a weapon. And anyone else who is in there with them might have weapons and they have put those officers in danger.



Khalil Kelley was the suspect the Warrant Squad was searching for. They were told he was living in the apartment they eventually raided

"When the door was opened by the officers, Arango called the person's name out that they were looking for and this individual, who turned out not to be the person, acknowledged he was the person and came at them. So at that point, they are thinking that's the person from the warrant and he was armed and dangerous.

"They had every reason to believe that this individual was the person they were seeking for a violent offense. They had a warrant for his arrest for the person they were looking for, they did everything that they would normally do in an effort to find out if that was the individual."

But it was not that individual. The person they found was Darryl Faitele, a man who was not wanted by police at the time but was later arrested after another assault charge.

Faitele was taken to the ground after Arango writes he "disregarded several commands" to get on the ground and later spit blood at Arango.

EXHIBIT 9

It's what happened after that, all caught on body camera, that led to the officers firing- including verbal and physical abuse by the officers on Faitele.

"I was horrified," said Savannah Mayor Van Johnson during a news conference last month. "As someone who served as a law enforcement officer and a member of this community, I felt, personally, that it was absolutely inappropriate,"

Schiavone says the officers were just doing their job, not crossing the line or doing anything criminal.



Darryle Faitele was the man who Sgt Arango and Cpl Kang are accused of verbally and physically abusing on that porch in April. They initially thought he was the suspect.

## SIMPLE BATTERY LEO
## SAVANNAH POLICE DEPARTMENT



201 Habersham Street

Savannah, GA 31412

Nature of Call
SERVICE, SERVE WARRANT

PHONE (912) 651-6675

FAX (912) 651-6683

**200414073**   Supplement No 0001

Reported Date
04/15/2020

Officer
ARANGO, OCTAVIO

### Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| SAVANNAH POLICE DEPARTMENT | 200414073 | 0001 | 04/15/2020 | 12:33 | 201051221 |

| Status | Nature of Call |
|---|---|
| CRN REQUESTED | 8754 |

| Location | | City | Rep Dist | Area | Beat |
|---|---|---|---|---|---|
| 9400 ABERCORN ST, SAV APT 530 | | Savannah | 5711B | 2S | 444B |

| Officer | Assignment | | Entered by |
|---|---|---|---|
| 00173/ARANGO,OCTAVIO | STRATEGIC INVESTIGATIVE UNIT | | 00173 |

| Assignment | RMS Transfer | Prop Trans Stat | Report Title |
|---|---|---|---|
| STRATEGIC INVESTIGATIVE UNIT | Successful | Successful | SIMPLE BATTERY LEO |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 00173 | 04/17/2020 | 14:42:49 |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 1 | 16-10-24 | OBSTRUCTION OF AN OF | |
| 2 | 16-5-23 | SIMPLE BATTERY | 2 |

### Summary Narrative

This report is in reference to an arrest made during a SIS Warrant Squad fugitive apprehension attempt at 9400 Abercorn St. (apt 530).

### ARRESTEE 1: FAITELE,DARRYL

| Involvement | Invl No | Type | Name | MNI | Race | Sex |
|---|---|---|---|---|---|---|
| ARRESTEE | 1 | Individual | FAITELE,DARRYL | 550712 | BLACK | MALE |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|
| /1995 | 24 | No | 5'05" | 160# | Brown | Brown | 2331557 |

| Type | ID No |
|---|---|
| SOCIAL SECURITY NUMBER | |

Sgt Arango detailed what happened during the incident at Moss Pointe Apartments in April in his report.

EXHIBIT 9

"There needs to be an explanation about the procedure that's employed and why it reflects the way it does on the video," said Schiavone. "What they did they had to do for safety purposes to protect not just themselves but the individual and everyone else in the apartment.

"This sends a signal to every officer who works in this department. Will they be thrown under the bus by the department itself but also thrown under the bus by the DA's office."

That body camera footage has not been made public, but the mayor and Savannah Police Chief Roy Minter have shown it to the Savannah CARES task force, a group of citizens empaneled to discuss racial issues and help build equality in the City.

That group said what they saw was wrong — a fireable offense and potentially criminal one.

"Would you be in this position if there wasn't this video out there?" News 3 asked.

"Absolutely not," said Schiavone.

The attorney calls the entire investigation "flawed" because it was all done internally.

Kang and Arango were the first two of more than 70 officers to put their names <u>on the complaint filed against Minter back in early April</u>.

Arango himself, two months earlier, had sent an email to his superiors discussing a lack of personnel, vehicles, and equipment, as well as an incomplete or non-existent set of policies for the SIS Warrant Squad, which he was leading.



"The police department did not follow their own policy and procedures in the way they terminated him," explained Schiavone. "This was retribution in the form of the Police Chief and that's what this was about in the terms of losing their jobs."

"There was no due process given to these officers internally.," he continued. "The recommendation of the investigators in internal affairs and chain of command my understanding was suspension."

Sgt Arango and Cpl Kang were first two of 70+ officers to sign complaint against Chief minter back in February. Arango's attorney believes this was one of the reasons the Chief fired him

The disciplinary committee for SPD actually did recommend suspensions for both Kang and Arango after watching the body camera video themselves. Minter overrode that recommendation and fired the pair of longtime officers.

EXHIBIT 9

Major Adams, Lieutenant Toth, and I sustained all the allegations against Sergeant Arango.

Major Adams, Lieutenant Toth, and I reached a consensus on the following recommendations:

1. Incident review and training assessment by the Training Unit followed by additional training for Sergeant Arango.
2. Transfer out of SIS.
3. Review of SWAT Team membership

Additionally, Major Adams recommended a twenty-day suspension, while Lieutenant Toth and I recommended a fifteen-day suspension.

CC:    Major Devonn Adams
       Lieutenant Joe Toth
       Lieutenant David Barefield

The SPD disciplinary committee recommended suspensions for both Sgt Arango and Cpl Kang after watching the video. Chief Minter overrode their decision and fired both men

"He didn't follow the recommendations as most chiefs normally do, and I think it was personal and a political vendetta against these officers and that's why he fired them," said Schiavone.

"They didn't follow any of the policies and procedures with how they handled this internal investigation administratively. They violated every policy that should either be in existence, they followed a policy that didn't exist."

Chatham County District Attorney Meg Heap says the special grand jury she empaneled to discuss possible criminal charges is not looking at the past, they are just looking at this incident, and this body camera footage.

"When I saw it, I said, 'this is troubling,'" said Heap.

EXHIBIT 9



Johnson and Heap at press conference on police firing

News 3 asked why the GBI wasn't called in to investigate.

"You'd have to ask the chief that question," said Heap, adding, "Normally my procedure on any case involving any case of law enforcement is to have an outside agency investigate the case. That was not done here."

"I usually ask for the GBI to be called in just because they don't have ties here," continued Heap. "They are skilled at investigating actions of other law enforcement. that's what they do."

News 3 also asked Minter why he didn't call in the GBI to investigate this case. Savannah Police responded:

> After reviewing the preliminary details of the use of force, Chief Minter made the decision to move forward with an internal investigation first. Then at the conclusion of that investigation, he would determine whether to move forward with any criminal investigations. In this case, the internal investigation warranted that the information is sent to the District Attorney's Office for review.

Heap says she just got a finished SPD investigation last week, two weeks after the news conference was called and two months after the officers were fired.

As for the calling of a special grand jury, the DA says neither the mayor nor Savannah CARES played a role in the decision.

EXHIBIT 9

"I was informed he did show this to them, but I saw it first hand and that's why I wanted to get this in front of a grand jury," she said.

Heap says it is her office's policy not to release body camera or other video or audio in a case before it has gone to court. That is why she has not made this video public.

"I have always wanted a case to be tried in a court of law not a court of public opinion," she said. "However, the mayor has an initiative about excessive use of force potentially by law enforcement. That is his initiative. I think he's trying to do what's right here. I don't object to that."

Heap says the special Georgia Judicial Decree during COVID-19 is planned for cases just like this one. Anything that would normally be a case to bring in front of the grand jury, from assaults to murders and beyond, are not eligible.

Cases like this are eligible "because it involves law enforcement officers certain measures have to be taken by law," explains Heap.

Despite what some, like Schiavone, say Heap says she is not being political and is just following the law.

"Every officer-involved I have put to a grand jury since 2013, I made that my stance," said Heap. "In 2014 I had my first officer-involved incident. We created a policy that would bring transparency and fairness to all parties involved. I am following the same policy."

The grand jury is expected to hear the case on Thursday.

Arango and Kang will each have a chance to address the jury and take questions after prosecutors make their case for indictment.

**EXHIBIT 9**



PLAINTIFF'S
EXHIBIT
33
ap 11-11-22



# SAVANNAH POLICE
To Serve, Protect and Build Trust

*SavannahPD.org*

### INTER-DEPARTMENT MEMO

**TO:**       Roy Minter Jr., Police Chief

**THRU:**    Lenny B. Gunther, Assistant Police Chief

              Devonn Adams. Field Operations Major

**FROM:**    Michelle Halford, Captain, Southside Commander

**SUBJECT:** OPS # 20-0058,20-0059, and 20-0060

**DATE:**    September 9, 2020

---

In reference to the above referenced OPS investigation, I submit the following regarding Officer Adrian Gates.

On Wednesday September 9 at 1330 PM a disciplinary review board convened by Assist Chief Gunther to review this investigation and make recommendations.

The board consisted of the following members:

> Assistant Chief Lenny B. Gunther, Field Operations
>
> Major DeVonn Adams, Field Operations
>
> Michelle Halford, Southside Commander & Scribe
>
> Darold Holmes, Southside Lieutenant
>
> Andrew Arnsdorff, Southside Sergeant
>
> Richard Wiggins, Sergeant of Office of Professional Standards

The disciplinary board met in private and discussed the investigation. Based on the information contained within the case file, BWC, and incident report we found that the incident report contained several untruthfulness statements and polices violations. Officer Gates has been employed with the Savannah Police Department since December 26, 2016. He has previous discipline to include several suspensions and written reprimand.

The board sustained following allegations against Officer Adrian Gates:

**OPS 20-0058**

KANG 000410

EXHIBIT 9

**ADM-018, Searches and Seizures**

- Consent Search

**ADM-004, Oath of Office, Ethics, and Conduct**

- Arresting and Dealing with Law Violators
- Knowledge of Laws and Rules
- Questions of Citizens
- Truthfulness/Honesty

**OPS# 20-0059**

**OPS-067, Body Worn Camera**

- *Activation and Deactivation of BWC*

**OPS-049, Incident Reporting**

- *Preliminary Incident Reports*

**ADM-015, Outside Employment**

- *Maximum Number of Allowable Hours*

**ADM-004, Oath of Office, Ethics, and Conduct**

- *Truthfulness/Honesty*
- *Treatment of Others*
- *Duty Time*
- *Fitness for Duty (Sleeping)*
- *Officer Availability*

**OPS# 20-0060**

**OPS-015, Arrest Protocol**

- Arrest with a Warrant

**ADM-018, Searches and Seizures**

- **Search Incident to Arrest**

**ADM-004, Oath of Office, Ethics, and Conduct**

- Arresting and Dealing with Law Violators
- Knowledge of Laws and Rules
- Incompetence

The disciplinary board **did not** sustain the following allegation against officer Gates:

**ADM-004, Oath of Office, Ethics, and Conduct**

- Address and Telephone Number

KANG 000411

EXHIBIT 9

The discussion then shifted to discipline. During this discussion, we discussed the seriousness of each policy violations. The board determined the appropriate discipline for Officer Adrian Gates is **Termination**. We also determined that Officer Bradshaw will receive additional coaching and mentoring for her policy violations.

### Douglas Factors

1) **MMH** The nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; **Officer Gates knowingly lied to his supervisor about the incident involving the arrest of Mr. Padgett and about the sleeping while on duty.**

2) **MMH** The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; **Numerous contacts with the public as a precinct beat/patrol officer.**

3) **MMH** The employee's past disciplinary record; **Officer Gates has received several suspensions and written reprimand for policy violations.**

4) **MMH** The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability **Officer Gates has been employed with the Savannah Police Department since December 26, 2016.**

5) **MMH** The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties; **Due to his Dishonesty, Officer Gates can no longer serve as a Savannah Police officer.**

6) **MMH** Consistency of the penalty with those imposed upon other employees for the same or similar offenses: **Termination due to untruthfulness issues has been the standard of the Savannah Police department.**

7) **MMH** Consistency of the penalty with any applicable agency table of penalties; **Termination is the appropriate penalty for untruthfulness.**

8) **MMH** The notoriety of the offense or its impact upon the reputation of the agency; **Every time this officer testifies in court, he will have to disclose that he has been**

EXHIBIT 9

**dishonest. His previous sustained complaints have been on the local news and has cause an embarrassment for our department.**

9) <u>**MMH**</u>  The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; **Officer Gates recently just served a 40 hour suspension for similar policy violations. Officer Gates should have known that honesty and integrity are the foundation of law enforcement and held in high regard with the Savannah Police Department.**

10) <u>**MMH**</u>  Potential for the employee's rehabilitation; **Termination was recommended.**

11) <u>**MMH**</u> Mitigating circumstances surrounding the offense such as unusual job tension, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; **None**

12) <u>**MMH**</u> The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others; **Holding employees accountable will deter others from doing the same violation.**

I hereby certify that I have considered the twelve (12) Douglas Factors as indicated above (with my initial next to each factor) for possible mitigation of the penalty. *Michelle Hubbard*

EXHIBIT 9



PLAINTIFF'S
EXHIBIT
34
ap 11-11-22

EXHIBIT 9

# Investigative File / Appeal Preparation

- While examining the case file, I came across a document labeled "Discipline Review Board Findings"
- This document contained each member of the board's decisions on what allegations were sustained and each member's recommended punishment.
- No one on the board recommended termination.
- The policies that were added as reference, were vague and were highlighted with no explanation.
- As I continued to search the disc, I realized that I had not been given the complete investigative file for OPS 20-0022.
- There was no Letter of Transmittal (LOT) included in the investigative case file.
- I was unable to see what explanations or justifications were given by my chain of command for sustaining the allegations.
- Also, I was unable to read the explanation for Chief Minter's refusal to accept the board's recommendation.



PLAINTIFF'S
EXHIBIT
35
ap 11-11-22
PENGAD 800-631-6989



**EXHIBIT 9**

201 Habersham St (S.P.D)
Sav GA
   31401

JACKSONVILLE FL 320
26 APR 2021 PM 1 L

Ea...
April 2...
FOREVER USA

ATTNY: Brent Savage
102 E Liberty St
8TH FLOOR
Savannah, GA
        31401

31401-444499



**PLAINTIFF'S EXHIBIT**
36
ayd 11-11-22
PENGAD 800-631-6989

EXHIBIT 9

To the Mayor, City Manager, City Council, Citizens of Savannah, and anyone whom cares about the Moral and Effectiveness of the Savannah Police Department......

CHIEF OF POLICE, (Roy Minter), has announced he will promote a Major to the ranks of our department. What he failed to make known is the comments overheard regarding his Cpt of choice. Chief Mentor has been overheard saying to Cpt. Gay **"You will be the next Major, regardless of who applies, I owe you that much".**

Cpt Gay has been under the wings of Chief Minter since he arrived, but never questioned the misguided, moral killing leadership Chief Minter has bestowed upon our department.

**SILENCE IS COMPLICITY**. Now we understand why Cpt Gay is the ONLY officer Chief Minter Confides in. He gets no push back from Cpt Gay. Others that have tried to push back have been punished in subliminal methods.

**Cpt Gay** has a former and current history surrounding his treatment of females that have worked for or with him. Even to the extent of having to remove a female from working for and/or around him.

**DON'T TAKE OUR WORD FOR IT.... RESEARCH HIS COMPLAINTS...**

**Cpt Gay** has never commanded at the precinct level (as the normal line of progression requires), he has never even attempted to create any sort of liaison with any Community or its Leaders. He has No street knowledge or experience. Which is what Savannah needs in light of the rash of shootings and unsolved killings.

**AGAIN, DON'T TAKE OUR WORD FOR IT.... RESEARCH IT FOR YOURSELF.**

WE HAVE MORE QUALIFIED, EXPERIENCED, AND COMMUNITY ORIENTED CPTS THAN CPT GAY...

Promoting Cpt Gay would be creating and archiving the failed Legacy of Chief Minter which would continue to plague our Police Dpt. It would also be a display of the ultimate disrespect for the woman he disrespected and discriminated against.

PLEASE ALLOW OUR POLICE DEPARTMENT TO RECOVER AND REBUILD FROM THE DISASTROUS TENURE OF CHIEF MINTER.

EXHIBIT 9



Termination Appeal

CPL Dan Kang
30 Jul 2020

KANG 001282



EXHIBIT 9

## Responsibility

- ADM-004: Conduct Unbecoming
- ADM-004: Treatment of Others
- ADMN-007: Reporting a Police Response to Aggression Resistance Force

KANG 001283

EXHIBIT 9

## Previous work history/performance

- Strong work ethic from patrol, CSU, VCTF, CNT, SWAT, SIS
- Spending personal time and finances to improve capabilities
- History of trying to improve SPD programs
  - SWAT
  - SIS – Warrants
- Military – Active and Reserve

KANG 001284

EXHIBIT 9

# Disciplinary History



**Office of Professional Standards**

**Sergeant Richard Wiggins, Investigator**
**Internal Affairs**

**Prior Discipline**

**Cpl. Daniel Kang**

No Prior Discipline

KANG 001285

EXHIBIT 9

# Discipline Review Board Findings (10 Jun)

Corporal Daniel Kang stood accused of violating the following policies:

1. SPD GO# ADM-004 Conduct Unbecoming
2. SPD GO# ADM-004 Treatment of Others
3. SPD GO# ADM-007 Reporting a Police Response to Aggression/Resistance/Force

Major Adams, Lieutenant Toth, and I sustained all the allegations against Corporal Kang.

Major Adams Lieutenant Toth and I recommended the following:

1. Incident review and training assessment by the Training Unit followed by additional training for Corporal Kang.
2. Transfer out of SIS.
3. Review of SWAT Team membership
4. A five-day suspension

KANG 001286

EXHIBIT 9



# Mitigating Factors

- October 2015 OIS
- COVID-19/Shelter in Place
- Previous work history and performance

KANG 001287

EXHIBIT 9

# October 2015 OIS

- Memories were non intrusive
- Hypervigilance
- Never hesitated to undertake dangerous operations to help fulfill SPD missions

- Several individuals may have observed symptoms but dismissed it or did not act
- July 2020: Dr Sampson (psychological evaluation) stated I should have been receiving treatment/counseling
  - Fit for duty
  - Recently learned of potential trauma

KANG 001288

EXHIBIT 9

# COVID-19 / Shelter in Place

- Shelter in Place:
    - Savannah – 24 Mar 2020
    - Georgia – 2 Apr 2020

- Did not receive PPE until late April

- 3 weeks – Loss of hobbies/Stress relief
    - Going out with friends
    - Gym
    - Jiujitsu
    - Competitive shooting
    - Afraid to visit parents

KANG 001289

EXHIBIT 9

# Khalil Kelly – High level threat to community

- Unit mission: Apprehension of high profile individuals who are a risk to the safety of the community

- Arrest Warrants:
  - Aggravated Assault
  - Battery
  - Obstructing/Hindering Emergency Call

- Previous arrest in 2017:
  - Felony Fleeing to Elude, Reckless driving, No child restraint

KANG 001290

EXHIBIT 9

# Previous work history/performance

- Decorated
  - CNT Agent of the Quarter – 1Q2019
  - Medal of Valor – August 2018
  - Medal of Distinction – March 2017
  - Team Award/Central Precinct CSU – April 2016
  - Team Award/SWAT – April 2016 (2 incidents)
  - Medal of Valor – March 2016
  - Certus Bank Community Spotlight Hero – December 2014

KANG 001291

EXHIBIT 9



## THE SAVANNAH POLICE DEPARTMENT

*proudly presents the*

# MEDAL OF VALOR

*to*

### Cpl. Daniel Kang

in honor and recognition for demonstrating exceptional bravery, exemplary courage and unselfishly risking your own life while responding to a barricaded gunman on Chapel Lake South on February 18, 2017, resulting in the successful apprehension of the suspect and rescue of a woman and two children. You are hereby authorized to wear the official Medal of Valor and service bar, issued by the Savannah Police Department

### on this 3rd day of August 2018

Mark Revenew, Chief of Police

KANG 001292

EXHIBIT 9



# THE SAVANNAH-CHATHAM METROPOLITAN POLICE DEPARTMENT

*proudly presents the*

# MEDAL OF DISTINCTION

*to*

## APO Daniel Kang

*in honor and recognition for demonstrating exceptional bravery and exemplary courage, along with your SWAT team members, when responding to a domestic shooting on December 23, 2016 and quickly rescuing the injured woman who had been shot. You are hereby authorized to wear the official Medal of Distinction and service bar, issued by the Savannah-Chatham Metropolitan Police Department*

*on this 3rd day of March 2017*

Joseph H. Lumpkin, Sr., Chief of Police

KANG 001293

**EXHIBIT 9**



## THE SAVANNAH-CHATHAM METROPOLITAN POLICE DEPARTMENT

*proudly presents this*

# UNIT-TEAMWORK CITATION

*to*

### APO Daniel Kang, SWAT Team

*in honor and recognition for your outstanding performance in the coordinated and cumulative effort when responding to an "officer down" call in Pooler on February 10th, 2016 in which a deputy had been shot by a barricaded gunman and others were pinned down behind their vehicles. The teamwork displayed to rescue fellow law enforcement officers and end the standoff peacefully illustrates your commitment to the SCMPD and the community.*

*on this 20th day of April, 2016*

Joseph H. Lumpkin, Sr., Chief of Police



KANG 001294

EXHIBIT 9



THE SAVANNAH-CHATHAM METROPOLITAN POLICE DEPARTMENT

*proudly presents this*

# UNIT-TEAMWORK CITATION

*to*

## APO Daniel Kang, SWAT Team

*in honor and recognition for the outstanding performance in the coordinated and cumulative effort on February 4th, 2016 when you responded to a barricaded gunman at a Georgetown apartment complex; the gunman was firing at officers, their vehicles, and equipment. The teamwork displayed to spend 10 hours in cold, wet conditions to convince the gunman to surrender without causing any harm to officers, bystanders, or the gunman illustrates your commitment to the SCMPD and the community.*

*on this 20th day of April, 2016*

Joseph H. Lumpkin, Sr., Chief of Police

KANG 001295

EXHIBIT 9



## THE SAVANNAH-CHATHAM METROPOLITAN POLICE DEPARTMENT

*proudly presents this*

# UNIT-TEAMWORK CITATION

*to*

### APO Daniel Kang, Central Precinct CSU

*in honor and recognition for your outstanding performance in the coordinated and cumulative effort to improve public safety in the Central Precinct neighborhoods by saturating high crime areas, tracking down the violent criminals, and building rapport with the citizens to improve community policing efforts. The teamwork displayed by you led to the arrests of several homicide and shooting suspects in 2015 and illustrates your commitment to the SCMPD and the community.*

*on this 20th day of April, 2016*

Joseph H. Lumpkin, Sr., Chief of Police

EXHIBIT 9



# THE SAVANNAH-CHATHAM METROPOLITAN POLICE DEPARTMENT

*proudly presents the*

# MEDAL OF VALOR

*to*

## Officer Daniel Kang

*in honor and recognition for demonstrating exceptional bravery, exemplary courage and unselfishly risking your own safety to alleviate danger during a shootout with a suspect and rendering aide to a fellow officers on October 28, 2015. You are hereby authorized to wear the official Medal of Valor and service bar, issued by the Savannah-Chatham Metropolitan Police Department*

*on this 25th day of March 2016*

Joseph H. Lumpkin, Sr., Chief of Police

KANG 001297

EXHIBIT 9





SAVANNAH, GA (December 16, 2014) — Certus Bank's, AVP and Manager of the Hodgson Memorial Branch, Tina Browning presented Central Precinct officer Daniel Kang with the Certus Bank Community Spotlight Hero award for his continued excellence in protecting and serving the citizens of the Central Precinct Neighborhood and the City of Savannah as a whole. Officer Kang is committed to his department, precinct and keeps the integrity of his beat intact. Officer Kang is a three-time deployment Iraq war veteran.



A triptych with Officer Daniel Kang's accomplishments will stand in the Certus Bank lobby located on Hodgson Memorial drive.

KANG 001298