## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| DANIEL KANG, | |
| Plaintiff, | CIVIL ACTION NO.: 4:21-cv-111 |
| v. | |
| THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH; and ROY W. MINTER, JR., Chief of Police for the City of Savannah, Georgia, in his Individual Capacity, | |
| Defendants. | |

## **O R D E R**

Plaintiff Daniel Kang sued Defendants the Mayor and Aldermen of the City of Savannah ("the City") and Savannah Police Chief Roy M. Minter alleging that the City, among other things, violated his rights under the First Amendment, the Due Process Clause, and the Equal Protection Clause when it terminated his employment after he reported complaints about Minter to the City's human resources department. (Doc. 35, pp. 24–29.) Presently before the Court is the City's Motion for Summary Judgment, in which it argues, among other things, that Plaintiff has failed to produce evidence that he was denied procedural due process in his termination proceedings, that he was retaliated against because of complaints against Minter, and that he was discriminated against because of his race. (Docs. 95, 95-1.) Plaintiff filed a Response, (doc. 118), the City filed a Reply, (doc. 128), and Plaintiff filed a Sur-Reply, (doc. 141). For the reasons more fully explained below, the Court **GRANTS** Defendants' Motion for Summary Judgment, (doc. 95).

# BACKGROUND

## I.      The April 14, 2020, Incident

In September 2012, Plaintiff, who identifies as an Asian male, began working for the City with the Savannah Police Department ("SPD").  (Doc. 118-76, pp. 1, 45.)  Plaintiff has a B.S. in Engineering and served as a Captain in the U.S. Air Force while on active duty.  (Id. at p. 1.)  He still serves in the Air Force Reserve.  (Id.)  While employed with SPD, Plaintiff served in patrol, crime suppression, counternarcotics, and SWAT, and, near the end of his employment, he served as a corporal on the four-person SIS warrant squad.  (Id. at p. 2.)  The warrant squad, headed by Sergeant Arango, received and served arrest warrants.  (Id.)

On April 14, 2020, the SIS warrant squad went to an apartment located at 9400 Abercorn Street, Savannah, Georgia, to find an individual named Kahlil Kelly who had an outstanding arrest warrant for aggravated assault.  (Id. at p. 5.)  The SIS warrant squad addressed a man inside the apartment they believed to be Kelly, who then came to the door.  (Id.)  Plaintiff then grabbed the suspect and pulled him to the ground.  (Id.; see doc. 95-3, p. 16.)  The suspect was taken to the ground face first, busted his chin, and began bleeding.  (Doc. 118-76, p. 6; see doc. 95-6, p. 9; doc. 95-3, p. 16.)  The SIS warrant squad then handcuffed the suspect, and the suspect began saying that he was not the man they were looking for.  (Doc. 118-76, p. 6; see doc. 95-6, p. 11.)  Once the man was made to stand up, Arango and Plaintiff placed him in a chair "with some force."  (Doc. 118-76, pp. 6–7; see doc. 95-6, p. 12–13.)  Shortly after the suspect was handcuffed, Plaintiff obtained the suspect's wallet and identified him as Darryl Faitele.[1]  (Doc. 118-76, pp. 7–8.)

---

[1]  Plaintiff contests this fact with general arguments that he could not have confirmed Faitele's identity because "[c]riminals often give false names and the [IDs] of family members and friends to hinder law enforcement."  (Doc. 188-76, p. 8.)  But Plaintiff explicitly admitted that he identified Faitele by looking at his ID.  (Doc. 95-6, p. 11.)

After identifying Faitele, Plaintiff then stood by, monitoring Faitele while the rest of the team cleared the apartment inside.  (Id. at p. 8.)  According to Plaintiff, once he realized this was not Kelly, he then continued to detain Faitele for "obstruction."  (Doc. 95-6, p. 42–44.)  Faitele proceeded to curse repeatedly at Plaintiff, and Plaintiff tried to ignore him.  (Doc 118-76, p. 9.)  Eventually, Plaintiff "lost [his] temper," and, together with Arango, began cursing back at Faitele.  (Id.; see doc. 95-3, p. 16; doc. 95-6, pp. 16–17.)  Plaintiff admitted that he spoke to Faitele in and unprofessional manner.  (Doc. 118-76, p. 11; see doc. 95-3, p. 18.)  At one point, Plaintiff told Faitele, "You didn't—you didn't f—ing listen, dude," referring to when Plaintiff allegedly said, "Police, stop."  (Doc. 118-76, p. 10; doc. 95-3, p. 17.)  However, Plaintiff later stated that he did not say, "Police stop," and he did not recall if anyone said that in fact.  (Doc. 118-76, pp. 10–11; see doc. 95-3, p. 17.)  Plaintiff also told Faitele to stop crying and be quiet because Plaintiff was losing his patience.  (Doc. 118-76, p. 11.)  While Plaintiff was turned away from Faitele, he believes that Faitele spit on Arango, and he described Faitele's behavior as "constantly spitting." (Doc. 95-6, p. 22.)  He also claimed that Faitele spit on him.  (Id.)  After Faitele apparently spit on Arango, Plaintiff heard a chair tipping and turned around to see Faitele on the ground with Arango above him.  (Doc. 118-76, p. 12.)  Plaintiff or Arango then covered up Faitele's face with a shirt to prevent him from spitting.  (Id.; doc. 95-6, p. 23; doc. 118-27, pp. 2, 6.)  This all happened during the COVID-19 pandemic.  (Doc. 118-76, pp. 11–12.)

Eventually, Faitele said something that "set [Plaintiff] off," and Plaintiff recalls that he "lost [his temper, and] postured like [he] was going to . . . fight [Faitele]."  (Doc. 118-76, pp. 12–13.)  Plaintiff sprinted towards Faitele with the intent to "[g]et in [Faitele's] face," but another officer, Officer Reagin, intervened and prevented him from doing so.  (Id. at p. 13.)  Plaintiff wanted to hit Faitele, but "knew that wouldn't be appropriate."  (Id. at pp. 13–14.)  Plaintiff did

not include his sprinting at Faitele and his use of profane language in his report.  (Id. at p. 14.)

When reflecting on the events of the incident, Plaintiff did not know why he kept Faitele in

handcuffs and antagonized him.  (Id.)  Plaintiff did not think Faitele could be charged with

obstruction for his actions that day.  (Id. at p. 15.)  Plaintiff also admits that he has been told to

"cool it down" in the past at the SPD.  (Doc. 118-76, p. 15.)

## II.    Investigation and Disciplinary Action against Plaintiff

On April 27, 2020, Plaintiff was placed on paid administrative leave.  (Doc. 118-76, p. 2.)

On May 1, 2020, Plaintiff was provided a written Notification of the Administrative Investigation

("Notification"), which stated that Darryl and Rebecca Faitele were the complainants and that the

investigation concerned an April 14, 2020, incident at 9400 Abercorn Street.  (Id.; see doc. 95-5.)

Under "allegations" of the investigation, the Notification stated "conduct."  (Doc. 95-5.)  The

Notification informed Plaintiff that "an administrative investigation [was] being conducted to

determine if [his] actions in the incident . . . constitute[d] a violation of [the SPD's] Policy and/or

Procedures."  (Id.)  The Notification also contained a "Garrity" warning, which Plaintiff

understood to mean that he was to cooperate and answer questions, and that his answers were not

to be used in criminal proceedings.  (Id.; doc. 118-76, p. 3.)  When Plaintiff received the

Notification, he knew the incident to which it referred.  (Doc. 118-76, p. 3.)

Following receipt of the Notification, Plaintiff was interviewed by SPD Sergeant Richard

Wiggins in connection with the administrative investigation.  (Id. at p. 4.)  Plaintiff claims that the

answers he provided as part of the investigation were honest.  (Id. at p. 5.)

On June 10, 2020, a Disciplinary Review Board ("DRB") within SPD reviewed allegations

against Plaintiff, Arango, and Reagin relating to the incident with Faitele.  (Id. at p. 16.)  Plaintiff

was ultimately accused of violating three SPD policies: (1) Conduct Unbecoming; (2) Treatment

of Others; and (3) Reporting a Police Response to Aggression/Resistance/Force.  (Id. at pp. 16–17.)  The DRB sustained the allegations and recommended: (1) incident review and training assessment by the Training Unit followed by additional training for Plaintiff; (2) transfer out of SIS; (3) review of SWAT Team membership; and (4) a five-day suspension.  (Id. at p. 17.)  Plaintiff was then asked to attend a telephonic "mitigation hearing," in which Minter and the DRB members were present.  (Id.)  Plaintiff understood that the hearing related to the Faitele incident but stated that he did not understand the nature of the hearing or what the charges against him were.  (Id. at pp. 17–19; see doc. 95-3, p. 21.)

Wiggins suggested that Plaintiff not prepare for the hearing and simply accept responsibility for his actions.  (Doc. 118-76, p. 19.)  At the hearing, Plaintiff was asked questions, sincerely accepted responsibility, and said, "I'll do better."  (Id.)  On July 17, 2020, Plaintiff was informed his employment was being terminated.  (Id. at p. 20.)  Plaintiff was provided a DVD, a Notice of Suspension Prior to Dismissal, and a form to appeal.  (Id.; see doc. 95-3, p. 22; doc. 95-6.)  The Suspension Notice stated that the reason for his dismissal was "Violation of City/Dept Policy," and under "Explanation," it listed the three violations of SPD General Orders: "Conduct Unbecoming," "Treatment of Others," and "Reporting a Police Response to Aggression Resistance Force."  (Doc. 118-76, p. 21; doc. 95-9.)  The Suspension Notice stated that Plaintiff would be suspended with pay through July 21, 2020, unless he appealed the decision within twenty-four hours of receipt, and that, "if no written appeal is received, dismissal will take effect [two] days after the suspension date."  (Doc. 95-9.)

Contained on the DVD was a July 17, 2020, memo from Minter, entitled "Notice of Final Discipline and Findings," in which Minter sustained the SPD policy violations reviewed by the DRB, but departed from the DRB's disciplinary recommendations.  (Doc. 118-76, p. 21; see doc.

95-8.)  Minter's Memo stated, "Based on my review of this investigation, I have concluded that termination of [Plaintiff's] employment is appropriate for this matter."  (Doc. 95-8.)  Minter testified that his reasoning was based in part on Plaintiff's aggressive demeanor towards Faitele, his use of foul language, that he said he would charge Faitele with obstruction, and that he looked at Faitele's identification, knew it was not Kahlil Kelly, yet continued to detain him anyway.  (Doc. 118-76, pp. 22–24; doc. 95-13, pp. 5–6, 30–31.)

Plaintiff appealed his termination in writing the same day, on July 17, 2020, stating: "The punishment appears disproportionate and does not follow principles of progressive discipline." (Doc. 118-76, p. 26.)  Plaintiff agreed with the DRB findings, and stated that, had Minter adopted the recommendations of the DRB, Plaintiff would not have appealed.  (Id. at pp. 17, 26–27.) Plaintiff's appeal to Minter was an hour long and in-person, and there were others present.  (Id. at p. 27.)  Plaintiff spoke at this appeal, and he presented a PowerPoint presentation.  (Id.)  There was no limit on what Plaintiff could say at the appeal hearing.  (Id.)  Plaintiff raised his concerns about the process and that there appeared to be several violations of internal affairs policy, such as lack of a Letter of Transmittal and improper consideration of the "Douglas Factors."  (Id.)  Plaintiff talked about his experience at SPD and in the military, and that he suffers from post-traumatic stress disorder ("PTSD").  (Id. at p. 28.)  He also highlighted his accomplishments with the SPD and presented copies of his awards.  (Id.)  Those present at the hearing asked Plaintiff questions and discussed his actions.  (Id. at pp. 28–29.)

On July 23, 2020, Minter denied Plaintiff's appeal and determined that "[t]ermination of employment is still appropriate for this matter."  (Id. at p. 29.)  Minter testified in his deposition that he considered Plaintiff's experience and the "Douglas factors," which he described as mitigating factors, in arriving at his decision.  (Id. at pp. 30–31.)  Minter's decision was appealable

to the City Manager, Patrick Chang Monahan.  (Id. at pp. 31–32.)  Under the Charter of the City of Savannah, the City Manager "shall exercise exclusive supervision and control over the departments, functions, and operations in which" the department heads are engaged.  (Id. at p. 31.)

## III.   Appeal of Minter's Decision to Terminate Plaintiff

Plaintiff appealed Minter's appeal decision to Monahan.  (Id. at p. 32.)  Monahan was born in Seoul, Korea, and identifies as Asian.  (Id. at p. 45–46; doc. 95-17, p. 11; doc. 95-3, p. 30.)  The appeal to Monahan took place via Zoom, and others were present on the call, including Minter, the internal affairs office, and perhaps persons from the City's human resources department ("HR").  (Doc. 118-76, p. 32.)  Plaintiff's attorney, Keith Barber, advised Plaintiff and helped him prepare for the appeal to Monahan but did not participate in Plaintiff's appeal hearing.  (Id.)  Barber helped Plaintiff prepare his PowerPoint presentation for the appeal to Monahan.  (Id.)  On the advice of Barber, Plaintiff removed his concerns about the process that was followed, including the lack of a Letter of Transmittal and Douglas factors.  (Id. at pp. 32–33.)  At the hearing, Plaintiff addressed the points that he and his counsel thought were appropriate.  (Id. at pp. 37–38.)  Plaintiff included in his presentation that he had no prior disciplinary record, that no disciplinary action had ever previously been taken against him, and that he accepted responsibility for the allegations against him.  (Id. at pp. 33–35.)  Plaintiff also included information in the presentation indicating he had strong work performance in various sectors of SPD.  (Id. at p. 34–35.)  Plaintiff presented that he "had PTSD and that he had been shot at representing the City," (id. at p. 39), and he presented various other "mitigating factors" that applied to his case, (id. at p. 36).  Ultimately Plaintiff told Monahan that he would accept a level of discipline for the charges, but that he did not think he should be terminated.  (Id.)

Monahan testified that he spent approximately two hours reviewing the facts of the case before Plaintiff's appeal hearing. (Doc. 95-16, p. 7; doc. 95-17, p. 10.) Monahan also testified that he reviewed the body camera video in its entirety as well as the 75- to 90-page fact-finding report. (Doc. 118-76, p. 38; see doc. 95-16, p. 7; doc. 95-17, p. 10.) In his deposition, Monahan testified that he had been "impressed" by Plaintiff's "rather detailed PowerPoint presentation," and that it was the first time he had seen one in an administrative appeal. (Doc. 118-76, p. 40.) During Monahan's deposition, Plaintiff's counsel asked Monahan, "Would you have liked to have known that [Minter] failed to follow City policy in terminating [Plaintiff]," to which Monahan replied, "Based on what you're telling me, I did receive an incomplete picture[,] but I don't know that that would have changed the outcome." (Doc. 118-76, pp. 39–40; doc. 95-16, p. 7.) Monahan testified that he struggled with this decision and considered that Plaintiff would be losing his job, (doc. 118-76, p. 41), but he also testified that, knowing what he knows today, he would reach the same conclusion and take the same action regarding Plaintiff's appeal, (id. at p. 40; doc. 95-16, p. 13).

Monahan testified that he understood that officers in a review panel had recommended a different discipline. (Doc. 118-76, p. 41; doc. 95-17, pp. 19–20.) Monahan overturned Minter's decisions in two other disciplinary cases, one of which involved a white police officer. (Doc. 118-76, p. 42; doc. 95-17, p. 13.) Monahan based his decision here on the fact that Plaintiff checked Faitele's identification but did not report that he was not the suspect they were looking for, that he became physically angry with Faitele, that he kept Faitele handcuffed, that he was separated from Faitele and then tried to charge back at him at which point he had to be restrained, and that he had the opportunity to deescalate the situation but did not. (Doc. 118-76, pp. 43–44; doc. 95-17, pp. 11–12.)

Monahan issued his written decision on July 30, 2020, in which he stated,

> I have met with [Plaintiff] concerning the appeal of Suspension Prior to Dismissal. Following is my decision: Uphold Chief Minter's decision. [Plaintiff's] pattern of behavior—abusive language, open anger towards suspect, not following department policy about use of force, challenging suspect—does not reflect well upon professional standards and conduct becoming of a police officer.

(Doc. 118-76, p. 44; doc. 95-11.)  While Plaintiff disagreed with the decision, including that the department's policy about use of force was violated, he agreed that the use of curse words and display of anger in the April 14, 2020, incident did not reflect well on the conduct of a police officer.  (Doc. 118-76, pp. 44–45; doc. 95-3, p. 30.)  Moreover, while Plaintiff did not agree with the "pattern of behavior" cited in Monahan's decision, he admitted it may have been in reference to his own admission during the internal affairs investigation that he had engaged in similar behavior during prior incidents.  (Doc. 118-76, pp. 44–45; 95-3, pp. 3, 30; see doc. 95-6, pp. 37, 48–49.)

Following Monahan's decision, City Mayor Van R. Johnson put together a "CARES" Committee as an extension of the Mayor's office to review the actions of the officers.  (Doc. 118-76, p. 46; see doc. 95-18, pp. 9–10; doc. 118-43, pp. 9–10.)  In their review, the committee watched the video footage and asked Minter questions.  (Doc. 118-43, pp. 9–10.)  After reviewing the video, Mayor Johnson described the officers' conduct as "inappropriate behavior."  (Doc. 95-18, p. 12.)  Once the CARES Committee members reviewed the video footage and discussed it, they recommended referral to the district attorney.  (Doc. 118-76, p. 50; doc. 118-43, pp. 10–11; doc. 95-18, p. 17.)  The district attorney and Mayor Johnson then held a press conference at the Chatham County Courthouse.  (Doc. 95-18, p. 17.)

Plaintiff has not been charged with a crime in connection with the April 14, 2020, incident.  (Doc. 118-76, p. 4.)  Plaintiff has filed no action in the State or Superior Court regarding any alleged due process violations.  (Id. at p. 46.)  Plaintiff could have, but did not have, a civil service board hearing following Monahan's decision on appeal.  (Id. at p. 56.)  Plaintiff did not think there

would be a point in attending one if it was offered because he was told by others that it was "a clown show," and he did not think it would be done in an equitable fashion.  (Id.)  Plaintiff does not wish to return to work at the SPD.  (Id.)

## IV.    Complaints about Minter

Before he was terminated, Plaintiff signed a group human resources complaint ("Group Complaint") against Minter that was submitted on April 15, 2020 (the day after the incident with Faitele).  (Id. at p. 52.)  Plaintiff also claims to have submitted an individual complaint to HR on April 10, 2020.  (Id.; see doc. 118-3, p. 6.)  Plaintiff never discussed the complaints with Minter. (Doc. 118-76, p. 52.)  While Plaintiff does not know if Minter ever saw the HR complaints, Monahan testified that Minter was generally aware of the Group Complaint, (doc. 95-16, p. 14; doc. 95-17, p. 5), and the Group Complaint received press coverage, (see docs. 118-12, 118-13, 118-14.).  Minter testified that he did not know, before Plaintiff's termination, that Plaintiff had signed the Group Complaint.  (Doc. 95-13, p. 41.)

Monahan hired attorney Susan Cox to lead an investigation into the Group Complaint. (Doc. 118-76, pp. 54–55; doc. 95-17, p. 22.)  Monahan testified that he did not know Plaintiff's name was on the Group Complaint, that he did not know Plaintiff, and that he had not seen Plaintiff before viewing the body camera footage as part of the appeals hearing.  (Doc. 95-17, pp. 18–19.) When he first received the Group Complaint, Monahan numbered how many individuals of a particular rank filed or signed the complaint.  (Doc. 118-76, p. 55; doc. 95-17, p. 5.)  Monahan decided to personally interview all the captains, but he did consider interviewing those below the captain rank.  (Doc. 118-76, p. 55; doc. 95-17, p. 5.)  On August 2, 2020, Cox issued a memo about the Group Complaint in which she stated her intention to allow Minter to respond to the issues

raised "while attempting to protect the identity of the individuals making the particular complaint." (Doc 118-76, pp. 56–57; doc. 95-20.)

## V.      Procedural History

Plaintiff filed suit against Minter[2] and the City on April 14, 2021.  (Doc. 1.)  As to the City, Plaintiff brings a claim for First Amendment Retaliation under Section 1983 (Count I), a substantive due process claim (Count III), a procedural due process claim (Count IV), an equal protection claim (Count VI), as well as attorneys' fees (Count VII) and punitive damages (Count VIII).  (Doc. 35, pp. 24–30.)  The City filed this Motion for Summary Judgment arguing, among other things, that Plaintiff has not shown that his speech caused his termination, that Plaintiff's procedural rights were not violated in his termination hearings, and that the City cannot be held liable for any alleged racial discrimination.  (See generally doc. 95.)  Plaintiff filed a Response, (doc. 118), the City filed a Reply, (doc. 128), and Plaintiff filed a Sur-Reply, (doc. 141).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'"  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

---

[2]  Minter does not join in this Motion, and this Order does not affect Plaintiff's claims against Minter. Minter has another summary judgment motion pending before this Court, (see doc. 152), that will be addressed in a separate order.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove its case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (citation and emphasis omitted).  Additionally, the Court is not

permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence.  Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

## DISCUSSION

## I.   **First Amendment Retaliation Claim**

Plaintiff's First Amendment claim centers on his signature appearing on the Group Complaint against Minter.  (See generally doc. 118, pp. 26–28; see doc. 118-2.)  Generally, "public employees do not surrender all their First Amendment rights by reason of their employment," and instead maintain a constitutional right, "in certain circumstances, to speak as a citizen addressing matters of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  For a public employee to make a prima facie case of First Amendment retaliation, he must show, by a preponderance of the evidence, that:

> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee.

Anderson v. Burke Cnty., 239 F.3d 1216, 1219 (11th Cir. 2001).  If a plaintiff makes this showing, "the burden then shifts to the employer to show, by a preponderance of the evidence, that 'it would have reached the same decision . . . even in the absence of the protected conduct.'"  Id. (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

A.   **Plaintiff Cannot Establish a Prima Facie Case of First Amendment Retaliation.**

The City argues that Plaintiff cannot establish a prima facie case of retaliation because he cannot show the Group Complaint played a "substantial part" in its decision to terminate Plaintiff.[3] (Doc. 95-1, p. 20.)   To determine whether speech played a substantial part in an employment action, courts look to evidence such as "the temporal proximity of the speech to the termination, whether reasons given for the termination are shown to be pretextual, comments or actions indicating that the speech and termination were connected, whether the asserted reason for discharge varied, who instigated internal investigations or termination proceedings, evidence of management hostility to the type of speech in question, and other evidence of an employer's motive to retaliate." Pattee v. Ga. Ports Auth., 477 F. Supp. 2d 1253, 1264 (S.D. Ga. 2006) (citing Stanley v. City of Dalton, 219 F.3d 1280, 1291 n.20 (11th Cir. 2000)).   "There is no one factor that is outcome determinative, but all factors must be taken into account."   Stanley, 219 F.3d at 1291 n.20.

In his Response, Plaintiff conclusorily asserts that this is a question of fact because Minter and Monahan knew of the existence of the Group Complaint, and thus could have known of Plaintiff's involvement with it.[4]   (Doc. 118, p. 27.)   Plaintiff contends that the Group Complaint "was a matter of common knowledge among the higher ups," that the complaints received media

---

[3]   Because the parties did not brief the matter, the Court assumes without deciding that Plaintiff's participation in the Group Complaint was a matter of public concern and outweighs SPD's interest in prohibiting the speech to promote department efficiency.

[4]   Plaintiff also states that Minter must have known of Plaintiff's involvement in the Group Complaint because it is referenced in the Internal Affairs file which Minter stated he reviewed.   Yet the cited portion of the file only references Arango's concerns with staffing and COVID-19, and it says, vaguely, that "they had an HR complaint against the Chief."   (See doc. 118-32, p. 21.)   Arango's reference to an ambiguous HR complaint in a twenty-four page report is not the smoking gun definitively alerting Minter of Plaintiff's involvement in the Group Complaint that Plaintiff believes it to be.

attention, and that Monahan believed Minter received a copy of the Group Complaint.  (Id.)  Both Monahan and Minter, however, denied having any knowledge of Plaintiff's involvement with the Group Complaint before he was terminated.  (Doc. 95-13, p. 41; doc. 95-17, p. 18.)  Beyond these general claims that Minter and Monahan *could have* known about Plaintiff's participation, Plaintiff offers no evidence that they actually knew much less that the Group Complaint factored into either Minter or Monahan's decisions.  Plaintiff altogether provides no supporting caselaw demonstrating how potential knowledge of protected speech suffices to establish causation.  (See generally doc. 118.)  Put simply, if this case went to trial, the jury would have no evidence from which it could conclude that Minter and Monahan knew of Plaintiff's participation in the Group Complaint.

Moreover, the decisions to termination Plaintiff were made months after the Group Complaint was submitted, and, therefore, are too temporally removed to support a causal inference between the complaint and the termination decisions.  (Doc. 128, pp. 7–8.)  The Group Complaint was filed on April 15, 2020.  (Doc. 118-76, p. 52.)  Plaintiff argues that Minter and Monahan would have received a copy of the Group Complaint after it was filed or at least would have known about it due to media coverage.  (Doc. 118, p. 27.)  The press coverage Plaintiff submits occurred in the weeks directly following the filing of the Group Complaint.  (See doc. 118-9 (April 22, 2020); doc. 118-10 (April 24, 2020); doc. 118-11 (April 21, 2020); doc. 118-12 (April 22, 2020).)  Minter made his decision to terminate Plaintiff on July 17, 2020.  (Doc. 95-8.)  Monahan affirmed Minter's decision on July 30, 2020.  (Doc. 95-11.)  Both decisions came over three months after the filing of the Group Complaint.  This large temporal gap, particularly when temporal proximity is the only evidence offered, cuts against any inference that the protected activity played a substantial part in the termination decision.  See Elver v. Whidden, No. 2:18-CV-102-FTM-29CM, 2019 WL 144916, at *6–7 (M.D. Fla. Jan. 9, 2019), *aff'd sub nom.* Elver v. Hendry Cnty. Sheriff's

Off., 791 F. App'x 56 (11th Cir. 2019) (noting that a three and a half month period, by itself, would be insufficient to establish causation); cf. Wiley v. City of Atlanta, No. 1:16-CV-0031-CC, 2017 WL 11634377, at *19 (N.D. Ga. Oct. 2, 2017) (plaintiff's protected speech "and her termination only days later suggest a causal relationship"); see also Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (in the Title VII retaliation context, "a three to four month disparity . . . [is] insufficient to show causal connection"); Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (same).

The Court simply does not see, and Plaintiff has not explained, how the mere possibility that the City knew of Plaintiff's involvement in the Group Complaint suffices to show that his involvement was considered, let alone played a substantial role, in the decision to terminate him three to three and half months later.  Absent any actual evidence, Plaintiff has failed to create a triable issue of fact on whether Plaintiff's involvement in the Group Complaint played a substantial part in the decision.  See, e.g., Bogus v. City of Birmingham, No. 2:17-CV-827-GMB, 2020 WL 704845, at *15 (N.D. Ala. Feb. 12, 2020) (plaintiff failed to point to any record evidence connecting her HR complaint and the alleged adverse employment actions against her, and thus "[a]t most" had only "put forth mere speculation and conjecture, which cannot create a genuine issue of fact") (internal quotations omitted); McAlpin v. Sneads, 61 F.4th 916, 934 (11th Cir. 2023) (granting summary judgment to defendant employer where there was "no evidence in the record that even suggests [the public-employer] terminated [the plaintiff] because of any First Amendment protected speech").

**B.     The City Has Provided Unrebutted Evidence that It Would Have Reached the Same Decision in the Absence of the Protected Activity.**

Even if Court assumes that Plaintiff can make a prima facie case, the City had "extensive, non-retaliatory reasons . . . to impose discipline for [Plaintiff's] conduct in the Faitele incident."

(Doc. 95-1, pp. 21 –22.)  It is undisputed that Plaintiff acted contrary to department policy during the Faitele incident.  The DRB found that Plaintiff violated three SPD policies, and Plaintiff himself admitted that he agreed with these findings.  (See doc. 95-3, p. 20.)  Indeed, Plaintiff conceded that his conduct should have led to some adverse employment action against him as he stated that he would not have appealed a punishment in line with the DRB's recommendations. (Doc. 118-76, pp. 25–26.)  Minter and Monahan both state that Plaintiff's admitted misconduct prompted their termination decisions.  Beyond mere speculation, Plaintiff cannot point to any record evidence that Minter and Monahan would not have reached the same decision in the absence of the Group Complaint.  The City has therefore shown that Plaintiff's removal was based on his conduct in the Faitele incident and was unrelated to any protected speech.  See Perez v. City of Opa-Locka, No. 22-20748-CIV, 2023 WL 6121896, at *10–12 (S.D. Fla. Sept. 19, 2023) (despite plaintiff's complaints about financial mismanagement within police department, because plaintiff broke department policy by inappropriately discharging a taser, department had adequate justification, unrelated to his protected speech, for removing him); DeLeon v. ST Mobile Aerospace Eng'g, Inc., 684 F. Supp. 2d 1301, 1325–26 (S.D. Ala. 2010) ("The [United States Court of Appeals for the] Eleventh Circuit has made clear that even if a plaintiff is terminated in close temporal proximity to a complaint of discrimination, a plaintiff's intervening act of misconduct severs the causal connection between the employee's initial complaint . . . and the decision to terminate her employment."); Hall v. Teva Pharm. USA, Inc., 214 F. Supp. 3d 1281, 1293 (S.D. Fla. 2016) (employee's misconduct in violating employer's electronic communications policy severed any causal connection between her termination and any protected activity).

In sum, the City has shown that Plaintiff was fired for admitted violations of SPD policy, and Plaintiff has offered nothing more than conjecture to link the Group Complaint to his dismissal.

Thus, the Court **GRANTS** the City's Motion for Summary Judgment on Plaintiff's First Amendment Retaliation claim (Count I).

## II.  Substantive Due Process

As to Plaintiff's substantive due process claim (Count III), the City argues that "[b]ecause employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection."  (Doc. 95, p. 22 (quoting McKinney v. Pate, 20 F.3d 1550, 1560 (1994).)  Indeed, "in non-legislative cases, only procedural due process claims are available to pretextually terminated employees."  McKinney, 20 F.3d at 1556, 1560 ("[A]reas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause.").  Because Plaintiff's termination stems from a non-legislative act, he may raise a procedural, but not a substantive, due process claim.  See id. at 1557 n.9 ("The most common examples [of non-legislative acts] are employment terminations.").

Plaintiff offers no argument in support of his substantive due process claim in his Response, and the Court assumes that Plaintiff concedes this claim.  (See doc. 118, p. 28 (stating only, "To the extent that [Plaintiff] argues that his employment termination was pretextual, [McKinney] precludes a claim for substantive due process.").)  Accordingly, the Court **GRANTS** the City's Motion for Summary Judgment on Plaintiff's Substantive Due Process claim.

## III.  Procedural Due Process

Plaintiff's claims primarily center on his contention that he was denied procedural due process by not receiving adequate notice of the charges he was facing.  (Doc. 118, pp. 28–31.)  The Due Process Clause requires "that a deprivation of life, liberty or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  Cleveland Bd. of Educ. v.

Loudermill, 470 U.S. 532, 542 (1985) (internal quotations omitted).  A Section 1983 claim alleging

a due process violation requires proof of three elements: "(1) a deprivation of a constitutionally

protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process."

Catron v. City of St. Petersburg, 658 F.3d 1260, 1266 (11th Cir. 2011) (quotation marks omitted).

The City does not contest that Plaintiff was deprived of a property interest that resulted from state

action.  (See doc. 95-1, pp. 22–27.)  Instead, the City argues that Plaintiff cannot show he faced

constitutionally inadequate process because he did not utilize available state remedies, and that

any alleged due process violation was cured before Plaintiff was terminated.  (Id. at pp. 23–26.)

### A.   Whether State Law Remedies Were Available.

The City first argues that the Court should not reach the merits of Plaintiff's procedural

due process claim because Plaintiff has not shown that Georgia's state procedures were inadequate

to cure any alleged procedural defect.  (Doc. 95-1, pp. 23–26.)  The Eleventh Circuit, in McKinney

v. Pate, held that "only when the state refuses to provide a process sufficient to remedy the

procedural deprivation does a constitutional violation actionable under [S]ection 1983 arise."  20

F.3d 1550, 1557 (11th Cir. 1994) (en banc).  The City argues that because Plaintiff could have, but

chose not to, seek a writ of mandamus in Georgia courts to remedy his claim, he cannot show that

he received a constitutionally inadequate process.  (Doc. 95-1, pp. 24–25.)  Plaintiff, on the other

hand, argues that McKinney does not apply because he was deprived of an adequate pre-

termination hearing altogether, and thus that violation could not be cured with state remedies post-

termination.  (Doc. 118, pp. 28–30.)

"[W]here a due process violation is already complete because no hearing was held as

required by Loudermill, McKinney has no application."  Galbreath v. Hale Cnty., Ala. Comm'n,

754 F. App'x 820, 828 (11th Cir. 2018).  Plaintiff is challenging the facial validity of the pre-

termination hearings under the <u>Loudermill</u> guarantees and, if such a violation exists, it would not be cured post termination.  <u>See</u> <u>Williams v. Town of Morris</u>, No. 2:18-CV-01307-AKK, 2019 WL 2058716, at *6 (N.D. Ala. May 9, 2019) ("As a result, because there is a question of fact regarding whether the Town afforded [plaintiff] with an adequate pre-termination hearing, the Town is not entitled to summary judgment on [plaintiff's] due process claim simply because he failed to seek a writ of certiorari in state court prior to filing suit."); <u>Bailey v. Henry Cnty.</u>, No. 119CV03504LMMRDC, 2022 WL 4596653, at *6 (N.D. Ga. June 27, 2022), *report and recommendation adopted*, No. 119CV03504LMMRDC, 2022 WL 18777540 (N.D. Ga. Sept. 27, 2022) (distinguishing <u>McKinney</u>'s state remedies requirement where plaintiff challenged whether he received an explanation of the government's evidence prior to his termination).  Because the state remedies question depends on whether Plaintiff was deprived of an adequate pre-termination hearing, the Court turns to the merits of his procedural due process claim.

**B.      Whether the City Satisfied the Requirements of Due Process.**

The Supreme Court has explained that the "root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest."  <u>Loudermill</u>, 470 U.S. at 542.  While this principle entitles an employee to "some kind of a hearing" before discharge, the hearing "need not be elaborate" and "need not definitively resolve the propriety of the discharge."  <u>Id.</u> at 542, 545.  The hearing "should be an initial check . . . of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."  <u>Id.</u> at 545–46.  To satisfy the due process requirement, the employer must conduct a pre-termination hearing where the employee is given (1) "oral or written notice of the charges against him," (2) "an explanation of the employer's evidence," and (3) "an opportunity to present his side of the story."  <u>Id.</u> at 546.

Plaintiff's due process claim primarily centers on his contention that "[h]e was not advised of the specific allegations against him until July 17, 2020, after Minter made the unilateral decision . . . to terminate his employment."[5]  (Doc. 118, p. 30.)   The Notification following the Faitele incident only advised Plaintiff that there was an internal investigation into his conduct in the April 14, 2020, incident, but did not apprise him of the exact allegations that were being investigated. (See docs. 95-4, 95-5.)  After the DRB finished the investigation, Minter reviewed and made an initial finding that termination was appropriate.  The DRB and Minter then met with Plaintiff telephonically to hear his side of the story, and Plaintiff maintains that while he knew what the phone call pertained to generally, he was unaware of the specific charges at this time.  In the telephonic hearing, the DRB and Minter advised Plaintiff that he was being terminated and presented him with a DVD, which contained the specific allegations against him and Minter's reasoning for his decision, a Notice of Suspension Prior to Dismissal, and a form to appeal.  (Doc. 118-76, p. 20; see doc. 95-3, p. 22; doc. 95-6.)  Plaintiff contends that because this information was provided after he was informed of dismissal, he was denied due process.  (Doc. 118, p. 30.)

The City, however, highlights that, while this was the first notice Plaintiff received about his termination, he was not actually terminated that day. (Doc. 128, pp. 16–17.)  Indeed, Plaintiff

---

[5]  Plaintiff also argues that the City violated its own SPD internal policies by not giving him a Letter of Transmittal, which amounts to a due process violation.  (Doc. 118, pp. 30–31.)  "[T]he procedural component of the Due Process Clause does not require the States to comply with state-created procedural rules," but only "to adhere to a certain minimal level of process when seeking to deprive an individual of a substantive interest protected by the [Due Process] Clause—namely, 'life, liberty, or property.'" Gissendaner v. Comm'r, Ga. Dep't of Corr., 794 F.3d 1327, 1330 (11th Cir. 2015) (quoting U.S. Const. Amend. XIV, § 1), cert. denied, 576 U.S. 1093 (2015); Smith v. City of Mobile, No. CV 16-00478-N, 2017 WL 6345804, at *3 (S.D. Ala. Dec. 12, 2017) ("States and municipalities are of course free to provide greater procedural protections than those offered by the federal constitution, but it does not follow that these enhanced protections enlarge federal rights.").  While Plaintiff points to internal violations of SPD policies, he has failed to show that this unconstitutionally hindered him from "present[ing] his side of the story" to either Minter or Monahan, as he was still provided with notice of the charges against him and the evidence on which Minter and Monahan were relying.  Loudermill, 470 U.S. at 546.

was provided an "Notice of Suspension *Prior to Dismissal*" form.  (Doc. 95-9 (emphasis added).)  The form explained that Plaintiff would be suspended with pay for two days *unless he submitted a written appeal* within twenty-four hours of the receipt of the notice.  (Id.)  The form specifically clarified "if no written appeal is received, dismissal will take effect [two] days after the suspension date."  (Id.)  The City thus argues that Plaintiff was specifically informed that he would *not* be dismissed on July 17, 2020, but instead would remain employed pending the results of the appeals process if he chose to appeal, which he did.  (Doc. 128, pp. 15–19.)

After receiving notice of the charges against him, Plaintiff immediately appealed the decision and was afforded a hearing where he was given unrestricted time to be heard.  (Doc. 118-76, p. 26.)  Plaintiff presented a PowerPoint presentation highlighting what he saw to be flaws in the decision.  (Id. at p. 27.)  Following the hearing, Minter found that Plaintiff's termination was "still appropriate."  (Id. at p. 29.)  Plaintiff was then afforded another appeal to the City Manager, Monahan.  (Id. at p. 31.)  He again was given unrestricted time to present his concerns, consulted an attorney in preparation, and addressed mitigating factors he felt were ignored in Minter's decision.  (Id. at p. 37–38.)  Again, his appeal was denied, and Plaintiff was formally terminated on July 30, 2020, when Monahan denied the appeal of Suspension Prior to Dismissal.  (Doc. 95-11.)

The City provided Plaintiff multiple layers of process, and Plaintiff only points out flaws in the first layer without acknowledging the other layers.  His Response does not meaningfully challenge the appeals process but summarily concludes that because Minter made a preliminary decision that Plaintiff's termination was appropriate, Plaintiff was denied due process of law which could not be cured in the appeals process.  Plaintiff's argument, however, assumes a denial of a pre-termination hearing—that is that Minter terminated Plaintiff in the first hearing.  Yet Plaintiff

fails to address, much less rebut, the evidence that he was not terminated until after Monahan denied his appeal.  He presents no argument challenging the sufficiency of the appeals hearings nor does he present any caselaw supporting his argument that his multiple pre-termination hearings were insufficient.

Considering the City's uncontested evidence, under these circumstances, Plaintiff was afforded notice of the charges against him, an explanation of the evidence, and an opportunity to present his side of the story before he was terminated, as Loudermill requires.  See Laskar v. Peterson, 771 F.3d 1291, 1299 (11th Cir. 2014) (no procedural due process violation where state employer provided "extensive pre-termination procedures" consisting of internal investigation report, hearing with opportunity to present witnesses, review of report and hearing, decision to terminate, ability to appeal, and affirmance on appeal); Martin v. Guillot, 875 F.2d 839, 844 (11th Cir. 1989) ("minimum constitutional standards for procedural due process" met where plaintiff received preliminary hearing recommending termination, termination was reviewed and affirmed by president, prior proceedings were reviewed by board of trustees which then conducted a full hearing where plaintiff could present argument, and board then deliberated and affirmed termination); McCoy v. Ala. Dep't of Corr., 427 F. App'x 739, 741–42 (11th Cir. 2011) (no procedural due process violation where state employer adequately served plaintiff notice of termination and reasons for it and afforded plaintiff hearing before formally terminating him); Finley v. Town of Camp Hill, No. 3:15CV195-CSC, 2016 WL 589695, at *8 (M.D. Ala. Feb. 11, 2016) (no procedural due process violation where plaintiffs were placed on administrative leave but not terminated until after hearing where they were notified of charges and provided explanation for mayor's reasons for recommending termination and given an opportunity to "tell [their] side of the story").

Plaintiff has failed to show a genuine issue of material fact as to whether he was denied procedural due process under the Fourteenth Amendment, and, accordingly, the City's Motion for Summary Judgment on this claim is **GRANTED**.

## IV.   Equal Protection

As to Plaintiff's Equal Protection claim, the City argues, among other things, that Plaintiff has failed to show how the City is responsible for any alleged racial discrimination. (Doc. 95-1, pp. 27–29.) A municipality cannot be liable for the actions of its employees under a theory of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91 (1978). Instead, to impose municipal liability, a plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." Underwood v. City of Bessemer, 11 F.4th 1317, 1333 (11th Cir. 2021). The Supreme Court has clarified that the policy or custom requirement may also be satisfied by "a single decision by municipal policymakers under appropriate circumstances." Morro v. City of Birmingham, 117 F.3d 508, 514 (11th Cir. 1997) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986)). Plaintiff here does not allege a widespread policy or custom of racial discrimination, but relies on a theory that a final policymaker made a racially motivated decision that imputes liability onto the City. (See generally doc. 35, pp. 28–29; doc. 118, pp. 31–33.)

Plaintiff argues that Minter was the final policymaker for SPD and was motivated by racial animus against Plaintiff, citing deposition testimony that he "can make a change to policy whenever he wants." [6] (Doc. 118, p. 32.) The Eleventh Circuit has "repeatedly recognized that a municipal official does not have final policymaking authority over a particular subject matter when

---

[6] Yet Plaintiff also concedes that "Minter [was] likely not the final policy maker." (Doc. 118, p. 32.)

that official's decisions are subject to meaningful administrative review." Lewis v. City of Union City, 934 F.3d 1169, 1190 (11th Cir. 2019) (internal quotations omitted).  It is undisputed that Minter's decision was immediately appealable and subject to administrative review by Monahan. (Doc. 118-76, pp. 31–32.)  Plaintiff argues that Monahan's review was not "meaningful." (Doc. 118, p. 32.)  Yet Monahan independently reviewed the termination decision.  He held a hearing during which he directly heard from Plaintiff who had been assisted by counsel, reviewed evidence of Plaintiff's misconduct (including body camera footage and a lengthy fact-finding report), and received evidence of mitigating factors included in Plaintiff's PowerPoint presentation.  Monahan ultimately decided that Plaintiff should be terminated because his "pattern of behavior—abusive language, open anger towards suspect, not following department policy about use of force, challenging suspect—does not reflect well upon professional standards and conduct becoming of a police officer." (Doc. 118-76, p. 44; doc. 95-11.)  Thus, it strains credulity to argue that Monahan did not conduct a meaningful review of Minter's decision.  Lewis, 934 F.3d at 1190; id. ("There is no requirement that the administrative review be ideal, simply that it be a meaningful layer of review of an official's decision.").

Accordingly, then, the question turns on whether *Monahan's* decision was motivated by any racial animus.  Plaintiff has failed to produce evidence that it was.  A city may be held responsible where the authorized policymakers "approve a subordinate's decision *and the basis for it*." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (emphasis added).  Plaintiff's claim of racial discrimination is based on his contention that Minter held racial animus towards Plaintiff.  Not only does Plaintiff fail to provide evidence that Minter held racial animus towards Plaintiff, he has also failed to show that Monahan adopted any such racially motivated basis for

the decision.[7]  Thus, without raising any evidence to show how Minter's decision was somehow motivated by race, Plaintiff cannot show that Monahan approved and adopted a racially motivated basis.[8]

Simply put, Monahan reviewed and affirmed Minter's decision to terminate Plaintiff, "but there is no evidence (and [Plaintiff] does not even allege) that [Monahan's] decision approved any improper motive that [Minter] may have had."  Scala v. City of Winter Park, 116 F.3d 1396, 1403 (11th Cir. 1997).  Accordingly, in the absence of *any* evidence that Monahan used race as the basis of his affirmance of Plaintiff's termination, Plaintiff has failed to factually support his Equal Protection claim against the City.  See id.; Hill v. Clifton, 74 F.3d 1150, 1152 (11th Cir. 1996) (affirming summary judgment for city when plaintiff presented no evidence that final decisionmaker approved any improper motive underlying the plaintiff's demotion); cf. Matthews v. Columbia Cnty., 294 F.3d 1294, 1297–98 (11th Cir. 2002) (municipal liability can exist when subordinate makes unconstitutional decision then adopted by final policymaker, so long as

---

[7]  Plaintiff summarily avers, based on a list of six African-American officers he claims were treated more favorably than Plaintiff, that "African American individuals received preferential treatment from Minter and the City." (Doc. 118, pp. 25–26.)  Plaintiff submits pages of records he apparently believes corroborate these claims, but he offers no supporting evidence or argument showing that these other cases support a disparate treatment claim.  (See id.)  It is not the Court's job to sift through Plaintiff's attachments and create arguments for him.  Even if the officers in these records are valid comparators in relation to Minter's decision (although, notably, Plaintiff has attached the DRB's review findings about some officers with no evidence of the ultimate disposition by Minter, (see, e.g., doc. 62)), Plaintiff provides no evidence or insight into how these would be valid comparators for *Monahan's* decision.  The Court is left with no record evidence on the ultimate status of these cases or whether any of these officers even appealed to Minter. (See generally docs. 58, 59, 60, 61, 62.)

[8]  Plaintiff also appears to base his Response in part on some sort of retaliation claim for Plaintiff's participation in the Group Complaint.  (See doc. 118, pp. 32–33.)  It is unclear to the Court whether Plaintiff erroneously included this argument in this section and meant instead to include it in his First Amendment Retaliation argument, or whether he believed his retaliation claim could somehow bolster his racial discrimination claim.  Nevertheless, these misplaced arguments bear no weight on whether Plaintiff was subject to *racial* discrimination under the Equal Protection Clause.

evidence shows final policymaker "shared the illegal motive"). Accordingly, the Court **GRANTS** the City's Motion for Summary Judgment on this claim (Count VI).

## V.     Attorney's Fees and Punitive Damages

Finally, the City argues that there is no basis for attorney's fees or punitive damages because "[t]here are no damages of any type recoverable against the City," and because "a municipality is immune from punitive damages under [Section] 1983." (Doc. 95-1, p. 29–30 (quoting City of Newport v. Fact Concerts, 453 U.S. 247, 271 (1981).) Plaintiff concedes that he cannot recover punitive damages against the City. (Doc. 118, p. 33.) Because he has not submitted evidence sufficient to survive summary judgment on any of his underlying claims, his request for attorneys' fees likewise cannot survive. Under O.C.G.A. § 13-6-11, a claim of attorneys' fees is derivative of a substantive cause of action. Gilmour v. Am. Nat'l Red Cross, 385 F.3d 1318, 1324 (11th Cir. 2004). Likewise, under 42 U.S. § 1988, a plaintiff must be a "prevailing party" to recover attorneys' fees. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). With no remaining claims to which Plaintiff could attach his claims for punitive damages or attorneys' fees, the Court **GRANTS** the City's Motion for Summary Judgment on those claims (Counts VII and VIII).

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Mayor and Aldermen of the City of Savannah's Motion for Summary Judgment in full. (Doc. 95.) Plaintiff's failure to show that his termination related to his participation in the Group Complaint dooms his First Amendment Retaliation Claim against the City (Count I). Plaintiff has also failed to present evidence from which a jury could find that he was denied the protections of due process before he was terminated from SPD. Thus, he cannot sustain a claim under the Due Process Clause (Counts III and IV). Plaintiff has pointed to no evidence that his the City racially discriminated against him in violation

of the Equal Protection Clause (Count VI).  Finally, because Plaintiff has no remaining substantive claims against the City, he cannot maintain a claim of punitive damages (Count VIII) or attorney's fees (Count VII).  The Court **DISMISSES** the Mayor and Aldermen of the City of Savannah from this case and **DIRECTS** the Clerk of Court to **UPDATE** the docket accordingly.

　　　　**SO ORDERED**, this 28th day of March, 2024.

_____

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA