## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

DANIEL KANG,

        Plaintiff,

        v.

THE MAYOR AND ALDERMEN OF THE
CITY OF SAVANNAH; and ROY W.
MINTER, JR., Chief of Police for the City of
Savannah, Georgia, in his Individual Capacity,

        Defendants.

CIVIL ACTION NO.: 4:21-cv-111

## O R D E R

Plaintiff Daniel Kang sued Defendants the Mayor and Aldermen of the City of Savannah[1]

(the "City") and Savannah Police Chief Roy M. Minter alleging that Minter, among other things,

violated Plaintiff's rights under the First Amendment, the Due Process Clause, and the Equal

Protection Clause when Minter terminated Plaintiff's employment after Plaintiff reported

complaints about Minter to the City's human resources department.  (Doc. 35, pp. 25–28.)

Presently before the Court is Minter's Motion for Summary Judgment, in which he argues,

among other things, that he is entitled to qualified immunity, that Plaintiff did not exercise his

First Amendment rights on a matter of public concern, and that Plaintiff has failed to produce

evidence showing a due process or equal protection violation.  (Doc. 152.)  Plaintiff filed a

Response, (doc. 159), Minter filed a Reply, (doc. 167), and Plaintiff filed a Sur-Reply, (doc.

---

[1]  The City of Savannah was terminated from this action on March 28, 2024.  (See doc. 174.)

170).   For the reasons more fully explained below, the Court **GRANTS** Minter's Motion for Summary Judgment, (doc. 152).

## BACKGROUND

### I.   The Faitele Incident

Plaintiff Daniel Kang, who identifies as an Asian male, was employed at Savannah Police Department ("SPD") and served as part of a team serving arrest warrants ("SIS Warrant Squad"). (Doc. 163, pp. 1, 38.)   On April 14, 2020, Plaintiff and his team were dispatched to 9400 Abercorn Street in Savannah, Georgia, to execute a warrant on Kahlil Kelly.[2]   (Id. at p. 1; see doc. 152-1, p. 1.)   During the attempted service, Plaintiff and other officers detained[3] Darryl Faitele ("Faitele Incident").   (Doc. 163, p. 1; see doc. 152-1, p. 1.)   In connection with the Faitele Incident, Faitele and his mother, Rebecca Faitele, both filed complaints concerning the officers' conduct.   (Doc. 163, p. 9; see doc. 152-1, pp. 3–5.)

In response to these complaints, SPD opened an investigation into Plaintiff's conduct in the Faitele Incident.   (Doc. 163, p. 10.)   On April 27, 2020, Plaintiff was placed on administrative leave with pay until further notice.   (Id.; doc. 152-2, p. 38.)   On May 1, 2020, Plaintiff received a "Notification of Administrative Investigation" stating that an investigation into his conduct on April 14, 2020, at 9400 Abercorn Street was being initiated "to determine if

---

[2]  Certain responses in Plaintiff's Response to Minter's Statement of Undisputed Facts appear to dispute a purported fact in full but go on to only meaningfully dispute a portion of the statement.   (See, e.g., doc. 163, p. 1 (stating the "contention is in dispute" but only responding to whether Darryl Faitele was "detained" or "under arrest").)   "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party."   L. R. 56.1.   The Court will, accordingly, deem admitted those portions of the Statement of Material Facts that are not refuted by Plaintiff so long as Minter provided a record citation in support.

[3]  Insofar as Plaintiff disputes that Faitele was "detained" as opposed to "under arrest," Plaintiff has presented no record evidence to show that Faitele was ever arrested for his conduct on April 14, 2020.

[his] action in the incident" violated department policies.  (Doc. 163, pp. 10–11; see doc. 152-2, p. 39.)

Plaintiff was then interviewed by SPD Sergeant Richard Wiggins in connection with the investigation.  (Doc. 163, p. 11; see doc. 152-2, pp. 40–89.)  During the interview, Plaintiff admitted to several actions that he described as unprofessional and warranting discipline.  (Doc. 163, pp. 12–13.)[4]  Specifically, Plaintiff stated that, on April 14, 2020, the SIS Warrant Squad went to an apartment at 9400 Abercorn Street, Savannah, Georgia, to serve an outstanding arrest warrant on Kahlil Kelly.  (Doc. 152-2, pp. 42–44.)  According to Plaintiff, when they got to the apartment, they believed the individual inside to be Kelly, so they breached the door and called the suspect over.  (Id. at pp. 45–46.)  Plaintiff stated that a man came to the door, and Plaintiff then grabbed him and pulled him to the ground.  (Id. at pp. 47–48.)  The suspect hit the ground face first, busted his chin, and began bleeding.  (Id. at pp. 16, 48.)  Plaintiff stated that he handcuffed the suspect, and the suspect began saying that he was not the man they were looking for.  (Id. at pp. 48–50.)  Shortly after the suspect was handcuffed, Plaintiff managed to get the suspect's wallet and identify him as Darryl Faitele.  (Id. at p. 50.)  After identifying Faitele, Plaintiff then stood by to monitor Faitele, who remained in handcuffs, while the rest of the team cleared the apartment inside.  (Id. at pp. 54–55.)  Faitele proceeded to curse repeatedly at Plaintiff, and eventually Plaintiff "lost [his] temper," and began cursing back at Faitele.  (Id. at pp. 55–56.)  At one point, Plaintiff told Faitele, "You didn't—you didn't f—ing listen, dude,"

---

[4]   In Plaintiff's Response to Minter's Statement of Material Facts, Plaintiff argues that his cited admissions were not "statement[s] of fact" but rather "Minter's characterization" of Plaintiff's testimony. (Doc. 163, p. 13.)  This is incorrect as the cited omission were pulled directly from Plaintiff's interview with Wiggins.  Moreover, as stated supra n.2, the Court deems these facts admitted as Plaintiff does not substantively dispute Minter's facts, which are supported by record citation.  (See id. at pp. 12–13.) Nevertheless, to help with Plaintiff's confusion as to his own admissions, the Court recites the citations that were provided in Minter's Statement of Material facts.

referring to when Plaintiff allegedly said, "Police, stop," at the beginning of the Faitele Incident. (Id. at p. 63.)  Yet later in the interview with Wiggins, Plaintiff admitted that he had never actually said, "Police, stop," and he could not recall if anyone had said that.  (Id.)  Plaintiff also told Faitele to stop crying and be quiet because Plaintiff was losing his patience.  (Id.)  Plaintiff admitted that the way he spoke to Faitele was unprofessional.  (Id. at pp. 66–67.)

Eventually, Faitele said something that "set [Plaintiff] off," and Plaintiff "lost [his temper, and] postured like [he] was going to . . . fight [Faitele]."  (Id. at p. 74.)  Plaintiff admitted that he sprinted towards Faitele with the intent to "[g]et in [Faitele's] face," but that another officer intervened and prevented him from doing so.  (Id. at pp. 74–75.)  Plaintiff admitted that he wanted to hit Faitele, but "knew that wouldn't be appropriate."  (Id. at p. 75.)  Plaintiff did not include his sprinting at Faitele and his use of profane language in his report on the Faitele Incident.  (Id. at p. 79.)  When reflecting on the events of the incident, Plaintiff admitted to Wiggins that he did not know why he kept Faitele in handcuffs or why he antagonized him.  (Id. at p. 83.)  Plaintiff also admitted that he did not think Faitele could be charged with obstruction for his actions that day.  (Id. at pp. 84–85.)  Plaintiff also told Wiggins that he had been told to "cool it down" in the past at SPD.  (Id. at p. 87.)

## II.     Plaintiff's Disciplinary Hearings and Termination

After his investigation, Wiggins compiled his facts and findings in an Incident Report, which was forwarded with other evidence to a disciplinary review board ("DRB") comprised of superior officers, including Plaintiff's chain of command.  (Doc. 163, p. 13.)  After reviewing the file, the DRB met to discuss the matter and unanimously found that Plaintiff violated three SPD policies: (1) conduct unbecoming, (2) treatment of others, and (3) reporting a police response to aggression/resistance/force.  (Id. at pp. 13–14.)  The DRB recommended discipline of additional training, transfer out of the SIS Warrant Squad, review of SWAT Team membership, and a five-

day suspension.  (Id. at p. 14.)  Plaintiff testified that he agreed with the DRB's findings that he violated SPD policies and stated that he would not have appealed the DRB's recommended discipline if Minter had adopted it.  (Id.; see doc. 152-2, p. 20.)

Plaintiff was then asked to attend a telephonic "mitigation hearing," which was attended by Minter and the DRB.  (Doc. 163, p. 14; see doc. 152-2, pp. 20–21.)  Plaintiff understood that the hearing related to the Faitele Incident and would be an opportunity for him to try to impact whatever disciplinary decision would be handed down, but he stated that he did not understand the full nature of the hearing or the specific charges brought against him.  (Doc. 163, p. 14; see doc. 152-2, p. 21.)  The mitigation hearing was a required procedure under a newly proposed "draft" policy but it was not required by the policy in effect at the time.  (Compare doc. 159-55; with doc. 159-56.)  Wiggins testified that the inclusion of a mitigation hearing under the draft policy was done at the direction of Minter.  (Doc. 152-13, p. 9.)  Plaintiff testified that, on the advice of Wiggins, he did not prepare prior to the hearing.  (Doc. 152-2, p. 21.)  According to Plaintiff, during the mitigation hearing, he was asked questions about his past conduct, and had a chance to respond.  (Doc. 163, p. 15; see doc. 152-9, p. 41.)  He ultimately took responsibility for his actions and stated, "I'll do better."  (Doc. 152-2, p. 22.)

Following the mitigation hearing, Minter reviewed "all the facts and findings of the investigation," including the body camera footage from the Faitele Incident, as well as Plaintiff's disciplinary history, awards, and commendations.  (Doc. 152-9, p. 41.)  Ultimately, Minter sustained the DRB's determination that Plaintiff violated certain SPD policies but elected to deviate upward from their recommended discipline and to terminate Plaintiff's employment. (Doc. 163, p. 16; doc. 152-9, p. 41; doc. 152-2, p. 92.)  Minter testified that his reasoning was based in part on Plaintiff's aggressive demeanor towards Faitele, his use of foul language, the

fact that he had said he would charge Faitele with obstruction, and the fact that he had looked at Faitele's identification and knew he was not Kelly yet continued to detain him anyway.  (Doc. 152-9, pp. 5–6, 31.)

Plaintiff was then given a "Notice of Suspension Prior to Dismissal," and a form to use if he wished to appeal.  (Doc. 163, pp. 16–17; doc. 152-2, pp. 93–94.)  The Notice of Suspension stated that the reason for his dismissal was "Violation of City/Dept Policy," and under "Explanation," it listed the three violations of SPD General Orders: "Conduct Unbecoming," "Treatment of Others," and "Reporting a Police Response to Aggression Resistance Force." (Doc. 163, pp. 16–17; doc. 152-2, p. 93.)  The Notice of Suspension noted that Plaintiff would be suspended with pay through July 21, 2020, unless he appealed the decision within twenty-four hours of its receipt, and that "if no written appeal is received, dismissal will take effect [two] days after the suspension date."  (Doc. 152-2, p. 93.)  Plaintiff signed the form acknowledging that "[t]his action has been discussed with me and I understand my due process appeal rights as noted above."  (Doc. 163, p. 17.)  Plaintiff filed his appeal on the same day, stating that "the punishment appears disproportionate and does not follow principle of progressive discipline." (Id.; doc. 152-2, p. 94.)  At that time, Wiggins gave Plaintiff a copy of the entire file related to his case prior to his appeal hearings, however, the file did not contain a "Letter of Transmittal" ("LOT") or evidence of consideration of the "Douglas Factors."  (Doc. 163, pp. 17–18; doc. 152-13, p. 11.)

Consistent with SPD procedures, Plaintiff first appealed directly to Minter.  (Id. at p. 18; doc. 152-2, p. 94.)  Plaintiff was not given any restrictions on what he could present during his appeal.  (Doc. 163, p. 18.)  During an approximately one-hour hearing, Plaintiff presented a PowerPoint presentation in which he referenced the policies he was accused of violating as well

as information about his work history, disciplinary history, commendations, and other mitigating factors he wished to have considered. (Id.) Following the appeal, Minter found that "termination of employment is still appropriate for this matter." (Id. at p. 19; doc. 152-2, p. 95.)

Plaintiff was then afforded an additional appeal to the City Manager, Patrick Monahan, who oversees all City department heads, including the Chief of Police. (Doc. 163, p. 19.) Before his hearing with the City Manager, Plaintiff retained an attorney. (Id. at p. 20.) At the hearing, Plaintiff presented another PowerPoint presentation to Monahan on the advice of counsel. (Id.) Monahan, after listening to Plaintiff's presentation and independently reviewing Plaintiff's file, made the determination based on the facts of the case to uphold Minter's decision. (Id. at p. 21.)

Under the City's Disciplinary Policy, SPD employed a "progressive discipline policy." (Doc. 152-25, p. 1.) However, the Policy additionally notes that, "[a]lthough the nature of this policy is progressive, circumstances may warrant more serious action, up to and including termination of employment." (Id.) Grounds for dismissal include "improper treatment toward a person in custody," being "wantonly offensive in . . . conduct or language toward the public," "disgraceful conduct," policy violations that are a "serious breach of proper discipline," and being "unwarrantedly disrespectful or discourteous to any citizen" "in the performance of . . . official duties." (Id. at pp. 3–5.) Plaintiff admitted to using offensive language against Faitele, keeping him in custody despite knowing that he was not the individual for whom they had a warrant, and otherwise behaving unprofessionally during the Faitele Incident.

SPD Policy additionally states that SPD "is under the direction of the Chief of Police who is vested with authority as Chief Executive Officer" and that "[a]ll matters pertaining to disciplinary action will be reviewed by the Chief of Police via the chain of command." (Doc.

152-28, pp. 2, 5.)  The Chief has "[f]inal . . . disciplinary authority and responsibility," including authority to "dismiss [an] employee . . . subject to review by the City Manager."  (Doc. 152-18, p. 16.)

### III.   Complaints Against Minter

In April 2020, before he was terminated, Plaintiff, along with seventy-six other SPD officers, signed a complaint ("Group Complaint") against Minter which was submitted to the City's human resources department ("HR").  (Doc. 163, p. 34; see doc. 159-2.)  Plaintiff also submitted an individual complaint to HR ("Individual Complaint").  (Doc. 163, p. 34.) According to Plaintiff, the Group Complaint focused on "the lack of communication when it came to being transferred," "lack of resourcing for [the] warrant squad," lack of consideration for proposed policies, and "bias against officers with tactical backgrounds."  (Id.; see doc. 152-2, p. 11.)  There was no mention of race in either the Group Complaint or the Individual Complaint. (See docs. 159-2, 159-3.)  Plaintiff never discussed the complaints with Minter.  (Doc. 163, p. 35; doc. 152-2, p. 11.)  Minter denied knowing the identities of the signatories to the Group Complaint.  (Doc. 152-9, pp. 15, 41, 44–45.)  Monahan testified only that he believed Minter received a copy of the Group Complaint and that Minter was "aware of it."  (Doc. 152-21, pp. 5, 18.)  The Group Complaint received press coverage after it was filed.  (See docs. 159-8, 159-9, 159-10, 159-11, 159-12, 13, 159-14.)

### IV.   Procedural History

Plaintiff filed suit against both Minter and the City[5] on April 14, 2021.  (Doc. 1.)  Against Minter, Plaintiff brings claims under 42 U.S.C. § 1983 ("Section 1983") of First Amendment Retaliation (Count II), violation of his substantive due process rights (Count III), and violation of

---

[5] As previously noted, the City was dismissed from this action in a previous order.  (See doc. 174.)

his equal protection rights (Count V), as well as claims for attorneys' fees (Count VII) and punitive damages (Count VIII).  (Doc. 35, pp. 25–30.)  Minter filed this Motion for Summary Judgment arguing, among other things, that Plaintiff has not shown that he engaged in protected speech, that Plaintiff's procedural rights were not violated in his termination hearings, and that there is no evidence of racial discrimination.  (See generally doc. 152.)  Plaintiff filed a Response, (doc. 159), Minter filed a Reply, (doc. 167), and Plaintiff filed a Sur-Reply, (doc. 170).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'"  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove its

case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (citation and emphasis omitted). Additionally, the Court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence.  Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

## DISCUSSION

Minter argues that summary judgment should be granted in his favor because he is entitled to qualified immunity on all claims.  (Doc. 152, pp. 20–25.)  Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

"Qualified immunity is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."  Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (citation and internal quotations omitted).

## I.     Whether Minter Was Acting Pursuant to His Discretionary Authority

To rely on qualified immunity, a defendant first must show that he or she acted within his or her discretionary authority.  Mobley v. Palm Beach Cty. Sheriff Dept., 783 F.3d 1347, 1352 (11th Cir. 2015).   It is a defendant's burden to establish that he was acting within his discretionary authority.  Kjellsen v. Mills, 209 F. App'x 927, 929 (11th Cir. 2006) (per curiam) (citing Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003)).  To satisfy this burden, a defendant must set forth "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."  Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994).  The appropriate inquiry is whether "the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265–66 (11th Cir. 2004) (citation omitted).  "This test requires analyzing the 'general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.'"  Mells v. City of Darien, No. 2:13-cv-099, 2016 WL 613004, at *8 (S.D. Ga. Feb. 12, 2016) (quoting Holloman, 370 F.3d at 1266).

Minter argues that termination decisions were squarely within his discretionary job functions.  (Doc. 152, pp. 20–21.)  Minter has submitted undisputed evidence that he had

discretion to make personnel decisions, including the termination of employees, and that SPD provided him flexibility in implementing these personnel decisions.  (Doc. 152, pp. 8–9; see doc. 152-21, p. 21; doc. 152-29, p. 11.)   Moreover, Minter has submitted the City's Disciplinary Policy which explicitly includes, as grounds for dismissal, reasons such as: "improper treatment toward a person in custody," being "wantonly offensive" in conduct or language toward the public, engaging in "disgraceful conduct," "being unwarrantedly disrespectful or discourteous to any citizen," and other policy violations that constitute a "serious breach of proper discipline." (Doc. 152-25, pp. 3–5.)   The SPD policy makes clear that SPD is "under the direction of the Chief of Police who is vested with authority as Chief Executive Officer," and that "[a]ll matters pertaining to disciplinary action will be reviewed by the Chief of Police via the chain of command."  (Doc. 152-28, pp. 2, 5.)   Finally, the record reflects that SPD policy provided that "the Chief of Police has the authority to reprimand, suspend up to 30 days, demote, or dismiss the employee from the Department, subject to review by the City Manager."  (Doc. 152-18, p. 16.)   These policies all indicate that taking disciplinary action up to and including termination were well within Minter's discretionary authority.[6]  See Robinson v. City of Darien, No. 2:17-CV-99, 2019 WL 1646403, at *4 (S.D. Ga. Apr. 16, 2019) (action was taken under defendant's discretionary duties as plaintiff's supervisor under city and police departments' policies).

---

[6] Plaintiff seemingly argues that Minter was not acting within his discretionary authority because he was acting pursuant to the draft policy that had not yet taken effect.  (See doc. 159, pp. 19, 27.)  Plaintiff does not meaningfully contest the policies cited by Minter vesting him with authority to make disciplinary decisions including termination, but instead summarily challenges Minter's authority to do anything under the draft policy "without informing [Plaintiff], the subject of the discipline, that the policy had changed."  (Id. at p. 27.)  The only notable difference between the policies that Plaintiff highlights is the addition—in the draft policy—of the mitigation hearing.  (Id. at p. 19; compare doc. 159-55; with doc. 159-56.)   The Court does not see, and Plaintiff has not explained, how implementing an additional hearing—where the employee could address Minter before Minter makes a decision—somehow undermines Minter's authority to make the challenged disciplinary decisions.

In Response, Plaintiff challenges Minter's claim that his at-issue actions fell within the scope of his discretionary authority, but he neglects to provide any supporting argument or caselaw.  (Doc. 159, pp. 26–27.)  Instead, Plaintiff relies on circular reasoning, arguing that Minter could not have been acting within his discretionary authority because he violated Plaintiff's clearly established rights.  (Id. at p. 27.)  Plaintiff misunderstands the relevant inquiry for determining discretionary authority.   "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act . . . .  Instead, a court must ask whether the act complained of [(i.e. the decision to terminate Plaintiff's employment)], if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties."  Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998); see, e.g., Jordan v. Doe, 38 F.3d 1559, 1565–66 (11th Cir. 1994) (proper inquiry was whether transferring prisoners was generally a discretionary duty, not whether defendants had specific discretionary authority to transfer prisoners to facility with unconstitutional conditions).  Thus, the question is not whether Minter had authority to terminate Plaintiff's employment for discriminatory or retaliatory reasons, but, rather, whether termination decisions generally fall within Minter's discretionary authority.  In light of Minter's job description, reasoned argument, and supporting caselaw, and absent any substantive response from Plaintiff,[7] the Court finds that Minter was acting within his discretionary authority when he made the decision to terminate Plaintiff's employment.

---

[7]  Plaintiff seems to concede that Minter did have the authority to make personnel decisions.  In his Response to Minter's Statement of Material Facts, Plaintiff stated that "Minter has authority to fire provided [he] follows proper procedure."  (Doc. 163, p. 22; doc. 152-2, p. 23.)

## II.     Whether Minter is Entitled to Qualified Immunity as to Plaintiff's Claims

Because Minter was acting pursuant to his discretionary authority, the Court now considers whether qualified immunity shields him from liability.  Determining whether qualified immunity is appropriate is a two-step inquiry.  Pearson v. Callahan, 555 U.S. 223, 232 (2009).  First, the Court must determine "whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right."  Id. (internal citations omitted).  If a plaintiff is able to show facts supporting a constitutional violation, the Court then must consider whether the right violated was "clearly established."  Id.; Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).

### A.     First Amendment Retaliation Claim

The Court first considers whether Plaintiff can overcome a qualified immunity defense with evidence that Minter violated his First Amendment rights.  Plaintiff's First Amendment retaliation claim is primarily grounded in the fact that his signature appears on the Group Complaint against Minter.  (See generally doc. 159, pp. 27–29; see doc. 35, pp. 25–26.)

While a governmental entity generally may not terminate "a public employee in retaliation for speech protected under the First Amendment, a public employee's right to freedom of speech is not absolute."  Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989).  Instead, public employees maintain a constitutional right, "in certain circumstances, to speak as a citizen addressing matters of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  For a public employee to make a prima facie case of First Amendment retaliation, he must show, by a preponderance of the evidence, that:

> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a

"substantial part" in the employer's decision to demote or discharge the employee.

Anderson v. Burke Cnty., 239 F.3d 1216, 1219 (11th Cir. 2001).  Additionally, if a plaintiff succeeds in establishing a prima facie case, "the burden then shifts to the employer to show, by a preponderance of the evidence, that 'it would have reached the same decision . . . even in the absence of the protected conduct.'"  Id. (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

### (1)   Plaintiff Has not Shown He Engaged in Constitutionally Protected Speech.

Courts evaluate whether a public employee's speech is protected under the balancing test set forth by the Supreme Court in Pickering v. Board of Education, 391 U.S. 563 (1968).  Under Pickering, courts weigh "the interests of the [public employee], as a citizen, in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  391 U.S. at 568.  However, before a court analyzes speech under Pickering, it first must "determin[e] whether the employee spoke as a citizen on a matter of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) (citing Pickering, 391 U.S. at 568).  "If the answer is no, the employee has no First Amendment cause of action."  Id.  If the answer is yes, "then the *possibility* of a First Amendment claim arises," and the court must then apply the balancing test set out in Pickering.  Id. (emphasis added).  Both inquiries "are questions of law for the court to resolve."  Alves v. Bd. of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1159 (11th Cir. 2015).

Minter argues that Plaintiff cannot establish a prima facie case of retaliation, and thus cannot show a constitutional violation, because he did not engage in constitutionally protected

speech.[8]  (Doc. 152, pp. 22–23, 26–28.)  To determine that Plaintiff engaged in constitutionally protected speech, the Court must find that he spoke "(1) as a citizen and (2) on a matter of public concern."  Alves, 804 F.3d at 1160.  This "threshold inquiry" focuses on "the role the speaker occupied and the content of the speech."  Id. (internal quotations omitted).  This is because "[t]he First Amendment will step in to safeguard a public employee's right, as a citizen, to participate in discussions involving public affairs, but 'it [will] not empower [him] to constitutionalize the employee grievance.'"  Id. (quoting Garcetti, 547 U.S. at 420).

To qualify as a matter of public concern, the speech "must relate to a matter of political, social, or other concern to the community."  Watkins v. Bowden, 105 F.3d 1344, 1353 (11th Cir. 1997).  If the speech at issue is personal in nature, "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."  Akins v. Fulton Cnty., 420 F.3d 1293, 1303 (11th Cir. 2005) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).  Additionally, "[a]n employee's speech will rarely be entirely private or entirely public," and a court must consider the content, form, and context of the speech to glean its "main thrust."  Morgan v. Ford, 6 F.3d 750, 754–55 (11th Cir. 1993).  If the "main thrust" of a public employee's speech is on a matter of public concern, then the speech is protected.  Id.

---

[8]  Minter additionally argues that Plaintiff cannot prevail on a First Amendment retaliation claim because there is no evidence that Minter knew about Plaintiff's involvement in the Group Complaint.  (Doc. 152, p. 22.)  Plaintiff, however, points to news articles from the week following the Group Complaint which contain the names of the signatories, (see docs. 159-14, 159-15, 159-16), as well as Monahan's testimony that he believed Minter received a copy of the Group Complaint and that everyone in the department was "aware of it."  (Doc. 152-21, pp. 5, 18.)  While this evidence may be insufficient to convince a jury that Minter knew of Plaintiff's participation in the Group Complaint, the Court cannot find, as a matter of law, that Plaintiff's lack of conclusive evidence as to Minter's knowledge, standing alone, warrants summary judgment.

As to the "citizen" requirement, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421.  "The central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities." Moss v. City of Pembroke Pines, 782 F.3d 613, 618 (11th Cir. 2015) (quoting Garcetti, 547 U.S. at 421).  Practical factors relevant to this inquiry include "the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." Alves, 804 F.3d at 1161.

Turning then to the Group Complaint, it contains twenty-two paragraphs describing the various ways that the signatories believed Minter "conducted himself in a manner contradictory to [SPD] polices," which were:[9]

(1)     "Threats of removal" from rank, command, or units;
(2)     "Intimidation and admonishing . . . as a tool to instill his power in . . . meetings";
(3)     "Selective positional movements with no standardized measure";
(4)     "Selective 'open door' policy [with] limited access to officers . . . to communicate issues and concerns";
(5)     "Lack of communication and distancing from responsibility";
(6)     Failing to assume control over critical incidents;
(7)     "Failure to plan for the safety and security [of] the department by the ways of supplies and equipment";
(8)     "Inability to communicate the focus, strategies, and goals of the department";
(9)     "Failure to listen to the needs of specialized units";
(10)    "Favoritism in the levels of promotions and specialized positions";
(11)    "Inconsistent punishment";
(12)    "Unable to create a strategy surrounding the community";
(13)    "No focus on the logistical needs of specific units";
(14)    "Untrue statements" to the public about SPD's effectiveness and morale;
(15)    "Implementation of unnecessary projects";

---

[9]  For the sake of conciseness, the Court has distilled each paragraph to its main thrust.

(16)   "Increasing workload . . . to impose his personal agenda with no explanation as to the goal";

(17)   "Renaming and reallocating of resources for pet projects believed to be ineffective and solely for personal growth";

(18)   "Unfocused training practices";

(19)   "Complete breakdown of communication";

(20)   "Outright disrespect shown to members of staff";

(21)   "Lack of structure and stability"; and

(22)   "Created a fractured team focused on survival of his administration."

(Doc. 159-2, pp. 4–6.)  Plaintiff claims that this qualifies as a matter of public concern because it "went further than the conditions of his employment" and "addressed issues of public safety and trust in the SPD." (Doc. 159, p. 31.)  Plaintiff further posits that his speech should be protected because it "intended to expose corruption or misconduct."  (Id.)  Plaintiff also points to his Individual Complaint, in which he alleged the existence of a "hostile work environment" that was causing him "significant grief, [and] anguish, and [was] a significant contributing factor to [his] moral, mental[,] and physical health." (Id. at p. 5; see doc. 159-3, p. 4.)

The Group Complaint was made by the officers in their capacities as employees criticizing their superior, not as private citizens criticizing a public official.  It focuses on Minter's leadership abilities, his treatment of subordinates in SPD, and how that has affected the job performance of the complainants.  It is replete with specific references as to how various internal decisions made by Minter have impacted the complainants' day-to-day performance of their duties.  For instance, there are complaints that Minter had not had the "foresight" to provide officers with certain safety gear and that he had left them "vulnerable to operating out of the standard federal and state levels." (Doc. 159-2, pp. 4–5.)  Similarly, they criticize his training practices, the way he communicates and punishes employees, and his general lack of team unity, which they claim hinders the execution of the department's goals.  (See generally doc. 159-2, pp. 4–6.)  Indeed, the Group Complaint is, as Plaintiff himself summarized, a critique upon "Minter's lack of effective leadership." (Doc. 159, p. 4 (internal quotation omitted).)  "Each

complaint in the [Group Complaint] was made in furtherance of [the complainants'] ability to fulfill their duties with the goal of correcting [Minter's] alleged mismanagement, which interfered with [the complainants'] ability to perform." Alves, 804 F.3d at 1164–65; see also Boyce v. Andrew, 510 F.3d 1333, 1347, n.15 (11th Cir. 2007) ("In criticizing their superiors' management . . . , [plaintiffs] have made allegations regarding only [defendants] acting as supervisors . . . , but they have not demonstrated wrongdoing or corruption by these supervisors . . . . [C]ommentary by government employees concerning alleged wrongdoing in a government office [is] related to the government employees' jobs and, therefore, they were not speaking as private citizens for the purpose of First Amendment, retaliation claims.").

Notably, the Group Complaint makes no mention of any corruption or any decisions by Minter that have critically diminished the safety of the community, and Plaintiff does not argue that Minter's alleged conduct would otherwise amount to a matter of political or social concern to the community.  (See generally doc. 159; see docs. 159-2, 159-3.)  The Group Complaint focuses on critiquing Minter as a boss to the complaining officers, and not as a general public figure.  Alves, 804 F.3d at 1166 (matter of private concern where the complaining employees lodged complaints that boss "mismanaged personnel, failed to maintain positive relationships with trainees, was hostile to feedback, encouraged certain testimony in pending tenure revocation proceedings, and treated staff of color differently from white-identified staff") (internal quotations omitted).  Put simply, the Court does not see, and Plaintiff has not explained, how employees criticizing their boss's leadership practices and routine decisions equates to a matter of public concern.[10]

---

[10]  Plaintiff's Individual Complaint complaining of a "hostile work environment" only highlights that Plaintiff's complaints were not made out of concern for the public at large but focused on Minter's treatment of employees within SPD.  (Doc. 159-3); see Bogus v. City of Birmingham, No. 2:17-CV-827-

The only possible statement in the Group Complaint from which the Court could glean some potential implication of public concern (one which, notably, Plaintiff does not mention in his briefing) is the "belief" that Minter was reallocating resources for "personal growth." (Doc. 159-2, p. 5.) It is true that allegations of mismanagement of public funds can constitute a matter of public concern. See Cooper v. Smith, 89 F.3d 761, 765 (11th Cir. 1996) ("There can be no doubt that corruption in a police department is an issue of public concern."). However, the complainants do not explain how or what Minter was reallocating or what sort of "personal growth" he was gaining as a result. Accordingly, the allegation fails to signal that the reallocation impacted the public at large. Alves, 804 F.3d at 1167 (finding it significant that the at-issue complaint went into great detail about the complainants' personal grievances with their superior but failed to show, beyond vague allegations, how it would impact the public interest). Moreover, this allegation that Minter was believed to be reallocating resources is one lone allegation among twenty-one other statements about Minter's leadership skills. The Group Complaint is overwhelmingly focused on Minter's efficacy as a department chief and on his treatment of his subordinates, and thus does not indicate that it is intended to expose a scheme involving mismanagement of funds. See id. ("[W]hile the Memorandum may touch up against matters of public concern, it is not directed to such concerns."); Connick, 461 U.S. at 154 (unprotected speech where employee circulated questionnaire that primarily focused on the functioning of the district attorney's office and the efficacy of leadership, even though it contained one question on a matter of public concern).

---

GMB, 2020 WL 704845, at *15 (N.D. Ala. Feb. 12, 2020) ("[Plaintiff's] complaints to HR [about suffering from a hostile work environment under her superiors,] arose out of issues specific to her employment, not issues of public concern.").

In sum, the Group Complaint and the Individual Complaint are "most accurately characterized as . . . employee grievance[s] concerning internal office polic[ies]," namely, complaints about Minter's general ineffectiveness as a leader.   Connick, 461 U.S. at 154. Because Plaintiff has not met his burden of showing he engaged in protected speech, he has failed to make a prima facie case of First Amendment retaliation, and Defendant is entitled to qualified immunity.

### (2)   Minter Has Provided Unrebutted Evidence that He Would Have Reached the Same Decision in the Absence of the Group Complaint.

Additionally, even if Plaintiff did engage in protected speech and even if the speech played a "substantial part" in Plaintiff's termination, Minter argues that Plaintiff still could not show a constitutional violation because Minter "would have reached the same decision in the absence of the speech."  (Doc. 152, p. 28.)  As previously established, if a plaintiff makes a prima facie case, "the burden shifts to the defendant to prove it would have made the same adverse employment decision absent the employee's speech."  Leslie v. Hancock Cnty. Bd. of Educ., 720 F.3d 1338, 1346 (11th Cir. 2013).  In support of his termination decision, Minter cited Plaintiff's admitted violations of multiple SPD policies during the Faitele Incident.  (Doc. 152-2, p. 93; see id. at p. 20.)  In Response, Plaintiff fails to point to *any* record evidence that this was not the true basis for Minter's decision.  (See doc. 159, pp. 31–32.)

Accordingly, because Minter has provided evidence supporting his assertion that Plaintiff's termination was based on his role in the Faitele Incident, and because Plaintiff has failed to produce evidence indicating that the true reason was his participation in the Group Complaint, Plaintiff cannot show that Minter violated his First Amendment rights.  See Perez v. City of Opa-Locka, No. 22-20748-CIV, 2023 WL 6121896, at *10–12 (S.D. Fla. Sept. 19, 2023) (notwithstanding plaintiff's complaints about financial mismanagement within the police

department, because the plaintiff broke department policy by inappropriately discharging a taser, the department had adequate justification, unrelated to his protected speech, for removing him); Hall v. Teva Pharm. USA, Inc., 214 F. Supp. 3d 1281, 1293 (S.D. Fla. 2016) (employee's misconduct in violating employer's electronic communications policy severed any causal connection between her termination and any protected activity).

In sum, because Plaintiff has failed to meet his burden by showing he engaged in protected speech, because Minter has shown that Plaintiff was fired for violation of SPD policy, and because Plaintiff has offered nothing more than conjecture to link his participation in the Group Complaint to his dismissal, no record evidence supports a violation of Plaintiff's First Amendment rights.  Plaintiff has thus failed to show a constitutional violation to overcome Minter's qualified immunity defense, and the Court **GRANTS** Minter's Motion for Summary Judgment on this claim (Count II).

**B.    Equal Protection**

Minter also argues that he is entitled to summary judgment on Plaintiff's Equal Protection claim because Plaintiff cannot make a prima facie case of racial discrimination and because Minter did not violate clearly established law.  (Doc. 152, pp. 24–25, 31–34.)  To make a prima facie case of employment discrimination, a plaintiff must show that: (1) he is a member of the protected class; (2) he was qualified to do the job; (3) he was subject to an adverse employment action; and (4) either he was replaced by someone outside his protected class or he received less favorable treatment than a similarly-situated employee outside of his protected class.[11]  See Flowers v. Troup Cnty., Ga., Sch. Dist., 803 F.3d 1327, 1336 (11th Cir. 2015).  If

---

[11]  Discrimination claims arising under the Equal Protection Clause are analyzed under the same burden shifting framework as Title VII claims.  See Bryant v. Jones, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009).

the plaintiff makes this showing, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment action.  Id.  If the employer does so, the plaintiff must demonstrate that the employer's proffered reason is merely a pretext for discrimination.  Id.

Minter argues that Plaintiff cannot make a prima facie case because he cannot satisfy the fourth prong, which requires him to show that he was replaced by someone outside his protected class or that he was treated less favorably than a similarly situated comparator.  (Doc. 152, p. 33.)  In Response, Plaintiff does not dispute Minter's contention that he cannot establish a prima facie case but argues that the Court should nevertheless deny Minter's Motion because Plaintiff has established a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  (Doc. 159, pp. 33–34 (quoting Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022).)  The Court disagrees.

Plaintiff is correct that he can survive summary judgment "if [he] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Sims v. MVM, Inc., 704 F.3d 1327, 1333 (11th Cir. 2013) (quotation marks omitted).  A "triable issue" exists when "the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." Id.  (internal quotations omitted).  A plaintiff may establish this convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext.  Jenkins, 26 F.4th at 1250.  Yet simply arguing a convincing mosaic is not the end-all-be-all, because "[a] failure in the prima facie case often also reflects a failure of the overall evidence."  Tynes v. Fla. Dep't of Juv. Just., 88 F.4th

23

939, 945 (11th Cir. 2023); see id. at 945–46 ("Even though we do not dwell on whether the technical requirements of the prima facie case are met once the defendant has met its burden of production, we keep in mind that the *questions* the plaintiff must answer to make a prima facie case are relevant to the ultimate question of discrimination.").

Plaintiff asserts that he can survive under a convincing mosaic standard because Minter engaged in systematically disparate treatment of African Americans in disciplinary matters. Plaintiff's Response includes a list of five African American officers[12] he claims were treated more favorably than he was.  (Doc. 159, pp. 24–25.)  He submits pages of records he believes corroborate these claims but he offers no evidence or argument showing how the individuals in these other cases were similarly situated to him.  (See generally id.; see docs. 159-58, 159-59, 159-60, 159-61, 159-62.)  It is not the Court's job to sift through Plaintiff's attachments and create arguments for him.  Wilson v. Collier Cnty., No. 2:21-CV-861-JLB-NPM, 2023 WL 8934020, at *11 (M.D. Fla. Dec. 27, 2023) (internal quotations omitted) (alterations adopted) ("In pursuing the evidentiary threads to create a convincing mosaic, a plaintiff must present the tiles and create the mosaic rather than expecting the court to piece it together for him.").

Moreover, based solely on Plaintiff's brief descriptions, the Court does not see how an isolated list of the discipline administered to five officers amounts to "systematic disparate treatment" that would lead a jury to infer discrimination.  Plaintiff's list of purported "comparators" contains four cases taken from different years.  (See doc. 159-58 (2019); doc. 159-59 (2017); doc. 159-60 (2019); doc. 159-62 (2022).)  There is no argument (and, as far as the Court can tell, no supporting evidence) that these other officers were accused of the same SPD policy violations and were treated differently.  Indeed, some of the stated misconduct seems

---

[12]  Plaintiff includes a list of six officers, but Gates is listed twice.  (See doc. 159, p. 25.)

wholly unrelated to Plaintiff's admitted misconduct.  (See doc. 159, p. 25 (describing one individual's misconduct as soliciting prostitution, another's conduct as misusing a database, and a third individual's conduct as consorting with felons).)  "Treating different cases differently is not discriminatory, let alone intentionally so."  Lewis, 918 F.3d at 1222–23.  Even under a convincing mosaic standard, a plaintiff must show that the other individuals were "similarly situated in all material respects."  See Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1311 (11th Cir. 2023) (citing Lewis v. City of Union City, 918 F.3d 1213, 1224 (11th Cir. 2019)).  Plaintiff has plainly failed to do that here.  Id. (plaintiff argued other comparators engaged in similar misconduct and were treated differently, but "[n]othing in the record suggest[ed] that [the alleged comparators] engaged in misconduct comparable in degree or kind to [plaintiff's] misconduct"); see also Lewis, 918 F.3d at 1230 (others were not "similarly situated in all material respects" where plaintiff provided a "broad-brush summary [that] glosses over critical differences" in the other employees, specifically, that plaintiff and the other employees were disciplined in different years under different personnel policies).

Plaintiff also argues that disparate treatment can be inferred from the following: his participation in the Group Complaint "which raised concerns of racism within the department"; "the use of a policy purportedly giving Minter sole and ultimate authority to terminate [Plaintiff]"; "the purposeful procurement of criminal prosecution of [Plaintiff] to the District Attorney[']s Office"; "the holding of a press conference to announce this criminal prosecution"; "the need to appear hyper-vigilant in the public eye in matters of police use of force against people of color";[13] and Minter's "rejection of the recommendation of the DRB for a five day

---

[13]  The Court notes that, even under Plaintiff's theory that Minter was responding to use of force cases against African Americans more harshly at the time of Plaintiff's termination, he has failed to show how such a shift in policy targeted SPD officers based on their race.  Additionally, such a theory may actually

suspension." (Doc. 159, p. 34.)  First, the Group Complaint is devoid of any allegations of racial discrimination, and the fact that Plaintiff claims as much in his Response is a reckless mischaracterization of the evidence to the Court.  As to the remainder of Plaintiff's points, he utterly fails to make any argument, or cite to any record evidence, that would lead to even the most attenuated connection between Plaintiff's race and Minter's decision to dismiss him.

The record is entirely devoid of any piece of evidence tending to show that race was considered in Minter's decision, let alone a convincing mosaic that would lead to an inference of discriminatory intent.  Put simply, Plaintiff has failed to "present a story, supported by evidence, that would allow a reasonable jury to find that the employer engaged in unlawful [discrimination] against the employee."  Berry, 84 F.4th at 1311.  Accordingly, the Court **GRANTS** Minter's Motion for Summary Judgment on this claim (Count VI).

## C.     Procedural Due Process

Minter also argues that he is entitled to qualified immunity on Plaintiff's due process claims.  (Doc. 152, pp. 23–24.)  Both sides extensively briefed Plaintiff's ability to succeed on a procedural due process claim against Minter.  (Id.; doc. 159, pp. 30–33.)  However, in reviewing the operative pleading in this case, the Court finds there is no claim of procedural due process brought against Minter.

The caption of Count IV of the Second Amended Complaint, the only count concerning procedural due process, makes clear the Count is explicitly brought *only* against the City.  (Doc.

---

cut against Plaintiff's purported list of comparators.  If part of Plaintiff's convincing mosaic standard rests on SPD appearing "hyper-vigilant" concerning cases of use-of-force against African Americans in the wake of the protests in 2020, then Plaintiff's "comparators" seem even less "similarly situated" to Plaintiff, as their incidents of misconduct did not occur during this period and thus would not have been held to the same standard of "hyper-vigilen[ce]." (Doc. 159, p. 34.)  Indeed, only one of the comparators, Gates, was subject to discipline in 2020, and he, as Minter points out, was ultimately terminated two months after Plaintiff.  (Doc. 152, pp. 17–18; see doc. 152-36.)

35, p. 27.)  While one sentence in the Count ambiguously refers to "Defendants," this cannot overcome the clear intention to bring this claim against the City as stated in the caption.  See Haralson v. United States, No. CV 19-00264-KD-MU, 2021 WL 3074176, at *3 (S.D. Ala. July 20, 2021) (defendant not included in count that explicitly stated it was brought against another defendant, despite that count containing use of the plural "defendants").  Accordingly, as far as the Court can make out, there was no claim of procedural due process ever brought against Minter.  Minter's addressing a procedural due process claim in his Motion does not amend the Second Amended Complaint to include him in Count IV, and the Court cannot read in a claim against Minter that never existed.  See Monaghan v. Worldpay US, Inc., 955 F.3d 855, 859 (11th Cir. 2020) (despite both parties having treated the complaint as if it contained a certain claim in their briefing, plaintiff cannot add claims at the summary judgment stage that were not pled in the complaint).  Put simply, "'[p]laintiffs are masters of their claims,' and a court may 'not simply ignore the allegations in the complaint' at the summary judgment stage." MSPA Claims 1, LLC v. Covington Specialty Ins. Co., 548 F. Supp. 3d 1269, 1278 (S.D. Fla. 2021), aff'd sub nom. MSP Recovery Claims, Series LLC v. United Auto. Ins. Co., 60 F.4th 1314 (11th Cir. 2023) (quoting Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC, 714 F.3d 1234, 1238 (11th Cir. 2013)).  Because Plaintiff never brought a claim against Minter for a due process violation, the Court cannot consider such a claim for the first time on a summary judgment motion.

Nonetheless, even if Plaintiff has pled a procedural due process claim against Minter, such claim would still be subject to dismissal.  For a plaintiff to show a procedural due process violation, he must show: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." Catron v. City of St. Petersburg, 658 F.3d 1260, 1266 (11th Cir. 2011) (quotation marks omitted).  Minter argues that

Plaintiff has failed on the third element because he has, at best, only shown violations of internal SPD policies but was otherwise provided constitutionally adequate process before his termination.  (See doc. 152, pp. 28–31.)  The Supreme Court has explained that the "the root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).  To satisfy the due process requirement, the employer must conduct a pre-termination hearing where the employee is given (1) "oral or written notice of the charges against him," (2) "an explanation of the employer's evidence," and (3) "an opportunity to present his side of the story."  Id. at 546.

Plaintiff's due process claim centers on his contention that he "did not receive either Douglas Factors nor an LOT at the conclusion of the investigation into his alleged misconduct," and thus "was deprived of a fair opportunity to learn of the charges against him in order to respond to them."  (Doc. 159, p. 20.)  Plaintiff spends multiple pages explaining how various City procedures were not strictly followed in his termination process.  (Doc. 159, pp. 19–24.)  Plaintiff misunderstands what is required to show a procedural due process violation.  "[T]he procedural component of the Due Process Clause does not require the States to comply with state-created procedural rules," but only "to adhere to a certain minimal level of process when seeking to deprive an individual of a substantive interest protected by the [Due Process] Clause—namely, 'life, liberty, or property.'"  Gissendaner v. Comm'r, Ga. Dep't of Corr., 794 F.3d 1327, 1330 (11th Cir. 2015) (quoting U.S. Const. Amend. XIV, § 1), cert. denied, 576 U.S. 1093 (2015); Smith v. City of Mobile, No. CV 16-00478-N, 2017 WL 6345804, at *3 (S.D. Ala. Dec. 12, 2017) ("States and municipalities are of course free to provide greater procedural protections than those offered by the federal constitution, but it does not follow that these

enhanced protections enlarge federal rights."). Accordingly, the question is not whether SPD's policies were violated, but whether they were violated in a way that also violates the Due Process Clause.

Beyond the violations of these policies, the undisputed evidence shows that Plaintiff received a Notice of Suspension following the Faitele Incident, notifying him of an internal investigation into his conduct in that incident. The investigation led to the DRB and Minter finding Plaintiff violated department policies, and Minter deciding that termination was appropriate. The DRB and Minter then met with Plaintiff telephonically to hear his side of the story. The DRB and Minter then advised Plaintiff that he was being terminated and presented him with the specific allegations against him and Minter's reasoning for his decision, a Notice of Suspension Prior to Dismissal, and a form to appeal. Plaintiff then did appeal to Minter, with full notice of the charges against him and an opportunity to present arguments in his own defense. Minter upheld his decision which Plaintiff then appealed to the City Manager, who formally terminated Plaintiff's employment on July 30, 2020, when he denied the appeal of Suspension Prior to Dismissal. Plaintiff does not meaningfully challenge the appeals process, but summarily concludes that "[t]he due process violation was complete" when Minter made the initial termination decision. (Doc. 170, p. 19.) Plaintiff offers no supporting caselaw[14] nor does he rebut Minter's evidence that Plaintiff was not terminated but suspended without pay pending his appeals process.

---

[14] Indeed, in Plaintiff's Sur-Reply attempting to address this issue, the only supporting law offered are general, previously established standards that appear to be copied and pasted directly from Plaintiff's Response brief. (Compare doc. 170, pp. 19–20; with doc. 159, pp. 32–33.) The utility of regurgitating previously established arguments is utterly lost on the Court, and the Court is not swayed by Plaintiff's repetitive and futile Sur-Reply on this issue.

Considering Minter's uncontested evidence, Plaintiff was afforded notice of the charges against him, an explanation of the evidence, and an opportunity to present his side of the story before he was terminated, as required under Loudermill.  See Laskar v. Peterson, 771 F.3d 1291, 1299 (11th Cir. 2014) (describing internal investigation report, hearing with an opportunity to present witnesses, review of the report and hearing, decision to terminate, ability to appeal, and affirmance on appeal and "extensive pre-termination procedures"); Hale v. City of Lanett, No. 3:12CV584–TFM, 2013 WL 3814318, at *6 (M.D. Ala. July 22, 2013) (no due process violation where plaintiff was provided with written notice of charges and a hearing before termination, despite violations of the defendant police department's own internal policies); Finley v. Town of Camp Hill, No. 3:15CV195-CSC, 2016 WL 589695, at *8 (M.D. Ala. Feb. 11, 2016) (no procedural due process violation where plaintiffs were placed on administrative leave but not terminated until after hearing where they were notified of charges, provided with an explanation for mayor's reasons for recommending termination, and given an opportunity to "tell [their] side of the story"); Martin v. Guillot, 875 F.2d 839, 844 (11th Cir. 1989) (where plaintiff received preliminary hearing which recommended his employment be terminated, his termination was reviewed and affirmed by president, board of trustees then reviewed prior proceedings and conducted full hearing where plaintiff could present his argument, and board then deliberated and affirmed termination, process "[met] the minimum constitutional standards for procedural due process"); McCoy v. Ala. Dep't of Corr., 427 F. App'x 739, 741–42 (11th Cir. 2011) (finding no procedural due process violation where state correctional facility employer adequately served plaintiff his notice of termination, provided reasons for it, and plaintiff was then afforded a hearing before formal termination).  Thus, even if Plaintiff has pled a procedural due process claim against Minter, he has failed to present evidence to support that claim.

Accordingly, because Plaintiff never brought a procedural due process claim against Minter, and, regardless, because Minter's decision to terminate plaintiff did not violate Plaintiff's due process rights, Minter's Motion for Summary Judgment on this claim is **GRANTED**.

## III.   Due Process

While Plaintiff did not include Minter in his procedural due process claim, Minter is explicitly listed as a subject of Plaintiff's substantive due process claim (Count III).  (Doc. 35, p. 26.)  Minter argues that a substantive due process claim is unavailable in this case.  (Doc. 152, p. 28.)  Minter is correct.

"Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." McKinney v. Pate, 20 F.3d 1550, 1560 (1994).  Indeed, "in non-legislative cases, only procedural due process claims are available to pretextually terminated employees." Id. ("[A]reas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause.").  Because Plaintiff's termination stems from a non-legislative act, he may raise a procedural, but not a substantive, due process claim. See id. at 1557 n.9 ("The most common examples [of non-legislative acts] are employment terminations.").  Furthermore, Plaintiff offers no argument in his Response, and the Court assumes that Plaintiff concedes this claim.  (See generally doc. 159.) Accordingly, the Court **GRANTS** Minter's Motion to the extent it is based on Plaintiff's Substantive Due Process claim (Count III).

## IV.   Attorneys' Fees and Punitive Damages

Finally, Minter argues that there is no basis for attorneys' fees or punitive damages because those claims "are derivative of the substantive claims made by Plaintiff and cannot

survive where all of the underlying claims . . . are dismissed." (Doc. 152, p. 34.)  Under Georgia law, "[a] punitive damages claim is derivative of a plaintiff's tort claim, and where a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required."  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1304 (11th Cir. 2009).  Under O.C.G.A. § 13-6-11, a claim of attorneys' fees is also derivative of a substantive cause of action. Gilmour v. Am. Nat'l Red Cross, 385 F.3d 1318, 1324 (11th Cir. 2004).  Likewise, under 42 U.S. § 1988, a plaintiff must be a "prevailing party" to recover attorneys' fees.  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  Because the Court has found that Minter is entitled to summary judgment on all of Plaintiff's substantive claims, his requests for attorneys' fees and punitive damages likewise cannot proceed.  With no remaining claims to which Plaintiff could attach his claims for punitive damages or attorneys' fees, the Court **GRANTS** the City's Motion for Summary Judgment on those claims (Counts VII and VIII).

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Minter's Motion for Summary Judgment in full.  (Doc. 152).  Plaintiff has failed to show that Minter violated any of Plaintiff's clearly established constitutional rights when he made Plaintiff's initial termination decision, and Plaintiff has failed to produce evidence that Minter's actions violated his First Amendment, due process, or Equal Protection rights.  Given the Court's prior order granting summary judgment to the City, (doc. 174), the Court has now granted judgment against Plaintiff and for all Defendants. Accordingly, the Court **DIRECTS** the Clerk of Court to enter the appropriate judgment and to **CLOSE** this case.

**SO ORDERED**, this 6th day of June, 2024.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA